# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

BRANDEE TRIPP,                           ) Case No. _____
                                         )
                    Petitioner,          )
          v.                             )
                                         )
DAWN DAVISON, Warden,                    )
                                         )
                    Respondent.          )
_____ )

## PETITION FOR WRIT OF HABEAS CORPUS;
## MEMORANDUM OF POINTS & AUTHORITIES

ADRIAN T. WOODWARD, Esq.
Law Offices of Adrian T. Woodward
State Bar # 184011
4266 Atlantic Avenue
Long Beach, CA  90807
Telephone: (562) 498-9666

Counsel for Petitioner
BRANDEE TRIPP

# TABLE OF CONTENTS

Page No.

Preliminary Requirements ................................... 1

    The Petition is Timely. .............................. 1

    Petitioner is in Custody. ............................ 2

    Exhaustion of State Administrative Remedies .......... 2

    Exhaustion of State Court Remedies ................... 2

Statement of the Case – Offense, Prior Record & Commitment ... 2

Petitioner's Post-Conviction Record ......................... 3

Petitioner's Parole Risk Evaluations ........................ 4

Parole Proceedings .......................................... 4

    1986-2001 ........................................... 4

    Petitioner's First Parole Grant & Reversal (2003) ... 5

    Petitioner's Second Parole Grant (2004) ............. 5

    The Governor's Second Reversal ...................... 8

State Court Proceedings ..................................... 8

Requirements of Due Process; Standard of Review ............. 9

Petitioner's Constitutional Claims .......................... 12

I.    **THE GOVERNOR'S ACTION VIOLATED DUE
PROCESS BECAUSE IT WAS BASED ON
INCORRECT "FACTS" AND BREACHED THE
EXPRESS TERMS OF MS. TRIPP'S PLEA
BARGAIN** ................................................ 12

# TABLE OF CONTENTS
(Continued)

Page No.

II.  THE GOVERNOR'S REVERSAL OF MS. TRIPP'S
     PAROLE GRANT BASED ON THE FINDING THAT HER
     PAROLE POSES "AN UNREASONABLE RISK OF
     DANGER TO SOCIETY," IS INAPPOSITE TO THE
     RECORD AND SUPPORTED BY NO EVIDENCE
     WHATSOEVER                                              18

III. THE DECISION OF THE GOVERNOR'S STAFF VIOLATED
     DUE PROCESS BECAUSE IT ESTABLISHED NO NEXUS
     BETWEEN THE IMMUTABLE FACTS ON WHICH IT WAS
     BASED AND MS. TRIPP'S CURRENT PAROLE RISK, THE
     STATE'S PAROLE DETERMINANT                              20

IV.  INTERMINABLE DENIAL OF MS. TRIPP'S PAROLE BASED
     SOLELY ON THE FACTS OF HER UNCHANGEABLE
     COMMITMENT OFFENSE VIOLATES DUE PROCESS BY
     AMENDING HER PRISON TERM TO LIFE WITHOUT ANY
     POSSIBILITY OF PAROLE                                   27

CONCLUSION                                                   38

VERIFICATION                                                 40

# **TABLE OF EXHIBITS**

Exhibit A    Abstract of Judgment

Exhibit B    Certified transcript, May 17, 2004, parole hearing

Exhibit C    Governor's reversal decision, October 11, 2004

Exhibit D    Petitioner's psychological (forensic) evaluations

Exhibit E    Petitioner's correctional evaluation

Exhibit F    *In re Tripp*, 150 Cal.App.4th 306

Exhibit G    California Supreme Court Order denying review

# TABLE OF AUTHORITIES

## Cases

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ............................................................. 10, 28, 29, 31, 35

*Blankenship v. Kane* (N.D. Cal 2007) 2007 WL 1113798 ................................................................ 22

*Brown v. Kane* (N.D. Cal 2007) 2007 WL 1288448 ...................................................................... 22

*Fowler v. Butler* (E.D.Cal. 2007) 2007 WL 1555726 ...................................................................... 22

*Greenholtzv. Nebraska* (1979) 442 U.S. 1 ............................................................................... 30

*In re Barker* (2007) 151 Cal.App.4[th] 346............................................................................... 11, 26, 31

*In re Brown*  (1967) 67 Cal.2d 339 ........................................................................................ 10

*In re Capistran* (2003) 107 Cal.Ap.4[th] 1299........................................................................... 10

*In re Caswell* (2001) 92 Cal.App.4[th] 1017.............................................................................. 10

*In re Clutchette* (1974) 39 Cal.App.3d 561 ............................................................................. 10

*In re Cooper* (2007) 153 Cal.App.4[th] 1043............................................................................. 23

*In re Dannenberg* (2005) 34 Cal.4th 1061............................................................................... 12, 25

*In re Elkins* (2006) 144 Cal.App.4[th] 475............................................................... 11, 23, 27, 31, 37, 39

*In re Fields* (1990) 51 Cal.3d 1063....................................................................................... 9

*In re Gray* (2007) 151 Cal.App.4[th] 379............................................................................. 11, 23, 31

*In re Ibarra* (1983) 34 Cal.3d 277 ...................................................................................... 17

*In re Lawrence* (2007) 150 Cal.App.4[th] 1511........................................................................ 11, 23, 31

*In re Lee* (2006) 143 Cal.App.4[th] 1400............................................................... 11, 23, 24, 26, 31, 39

*In re Lewallen* (1979) 23 Cal.3d 274 ..................................................................................... 9

*In re Lowe* (2005) 130 Cal.App.4[th] 1405.............................................................................. 26

*In re McClain* (1960) 55 Cal.2d 78........................................................................................ 10

*In re Minnis* (1972) 7 Cal. 3d 639........................................................................................ 10

*In re Monzo* (1973) 33 Cal.App.3d 144.................................................................................. 10

*In re Powell* (1988) 45 Cal.3d 894........................................................................................ 10

*In re Ramirez* (2001) 94 Cal.App.4[th] 549 ........................................................................... 10, 28

*In re Roderick* (2007) 154 Cal.App.4[th] 242........................................................................... 20, 25

*In re Rosenkrantz* (2002) 29 Cal.4[th] 616....................................................................8-12, 18, 25, 28

*In re Scott* (2004) 119 Cal.App. 4th 871............................................................................... 12, 25

*In re Scott* (2005) 133 Cal.App. 4th 573................................................... 10, 11, 23, 24, 26, 31, 36, 37

# TABLE OF AUTHORITIES

## (Continued)

**Cases**

*In re Sixto* (1989) 48 Cal.3d 1247............................................................................................................. 9

*In re Smith* (2003) 109 Cal.App.4th 489 ................................................................................................. 14

*In re Smith* (2003) 114 Cal.App.4th 343...................................................................................... 12, 14, 20

*In re Smith*, 2007 WL 2484107............................................................................................................... 39

*In re Tripp* (2007) 150 Cal.App.4th 306................................................................................................... 8

*Irons v. Carey* (9th Cir. 2007) 479 F.3d 658 ............................................................................... 11, 31, 34

*Irons v. Warden* (E.D.Cal. 2005) 358 F.Supp.2d 936.................................................................. 30, 31, 35, 36

*Johnson v. Finn* (E.D. Cal. 2006), 2006 WL 195159 ............................................................................ 30

*Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038.................................................................. 10, 22, 36

*Martin v. Marshall* (N.D. Cal. 2006) 448 F.Supp.2d 1143.................................................................. 10, 36, 39

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895.............................................................................. 9, 36

*Newton v. Rumery* (1980) 480 U.S. 386 ................................................................................................. 15

*Nikooseresht v. Curry* (N.D.Cal. 2007) ___ F.Supp.2d ___, 2007 WL 2088558.............................. 22

*People v. Cunningham* (1996) 49 Cal.App.4th 1044............................................................................. 15

*People v. Harvey* (1979) 25 Cal.3d 754................................................................................................. 17

*People v. Nieto Benitez* (1992) 4 Cal.4th 91 ......................................................................................... 14

*People v. Roberts* (1992) 2 Cal.4th 271 ................................................................................................. 14

*People v. Sanchez* (2001) 86 Cal.App.4th 970...................................................................................... 14

*People v. Watson* (1981) 30 Cal.3d 290 ................................................................................................ 14

*Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp.2d 1063 .......................................... 11, 29, 31, 39

*Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049 ....................................................... 11, 35, 36, 39

*Santobello v. New York* (1971) 404 U.S. 257 ........................................................................................ 17

*Sass v. Cal. Board Of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 ..................................................... 31

*Superintendent v. Hill* (1985) 472 U.S. 445........................................................................................ 31, 36

*Thomas v. Brown* (N.D. Cal. 2006) 2006 WL 3783555 ........................................................................ 22

*Willis v. Kane* (N.D. Cal. 2007) 485 F.Supp.2d 1126, 2007 WL 1232060 ........................................... 21

# TABLE OF AUTHORITIES

(Continued)

## Regulations

15 CCR § 2000......................................................................................................................... 3, 10

15 CCR § 2401........................................................................................................ 4, 10, 11, 19, 21, 23, 24

15 CCR § 2402............................................................................ 4, 10, 11, 14, 16, 19, 23, 24, 26, 27

15 CCR § 2403.............................................................................................................................. 3

15 CCR § 2410.............................................................................................................................. 3

## Statutes

Pen.C. § 190.2.............................................................................................................................. 16

Pen.C. § 2900.5............................................................................................................................. 3

Pen.C. § 3000............................................................................................................................... 38

Pen.C. § 3041 ........................................................................................... 4, 10, 11, 19, 20-25, 38

Pen.C. § 3041.2......................................................................................................................... 5, 12

Pen.C. § 4019.............................................................................................................................. 3

## Constitutional Provisions

Cal.Const., Art.V § 8(b) ............................................................................................................ 5, 12

TRIPP v. DAVISON (Petition for Writ of Habeas Corpus)

1  ADRIAN T. WOODWARD, Esq.
   Law Offices of Adrian T. Woodward
2  State Bar # 184011
   4266 Atlantic Avenue
3  Long Beach, CA 90807
   Telephone: (562) 498-9666
4
   Counsel for Petitioner
5  BRANDEE TRIPP

6

7               UNITED STATES DISTRICT COURT

8              NORTHERN DISTRICT OF CALIFORNIA
9

10

11  BRANDEE TRIPP,                    )    Case No. _____
                                      )
12                  Petitioner,       )    **PETITION FOR WRIT**
                                      )    **OF HABEAS CORPUS;**
         v.                           )    **MEMORANDUM OF**
13                                    )    **POINTS & AUTHORITIES**
                                      )
14  DAWN DAVISON, Warden,             )
                                      )
15                  Respondent.       )
    _____)
16

17      Based on the facts, grounds, authorities and exhibits herein, counsel for

18  Petitioner Brandee Tripp respectfully requests an order granting the Petition

19  and issuing a habeas corpus order vacating the Governor's staff's action of

20  October 11, 2004, that reversed Ms. Tripp's parole grant for the second time,

21  and directing respondent to discharge her prison and parole terms.

22

23                    **PRELIMINARY REQUIREMENTS**

24      ***The Petition is Timely.*** The Petition is submitted within AEDPA time

25  constraints. The California Supreme Court denied the Petition for review

26  without opinion or a procedural bar on August 15, 2007. Exhibit G.

27

28

          TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 1

*Petitioner is in Custody*.  Petitioner is confined by CDCR at the California Institution for Women, Corona, California, Dawn Davison, Warden.

*Exhaustion of State Administrative Remedies.*  No administrative remedy exists to appeal the reversal of a parole grant by the Governor's staff.

*Exhaustion of State Court Remedies.*  The Monterey County Superior Court and California Court of Appeal (exhibit F) denied habeas corpus Petitions raising the instant claims.  On August 15, 2007, the California Supreme Court denied a Petition for Review of the Court of Appeal's decision. Exhibit G.

## STATEMENT OF THE CASE AND FACTS
### PETITIONER'S OFFENSE, PRIOR RECORD, & COMMITMENT

On February 11, 1981, pursuant to her guilty plea to second degree murder, Petitioner was sentenced by the Monterey County Superior Court, case No. CR7639, to 15 years-to-life for the July 3, 1979, murder of Tameron Carpenter.  Exhibit A.  At the time Petitioner was 20 years old and had no prior criminal record.  Exhibit B, pp. 10-11, 23-25.

Randy Cook and Hilton Tripp, Petitioner's husband, kidnapped the victim, age 10, in order to receive $1,000 promised by William Record (Record), Petitioner's stepfather, to prevent the victim from testifying against Record in a child molestation case.  Cook and Hilton Tripp eventually choked, killed, and buried the victim.  Ms. Tripp has always admitted her involvement in the kidnapping but denies knowledge of any plan to kill the victim.  As revenge against Record, who had sexually molested and physically abused Ms. Tripp since she was seven years old, planned only to keep Tameron's whereabouts secret, then to release her to insure Tameron's testimony against Record.  She sent Tameron to the store, where she would be abducted by her husband and Cook.  Although Petitioner did not plan or anticipate a murder,

she has since before her commitment accepted responsibility and admitted her role in the offense. Exhibit B, pp. 10-21, 23-27.

Petitioner was committed to prison on February 18, 1981. Her minimum eligible parole date (MEPD)[1] lapsed on May 6, **1989**. Exhibit B, p.1. The *maximum* prison term prescribed by the regulations for the facts of Petitioner's particular second-degree murder lapsed in **1991**.[2] The net prison term set by the 2004 BPH parole hearing panel, 131 months, when reduced by 29 months of pre-sentencing credits, lapsed in **1989**. Exhibit B, p. 69. The prison term prescribed for Petitioner's criminal conduct, had it resulted in a *first-degree murder* conviction, lapsed 8 years ago in *1999*.

## PETITIONER'S POST-CONVICTION RECORD

Ms. Tripp has maintained an exemplary, disciplinary-free record for more than 16 years. Her last infraction occurred in 1988 (failure to report to work). Her work supervisors' reports are consistently excellent. Her classification score (19) is the lowest attainable for a lifer. Petitioner earned her GED and became certified in two vocations, Word Processing and Forklift Operation. She has successfully completed all applicable therapy and self-help programming, including attendance in AA and NA since 1988, Women Against Abuse, Relapse Prevention, Breaking Barriers, Drug Awareness Counseling, New Beginnings, SOS, Inmate Assistance Module, American

---

[1] The minimum eligible parole date (MEPD) is defined as "the earliest date on which an ISL or life prisoner may be released on parole." 15 CCR § 2000(b)(67).

[2] 15 CCR § 2403(c) prescribes a maximum base term of 18 years (subsec. II-A: victim had relationship to prisoner but not directly assaulted by prisoner), to be reduced by 64 months of postconviction credit (4 months for each of 16 disciplinary-free years of imprisonment per 15 CCR § 2410), resulting in a net maximum prison term of 12 years, 8 months, which must be further reduced by deducting 875 days of pre-sentencing Pen.C. §§ 2900.5, 4019 credit (exhibit A), resulting in a parole date that lapsed in May *1991*.

Bible Program, and Arts in Corrections. Petitioner's file is replete with laudatory chronos for her conduct, work, and reform from custody and free staff, and for her charitable work. Her parole plans, repeatedly approved by BPH, include offers of employment, a residence, and substantial family and community support. BPH has consistently acknowledged Petitioner's exemplary record of good conduct, work, reform, and rehabilitation. See exhibit A, pp. 65-68; exhibit E.

## PETITIONER'S PAROLE RISK EVALUATIONS

In recent years Ms. Tripp has been uniformly evaluated to pose a low (if any) parole risk. In the current psychological evaluation Peter Hu, M.D., a forensic psychiatrist, concluded that she has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. Exhibit D, p. 3.  Two years earlier, a different forensic psychiatrist Robert D. McDaniel, M.D., reached the same conclusions. Exhibit D, pp. 5-6. The same assessment occurred in 1999.  Exhibit D, pp. 13-14.

## PAROLE PROCEEDINGS

### 1986-2001

At **twelve** parole hearings between 1986 and 2001, BPH panels found Petitioner unsuitable for parole based largely or entirely on her commitment offense, and therefore refused to set her prison term or a parole date.[3]  At her

---

[3] The parole statutes and regulations prescribe a two-step process: The panel first determines whether a lifer is suitable or unsuitable for parole based on a preponderance of the evidence addressing the issue of whether parole would pose "an unreasonable risk of danger" to "public safety."  The panel proceeds to the second step of determining the length of the prison term and a parole date for lifers it finds to be suitable for parole. Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).

ten hearings since 1990, the panels scheduled Petitioner's subsequent hearing
in one year, the shortest interval permitted.[4]

## Petitioner's First Parole Grant and Reversal (2003)

At her *thirteenth* hearing on November 6, 2002, a BPH panel
unanimously found Ms. Tripp suitable for parole and set her prison term and a
parole date. The panel's grounds for suitability were similar to those set forth
at Petitioner's 2004 hearing, detailed below.

Predictably, on April 4, 2003, former Governor Gray Davis, exercising
his authority under Pen.C. § 3041.2 and Art. V, § 8(b) of the California
Constitution, as he promised to do in all murder cases, reversed Ms. Tripp's
parole grant based on her commitment offense.

## Petitioner's Second Parole Grant (2004)

On May 17, 2004, a new BPH panel unanimously found Ms. Tripp
suitable. The panel addressed at length the findings stated by Governor Davis
for his reversal of the previous panel's grant of parole, and read his report into
the record. See exhibit B, pp. 29-38, 48-54. Neither the District Attorney nor
members of the victim's family opposed parole. The panel explained in detail
the grounds for its finding of suitability:

> The Panel reviewed all information received from the public and
> relied on the following circumstances in concluding that the
> prisoner is suitable for parole and would not pose an unreasonable
> risk of danger to society or a threat to public safety if released
> from prison.

---

[4] Petitioner's counsel will provide, upon the Court's request, certified copies of her past
parole hearing transcripts. The transcript of petitioner's 2004 parole hearing is attached as
exhibit B.

The prisoner, while imprisoned, has enhanced her ability to function within the law upon release through participation in educational programs. She has obtained a GED [and] a vocational certificate in forklift operation and also in vocational word processing . . . She's been in AA and NA since . . . 1988. She's been in the SOS program. She's taken the Women Against Abuse program, the American Bible Academy, Arts and Correctional Music Program, the Relapse Prevention program, the HIV AIDS Prevention program, and Breaking Barriers. Her institutional job assignment is in the PIA working as a label mechanic operator since 2000, and she has received satisfactory work reports in that assignment.

The prisoner lacks a significant criminal history of violent crime. Because of maturation, growth, greater understanding, and advanced age have reduced the probability of her recidivism.

The prisoner has realistic parole plans, which includes a job offer and family support . . . I would rate the parole plans as superior. She has a place to live at the Casa Solano, which is in Grover Beach [and two] job offer[s].

The prisoner has maintained close family ties while in prison by letters and visits [and] has maintained positive institutional behavior, which indicates significant improvement in self-control. She has had no 115s [disciplinary infractions] since 1988 . . .So we feel that she has a good disciplinary record while in custody. Prisoner shows signs of remorse. She has indicated that she understands the nature and the magnitude of the offense and accepts responsibility for her criminal behavior and has a desire to change towards good citizenship.

The most recent psychological report, authored by Peter Hu, a staff psychologist, is favorable. He states:

> The inmate has not been dangerous within a controlled setting, and I do not believe that she will be dangerous if released to the community. The inmate has gained a healthier respect for the rights and privacy of others and appears to have followed

1

2

3

4

5

6

> diligently in the rules and regulations here at the
> institution. The inmate has been able to keep her
> pathological characteristics in control and she has
> obtained a certain level of peace and contentment
> with herself. Risk factor, as always, would be if she
> ever attempted to resort to acts of criminality, though
> given her peace and contentment, I do not suspect
> that to be the case.

7

8    The panel set Petitioner's base term at the mid-term of 204 months

9  prescribed by the regulations for the specific factors of her second-degree

10  murder including her relationship with the victim and the fact that she did not

11  participate in the killing. The panel deduced 73 months of postconviction

12  credit as prescribed in the regulations, resulting in a total period of confinement

13  of 131 months. Exhibit B, pp. 68-69. Considering Ms. Tripp's commitment

14  date of February 18, 1981, and 875 days of pre-commitment credits (exhibit

15  A), her parole date lapsed in September *1989*. If she had been convicted of

16  *first*-degree murder with the same facts, her parole date lapsed in September

17  *1999*. Please see p. 3, n. 2, above.

18    Parole conditions imposed by the panel included abstinence from alcohol

19  and substance abuse therapy and testing. Exhibit B, p. 69.

20    In closing, the panel commented:

21

22

23

24

25

26

27

> Couple of comments. I noticed that when you talked
> About . . . your involvement in the crime, you were very
> emotional. And I think that is a consideration. I also
> took into consideration the fact that you've been denied
> and still kept programming. You didn't give up. There's
> a lot of people in the institution that will depend on you
> because people who go out and make mistakes and
> have to come back, it reflects on them. We as panel
> members say, where did I go wrong. So you've got a
> lot of things resting on you. But I want to say that I

28

didn't give you the date. You earned it. You've done a
good job in here. So good luck in the future. Exhibit B,
pp.70-71.

## The Governor's Second Reversal

On October 11, 2004, Governor Schwarzenegger's staff reversed Ms.
Tripp's second parole grant, concluding as always, "I believe she would pose
an unreasonable threat to public safety if released from prison at this time."
Exhibit C, p. 3. The sole ground for that conclusion was the 25-year-old (now
28 year old) commitment offense, described by the Governor's staff as
"premeditated," "monstrous," and demonstrative of "exceptional depravity and
an utterly callous disregard for human life and suffering" that Petitioner, who
was in a "position of trust . . .could have prevented." Exhibit C, pp. 2-3.

## State Court Proceedings

Petitioner respectfully draws the Court's attention to a few salient
aspects of the Court of Appeal's opinion, *In re Tripp,* 150 Cal.App.4[th] 306
(2007) [*Tripp*], the last reasoned State court opinion.

The opinion focuses largely on whether Petitioner anticipated that a
murder would occur or participated in its planning. Ms. Tripp has stipulated all
along that she was present at a stage when murder was discussed and that she
blames herself for not anticipating it and stopping the precedent kidnapping.
The opinion's conclusion that the Governor could have reasonably interpreted
the facts to implicate Petitioner in planning the murder that eventually occurred
in her absence is unavailing because by the time of the reversal at issue
Petitioner had served long in excess of the prison term prescribed for a
premeditated *first*-degree murder had she personally planned and committed it.
See *In re Rosenkrantz,* 29 Cal.4[th] 616, 689-690 (2002).

*Tripp* failed to address or adjudicate the crucial claim raised by Petitioner - how long a commitment offense may be employed as the sole basis for precluding the parole of one sentenced to a prison term with the possibility of parole who has served in excess of the prison term prescribed by the regulations, even for the most aggravated version of the offense.

*Tripp* impliedly disqualified this claim because although Petitioner offered to supply any additional transcripts of the previous hearings, if requested by the court, she did not lodge all of them (approximately 2,000 pages of transcripts). Petitioner lodged transcripts and records of the parole proceedings at issue and notified the superior and appellate courts that approximately twelve additional transcripts were available and would be lodged upon request. Importantly, the facts and statistics regarding the number of Petitioner's parole hearings, the grounds used by the panels to deny her parole, and the length of her imprisonment, set forth in the superior court and Court of Appeal Petitions, *have not been contested* in Respondent's briefs. See, e.g., *In re Fields,* 51 Cal.3d 1063, 1070, fn. 2 (1990); *In re Sixto,* 48 Cal.3d 1247, 1252 (1989); *In re Lewallen,* 23 Cal.3d 274, 278 (1979) [facts alleged in habeas petition not disputed in respondent's briefs taken as true by reviewing court].

## REQUIREMENTS OF DUE PROCESS; STANDARD OF REVIEW

1. State parole law provides inmates a liberty interest in parole protected by due process. *McQuillion v. Duncan,* 306 F.3d 895, 901-903 (9th Cir. 2002) [*McQuillion*]; *In re Rosenkrantz,* 29 Cal.4th 616, 621 (2002) [*Rosenkrantz*].

2. Said liberty interest is heightened considerably in the case of an inmate like Ms. Tripp who has been found suitable for parole and granted a parole date. *McQuillion, supra,* 306 F.3d at 903.

3. Ms. Tripp's protected liberty interest required her being granted parole because she has been eligible to parole since *1989* and has been consistently evaluated to pose a "low" (if any) risk of danger to public safety, well below the State's "unreasonable risk of danger" parole suitability standard below which parole "shall" be granted. Pen.C. § 3041; 15 CCR §§ 2401, 2402(a).

4. Due process required the findings supporting Ms. Tripp's parole decision to be based on a weighing of all relevant, reliable evidence in the record *In re Minnis*, 7 Cal. 3d 639, 646 (1972); *In re Ramirez*, 94 Cal.App.4th 549, 569-572 (2001); see *Rosenkrantz*, *supra*, at 655; 15 CCR § 2402(b)), using the *preponderance of the evidence* standard.[5]

5. Parole denial based solely on some evidence of an egregious commitment offense may violate due process if the Governor's staff did not duly consider and weigh in its decision *all* of the evidence in the record favoring parole suitability. *In re Scott*, 133 Cal.App.4th 573, 594 et seq. (2005); see 15 CCR § 2402(b); *In re Minnis*, *supra*, at 646; *In re Capistran*, 107 Cal.App.4th 1299, 1306 (2003).

6. Although a prisoner like Ms. Tripp who qualifies for parole may initially be found unsuitable if the commitment offense was particularly egregious compared to other instances of the offense, such cases are *exceptions*, and commitment offenses cannot justify *repeated* or *interminable* parole denials. *Biggs v. Terhune*, 334 F.3d 910, 916 (9th Cir. 2003) [*Biggs*]; *Martin v. Marshall*, 431 F.Supp. 2d 1038, 1046-1047 amended at 448

---

[5] BPH decisions determining parole must be based on "good cause." *In re Powell*, 45 Cal.3d at 901 (1988); *In re Brown*, 67 Cal.2d 339, 342 (1967); *In re McClain*, 55 Cal.2d 78, 87 (1960); *In re Caswell*, 92 Cal.App.4th 1017, 1024, 1026 (2001); *In re Clutchette*, 39 Cal. App.3d 561, 565 (1974); *In re Monzo*, 33 Cal.App.3d 144, 147 (1973). The Board's regulations define good cause as a *preponderance of the evidence*. 15 CCR § 2000(b)(50).

F.Supp.2d 1143 (N.D. Cal. 2006); *Sanchez v. Kane,* 444 F.Supp.2d 1049, 1062 (C.D. Cal. 2006); see *Rosenkrantz v. Marshall,* 444 F.Supp.2d 1063, 1080-1087 (C.D. Cal. 2006); *In re Scott*, 133 Cal.App.4[th] 573, 595 (2005); *In re Lawrence,* 150 Cal.App.4[th] 1511, 1554-1556 (2007); *In re Gray,* 151 Cal.App.4[th] 379 (2007); *In re Barker,* 151 Cal.App.4[th] 346, 374-375 (2007).

7. If a Governor's staff uses offense facts and other immutable factors to justify a finding of parole unsuitability, the "some evidence" standard of proof requires it to articulate some *nexus* to the State's codified standard by explaining **how** *such factors make Ms. Tripp a* **current** *"unreasonable risk of danger" to public safety* if paroled. See Pen.C. § 3041; 15 CCR §§ 2401, 2402(a); *In re Lee,* 143 Cal.App.4[th] 1400, 1407-1412 (2006); *In re Elkins*, 144 Cal.App.4[th] 475, 502 (2006); please see authorities cited at pp. 21-27, below.

8. Denial of parole based solely on the facts of a commitment offense may deny due process also when the prospective parolee has served a prison term in excess of that prescribed by the regulations for an offense with those facts, particularly if the term served at that point exceeds "the minimum number of years to which he had been sentenced" (*Irons v. Carey,* 479 F.3d 658, 664-665 (9th Cir. 2007)), and especially when an inmate committed for second-degree murder has served the term prescribed for a premeditated first-degree murder with the same facts. *Rosenkrantz, supra*, at pp.689-690.

9. Governors do not have unfettered discretion in parole matters but are bound by the same statutes and regulations that govern parole determination by BPH. Governors' decisions reversing BPH parole grants must be based on a governor's personal review of the case records and facts considered by the BPH panel in its decision. Due process requires each finding by a governor for a decision reversing a parole grant to be supported by the same preponderance of the evidence required of BPH panels' findings and upon all reliable, relevant

evidence in the record. Cal. Const., Art.V, §8(b); Pen.C. § 3041.2;
*Rosenkrantz*, at pp. 655, 676; *In re Scott,* 119 Cal.App.4th 871, 899 (2004); *In re Smith,* 114 Cal.App.4th 343, 361 (2003).

10. Preclusion of parole based solely on commitment offense facts may deny due process if the prospective parolee's criminal conduct in the offenses was the minimum necessary to establish the essential elements requisite to a conviction. *In re Dannenberg*, 34 Cal.4th 1061, 194-1095 (2005); *Rosenkrantz*, 29 Cal.4th at 683.

## PETITIONER'S CONSTITUTIONAL CLAIMS

The following constitutional claims, argument, and authorities were set forth in the California state courts.

## I. THE GOVERNOR'S ACTION VIOLATED DUE PROCESS BECAUSE IT WAS BASED ON INCORRECT "FACTS"AND BREACHED THE EXPRESS TERMS OF MS. TRIPP'S PLEA BARGAIN

The Governor's sole ground for his "unreasonable risk"/parole unsuitability finding, Petitioner's commitment offense, was legally untenable because (1) it was based on incorrect "facts" and (2) it improperly re-classified Petitioner's offense and sentence as that for first degree murder in violation of her plea bargain and due process; (3) it was not based on Ms. Tripp's particular conduct in the offense, and (4) whether the facts alleged by the Governor are true is irrelevant because Ms. Tripp has fully served the prison term prescribed for *first*-degree murder.

## A. The Governor Relied on Incorrect Facts

The Governor stated Petitioner, her husband, and Cook "decided to kidnap *and kill*' the victim, that Petitioner "helped plan the kidnap *and murder*." Exhibit C, p. 2; emphasis added. No such testimony was elicited against Petitioner, who was not tried. In the perpetrators' trials, a single witness testified that he overheard the three defendants mention a possible killing. Petitioner did not contemplate murder or agree to do more than what she did, help set up the kidnapping by sending the victim to the store. She intended, as revenge against her stepfather who had sexually and physically abused her for 12 years, to keep Tameron's location secret until his trial and thereby insure her testimony against him. Petitioner was shocked and dismayed to learn of the victim's death. Exhibit B, pp. 12-23. Had she known that Tameron would be harmed, she would not have participated even to that extent.

Ms. Tripp did not participate in, plan, anticipate, or contemplate a murder; she participated in a kidnapping. Notably, the prosecutor's office, although notified, did not submit documents or attend Petitioner's hearing to claim otherwise. Contrary to the Governor's notion, Petitioner's statements are not "inconsistent." For more than 25 years she has consistently maintained that although murder may have been discussed at one point, it was not in the plan that she helped initiate or anticipated by her; nevertheless her early acceptance of full responsibility for the offense has never been questioned.

Reversal of Petitioner's parole grant based on the notion that she planned or premeditated a murder was arbitrary and violated due process.

## B. "Utterly Callous Disregard for Human Life and Suffering"[6]

Use of this factor, recited in all of the Governor's parole reversals in second degree murder cases, is arbitrary because (1) "utterly" or otherwise, Petitioner did not disregard life or suffering because she did not plan, anticipate or know that a murder would occur and more importantly, because disregard for life is the *definition* of implied malice, an element of second-degree murder, it could be used to reverse paroles granted in all second-degree murder cases. In *People v. Roberts,* 2 Cal.4th 271 (1992), the California Supreme Court explained that the implied malice theory of second-degree murder applies:

> [W]hen a defendant, knowing that his or her conduct endangers a life, and acting with a conscious disregard of the danger, commits an act the natural consequences of which are dangerous to life. (*Roberts, supra,* 2 Cal.4th at pp. 281-282; emphasis added; See also CALJIC 8.11; *People v. Nieto Benitez,* 4 Cal.4th 91, 93 (1992); *People v. Watson,* 30 Cal.3d 290, 299-301 (1981); *People v. Sanchez,* 86 Cal.App. 4th 970, 975-976, 981 (2001).)

Courts have repeatedly cautioned governors, who are bound by the same parole determination guidelines that govern BPH, against such reckless, routine use of these terms in cases like Petitioner's in which they are inherent or do not apply. Because Petitioner's offense was not in that category, parole reversal based on her planning and premeditating a murder or acting with disregard for life and suffering, an element of her offense, violated due process. See *In re Mark Smith*, 109 Cal.App.4th 489 , 506 & fn.9 (2003); also *In re Ernest Smith,* 114 Cal.App.4th 343, 367 (2003).

---

[6] 15 CCR § 2402(c)(1)(D) lists the unsuitability factor, "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."

### C. Basing Parole Reversal on a Re-characterization of the Offense as a First Degree Murder Violated Due Process and Breached the Express Terms of Petitioner's Plea Bargain

In exchange for the State's promise to determine her offense to be second-degree murder and her sentence to be that for second-degree murder, Petitioner waived her constitutional rights, pled guilty to that offense, and testified truthfully as promised in order to secure the State's first-degree murder convictions of the two remaining defendants. In entering into the plea bargain, Petitioner understood and relied on the fact that she would be eligible for parole around 1989 and that her parole suitability would be determined only by BPH according to the laws then in effect.

The Governor's staff's sole ground for reversing Petitioner's parole grant was the commitment offense, re-cast as a "premeditated" and "planned" first-degree murder. Exhibit C, p. 2. Aside from the falsity of that finding, reversal on that basis violated the express term of Petitioner's plea agreement that the offense was *not* premeditated, *not* first degree, and did *not* involve the planning of a murder on her part. Petitioner's claim is not diminished by this Court's ruling in *Rosenkrantz* because the defendant in that case knew that his **not** guilty plea exposed him to sentences for first or second-degree murder or manslaughter. Petitioner, on the other hand, contracted with the state for a specific prison term to be determined as it was at the time the contract was entered into.

Whether "some evidence" existed that Petitioner planned or premeditated a murder is also irrelevant because the Contract and Due Process Clauses prohibit the State from reneging on its promise. It is beyond dispute that the plea bargain was a binding contract (*People v. Cunningham,* 49 Cal.App.4th 1044, 1047 (1996); see *Newton v. Rumery,* 480 U.S. 386, 394

(1980)) that incorporated the explicit terms, specified and approved by the Executive Branch (District Attorney) and Judicial Branch (trial court), and that the offense was a *second*-degree murder, *not* a premeditated first-degree murder. It is also axiomatic that the plea bargain, a binding contract fixing Petitioner's sentence, incorporated the laws existing at the time it was executed governing the determination of Petitioner's sentence.

Importantly, the factors used by the Governor's staff to reverse Ms. Tripp's grant of parole ("utterly callous disregard for human life and suffering") are sub-factors listed under 15 CCR § 2402(c)(1), examples of "an especially heinous, atrocious, and cruel" murder. This regulation is derived from the special circumstances provision of Pen.C. § 190.2(a)(14): "[t]he murder was especially heinous, atrocious, or cruel," a provision that applies only to sentences of *death* and *life without the possibility of parole.*

Accordingly, the only arguably viable factor supporting the reversal of Ms. Tripp's parole grant was the irrational notion that she had committed a special circumstance first degree murder deserving of death or life without parole.

A defendant's right to punishment in accord with that contemplated **at the time of the plea** is implicit in the plea and must be honored by the State, particularly by the Executive Branch which suggested and approved it, and by the Judicial Branch, the court that ratified it. Although enforcing that provision may vindicate the rights of a disrespected member of society, it focuses a Court's resources on the honor of the government and the fair administration of justice. Fundamental precepts of due process are abrogated when, in order to extract additional retribution from an agreement entered by a defendant, the Executive Branch increases the punishment by imposing an additional, more

onerous obstacle to parole. The State "cannot with one hand give a benefit and with the other take it away." *People v. Harvey,* 25 Cal.3d 754, 758 (1979).

It was not a term of the plea contract that Ms. Tripp's parole would be determined *by re-characterizing it as a **first**-degree murder*. No defendant would have entered such a plea, and her counsel for would have been derelict for not warning her of the illusory nature of such a deal, which would as well betray the District Attorney's ethical duty, as a state representative, to conduct the state's business fairly and honestly. *Santabello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) [plea bargain contracts "presuppose fairness in securing agreement between an accused and a prosecutor"]; *In re Ibarra,* 34 Cal.3d 277, 289 (1983) [illusory concessions offered by state in plea bargain constitute "a species of fraud"].

Respondent may argue that it was never an explicit term of the plea that the State could not re-construe his offense as first-degree murder to preclude her parole. What, then, was the purpose of the plea bargain? It is absurd to believe that when a defendant enters into a plea to *second*-degree murder she gives the State carte blanche discretion to increase her prison term by re-characterizing it as a special circumstance first-degree offense.

Requiring Ms. Tripp's parole determination to be based a *second-degree* murder offense was the *only* benefit she could receive from his plea. Contract law and the Due Process clause preclude the State from reneging on its promise. Ms. Tripp's plea contract with the State absolutely precluded the State's imposition upon her of a new more onerous sentence that has converted her prison term to life without any possibility of parole, or at a minimum, parole determination and a prison term based on a special circumstance first-degree murder commitment offense. Even had Ms. Tripp known that

known that Tameron's murder would follow her kidnapping, that fact cannot render her currently unsuitable for parole.

At the time of the Governor's action in dispute Ms. Tripp had served 5 years in excess of the term prescribed for the particular facts of her offense had it resulted in her conviction of *first*-degree murder. In such a case, the California Supreme Court in *Rosenkrantz*, a second-degree murder case, warned:

> [T]here will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a *first degree* murder in order to promote the parole statute's goal . . . Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard.   (29 Cal.4th at 691.)

## II. THE GOVERNOR'S REVERSAL OF MS. TRIPP'S PAROLE GRANT BASED ON THE FINDING THAT HER PAROLE POSES "AN UNREASONABLE RISK OF DANGER TO SOCIETY," IS INAPPOSITE TO THE RECORD AND SUPPORTED BY NO EVIDENCE WHATSOEVER

The Governor's staff's basis for reversing petitioner's parole grant was a boilerplate recitation that her parole poses an "unreasonable threat to public safety if released from prison at this time." Exhibit C, p. 3. The sole ground stated by the Governor's staff in support of that conclusion, the commitment offense, is detailed herein. Parole denial on that basis abrogated due process because *no* evidence whatsoever, not even the 25-year old commitment offense, supports the notion that Ms. Tripp's parole currently poses an unreasonable risk and because *all* evidence in the record that addresses her

current parole risk and potential danger to public safety, assesses these factors as <u>low</u>. Not a speck of evidence supports the Governor's contrary recitation.

The only reliable evidence of Ms. Tripp's current dangerousness and parole risk, her forensic psychiatric and correctional evaluations, are uniformly parole-favorable and assess these factors to be low. For several years, Petitioner has been consistently evaluated to pose a low parole risk. In January 2004 Peter Hu, M.D., a forensic psychiatrist, concluded that Ms. Tripp has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. Exhibit D, p. 3. Two years earlier, Robert D. McDaniel, M.D., reached the same conclusions (exhibit D, pp. 5-6), as was the case in 1999. Exhibit D, pp. 13-14. Petitioner's last three correctional evaluations have likewise concluded that she would pose a low risk to public safety if paroled. Exhibit D, pp. 3, 6, 14.

The sole ground stated by the Governor's staff for reversing Ms. Tripp's grant of parole was its boilerplate statement that her parole would pose "an unreasonable risk of danger to society," the State's codified suitability standard below which a parole date "shall" be set. See Pen.C. § 3041; 15 CCR §§ 2401, 2402(a). All evidence addressing this factor assessed Ms. Tripp's parole risk to public safety to be "low." Exhibit D, pp. 3, 6, 14.

The Governor has no known forensic psychological training and offered *no evidence*, just a "belief" that Ms. Tripp's parole would be "pose an unreasonable risk of danger" ["I believe she would pose..."]. He considered exactly the same record considered by the State's forensic experts, who determined, considering her offense and entire record, that Ms. Tripp would pose a "low" risk of dangerousness if released on parole, well below the State's codified "unreasonable risk of danger" standard, requiring a grant of parole. Pen.C. § 3041; 15 CCR §§ 2401, 2402(a). Because no evidence in the record

supports the "unreasonable risk" determinant, and because the Governor lacks the expertise necessary to disregard or override the State's forensic determinations, denial of parole on this basis was arbitrary, flunks the "some evidence" test and violated Ms. Tripp's right to due process. Please see *In re Smith,* 114 Cal.App.4th 343, 369 (2003) [absent actual evidence negating Governor's assessment of subject's current parole risk, "the Governor's view [of] Smith's propensity for violence . . . is unsubstantiated speculation and as such appears to be arbitrary and capricious"]; see also *In re Roderick,* 154 Cal.App.4th 242, 272, fn. 27 (2007).

## III. THE DECISION OF THE GOVERNOR'S STAFF VIOLATED DUE PROCESS BECAUSE IT ESTABLISHED NO NEXUS BETWEEN THE IMMUTABLE FACTS ON WHICH IT WAS BASED AND MS. TRIPP'S CURRENT PAROLE RISK, THE STATE'S PAROLE DETERMINANT

The parole determination statute requires that parole "shall normally" be granted (Pen.C § 3041(a)), *unless* "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that a consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting." (Subd. (b).) The statute and Ms. Tripp's protected liberty interest in its benefits require more than what the Governor did – recite alleged commitment offense factors to *presume* a current parole risk to public safety. Even the narrow "some evidence" test requires more than a presumption – it requires *evidence* of a *nexus* between those facts and the State's parole suitability determinant, the alleged risk to public safety currently posed by Ms. Tripp's parole.

Such a nexus may be established, e.g., if an offense was caused by or related to alcohol, drugs, gangs, or other factors that the inmate's prison record or forensic evaluations indicate may still be a public safety concern. The Governor's staff merely recited the "utterly callous disregard for human life and suffering" verbiage to imply that public safety *therefore* requires her continued imprisonment (*forever* – the offense facts can never change).

Reciting 25-year old (now 28-year old) commitment offense facts – *without* suggesting how those facts render Ms. Tripp a *current* unreasonable parole risk (*all* who murder posed unreasonable risks *at the time of the murder*), does not constitute *any* evidence of parole unsuitability. The omission was crucial considering the facts that (a) at the time of the 2004 hearing Ms. Tripp had served *fifteen* years (now *18* years) in excess of prison term set by the 2004 panel for a second-degree murder with the recited facts (and has now served *eight* years in excess of the term for a *first*-degree murder with those facts) and (b) her forensic evaluations by the Board's experts determined that she posed a "low" risk to public safety (see p. 4 above and references), far below the State's standard of "unreasonable risk" below which a panel "shall" grant parole. Pen.C. 3041; 15 CCR 2401, 2402(a).

The panel's recitation of immutable 28-year old offense facts and further notions unsupported by or inapposite to the record is not "some" – or *any* – evidence suggesting that Ms. Tripp currently poses an unreasonable public safety risk. Without articulating some minimal nexus to the State's parole determinant – her current public safety risk if paroled – such reiterations are meaningless. Please see *Willis v. Kane*, 485 F.Supp.2d 1126, 1135 (N.D. Cal. 2007) ["Notwithstanding the terrible nature of the crime, the critical question the BPH was supposed to decide at the parole suitability hearing was whether 'consideration of the public safety requires a more lengthy period of

incarceration for this individual' *See* Cal.Penal Code § 3041(b) . . . Willis' 1983 crime did not provide sufficient evidence to find him unsuitable for parole in 2003"]; *Martin v. Marshall*, 431 F.Supp.2d 1038, 1049 (N.D. Cal. 2006); *Nikooseresht v. Curry*, 2007 WL 2088558 (N.D. Cal. 2007) at *6 ["petitioner's commitment offense cannot by itself constitute some evidence of unsuitability for parole because it fails to establish a basis for determining that petitioner continues to pose an unreasonable risk of danger to society]; *Fowler v. Butler*, 2007 WL 1555726 (E.D. Cal. 2007) at *9 (adopted as judgment June 13, 2007) ["the record . . . does not, however, show any facts which suggest that the circumstances of the crime were sufficiently callous, or the motive for petitioner's actions sufficiently trivial, that sixteen years after the offense the circumstances of the crime would still suggest that petitioner remained a danger to society. Absent such facts, the Board's reliance on petitioner's criminal conviction to support the denial of parole violates petitioner's right to due process"]; *Brown v. Kane*, 2007 WL 1288448 (N.D. Cal. 2007) at *7 ["Petitioner's commitment offense would be a sufficient basis to deny his parole if it indicated a risk of re-offending and of a danger to society. It does not . . . Not only did the Governor and state courts fail to point to any such indicators, but Brown's ultimately positive prison record over the past two and a half decades indicates, as the BPT concluded, that he is suitable for parole"]; *Blankenship v. Kane*, 2007 WL 1113798 at *10 (N.D. Cal. 2007) [". . . the California regulations require . . . some evidence that the prisoner poses a present danger to society . . . continued reliance over time on an unchanging factor . . . the commitment offense . . . does not provide evidence of a present danger to society"]; *Thomas v. Brown*, 2006 WL 3783555 at *6 (N.D. Cal. 2006) [not some evidence that the murder shows current parole unsuitability]; *Rosenkrantz v. Marshall*, 444 F.Supp. 2d 1063, 1086 (C.D. Cal. 2006) ["the

facts surrounding Petitioner's crime no longer amount to 'some evidence' supporting the conclusion that Petitioner would pose an unreasonable risk of danger if released on parole"]. Please see also *In re Cooper*, 153 Cal.App.4th 1043, 1066-1067 (2007) [not "some evidence . . . establishing that the gravity of Cooper's offense shows him unsuitable for release"]; *In re Scott, supra*, at 573, 595 ["the commitment offense can negate suitability only if circumstances of the crime . . . rationally indicate that the offender will present an unreasonable public safety risk if released from prison"]; *In re Elkins, supra, at* 496, 499 ["Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts indicating that release currently poses 'an unreasonable risk of danger to society'"]; *In re Lee, supra,* 143 Cal.App.4th at p. 1413 [". . . the board and Governor must focus their parole decisions on whether a prisoner continues to pose an unreasonable risk to public safety"]; *In re Lawrence,* 150 Cal. App.4th 1511, 1554-1556 (2007); *In re Gray,* 151 Cal.App.4th 379 (2007).

As these recent state and federal decisions hold, due process and the State's parole scheme (Pen.Code § 3041; 15 CCR §§ 2401, 2402(a)) clearly require the articulation of a nexus between the offense facts recited and a prospective parolee's current parole risk. Because none was set forth by the Governor's staff or *exists*, reversal of a parole grant based on a recitation of offense factors was arbitrary and violated due process, particularly after Ms. Tripp had been repeatedly evaluated by the Board's forensic experts **not** to pose an unreasonable risk – but a low risk - of danger to public safety if paroled.

Put another way, in order to apply the some evidence standard, a reviewing court must first ask the pivotal question, "Some evidence of WHAT"? The question is answered by the State's parole determination

statute: The offense facts must demonstrate that the "timing" or "gravity" of the commitment offense renders the inmate's parole a *current* public safety risk (every prospective parolee was dangerous when he or she committed a murder). Pen.Code. § 3041(b).

*What* did the Governor say about the "timing" of Ms. Tripp's offense that makes her a current parole risk to public safety? *Nothing*.

*What* did the Governor say about how or why the "gravity" of the offense *makes Ms. Tripp a current public safety risk*? *Nothing*. The Governor offered no hint at how the facts he alleges *still serve to make Petitioner a public safety risk if paroled*. The omission was crucial because the State's forensic experts have for several years assessed Ms. Tripp's impending parole not to pose an "unreasonable risk of danger" to public safety, the State's parole suitability standard below which the panel "shall" grant parole. Pen.C. § 3041(a); 15 CCR §§ 2401, 2402(a).

Very recent State court decisions explain in further detail why due process requires that, in order to deny parole a Governor must, irrespective of the facts of the commitment offense or subsequent events, set forth evidence suggesting that the subject still would pose an unreasonable risk to public safety if paroled.

> *Thus, it is not enough that there is some evidence to support the factors cited for denial; that evidence must also rationally support the core determination required by the statute before parole can be denied, i.e., that a prisoner's release will unreasonably endanger public safety.* ( *In re Lee* (2006) 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 ( *Lee* ); *In re Scott* (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 ( *Scott II* ).) "Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (*Lee, supra,* 143 Cal.App.4th at p. 1408, 49 Cal.Rptr.3d 931.) The dissent's

proposed standard of review would require judicial affirmation of every Board decision if even a single unsuitability factor is found, regardless of whether that factor would rationally support a conclusion, based on individualized consideration, that the inmate would pose an unreasonable risk of danger . . If this were the standard, the courts would indeed be relegated to the status of potted plants. ( *Scott I, supra,* 119 Cal.App.4th at p. 898, 15 Cal.Rptr.3d 32.)

*The only ground for a parole denial is* found in Penal Code section 3041, subdivision (b), which provides that a release date shall be set "unless [the Board] determines *that ... consideration of the public safety requires a more lengthy period of incarceration.*" Interpreting that standard, our high court has required that the Board's decisions not be arbitrary or capricious ( *Rosenkrantz, supra,* 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174), and that the Board's decisions be made "on *relevant* grounds" and supported by the evidence ( *Dannenberg, supra,* 34 Cal.4th at p. 1071, 23 Cal.Rptr.3d 417, 104 P.3d 783, italics added). *We read those directives as mandating that the Board, in its decisions, must articulate reasons that are grounded in evidence and rationally related to the statutory basis for denial.* The dissent's proposed standard, we think, goes beyond even the deferential "some evidence" standard and would annul any meaningful judicial review. Were we required to engage in the kind of prodigious efforts undertaken by our dissenting colleague to shore up the Board's decisions denying parole, affirmance would be guaranteed in every case.

*In re Roderick, supra,* at 263; emphasis added.

Finally, as has been recently stated, because *the overarching consideration is public safety*, the test in reviewing the Board's decision denying parole "*is not whether some evidence supports the reasons [the Board] cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.* [Citations.] *Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers*

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 25

*public safety.*" (*Lee, supra,* 143 Cal.App.4th at p. 1408, 49 Cal.Rptr.3d 931, fn. omitted.)

As discussed above, the "overarching" factor determining whether parole should be granted or denied is *whether the criminal poses "an unreasonable risk of danger to society.*" ( *Scott II, supra,* 133 Cal.App.4th at p. 591, 34 Cal.Rptr.3d 905; § 2281, subd. (a); *Lee, supra,* 143 Cal.App.4th at p. 1400, 49 Cal.Rptr.3d 931.) As also discussed above, every psychological evaluation in the record dating back at least to 1999 has concluded Barker would pose little or no danger to public safety if released on parole.

*In re Barker, supra,* at 375; emphasis added.

The Attorney General argues that so long as "some evidence," which may be as little as a "modicum," supports the Governor, we must affirm . . . *The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety.* ( Cal.Code Regs., tit. 15, § 2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison"]; see e.g. *In re Scott* (2005) 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison"]; but see *In re Lowe* (2005) 130 Cal.App.4th 1405, 31 Cal.Rptr.3d 1 [suggested "some evidence" applies to the factors, not dangerousness].) *Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.* . we find no evidence that Lee is likely to commit another crime or that his release would unreasonably endanger the public.

*In re Lee, supra,* at 1408; emphasis added.

Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on *facts indicating that release currently*

*poses "an unreasonable risk of danger to society*"    (§ 2402,
subd. (a); accord, Pen.Code, § 3041, subd. (b)).

*In re Elkins, supra*, at 499; emphasis added.

In sum the Governor's staff would preclude Ms. Tripp's parole (*forever* –
neither her undisputed maximum parole suitability otherwise and low public
safety risk, nor the facts of the offense, can ever improve) for the very *reason*
that she is *suitable* for parole – she has served *eight years more* than the term
prescribed by the State's regulations for a *first-*degree murder with these facts,
established an exemplary post-conviction record, and poses no further risk of
danger to public safety.

The statutory, regulatory, and decisional law set forth above requires a
nexus between the unsuitability factors dutifully recited by the Governor and a
prospective parolee's current risk of danger to public safety if paroled.
Because none was set forth by the Governor's staff and none exists in her case,
reversing Ms. Tripp's parole grant on this basis violated her right to due
process and untenably extinguished her protected liberty interest in parole.

## IV. INTERMINABLE DENIAL OF MS. TRIPP'S PAROLE BASED SOLELY ON THE FACTS OF HER UNCHANGEABLE COMMITMENT OFFENSE VIOLATES DUE PROCESS BY AMENDING HER PRISON TERM TO LIFE WITHOUT ANY POSSIBILITY OF PAROLE

The only *arguably* viable ground for the 2004 finding by the Governor's
staff that Ms. Tripp was unsuitable for parole was the gravity of the offense.
Although in some cases a parole-qualified prisoner like Ms. Tripp may be
denied parole initially if the commitment offense was particularly egregious

compared to other examples of that offense, offense factors alone cannot continue to serve, as here, as the basis for *interminably* precluding parole. See *Biggs v. Terhune, supra* 334 F.3d at 916-917.

The State's courts warn that "[T]he Board's authority to make an exception based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is "normally" to be granted . . ." *Rosenkrantz*, 29 Cal.4[th] at 683, citing *Ramirez, supra*, 94 Cal.App.4[th] at 570.

The Ninth Circuit reviewed the constitutional propriety of a BPH panel's use of a first degree murder commitment offense to find a prisoner unsuitable for parole at his *first* hearing. The Court found no evidence to support most of the panel's grounds for unsuitability, but held that a particularly egregious commitment offense could be an appropriate basis for finding such a prisoner unsuitable for parole at an *initial* parole hearing. The Ninth Circuit cautioned:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole...
>
> A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

*Biggs, supra,* 334 F.3d at 916-917.

1    *Biggs*' holding has been ratified in addressing the issue here raised by

2    Ms. Tripp in decisions by the U.S. District Courts for the Central, Eastern, and

3    Northern Districts of California, and more recently by several California

4    Courts of Appeal.

5        In a recent decision on the issue following the California Supreme

6    Court's caveat quoted above (see *Rosenkrantz*, at p. 18, above) a federal

7    district court ordered the release of a California life term prisoner whose

8    commitment offense was one of the most egregious second-degree murders on

9    record – the defendant had purchased and practiced with an Uzi, laid in wait,

10   shot the victim ten times, absconded, and threatened further revenge.  In

11   reversing the panel's decision at Rosenkrantz' fourth parole hearing and

12   ordering his release from prison, the district court explained:

13       In the circumstances of this case, the BPT's continued reliance
14       upon the nature of Petitioner's crime to deny parole [ ] violated
         due process. First, continued reliance upon the unchanging facts of
15       Petitioner's crime makes a sham of California's parole system and
16       amounts to an arbitrary denial of Petitioner's liberty interest.
         Petitioner had been denied parole on six occasions prior to the
17       determination he now challenges. Continued reliance upon the
18       unchanging characterization of Petitioner's offense amounts to
         converting Petitioner's sentence of seventeen years to life to a term
19       of life without the possibility of parole. [ ]

20

21       Second, in this case, the circumstances of Petitioner's crime do not
         amount to some evidence supporting the conclusion that Petitioner
22       poses an unreasonable risk of danger if released. As discussed,
         "[i]n the parole context, the requirements of due process are met if
23       some evidence supports the decision." Significantly, the evidence
24       underlying the decision must be supported by "some indicia of
         reliability." *Biggs*, 334 F.3d at 914 (internal quotations omitted)[.]
25       Otherwise, it does not constitute "some evidence." [ ]

26

27       While relying upon Petitioner's crime as an indicator of his
         dangerousness may be reasonable for some period of time, in this
28

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 29

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

case, continued reliance on such unchanging circumstances - after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because Petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. *See Johnson v. Finn,* 2006 WL 195159 at p. 8 n. 3 (E.D.Cal.2006) (stating that "the seriousness of the crime had predictive value for the dangerousness of Petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming Petitioner's record in prison is exemplary)."); *Irons,* 358 F.Supp.2d at 947 n. 2.

Petitioner's case is exactly what *Biggs* envisioned when it stated that repeated refusals to grant a parole release date to an inmate with an exemplary post-conviction record may violate the prisoner's due process rights. *Biggs,* 334 F.3d at 919. The record is replete with evidence of Petitioner's remorse and rehabilitation, including glowingly positive psychological reports, extensive self-improvement through educational and vocational advancements as well as therapy, valued service in promoting the penological goals of the prison, and nearly two decades of disciplinary-free incarceration. The evidence of Petitioner's outstanding performance while incarcerated is particularly significant. As the Supreme Court has recognized, "[t]he behavior of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release." *Greenholtz v. Nebraska,* 442 U.S. at 15. Regardless of whether the BPT ever was entitled to rely upon the commitment offense to find that this particular Petitioner posed an unreasonable risk of danger and was unsuitable for parole, under these unusual circumstances, the BPT's continued reliance on the commitment offense violates due process because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" with "some indicia of reliability" of

Petitioner's dangerousness. *See Hill,* 472 U.S. at 455; *Biggs,* 334 F.3d at 917; *Irons,* 358 F.Supp.2d at 947[.]

*Rosenkrantz v. Marshall, supra,* 444 F.Supp.2d at 1083-1087.

The State's courts have ruled identically on the issue in ordering the release of inmates committed for life offenses. See *In re Gray, supra,* 151 Cal.App.4[th] 379; *In re Lawrence, supra,* 150 Cal.App.4[th] at 1535-1540; *In re Elkins, supra,* 144 Cal.App.4[th] at 498-499; *In re Lee, supra,* 143 Cal.App.4th at 1412-1413; *In re Scott, supra,* 133 Cal.App.4[th] at 595; see also *In re Barker, supra,* 151 Cal.App.4[th] at 372.

Because neither the facts of her offense nor the maximum parole suitability she has indisputably achieved and maintained can possibly improve, the continued preclusion of Ms. Tripp's parole based on her offense is necessarily *interminable.* The process has converted her prison term, 15-years-to-life with the possibility of parole, to life without **any** possibility of parole — unless, as a district court recently posed — some future Governor arbitrarily decides — before Ms. Tripp's ultimate death in state prison — that all of the previous Governors were wrong. *Irons v. Warden,* 358 F.Supp.2d 936, 947 (E.D.Cal. 2005). Neither the liberty interest provided by the State's parole laws and regulations nor the Due Process Clause itself permits the possibility of Petitioner's parole to rest entirely on such arbitrary speculation.

*Irons v. Carey,* 479 F.3d 658 (9th Cir. 2007) [*"Irons"*] is the Ninth Circuit's third in a trilogy that includes *Biggs,* and *Sass v. California Board of Prison Terms,* 461 F.3d 1123 (9th Cir. 2006) [*"Sass"*]. In *Biggs, Sass, and Irons,* the Ninth Circuit adjudicated Petitioner's pivotal claim: whether, consistent with due process, the unchanging facts of commitment offenses may be employed repeatedly or interminably to preclude the parole of one like Ms.

Tripp who indisputably satisfies all parole requirements who is forensically evaluated to pose a low parole risk, and who has served in excess of the appropriate or maximum prison term prescribed by the regulations for an offense with those facts.

In *Irons* the Ninth Circuit held that the BPH panel's use of Irons' crime, a *particularly egregious* second-degree murder, at Irons' *fourth* parole hearing, and *before he had served the minimum prison term imposed by the trial court*, satisfied the "some evidence" test sufficiently to uphold the BPH panel's decision finding that Irons was unsuitable for parole.

The Ninth Circuit first focused on Irons' egregious murder; he fired 12 rounds into the victim, then, when he found the victim was still alive, stabbed him twice. After leaving the corpse in a sleeping bag for 10 days, Irons removed and weighted it, and dropped it in the ocean. Irons received a sentence of 17 years-to-life. Petitioner is serving 15 years-to-life for a second-degree murder she did not commit but for which she was vicariously responsible.

The Ninth Circuit then emphasized that Irons, like Sass and Biggs before him, had not served his minimum term, i.e., "the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board." In discussing *Biggs*, *Sass*, and *Irons*, the Court carefully noted that while each decision must rest on its own facts, neither Biggs, Sass, nor Irons had served their aforementioned "minimum" terms when the Board denied parole.

In *Irons* the Court explained why *Biggs* is still good law and was not overturned by *Sass*, and re-emphasized that ***continued use of commitment offense facts to find such an inmate unsuitable for parole may constitute a due process violation after the minimum term has been served***:

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 32

In *Biggs,* we affirmed the district court's denial of a prisoner's petition for habeas corpus challenging the Board's determination that he was unsuitable for parole on the basis of his commitment offense. [ ] Although we held that the Board's decision was supported by "some evidence" because "[t]he murder of which Biggs was convicted involved killing a witness in a manner which exhibited callous disregard for life," we made clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

. . . Specifically, we held that a parole board's sole ... reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole. []

Subsequently, in *Sass,* we held that denying parole to an individual in reliance on his offense of commitment did not violate due process. [] Although we acknowledged that *Biggs* represents the law of this circuit and specifically noted that "continued reliance ... [on] the offense and on conduct prior to imprisonment ... could result in a due process violation,' " *id.,* we nonetheless held that the Board's reliance on the "gravity" of the second degree murder of which Sass was convicted, in combination with prior incidents of unlawful conduct, provided a sufficient basis for the Board to deem Sass unsuitable for parole.

Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in *Sass* precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief. *We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his*

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 33

*commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.* Specifically, *in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.* [] All we held in those cases and all we hold today, therefore, is that, *given the particular circumstances of the offenses in these cases*, due process was not violated when these prisoners were deemed unsuitable for parole *prior to the expiration of their minimum terms.*

Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. *We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. Biggs*, 334 F.3d at 917.

*Irons v. Carey, supra*, at 664-665; emphasis added.

In the case at bench these facts are undisputed: At the time of Ms. Tripp's 2004 reversal of her parole grant, she had appeared before *fourteen* BPH panels, she had been found suitable and granted parole by *two* of those panels; she had been imprisoned for more than *twenty-five years (now 28 years)*. Petitioner became eligible to parole *15 years earlier* in *1989* and had served *more than ten years in excess* of her minimum term of fifteen years imposed by the sentencing court (not including term credits she had earned by then), *thirteen years in excess of the maximum* prison term prescribed by the regulations for the facts of her offense, and *five years (currently 8 years) in excess of the prescribed term if she had been convicted of a first-degree*

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 34

1   *murder with the same facts.* The Ninth Circuit's reasoning in *Irons* is relevant,

2   depicting and prohibiting the very due process violation argued by Petitioner.

3       In *Sanchez v. Kane, supra*, 444 F.Supp.2d 1049, Sanchez had been

4   denied parole for the fourth time compared to **ten** denials for Petitioner, the

5   only arguably viable ground being the gravity of his commitment offense, also

6   a second degree murder. The Court affirmed Sanchez' protected liberty

7   interest in parole. (*Id.* at 1058.) After rejecting several evidentiarily

8   unsupported grounds, the Court, in ordering Sanchez' release, addressed the

9   claim here at issue – the continued use of commitment offenses to repeatedly

10  preclude Sanchez' parole:

11          Finally, the Governor relied upon the callous nature and
12          circumstances of the crime, stating "[i]t was a planned
            calculated and cold-blooded murder demonstrating
13          exceptionally callous disregard for human suffering ⋯ [and it]
14          involved particularly egregious acts beyond the minimum
            necessary to sustain a conviction of second-degree murder." []
15          However, as the Board recognized, the events and
16          circumstances surrounding petitioner's crime are unchanging. []
            ("I want to explain to you that no matter what happens in your
17          lifetime, the crime is never going to change. You understand
            that⋯ That's always going to be there, period⋯ [T]he crime is
18          never going to change⋯").
19

20          Although the Board or Governor is "initially justified" in
            relying on the gravity of an inmate's offense in denying him
21          parole, *Rosas,* 428 F.3d at 1232-33; *Biggs,* 334 F.3d at 916,
22          "continued reliance ⋯ on an unchanging factor, the
            circumstances of the offense and conduct prior to
23          imprisonment, runs contrary to the rehabilitation goals
24          espoused by the prison system and could result in a due process
            violation." *Biggs,* 334 F.3d at 916-17; *Irons v. Warden of Cal.*
25          *State Prison-Solano,* 358 F.Supp.2d 936, 947 (E.D.Cal.2005).
26
            . . . if the Governor's decision to deny parole based on the
27          nature of the offense is permitted to stand, contrary to the parole
28

            TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 35

statutes which logically measure parole eligibility on the
reformation of the prisoner after the proscribed period of
punishment, parole eligibility is an impossibility, not a
possibility. The parole statutes do not vest the Governor with
the power to re-sentence petitioner.").

For the reasons stated herein, the Court finds the Governor's
reversal of the Board's grant of parole to petitioner is not
supported by "some evidence" in the record, *Hill,* 472 U.S.
455-56, 105 S.Ct. at 2774; *McQuillion,* 306 F.3d at 912; thus,
petitioner was denied due process. Accordingly, "the California
Supreme Court's silent denial of this claim was an unreasonable
application of clearly established Supreme Court authority [,]"
*Irons,* 358 F.Supp.2d at 949, and petitioner "is therefore entitled
to the release date ordered by the Board." *Scott,* 133
Cal.App.4th at 603, 34 Cal.Rptr.3d 905.

*Sanchez v. Kane, supra,* 444 F.Supp.2d at pp. 1061-1062.

In another recent decision, *Martin v. Marshall,* 431 F.Supp.2d 1038
(N.D. Cal. 2006), this Court re-affirmed the principles of *Biggs* and its progeny
in vacating a decision denying parole in a second-degree murder case. Unlike
Ms. Tripp, Martin's parole risk was moderate to low, and he committed twenty
disciplinary infractions. The court held that "because petitioner cannot change
the past," repeated denials of parole based on outdated static factors
impermissibly converted Martin's prison term to life without the possibility of
parole. Please see the Court's amended judgment in *Martin v. Marshall,
supra,* at 448 F.Supp.2d 1143.

California's state courts have ruled identically on the issue in ordering
the release of inmates committed for second-degree murders. In *In re Scott,
supra,* 133 Cal.App.4th 573, the Court of Appeal recently relied on *Biggs* in
reversing an almost identical decision by Governor Schwarzenegger. *Id.,* pp.
594-595.

1   In *In re Elkins, supra,* 144 Cal.App.4[th] 475, the Court of Appeal, in a published

2   decision in a *first*-degree murder case held, in ordering the prisoner's release

3   on parole:

4       Given the lapse of [many] years and the exemplary

5       rehabilitative gains made by Elkins over that time, continued
        reliance on these aggravating facts of the crime no longer

6       amount to "some evidence" supporting denial of parole.

7       [Note: Elkins' sentence was 25 years-to-life.]

8       The commitment offense, this court has observed, is an

9       unsuitability factor that is immutable and whose predictive
        value "may be very questionable after a long period of time

10      [citation]." ( *Scott II, supra,* 133 Cal.App.4th at pp. 594-595, fn.

11      omitted.) We have also noted, as has our Supreme Court, strong
        legal and scientific support that "predictions of future

12      dangerousness are exceedingly unreliable," even where the

13      passage of time is not a factor and the assessment is made by an
        expert. ( *Id.* at p. 595, fn. 9.) Reliance on an immutable factor,

14      without regard to or consideration of subsequent circumstances,

15      may be unfair, run contrary to the rehabilitative goals espoused
        by the prison system, and result in a due process violation. (

16      *Id.* at p. 595.)

17

18      [Court reviews authorities, mostly those herein, and orders
        Elkins' release on parole forthwith.]

19

20      *In re Elkins*, *supra*, 144 Cal.App.4th 475, 498-499.

21

22      The facts of Petitioner's case are more compelling than those in the

23  cases cited above in which BPH panels and governors employed the same

24  boilerplate offense factors. Because neither the facts of her offense nor the

25  maximum parole suitability she has indisputably achieved and maintained can

26  ever improve, preclusion of her parole based on her offense is necessarily

27  *interminable*. The process has converted Ms. Tripp's prison term, 15-years-to-

28

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 37

life with the possibility of parole, which Pen.C. § 3041(a) defines as a

*probability* of parole (panel "shall normally set a parole release date"), to life

without any possibility of parole – unless some future governor's staff

arbitrarily decides – before Petitioner's ultimate death in state prison – that all

of the previous governors were wrong.  Neither the State's parole laws and

regulations nor the Due Process Clauses permit the possibility of Ms. Tripp's

parole to rest entirely on such arbitrary speculation.

## CONCLUSION

Not a shred of evidence supports the Governor's belief that the 28-year-old facts of Ms. Tripp's criminal conduct continue to render her an unreasonable risk of danger to public safety, the Governor's sole ground for reversing her <u>second</u> parole grant.  The offense facts recited by the Governor's staff bear no nexus to Ms. Tripp's forensically assessed low parole risk.  The continued use of these facts to preclude Ms. Tripp's parole has converted her prison term to life without the possibility of parole, and has extinguished her constitutionally protected liberty interest in parole.

The risk to public safety posed by Ms. Tripp's parole, as assessed in her forensic psychological evaluations, is low.  No contrary evidence exists.  Nor is that assessment negated by the *28 year old* commitment offense facts, which have no further predictive value or bearing upon Ms. Tripp's current parole risk.  Not a shred of evidence supports the opposite conclusion.  Accordingly, the Governor's decision flunks the some evidence test, denies due process, and must be vacated.

Ms. Tripp seeks an order vacating the October 11, 2004, decision of the Governor's staff and directing her release from prison on parole, and because any prison term set by the panel in accordance with the regulations

commensurate with the facts of Ms. Tripp's offense, including the terms set by

two BPH panels, and her prescribed five-year parole term (Pen.Code § 3000 et.

seq.) have lapsed (see pp. 3, 7, 34 above and references), directing her release

from prison and the discharge of her prison and parole terms.  See *Rosenkrantz*

*v. Marshall, supra*, 444 F.Supp.2d at 1087; *Martin v. Marshall, supra*, 448

F.Supp.2d 1143; *Sanchez v. Kane, supra*, 444 F.Supp.2d at 1063; *In re Lee,*

*supra*, 143 Cal.App.4[th] at 941; *In re Elkins, supra*, 144 Cal.App. 4th at 503

[vacating decisions denying parole in second-degree murder cases and ordering

parole release]; see also *In re Smith*, 2007 WL 2484107 [additional remedy of

reduction or deletion of parole term by excessive term and credits].

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

//

Date  11-6-07

Respectfully submitted,

Adrian T. Woodward
Counsel for Petitioner
BRANDEE TRIPP

## **VERIFICATION**

I declare, under penalty of perjury, that the facts stated above are true.

Dated  11-6-07 , at Long Beach, California.

Declarant

TRIPP v. DAVISON; Petition for Writ of Habeas Corpus – Page 40