Exhibit  B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                      )
BRANDEE TRIPP )
_____)

CDC Number W-15695


COPY
INMATE

CALIFORNIA INSTITUTION FOR WOMEN

CORONA, CALIFORNIA

MAY 17, 2004

1:50 P.M.

**PENDING REVIEW
AND APPROVAL**

PANEL PRESENT:

KEN RISEN, Presiding Commissioner
HERBERT MAY, Deputy Commissioner

OTHERS PRESENT:

BRANDEE TRIPP, Inmate
ADRIAN WOODWARD, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No
_____ Yes

See Review of Hearing
Transcript Memorandum

**Matthew Yates**             **Capitol Electronic Reporting**

ii

## INDEX

                                                              Page

Proceedings ........................................  1

Case Factors ...................................... 10

Pre-Commitment Factors ............................ 23

Post-Commitment Factors ........................... 29

Parole Plans ...................................... 38

Closing Statements ................................ 59

Recess ............................................ 64

Decision .......................................... 65

Adjournment ....................................... 71

Transcriber Certification ......................... 72

--oOo--

1

1         **P R O C E E D I N G S**

2         **DEPUTY COMMISSIONER MAY:**  On record.

3         **PRESIDING COMMISSIONER RISEN:**  This is a

4    Subsequent Parole Consideration Hearing for BranDee

5    B-R-A-N-D-E-E Tripp, T-R-I-P-P.  CDC number is W-

6    15695.  Today's date is May the 17th, 2004.  The

7    time is 1:50 P.M. here at the CIW Boardroom,

8    California Institute [sic] for Women.  Prisoner's

9    legal status: She was received 2/18 of '81 from

10   Monterey County.  The offense is murder second,

11   case number CR7639.  Count number three, 187 of the

12   Penal Code.  Term is 15 years to life.  Minimum

13   eligible parole date is 5/6 of 1989.  This hearing

14   is being tape recorded.  For purposes of voice

15   identification, we need to go around the room and

16   identify ourselves.  Please state your name.  Spell

17   your last name.  And in addition to spelling your

18   last name, we need the inmate to give her CDC

19   number.  Go to my left.  My name is Ken Risen, R-I-

20   S-E-N, Commissioner.

21        **DEPUTY COMMISSIONER MAY:**  Herbert May, M-A-

22   Y, Deputy Commissioner.

23        **ATTORNEY WOODWARD:**  Adrian Woodward, W-O-O-

24   D-W-A-R-D, Ms. Tripp's Attorney.  Your turn.

25        **INMATE TRIPP:**  BranDee Tripp, T-R-I-P-P, W-

26   15695.

27        **PRESIDING COMMISSIONER RISEN:**  Okay. We also

1    have one correctional peace officer in the room.

2    She will not be participating in the hearing.  She

3    is here for security purposes.  Ms. Tripp, your

4    first name is spelled Bran, B-R-A-N-capital D-E-E,

5    isn't it?

6            **INMATE TRIPP:**  Yes, Sir.

7            **PRESIDING COMMISSIONER RISEN:**  Okay.  Now,

8    you filled out a form 1073, which is our Americans

9    With Disability Act form.  This was done on March

10   15th, 2004 and at that time, you indicated you did

11   not have a disability.  Is that correct?

12           **INMATE TRIPP:**  Yes, Sir.

13           **PRESIDING COMMISSIONER RISEN:**  Okay.  What I

14   need you to do is to read that ADA statement there

15   in front of you.

16           **INMATE TRIPP:**  "The Americans With

17                Disability Act, ADA, is a law to help

18                people with disabilities.

19                Disabilities are problems that make

20                it harder for some people to see,

21                hear, breathe, talk, walk, learn,

22                think, work, or take care of

23                themselves than it is for others.

24                Nobody can be kept out of public

25                places or activities because of a

26                disability.  If you have a

27                disability, you have the right to ask

3

```
 1          for help to get ready for your BPT

 2          hearing, get to the hearing, talk,

 3          read forms and papers, and understand

 4          the hearing process.  BPT will look

 5          at what you've asked for to make sure

 6          that you have a disability that is

 7          covered by the ADA and that you have

 8          asked for the right kind of help.  If

 9          you do not get help, or if you do not

10          think you got the kind of help you

11          need, ask for a BPT 1074 Grievance

12          form.  You can also get help to fill

13          it out."
```

14          **PRESIDING COMMISSIONER RISEN:**  Thank you.

15   Now, do you have any problems walking up and down

16   stairs or over a distance of more than 100 yards?

17          **INMATE TRIPP:**  No, Sir.

18          **PRESIDING COMMISSIONER RISEN:**  Do you need

19   glasses or a magnifying device to see or read

20   documents?

21          **INMATE TRIPP:**  Well, I'm waiting for

22   glasses, but it's for distance.  It's not for

23   reading.

24          **PRESIDING COMMISSIONER RISEN:**  Okay.  Do you

25   have any hearing impairments?

26          **INMATE TRIPP:**  No, Sir.

27          **PRESIDING COMMISSIONER RISEN:**  Do you take

4

```
1   any medication?

2          INMATE TRIPP:  (Inaudible.)

3          PRESIDING COMMISSIONER RISEN:  Any

4   medication that might interfere with your

5   participation in the hearing?

6          INMATE TRIPP:  No, Sir.

7          PRESIDING COMMISSIONER RISEN:  Have you ever

8   been classified as Triple CMS or EOP?

9          INMATE TRIPP:  No, Sir.

10         PRESIDING COMMISSIONER RISEN:  How far did

11  you go in school on the street?

12         INMATE TRIPP:  I went to the 10th or 11th

13  grade.  I got kicked out and then I went to

14  continuation and finished.

15         PRESIDING COMMISSIONER RISEN:  Okay.  So do

16  you have a high school equivalency or a GED?

17         INMATE TRIPP:  I have both.

18         PRESIDING COMMISSIONER RISEN:  Were you ever

19  placed in special education classes or classes for

20  slow learners?

21         INMATE TRIPP:  No, Sir.

22         PRESIDING COMMISSIONER RISEN:  Okay.  The

23  Panel will find that the prisoner has no disability

24  as defined under the Americans With Disability Act.

25  Would you agree, Counsel?

26         ATTORNEY WOODWARD:  I agree.

27         PRESIDING COMMISSIONER RISEN:  Okay.  The
```

1    purpose of today's hearing is to again consider

2    your suitability for parole.  In arriving at a

3    decision, we will consider the commitment offense,

4    your prior criminality and social history, as well

5    as your behavior and overall programming since your

6    commitment.  We have reviewed your files and prior

7    transcripts.  You will have an opportunity to make

8    corrections and clarifications regarding the

9    records.  We will probably read into the record

10   Statement of Facts as reflected by the record.  We

11   will then directly go to your progress since your

12   last hearing, referring to new psychiatric reports,

13   and any other information that has a bearing on

14   your parole suitability.  Any additional parole

15   plans should be brought to our attention.  The

16   prisoner's attorney and the prisoner will be given

17   an opportunity to make a statement regarding parole

18   suitability and length of confinement.  After this

19   is done, we will recess, clear the room, and

20   deliberate.  Once we've reached our decision, we'll

21   resume the hearing and announce the decision.  The

22   prisoner is afforded certain rights, timely notice

23   of this hearing today, availability to review the

24   Central File, the right to present relevant

25   documents at this hearing, the right to an

26   impartial Panel.  Is the prisoner's attorney

27   satisfied these rights are met?

1        **ATTORNEY WOODWARD:**  Yes.

2        **PRESIDING COMMISSIONER RISEN:**  The prisoner

3    will receive a copy of a tentative written decision

4    today.   That decision becomes effective upon

5    approval by the Decision Review Unit at the Board

6    of Prison Terms.  Later, you will receive a

7    transcript and a copy of the decision.  It's

8    automatically sent to you. As of May 1st, 2004,

9    there was a major change limiting your right to

10   appeal.  The Board of Prison Terms no longer accept

11   appeals.  You have to appeal directly to the

12   courts.  And apparently, that information is

13   contained in the prison law library and there's

14   (inaudible) in the Administrative Appeals

15   correspondence, grievance concerning Board of

16   Prison Term decisions.  It's administrative

17   directory AD 4 slash 01.  Okay, today you will not

18   be required to discuss the commitment offense with

19   the Panel, and you will not be required to admit

20   the commitment offense.  However, the Panel accepts

21   as true the Court findings.  Any confidential

22   materials?

23       **DEPUTY COMMISSIONER MAY:**  There will be

24   none, Mr. Chairman, thank you.

25       **PRESIDING COMMISSIONER RISEN:**  Okay.  Any

26   additional documents for us to review today?

27       **ATTORNEY WOODWARD:**  As requested, have the

1   Chairpersons had an opportunity to read the brief

2   submitted by my office?   Because I was afraid --

3   it's not in front of you.

4           **PRESIDING COMMISSIONER RISEN:**   Where?

5   Where?  I didn't see it.

6           **ATTORNEY WOODWARD:**   I didn't see it in front

7   of you and it was submitted.

8           **PRESIDING COMMISSIONER RISEN:**   Nope.

9           **ATTORNEY WOODWARD:**   So I'm a little

10  concerned.

11          **PRESIDING COMMISSIONER RISEN:**   I was going

12  to say I have two documents, one letter from the

13  archdiocese and a letter from someone else.  So I

14  only have those two letters.  Are there more than

15  that?

16          **ATTORNEY WOODWARD:**   Yes.  There's additional

17  documentation from a prospective employer.  There's

18  documentation from a conversion to a controlled

19  halfway house, (inaudible).  I can submit copies to

20  this Board presently.

21          **DEPUTY COMMISSIONER MAY:**   You want to do

22  that right now?

23          **ATTORNEY WOODWARD:**   My only concern is that

24  the brief is --

25          **DEPUTY COMMISSIONER MAY:**   Do you have a copy

26  of it?

27          **ATTORNEY WOODWARD:**   I do.

8

1          **DEPUTY COMMISSIONER MAY:**  (Inaudible.)  Is

2     that a copy of your (inaudible)?

3          **ATTORNEY WOODWARD:**  These are the two copies

4     of an indication from Casanova and your prospective

5     employer.

6          **DEPUTY COMMISSIONER MAY:**  Okay.  Great.

7     That's really cool.

8          **ATTORNEY WOODWARD:**  Absolutely.  I don't

9     think the Chairman will have an opportunity to read

10    this.  Mind if we take a brief recess for you?

11         **PRESIDING COMMISSIONER RISEN:**  Okay, in a

12    moment, we'll take a recess and I'll read them.

13         **ATTORNEY WOODWARD:**  Yeah.

14         **PRESIDING COMMISSIONER RISEN:**  I have a

15    hearing check -- No, why don't we finish this so I

16    don't forget where we're at.

17         **ATTORNEY WOODWARD:**  Yes, I apologize.  These

18    are also two letters, one from two family members

19    that are supportive of her release.

20         **PRESIDING COMMISSIONER RISEN:**  Okay, so four

21    letters and a brief?  Okay, I have a checklist of

22    documents contained in my file.  I've marked it

23    Exhibit One.  I'd like you to look at it to ensure

24    that you have those documents.  Also, do you have

25    this letter from the Arroyo Grande Police

26    Department?

27         **ATTORNEY WOODWARD:**  No.  That was never --

1  We have (inaudible) type concerns.  We never

2  received a notification from (inaudible).

3       **PRESIDING COMMISSIONER RISEN:**  I'm sure it's

4  basically the same as it said last time.  Almost

5  word for word.

6       **ATTORNEY WOODWARD:**  Okay.  Thank you.  I

7  believe I'm aware of the documentation of

8  (inaudible), I'm sure.

9       **PRESIDING COMMISSIONER RISEN:**  Okay.  Any

10  objections at this time?  Are they in the brief?

11       **ATTORNEY WOODWARD:**  The objections are not

12  in the brief.  My only concern is the brief is a

13  relevant document and as long as the gentleman --

14  Mr. Risen, you indicate that you're going to --

15  Excuse me, Risen -- read the brief.  It's relevant,

16  and so that's my only concern.

17       **PRESIDING COMMISSIONER RISEN:**  Okay.  I will

18  read it in just a moment, then.  At this point,

19  we'll go to recess.  The time is 2:04 and we'll

20  call you back in in a few minutes.

21       **ATTORNEY WOODWARD:**  Thank you.  I understand

22  and appreciate.

23            [Off the record.]

24       **DEPUTY COMMISSIONER MAY:**  We're back on

25  record.

26       **PRESIDING COMMISSIONER RISEN:**  Okay, we'll

27  resume the hearing.  We have read the Counsel's

1   brief and we do have copies of them.  The time is
2   2:20.  At this point, is the prisoner going to
3   address the Panel today?

4           **ATTORNEY WOODWARD:**  Yes.

5           **PRESIDING COMMISSIONER RISEN:**  Could you
6   raise your right hand, please?  Best you can.  Do
7   you solemnly swear or affirm that the testimony you
8   give at this hearing will be the truth, the whole
9   truth, and nothing but the truth?

10          **INMATE TRIPP:**  I do.

11          **PRESIDING COMMISSIONER RISEN:**  Okay.  I'm
12  going to read the Statement of Facts from the
13  summary of the crime in the June, 2004 Board
14  report.

15          "On July 8th of 1979, the victim's
16          mother reported her daughter missing
17          and indicated William Ruckert,
18          parenthesis, BranDee Tripp's
19          stepfather parenthesis, might be
20          involved in the disappearance of her
21          daughter.  The victim was scheduled
22          to testify against Mr. Ruckert in a
23          child molestation case.  Subsequent
24          investigation led Jon Sorenson to
25          reveal knowledge of a conspiracy to
26          kidnap the child by Mr. Ruckert and
27          Mr. Hilton Tripp, T-R-I-P-P,

1          parenthesis, Mrs. Tripp's husband,

2          close parenthesis.  Roger Ladd

3          indicated Mr. Ruckert offered him

4          $1,000 to kidnap the victim's older

5          sister Betty Ann Murdock.  He

6          observed Hilton Tripp, Randy Cook,

7          and BranDee Tripp discussing methods

8          of killing the older sister.  Mr.

9          Ladd also observed further

10         discussions of methods of kidnapping

11         and killing Tamron Carpenter by

12         Hilton and BranDee Tripp.  On July

13         9th, 1979, Hilton Tripp implicated

14         Randy Cook as the person who killed

15         the victim and acknowledged he

16         assisted in burying the child.  He

17         stated his wife BranDee was in

18         agreement with the kidnapping and

19         arranged for the child to leave the

20         home in order to facilitate the

21         event.  The body of the victim was

22         found buried near Avila Beach, A-V-I-

23         L-A.  Ms. Tripp was arrested on July

24         10th, 1979."

25    Okay.  Would you like to make any corrections or

26    clarifications regarding this crime?

27         **INMATE TRIPP:**  Well, some of the things in

1    there I really don't remember happening.  I mean, I
2    didn't know that Roger Ladd was approached.  I was
3    always been under the impression that we brought
4    him into the mess.  Because I was staying at his
5    trailer and my ex-husband, now, found me when we
6    were discussing everything which involved Roger,
7    but I don't remember him being directly involved as
8    far as that version.  I always thought we
9    implemented him just by -- I mean, just by being in
10   his area.

11        **PRESIDING COMMISSIONER RISEN:**  Okay, were
12   you -- Okay, let me ask you this.  Now, were you
13   ever present when there was a conversation between
14   Ruckert, yourself, and someone else to kidnap the
15   older sister and kill her?

16        **INMATE TRIPP:**  Well, it was a while ago.  It
17   was a few Board hearings ago.  And at the time,
18   they didn't really care to know and -- What
19   happened at the time is me and Randy went with
20   Hilton to talk to my stepfather.  But me and Randy
21   had to sit in the car, and that would be Cook.
22   That would be Mr. Cook.  And we watched Hilton talk
23   to my stepfather on the front of our grass where my
24   mom's house is.  That was when he was staying -- He
25   was being allowed to go there to get his clothes at
26   the time. And we watched the conversation, but we
27   never really heard the conversation.  But when it

1  came to testifying to them, I perjured myself and
2  said I heard everything. And I just repeated what
3  my husband told me because I didn't think that my
4  stepfather should be the only one not going
5  anywhere.

6         **PRESIDING COMMISSIONER RISEN:** Okay.

7         **ATTORNEY WOODWARD:** I think -- necessary to
8  clarify that for me is that -- I think what Ms.
9  Tripp is indicating at the trial for Mr. Ruckert,
10 she was primary state's witness against him. Had
11 she not testified, it's quite probable he would
12 have been exculpated, I think. Because they
13 couldn't find -- So she perjured herself to convict
14 Mr. Ruckert and become the star witness against Mr.
15 Ruckert in the subsequent (inaudible) convicted of
16 first degree.

17        **PRESIDING COMMISSIONER RISEN:** Okay. Does
18 that mean that her husband Hilton never testified
19 against Ruckert?

20        **INMATE TRIPP:** Not to my knowledge. I was
21 the last one that they ever seen.

22        **PRESIDING COMMISSIONER RISEN:** Okay.

23        **INMATE TRIPP:** Out of the -- There was four
24 of us. I was the last. That would have went to
25 trial if I hadn't pled guilty.

26        **PRESIDING COMMISSIONER RISEN:** Okay, now the
27 first one they were going to kidnap was -- and

14

1    according to someone, murder -- would be the older
2    sister.   What was her name?

3         **INMATE TRIPP:** Betty Ann Maddox.

4         **PRESIDING COMMISSIONER RISEN:** Okay.   What
5    ever happened to her?

6         **INMATE TRIPP:** Okay.  He came with this
7    wonderful idea.  I wasn't real thrilled.  And in my
8    mind at the time, I didn't really think I was
9    participating in murder.  And they did discuss
10   murder and they were smoking a joint and they were
11   talking, just like, bizarre, and I told them, I'm
12   not helping you with any murder.  I'll get her out
13   of the house.  If you want to do what you're going
14   to do, you can do it.

15        **PRESIDING COMMISSIONER RISEN:** Okay.

16        **INMATE TRIPP:** But I'll get her out of the
17   house.  But when I went to get her out of the
18   house, they stayed in the bushes and nobody did
19   anything.  So she went back to her home, so nothing
20   ever happened to her.

21        **PRESIDING COMMISSIONER RISEN:** So we're
22   talking about the older sister?

23        **INMATE TRIPP:** That's the older sister.

24        **PRESIDING COMMISSIONER RISEN:** Okay.  Now,
25   how were you involved in the younger sister's
26   kidnapping?

27        **INMATE TRIPP:** In the beginning, I was

1   actually running interference with her.  Because
2   they were talking and they wanted to kill her.  I
3   didn't want to kill her.  I didn't want to help
4   kill her.  I didn't think she needed to be dead,
5   and I didn't want to do it.  And so, we'd set up
6   little plans and they'd kind of just casually fall
7   through.  And it wouldn't work, and I'd take Tammy
8   home and we'd go places, and I'd take Tammy home.
9   Well, the day that this happened, before it
10  happened, my husband promised me that no one would
11  get hurt.  He promised me that he would go pick
12  Tammy up if I sent her down to the store.  I could
13  go to Randy's house and watch her, and they would
14  go convince my stepfather that they kidnapped her
15  and she wouldn't be testifying to get the money.
16  And then we were going to let her go.

17          **PRESIDING COMMISSIONER RISEN:**  And you were
18  supposed to be at Randy Cook's house?

19          **INMATE TRIPP:**  Yeah.

20          **PRESIDING COMMISSIONER RISEN:**  The trailer.

21          **INMATE TRIPP:**  So after she came up -- No, I
22  was supposed to be -- He lived with his girlfriend
23  in a house in Arroyo Grande.  So I went after her
24  mom called, I went to Randy's house and I waited
25  and I waited and I waited.  And in my head, I knew
26  something wasn't going right, but I was afraid to
27  leave, because I was afraid if I wasn't where I was

1  supposed to be and something happened to her, then

2  it was my fault.  And that's how I thought when I

3  was  --

4       PRESIDING COMMISSIONER RISEN:  Okay.  Now

5  how did Tamron Carpenter, the victim, know you?

6       INMATE TRIPP:  He --

7       PRESIDING COMMISSIONER RISEN:  She.

8       INMATE TRIPP:  They were a friend of my

9  stepdad's for years and I met them through my

10  stepfather for years.

11       PRESIDING COMMISSIONER RISEN:  Did you watch

12  them?  Were you like a caretaker?

13       INMATE TRIPP:  Well, no.  We never

14  babysitted, but her older sister, Betty Ann, was my

15  best friend.

16       PRESIDING COMMISSIONER RISEN:  The one --

17       INMATE TRIPP:  The older one.

18       PRESIDING COMMISSIONER RISEN:  The older

19  one.

20       INMATE TRIPP:  Maddox.

21       PRESIDING COMMISSIONER RISEN:  Okay.  But

22  Tamron knew you well.

23       INMATE TRIPP:  Yeah.

24       PRESIDING COMMISSIONER RISEN:  So if you

25  went to Randy Cook's house and held her there, how

26  -- Once you ultimately got away, how would you not

27  be identified?

1        **INMATE TRIPP:**  Well, in my head, I was not
2    going to let her know that she was being kidnapped.
3    I had planned in my head that I would just tell
4    her, your mom knows we're here.  And we're just
5    going to hang out for a while, and then we'll go to
6    the beach and then we'll go back to your mom's.
7    Because she thought we were going somewhere.  She
8    never knew.  When she was with me and I would take
9    her places and they would want to kidnap her and I
10   wouldn't let them do it then.  And I'd tell them,
11   no, no.  This isn't going to work.  And I'd talk
12   them out of it because I was there.  We were going
13   places.  Like, we'd go to the park.  We'd go
14   swimming.  So I was always there with her.  And
15   they promised me that they would drop her off and I
16   would just watch her and so I had it planned.  And
17   I had my moped and I had it planned that we'd go to
18   the park and she would never know.  In my head.  I
19   didn't think that anything could go wrong, and I
20   didn't think far enough to know that her life would
21   be taken.

22       **PRESIDING COMMISSIONER RISEN:**  Didn't you
23   feel that Ruckert would have to ensure in some way
24   that she'd been taken care of?  Not just by you
25   telling him.

26       **INMATE TRIPP:**  I never thought that far.
27   And after years of growing up and thinking of how

1   he was, I would think that now.  I know what kind

2   of person he is today.  But back then, I didn't

3   think that.  I figured --

4           **PRESIDING COMMISSIONER RISEN:**  How old were

5   you then?

6           **INMATE TRIPP:**  I had just turned 20.

7           **PRESIDING COMMISSIONER RISEN:**  And where

8   were you living?

9           **INMATE TRIPP:**  Well, at the time, we were

10  living in a tent.

11          **ATTORNEY WOODWARD:**  Sorry, but did I hear

12  the tape recorder go off or am I imagining things?

13          **DEPUTY COMMISSIONER MAY:**  It's on.

14          **ATTORNEY WOODWARD:**  I apologize.  I'm sorry.

15          **PRESIDING COMMISSIONER RISEN:**  Where you

16  living at the time?

17          **INMATE TRIPP:**  We were living in a tent

18  underneath an overpass by Avila.

19          **PRESIDING COMMISSIONER RISEN:**  And this was

20  in 1979.

21          **INMATE TRIPP:**  Yes, Sir.

22          **PRESIDING COMMISSIONER RISEN:**  Well, how do

23  you feel about your involvement now in the case?

24          **INMATE TRIPP:**  I believe that if I hadn't

25  gotten involved at all -- I mean, I should have

26  just called when they were talking about it and

27  preventing it altogether.

1      **PRESIDING COMMISSIONER RISEN:**  Probably.

2      **INMATE TRIPP:**  I would have called the

3    police.  I did try to call the police once or

4    twice, but I got scared.  When they picked up the

5    phone, I hung up.  And I called from a payphone.

6    And now that I'm older, I know that I knew at the

7    time something wasn't right.  Or I wouldn't be

8    trying to call the police.

9      **PRESIDING COMMISSIONER RISEN:**  Okay.  What

10   you're saying, then, is on July 8th, '79, when they

11   didn't bring the girl to you, you knew something

12   was wrong.  And so you tried to call the police?

13     **INMATE TRIPP:**  I tried twice and I got

14   scared and I hung up the phone as soon as he

15   answered.  I was at a payphone in old Arroyo Grande

16   by this bridge.  And I hung up the phone.  I never

17   talked to anyone because I got scared.  In my head,

18   I was thinking, well, if I'm not there and they

19   show up, what happens if they take things into

20   their own hands?

21     **PRESIDING COMMISSIONER RISEN:**  Okay, now,

22   she knew both Hilton and Randy Cook?  Hilton Tripp?

23     **INMATE TRIPP:**  I'm not sure if she really

24   knew Randy really well, but she knew Hilton because

25   he was with me most of the time.

26     **PRESIDING COMMISSIONER RISEN:**  Okay.  And

27   you sent her to the store near Avila Beach?

1      **INMATE TRIPP:**  No.  I sent her down -- The

2  store was, like, right down from her house.  But

3  they were parked down there waiting.

4      **PRESIDING COMMISSIONER RISEN:**  Did you

5  ever --

6      **INMATE TRIPP:**  They (inaudible) up on a hill

7  and the store was right --

8      **PRESIDING COMMISSIONER RISEN:**  Okay.  You

9  were arrested two days later.  Did you ever talk to

10  Hilton and Randy?

11      **INMATE TRIPP:**  No.  No.  What actually

12  happened is they picked me up for questioning.  I

13  denied the whole thing.  I acted like I didn't know

14  anything.  And they held me.  And at the time, I

15  guess it was 23 hours.  They can hold you 23 hours

16  and they have to let you go if they're not going to

17  arrest you.  And during that time, Hilton had came

18  into the police department looking for me.  And

19  they ended up picking him up because he had a

20  juvenile warrant for him for a prior conviction.

21  And they let me go and then I think I got arrested

22  the next day.  I think it was the next day early

23  morning.  I mean, I went through a whole day and

24  then they woke me up out of a dead sleep, so it

25  was, like, two days later, the following morning.

26  But it was, like, within a 24 hour period

27  (inaudible).

1  **PRESIDING COMMISSIONER RISEN:**  Well, if
2  she's walking somewhere and these two guys pull up
3  and attempt to pick her up, she's probably not
4  going to get in the car.

5  **INMATE TRIPP:**  No, she was in the store and
6  she knew them.  There's a grocery store down there
7  and I sent them down to the store to buy some
8  items.  And they asked her if -- I guess they asked
9  her if she wanted a ride.  I never really talked to
10  them after it happened because I couldn't believe
11  that they did it.  I couldn't believe that they
12  killed someone.

13  **PRESIDING COMMISSIONER RISEN:**  Did Hilton or
14  Cook ever tell you that she was strangled to death?

15  **INMATE TRIPP:**  When they came back, they
16  finally showed up at Randy's house and I asked them
17  where they had been.  And they told me and I told
18  them, I don't want to hear it.  And when they told
19  me where it was, I never went back to the area
20  because I knew that she was there.  And I just
21  couldn't do it.  But before I told him that I
22  didn't want to hear anymore -- He had made the
23  statement that me and Randy pulled the rope at the
24  same time, so neither one of us knows who killed
25  her.  And I told him, I don't want to hear
26  anything.  Don't tell me anything.  I can't believe
27  that you did it.  And then I wouldn't go back to

1    the area.

2         **PRESIDING COMMISSIONER RISEN:** Well, how

3    would you handle a situation like that today?

4         **INMATE TRIPP:** If I heard anyone

5    conspiracizing about any kind of awful thing, I

6    would call the police within a minute. I would

7    have no problem turning anyone in today. Because

8    when I was young, you think, no, they're really not

9    going to do it. You know, people always talk and

10   it's like, they really don't mean it. I wouldn't

11   take that chance. Because what if they do mean it.

12   You know. Tammy's gone, and it is my fault.

13   Because she would have never went down to the

14   store. You know, and they may have not have done

15   anything if I hadn't helped, but I wouldn't have

16   helped if they hadn't promised me that she wouldn't

17   have got hurt. The reason it took so long --

18        **PRESIDING COMMISSIONER RISEN:** Then your

19   motivation was you wanted the $1,000?

20        **INMATE TRIPP:** Well, I wanted to burn my

21   stepfather. I wanted to pay him back for

22   everything that I went through with him.

23        **PRESIDING COMMISSIONER RISEN:** And how did

24   you plan to do that?

25        **INMATE TRIPP:** When he gave us the money, we

26   were going to turn Tammy loose and let her testify.

27   We weren't going to keep her. We were going to let

23

1   her do what she needed to do.  Because we knew he

2   wouldn't -- The one thing we did know is he would

3   never turn us in.  Because what would he say.  You

4   know, he couldn't turn us in.  And I don't remember

5   who put that knowledge in our head, but we knew

6   that for a fact that he wouldn't turn us in.  So if

7   he gave us the money, there was nothing he could do

8   if Tammy showed up to testify.

9        **PRESIDING COMMISSIONER RISEN:**  Okay, but it

10  was $1,000.

11       **INMATE TRIPP:**  Well, they said 1,000.  I was

12  told 10,000, so I'm not really sure because I never

13  really heard -- The only thing I heard was what

14  Hilton ever told us.

15       **PRESIDING COMMISSIONER RISEN:**  Okay, now

16  let's go over your pre-conviction factors.  Says

17  you have no juvenile record.

18       **INMATE TRIPP:**  No, I don't have (inaudible).

19       **PRESIDING COMMISSIONER RISEN:**  Okay.  Now,

20  in the Governor's letter, he said that in the '85,

21  '91, and '93 psych evaluation, you talked about

22  shoplifting as a juvenile.  Did you do that?

23       **INMATE TRIPP:**  I was a delinquent at times,

24  but I never got arrested for it.

25       **PRESIDING COMMISSIONER RISEN:**  Okay.  Then

26  you stole cars.

27       **INMATE TRIPP:**  I stole two cars to run away

1    with.

2        **PRESIDING COMMISSIONER RISEN:**  Okay.  And

3    then you stole money from your parents?

4        **INMATE TRIPP:**  I did steal money from my

5    mom.

6        **PRESIDING COMMISSIONER RISEN:**  Back to the

7    commitment offense.  Was there any drugs or alcohol

8    on your part?  Were you using drugs or under the

9    influence of alcohol?

10       **INMATE TRIPP:**  When we were talking about

11   Betty Ann, we were smoking weed.  We were pretty

12   loaded.

13       **PRESIDING COMMISSIONER RISEN:**  Okay, but on

14   the --

15       **INMATE TRIPP:**  But I don't remember doing

16   drugs or alcohol at the time when Tammy -- I really

17   tried to talk them out of it and why I didn't call

18   the cops --  At that age, that young.  I think it's

19   because I thought I was in love with him, and I

20   realized that wasn't love when I grew up.  I'm not

21   real sure why.  I think my judgment was very

22   impaired because of everything.  I think I hated my

23   stepfather so much, honestly, that it just blinded

24   me of what was really right and wrong.

25       **PRESIDING COMMISSIONER RISEN:**  Okay.  But

26   drugs or alcohol didn't cloud your decision-making

27   abilities on this particular day when you sent the

25

1    victim down to the market?

2         **INMATE TRIPP:**  I don't think so.  I don't

3    remember being high or drinking that day.

4         **PRESIDING COMMISSIONER RISEN:**  And you had

5    no adult convictions (inaudible).

6         **INMATE TRIPP:**  No.

7         **PRESIDING COMMISSIONER RISEN:**  Okay.  Says

8    you're divorced.  Were you divorced at the time of

9    the commitment offense?

10        **INMATE TRIPP:**  No.  I was still married and

11   my attorney advised me not to get a divorce until

12   after everything was over.  So when I arrived at

13   CIW within the year, I was divorced.

14        **PRESIDING COMMISSIONER RISEN:**  Okay.  You

15   were born where?  In California?

16        **INMATE TRIPP:**  Yes.  San Luis Obispo.

17        **PRESIDING COMMISSIONER RISEN:**  You have one

18   half-sister and one half-brother.  Your parents

19   separated when you were two years old.

20        **INMATE TRIPP:**  Yes.

21        **PRESIDING COMMISSIONER RISEN:**  Your mother

22   married William Ruckert.  That's the guy who was

23   charged with the molestation.

24        **INMATE TRIPP:**  Yeah.

25        **PRESIDING COMMISSIONER RISEN:**  You were

26   especially close to your maternal grandmother, who

27   is now deceased.

1          **INMATE TRIPP:**  Yes.

2          **PRESIDING COMMISSIONER RISEN:**  Your mother

3    was a secretary and Ruckert was an electrician?

4          **INMATE TRIPP:**  Yes.

5          **PRESIDING COMMISSIONER RISEN:**  Says you were

6    close to your stepfather despite the fact he once

7    attempted to molest you once you were seven years

8    of age.

9          **INMATE TRIPP:**  That part I disagree because

10   it wasn't a once thing.  It was from seven all my

11   life until I decided I wasn't sleeping with him.

12   It was a molest thing when I was younger and as I

13   matured, it became a money exchange thing.  For me.

14         **PRESIDING COMMISSIONER RISEN:**  You received

15   average grades in school.  Not a behavioral problem

16   until you met Hilton Tripp.  That was your husband,

17   the guy you married.

18         **INMATE TRIPP:**  Yes, Sir.

19         **PRESIDING COMMISSIONER RISEN:**  And that

20   would be in the 10th grade?

21         **INMATE TRIPP:**  Yeah, it was the 10th grade.

22         **PRESIDING COMMISSIONER RISEN:**  What kind of

23   an influence did he have on you?

24         **INMATE TRIPP:**  He was the one who was saving

25   me from my stepdad.  That's why I ran away so much.

26         **PRESIDING COMMISSIONER RISEN:**  Okay.

27         **INMATE TRIPP:**  Because he was going to

1   protect me and save me.

2        **PRESIDING COMMISSIONER RISEN:**  And it says

3   you graduated from a continuation high school.

4        **INMATE TRIPP:**  Yes, Sir.

5        **PRESIDING COMMISSIONER RISEN:**  Now, you

6   didn't want to marry Tripp?

7        **INMATE TRIPP:**  When I was pregnant, I didn't

8   want to get -- Getting married wasn't something I

9   really wanted.

10       **PRESIDING COMMISSIONER RISEN:**  Okay, but

11  your parents --

12       **INMATE TRIPP:**  My stepdad did and one of my

13  grandmothers.  They said it would be wise because I

14  was pregnant and I should do the right thing and

15  not have the baby out of --

16       **PRESIDING COMMISSIONER RISEN:**  And Tripp was

17  the father.

18       **INMATE TRIPP:**  Tripp was the father.

19       **PRESIDING COMMISSIONER RISEN:**  Okay, then

20  your mother adopted the child.

21       **INMATE TRIPP:**  Yes, Sir.

22       **PRESIDING COMMISSIONER RISEN:**  And how old

23  is she now?

24       **INMATE TRIPP:**  She's going to be 25 in June.

25       **PRESIDING COMMISSIONER RISEN:**  Any type of

26  work prior to coming to prison?

27       **INMATE TRIPP:**  I had pieces of jobs.

1    **PRESIDING COMMISSIONER RISEN:** How long was

2    the longest time you worked?

3    **INMATE TRIPP:** Probably, like, three months.

4    I was in Texas when I got certified to become a

5    nurse's aide.

6    **PRESIDING COMMISSIONER RISEN:** Okay, how

7    long before the commitment offense were you in

8    Texas?

9    **INMATE TRIPP:** I went to Texas the summer of

10   '77. Because I had just graduated. That's when I

11   first met my (inaudible). And I had to get a job

12   to come back to California.

13   **PRESIDING COMMISSIONER RISEN:** And you

14   worked about three months doing what?

15   **INMATE TRIPP:** I was working in a nursing

16   home. Trying to become a nurse. It was a class

17   where you worked. You could become a nurse's aide

18   as you were working and you took the schooling and

19   the training at the same time.

20   **PRESIDING COMMISSIONER RISEN:** Okay, now,

21   did you have a problem with drugs at all on the

22   street?

23   **INMATE TRIPP:** I consider me an addict, an

24   alcoholic, only because of the way I consumed

25   alcohol and drugs. When I did them, I consumed a

26   lot of them. I didn't just --

27   **PRESIDING COMMISSIONER RISEN:** Okay. What

1    age did you start using drugs?

2          **INMATE TRIPP:**  I started smoking weed in the

3    ninth grade.

4          **PRESIDING COMMISSIONER RISEN:**  And it just

5    went on from there?

6          **INMATE TRIPP:**  Yeah.  Most of my stuff was I

7    smoked marijuana and I drank hard liquor.  Once in

8    a while, I would do acid.  Once in a while, I'd do

9    speed.  Once in a while, but --

10          **PRESIDING COMMISSIONER RISEN:**  Okay.  And at

11    this point, we'll go to the next part of the

12    hearing, post-conviction factors.

13          **DEPUTY COMMISSIONER MAY:**  Thank you, Mr.

14    Chairman.  At the last hearing -- That was November

15    the 6th, 2002.  Inmate was granted, but the

16    Governor, on April 4th, 2003, reversed the grant

17    and with the following decision:

18                "According to the Probation Officer's

19                report, Tamron Carpenter and her

20                older sister were schedule to testify

21                in a criminal proceeding that William

22                Ruckert had sexually abused them.

23                Mr. Ruckert offered $10,000 to his

24                stepdaughter BranDee Tripp, her

25                husband Hilton, and her husband's

26                friend to kill the girls before they

27                could testify.  The originally agreed

1          to kidnap and murder Tamron's older
2          sister.  When that plan failed, they
3          plotted to kidnap the 10 year old
4          Tamron.  Ms. Tripp, age 20, was a
5          family friend of the young victim.
6          In fact, Mrs. Tripp was the only
7          person Tamron's mother trusted to
8          take Tamron places.  Ms. Tripp
9          arranged to take Tamron swimming on
10         July the 8th, 1979.  According to the
11         plans Tripp sent Tamron to the store
12         alone.  Mr. Tripp and his friend met
13         Tamron there, offering to give her a
14         ride back.  This provided them the
15         opportunity to kidnap Tamron, taking
16         her to the beach, where Mrs. Tripp
17         and her husband lived.  Ms. Tripp's
18         husband and his friend tied Tamron
19         up, dug a shallow grave, and then
20         strangled and buried her.  Ms. Tripp
21         pled to second degree murder on the
22         condition that she testify against
23         her stepfather, William Ruckert.  She
24         was sentenced to 15 years to live.
25         While incarcerated, Mrs. Tripp has
26         participated in many self-help and
27         therapy programs, including Alcohol

1    and Narcotic Anonymous, 12 Step
2    program, various psychotherapy
3    groups, anger management programs,
4    and Victim Awareness Programs.  She
5    has also been involved with a variety
6    of organizations and activities.  She
7    has completed her GED and taken some
8    additional classes.  All this is
9    commendable.  The crime she
10   facilitated, however, was
11   particularly heinous, the planned
12   killing of an innocent child to
13   prevent her from testifying against a
14   serial child abuser.  It was clear
15   that Tamron's mother was concerned
16   about her child's safety.  Mrs. Tripp
17   was the only person she trusted to
18   take care of Tamron.  Mrs. Tripp
19   abused the trust of not only Tamron's
20   mother, but also Tamron herself.
21   Mrs. Tripp arranged to send Tamron to
22   the store by herself for the very
23   purpose of facilitating the
24   kidnapping and subsequent murder.
25   Mrs. Tripp claims that she only
26   agreed to arrange for the kidnapping
27   on the condition that no one was to

32

```
 1        be hurt.  This is simply not credible
 2        and is inconsistent with the facts.
 3        Mrs. Tripp claimed she has accepted
 4        responsibility for the crime and
 5        realizes that her cooperation made
 6        the victim more accessible to being
 7        kidnapped and murdered.  I am not
 8        convinced, however, that Ms. Tripp is
 9        not trying to minimize her
10        culpability.  She says that the plan
11        had been to kidnap Tamron, collect
12        the money, and doublecross her
13        stepfather.  But she had to realize
14        that Mr. Ruckert would not agree to
15        pay anything while Tamron's sister
16        could still testify against him.
17        Furthermore, it is not credible that
18        she did not know that Tamron would be
19        killed.  Indeed, in her 1999
20        psychiatric evaluation, Mrs. Tripp
21        admits that she and her husband
22        discussed killing both Tamron and her
23        sister.  Moreover, Mrs. Tripp and her
24        husband lived in a tent.  Mrs. Tripp
25        had to know that they could not keep
26        Tamron hidden there very long.  The
27        planned kidnap and murder of a 10
```

1          year old child is atrocious in and of
2          itself, but Mrs. Tripp's motive is
3          especially heinous.  She aided in the
4          murder of profit to prevent the
5          victim from testifying and to allow a
6          serial child abuser to continue
7          abusing other innocent children.
8          These factors are far beyond the
9          minimum required to support a
10         conviction of second degree murder.
11         The Arroyo Grande Police Department
12         recommended against parole due to
13         Mrs. Tripp's active participation in
14         this heinous crime.  I agree.  The
15         calculated murder for hire,
16         demonstrating especially callous
17         disregard for human suffering,
18         indicates that Mrs. Tripp is not
19         suitable for parole at this time.
20         Additionally, I note that one factor
21         the Board relied upon in granting
22         parole was that Mrs. Tripp had no
23         juvenile record.  I question,
24         however, Mrs. Tripp's truthfulness
25         regarding her discussion of her
26         juvenile history.  During the
27         psychological evaluation in 1985,

1   1991, and 1993, she admitted to

2   having had behavior problems,

3   shoplifting, stealing cars, and

4   stealing from her parents. Yet at

5   the 2002 hearing, she indicates that

6   she had no prior criminal activities

7   before the murder. Mrs. Tripp has

8   demonstrated a very unstable

9   lifestyle. She was expelled from

10  school in the 10th grade. She is an

11  alcoholic and (inaudible) from

12  cocaine beginning as a teenager.

13  Prior to the murder, she was living

14  in a tent and stealing for food. In

15  prison, she accumulated 21

16  disciplinary reports, the most recent

17  in 1999. Over the years, psychiatric

18  evaluations have diagnosed her as

19  polysubstance dependent, having an

20  anti-social personality disorder, and

21  a quick and violent temper. Ms.

22  Tripp's role in this murder for hire

23  showed an exceptional callousness and

24  indifference to human life. In view

25  of her unstable history and

26  lifestyle, Mrs. Tripp must

27  demonstrate over a prolonged period

```
 1          that the gains she has begun to make
 2          in a controlled institutional setting
 3          can be maintained upon release.  I am
 4          also concerned that Mrs. Tripp lacks
 5          realistic parole plans.  She has a
 6          sparse employment history before
 7          incarceration and does not appear to
 8          have any credible employment
 9          prospects if paroled.  Instead, she
10          intends to rely on a trust fund and
11          live with her mother.  In this
12          unstructured environment, Mrs. Tripp
13          may lose the gains she has made in
14          prison.  Based upon each of the
15          negative factors discussed above, I
16          believe Mrs. Tripp still poses an
17          unreasonable risk of danger to
18          society if paroled at this time.
19          Accordingly, I reverse the Board of
20          Prison Terms' decision to parole Mrs.
21          Tripp."
22   Since her last hearing, she has remained
23   disciplinary free.  She has accumulated a total of
24   14 128s, the last being May the 27th, 1999 for
25   excessive property.  A total of 11 115s, the last
26   being March the 31st, 1988, Division F.  And since
27   the last hearing, she has continued to participate
```