1    in various self-help and voluntary activities.  She
2    completed the Inmate Assistance Module of Anger
3    Management, continued attendance and participation
4    as a member of AA, NA.  She also participated in
5    the SOS group crochet project from November the
6    15th, 2002 through May 1st, 2003, and the CIW mass
7    choir.  Then the assessment.  Mrs. Tripp last
8    appeared before the Board -- She has continued to
9    participate in self-help, voluntary activities, and
10   the assessment was a positive outlook for its
11   future parole possibility and is an asset to the
12   institution.  A summary by the Counselor, and that
13   is Pete Florence.  With consideration to the
14   commitment offense, prison adjustment, and personal
15   interaction with Mrs. Tripp, this writer believes
16   the prisoner would probably pose a medium to low
17   degree of threat to the public if released from
18   prison at this time.  The psychiatric report by Dr.
19   Hu dated January the 16th, 2004.  Axis I, no
20   diagnosis.  Axis II, no diagnosis.  The Doctor
21   concluded the inmate has not been dangerous within
22   a controlled setting.
23            "I do not believe that she will be
24            dangerous if released to the
25            community.  This is based on the
26            interview as well as review from her
27            Central File.  The first couple of

1    years of incarceration has been
2    difficult with numerous write-ups.
3    However, the inmate has been
4    motivated in her self-discovery and
5    has improved dramatically over the
6    years, to the point where she has
7    matured significantly.  The inmate
8    has gained a healthy respect for the
9    rights and privacy of others and
10    appeared to have followed diligently
11    in the rules and regulations here at
12    this institution.  The inmate has
13    been able to keep her pathological
14    characteristics in control and she
15    has also attained a certain level of
16    peace and contentment within herself.
17    Her parole plans, though a viable
18    one, may be better improved if
19    certain additional structures are
20    involved, such as a search for higher
21    education in a junior college, or
22    even a college degree.  Given her
23    level of high intellectual
24    functioning and, or the possibility
25    of a reentry program that can offer
26    her a better strategy of acclimation
27    back into society.  Risk factors, as

```
 1            always, would be if she ever
 2            attempted to resort to acts of
 3            criminality, though given her level
 4            of peace and contentment, I would not
 5            suspect that to be the case."
 6   With that, I will return to the Chair.
 7            PRESIDING COMMISSIONER RISEN:  Okay.
 8   Regarding your parole plans, I'm going to work from
 9   your attorney's brief.  It indicates that you've
10   been accepted by the Casa Solano, a residential
11   treatment facility in Grover Beach.  Is that
12   correct?
13            INMATE TRIPP:  Yes, Sir.
14            PRESIDING COMMISSIONER RISEN:  And that's
15   where you were raised, in Grover Beach?
16            INMATE TRIPP:  Yes, Sir.
17            PRESIDING COMMISSIONER RISEN:  Your mother
18   also lives near there.
19            INMATE TRIPP:  Yeah.
20            ATTORNEY WOODWARD:  And extensive family.
21            PRESIDING COMMISSIONER RISEN:  Yeah.  Also,
22   they provide transportation.  Says here, the
23   residents providing transportation, teaching
24   residents necessary life skills.  Have you ever had
25   a driver's license?
26            INMATE TRIPP:  Yeah.  I had a driver's
27   license before I got arrested.
```

1          **PRESIDING COMMISSIONER RISEN:**   Okay.

2          **INMATE TRIPP:**   Expired.

3          **PRESIDING COMMISSIONER RISEN:**   Now, also in

4    reading the psych evaluation, there it indicated

5    you were probably going to live with your mother.

6    That's not the case now.

7          **INMATE TRIPP:**   No.   When he did my psych

8    evaluation, that was in January.   And between

9    January and March, I was on the calendar for March

10   31st.   They removed me and put me on May 17th.

11   After my meeting with him, he had talked to me for

12   a minute and he said, well, I think your parole

13   plan is viable, but I think you'd do better.   And I

14   listened and as soon as I walked out the building,

15   I proceeded to try to do what he felt would be

16   better also.

17         **PRESIDING COMMISSIONER RISEN:**   A little more

18   structured setting, I think.

19         **INMATE TRIPP:**   Yeah.

20         **PRESIDING COMMISSIONER RISEN:**   And there is

21   a letter in the file dated March 4th, 2004 from

22   Sister Mary Sheen Hodges, H-O-D-G-E-S, at the Casa

23   Solano in Grover Beach, California, accepting you

24   into the program.   Now, for work, you've already

25   found a job for release.   There's a letter here

26   from Cheryl Langford Bookkeeping and Tax Services

27   in Pismo Beach, which is nearby.   But you're going

1    to have to have some transportation to get there.

2    Offering you a job.  She says, both of my

3    businesses have the capability of ensuring a job

4    for BranDee when she is released.  I understand

5    that from BranDee's mom that BranDee has acquired a

6    broad knowledge of many different skills and I am

7    sure I can put her to work.  Do you know Cheryl

8    Langford or is it someone in your family?

9        **INMATE TRIPP:**  Not personally.  My mother

10   knows her.

11       **PRESIDING COMMISSIONER RISEN:**  Okay.  And

12   what is your knowledge as to what you plan to do

13   there in the way of work?

14       **INMATE TRIPP:**  Pretty much anything she

15   wants me to do.  I do have good clerical skills.  I

16   do know how to operate computers from in here.

17       **DEPUTY COMMISSIONER MAY:**  You do know how to

18   operate computers?  You're familiar with a word

19   processor?

20       **INMATE TRIPP:**  Yeah.  I do have a word

21   processor in my present job right now.  So, I mean,

22   I could type.  I did take a bookkeeping class about

23   probably 17, 18 years ago.  But I'm sure that if

24   she sat down with me and helped refresh my memory,

25   I would -- I'm a very quick learner, so I don't

26   really see the problem as being able to do what she

27   would like me to do for --

1          [Thereupon, the tape was turned over.]

2          **DEPUTY COMMISSIONER MAY:**  Okay.

3          **PRESIDING COMMISSIONER RISEN:**  Okay, there

4    is also some indication here that you will receive

5    a monthly income from a family trust.  Who set the

6    trust up for you?

7          **INMATE TRIPP:**  My grandmother.

8          **PRESIDING COMMISSIONER RISEN:**  Okay, and you

9    have any idea of what the monthly lump would be for

10   you?

11         **INMATE TRIPP:**  My mother's attorney had said

12   it would be, like, $1,000.

13         **ATTORNEY WOODWARD:**  She has current access

14   to 1,000, so minimum of 1,000.  It may approach

15   $1,500.

16         **PRESIDING COMMISSIONER RISEN:**  Okay.  And

17   you also have indicated in here that you want to

18   attend some computer courses and continue in self-

19   help.  How do you plan to remain substance free

20   once you're out of here?

21         **INMATE TRIPP:**  Well, once I complete the

22   recovery program, then I'll continue to go to my

23   meetings and stuff.  I've been writing Mr. Golodner

24   for about the last five, six, seven years.  And

25   I've never personally met him, but he's familiar

26   with me through my letters for my counseling.

27   Because I believe that integration isn't going to

1    be really simple.  I believe that you need help and

2    keeping yourself in a positive atmosphere is really

3    beneficial for you and -- So I'll keep going

4    because the meetings presently right now -- The

5    home meetings are -- They're only, like,

6    approximately maybe three or four blocks from my

7    house.  And I tried to find things that would be

8    within walking distance because I know getting a

9    driver's license isn't as easy as it was.  You have

10   to have insurance.  You have to have a car and you

11   have to have a lot of things in order just to be

12   able to drive.  So as long as I can get to the area

13   on a bicycle and a helmet -- Because I know they

14   have a helmet law now.  -- that I, you know, I can

15   keep myself in my program.  So I tried to make my

16   arrangements close to where I would be.  And with

17   Golodner, he's in Santa Maria, but I know my mom

18   would make sure that I got to my appointments.  My

19   mom and my dad, if I can't have a driver's license

20   at the time.

21          PRESIDING COMMISSIONER RISEN:  Okay, you're

22   referring to Charles Golodner.

23          INMATE TRIPP:  Golodner.  Yeah.

24          PRESIDING COMMISSIONER RISEN:  G-O-L-O-D-N-

25   E-R.  It's a counseling group on Willow Street in

26   Santa Maria.  There's a letter here, 9/5 of 2003

27   from him, indicating that he would meet with you as

1    a counselor once you're released.  Now there's a

2    letter here from Help?  Eldrit?  What is in

3    (inaudible)?

4         **INMATE TRIPP:**  Yeah.  She was at (inaudible)

5    -- Well, what it was was I had written her husband,

6    right.  Her husband, he had recently passed on and

7    he was into the job training partnership back in

8    the EED program.

9         **PRESIDING COMMISSIONER RISEN:**  Okay.

10        **INMATE TRIPP:**  And so she was writing me to

11   let me know that he had passed on and was no longer

12   in that.  It was just giving me other outlets.  And

13   you can look here, and you can look here, because

14   I'm under the understanding that the EED Employment

15   Agency has specific programs that are for ex-

16   felons.  That they do help ex-felons.  Yes, Sir.

17        **PRESIDING COMMISSIONER RISEN:**  The crime was

18   committed in Grover Beach, well, Avila Beach.  In

19   that area.

20        **INMATE TRIPP:**  Yeah, in San Luis Obispo.

21        **PRESIDING COMMISSIONER RISEN:**  Is this going

22   to be a problem, you paroling back to that area?

23        **INMATE TRIPP:**  No.  In the beginning, I

24   thought it would because I figured that it would be

25   very hard to find work and I had started looking

26   outside where I did have family, but in other

27   areas.  But when the program accepted me and my

```
 1   mom's tax lady said, okay, I'll hire her.  And I
 2   thought, well, I can get a job and those people
 3   will accept me.  I thought maybe it would be all
 4   right.  From what my mom tells me, I don't know
 5   personally, no, but I know that Ruckert's family,
 6   they just moved.  So they no longer live there.
 7   And if they still lived there, I don't think I'd
 8   feel comfortable being there.  Or for them or
 9   myself, because, you know, they tried real hard to
10   move on with their life, I'm assuming.  You know,
11   they've left that behind and tried to move on and
12   to see my face every day around the corner, that
13   would be, you know.  That's just not right to do,
14   and I would work on finding something out of that
15   community.  But I don't feel that they live there
16   anymore.
17            PRESIDING COMMISSIONER RISEN:  Okay, Vivia?
18   Vivian, is it?  Vienna, is it?
19            INMATE TRIPP:  Venna.
20            PRESIDING COMMISSIONER RISEN:  Venna Jenkins
21   is your daughter.
22            INMATE TRIPP:  Yeah.  She was my --
23            PRESIDING COMMISSIONER RISEN:  And there's a
24   letter here dated 5/11/2004.  She lives with your
25   mother.
26            INMATE TRIPP:  Yes, Sir.
27            PRESIDING COMMISSIONER RISEN:  And this is
```

1    the daughter your mother adopted.

2            **INMATE TRIPP:**  Yes, Sir.

3            **PRESIDING COMMISSIONER RISEN:**  Okay.  And

4    there's a letter of support from her here.  And

5    there's also a letter from your mother, Mary

6    Jenkins.

7            **INMATE TRIPP:**  Yes, Sir.

8            **PRESIDING COMMISSIONER RISEN:**  Dated May

9    11th, 2004.  It's a letter of support.  She also

10   lists one, two, six, six names for the relatives

11   who live in that area.  Santa Maria, Clovis,

12   Nipomo, Santa Maria, Grover Beach.  They're also

13   supporting you in your release.  Is there anything

14   else we should know about your parole plans?

15           **INMATE TRIPP:**  Once I complete the program,

16   I know the program (inaudible).  It's a three and

17   six month program, and they have two separate

18   houses, from what my daughter told me.

19           **PRESIDING COMMISSIONER RISEN:**  Okay.  And

20   now, as part of the hearing process, we sent out

21   3042 notices.  Those are notices that go to the

22   presiding judge, District Attorney, the Police

23   Department, and solicit comments from them

24   *regarding* your release.  Only response we received

25   was from the Arroyo Grande Police Department.

26   Received a letter May 6, 2004 from Steven Andrews,

27   Operational Commander of the Police Department.

1  And they would be opposed to your parole.  We

2  received no other responses for two of those

3  letters.  We'll go to the next phase.  Any

4  questions?

5      **DEPUTY COMMISSIONER MAY:**  No.  Just for the

6  record, though, you've completed vocation forklift

7  operator and vocational word processing.  Is that

8  it or was there any other vocational?

9      **INMATE TRIPP:**  No.  I completed vocational

10  word processing and then I focused my jobs around

11  utilizing my vocation.

12      **DEPUTY COMMISSIONER MAY:**  Just those are the

13  two, right?

14      **INMATE TRIPP:**  Yeah.  The forklift was on

15  the side kind of thing.

16      **DEPUTY COMMISSIONER MAY:**  Yeah.  Okay.  Now,

17  as far as the different therapy groups, you were in

18  Breaking Barriers, Relapse Prevention, HIV AIDS

19  Education Prevention Program, Mexican-American

20  Resource Association, Arts and Crafts, Correction

21  Music Program, American Bible Academy Study Course.

22  Was there any other or is that it?  But did I cover

23  everything?

24      **INMATE TRIPP:**  I did for -- I'm trying to

25  think.  I think it was (inaudible).

26      **DEPUTY COMMISSIONER MAY:**  What about AA, NA?

27      **INMATE TRIPP:**  I've been in AA, NA since

```
1    1988.

2           DEPUTY COMMISSIONER MAY:  Are you in that

3    now?

4           INMATE TRIPP:  Yes.

5           DEPUTY COMMISSIONER MAY:  Did I cover

6    everything?

7           INMATE TRIPP:  And I also did -- I had an

8    incest therapy group.

9           DEPUTY COMMISSIONER MAY:  Incest?

10          INMATE TRIPP:  Yeah, it was for incest

11   survivors.  And then I had --

12          DEPUTY COMMISSIONER MAY:  Yeah.  Women

13   Against Abuse.  The domestic violence.

14          INMATE TRIPP:  Yeah, by Linda Hayes.

15          DEPUTY COMMISSIONER MAY:  Yeah.  That's

16   domestic violence.

17          INMATE TRIPP:  Okay.  Okay.

18          PRESIDING COMMISSIONER RISEN:  I believe the

19   file contains a -- from the last Board, some

20   recommendations from Ms. Hayes as to her counseling

21   therapy as a result of the sexual relationship that

22   she suffered (inaudible).

23          DEPUTY COMMISSIONER MAY:  So does that cover

24   everything that you've done in the institution?

25          INMATE TRIPP:  Besides volunteering my time

26   (inaudible).

27          DEPUTY COMMISSIONER MAY:  Yeah, I mean --
```

1    **INMATE TRIPP:** I mean, because I did

2    volunteer for things. I mean, I teach line

3    dancing.

4    **DEPUTY COMMISSIONER MAY:** Okay.

5    **INMATE TRIPP:** And we'd volunteer. When

6    they'd have little shows, we'd volunteer to go in

7    front of all those people.

8    **DEPUTY COMMISSIONER MAY:** Okay. All right.

9    Thank you. That's it. Return to the Chair.

10    **PRESIDING COMMISSIONER RISEN:** All right.

11    Couple of questions. In the Governor's letter we

12    talked a little bit about -- It says in 2002, you

13    indicated that you had no prior criminal activity

14    before the murder. Then he refers back to the '85,

15    '91, and '93 psych reports where you talked about

16    stealing cars and stealing from your parents and

17    shoplifting. You were never arrested on any of

18    those charges?

19    **INMATE TRIPP:** The only thing that ever

20    happened to me was I was picked up in Utah when I

21    ran away. And I had a stolen car, but they never

22    filed on me, but they picked me up in Utah. I

23    stayed in juvenile hall and got shipped back down

24    to my mom. But I wasn't put under arrest for it.

25    It was because I was out of state when they picked

26    me up.

27    **ATTORNEY WOODWARD:** And I believe that the

1    -- I was present at that hearing. -- that the
2    statement by Ms. Tripp where she had no past
3    criminal record.  I don't think she made any
4    assertions as to any other activity.

5        **PRESIDING COMMISSIONER RISEN**:  Okay.  Says
6    in the 1999 psychiatric evaluation, Ms. Tripp
7    admits that she and her husband discussed both
8    Tamron and her sister.  Moreover, Ms. Tripp and her
9    husband looked at, you know -- He says, it is not
10   credible that she did not know that Tamron would be
11   killed because you had discussed her being killed
12   with your husband prior to this.

13       **INMATE TRIPP**:  I was part of -- I can't take
14   myself out of the conversation.  I was there when
15   -- All four of us were actually there when the
16   conversations were taking place.  I didn't help the
17   matters.  I know today that I probably helped them
18   more than I really liked to.  I didn't help stop
19   the matters and it was a discussion that I was on
20   the side of no, let's not do it that way.  No,
21   let's not do it that way.  Let's try to do it this
22   way.  And I guess that's why I ended up being
23   considered the person in charge.  Pretty much, they
24   think I was the overseer of the whole thing and
25   there was really nothing I could do about that.
26   Because that's how they see that, but I was always
27   trying to run interference.  And then when he

1    promised me that they wouldn't hurt her, then I

2    became more willing to go along with it because I

3    didn't know that (inaudible).  And then I became

4    afraid to act on it.  I was too afraid to do

5    anything.  I didn't really want to believe that my

6    husband would kill anyone anyway, because they

7    didn't do anything with Betty Ann.  They were

8    supposed to do everything and they didn't do

9    anything.  So in the back of my mind, I guess I

10    just thought, well, you know, they couldn't do

11    that.  They couldn't even just throw her in the

12    trunk.  You know, they're not going to do anything.

13    He promised me he's going to do that and I just

14    talked myself into believing that he wouldn't kill

15    anyone, which blinded me about any results other

16    than what it was supposed to be like.  That's how

17    it was supposed to be.  He said it was going to

18    happen that way.  I believed him, and I didn't want

19    to believe anything else until I got older and

20    realized that this was the first time they ever

21    asked me to go along.  What did you think, because

22    they had asked me before what did I think my dad

23    was going to do if we didn't produce positive proof

24    that they did what they said they were going to do.

25    Well, I never thought of that.  I didn't think

26    beyond just making him believe that taking his

27    money, letting her go.  I thought that was the

1    reality.  I thought that could really happen at the
2    time.  And I know that could never happen.  I mean,
3    because of me, I know she is dead because her
4    family wouldn't have -- I don't know if Tammy
5    would have gotten in the car with them if I hadn't
6    of been a part of it in the beginning because
7    that's not what happened.  But I know it helped her
8    to get in the car because she knew they were taking
9    her back.  (inaudible) going to the beach, so she
10   (inaudible) okay, let's go.  And I put that thought
11   in her mind, so it's just as much my fault as it
12   probably was to pull the rope (inaudible).

13        **PRESIDING COMMISSIONER RISEN:**  Okay.  I have
14   no other questions.  Do you have any questions of
15   your client?

16        **ATTORNEY WOODWARD:**  Yes.  We touched briefly
17   on it.  I want to make sure that we understand.
18   You indicated that from age seven for approximately
19   seven, eight, nine, 10 years, you were molested by
20   your stepfather.  Is that a true statement?

21        **INMATE TRIPP:**  Yeah.  I would say it was
22   mostly from seven to about 14.  Fifteen, 14 years
23   old and then it started to become, well, if you do
24   this, I'll get you this.  If you do this, then I'll
25   get you that type of thing.  So it was a money
26   deal.  And when I was young, early in the time, I
27   used to call -- I thought it was blackmail.  I

52

1    didn't really know the concept of blackmail at the

2    time when I said it and it was more of a

3    prostitution thing.  I classify it as prostituting

4    because if I gave him sex, he would give me money

5    or he'd buy me something or we'd, like, go

6    somewhere.  And that was the way that I got things

7    that I wanted was to pay for it with my body,

8    actually.

9        **ATTORNEY WOODWARD:**  That was after seven

10   years of non-consensual sex.

11       **INMATE TRIPP:**  Yeah.  I don't remember it

12   being consensual until after I was 17 and I figured

13   out that's how I could get my way.  That's how I

14   could get things.  Daddy will give them to me.

15       **ATTORNEY WOODWARD:**  Mr. May indicated that

16   you were disciplinary free since 1988, with the

17   exception of a 115 in 1999.

18       **INMATE TRIPP:**  No, 128.

19       **ATTORNEY WOODWARD:**  128, sorry, in 1999.

20   And that 128, I understand, was for -- You'd kept

21   some clothing (inaudible).

22       **INMATE TRIPP:**  No, I had a extra laundry

23   bag.

24       **ATTORNEY WOODWARD:**  You had an extra laundry

25   bag.  Other than that issue, you've been

26   disciplinary free since 1988.

27       **INMATE TRIPP:**  And there was a '95 one for

1   logbook.  My sponsor had given me a logbook that
2   was empty, so I could use as a clipboard.  And the
3   warden took it in room searches and said it was
4   contraband.  My boss said it would be contraband
5   only if the pages were written on, so she ripped
6   the pages out.  It was still contraband, so.

7          **ATTORNEY WOODWARD:**  If you were given a
8   parole date, you are comfortable with the
9   transition going to the Casa Solano?

10         **INMATE TRIPP:**  Yes.  I'm real comfortable
11   with that because that puts me in an area to help
12   adjust around people that are really familiar with
13   the adjusting period.  Because I've never paroled.
14   You know, I just hear stories about it from people
15   that come in and out and it's just -- To me, it
16   feels better to be in an environment of people that
17   are going to understand that you're going to have a
18   lot of questions.  Learning how to work a CDC
19   player was really a big deal for me.  And the
20   microwave.  That was something I was like, oh, god.
21   And I realize -- It made me realize that the world
22   has changed out there since I've been out there,
23   and it's not the same.  When I was out there, they
24   had eight track tapes and those I don't think exist
25   anymore, so.  So things have changed and it's good
26   to have people that are familiar and comfortable
27   around inmates.  I was mostly concerned about my

54

1  mom, you know.  Putting the burden of adjusting on
2  her, because she's never had an ex-con in her house
3  that she knew of.  Because she never knew about
4  Ruckert until it was too late.  So she's never been
5  through the parole procedures and parole plans and,
6  you know, and having a parole officer and all that.
7  And I told her, well, you know, there's a lot of
8  things I can't do, Mom, but it's okay.  You know,
9  at least we get to see each other.  That'll be okay
10  with me.  If I have to stay home all the time,
11  that's fine with me.
12       PRESIDING COMMISSIONER RISEN:  Your being
13  there.
14       INMATE TRIPP:  So I can work there because
15  then I'll be able to adjust.  It'll be easier for
16  me and my mom.  Then I can help my mom with her
17  adjustment, too.
18       PRESIDING COMMISSIONER RISEN:  And you did
19  testify against Mr. Ruckert at his trial?
20       INMATE TRIPP:  Yes, I did.
21       PRESIDING COMMISSIONER RISEN:  And you've
22  been here almost 25 years?
23       INMATE TRIPP:  Twenty-five years in July.
24       PRESIDING COMMISSIONER RISEN:  And when you
25  testified against Mr. Ruckert, you entered into a
26  plea negotiation with the District Attorney's
27  office?

1        **INMATE TRIPP:** Yes, I did.

2        **PRESIDING COMMISSIONER RISEN:** Did you

3    understand in the plea negotiation that you were to

4    serve 15 years to life?

5        **INMATE TRIPP:** Yes. Someone in that area,

6    but I'm not sure if it was ever on record, he told

7    me I'd only do ten years. But I just figured that

8    until it's (inaudible) formal, I guess that's how

9    long it's supposed to be. And just trying to do

10   the best I can while I'm here.

11       **PRESIDING COMMISSIONER RISEN:** So you

12   honestly think you've had time to reflect on your

13   actions and what you did? Your participation in

14   this crime? Do you believe you pose a risk to

15   society? That you (inaudible) any kind of a

16   criminal act that would pose a danger to society?

17       **INMATE TRIPP:** I don't think I have the

18   capabilities of becoming a risk anymore, creating a

19   danger. Because I've learned to become very law-

20   abiding. Even in prison. I'm very rule-bound and

21   you don't break the rules. They don't allow you to

22   smoke. You go outside and (inaudible). Little

23   things that people take advantage of every day that

24   they don't think twice of that are big rules for us

25   in here. And can do just as much damage in

26   (inaudible) and you're here for a reason. And I

27   understand that and I don't think any -- I've

56

1  worked for years putting myself in a place where no
2  one can twist me or manipulate me into
3  participating in anything that's against the law,
4  period, any way. But especially (inaudible) After
5  years, I know the difference between right and
6  wrong. And I wouldn't have any problem standing up
7  and telling. I could pick up the phone or stay on
8  the line and turn someone in today. Because it's
9  not right.
10      **ATTORNEY WOODWARD:** I have no further
11  questions.
12      **PRESIDING COMMISSIONER RISEN:** I have a
13  couple. Where is Mr. Ruckert?
14      **INMATE TRIPP:** I think he passed away in
15  1985.
16      **PRESIDING COMMISSIONER RISEN:** (Inaudible.)
17      **INMATE TRIPP:** And I don't know what
18  institution he was in.
19      **PRESIDING COMMISSIONER RISEN:** They're still
20  in as far as you --
21      **INMATE TRIPP:** As far as I know.
22      **PRESIDING COMMISSIONER RISEN:** And Randy
23  Cook?
24      **INMATE TRIPP:** And he's still in also as far
25  as I know.
26      **ATTORNEY WOODWARD:** But they have a first
27  degree conviction (inaudible).

57

1        **PRESIDING COMMISSIONER RISEN:** Now, when

2    Ruckert was molesting you, did you ever think about

3    telling your mom?

4        **INMATE TRIPP:** I did think about telling my

5    mom. I think because of my mom's (inaudible)

6    divorce with my original dad and the remarried

7    thing, it was real important for me as a child to

8    have a full family. Because kids would make fun of

9    me anyway and I can't really remember why. I just

10   know they used to make fun of me. When I was in

11   school, I wasn't quite built like everybody or

12   something. And so he used to tell me that if I

13   told my mom, you know, she'll make me leave and you

14   won't have a daddy and people aren't going to like

15   you. And when I was little, having friends was

16   really important to me. And well, now I'm older, I

17   don't know why that was so important because I

18   couldn't invite them over because one time I tried,

19   my stepdad really did try to touch one of my

20   friends and I didn't do anything about it. I was

21   younger then. I was probably only around 12 or

22   something. But I never asked anybody over to my

23   house again because now I had to protect them from

24   him also.

25       **PRESIDING COMMISSIONER RISEN:** Okay. You

26   know, you indicated in -- Not today, but I read it

27   here. In the first nine years, you felt that you

58

1    really hadn't done too much.  What was it that made
2    you realize that you were more involved in the
3    crime and responsible than you were the first nine
4    years?  What changed your mind?

5         **INMATE TRIPP:**  Actually, what really started
6    making me think about it was -- It was a
7    combination.  When I started going to AA and NA and
8    started doing 12 Steps.  Twelve Steps were very big
9    for me.  And at the same time, I was doing my
10   Incest Survivor's Group and realized where it came
11   from.  But I would have to say more of my AA.  My
12   AA and my honesty in accepting responsibility
13   because there's nothing I -- I can't do anything to
14   change it.  And my biggest motivation, actually,
15   was Tammy.  Because it was, like, well, she's gone
16   now.  And I can't do nothing, but I can make sure I
17   never let anyone (inaudible) sister again.  It kind
18   of motivated me to find out why.  And as I was
19   doing my programming, the honesty thing kicked in,
20   everything was starting to say, well, okay, you
21   were a little more -- Because I used to get an
22   attitude when they tried to throw it all off on me
23   and I didn't understand why.  And I thought well,
24   if it wasn't for me, she probably wouldn't have
25   been at the store.  And if she wasn't at the store,
26   they probably wouldn't have picked her up, so yeah,
27   you're responsible.  You did that and then I had to

1  deal with that.  And then I had to learn how to

2  kind of try to forgive myself.  And the only way I

3  can do that is by working my program and helping

4  people.  That's why I really like the SOS program.

5  Because we give all those things either to the

6  elderly veterans or the homeless children.

7  **PRESIDING COMMISSIONER RISEN:**  Okay.  What

8  does SOS stand for?

9  **INMATE TRIPP:**  Sharing Our Stitches.  My

10  program I'm involved in is the crochet program.  So

11  we crochet little hats and sweaters and blankets

12  and booties.  And our sponsor takes them to the

13  homeless shelter places for the kids.  And so, I

14  focus my area around helping kids and helping other

15  people so they don't have to go through this.

16  **PRESIDING COMMISSIONER RISEN:**  Any

17  questions?

18  **ATTORNEY WOODWARD:**  Closing statement, but I

19  (inaudible).

20  **PRESIDING COMMISSIONER RISEN:**  Okay.  Okay.

21  We'll go to closing then.

22  **ATTORNEY WOODWARD:**  Initially, I want to

23  point out to the Board, if I may, the same

24  Probation Report that Governor Davis drew most of

25  his information in rejecting the last parole date

26  that was issued last parole Board.  There's a

27  paragraph in there by the author that indicates

```
 1    that that author in 1979 agreed with Ms. Tripp in
 2    that she said -- And you can read the words
 3    yourself.  Quote, I believe that she's being
 4    truthful in her words, unquote.  The relevance of
 5    that is that while Ms. Tripp is understood her
 6    complicity in the conspiracy and understood that
 7    complicity that ultimately led to the death of a
 8    child -- that it does drive home the persistent
 9    adamance that she believed, whether it was founded
10    in reality or not, that she was a participant in a
11    kidnapping and not a murder.  It is also relevant
12    to understand that most of us sitting here could
13    not fathom, as you raised, Mr. Risen, is why
14    couldn't you project down the road that your
15    actions would have created these reactions.  Is
16    that it's relevant to understand that we come from
17    a position not helping sexual abuse.  It does
18    change your personality.  It does impact your
19    ability to reason.  And I would ask that when you
20    look at the egregiousness of the crime, that we
21    understand that we have to place ourselves in that
22    capacity and not the capacity we sit in here today.
23    Her remorse is documented and unfaltering in the
24    last 14 years.  She understands, agrees, and has to
25    deal with, her complicity in the crime.  The issue
26    is whether in fact she poses an unreasonable risk
27    to society if she is released.  Whether, in fact if
```

```
 1    she is released, that her employment or future
 2    prospective plans are realistic.  She has served 24
 3    years, 10 months for her participation in this
 4    crime.  Following case law, if you compare it to
 5    the egregiousness of the crime to similarly
 6    situated people, many of those same people cited in
 7    case law, specifically Danberg and Rosenberg --
 8    Excuse me, Ramirez. -- were committed for longer
 9    periods, did less time than if they had committed a
10    more egregious act.  The matrix for an egregious
11    act of this type, if you assume all things to be
12    true, even in Governor Davis's letter, the matrix
13    is 21 years.  She has done just about 25 years.  If
14    you take her combined time, her prior incestual
15    issues, her remorse, her realistic post-parole
16    plans and you combine that with 13 subsequent psych
17    reports issued from this institution indicating she
18    would not pose an unreasonable risk to society --
19    Thirteen years.  In fact, the first one was 18
20    years ago.  The last 13 psych report have parroted
21    the same words: She would not pose an unreasonable
22    risk to society.  In light of the consideration
23    given to her time spent, her plans after she leaves
24    here, her remorse, her participation in the act
25    itself.  At some point we have to ask ourselves has
26    she paid her debt.  If she has paid her debt, if
27    she doesn't pose an unreasonable risk, and she has
```

1    realistic parole plans, then it is the right thing
2    to parole and give her a release date.  It is the
3    absolute correct thing to do.  It is time to do it.
4    This Board at the last meeting, I believe saw an
5    opportunity for an individual to become a
6    constructive member of society.  Unfortunately,
7    this present administration, then-present
8    administration, did not.  Nothing has changed since
9    then other than her continued good participation in
10   this institution.  I ask you to look at all of the
11   honest considerations given to her parole date and
12   issue a parole release date  for Ms. Tripp.

13       **PRESIDING COMMISSIONER RISEN:**  Thank you.
14   Ms. Tripp, it's now your opportunity to tell the
15   Board why you're suitable for parole or you can
16   rely on your attorney's statement.

17       **INMATE TRIPP:**  I personally feel that I've
18   done a lot of time.  I feel that I've learned what
19   I was supposed to learn in here.  That I've grown
20   how I was supposed to grow in here.  And that I
21   actually have morals and principles in my life and
22   that I have a foundation and will stand on it.  I
23   couldn't tell people no.  I couldn't differ from
24   right or wrong and not go along with it.  I had to
25   fit in and today, I don't have to go against the
26   grain and I don't have to go against the rules and
27   regulations to fit in.  Because I know I'm okay

1   today being who I am and just being who I am and
2   not having to prove anything to anybody else
3   because who I am is going to show by itself anyway.
4   I think that if the Board finds me suitable and,
5   Lord willing, the Governor decides to agree with
6   the Board this year -- If you find me suitable,
7   that I would be a very productive part of society.
8   I have very good work ethics which I had to learn
9   in there.  I think if I had to praise my own self,
10  the work ethics are very -- That would be my high
11  points because I really enjoy keeping a job and
12  working in a job and doing my best and realizing
13  that anything that you do in life reflects who you
14  are.  So everything I do, I try to do to the best
15  of my ability and the qualities that I have in here
16  that's been given to me and taught to me.  And I
17  feel that I would be very -- I would make the Board
18  proud and my attorney proud and the institution
19  real proud when I never came back here again.  And
20  I would be able to fit into society because I think
21  my qualities and my job skills would fit out there
22  once I got a driver's license.  Of course, since I
23  can't drive or anything until I can, but -- And
24  then one of my biggest things that I was thinking
25  about the other day is that -- Because I don't know
26  where they put Tammy when they buried her in that
27  sewer, she's (inaudible).  But if she's in the

1    area, I think, I thought one of my biggest things

2    that I would probably do for her is just, you know.

3    Because I know that I've never had anyone pass away

4    before, that I had to take care of their little

5    area that I know you have to take care of it.  And

6    that is one of the things that I'd like to do for

7    her is take care of her little area.  And make her

8    little bed nice.  And I'm just (inaudible).

9         **PRESIDING COMMISSIONER RISEN:**  Okay.  We'll

10   recess -- It is 3:30 -- for deliberations.  We'll

11   call you back in a few minutes.

12                    **R E C E S S**

13                    --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

1        **CALIFORNIA BOARD OF PRISON TERMS**

2                **D E C I S I O N**

3        **DEPUTY COMMISSIONER MAY:**  We're on record.

4        **PRESIDING COMMISSIONER RISEN:**  Okay.  Everyone

5    who was previously in the room has returned.  The

6    time is 4:00.  The Panel reviewed all information

7    received from the Public and relied on the

8    following circumstances in concluding that the

9    prisoner is suitable for parole and would not pose

10   an unreasonable risk of danger to society or a

11   threat to public safety if released from prison.

12   The prisoner, while imprisoned, has enhanced her

13   ability to function within the law upon release

14   through participation in educational programs.  She

15   has obtained a GED, vocational programs.  She has

16   obtained a vocational certificate in forklift

17   operation and also in vocational word processing.

18   She's also, through self-help, taken the following:

19   She's been in AA and NA since 1998.  What did I

20   say?

21        **DEPUTY COMMISSIONER MAY:**  1988.

22        **PRESIDING COMMISSIONER RISEN:**  1988.  She's

23   been in the SOS program.  She's taken the Womens

24   Against Abuse program, the American Bible Academy,

25   Arts and Correctional Music Program, the Relapse

26   Prevention program, the HIV AIDS Prevention

27   **BRANDEE TRIPP   W-15695   DECISION PAGE 1  5/17/04**

1    Program, and Breaking Barriers.  Her institutional

2    job assignment is in the PIA working as a label

3    mechanic operator since 2000, and she has received

4    satisfactory work reports in that assignment.  The

5    prisoner lacks a significant criminal history of

6    violent crime.  Because of maturation, growth,

7    greater understanding, and advanced age has reduced

8    the probability of her recidivism.  The prisoner

9    has realistic parole plans, which includes a job

10   offer and family support.  Would say that I would

11   rate the parole plans as superior.  She has a place

12   to live at the Casa Solano, which is in Grover

13   Beach.  It is part of the Archdiocese of Los

14   Angeles.  She also has a job offer from Cheryl

15   Langford, who has a bookkeeping and tax service.

16   In fact, she has two of them in the Pismo Beach

17   area.  The prisoner has maintained close family

18   ties while in prison by letters and visits.  And

19   today, we have a letter, from her mother, of

20   support listing six relatives in the Grover Beach,

21   Santa Maria, Nipomo, Clovis area that support her

22   release and are willing to help her in any way they

23   can when she is released.  Prisoner has maintained

24   a positive institutional behavior, which indicates

25   significant improvement in self-control.  She has

26   had no 115s since 1988.  Her last 115 was failure

27   **BRANDEE TRIPP   W-15695   DECISION PAGE 2   5/17/04**

1   to report to a work assignment.  She also has had a
2   few 128As.  The last was in 1999 for excessive
3   clothing.  And prior to that, was three years,
4   misuse of state property.  And then the last was in
5   1988 prior to that.  So we feel that she has a good
6   disciplinary record while in custody.  Prisoner
7   shows signs of remorse.  She has indicated that she
8   understands the nature and the magnitude of the
9   offense and accepts responsibility for her criminal
10  behavior and has a desire to change towards good
11  citizenship.  The psychological factors -- The most
12  recent psychological report, authored by Peter Hu,
13  H-U. Mr. Hu is a staff psychologist and is
14  reporting through January 16th, 2004.  It is
15  favorable.  He states,

16          "The inmate has not been dangerous
17          within a controlled setting, and I do
18          not believe that she will be
19          dangerous if released to the
20          community.  The inmate has gained a
21          healthier respect for the rights and
22          privacy of others and appears to have
23          followed diligently in the rules and
24          regulations here at the institution.
25          The inmate has been able to keep her
26          pathological characteristics in
27  **BRANDEE TRIPP    W-15695    DECISION PAGE 3  5/17/04**

```
 1          control and she has obtained a
 2          certain level of peace and
 3          contentment with herself.  Risk
 4          factor, as always, would be if she
 5          ever attempted to resort to acts of
 6          criminality, though given her peace
 7          and contentment, I do not suspect
 8          that to be the case."
 9   The psych evaluation prior to that was prepared on
10   9/10 of '99 by Robert D. McDaniels, who's also a
11   staff psychiatrist.  It is favorable.  He states,
12          "The inmate has not been dangerous
13          within a controlled setting.  I do
14          not believe she would be dangerous if
15          released to the community.  Her
16          orientation was obviously changed
17          over many years, as reflected by a
18          good work ethic and her involvement
19          within the institution.  A
20          significant risk factor, as always,
21          would be appropriate parole plans.
22          However, these have been deemed
23          viable in the past."
24   We would comment that the Panel feels her parole
25   plans are superior.  Base term of confinement.  The
26   base of life offense for which the prisoner has
27   BRANDEE TRIPP   W-15695   DECISION PAGE 4  5/17/04
```

1    been convicted is murder second, 187 of the Penal

2    Code.   The offense occurred on 7/8 of '79.   The

3    term is derived from the matrix located in the CC

4    and R Title XV at 2403 parentheses C, second degree

5    murder, offense committed on or after 11/8 of '78.

6    The Panel finds that Category A2 is appropriate in

7    that the crime partners were actually the one who

8    committed the homicide or murder and the prisoner

9    had a relationship with the victim.   It was that of

10   a friend.   The Panel assess 204 months for the base

11   offense and notes that this is the midterm.   So the

12   base term of confinement is 204 months.   The total

13   period of confinement is 204 months.   Post-

14   conviction credits from February 18th, 1981 until

15   today's date, 5/17 of 2004, is 73 months.   Total

16   period of confinement -- That would be minus the

17   post-conviction credits.   Total period of

18   confinement is 131 months.   Special conditions of

19   parole.   The following special conditions of parole

20   are imposed: Do not use alcoholic beverages.

21   Submit to alcohol testing.   Submit to anti-narcotic

22   testing.   Submit to THC testing.   Participate in

23   substance abuse program, such as AA or NA and

24   attend outpatient clinic for evaluation.   These

25   were made conditions of parole because the

26   psychologist -- And at the time of the commitment

27   **BRANDEE TRIPP    W-15695    DECISION PAGE 5   5/17/04**

1    offense, she had been using drugs, although it

2    wasn't something that was involved in the

3    commitment offense itself.  You will be paroled

4    back to the same county that the commitment offense

5    was.  And that's where the Panel feels that you

6    will be most successful, based upon the parole

7    plans that you've developed today.  Any comments,

8    Commissioner?

9        **DEPUTY COMMISSIONER MAY:**  Good luck to you.

10        **PRESIDING COMMISSIONER RISEN:**  Okay.  The

11    process now is it goes to Decision Review and

12    they'll evaluate it.  Once it's gone to them, it

13    then will go to the Governor and he has 90 days

14    from the date we give it to him to make an

15    evaluation.  So I think overall it's going to be

16    about six months before you hear anything.  Couple

17    of comments.  I notice that when you talked about

18    -- You were closing. -- about your involvement in

19    the crime, you were very emotional.  And I think

20    that is a consideration.  I also took into

21    consideration the fact that you've been denied and

22    you still kept programming.  You didn't give up.

23    There's a lot of people in the institution that

24    will depend on you because people who go out and

25    make mistakes and have to come back, it reflects on

26    them.  We as Panel members say, where did I go

27    **BRANDEE TRIPP    W-15695    DECISION PAGE 6  5/17/04**

1    wrong.  So you've got a lot of things resting on

2    you.  But I want to say that I didn't give you the

3    date.  You earned it.  You've done a good job in

4    here.  So good luck in the future.

5        **INMATE TRIPP:**  Thank you very much.

6        **PRESIDING COMMISSIONER RISEN:**  Bye now.  Thank

7    you both.  I'm going to keep your parole plan

8    letters and send them up with the file.

9        **INMATE TRIPP:**  Okay.  Thank you very much.

10       **PRESIDING COMMISSIONER RISEN:**  Thank you.

11       **INMATE TRIPP:**  You guys have a nice evening.

12       **PRESIDING COMMISSIONER RISEN:**  You too.

13                    --oOo--

14

15

16

17

18

19

20

21

22

23   PAROLE GRANTED                  PENDING REVIEW

24   THIS DECISION WILL BE FINAL ON: AND APPROVAL
                                     _____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26   DATE, THE DECISION IS MODIFIED.

27   BRANDEE TRIPP    W-15695    DECISION PAGE 7   5/17/04

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MATTHEW YATES, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 71, and which recording was duly recorded at CALIFORNIA INSTITUTION FOR WOMEN, at CORONA, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of BRANDEE TRIPP, CDC No. W-15695, on MAY 17, 2004 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 26, 2004 at El Dorado County, California.

Matthew Yates
Transcriber
**CAPITOL ELECTRONIC REPORTING**