# Exhibit C

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**BRANDEE TRIPP, W-15695**
**SECOND-DEGREE MURDER**

NO ACTION: _____

MODIFY: _____

REVERSE: ___X___

On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death. Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both Tameron and Ms. Maddocks. To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks. Mr. Tripp, his 20-year-old wife, Brandee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks. That plan failed. They then decided to kidnap and kill young Tameron.

Mrs. Tripp was a family friend and had access to Tameron. On the day of the murder, she arranged to take Tameron on a swimming trip. Before the trip, she asked Tameron to go to the store and pick up some drinks. Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted. The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living. They took Tameron into the Tripps' tent, tied her up, and placed cord from the tent around her neck. Mr. Tripp pulled on one side while Mr. Cook pulled on the other—until Tameron died. They then buried her in a grave that they had dug near the tent.

Tameron's mother notified police that her daughter was missing and that she suspected Mr. Record might be involved.

When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts. Mr. Trip, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried. Mrs. Tripp was arrested the next day. And Mr. Cook later surrendered to the police.

Mrs. Tripp was charged with conspiracy to commit murder, kidnapping, and murder with special circumstances. She accepted a plea agreement and pled guilty to second-degree murder, with the other counts to be dismissed in exchange for her testimony against her stepfather, Mr. Record. Mrs. Tripp was sentenced to 15 years to life in prison. Her husband was found guilty by a jury of conspiracy to commit murder and first-degree murder and was sentenced to 25 years to life. Mr. Cook pled guilty to first-degree murder and was also sentenced to 25 years to life. Mr. Record was convicted of second-degree and was sentenced to 15 years to life.



Brandee Tripp, W-15695
Second-Degree Murder
Page 2

Despite a turbulent pre-prison history, which included verbal, emotional, and sexual abuse, substance abuse, and prostituting herself, Mrs. Tripp had no criminal record at the time of Tameron's murder.

Now 45 years old, Mrs. Tripp has been incarcerated for more than 23 years. While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release. She completed her GED and has obtained vocational certificates in word processing and forklift operation. She has participated in a number of self-help and therapy programs, including Women Against Abuse, the Relapse Prevention Program, Breaking Barriers, Anger Management, and Alcoholics Anonymous and Narcotics Anonymous consistently since 1988. She has received laudatory reports from various prison staff for her volunteer and self-help activities as well as receiving favorable Life Prisoner and mental-health evaluations. She has also established and maintained seemingly solid relationships with her mother and her daughter and has viable parole plans that include residence at a licensed treatment facility for recovering addicts and a job offer from a family friend.

Mrs. Tripp maintains that she did not intend for Tameron to be killed. During her 2004 parole hearing, she told the Board that her husband "promised me that no one would get hurt" and that "In my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken." But at that same hearing, she admitted to suggesting various ways to kill Tameron, and explained, "I guess that's why I ended up being considered the person in charge." In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be involved in the physical abduction of Ms. Maddocks—but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder.

Be that as it may, however, I cannot ignore the circumstances surrounding this particularly monstrous—and premeditated—crime. Mrs. Tripp, who was initially charged with conspiracy to commit murder, kidnapping, and special-circumstances murder, helped plan the kidnap and murder of a 10-year-old child. And she did so for money and to help an accused child molester by eliminating Tameron so she could not testify against him. Because of Mrs. Tripp, Tameron was lured into a car, taken to a remote location, and viciously killed by two individuals who strangled her in a type of tug-of-war action between them. The terror and horror Tameron must have endured is unimaginable. Mrs. Tripp had numerous opportunities to prevent this murder from happening—but she did nothing to spare Tameron. Mrs. Tripp herself acknowledged during her 1985 mental-health evaluation that she could have prevented the murder. Similarly, during her 2004 parole hearing, she said that she tried calling the police twice on the day of the murder but failed to do so because she was "scared." The manner in which this crime was planned and carried out—particularly against one so young and vulnerable—demonstrates exceptional depravity and an utterly callous disregard for human life and suffering.



INMATE COPY

Brandee Tripp, W-15695
Second-Degree Murder
Page 3

Moreover, Tameron was not just any child to Mrs. Tripp. At the 2004 parole hearing, Mrs. Tripp described Tameron's sister as her "best friend." During her 1992 mental-health evaluation, she stated that she was "the only one who was allowed to take Tameron places alone." Mrs. Tripp not only perpetrated a chilling and revolting crime, she did so by violating her position of trust with Tameron and Tameron's family.

Mrs. Tripp has made creditable gains while in prison. But after carefully considering each of the factors the Board is required to consider, the gravity of the murder Mrs. Tripp perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole. Accordingly, because I believe she would pose an unreasonable threat to public safety if released from prison at this time, I REVERSE the Board of Prison Terms' 2004 decision to parole Ms. Tripp.

Decision Date: 10/11/04

ARNOLD SCHWARZENEGGER
Governor, State of California



INMATE COPY

# Exhibit D

CALIFORNIA INSTITUTION FOR WOMEN
PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
March 2004 CALENDAR

TRIPP, Brandee
W-15695

**IDENTIFYING DATA:** This is a subsequent and my first Board Report on this 40-year old Caucasian female who was received at CIW on 2/18/81 for the term of 15 years to life for Second Degree Murder.

**RELEVANT INFORMATION:** I spent approximately 1 hour and 15 minutes on 1/15/04 interviewing the inmate. In addition to the interview, I also had an opportunity to review her central file and medical records.

The inmate was informed regarding the non-confidential nature of the interview, and that I would be utilizing the information from the interview as well as information obtained from the central file and medical records in order to generate an opinion for the Board of Prison Terms. The inmate had a clear understanding regarding the non-confidential nature of the report.

**REVIEW OF LIFE CRIME:** Please refer to her central file for more information.

In essence, the inmate was the victim of her stepfather's sexual molestation since the age of 7 until she moved out at age 18. Per the inmate, her stepfather was allegedly charged with sexual molestation and had offered her boyfriend and her, in addition to two additional accomplices, to murder the victims in his child molestation case. Per the inmate as well as the review of the central file, the inmate was responsible in participating in the planning of the kidnapping of the victim in this case. In a plea bargain process, she was convicted of Second Degree Murder and testified against others in the trial.

During the discussion of this crime and incidence that led up to this crime and subsequent events following her incarceration, the inmate has demonstrated an excellent understanding of her actions. In addition, she demonstrated significant remorse and regret of the crime and assumed responsibility for her actions. She indicated that the first nine years of her incarceration that she had significant difficulties and has had numerous write-ups and acts of rebellion. However, she began to focus on her actions and her characters after being involved in the mental health treatment. She stated that she has developed a new sense of understanding regarding her chaotic past and her sense of "narcissism." She indicated that she has obtained a new respect for people's rights and understood that she can only control her own actions.

## CURRENT PROGRESS WHILE IN THE INSTITUTION

**Medical Information:** The inmate has been diagnosed with diabetes and is currently receiving medications for the treatment of the medical problem. In addition, the inmate indicated that she is allergic to Penicillin.

**Mental Health Information:** The inmate indicated that she is currently not involved in the mental health system at this point in time as she does not satisfy criteria for treatment.

**Substance Abuse History:** The inmate indicated that prior to incarceration she always has done things to the extreme, and that while using alcohol that there was relatively poor self control. The inmate has indicated that since she began in earnest to change herself for the better, she has been actively involved in Alcoholic Anonymous and Narcotic Anonymous, and she has a healthy understanding regarding her skills in maintaining abstinence.

**Disciplinary Problems:** The inmate has indicated that she has had no disciplinary problems during the last interval. This is consistent with what's found in the disciplinary section of her central file.

**Work:** The inmate indicated that she is currently working as a label maker in the PIA. In addition, she also volunteers her time in the band as well as S.O.S. She also participates actively in AA and NA, and in anger management modules that are offered to her at the institution. Please refer to her central file for the numerous laudatory chronos regarding her accomplishments and her achievements.

**PLANS IF GRANTED RELEASE:** The inmate stated that she wishes to be paroled to her mother in Grover Beach, California. She states that she has a contact with the E.D.D. in the city and plans to be involved with the E.D.D. in assisting her to acclimate back into society by working on finding employment. She states that she is hopeful that with the possibility of employment that she will be able to receive health benefits from her employer. The inmate indicated that her family, which consists of her mother and her daughter, are supportive of her emotionally and has offered assistance to her such as housing. The inmate has a very realistic expectation of her parole. She indicates that because it is a small city that people would be aware of her parole given the notoriety of the crime.

The inmate states that despite her expectation that the transition back to society will be a difficult one, she is hopeful that with the assistance from the community that she would be able to acclimate successfully and re-intregate with society.

**MENTAL STATUS EXAMINATION:** Appearance: The inmate is a clean groomed Caucasian female in no acute distress. Behavior showed no psychomotor agitation, retardation. The inmate was calm and cooperative with interview. Maintained good eye contact. Speech was regular rate and rhythm. Mood was described as feeling okay.

TRIPP, Brandee  W-15695                     2                     CIW  1/16/04  PH/la

Affect was noted to be normal intensity, normal range. Affect was mood congruent, it was stable. I was able to relate. Thought process was goal directed. Thought content: The inmate was preoccupied with her parole plans. The inmate denied any perceptual disturbances such as hallucinations with delusions. Denies any suicidal or homicidal thoughts. Her cognition is intact. Her insight and judgment is appropriate.

DIAGNOSIS:

    AXIS I        No Diagnosis
    AXIS II       No Diagnosis

**ASSESSMENT OF DANGEROUSNESS:** The inmate has not been dangerous within a controlled setting. I do not believe she will be dangerous if released to the community. This is based on the interview as well as review from her central file; although the first couple of years of incarceration has been difficult with numerous write-ups. However, the inmate has been motivated in her self-discovery and has improved dramatically over the years, to the point where she has matured significantly. The inmate has gained a healthy respect for the rights and privacy of others, and appeared to have been followed diligently in the rules and regulations here at this institution. The inmate has been able to keep her pathological characteristics in control and she has also obtained a certain level of peace and contentment within herself. Her parole plans, though a viable one, may be better improved if certain additional structures are involved, such as a search for higher education in a junior college or even a college degree given her level of high intellect functioning; and/or the possibility of a reentry program that can offer her a better strategy of acclimation back into society. Risk factors as always would be if she was ever tempted to resort to acts of criminality though given her level of peace and contentment, I would not suspect that to be the case.

Inmate Tripp was informed that she could consult with me again regarding this report should she have any questions.

Respectfully submitted,

PETER HU, M.D.
Staff Psychiatrist

CALIFORNIA INSTITUTION FOR WOMEN
PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERM
NOVEMBER 2002 CALENDAR

TRIPP, Brandee
W-15695

**IDENTIFYING DATA:** This is a Subsequent, and my sixth, Board Report on this 43-year-old inmate received at CIW on 2/18/81, for the term of 15-years to life for Second Degree Murder. This report was the result of review of the central file, clinical chart, and an interview on 8/29/02.

**RELEVANT HISTORY:** The inmate, when last evaluated in 1999, had no psychiatric diagnosis. Her last Board appearance was in July 2001 at which time parole plans were considered acceptable.

**CURRENT PROGRESS WHILE IN THE INSTITUTION:**
1. Disciplinary Problems: The inmate has had no disciplinary problems in the interval period.

2. Work/School in Past Year: The inmate has above average work reports, documented January 2002, as a label machine operator. She is described as dependable, with a good attitude. The inmate indicates that she has learned a lot about label technology, and in her spare time has also worked overtime sewing Nomex garments, which has afforded her other job skills.

**MEDICAL HISTORY:** The inmate has been diagnosed with diabetes. She is under fair control, via her clinical chart, although her eating habits are not quite ideal. Nevertheless, it has not resulted in any significant disability. She is currently on medication to control her diabetic condition.

**PLANS IF GRANTED RELEASE:** The inmate has had no change in her parole plans. Because her parole plans have been considered viable by her last appearance, I did not delve into this much further. I believe she has a good prognosis for community living.

<u>Clinical Assessment</u>

**MENTAL STATUS EVALUATION:** There has been no appreciable change in her mental status evaluation over the last several years. She is alert and oriented to time, person, and place. Her affect shows a full range of emotion. Memory for short term and long term is good. Psychomotor activity and speech are normal. She currently denies any alteration in sleep or appetite, and denies being troubled by nightmares. Her energy

TRIPP, B. W-15695 CIW         -1-         BPT EVAL.         9/10/02         hm



levels tend to vary according to how she eats. She denies difficulty with mental concentration, and none is observed. She denies any particular difficulty with tearfulness, although as she relates her crime she becomes emotional. She denies any specific fears or phobias or symptoms of anxiety. She denies any suicidal, homicidal, or paranoid ideation. There is no evidence for any thought disorder.

Insight and judgment both appear to be good. The inmate later spoke at considerable length regarding the origins of her behavior, how it manifested antisocial behavior, why she picked the type of people she did to be around, and how all this resulted into a rather awful crime.

**DIAGNOSIS:**
**Axis I:**     No Diagnosis.
**Axis II:**    No Diagnosis.

**CURRENT LEVEL OF CARE:** The inmate currently is not afforded any treatment through the C3MS Program. She has, however, been through many different psychotherapy groups over the years, dealing with incest issues as well as other psychological issues. She currently is involved in an anger management group. In the past she has been involved in 12-Step and AA Programs. I am satisfied that these needs are being met. The inmate also continues to be active in various activities within the Institution.

**REVIEW OF LIFE CRIME:** Per central file, the inmate had lured a ten-year-old victim to be kidnapped by two others, who later strangled her to death. The background behind this has been described extensively in past reports. The inmate had been sexually abused by her stepfather, who was a serial predator among women, and who was about to be held accountable. A potential witness was kidnapped. The stepfather had promised her financial reward if she followed the plan. The inmate states that her two codefendants agreed not to hurt the young girl, but merely to take her stepfather's money. They were being offered $10,000. They instead strangled the girl and buried her.

The inmate believes that at the time she had been raised in a very ugly, distorted environment in which her stepfather preyed upon her. She associated with the man who became her husband, who was a sociopath. She states that she never would have stood by and saw the victim killed, and would have prevented it had she been there. She indicates she could not imagine ever associating with someone who could be that violent and cruel.

Causative factors appear obviously to reflect the type of upbringing she had and her association with the antisocial element, and the predicament she was in regarding her stepfather, who was particularly cruel and manipulative. She demonstrates a degree of insight and empathy regarding the crime.

TRIPP, B. W-15695 CIW        -2-        BPT EVAL.        9/10/02        hm

**ASSESSMENT OF DANGEROUSNESS:** The inmate has not been dangerous within a controlled setting. I do not believe she would be dangerous if released to the community. Her orientation has obviously changed over many years, as reflected by a good work ethic and her involvement within the Institution. Significant risk factors as always would be appropriate parole plans, however these have been deemed viable in the past.

Inmate Tripp was informed that she could consult with me again regarding this report should she have any questions.

Robert D. McDaniel, M.D.
Staff Psychiatrist

TRIPP, B.  W-15695  CIW        -3-        BPT EVAL.        9/10/02        hm

CALIFORNIA INSTITUTION FOR WOMEN
PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERM
NOVEMBER 1999 CALENDAR


TRIPP, Brandee
W-15695


**IDENTIFYING DATA:** This is a subsequent, and my fifth, Board Report on this 40-year-old inmate received at CIW on 2/18/81, for the term of 15 years to life for Second Degree Murder of a ten year old kidnap victim. This report was the result of review of the central file, clinical chart, and an interview on 9/7/99, lasting approximately 45 minutes.

**RELEVANT HISTORY:** My prior report of May 1998 noted no psychiatric diagnosis and that the inmate had undergone a lot of psychotherapy. She, in the past, had been dependent upon sociopathic individuals. She has stated that she trusted her codefendants not to hurt the victim. In addition, the past use of illegal drugs had made her aggressive.

### Psychosocial Assessment

I.  Identifying Information
    A.  Age: 40
        Date of Birth: 3/30/59

    B.  Marital Status: Divorced once.
        Race: White
        Sex: Female
        Religion: Unaffiliated

    C.  Unusual physical characteristics, nicknames, aliases:
        The inmate notes that she has had tattoos on 27 separate occasions.

II. Developmental History
    A.  Prenatal/perinatal concerns, birth defects:
        The inmate notes that she was born with a congenital heart defect that required surgical correction. She was also born with an underdeveloped hip socket that required some type of physical therapy.

TRIPP, B. W-15695 CIW            -1-         BPT EVAL.       9/10/99         hm

- B. Abnormalities of developmental milestones, speech/language/motor developments:
  The inmate otherwise notes no other abnormalities of development.

- C. Habits, peer interaction and socialization skills:
  She denies any problem interacting with peers as a child.

- D. History of cruelty to animals, enuresis, arson:
  She denies a history of cruelty to animals or enuresis, but admits to fire-setting on one occasion as a child.

- E. Significant childhood medical history:
  She notes no other significant childhood medical problems.

- F. History of physical or sexual abuse as perpetrator or victim:
  The inmate has a history of sexual abuse, being abused by her stepfather from ages 7 to 18.

III. Education
  - A. Claimed grade level:
    The inmate notes that she did finish high school through a continuation school. She had been running away at the age of 17 and had missed school, requiring the transfer.

  - B. Measured grade level:
    She believes her measured grade level to be 12.9.

  - C. History of special education, academic or behavioral problems:
    She denies a history of any other special education problems other than the behavioral problems noted above.

  - D. Current involvement/interests in educational activities:
    She denies any current involvement in educational activities.

IV. Family History
  - A. Age, mental medical, substance abuse, educational, occupational, legal and criminal information on biological/step/adoptive parents, grandparents, and siblings:
    The inmate is unaware of her biological father's history, but notes her stepfather was a pedophile and died five years after her crime. Her mother is currently in her sixties and in frail health, having been treated with chemotherapy for breast cancer. Her mother has a history of alcoholism, but no longer drinks. The inmate has no siblings.

TRIPP, B.   W-15695   CIW           -2-           BPT EVAL.        9/10/99        hm

        B.    Relationship with family members historically and currently:
             The inmate communicates with her mother weekly.

V.    Psychosexual Development and Sexual Orientation
       A.    Age of puberty, sexual relationship, sexual orientation:
            The inmate feels her age of puberty was around 17. Her early life was sexualized by a pedophilic stepfather, later leading to sexual behavior with her peers in the ninth grade.

       B.    History of high-risk behavior, sexual aggression, fantasy, etc.:
            She denies any other particular high-risk behavior.

VI.   Marital history
       A.    Dates of marriages/common-law type relationships
            The inmate notes she was only married once, to her codefendant, at the age of 19. He was 17.

       B.    Children:
            The inmate indicates that she has one daughter, age 21, currently living with her mother.

       C.    Characterize past and current relationships with spouse/children:
            The inmate indicates she is very close with her daughter and communicates with her regularly.

VII.  Military History
       A.    Periods of service:
            The inmate denies any military history.

VIII. Employment/Income History
       A.    Significant periods of employment/reasons for termination:
            The inmate notes she worked variously as a nurses aide or as a maid in a motel up until the time that she was married. Thereafter, she did not work.

       B.    Work skills/government programs/union affiliations:
            The inmate has no union affiliations.

       C.    Public assistance/money management:
            She was on public assistance while pregnant.

       D.    Current interests/aptitudes:
            While incarcerated, she has variously worked as a clerk, forklift driver, and currently working in the maintenance warehouse.

**TRIPP, B. W-15695 CIW**       -3-       BPT EVAL.      9/10/99      hm

IX. Substance Abuse History
    A. Acknowledged alcohol and illegal drug usage:
       The inmate describes using illegal drugs and alcohol at the age of 13. She used marijuana, cocaine, and amphetamine.

    B. Treatment programs or placements:
       The inmate had no treatment prior to incarceration. Since, she has attended various AA and 12-step groups, and in the past has demonstrated a good working knowledge of the technical aspects of the maintenance of sobriety. She continues to maintain herself in these activities which should continue on a lifetime basis.

X. Psychiatric and Medical History
    A. Prior diagnoses, onset of illness:
       The inmate denies any prior diagnosis.

    B. Prior hospitalizations and response to treatment:
       She denies a history of psychiatric treatment.

    C. History of serious accident or head injury:
       She denies a history of any serious accident or head injury.

    D. History of suicidal/homicidal assaultive behavior:
       She denies a history of suicidal behavior. She denies homicidal behavior but notes she was assaultive towards a boy who struck her at the age of 16 or 17. She recalls being drunk at the time.

    E. Seizure or other neurological conditions:
       She denies any seizure or neurologic condition.

    F. Disabilities, significant impairments or illnesses:
       She denies any current disabilities or impairments.

    G. Medications:
       She is on no medications.

XI. Plans if Granted Release
    A. Living arrangement and support system:
       The inmate would return to live with her mother, where her daughter currently resides as well.

TRIPP, B.  W-15695  CIW      -4-      BPT EVAL.      9/10/99      hm

B.  Financial/vocational plans:
She has been made the beneficiary of her mother's trust and anticipates an income of approximately $1000 per month. She would like to work part time in the capacity of a hotel maid, or any other capacity, and attend computer school at the same time.

C.  Compliance with conditions of parole/outpatient treatment:
She indicates that she would attend meetings and go to counseling. She describes what attempt she has made to locate these services which might be nearby.

D.  Viability of plans/problem areas/supportive relationships:
It appears that the inmate has given some thought regarding the viability of her parole plans, including the community reaction to her release.

E.  Prognosis for community living:
The prognosis for community living is likely to be good based upon her current ability to conform within the confines of the Institution and attend self-help activities.

## Clinical Assessment

XII.  Current Mental Status/Treatment Needs
A.  Summary Mental Status Evaluation:
The inmate is alert and oriented to time, person, and place. Her affect shows a full range of emotion. Her overall mood is normal. Her attitude towards the examination is fairly calm and self-disclosing. Memory for short term and long term is good. She can quickly recall three of three objects after three minutes. She can serially subtract 7 from 100. Psychomotor activity and speech are normal. She reports no problem with sleep, appetite, or energy. She denies being troubled by nightmares. She denies and shows no difficulty with mental concentration or focusing her attention. She denies and shows no evidence for any tearfulness, but does become briefly emotional when speaking about the death of her victim. She denies any particular fears or phobias or symptoms of anxiety. She denies any suicidal, homicidal, or paranoid ideation. There is no evidence for any thought disorder.

Insight appears to be good into the consequences of an incestuous relationship with an abusive stepfather, leading to substance abuse and the association with the antisocial element. Judgment would appear to be

TRIPP, B.  W-15695  CIW        -5-        BPT EVAL.        9/10/99        hm

good as manifested by a disciplinary-free record in the interval period, with the exception of a 128 in May 1999 for excessive and altered clothing.

B.  Clinical Diagnoses and Level of Functioning (including personality disorders and organic/neurological impairment):
    **DIAGNOSIS:**
    **Axis I:**    No Diagnosis.
    **Axis II:**   No Diagnosis.

C.  Current Level of Care:
    Currently psychological treatment is not available to inmates who do not meet C3MS criteria.

D.  Treatment Activities:
    The inmate has participated in the victim's impact group, as well as relapse prevention groups, through the auspices of AA. She has also facilitated Breaking Barrier groups.

E.  Medications:
    She is currently on no medication.

F.  Prognosis:
    Her prognosis for continued self-improvement is good.

XIII. Review of Life Crime
    A.  Inmate's version of offense/attitude toward victim/assessment of causative factors:
        The inmate's crime has been discussed extensively in prior evaluations. The inmate conspired with two others to kidnap a potential witness to a trial in which her stepfather had been accused of molesting a ten year old girl. The inmate lured the girl to where her two male codefendants took her to a remote location where she was strangled and buried. The inmate states that the victim died because of the inmate's stupidity. She becomes emotional stating that while she did not physically kill the child, she feels bad that she married the person she did, that she associated with these type of people, and that she allowed these series of events to happen. She maintains, however, that it was never her intention that the victim come to any harm.

        The inmate disputes her husband's version of the crime, feeling that he is merely self-serving and unable to face the truth. The inmate will describe

her husband as being younger, and not very intelligent. She indicates he probably would have been capable of more if he had ever applied himself. He was too busy being "tough." Of note, a review of the central file reveals that her husband's I.Q. was assessed in prison as being around 78.

I asked the inmate if there had ever been another kidnapping planned amongst herself and her codefendants. The inmate admits that the victim's sister, an older woman of 20 years, had also been considered for abduction. When asked if she had been in on this possible plan, the inmate replies, "I was partly in on it." The inmate notes that she had refused to be involved in the physical abduction, but would have helped them in luring the woman outside.

I asked the inmate if any particular discussion had been made about killing this particular woman. She replies, "They talked about killing her, but I felt that if I didn't participate I wouldn't be guilty."

I asked the inmate if there was ever any talk about killing the victim in her crime, that is, the 10 year old girl. She replies, "Hilton talked about it one night while smoking marijuana." The inmate goes on to explain that her husband had spoken of shooting people from a distance, but that she had told him that it was not right to shoot someone. The inmate then reflects that at the time she felt that if she was involved in the circumstances, she might be able to control it. Of note there is information in a police report in the central file that alludes to one witness stating that the inmate, as well as her two codefendants, did in fact discuss killing a potential victim sometime before the crime itself.

B.  Relevance of mental condition to life crime/criminal behavior
    The inmate, at the time, had an antisocial orientation, perhaps the result of being the victim of an incestuous relationship, involving herself in drugs and alcohol, and the antisocial element.

C.  Inmate's level of insight/remorse/empathy:
    The inmate demonstrates regret for the victim's death, and seems to recognize the type of behaviors that led to this circumstance.

D.  Causative factors (including mental condition, if appropriate):
    The inmate maintains that she never intended the victim to come to any personal harm. Information contained in the central file describes some type of discussion regarding harm coming to the victim, although this is not clear.

TRIPP, B.  W-15695 CIW         -7-         BPT EVAL.     9/10/99        hm

XIV: Assessment of Dangerousness
    A. Within Controlled Setting:
        The inmate has not been dangerous within a controlled setting in the recent past.

    B. If Released to Community:
        If released to the community it appears likely that she would continue with her current behavior. She shows enthusiasm for a good work ethic, introspection, and has availed herself of numerous self-help groups and opportunities.

    C. Significant Risk Factors/Precursors to Violence:
        In the past, significant risk factors appeared to involve this inmate's inability to support herself either financially or emotionally, and she did not appear to appreciate the level of dangerousness she was involved in while associating with her codefendant.

XV: Clinical Observations/Comments/Recommendations:
It appears that the inmate has become far more careful regarding who she associates with and verbalizes at length her desire to be extremely cautious regarding her behavior, the people she associates with, and to be vigilant regarding what is going on around her.

Inmate Tripp was informed that she could consult with me again regarding this report should she have any questions.

Robert D. McDaniel, M.D.
Staff Psychiatrist