# Exhibit E

CALIFORNIA INSTITUTION FOR WOMEN
BOARD OF PRISON TERMS
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

TRIPP, BRANDEE W-15695

I. COMMITMENT FACTORS:

A. Life Crime:

Murder 2nd, PC 187, Case #CR7639, Monterey County, 15 years to life. Victim: Tameron Carpenter, age 10.

1. SUMMARY OF CRIME:

As taken from Initial Parole Consideration Hearing Report dated 08/16/88.

On July 8, 1979, the victim's mother reported her daughter missing, and indicated William Record (Brandee Tripp's Stepfather) might be involved in the disappearance of her daughter. The victim was scheduled to testify against Mr. Record in a child molestation case. Subsequent investigation led John Sorenson to reveal knowledge of a conspiracy to kidnap the child by Mr. Record and Hilton Tripp (Ms. Tripp's husband). Roger Ladd indicated Mr. Record offered him $1000.00 to kidnap the victim's older sister, Betty Ann Murdock. He observed Hilton Tripp, Randy Cook and Brandee Tripp discussing methods of killing the older sister. Mr. Ladd also observed further discussions of methods of kidnapping and killing Tameron Carpenter by Hilton and Brandee Tripp. On July 9, 1979, Hilton Tripp implicated Randy Cook as the person who killed the victim, and acknowledged he assisted in burying the child. He stated his wife Brandee was in agreement with the kidnapping and arranged for the child to leave home in order to facilitate the events. The body of the victim was found buried near Avila Beach. Ms. Tripp was arrested on July 10, 1979.

2. **Prisoner's Version:**

Ms. Tripp has reviewed her Prisoner's Version from her BPT report dated September 2002. Her version remains the same.

Ms. Tripp admits that she had prior knowledge of the kidnapping, and that she arranged for the victim to go to the store alone, where she would be picked up by Hilton Tripp and Randy Cook. However, she remains adamant that she had no idea that Tameron would be killed. She states that throughout their planning it was never a question in her mind that their scheme would result in the victim's murder. She alleges that she agreed to and participated in the kidnapping to collect $10,000 offered by William Record, and that she was not present during the commission of the crime. When the others told her that Tameron had been murdered she reported that she was stunned and upset, and wanted to block the incident out of her mind. She accepts responsibility for Tameron's death and realizes that her cooperation made the victim more accessible to being kidnapped and subsequently murdered.

3. **AGGRAVATING/MITIGATING CIRCUMSTANCES:**

A. **AGGRAVATING FACTORS:**

1. Victim was particularly vulnerable since she was only 10-years-old.

2. Inmate may have occupied a position of leadership or dominance over other participants in the commission of the crime.

3. During the commission of the crime the inmate had a clear opportunity to cease but instead continued.

4. Inmate had special position of trust with the victim as a family friend for several years.

5. The inmate involved minors in the commission of the crime.

6. The crime involved a high degree of viciousness and callousness.

7. The planning of the crime indicated premeditation.

B. **MITIGATING FACTORS:**

1. The inmate has no prior history of criminal behavior.

II. **PRECONVICTION FACTORS:**

A. **JUVENILE RECORD:**

None indicated.

B. **ADULT CONVICTIONS AND ARRESTS:**

None indicated.

C. **PERSONAL FACTORS:**

Ms. Tripp is a divorced woman, born to the union of Bill Sisemore and Mary Record in California. She has one half sister and one half brother. Her parents were separated when Ms. Tripp was two-years-old and her mother married William Record, co-defendant, three-years later. Ms. Tripp claims she was especially close to her maternal grandmother who is now deceased. Her mother was employed as secretary and her stepfather as an electrician. Ms. Tripp claims she was close to her stepfather despite the fact that he once attempted to molest her when she was about 7-years of age. She describes the relationship between herself and her stepfather as sick, in that she would often use blackmail attempts to get what she wanted from him. Ms. Tripp received average grades in school and was not seen as a behavior problem until she met Hilton Tripp in the 10th grade. At this point she was expelled from school, but later graduated from a continuation high school. Ms. Tripp claims her marriage to Hilton was forced upon her by both her grandmother and stepfather because she was pregnant. She reports she never loved or wanted to marry him. A child was conceived as a result of this union. After the birth of her daughter, she and her husband were unable to financially care for the child; therefore her mother became the primary caretaker and has since legally adopted Ms. Tripp's child. Ms. Tripp has no documented history of prior work experience.

## III. POST CONVICTION FACTORS:

### A. SPECIAL PROGRAMMING/ACCOMMODATIONS:

Not applicable.

### B. CUSTODY HISTORY:

Ms. Tripp was received at the California Institution for Women on 02/18/81 for the offense of Murder 2nd Degree, PC 187, count 3, case #CR7639. She received a term of 15 years to life.

02/18/81 Received at the Reception Center of the California Institution for Women.

02/24/81 Appeared before the Institutional Classification Committee where she was placed in protective custody.

03/04/81 Assigned to PTU Proper by ICC.

10/16/81 Job change to SCU Clerk.

06/18/82 Assigned as CCI Clerk, Medium A custody, receiving above average to excellent evaluations.

05/06/83 Appeared before UCC for Program Review, Minimum A custody. Ms. Tripp was subsequently granted Minimum A custody and a white pass.

08/22/83 Appeared before UCC, Minimum A custody and was job changed to RC Statistic Clerk.

11/04/83 Appeared before UCC, Minimum A custody for a Six-month Review. Committee elected to continue present programming.

03/27/84 Appeared before UCC, Minimum A custody and reassigned to RC Records Clerk.

| | |
|---|---|
| 05/04/84 | Appeared before UCC for Program Review. The committee acted to raise custody to Medium A and continue present program. |
| 02/15/85 | Appeared before UCC, Medium A custody and was job changed to Relief PM Cook. |
| 04/19/85 | Reviewed in absentia by UCC for a Semi-Annual Program Review. The committee acted to retain subject in her work assignment. |
| 06/06/85 | Appeared before Classification Sub-Committee for Review for a Campus Pass. Committee acted to give Ms. Tripp and undesignated Green Pass. |
| 07/19/85 | Appeared before Classification Subcommittee for consideration for a White Pass. The committee acted to approve a White Pass. |
| 10/25/85 | Appeared before Unit Classification for a Six-month Program Review. Committee acted to continue present program and reschedule for review in six-months. |
| 12/13/85 | Appeared before Unit Classification Committee, Medium A custody. The committee acted to reassign Ms. Tripp to RC ADM JTS and Self-Development Class. |
| 08/15/86 | Appeared before Unit Classification Committee for Annual Review, medium custody, classification score 42. The committee acted to continue present program. |
| 12/22/86 | Appeared before Classification Committee for work reassignment. Reassigned to Self-Development. |
| 02/13/87 | Appeared before Unit Classification Committee for Annual Review, Medium A custody, classification score 38. Committee acted to refer case to ICC, |

recommending general population placement.

| | |
|---|---|
| 05/29/87 | Appeared before Unit Classification Committee for housing evaluation, Medium A custody, classification score 38. Committee acted to refer case to ICC for general population placement. |
| 09/18/87 | Appeared before Unit Classification Committee for Annual Review. Medium A custody, classification score 44, assignment IST Clerk. Committee acted to continue present program. |
| 12/14/89 | Appeared before UCC for Annual Review, medium A custody, classification score 46, assignment Clerk Maintenance. Committee acted to continue present program. |
| 08/01/91 | Appeared before UCC I for Annual Review, medium A custody, classification score 26, assignment Maintenance Office Clerk. Committee acted to refer case to CSR, recommending CIW. |
| 08/13/91 | Endorsed for CIW, administrative placement, WOR. |
| 08/04/92 | Appeared before UCC for Program Review, medium A custody, classification score 26. Committee acted to confirm Peer Helper assignment. |
| 08/18/92 | Appeared before UCC for Annual Review, medium A custody, classification score 18, assignment Peer Helper Clerk. Committee acted to refer case to CSR recommending CCWF/Retain at CIW due to critical worker position need. |
| 09/09/92 | Endorsed for CIW-III based on Life term status. |

| | |
|---|---|
| 07/03/93 | Appeared before Unit Classification Committee for Program Review requesting job change, medium A custody, classification score 10, assignment Peer Helper. Committee acted to place on Word Processing Waiting List. |
| 08/17/93 | Appeared before UCC for Annual Review, medium A custody, classification score 10, assignment Graphic Arts. Committee acted to retain at CIW level I per inmate request. |
| 08/18/94 | Appeared before Unit Classification Committee for Annual Review, Medium A custody, classification score 2. The committee acted to continue present program per inmate request. |
| 08/17/95 | Appeared before UCC for Annual Review, medium A custody, Classification Score 0. The committee acted to continue present program per inmate request. |
| 08/28/96 | Appeared before UCC for Annual Review, medium A custody, classification score 0. Committee acted to continue present program per inmate request. |
| 08/06/97 | Appeared before UCC for Annual Review, medium A custody, classification score 0, assignment Warehouse Clerk. The committee acted to continue present program per inmate request. |
| 08/12/98 | Appeared before UCC for Annual Review, medium A custody, classification score 0. The committee acted to refer the case to CSR, recommending CIW-III override per inmate request. |
| 08/25/98 | Ms. Tripp was endorsed for CIW-III. Administrative placement Life. |
| 08/05/99 | Appeared before UCC for Annual Review, medium A custody, classification score |

0, assignment Warehouse Clerk. The committee acted to continue present program per inmate's request.

05/11/00 Appeared before UCC for Job change Review, medium A custody. The committee acted to assign to PIA.

08/10/00 Appeared before UCC for Annual Review, medium A custody, classification score 0, assignment Industry. The committee acted to continue present program per inmate's request.

08/02/01 Appeared before UCC for Annual Review, medium A custody, classification score 0. The committee acted to refer case to CSR, recommending CIW-II/LIF/WOR/FAM.

09/06/02 Endorsed for CIW-II.

08/12/03 Appeared before UCC for Annual Review, medium A custody, placement score 19, assignment PIA. The committee acted to continue present program per inmate request.

C. **THERAPY AND SELF-HELP ACTIVITIES:**

Since her last hearing on 11/06/02, Ms. Tripp has continued her positive program and enhanced her parole suitability by continuing her participation in various self-help and volunteer activities. On 12/04/02, she completed the Inmate Assistance Module, Anger Management. She is noted for continued attendance and participation as a member of AA/NA. Ms. Tripp also participated in the SOS Crochet Project from 11/15/02 through 05/01/03. The CIW Mass Choir also thanks Ms. Tripp for her continued assistance and dedication to the choir. (See Post Conviction Progress Report for more details.)

D. **DISCIPLINARY HISTORY:**

Custodial Counseling Chrono (CDC 128-A):

06/03/81 Refusing to work.

06/05/81 Horseplay.

| | |
|---|---|
| 08/18/81 | Disruptive behavior. |
| 10/30/81 | Door not being flushed. |
| 05/30/82 | Sexual behavior. |
| 07/11/82 | Inappropriate photograph. |
| 09/17/83 | Playing radio too loudly. |
| 06/06/84 | Disrupting count. |
| 09/08/84 | Disruptive behavior. |
| 03/23/87 | Out of Bounds. |
| 03/09/88 | Failed to report to work assignment. |
| 03/30/88 | Failed to report to work assignment. |
| 01/25/96 | Misuse of state property. |
| 05/27/99 | Excess property. |

<u>Rule Violation Reports (CDC 115):</u>

| | |
|---|---|
| 09/04/81 | DR3007- Guilty, 10 days disciplinary detention. |
| 02/14/82 | DR3005(A)-Guilty, 5 days CTQ. |
| 03/11/82 | DR3005(B)-Guilty, 4 days disciplinary detention. |
| 10/06/85 | 3040(D), division F-Guilty, 10 days LOC. |
| 12/23/86 | 3004(B) & 3005(B)-Administrative-Guilty, 3 weekend room locks. |
| 05/10/87 | 3015-Administrative-Guilty, 20 hours extra duty. |
| 06/18/87 | 3005(B), division F-Guilty, 10 days LOC. |
| 11/24/87 | 3004, division F-Guilty, 20 days LOC. |
| 11/27/87 | 3007, division F-Guilty 20 days LOC. |
| 11/24/87 | 3004, division F-Guilty, 20 days LOC. |
| 03/31/88 | 3063, division F-Guilty, 2 weekend locks |

E. OTHER:

Noted in the Miscellaneous Section are various certificates of completion.

IV. FUTURE PLANS:

Ms. Tripp is single and has no children to support. She has made no plans to wed in the near future and does not foresee any problems.

A. RESIDENCE:

Upon her release, Ms. Tripp plans to parole to Casa Solana, which is a residential treatment facility. The address is 383 s. 13th St., Grover Beach, CA 93433. Telephone number is (805) 489-4179. After completion of this program, Ms. Tripp plans to reside with her mother Mary Jenkins, at 1559 Seabright, Grover Beach, CA 93433, telephone number (805) 489-4179.

B. EMPLOYMENT:

Ms. Tripp will seek employment in the areas of Word Processing, clerical work, warehousing, forklift driver or as a label mechanic operator. She also plans to attend computer school and has written programs for additional housing and employment plans.

C. ASSESSMENT:

Ms. Tripp last appeared before the Board of Prison Terms on 11/06/02. The BPT found Ms. Tripp suitable for parole pending Governor's Review. On 04/04/03 the Governor invoked his authority to reverse the Board's decision to grant Ms. Tripp parole. Since her last hearing, Ms. Tripp has enhanced her suitability by continued participation in various self-help and volunteer activities. She maintains a positive outlook towards future parole possibilities and is an asset to the institution.

V USINS STATUS:

Not applicable.

VI. SUMMARY:

A. With consideration to the commitment offense, prison adjustment and personal interaction with Ms. Tripp, this writer believes the prisoner would probably present a Medium to Low degree of threat

to the public if released from prison at this time.

B. Prior to release, Ms. Tripp could benefit from:

1. Continue to remain disciplinary free.

2. Continue to upgrade vocationally.

3. Continue to participate in available self-help/therapy programs.

C. This Report is based on a one (1) hour interview with Ms. Tripp and a four (4) hour review of the central file.

D. Ms. Tripp took the opportunity to examine her central file on 04/08/04 in preparation for her BPT hearing.

E. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication to complete this report.

PREPARED BY: REVIEWED BY:

P. FLORENCE, CCI D. GARCIA, CCII

P. CLARK
CLASSIFICATION & PAROLE REPRESENTATIVE

BOARD OF PRISON TERMS STATE OF CALIFORNIA

# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☐ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | **PLACEMENT:**<br>Review Period 11/2002 to Present<br><br>Ms. Tripp remained in general population, medium A custody, Placement Score of 19. Continued assignment in PIA receiving primarily satisfactory evaluations.<br><br>**CUSTODY:**<br><br>Medium A.<br><br>**VOCATIONAL TRAINING:**<br><br>Continued assignment in PIA, where she has been since 05/12/00. Lupe Quiroz, PIA Supervisor notes, Ms. Trip is doing satisfactory work, has good working habits and is always willing to cooperate.<br><br>**ACADEMICS:**<br><br>None noted. |

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
|---|---|
| | |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE | |
|---|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | **WORK RECORDS:**<br><br>Continued in PIA since 05/12/00.<br><br>**GROUP ACTIVITIES (CDC 128-B):**<br><br>12/11/02 A member of AA/NA.<br><br>01/09/03 Received a letter of appreciation from the Forever Free Program.<br><br>03/31/03 Recognized for contributing to the line-dancing classes.<br><br>05/01/03 Acknowledged for her commitment to the SOS Crochet Project.<br><br>06/04/03 Continued participation as a member of AA/NA.<br><br>06/25/03 Continued participation in the Inmate Assistance Module, Anger Management.<br><br>12/04/03 Completed the Inmate Assistance Module, Anger Management. |

ORDER:

☐ BPT date advanced by ______ months. ☐ BPT date affirmed without change

☐ BPT date advanced by ______ months. ☐ PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify ______

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING | |
|---|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |

12/30/03 CIW Mass Choir thanks Ms. Tripp for her assistance and dedication to the choir.

**PSYCHIATRIC TREATMENT:**

None Noted.

**PRISONER BEHAVIOR:**

Ms. Tripp's overall prison behavior would be described as satisfactory. She interacts well with staff and inmates at the California ~~Institution for Women and meets the standards~~ and expectations set down by the Department of Corrections.

**OTHER:**

No further information.

ORDER:

- [ ] BPT date advanced by ______ months.
- [ ] BPT date affirmed without change
- [ ] BPT date advanced by ______ months.
- [ ] PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify ______
- [ ] Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | | CALENDAR | HEARING |
|---|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | SUBMITTED BY: P. FLORENCE, CCI<br>REVIEWED BY: D. GARCIA, CCII<br>P. CLARK<br>CLASSIFICATION & PAROLE REPRESENTATIVE |

ORDER:

☐ BPT date advanced by ______ months. ☐ BPT date affirmed without change

☐ BPT date advanced by ______ months. ☐ PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify ______

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING | |
|---|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

# Exhibit F

**In re Tripp**
150 Cal.App.4th 306, 58 Cal.Rptr.3d 64
Cal.App. 6 Dist.,2007.
March 28, 2007 (Approx. 12 pages)



150 Cal.App.4th 306, 58 Cal.Rptr.3d 64, 07 Cal. Daily Op. Serv. 4630, 2007 Daily Journal D.A.R. 5877

Briefs and Other Related Documents
Court of Appeal, Sixth District, California.
In re Brandee TRIPP, on Habeas Corpus.
No. H029507.
March 28, 2007.
As Modified April 26, 2007.
Review Denied Aug. 15, 2007.
Background: Prisoner petitioned for writ of habeas corpus to challenge Governor's reversal of decision of Board of Prison Terms that prisoner was entitled to parole release date. The Superior Court, Monterey County, No. HC05015, Marla O. Anderson, J., denied petition. Prisoner petitioned to the Court of Appeal.

Holdings: The Court of Appeal, Duffy, J., held that:
(1) some evidence supported Governor's denial, and
(2) denial based on commitment offense did not violate due process.

Petition denied.
West Headnotes

[1] KeyCite Notes 

284 Pardon and Parole
284II Parole
284k48 Eligibility for Parole or Parole Consideration
284k49 k. Factors Governing Decision, in General. Most Cited Cases

A parole date should be denied if the prisoner is a continuing danger to the public. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402(a).

[2] KeyCite Notes 

284 Pardon and Parole
284II Parole
284k57 Proceedings
284k62 k. Review. Most Cited Cases

Although parole provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the decision of the Board of Prison Terms. West's Ann.Cal. Const. Art. 5, § 8(b); West's Ann.Cal.Penal Code § 3041; 15 CCR §§ 2281, 2402.

[3] KeyCite Notes 

284 Pardon and Parole
  284II Parole
    284k57 Proceedings
      284k62 k. Review. Most Cited Cases

Since parole unsuitability factors need only be found by a preponderance of the evidence, the Governor, on review of a decision of the Board of Prison Terms, is free to consider facts apart from those found true by a jury or judge beyond a reasonable doubt. West's Ann.Cal. Const. Art. 5, § 8(b); West's Ann.Cal.Penal Code § 3041; 15 CCR §§ 2281, 2402.

[4] KeyCite Notes 

284 Pardon and Parole
  284II Parole
    284k57 Proceedings
      284k62 k. Review. Most Cited Cases

Judicial review of the Governor's parole decision properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the Board of Prison Terms. West's Ann.Cal.Penal Code § 3041.

[5] KeyCite Notes 

284 Pardon and Parole
  284II Parole
    284k57 Proceedings
      284k62 k. Review. Most Cited Cases

The "some evidence" standard of review of the Governor's parole decision is extremely deferential; only a modicum of evidence is required, and resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor. West's Ann.Cal.Penal Code § 3041.

[6] KeyCite Notes

284 Pardon and Parole
284II Parole
284k57 Proceedings
284k62 k. Review. Most Cited Cases

On review of the Governor's denial of parole, the evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. West's Ann.Cal.Penal Code § 3041.

[7] KeyCite Notes

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)12 Other Particular Issues and Applications
92k4838 k. Parole. Most Cited Cases

It violates a prisoner's right to due process when the Board of Prison Terms or Governor, in denying parole, attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. U.S.C.A. Const.Amend. 14; West's Ann.Cal.Penal Code § 3041.

[8] KeyCite Notes

284 Pardon and Parole
284II Parole
284k57 Proceedings
284k62 k. Review. Most Cited Cases

The Governor's interpretation of a documentary record in a parole matter is due deference; so long as the Governor's interpretation of a document is reasonable, it is not for the court to say that he should have adopted another interpretation, though equally reasonable. West's Ann.Cal.Penal Code § 3041.

[9] KeyCite Notes 

284 Pardon and Parole
284II Parole
284k57 Proceedings
284k62 k. Review. Most Cited Cases

On review of the Governor's denial of parole, the court confines its review to the evidence of unsuitability credited by the Governor and does not consider unsuitability factors apparently discounted by the Governor. West's Ann.Cal.Penal Code § 3041.


[10] KeyCite Notes

284 Pardon and Parole
  284II Parole
    284k57 Proceedings
      284k62 k. Review. Most Cited Cases

Some evidence supported Governor's denial of parole on ground that prisoner's role in planning commitment offense, second degree murder of 10-year-old girl killed by prisoner's husband and coperpetrator on direction of suspected child molester, made her danger to public; although prisoner claimed she did not want to kill victim, her statements, although ambiguous, were susceptible to interpretation she was involved in plan to kidnap and murder and suggested ways of carrying out plan. West's Ann.Cal.Penal Code § 3041.

See 3 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Punishment, § 628; Cal. Jur. 3d, Penal and Correctional Institutions, § 243.


[11] KeyCite Notes

284 Pardon and Parole
  284II Parole
    284k57 Proceedings
      284k62 k. Review. Most Cited Cases

While reviewing parole decision of the Board of Prison Terms, the Governor is free to make his own credibility determinations, and if he chooses to disbelieve the prisoner, the court is bound by that determination. West's Ann.Cal.Penal Code § 3041.

[12] KeyCite Notes

92 Constitutional Law
  92XXVII Due Process
    92XXVII(H) Criminal Law
      92XXVII(H)12 Other Particular Issues and Applications
        92k4838 k. Parole. Most Cited Cases

284 Pardon and Parole KeyCite Notes 
  284II Parole
    284k48 Eligibility for Parole or Parole Consideration
      284k49 k. Factors Governing Decision, in General. Most Cited Cases

Governor's denial of parole, based solely on immutable circumstances of prisoner's commitment offense of murder, did not violate due process; Governor cited factors favoring parole, did not overlook any factors in regulation, and acted within his authority in independently reviewing record and concluding prisoner's role in murder of 10-year-old made her danger to public. U.S.C.A. Const.Amend. 14; West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

[13] KeyCite Notes 

284 Pardon and Parole
  284II Parole
    284k57 Proceedings
      284k62 k. Review. Most Cited Cases

The commitment offense alone can negate suitability for parole only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. West's Ann.Cal.Penal Code § 3041.

[14] KeyCite Notes 

284 Pardon and Parole
  284II Parole
    284k48 Eligibility for Parole or Parole Consideration
      284k49 k. Factors Governing Decision, in General. Most Cited Cases

Denial of parole solely on the basis of the gravity of the commitment offense warrants especially close scrutiny, and thus the gravity of the commitment offense or offenses alone may be a sufficient basis for denying a parole application, so long as the Board of

Prison Terms does not fail to consider all other relevant factors. West's Ann.Cal.Penal Code § 3041; 15 CCR § 2402.

**66 Richard Darington Pfeiffer, Santa Ana, CA, Adrian T. Woodward, Law Ofc. Adrian T. Wooward, Long Beach, CA, for petitioner Brandee Tripp.

Elizabeth Seon Kim, Office of the Attorney General, San Francisco, CA, for real party in interest The People.

DUFFY, J.
*310 INTRODUCTION

At issue in this case is whether petitioner BranDee Tripp is entitled to a parole release date. She is currently in prison because, on July 8, 1979, 10-year-old Tameron Carpenter was strangled to death by Hilton Tripp and Randy Cook. At the time, petitioner, born in March 1959, was Hilton's wife and the mother of his child. In February 1981, petitioner was convicted by guilty plea of second degree murder and was sentenced to prison for 15 years to life. (Pen.Code, § 187.) FN1 Under the plea agreement, other charges were *311 dismissed, and petitioner agreed to testify against the man who solicited this murder, William Record, petitioner's stepfather.FN2

FN1. Unspecified code section references are to the Penal Code.

FN2. Eventually, Cook pleaded guilty to first-degree murder and was sentenced to 25 years to life. Hilton Tripp received the same sentence after a jury convicted him of first-degree murder and conspiracy to murder. After petitioner testified against Record, he was convicted of second-degree murder and was sentenced to 15 years to life.

After a hearing on May 17, 2004, California's Board of Prison Terms FN3 determined that petitioner, then age 45, was entitled to a parole date, as she "is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board had previously found petitioner suitable for parole after a hearing on November 6, 2002, and that decision was reversed on April 4, 2003, by Governor Davis.

FN3. As of July 1, 2005, the Board of Parole Hearings replaced the Board of Prison Terms. (Gov.Code, § 12838.4; Pen.Code, §§ 5075, 5075.1.) We will use "Board" to refer to these successive entities.

[1] The overarching concern of the Board in granting a prisoner a parole release date is whether "consideration of the **67 public safety requires a more lengthy period of incarceration for this individual." (§ 3041, subd. (b).) A parole date should be denied if "the prisoner will pose an unreasonable risk of danger to society if released from prison" (Cal.Code Regs., tit. 15, § 2402(a)),FN4 in other words, if the prisoner is "a continuing danger to the public." ( In re Dannenberg (2005) 34 Cal.4th 1061, 1084, 23 Cal.Rptr.3d 417, 104 P.3d 783) ( Dannenberg ).

FN4. All further references to regulations ("Regs.") are to the California Code of Regulations, title 15.

Governor Arnold Schwarzenegger (Governor) reviewed the May 2004 grant of a parole date and, on October 14, 2004, reversed it, asserting his belief that petitioner "would pose an unreasonable threat to public safety if released from prison at this time."

Petitioner has challenged the Governor's decision by a habeas corpus petition, which the Monterey County Superior Court denied in September 2005. In August 2006, this court issued an order to show cause asking the parties to further discuss "whether some evidence supports the Governor's determination that petitioner poses an unreasonable threat to public safety considering her actual role in the murder and her progress in prison." FN5 After *312 reviewing the administrative record under a deferential standard, we will conclude that there is some evidence supporting the Governor's decision and will deny the habeas petition.

FN5. Petitioner's habeas petition also presented other issues that we did not ask the parties to brief, such as that the parole denial violated the ex post facto clause and breached petitioner's plea bargain and that the Governor did not personally review her case. This court has rejected similar plea bargain arguments. ( In re DeLuna (2005) 126 Cal.App.4th 585, 598-599, 24 Cal.Rptr.3d 643 ( DeLuna); In re Honesto (2005) 130 Cal.App.4th 81, 92, 29 Cal.Rptr.3d 653; In re Lowe (2005) 130 Cal.App.4th 1405, 1422-1426, 31 Cal.Rptr.3d 1.) The California Supreme Court has rejected an ex post facto argument. ( In re Rosenkrantz (2002) 29 Cal.4th 616, 636-652, 128 Cal.Rptr.2d 104, 59 P.3d 174 ( Rosenkrantz ).)

## STANDARDS OF REVIEW

[2] [3] In this case it is important to establish the applicable standard of review before stating the critical facts available in the record. Whether a prison inmate is entitled to release on parole is an inherently subjective determination ( *Rosenkrantz, supra,* 29 Cal.4th at p. 655, 128 Cal.Rptr.2d 104, 59 P.3d 174; *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668) that should be guided by a number of factors, some objective, identified in section 3041 and in the Board's regulations. (Regs., §§ 2281, 2402.) [FN6] "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." ( Cal. Const., art. V, § 8(b).) The Governor's decision is based on "materials provided by the parole authority." (§ 3041.2, subd. (a).) "Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the Board's decision." ( *Rosenkrantz, supra,* 29 Cal.4th at pp. 660-661, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Since parole unsuitability ***68* factors need only be found by a preponderance of the evidence, the Governor is free to consider facts apart from those found true by a jury or judge beyond a reasonable doubt. ( *Id.* at p. 679, 128 Cal.Rptr.2d 104, 59 P.3d 174; cf. *In re Morrall* (2002) 102 Cal.App.4th 280, 302, 125 Cal.Rptr.2d 391.)

FN6. The same parole suitability criteria are listed in Regulations section 2281 and section 2402, with the latter applying to murders like this one committed after November 8, 1978. The text of these regulations is fully quoted in several cases. (E.g., *In re Scott* (2005) 133 Cal.App.4th 573, 592-593, 34 Cal.Rptr.3d 905 ( *Scott II*); *In re Lee* (2006) 143 Cal.App.4th 1400, 1406, fn. 2, 49 Cal.Rptr.3d 931.) We quote relevant parts below.

[4] *Rosenkrantz* concluded "that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." ( *Rosenkrantz, supra,* 29 Cal.4th at p. 658, 128 Cal.Rptr.2d 104, 59 P.3d 174.) After further discussion ***313** ( *id.* at pp. 658-667, 128 Cal.Rptr.2d 104, 59 P.3d 174), the California Supreme Court concluded that the same standard applies to judicial review of a Governor's parole suitability decision. Judicial "review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the Board." ( *Id.* at p. 667, 128 Cal.Rptr.2d 104, 59 P.3d 174.) We are bound by these determinations of our standard of review. ( *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455, 20 Cal.Rptr. 321, 369 P.2d 937.)

We note that *Rosenkrantz* identified a prisoner's conditional liberty interest in a parole release date as arising under California's constitution. ( *Rosenkrantz, supra,* 29 Cal.4th, at p. 655, 128 Cal.Rptr.2d 104, 59 P.3d 174.) According to the Ninth Circuit, the some evidence standard is also settled federal law in reviewing California's parole suitability determinations. ( *Sass v. California Bd. of Prison Terms* (9th Cir.2006) 461 F.3d 1123, 1129.)

[5] [6] [7] *Rosenkrantz* emphasized that this standard of evidentiary review "is extremely deferential." ( *Rosenkrantz, supra,* 29 Cal.4th at p. 665, 128 Cal.Rptr.2d 104, 59 P.3d 174.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor." ( *Id.* at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) On the other hand, the evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. ( *Ibid.*; *In re Lee, supra,* 143 Cal.App.4th at p. 1408, 49 Cal.Rptr.3d 931.) It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. (E.g., *DeLuna, supra,* 126 Cal.App.4th at p. 597, 24 Cal.Rptr.3d 643 [Board concluded, contrary to psychological evaluations, that inmate needed therapy, and faulted inmate facing deportation for failing to learn English]; *Scott II, supra,* 133 Cal.App.4th at pp. 597-603, 34 Cal.Rptr.3d 905 [Governor was wrong about inmate's history of violent crime and the nature of the commitment offense]; *In re Lee, supra,* 143 Cal.App.4th at pp. 1411-1414, 49 Cal.Rptr.3d 931 [Governor overstated seriousness of commitment offense and wrongly faulted inmate for late acceptance of responsibility].)

[8] [9] If we were reviewing a trial court's habeas findings based on documentary evidence without an evidentiary hearing, we would independently review the record. ( *Rosenkrantz, supra,* 29 Cal.4th at p. 677, 128 Cal.Rptr.2d 104, 59 P.3d

174.) However, the Governor's interpretation of a documentary record is due deference. So long as the Governor's interpretation**69 of a document is reasonable, it is not for us to say that he should have adopted another interpretation, though equally reasonable. We confine our review to the evidence of unsuitability credited by the Governor and do not consider unsuitability factors apparently *314 discounted by the Governor. (*In re Elkins, supra,* 144 Cal.App.4th at p. 493, 50 Cal.Rptr.3d 503; cf. *DeLuna, supra,* 126 Cal.App.4th at pp. 593-594, 24 Cal.Rptr.3d 643.)

THE GOVERNOR'S DECISION

The Governor reversed the Board in a two-and one-half page, single-spaced, typed decision. It narrows our review to identify what is not in issue. The Governor recognized that, during petitioner's 23 years in prison, while she initially violated some rules, for the last 16 years she has obeyed the rules and made consistent and commendable progress in terms of education, vocations and therapy.[FN7]

FN7. The Governor noted the following: "Now 45 years old, Mrs. Tripp has been incarcerated for more than 23 years. While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release. She completed her GED and has obtained vocational certificates in word processing and forklift operation. She has participated in a number of self-help and therapy programs, including Women Against Abuse, the Relapse Prevention Program, Breaking Barriers, Anger Management, and Alcoholics Anonymous and Narcotics Anonymous consistently since 1988. She has received laudatory reports from various prison staff for her volunteer and self-help activities as well as receiving favorable Life Prisoner and mental-health evaluations. She has also established and maintained seemingly solid relationships with her mother and her daughter and has viable parole plans that include residence at a licensed treatment facility for recovering addicts and a job offer from a family friend."

The Governor's decision was not based on prison misconduct by petitioner, her lack of rehabilitation, or any prior criminal history. He noted, "Despite a turbulent pre-prison history, which included verbal, emotional, and sexual abuse, substance abuse, and prostituting herself, [petitioner] had no criminal record at the time of Tameron's murder."[FN8] Contrary to the Attorney General's suggestion, we do not understand the Governor to have relied on petitioner's pre-offense behavior as evidence of unsuitability.

FN8. Although the Governor's decision does not elaborate, the sexual abuse to which he refers was obviously the molestation of petitioner by her stepfather, William Record, beginning at the age of seven.

The Governor's parole denial is based entirely on the commitment offense. He explained, "after carefully considering each of the factors the Board is required to consider, the gravity of the murder [petitioner] perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole." The Governor stated that petitioner "helped plan the kidnap and murder of a 10-year-old child. And she did so for money and to help an *315 accused child molester by eliminating Tameron so she could not testify against him." We further consider the Governor's understanding of the commitment offense in the next sections.

THE COMMITMENT OFFENSE

There is no dispute that the murder occurred as broadly outlined in the Governor's decision. "On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death. Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both **70 Tameron and Ms. Maddocks. To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks. Mr. Tripp, his 20-year-old wife, Bran[D]ee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks. That plan failed. They then decided to kidnap and kill young Tameron.

"Mrs. Tripp was a family friend and had access to Tameron. On the day of the murder, she arranged to take Tameron on a swimming trip. Before the trip, she asked Tameron to go to the store and pick up some drinks. Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted. The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living. They took Tameron into the Tripps' tent, tied her up, and placed cord from the tent around her neck. Mr. Tripp pulled on one side while Mr. Cook pulled on the other-until Tameron died. They then buried her in a grave that they had dug near the tent."

"When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts. Mr. Tripp, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried. Mrs. Tripp was arrested the next day. And Mr. Cook later surrendered to the police."

To establish petitioner's role in the murder, the Governor considered some of petitioner's later statements as follows. "Mrs. Tripp maintains that she did not intend for Tameron to be killed. During her 2004 parole hearing, she told the Board that her husband 'promised me that no one would get hurt' and that 'In my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken.' But at that same hearing, she admitted to suggesting various ways to kill Tameron, and explained, 'I guess that's why I ended up being considered the person in charge.' In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be *316 involved in the physical abduction of Ms. Maddocks-but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder." Petitioner acknowledged that she could have prevented the murder. "[D]uring her 2004 parole hearing, she said that she tried calling the police twice on the day of the murder but failed to do so because she was 'scared.' "

The Governor concluded, "The manner in which this crime was planned and carried out-particularly against one so young and vulnerable-demonstrates exceptional depravity and an utterly callous disregard for human life and suffering."

PETITIONER'S ROLE IN THE COMMITMENT OFFENSE

[10] Petitioner objects to the Governor's conclusion that she "helped plan the kidnap and murder" and that she was involved in the decision "to kidnap and kill" Tameron. Petitioner focuses on her role in the conspiracy that led to Tameron being kidnapped and killed by petitioner's husband and his friend. As quoted above, the Governor's conclusion

about petitioner's role is based on her statements at the May 2004 parole hearing, so we focus on those statements.

This topic was discussed twice at the parole hearing. Initially, petitioner stated: "In the beginning, I was actually running interference with [ *sic* ] her. Because they ***71* were talking and they wanted to kill her. I didn't want to kill her. I didn't want to help kill her.... Well, the day that this happened, before it happened, my husband promised me that no one would get hurt. He promised me that he would go pick Tammy up if I sent her down to the store. I could go to [Cook's] house and watch her, and they would go convince my stepfather that they kidnapped her and she wouldn't be testifying to get the money. And then we were going to let her go." It was only as petitioner kept waiting for them at Cook's house that she realized something had gone awry.

Later at the hearing, the presiding commissioner stated: "Says in the 1999 psychiatric evaluation, [petitioner] admits that she and her husband discussed both Tam[e]ron and her sister. Moreover, [petitioner] and her husband looked at, you know-He says, it is not credible that she did not know that **317* Tam[e]ron would be killed because you had discussed her being killed with your husband prior to this." FN9

FN9. In the 1999 evaluation, Dr. McDaniel reported asking petitioner if there was ever talk about killing Tameron. Petitioner stated that her husband talked about it one night while smoking marijuana. He talked about shooting people from a distance. She told him it was not right to shoot someone.

The evaluation noted that there was a "police report" in the central file alluding to a witness who stated that petitioner had discussed killing a potential victim. This police report does not appear in the record we have, unless it is a misdescription of the 1981 probation report. That probation report quotes statements by Roger Ladd that he participated in a conversation in which petitioner and her husband thought up a half a dozen ways to kidnap and kill Tameron. The Attorney General has also invoked this probation report, but the Governor did not rely on it.

Petitioner responded: "I was part of-I can't take myself out of the conversation. I was there when-All four of us were actually there when the conversations were taking place. I didn't help the matters. I know today that I probably helped them more than I really liked to. I didn't help stop the matters and it was a discussion that I was on the side of no, let's not do it that way. No, let's not do it that way. Let's try to do it this way. And I guess that's why I ended up being considered the person in charge. Pretty much, they think I was the overseer of the whole thing and there was really nothing I could do about that. Because that's how they see that, but I was always trying to run interference. And then when he promised me that they wouldn't hurt her, then I became more willing to go along with it because I didn't know that (inaudible.) And then I became afraid to act on it. I was too afraid to do anything. I didn't really want to believe that my husband would kill anyone anyway, because they didn't do anything with Betty Ann.... He promised me he's going to do that and I just talked myself into believing that he wouldn't kill anyone."

Having studied these statements closely, we conclude that they are reasonably susceptible to the Governor's interpretation. Petitioner's statements at the parole hearing fall short of a claim that she told her husband in no uncertain terms that she opposed killing Tameron. Petitioner stated that she "did not want to help kill her." This could mean that she did not share the criminal intent required for an aider and abettor (cf. *People v. Coffman* (2004) 34 Cal.4th 1, 107, 17 Cal.Rptr.3d 710, 96 P.3d 30 [aider and abettor is liable for natural and probable consequences of target crime]; *People v. Prettyman* (1996) 14 Cal.4th 248, 261, 58 Cal.Rptr.2d 827, 926 P.2d 1013 [same] ), but it also could mean only that she would not personally participate in the actual murder.

Even if petitioner proposed alternatives to killing **72 Tameron, she did not say she unequivocally disavowed the fatal option. She said she "became more willing to go along with" the plan when *318 her husband promised not to hurt Tameron This suggests some initial acquiescence to the fatal alternative.[FN10]

FN10. We do not intend to suggest that her use of the word "more" in this context is why petitioner deserves continued incarceration. Other parts of her statement, in the absence of further explanation, also appear to suggest a reluctant acquiescence to murder.

[11] Although the Governor simply reviewed the documents before the Board, he was free to make his own credibility determinations. If he had chosen to disbelieve petitioner, we would be bound by that determination. ( *Rosenkrantz, supra,* 29 Cal.4th at 626, 665, 677, 128 Cal.Rptr.2d 104, 59 P.3d 174.) Contrary to the Attorney General's oral argument, we do not understand the Governor to have disbelieved petitioner. Instead, he found and believed that she admitted helping to plan Tameron's murder. We conclude that this is a reasonable interpretation of petitioner's somewhat ambiguous and unclear statements at her parole hearing. When undisputed facts in an administrative record give rise to conflicting inferences and support equally reasonable interpretations, our appellate function requires us to defer to the fact-finder's interpretation. (Cf. *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74-75, 227 Cal.Rptr. 667, 720 P.2d 15; *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 774, fn. 2, 163 Cal.Rptr. 619, 608 P.2d 707; *Yordamlis v. Zolin* (1992) 11 Cal.App.4th 655, 659-660, 14 Cal.Rptr.2d 225.) [FN11] There is thus some evidence that petitioner participated in planning not only the kidnapping, but the 1979 murder, of Tameron. This evidence also supports the Governor's conclusion that petitioner, at age 45, remained dangerous to public safety.

FN11. At least after *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 44 Cal.Rptr. 767, 402 P.2d 839, appellate courts have not been similarly deferential to trial courts when the issue is interpretation of a written instrument unaided by extrinsic evidence ( *id.* at pp. 865-866, 44 Cal.Rptr. 767, 402 P.2d 839), but that situation involves different jurisprudential concerns than the reading of a transcript.

REPEATED RELIANCE ON COMMITMENT OFFENSE

[12] Petitioner further argues that she has been denied due process by the Governor denying her parole based solely on the immutable circumstances of her commitment offense.

A person who commits the kind of crime subject to an indeterminate life prison term almost always poses an unreasonable risk of danger to society at the time of the crime.[FN12] The "timing and gravity" of the circumstances of that crime may remain probative of an inmate's current dangerousness many years later. ( § 3041, subd. (b).) The California Supreme Court has *319 concluded that the " 'nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole.' " ( *Dannenberg, supra,* 34 Cal.4th 1061, 1094, 23 Cal.Rptr.3d 417, 104 P.3d 783, quoting **73 *Rosenkrantz, supra,* 29 Cal.4th at p. 682, 128 Cal.Rptr.2d 104, 59 P.3d 174.) One indicator of parole unsuitability is that "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1).) [FN13] The *Dannenberg* majority decided that the Board and Governor can find the commitment offense to be especially heinous, atrocious or cruel so long as the crime involved

elements beyond " 'the minimum necessary to sustain a conviction for that offense,' " without comparing the crime to other similar crimes. ( Dannenberg, supra, 34 Cal.4th at pp. 1094-1095, 1098, 23 Cal.Rptr.3d 417, 104 P.3d 783.)

FN12. Among the crimes subject to an indeterminate life sentence are certain types of gang crimes (§ 186.22, subd. (b)(4)), murder (§ 190), attempted premeditated murder (§ 664, subd. (a)), gross vehicular manslaughter while intoxicated (§ 191.5), aggravated sexual assault on a child (§ 269), aggravated arson (§ 451.5), aggravated sex offenses (§ 667.61), certain types of kidnapping (§§ 209, 209.5), and various recidivist felony offenses (§ 667, subd. (e)(2)(A), § 667.51, subd. (c), § 667.75, § 1170.12, subd. (c)(2)(A)).

FN13. The full regulation states: "The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

"(C) The victim was abused, defiled or mutilated during or after the offense.

"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

"(E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Regs., § 2402, subd. (c)(1).)

Establishing that the commitment offense involved some elements more than minimally necessary to sustain a conviction is a step on the path of evaluating a prisoner's current dangerousness, but it is not the final step under the regulations. Due process affords an inmate "an individualized consideration of all relevant factors." ( In re Rosenkrantz, supra, 29 Cal.4th at p. 655, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

[13] KC [14] KC As Scott II, supra, 133 Cal.App.4th 573, 34 Cal.Rptr.3d 905 explained at pages 594-594, 34 Cal.Rptr.3d 905, the proposition that the commitment offense alone may establish unsuitability for release "must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair ( In re Smith (2003) 114 Cal.App.4th 343, 372[, 7 Cal.Rptr.3d 655] ), and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' ( Biggs v. Terhune [ (9th Cir.2003) ] 334 F.3d [910,] 917 [ Biggs ].) The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. ***320** ( Irons v. Warden of California State Prison-Solano (E.D.Cal.2005) 358 F.Supp.2d 936, 947, fn. 2.) [FN14] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny. '[T]he gravity of the commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, *so long as the Board does not fail to consider all other relevant factors.*' ( in rE ramirez, supra, 94 caL.app.4th at p. 569[, 114 caL.rptr.2d 381]; latter italics added;

accord *Rosenkrantz, supra,* 29 Cal.4th at pp. 660, 677[, 128 Cal.Rptr.2d 104, 59 P.3d 174]; *Scott I, supra,* 119 Cal.App.4th at p. 891 [, 15 Cal.Rptr.3d 32].)" (Fns. omitted.)

FN14. The Ninth Circuit recently reversed this district court decision in *Irons v. Carey* (9th Cir.2007) 479 F.3d 658.

***74** Under the regulations applicable to evaluating an inmate's current dangerousness, the viciousness of the commitment offense must be balanced against the passage of time and any evidence of an inmate's rehabilitation. Among the indicators of parole suitability are: "(7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d).)

Relying on dictum in *Biggs*, petitioner asserts that it is a denial of due process to interminably deny her parole based solely on her commitment offense. Petitioner asserts at one point in her petition that she has "endured ***fourteen*** parole denials by [Board] panels and governors *based on her commitment offense.*" (Original bolding.) At another point, she claims that, "At **twelve** parole hearings between 1986 and 2001, [Board] panels found petitioner unsuitable for parole based largely or entirely on her commitment offense." (Original bolding.) Petitioner offers to provide the transcripts of these prior hearings on request. The only hearing for which she has provided a transcript is the latest one. This offer falls short of adequately documenting this contention. ( *People v. Duvall* (1995) 9 Cal.4th 464, 474, 37 Cal.Rptr.2d 259, 886 P.2d 1252.)

In any event, in the latest decision denying parole, it appears that the Governor has provided petitioner with an individualized consideration of the relevant factors. We have quoted above (in footnote 8 on page 5), his recognition of several factors favoring petitioner's parole, including numerous rehabilitative efforts in prison. Petitioner cites no factor as overlooked by the Governor. Her real disagreement is with the weight he attached in 2004 to her 1979 behavior. But the Governor was authorized to independently review the evidence before the Board that granted her a parole date. On the existing record, we cannot say that due process required the Governor to strike a different balance.

***321** DISPOSITION

The petition for writ of habeas corpus is denied.

PREMO, Acting P.J., and MIHARA, J., concur.

Cal.App. 6 Dist.,2007.
In re Tripp
150 Cal.App.4th 306, 58 Cal.Rptr.3d 64, 07 Cal. Daily Op. Serv. 4630, 2007 Daily Journal D.A.R. 5877

Briefs and Other Related Documents (Back to top)

- H029507 (Docket) (Nov. 4, 2005)

END OF DOCUMENT

(C) 2007 Thomson/West. No Claim to Orig. US Gov. Works.

# Exhibit G

Exh G

Court of Appeal, Sixth Appellate District - No. H029507
**S152032**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re BRANDEE TRIPP on Habeas Corpus

---

The petition for review is denied.
The requests for an order directing depublication of the opinion are denied.

SUPREME COURT
FILED

AUG 15 2007

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

**DECLARATION OF SERVICE BY MAIL**

Case : **Tripp v. Davison** (Habeas Corpus)

I declare that I am a citizen of the United States. I am over the age of 18 and am not a party to the within title cause.

On November 7, 2007, I served the attached

**Petition for Writ of Habeas Corpus; Points & Authorities; Exhibits**

on the parties listed below by enclosing same in an envelope to which adequate postage was affixed, and depositing same at the United States Post Office in Walnut, California for mailing.

Attorney General
455 Golden Gate Avenue
San Francisco, California 94102

I declare, under penalty of perjury, that the facts I have stated above are true and correct.

Dated November 7, 2007, at Walnut, California

Joseph Wosko
Declarant