# EXHIBIT 2
Part 1 of 2

COPY

# CALIFORNIA COURT OF APPEAL

## SIXTH APPELLATE DISTRICT

In re                                    Case No. **H029507**

BRANDEE TRIPP,

     Petitioner,

For Writ of Habeas Corpus

**FILED**

NOV 04 2005

---

# PETITION FOR WRIT OF HABEAS CORPUS
## MEMORANDUM OF POINTS & AUTHORITIES
## EXHIBITS A-G

---

ADRIAN T. WOODWARD, Esq.
Law Offices of Adrian T. Woodward
State Bar # 184011
4266 Atlantic Avenue
Long Beach, CA 90807
Telephone: (562) 424-4580

Counsel for Petitioner
BRANDEE TRIPP

# *TABLE OF CONTENTS*

|  | Page No. |
|---|---|
| Custody | 2 |
| Jurisdiction & Venue | 2 |
| Administrative Remedies | 2 |
| Lower Court Remedy | 2 |
| Petitioner's Offense, Prior Record, and Commitment | 3 |
| Petitioner's Post-Conviction Record | 4 |
| Petitioner's Parole Risk Evaluations | 4 |
| Parole Proceedings | 5 |
|     1986-2001 | 5 |
|     Petitioner's First Parole Grant & Reversal (2003) | 5 |
|     Petitioner's Second Parole Grant (2004) | 6 |
|     The Governor's Reversal of Petitioner's Second Parole Grant | 8 |
| The Requirements of Due Process; Standard of Review | 9 |
| Petitioner's Constitutional Claims | 10 |
|     **I. The Governor's Action Violated Due Process Because It Was Based On Incorrect "Facts"And Breached The Express Terms Of Her Plea Bargain** | 10 |
|     **II. Because The Governor's Finding, That Petitioner's Parole Poses "An Unreasonable Risk Of Danger To Society," And That She Is Therefore Unsuitable For Parole, Is Inapposite To The Record And Supported By No Evidence Whatsoever, Parole Reversal On That Basis Abrogated Due Process And Petitioner's Liberty Interest In Parole.** | 17 |
|     **III. Invocation Of The Unchangeable Facts Of Petitioner's Commitment Offense To Interminably Preclude Her Parole Abrogates Due Process** | 14 |

# TABLE OF CONTENTS
## (Continued)

**IV. Petitioner Did Not Receive Due, Individualized,
Or ANY Consideration By Governor Schwarzenegger,
Who Did Not Personally Review Petitioner's Files And
The Evidence Relied On By The Panel As Required, And
Because The Decision Was A Boilerplate Of All Reversals
Of Paroles Granted By BPT In Murder Cases**      21

**V. The Governors' Actions Were Prohibited By The Ex
Post Facto And Due Process Clauses Of The Federal And
California Constitutions**      24

Conclusion; Relief Requested      28

Verification      29

# TABLE OF EXHIBITS

Exhibit A      Abstract of Judgment

Exhibit B      Certified transcript, May 17, 2004, parole hearing

Exhibit C      Governor's reversal decision, October 11, 2004

Exhibit D      Petitioner's psychological (forensic) evaluations

Exhibit E      Petitioner's correctional evaluation

Exhibit F      Communications regarding BPT's "Executive Summaries"

Exhibit G      Monterey County Superior Court order denying habeas corpus petition

# *TABLE OF AUTHORITIES*

**Page Nos.**

**Cases**

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ...................................................... 9, 18, 19, 21, 26

*Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155 .................................................................. 14, 26

*Fleming v. Oregon Board of Paroles* (9th Cir.1993) 998 F.2d 721 .................................. 25

*Garner v. Jones* (2000) 529 U.S. 244 .................................................................................... 25

*Hudson v. Kane* (N.D. Ca. 2005) __F.Supp.2d__, 2005 WL 2035590 .............................. 9, 20, 21

*In re Arafiles* (1992) 6 Cal.App.4[th] 1467 ........................................................................... 22

*In re Dannenberg* (2005) 34 Cal.4[th] 1061 ......................................................................... 15, 18

*In re Dunham* (1976) 16 Cal. 3d 63 ....................................................................................... 22

*In re Ibarra* (1983) 34 Cal.3d 277 ......................................................................................... 14, 26

*In re Minnis* (1972) 7 Cal. 3d 639 ........................................................................................... 9

*In re Ramirez* (2001) 94 Cal.App.4[th] 549 ......................................................................... 9, 22

*In re Rosenkrantz* (2000) 80 Cal.App.4[th] 409 ................................................................... 22

*In re Rosenkrantz* (2002) 29 Cal.4[th] 616 ....................................................... 9, 16, 23, 24, 27

*In re Scott* (2005) __ Cal.App.4[th] __, 2005 WL 2651154 ................................................ 28

*In re Smith* (2003) 109 Cal.App.4[th] 489 ........................................................................... 12, 18

*In re Smith* (2003) 114 Cal.App.4[th] 343 ........................................................................... 12

*In re Stanley* (1976) 54 Cal.App.3d 1030 ............................................................................. 22

*In re Stanworth* (1982) 33 Cal.3d 176 .................................................................................. 25

*INS v. St. Cyr* (2001) 533 U.S. 289 ................................................................................. 14, 26, 27

*Irons v. Warden*  (E.D.Cal. 2005) 358 F. Supp. 2d 936 .................................................... 9, 20, 21

*Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964 ................................................................. 22

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ......................................................... 9

*Miller v. Florida* (1987) 482 U.S. 423 .................................................................................. 25

*Newton v. Rumery* (1987) 480 U.S. 386 .......................................................................... 13, 26

*Nulph v. Faatz* (9th Cir. 1994) 27 F.3d 451 ...................................................................... 25

*People v. Barasa* (2002) 103 Cal.App.4th 287 .................................................................... 15

*People v. Collins* (1996) 45 Cal.App.4th 849 .................................................................. 13, 26

*People v. Cunningham* (1996) 49 Cal.App.4th 1044 ............................................................ 13

*People v. Frazer* (1999) 21 Cal.4th 737 .............................................................................. 27

# TABLE OF AUTHORITIES

## (continued)

*People v. Harvey* (1979) 25 Cal.3d 754.................................................................... 15, 16

*People v. Leroy* (1984) 155 Cal.App.3d 602 .................................................................. 13

*People v. Mancheno* (1982) 32 Cal.App.3d 855.............................................................. 13

*People v. Nieto Benitez* (1992) 4 Cal 4th 91 .................................................................. 11

*People v. Roberts* (1992) 2 Cal 4th 271................................................................................ 11

*People v. Sanchez* (2001) 86 Cal. App. 4th 970 .......................................................... 11

*People v. Vargas* (2001) 91 Cal.App.4th 506 ................................................................ 26

*People v. Watson* (1981) 30 Cal 3d 290 ......................................................................... 11

*Santabello v. New York* (1971) 404 U.S. 257 ................................................................. 14

*Stogner v. California* (2003) 156 L.Ed.2d 544 .............................................................. 27

*Weaver v. Graham* (1982) 450 U.S. 24 ........................................................................... 25

*Weaver v. Maas* (9th Cir. 1995) 53 F.3d 956 ................................................................. 25

## Statutes

Pen.C. §1508.................................................................................................................. 2

Pen.C. § 2900.5 ............................................................................................................... 4

Pen.C. § 3041 ....................................................................................................... 2, 5, 9, 18

Pen.C. § 3041.2............................................................................................. 5, 22, 23, 24, 26

Pen.C. § 4019.................................................................................................................. 4

Pen.C. § 5000.................................................................................................................. 1

Pen.C. § 5075.................................................................................................................. 1

## Regulations

15 CCR § 2000................................................................................................................ 3

15 CCR § 2401 ............................................................................................................. 5, 9

15 CCR § 2402 ...................................................................................................... 5, 9, 11, 22

15 CCR § 2403 ................................................................................................................ 4

15 CCR § 2410 ................................................................................................................ 4

# *TABLE OF AUTHORITIES*

## *(continued)*

**Constitutional Provisions**

U.S.Const., Art.I, §10 ................................................................................................ 25

Cal.Const., Art. I, § 9 ................................................................................................ 25

Cal.Const., Art.V, § 8(b) ................................................................... 5, 9, 22, 24, 26

Cal.Const., Art.VI, § 10 ............................................................................................. 2

ADRIAN T. WOODWARD, Esq.
Law Offices of Adrian T. Woodward
State Bar # 184011
4000 Long Beach Boulevard
Long Beach, CA 90807
Telephone: (562) 424-4880

Counsel for Petitioner
BRANDEE TRIPP

CALIFORNIA COURT OF APPEAL

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re | ) Case No.:_____ |
|     BRANDEE TRIPP, | ) **PETITION FOR WRIT** |
| | ) **OF HABEAS CORPUS;** |
|                 Petitioner, | ) **MEMORANDUM OF** |
| | ) **POINTS & AUTHORITIES;** |
| For Writ of Habeas Corpus. | ) **EXHIBITS A-G** |

Based on the facts, grounds, authorities and exhibits herein, petitioner respectfully applies for issuance of a writ of habeas corpus vacating Governor Schwarzenegger's action of October 11, 2004, that reversed the May 17, 2004, decision by the Board of Prison Terms (BPT, now BPH, Board of Parole Hearings; see Pen.C. § 5075) granting petitioner parole (the second time petitioner's parole grant has been reversed by a Governor), reinstating BPT's decision, and directing the California Department of Corrections and Rehabilitation (CDCR, formerly California Department of Corrections, CDC; see Pen. C. § 5000) to release petitioner on parole forthwith and to credit her parole term with the time during which she has been confined in prison in excess of her prison term calculated by BPT at her May 17, 2004, parole hearing after its reduction by appropriate postconviction credit.

## Custody

Petitioner is confined by CDCR at California Institution for Women, Corona, California, Dawn Davison, Warden.

## Jurisdiction and Venue

This Court has original jurisdiction to issue the writ and venue to adjudicate the petition (petitioner was prosecuted and her parole will occur in Monterey County). (Cal.Const., Art.VI, § 10; Pen.C. § 1508.)

## Administrative Remedies

There is no administrative remedy for an unconstitutional action by a governor reversing a BPH grant of parole.

## Lower Court Remedy

Petitioner filed a similar petition in the Monterey County Superior Court (no. HC 05015) which was denied on September 18, 2005. A copy of the order of denial is attached as exhibit G. The Court seemed to agree that the interminable preclusion of petitioner's parole (14 denials by 12 BPT panels and 2 governors since she became eligible to parole 16 years ago) based on unchangeable facts of her 25-year-old offense (she was an accessory to a second degree murder) is tantamount to conversion of her prison term from 15 years-to-life with the possibility of parole to life without the possibility of parole. The court also found the process to be contrary to the parole statute, Pen.C. § 3041, but ratified the Governor's authority to continue to use the alleged facts of petitioner's offense to preclude her parole, apparently forever.

The Superior Court did not reach the merits of the majority of petitioner's due process claims: that Governor Schwarzenegger did not review petitioner's case or play any role in "his" decision, that the facts of her offense set forth by the Governor in

support of his decision were false, irrelevant to parole suitability, unsupported by any evidence whatsoever and/or contrary to the record, and that preclusion of petitioner's parole based on recasting of her offense as a first degree murder and by means of a new level of gubernatorial review more onerous that the parole determination process in place at the time she entered into her plea contract with the State abrogated her rights under the Due Process and Ex Post Facto Clauses.

## PETITIONER'S OFFENSE, PRIOR RECORD, & COMMITMENT

On February 11, 1981, pursuant to her guilty plea to second degree murder, petitioner was sentenced by the Monterey County Superior Court, case no. CR7639, to 15 years-to-life for the July 3, 1979, murder of Tameron Carpenter. (Exhibit A.) At the time of the offense, petitioner was 20 years old and had no prior criminal record. (Exhibit B, pp. 10-11, 23-25.)

Randy Cook and Hilton Tripp, petitioner's husband, kidnapped the victim, age 10, in order to receive $1,000 promised by William Ruckert (Ruckert), petitioner's stepfather, to prevent the victim from testifying against Ruckert in a child molestation case. Cook and Hilton Tripp eventually choked, killed, and buried the victim. Petitioner, as revenge against her stepfather who had sexually molested and physically abused her from age 7 to age 19, planned to keep Tamara's whereabouts secret, then to release her to testify against him. She sent Tamara to the store, where she would be abducted by her husband and Cook. Petitioner, who did not plan or anticipate a murder, has since before her commitment accepted responsibility and admitted her role in the offense. (Exhibit B, pp. 10-21, 23-27.)

Petitioner was committed to prison on February 18, 1981. Her minimum eligible parole date (MEPD)[1] lapsed on May 6, **1989**. (Exhibit B, p.1.) The <u>maximum</u>

---

[1] The minimum eligible parole date (MEPD) is defined as "the earliest date on which an ISL or life prisoner may be released on parole." (15 CCR § 2000(b)(67).)

prison term prescribed by the regulations for the facts of petitioner's particular second degree murder lapsed in **1992**.[2]  The net prison term set by the 2004 BPT parole hearing panel, 131 months, when reduced by 29 months of pre-sentencing credits, lapsed in **1990**.  (Exhibit B, p. 69.)

## PETITIONER'S POST-CONVICTION RECORD

Petitioner has maintained an exemplary, disciplinary-free record for more than 16 years.  Her last disciplinary infraction occurred in 1988 (failure to report to work). Her work supervisors' reports are consistently excellent. Her classification score (19) is the lowest attainable for a lifer.  Petitioner earned her GED and became certified in two vocations, Word Processing and Forklift Operation.  She has successfully completed all applicable therapy and self-help programming, including attendance in AA and NA since 1988, Women Against Abuse, Relapse Prevention, Breaking Barriers, Drug Awareness Counseling, New Beginnings, SOS, Inmate Assistance Module, American Bible Program, and Arts in Corrections.  Petitioner's file is replete with laudatory chronos for her conduct, work, and reform from custody and free staff, and for her charitable work.  Her parole plans, repeatedly approved by BPT, include offers of employment, a residence, and substantial family and community support. BPT has consistently acknowledged petitioner's exemplary record of good conduct, work, reform, and rehabilitation.  See exhibit A, pp. 65-68; exhibit E.

## PETITIONER'S PAROLE RISK EVALUATIONS

In recent years petitioner has been uniformly evaluated to pose a low (if any) parole risk.  In the current psychological evaluation Peter Hu, M.D., a forensic

---

[2] 15 CCR § 2403(c) prescribes a maximum base term of 18 years (subsec. II-A: victim had relationship to prisoner but not directly assaulted by prisoner), to be reduced by 64 months of postconviction credit (4 months for each of 16 disciplinary-free years of imprisonment per 15 CCR § 2410), resulting in a net maximum prison term of 12 years, 8 months, which must be further reduced by deducting 875 days of pre-sentencing Pen.C. §§ 2900.5, 4019 credit (exhibit A), resulting in a parole date that lapsed in *1992*.

psychiatrist, concluded that petitioner has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. (Exhibit D, p. 3.)   Two years earlier, a different forensic psychiatrist Robert D. McDaniel, M.D., reached the same conclusions.  (Exhibit D, pp. 5-6.)  The same assessment occurred in 1999.  (Exhibit D, pp. 13-14.)

# PAROLE PROCEEDINGS

## 1986-2001

At **twelve** parole hearings between 1986 and 2001, BPT panels found petitioner unsuitable for parole based largely or entirely on her commitment offense, and therefore refused to set her prison term or a parole date.[3]  At her ten hearings since 1990, the panels scheduled petitioner's subsequent hearing in one year, the shortest interval permitted.[4]

## Petitioner's First Parole Grant and Reversal (2003)

On November 6, 2002,  a BPT panel unanimously found petitioner suitable for parole and set her prison term and a parole date.  The panel's grounds for suitability were similar to those set forth at petitioner's 2004 hearing, detailed *infra*.

Predictably, on April 4, 2003, former Governor Gray Davis, exercising his authority under Pen.C. § 3041.2 and Art. V, § 8(b) of the California Constitution, as he promised to do in all murder cases, reversed petitioner's parole grant based on her commitment offense.

---

[3] The parole statutes and regulations prescribe a two-step process: The panel first determines whether a lifer is suitable or unsuitable for parole based on a preponderance of the evidence addressing the issue of whether parole would pose "an unreasonable risk of danger" to "public safety."  The panel proceeds to the second step of determining the length of the prison term and a parole date for lifers it finds to be suitable for parole.  Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).

[4] Petitioner's counsel will provide, upon the Court's request, certified copies of her past parole hearing transcripts. The transcript of petitioner's 2004 parole hearing is attached as exhibit B.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Petitioner's Second Parole Grant (2004)

On May 17, 2004, a new panel unanimously found petitioner suitable. The panel addressed at length the findings stated by Governor Davis for his reversal of the previous panel's grant of parole, and read his report into the record. See exhibit B, pp. 29-38, 48-54. The District Attorney did not oppose parole, nor did members of the victim's family. The panel explained in detail the grounds for its finding of suitability:

> The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison.
>
> The prisoner, while imprisoned, has enhanced her ability to function within the law upon release through participation in educational programs. She has obtained a GED [and] a vocational certificate in forklift operation and also in vocational word processing . . . She's been in AA and NA since . . . 1988. She's been in the SOS program. She's taken the Women Against Abuse program, the American Bible Academy, Arts and Correctional Music Program, the Relapse Prevention program, the HIV AIDS Prevention program, and Breaking Barriers. Her institutional job assignment is in the PIA working as a label mechanic operator since 2000, and she has received satisfactory work reports in that assignment.
>
> The prisoner lacks a significant criminal history of violent crime. Because of maturation, growth, greater understanding, and advanced age have reduced the probability of her recidivism.
>
> The prisoner has realistic parole plans, which includes a job offer and family support . . . I would rate the parole plans as superior. She has a place to live at the Casa Solano, which is in Grover Beach [and two] job offer[s].
>
> The prisoner has maintained close family ties while in prison by letters and visits [and] has maintained positive institutional behavior, which indicates significant

improvement in self-control.  She has had no 115s [disciplinary infractions] since 1988 . . .So we feel that she has a good disciplinary record while in custody.

Prisoner shows signs of remorse.  She has indicated that she understands the nature and the magnitude of the offense and accepts responsibility for her criminal behavior and has a desire to change towards good citizenship.

The most recent psychological report, authored by Peter Hu . . . a staff psychologist . . . is favorable.  He states,

> The inmate has not been dangerous within a controlled setting, and I do not believe that she will be dangerous if released to the community.  The inmate has gained a healthier respect for the rights and privacy of others and appears to have followed diligently in the rules and regulations here at the institution.  The inmate has been able to keep her pathological characteristics in control and she has obtained a certain level of peace and contentment with herself.  Risk factor, as always, would be if she ever attempted to resort to acts of criminality, though given her peace and contentment, I do not suspect that to be the case.

The psych evaluation prior to that was prepared on 9/10 of '99 by Robert D. McDaniels, who's also a staff psychiatrist.  It is favorable.  He states,

> The inmate has not been dangerous within a controlled setting.  I do not believe she would be dangerous if released to the community.  Her orientation was obviously changed over many years, as reflected by a good work ethic and her involvement within the institution.  A significant risk factor, as always, would be appropriate parole plans.  However, these have been deemed viable in the past.  (Exhibit B, pp. 65-68.)

The panel set petitioner's base term at the mid-term of 204 months prescribed by the regulations for the specific factors of her second degree murder including her relationship with the victim and the fact that she did not participate in the killing. The panel deduced 73 months of postconviction credit as prescribed in the regulations, resulting in a total period of confinement of 131 months. (Exhibit B, pp. 68-69.)

Parole conditions imposed by the panel included abstinence from alcohol and substance abuse therapy and testing. (Exhibit B, p. 69.)

In closing, the panel commented:

> Couple of comments. I noticed that when you talked
> About . . . your involvement in the crime, you were very
> emotional. And I think that is a consideration. I also
> took into consideration the fact that you've been denied
> and still kept programming. You didn't give up. There's
> a lot of people in the institution that will depend on you
> because people who go out and make mistakes and
> have to come back, it reflects on them. We as panel
> members say, where did I go wrong. So you've got a
> lot of things resting on you. But I want to say that I
> didn't give you the date. You earned it. You've done a
> good job in here. So good luck in the future. (Exhibit B,
> pp.70-71.)

### The Governor's Reversal of Petitioner's Second Parole Grant

On October 11, 2004, Governor Schwarzenegger reversed petitioner's second parole grant, concluding as always, "I believe she would pose an unreasonable threat to public safety if released from prison at this time." (Exhibit C, p. 3.) The sole ground stated for that conclusion was the 25-year-old commitment offense itself, described by the Governor as "premeditated," "monstrous," and demonstrative of "exceptional depravity and an utterly callous disregard for human life and suffering" that petitioner, who was in a "position of trust . . .could have prevented." (Exhibit C, pp. 2-3.)

# REQUIREMENTS OF DUE PROCESS; STANDARD OF REVIEW

1. State parole statutes and regulations bestow on life prisoners a liberty interest in parole protected by due process. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 621 ["*Rosenkrantz*"]; see *McQuillion v. Duncan* (9th Cir.2002) 306 F.3d 895, 901-903 ["*McQuillion*"].)

2. Said liberty interest is heightened considerably in the case of an inmate like petitioner who has already been granted a parole date. (*McQuillion*, 305 F.3d at 903.)

3. Petitioner's liberty interest required her being found suitable for and granted parole because, after her minimum eligible parole date lapsed, she was evaluated not to pose an unreasonable risk of danger to public safety. (Pen.C. §3041(a); 15 CCR §§ 2401, 2402(a).) Accordingly, BPT panels found petitioner suitable and set parole dates at her successive 2002 and 2004 hearings.

4. Although the commitment offense may justify a finding of unsuitability in some cases, it cannot serve as the basis for *repeated* or *interminable* parole denials. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916 [*Biggs*]; *Irons v. Warden of California State Prison – Solano* (E.D. Ca. 2005) 358 F.Supp.2d 936, 946-947; *Hudson v. Kane* (N.D. Ca. 2005) __F.Supp.2d__, 2005 WL 2035590 at p. 9.)

5. The BPT panel was required to base its findings on a weighing of all relevant, reliable evidence before it. (*Rosenkrantz*, 29 Cal.4th at 655; 15 CCR § 2402(b); *In re Minnis* (1972) 7 Cal. 3d 639, 646; *In re Ramirez* (2000) 94 Cal.App.4th 549, 569-672.)

6. Governors are bound by the same statutory and regulatory constraints that bind parole determination by BPT. A governor's decision reversing a BPT parole grant must be based on the governor's personal review of the same evidence that the BPT panel considered and upon the same factors that the BPT panel was required to consider. (*Rosenkrantz*, 29 Cal.4th at p.676; Cal.Const., Art.V, §8(b).)

7. Due process requires that the grounds set forth by a governor for a decision reversing a BPT parole grant must be supported by at least some reliable, relevant evidence. (*Rosenkrantz*, 29 Cal.4th at p. 658.)

8. As set forth by the controlling authorities cited *infra*, the Governors, head of the Executive Branch, were bound by the terms of petitioner's plea agreement and constitutionally and contractually prohibited from imposing a new, extremely more onerous level of gubernatorial review to reverse her parole grant and preclude her parole (interminably, since the basis for reversal can never change) by mis-characterizing her commitment offense as a premeditated first degree murder after the Executive Branch (prosecutor) struck that offense as a condition of the plea contract and after petitioner had fully performed her end of the bargain.

# PETITIONER'S CONSTITUTIONAL CLAIMS

## I. THE GOVERNOR'S ACTION VIOLATED DUE PROCESS BECAUSE IT WAS BASED ON INCORRECT "FACTS" AND BREACHED THE EXPRESS TERMS OF HER PLEA BARGAIN

The Governor's sole ground for his "unreasonable risk"/parole unsuitability finding, petitioner's commitment offense, was legally untenable because (1) it was based on incorrect "facts" and (2) it improperly re-classified petitioner's offense and sentence as that for first degree murder in violation of her plea bargain and due process.

### 1. The Governor Relied on Incorrect Facts

The Governor stated petitioner, her husband, and Cook "decided to kidnap *and kill*" the victim, that petitioner "helped plan the kidnap *and murder*." (Exhibit C, p. 2; emphasis added.) No such testimony was elicited against petitioner who was not tried. In the perpetrators' trials, a single witness testified that he overheard the three defendants mention a possible killing. Petitioner did not contemplate murder or agree to do more than what she did, help set up the kidnapping by sending the victim to the store. She intended, as revenge against her stepfather who had sexually and physically abused her for 12 years, to keep Tamara's location secret until his trial and then insure her testimony against him. Petitioner was shocked and dismayed to learn of the

victim's death. (Exhibit B, pp. 12-23.) Had petitioner known that Tameron would be harmed, she would not have participated even in the revengeful act. Petitioner did not participate in, plan, anticipate, or contemplate a murder; she participated in a kidnapping. Notably, the prosecutor's office, although notified, did not submit documents or attend petitioner's hearing to claim otherwise. Contrary to the Governor's notion, petitioner's statements are not "inconsistent." For more than 25 years she has consistently maintained that although murder may have been discussed at one point, it was not in the plan that she helped initiate or anticipated by her.

Accordingly, reversal of petitioner's parole grant based on the notion that she planned or premeditated a murder was arbitrary and abrogated due process.

## 2. "Utterly Callous Disregard for Human Life and Suffering"[5]

Use of this factor, recited in all of the Governor's parole reversals in second degree murder cases, is arbitrary because (1) "utterly" or otherwise petitioner did not disregard life or suffering because she did not plan, anticipate or know that a murder would occur and more importantly, because disregard for life is the *definition* of implied malice, an element of second degree murder, it could be (and is) used in all second degree murder case parole reversals. In *People v. Roberts* (1992) 2 Cal.4th 271, the California Supreme Court explained that the implied malice theory of second-degree murder applies :

> "[W]hen a defendant, knowing that his or her conduct
> endangers a life, and acting with a conscious disregard of the
> danger, commits an act the natural consequences of which
> are dangerous to life." *Roberts, supra,* 2 Cal.4th at pp. 281-
> 282; emphasis added; See also CALJIC 8.11; *People v. Nieto
> Benitez* (1992) 4 Cal.4th 91, 93; *People v. Watson* (1981) 30
> Cal.3d 290, 299-301; *People v. Sanchez* (2001) 86 Cal.App.
> 4th 970, 975-976, 981.

---

[5] 15 CCR § 2402(c)(1)(D) lists the unsuitability factor, "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."

Our courts have repeatedly cautioned governors, who are bound by the same parole determination guidelines that govern BPT, against such reckless, routine use of these terms in cases like petitioner's in which they are inherent or do not apply. Because petitioner's offense was not in that category, parole reversal based on her planning and premeditating a murder or acting with disregard for life and suffering, an element of her offense, violated due process. See *In re Mark Smith* (2003) 109 Cal.App.4[th] 489, 506 & fn.9; also *In re Ernest Smith* (2003) 114 Cal.App.4[th] 343, 367.

### 3. Basing Parole Reversal on a Re-characterization of the Offense as a First Degree Murder Abrogated Due Process and Breached the Express Terms of Petitioner's Plea Bargain

In exchange for the State's promise to determine her offense to be second degree murder and her sentence to be that for second degree murder, petitioner waived her constitutional rights, pled guilty to that offense, and testified truthfully as promised in order to secure the State's first degree murder convictions of the two remaining defendants. In entering into the plea bargain, petitioner understood and relied on the fact that she would be eligible for parole around 1989 and that her parole suitability would be determined only by BPT according to the laws then in effect.

The Governor's sole ground for reversing petitioner's parole grant was the commitment offense, re-cast by the Governor as a first degree murder. The Governor stated that petitioner "premeditated" the offense, that she "planned" the victim's murder. (Exhibit C, p. 2.) Aside from the falsity of that finding, reversal on that basis violated the express term of petitioner's plea agreement that the offense was *not* premeditated, *not* first degree, and did *not* involve the planning of a murder on her part.

Even if "some evidence" existed that petitioner planned or premeditated a murder is also irrelevant because the Due Process Clause prohibits the State from reneging on its promise. The Legislative Branch has decreed a different and less severe punishment for second degree murder than that prescribed for first degree

murder. When the Executive Branch enters into a plea bargain with a defendant it binds itself, as when enacting a contract, to the terms of that plea. If the principal term of a plea is that the murder be designated as being of the second degree, then plainly, it would be a violation of that plea for a different division of the Executive Branch to unilaterally re-characterize the appropriate punishment. The Judicial Branch, by accepting a plea reducing a first degree murder to a second degree, places a constitutional imprimatur upon the contract and is available to either party seeking redress. See *People v. Cunningham* (1996) 49 Cal.App.4[th] 1044, 1047: "A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound."

Sometimes it is the defendant who breaches the plea. In *People v. Collins* (1996) 45 Cal.App.4[th] 849, 863, when the defendant breached the plea bargain by refusing to testify as promised against a co-defendant, the Court of appeal held: "The reciprocal nature of a plea bargain agreement mandates that either party to the agreement be entitled to enforce the agreement in a situation where the party is deprived of the benefit of the bargain." Usually, all that is required of a defendant is to waive his or her constitutional rights and accept immediate punishment. See *Newton v. Rumery* (1987) 480 U.S. 386, 394: "When the State enters a plea bargain with a criminal defendant, it receives immediate and tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources." After a defendant has performed his or her part of the bargain the remedy of specific performance of the State's obligation exists. (*People v. Leroy* (1984) 155 Cal.App.3d 602, 606; *People v. Mancheno* (1982) 32 Cal.3d 855, 860.)

Petitioner gave the State much more than the usual acceptance of immediate punishment. She agreed to testify against the codefendants. In doing so, petitioner substantially assisted the prosecutor and State in securing two first degree murder convictions, and exposed herself to the fright and peril of a "rat jacket" that has persisted throughout 25 years of her imprisonment.

The government insures a defendant that her punishment will be imposed *as contemplated **at the time of the plea***. Although remedying the Governor's breach of a plea agreement may vindicate the rights of a disrespected member of society, it focuses the Court's resources on the honor of the government and the fair administration of justice. Fundamental precepts of due process are abrogated when, in order to extract additional punishment from an agreement entered by a defendant, the State increases the punishment by increasing the degree of the offense pled.

Respondent may argue that it was never an explicit term of the plea that the Governor would be bound by the prosecutor's and plea court's concession that the offense be designated as second degree murder. What then, was the purpose of the plea bargain? Petitioner, who had insisted on a jury trial and had valid defenses available, did not intend to give the State everything she had fought against to that point. It would be absurd to believe that when a defendant enters into a plea to second degree murder she does so to have her punishment fixed as that contemplated for first degree murder. Please see the recent BPT case of *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155, citing *INS v. St.Cyr* (2001) 533 U.S. 289, 322-323, 325 [inferring based on general analysis of what would motivate defendants to accept plea agreements that particular "defendant 'almost certainly' relied on availability of particular relief"].

It was not a term of the plea that a governor would have the power of nullification.[6] No defendant at the time would have entered such a plea, and defense counsel for such a defendant would have been derelict for not warning the client of the illusory nature of such a "deal," which would betray the District Attorney's ethical duty, as a representative of the state, to conduct the state's business fairly and honestly. See *In re Ibarra* (1983) 34 Cal.3d 277, 289 [illusory concessions offered by state in plea bargain constitute "a species of fraud"]; *Santabello v. New York* (1971) 404 U.S.

---

[6] The Governor's authority to modify and reverse BPT parole grants did not exist until 1989, an issue detailed in the following subsection.

257, 261 [plea bargain contracts "presuppose fairness in securing agreement between an accused and a prosecutor"].

The Governor may argue, as suggested recently in *In re Dannenberg* (2005) 34 Cal.4[th] 1061, that even if the offense must be designated as second degree murder, he must still be able to decide whether it was a particularly egregious example of that offense or whether petitioner's role was more than the minimum necessary to constitute its elements, and for that reason, deny parole. The notion is tantamount to a claim to unfettered discretion that disrespects the terms of the plea bargain. Further, an inability to define the offense as a more serious, first degree murder, does not deprive the Governor of the use of any of BPT's other codified factors indicating parole unsuitability; e.g., serious prison misconduct, unviable parole plans, or failure to reform or participate in therapy or other programming.

Requiring parole decisions to be based on the crime being second degree murder was the *only* benefit petitioner would receive from her plea. When, as here, the only basis for a Governor's jurisdiction over petitioner is her plea bargain, contract law and her due process and liberty interest rights compel a Governors' strict compliance with its terms, which absolutely precluded the actions of Governors Davis and Schwarzenegger that have twice extended her prison term. On this issue, the State's highest court has explained:

> It would be improper and unfair to permit the sentencing court to consider any of the facts underlying the dismissed count for purposes of aggravating or enhancing defendant's sentence. Count three was dismissed in consideration of defendant's agreement to plead guilty to counts one and two. Implicit in such a plea bargain, we think, is the understanding (in the absence of any contrary agreement) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count. (*People v. Barasa* (2002) 103 Cal.App.4[th] 287, 291, quoting *People v. Harvey* (1979) 25 Cal.3d 754, 758.)

Thus, for at least 25 years it has been held legally untenable to circumvent a plea by using the material the People bargained away against the defendant. The California Supreme Court holds the principle "implicit." The United States Supreme Court also recognizes it. It is implicit in a plea bargain reducing the charge of first degree murder to second degree murder that the indeterminate sentence will not, in actual fact, be based on a representation of the crime as a first degree murder, eliminating all benefit to the defendant from the plea bargain under the guise and expediency of quasi-judicial action by political appointees. The California Supreme Court holds that the State "cannot with one hand give a benefit and with the other take it away." (*People v. Harvey, supra*, 25 Cal.3d at p. 758.)

Had the prosecutor or trial judge believed that petitioner had acted in a "brutal," or "premeditated" manner or that her role in the offense amounted to first degree murder, there would have been no plea bargain. *Petitioner's second degree plea resulted from the prosecutor's obvious difficulty in proving the elements of first degree murder; specifically, that she planned the murder and acted with premeditation.*

Because the Governor's action depriving petitioner of parole was based on a nonexistent conviction of a planned, premeditated first degree murder and overtly violated petitioner's plea contract with the State, it must be set aside.

It is particularly noteworthy that petitioner has served 13 years in excess of the *maximum* term prescribed for her offense had it resulted in her conviction of *first* degree murder. In such a case, the California Supreme Court in *Rosenkrantz*, a second degree murder case, warned:

> [T]here will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a *first degree* murder in order to promote the parole statute's goal . . . Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard. (29 Cal.4[th] at p. 691.)

## II. **BECAUSE THE GOVERNOR'S FINDING, THAT PETITIONER'S PAROLE POSES "AN UNREASONABLE RISK OF DANGER TO SOCIETY" AND THAT SHE IS THEREFORE UNSUITABLE FOR PAROLE, IS INAPPOSITE TO THE RECORD AND SUPPORTED BY NO EVIDENCE WHATSOEVER, PAROLE REVERSAL ON THAT BASIS ABROGATED DUE PROCESS AND PETITIONER'S LIBERTY INTEREST IN PAROLE.**

The Governor's basis for reversing petitioner's parole grant was a boilerplate recitation that her parole poses an "unreasonable threat to public safety if released from prison at this time." (Exhibit C, p. 3.) The sole ground stated by the Governor in support of that conclusion, the commitment offense, is detailed herein. Parole denial on that basis abrogated due process because *no* evidence whatsoever supports the notion that petitioner's parole poses an unreasonable risk and because *all* evidence in the record (which Governor Schwarzenegger did not review) that addresses her current parole risk and potential danger to public safety, assesses these factors as <u>low</u>. Not a speck of evidence supports "the Governor's" contrary recitation.

The only reliable evidence of petitioner's current dangerousness and parole risk, her forensic psychiatric and correctional evaluations, are uniformly parole-favorable and assess these factors to be low. For several years, petitioner has been consistently evaluated to pose a low parole risk. Last year Peter Hu, M.D., a forensic psychiatrist, concluded that petitioner has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. (Exhibit D, p. 3.) Two years earlier, Robert D. McDaniel, M.D., reached the same conclusions (exhibit D, pp. 5-6), as was the case in 1999. (Exhibit D, pp. 13-14.) Petitioner's last three correctional evaluations have likewise concluded that she would pose a low risk to public safety if paroled. (Exhibit D, pp. 3, 6, 14.)

*All* forensic documentary evidence addressing petitioner's level of danger and parole risk developed over the past 6 years places her in the lowest category. *No* evidence supports Governor Schwarzenegger's contrary notion that petitioner's parole

poses "an unreasonable threat." Parole reversal based on such a whim abrogated due process and petitioner's liberty interest in parole. See *In re Smith* (2003) 109 Cal.App. 4th 489, 506-507 [no evidence supporting Governor Davis' "unreasonable risk" grounds; parole ordered].

## III. INVOCATION OF THE UNCHANGEABLE FACTS OF PETITIONER'S COMMITMENT OFFENSE TO INTERMINABLY PRECLUDE HER PAROLE ABROGATES DUE PROCESS

The California Supreme Court in *Dannenberg, supra*, held that the facts of a commitment offense may *in some cases* serve as a ground to deny parole to an otherwise parole qualified inmate. *Dannenberg* did <u>not</u> hold, and cannot tenably be construed to permit the facts of an offense, because they are unchangeable, to serve as in petitioner's case as a valid basis on which to ***interminably*** deny her parole, converting her legislatively prescribed, judicially imposed prison term of 15 years to life with the possibility of parole, which Pen.C. § 3041(a) defines as a probability of parole (Board "shall normally set a parole release date"), to life without any possibility of parole. Please see *Biggs, supra*, 334 F.3d at p. 916.

The Ninth Circuit recently reviewed the constitutional propriety of a BPT panel's use of factors of a first degree murder commitment offense to find a California inmate unsuitable for parole at his *first* hearing. (*Biggs, supra*, 334 F.3d at p. 916.) The Court found no evidence to support most of the panel's grounds for unsuitability, but held that a particularly egregious commitment offense could be an appropriate basis for finding such a prisoner unsuitable for parole at an *initial* parole hearing. The Ninth Circuit cautioned:

> As in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs

continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole. . . .

A continued reliance in the future on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation. *(Biggs,* 334 F.3d at 916-917.)

*Biggs*' holding has been relied on in addressing the issue raised by petitioner, most recently in decisions by the U.S. District Courts in California involving repeated unsuitability findings by BPT panels based on the facts of their commitment offense:

In finding petitioner unsuitable at this fifth parole suitability hearing, the panel relied exclusively on unchanging factors: the commitment offense and petitioner's drug use at the time of the offense. In <u>Biggs,</u> the Ninth Circuit stated that the BPT was "*initially* justified" in finding Mr. Biggs unsuitable based on the circumstances of the offense and conduct prior to imprisonment. <u>334 F.3d at 916</u> (emphasis added). However, the Ninth Circuit was not specific as to when reliance on the circumstances of the offense and conduct prior to imprisonment would "run contrary to the rehabilitative goals espoused by the prison system" and result in a due process violation. <u>334 F.3d at 917.</u>

More important to the undersigned in assessing any due process violation is the fact that continuous reliance on unchanging circumstances transforms an offense for which California law provides eligibility for parole into a de facto life imprisonment without the possibility of parole. The court asks rhetorically--what is it about the circumstances of petitioner's crime or motivation which are going to change? The answer is nothing. The circumstances of the crimes will always be what they were, and petitioner's motive for committing them will always be trivial.

Petitioner has no hope for obtaining parole except perhaps that a panel in the future will arbitrarily hold that the circumstances were

not that serious or the motive was more than trivial. Given that *no one* seriously contends lack of seriousness or lack of triviality at the present time, the potential for parole in this case is remote to the point of non-existence. Petitioner's liberty interest should not be determined by such an arbitrary, remote possibility. [FN2]

FN2. To a point, it is true, the circumstances of the crime and motivation for it may indicate a petitioner's instability, cruelty, impulsiveness, violent tendencies and the like. However, after fifteen or so years in the caldron of prison life, not exactly an ideal therapeutic environment to say the least, and after repeated demonstrations that despite the recognized hardships of prison, this petitioner does not possess those attributes, the predictive ability of the circumstances of the crime is near zero.

*Irons v. Warden of California State Prison – Solano* (E.D. Ca. 2005) 358 F.Supp.2d 936, 946-947.

The Northern District of California likewise held:

Now before the Court is petitioner's third denial of parole, which was the first denial based solely on the facts of the crime. Petitioner's present situation falls under the same factual circumstances as *Biggs,* which held that a prisoner's due process rights are not violated the first time parole is denied based solely on the facts of the crime.

Petitioner has subsequently had a fourth hearing in August 2004, in which the BPT again denied parole based on the facts of the crime . . . He is due for his fifth parole hearing in August 2005.

A denial based on the unchanging facts of the crime at the August 2005 hearing would make it the third time that petitioner is denied parole solely on the basis of the facts of his convicted offense. At that time, petitioner's situation would be more factually similar to the *Irons* case and would more clearly require analysis of the concerns raised in *Biggs,* that continued denial based solely on the facts of the crime can raise serious questions of due process violations. *Hudson v. Kane* (N.D. Ca. 2005) __F.Supp.2d__, 2005 WL 2035590 at p. 9.

The facts of this case are more compelling than those in *Biggs*, *Irons*, and *Hudson*. Biggs was attending his *first* parole hearing. Petitioner has been imprisoned for 25 years after serving the equivalent of 2½ years in jail. She was eligible for parole *16 years ago* and has served *2 to 2½ times* the minimum and *maximum* terms prescribed by BPT's regulations for her second degree murder and *in excess of her prescribed term had the murder been first degree*. She has been repeatedly declared a low parole risk to public safety but remains imprisoned despite being found suitable for parole by two unanimous BPT panels. The prison term prescribed for the facts of her offense, properly set by two panels in compliance with the regulations, including term credits, *lapsed 14½ years ago in 1990*. Petitioner has endured *fourteen* parole denials by BPT panels and governors *based on her commitment offense*.

The interminable preclusion of petitioner's parole based on static factors of her offense, converting her prison term to life with no possibility of parole, has abrogated her right to due process and liberty interest in parole, particularly after she has remained imprisoned for 13 years in excess of the maximum term prescribed for those facts and has throughout that time been forensically determined to pose the lower risk to public safety possible.

## IV. PETITIONER DID NOT RECEIVE DUE, INDIVIDUALIZED, OR ANY CONSIDERATION BY GOVERNOR SCHWARZENEGGER, WHO DID NOT PERSONALLY REVIEW PETITIONER'S FILES AND THE EVIDENCE RELIED ON BY THE PANEL AS REQUIRED, AND BECAUSE THE DECISION WAS A BOILERPLATE OF ALL REVERSALS OF PAROLES GRANTED BY BPT IN MURDER CASES

### 1.

BPT's and the Governor's staffs write the "Governor's" decisions, by preparing a list of all conceivably negative facts and non-"facts" concerning the commitment offense that omit most parole-favorable evidence on which the BPT panel based its

decision to grant parole.  See exhibit F.  The Governor or a designated member of his staff signs the report but the Governor does not personally review, as required, all or *any* of the materials reviewed by the BPT panel that granted parole.  Governor Schwarzenegger's only involvement is to sign or designate a staff member to sign the report.  The procedure is overtly devoid of due process and violates the language and intent of the statute and State Constitution which require that:

> "[T]he governor, when reviewing the authority's decision . . . shall review materials provided by the parole authority . . . if the governor decides to reverse or modify a parole decision . . . he or she shall send a written statement to the inmate specifying the reasons for his or her decision." (Pen.C. § 3041.2.)

> "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (Cal.Const., Art.V, § 8(b).)

BPT (the "parole authority") "shall" consider "all relevant, reliable information available to the panel." (15 CCR § 2402(b); *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 424-427; see *In re Dunham* (1976) 16 Cal.3d 63, 66; *In re Stanley* (1976) 54 Cal. App.3d 1030, 1038.)

§ 8(b) of Article V of the California Constitution, quoted above, requires a governor's decision to be based on the same factors that the hearing panel considered in arriving at its decision.  See *In re Arafiles* (1992) 6 Cal.App.4th 1467, 1477, 1479, 1481; also, *Johnson v. Gomez* (9th Cir, 1996) 92 F.3d 964, 967; *In re Ramirez, supra*, 94 Cal.App.4th at pp. 559-560.

The current process of rote boilerplate gubernatorial reversals abrogates due process and reduces gubernatorial review to a sham.  The "Governor's" decision is legally untenable because Governor Schwarzenegger was not involved in it.  It

therefore did not provide petitioner with the Governor's individualized consideration of her case or *any* consideration. The action must be set aside because it violates state law and due process. The panel's grant of parole must be reinstated and enforced.

## 2.

A governor's action under Pen.C. § 3041.2 is arbitrary, capricious and denies due process if it is not based on the governor's "individualized consideration" of the case at hand. See *Rosenkrantz,* 29 Cal.4[th] at p. 677. Governor Schwarzenegger did not give individualized (or *any*) consideration to petitioner's case.

"The Governors'" recitations of boilerplate grounds *across-the-board* in all reversals of paroles granted to inmates convicted of second degree murders to characterize *all* second degree murders as "intentional," "deliberate," "premeditated," and committed with varying degrees of "disregard for human life [suffering]" abrogates due process because the boilerplate format is arbitrary in the extreme, not based on individualized consideration.

Review of the Governors' reports to the Legislature for the 6-year period from 1999 through 2004 dispels "individualized consideration." The Governors recited identical grounds in <u>all</u> second degree murder reversals. The governors' parole decisions for the 6-year period contained in the Governors' published Annual Executive Reports to the Legislature reveal that Governor Davis reversed 233 of 242 paroles granted by BPT in second degree murder cases, that Governor Schwarzenegger has reversed 94 of 146 such grants, and that as grounds for *all* such reversals the Governors listed the gravity and factors of the commitment offenses, *all* of which the Governors characterized as "deliberate" or "premeditated" and/or committed with "exceptionally callous disregard for human suffering [life]." In *every*

case the Governor listed the commitment offense as the basis for concluding that the inmate's parole currently poses an "unreasonable risk of danger" to public safety.[7]

Petitioner did not receive individualized consideration or *any* consideration. Use of the formatted boilerplate language in *all* such cases, including petitioner's, as a substitute for the Governor's personal review of the documents considered by the panel that granted parole, to interminably preclude her parole is arbitrary in the extreme, prohibited by the authorities cited herein, and offensive to due process.

## V. THE GOVERNORS' ACTIONS WERE PROHIBITED BY THE EX POST FACTO AND DUE PROCESS CLAUSES OF THE FEDERAL AND CALIFORNIA CONSTITUTIONS

### *1. Ex Post Facto*

Section 8(b) of Article 5 of the California Constitution and its enabling statute, Pen.C. § 3041.2, enacted in 1988 authorizing governors to review, modify, and reverse BPT parole grants in murder cases, are ex post facto when applied to cases like petitioner's in which the offense occurred prior thereto and *in which gubernatorial jurisdiction is based on a plea bargain contract between the State and the defendant.*

In *Rosenkrantz, supra,* 29 Cal.4[th] 616, the California Supreme Court held the law not to be ex post facto when applied to a defendant convicted by a trier of fact of a murder committed prior to its enactment. *Rosenkrantz* is inapplicable and inapposite to petitioner's case. Unlike the petitioner in *Rosenkrantz,* who at trial defended against charges of first degree murder, second degree murder, and voluntary manslaughter and who had no inkling of what his eventual sentence might be nor any voice therein, petitioner waived her not guilty plea and her right to a trial and further agreed to assist the prosecution of her codefendants, thereby subjecting herself to years of peril in

---

[7] On the Court's request, petitioner will lodge copies of the Annual Reports containing all of the governors' decisions.

exchange for a specific sentence, the length of which would be determined solely by the Board of Prison Terms based on her commission of an unpremeditated, unplanned second degree murder according to the laws then in effect.

Imposition of a new obstacle to her parole, almost certain gubernatorial reversal, which has extended her prison term interminably, extinguished two valid grants of parole by BPT to date and will always preclude her parole because her offense can never change, constitutes a classic example of ex post facto law. Because the new law is necessarily more onerous to petitioner it is ex post facto. (U.S.Const., Art.I, §10; Cal.Const., Art.I, §9; *Miller v. Florida* (1987) 482 U.S. 423, 428-432,; *Weaver v. Graham* (1982) 450 U.S. 24, 28-31; *Weaver v. Maas* (9th Cir, 1995) 53 F.3d 956, 959 ; *Fleming v. Oregon Board of Paroles* (9th Cir, 1993) 998 F.2d 721, 725; *In re Stanworth* (1982) 33 Cal.3d 176, 180, 187-188.)

Petitioner, to establish an ex post facto violation, need not prove that she is necessarily serving a longer prison term due to the new law than would have been the case had it not been enacted (*Miller v. Florida, supra,* 482 U.S. at p. 432; *Fleming v. Oregon Board of Paroles, supra,* 998 F.2d at pp. 723-725), although that is the case here, a case that amply satisfies her obligation to establish that application of the new law to her case created a "***significant risk*** of increasing her punishment." See *Garner v. Jones* (2000) 529 U.S. 244, 256. The new gubernatorial obstacle in fact ***necessarily*** works to her detriment and can ***not*** work to her benefit. See *Nulph v. Faatz* (9th Cir, 1994) 27 F.3d 451, 456.

Accordingly, Governors Davis and Schwarzenegger violated petitioners right secured by the Ex Post Facto Clauses of the Federal and State Constitutions in reversing two valid grants of parole by means of a new, more onerous law enacted after she entered into a plea contract with the State to have her prison sentence for second degree murder determined solely by BPT as provided by the laws then in force.

## 2. Due Process

Application of Pen.C. § 3041.2 (Cal.Const., Art.5, §8(b)) to individuals like petitioner who entered into guilty plea contracts prior to its enactment violates the Due Process Clauses of the Federal and State Constitutions.

Petitioner gave the State the substantial benefit of a murder conviction, without costly, protracted proceedings, and extensive personal testimony permitting the State to secure two first degree murder convictions, by waiving all defenses and convicting herself by a plea of guilty. Central to the plea contract was petitioner's reliance on the condition that she would be released on parole once she served her minimum term for second degree murder, met the suitability criteria, and was therefore found suitable for parole by BPT. The State's courts and prosecutors are well aware of and rely on the fact that when defendants enter into pleas to murder they are focused on and motivated by the prospect of parole pursuant to the process then in place. See *Brown v. Poole, supra*, 337 F.3d 1155, citing *INS v. St.Cyr, supra*, 533 U.S. at pp. 322-323.

It cannot be denied that application of Pen.C. § 3041.2 to preclude petitioner's parole interminably has extinguished the consideration the State gave for her plea bargain. Petitioner had a vested right in the parole determination procedure in place at the time of her plea because it is what the State promised in exchange for the valuable consideration, an expedient cost efficient conviction, and a means to procure two additional convictions that she supplied with a guilty plea. (*Newton v. Rumery, supra*, 480 U.S. at p. 394.) When the state nullifies the benefit of a bargain after the fact, it perpetrates "a species of fraud." See *In re Ibarra, supra*, 34 Cal.3d at p. 289. A party of a plea agreement is entitled to enforce it when deprived of its benefits. Failure to hold a party to its terms "would undermine the integrity of the judicial process." See *People v. Vargas* (2001) 91 Cal.App.4[th] 506, 533-534, citing *People v. Collins, supra*, 45 Cal.App.4[th] at pp. 863-864.

Although *Rosenkrantz, supra,*[8] 29 Cal.4th at p. 640, defeated an <u>ex post facto</u> claim[9] by labeling the new gubernatorial power "merely" "an additional level of discretionary review," that definition **defines** a <u>due process</u> violation under these circumstances. Because a plea agreement is a binding contract, it is unacceptable for the State to reap the "benefit of the[ ] plea agreement" and then impose "significant and manifest" detriments on the defendant retroactively. That "would surely be contrary to familiar considerations of fair notice, reasonable reliance, and settled expectations [because it] clearly attaches a new disability, in respect to transactions or considerations already past." See *INS v. St.Cyr, supra,* 150 L.Ed.2d at pp. 375-378. It matters not that parole decisions are discretionary; the United States Supreme Court's holdings in *St.Cyr* were made in the context of a similarly discretionary benefit.

Even if the voters intended the new gubernatorial authority to be retrospective, its impact on existing plea bargains was not contemplated. Because the principle of the above cited Supreme Court cases is controlling, the Governors' power may only be applied to individuals who were convicted by a trier of fact before its passage or who committed their offenses after its passage.[10] Its application to reverse petitioner's grants of parole abrogated her right to due process and liberty interest in parole.

---

[8] The validity of *Rosenkrantz* has been cast into doubt given the United States Supreme Court's decision in *Stogner v. California* (2003) 156 L.Ed.2d 544 , that disapproved the California Supreme Court's "too narrow" ex post facto position in *People v. Frazer* (1999) 21 Cal.4th 737, on which *Rosenkrantz* relied that labeled statutory changes "procedural only" rather than addressing their impact on fundamental fairness.

[9] As detailed in a previous section, *Rosenkrantz*' ex post facto analysis of the impact of the new statute on a defendant convicted by a trier of fact of an offense committed prior to its enactment is inapplicable to a plea bargain for a specific term, sentence, and parole determination.

[10] Petitioner claims separately that even if her plea bargain had been contracted after enactment of the new law, the Governors' decisions in her case would have violated due process and contract law because they were based on re-characterization of her offense as a premeditated first degree murder.

## *CONCLUSION; RELIEF REQUESTED*

Having set forth a prima facie case for relief, petitioner respectfully requests issuance of an order to show cause, and after briefing by the parties based on the foregoing authorities, issuance of a writ of habeas corpus vacating the Governor's action of October 11, 2004, that reversed BPT's second grant of parole, reinstating BPT's decision of May 17, 2004, releasing petitioner on parole on the date calculated therein, and ordering CDCR to credit her parole term with the number of days of her prison confinement in excess of her prison term calculated by BPT, after deducting applicable statutory and regulatory postconviction credit.

## *ADDENDUM*

Petitioner respectfully calls the Court's attention to a newly published, relevant case, *In re Scott* (2005) __Cal.App.4th__, 2005 WL 2651154, in which the Fifth Appellate District properly applied the "some evidence" standard of review and addressed the issue of repeated parole denial based on commitment offenses.

Dated ___10-31-05___

Respectfully submitted,

Adrian T. Woodward
Counsel for Petitioner

# VERIFICATION

I declare, under penalty of perjury, that the facts set forth above are

Dated ___10-31-05___, at Long Beach, California.

Declarant

# *TABLE OF EXHIBITS*

Exhibit A     Abstract of Judgment

Exhibit B     Certified transcript, May 17, 2004 parole hearing

Exhibit C     Governor's reversal decision, October 11, 2004

Exhibit D.    Petitioner's psychological (forensic) evaluations

Exhibit E     Petitioner's correctional evaluation

Exhibit F     Communications regarding BPT's "Executive Summaries"

Exhibit G     Monterey County Superior Court order denying habeas corpus petition

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

ABSTRACT OF JUDGMENT

(Commitment to State Prison)

The People of the State of California,
PLAINTIFF,

vs

BRANDEE TRIPP, DEFENDANT.

Present:
Hon.    Ralph M. Drummond
JUDGE OF THE SUPERIOR COURT
James T. O'Farrell/Gregory Jacobson
DISTRICT ATTORNEY
Frank Dice
COUNSEL FOR DEFENDANT

This certifies that on  2/11/81   Judgment of conviction of defendant was entered as follows:

(1) Case No.  CR 7639  Count No.  3  On his plea of  Guilty

he was convicted by  the Court  of violation of Section 187 of the Penal Code,

murder in the second degree, a felony

with prior felony convictions as follows: None

| Date | County and State | Crime | Disposition |
|------|------------------|-------|-------------|
|      |                  |       |             |

Defendant has been held in custody for  875  days as a result of the same criminal act or acts for which he has been convicted.

Defendant  was not  armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c, 3024.

Defendant  was not  armed with a deadly weapon at the time of his commission of the offense within the meaning of Penal Code Sections 969c, 12022.

Defendant  did not use  a firearm in his commission of the offense within the meaning of Penal Code Sections 969d, 12022.5.

(2) Defendant  was not  adjudged an habitual criminal within the meaning of Subdivision  a  or  b  of Section 644 of the Penal Code, and the Defendant  is not  an habitual criminal in accordance with provisions of Subdivision (c) of that section.

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant be punished by imprisonment in state prison of the state of California for the term provided by law and that he be remanded to the Sheriff of the County of Monterey, and by him delivered to the Director of Corrections of the State of California at  California Institute for Women, Frontera

It is ordered that sentences shall be served in respect to one another as follows:  N/A

and in respect to any prior incompleted sentence(s) as follows:  N/A

(4) To the Sheriff of the County of Monterey and to said Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above named defendant into custody of Director of Corrections at the Facility above named, at your earliest convenience.

Witness my hand and seal of said court

on  February 11, 1981

ERNEST A. MAGGINI, Clerk

By _____
                              Deputy

I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made and entered on the minutes of the Superior Court in the above entitled action as provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court on  February 11, 1981

ERNEST A. MAGGINI, County Clerk and Clerk of the Superior Court of California for the County of Monterey.

By _____
                              Deputy

_____
Judge of the Superior Court of the State of
California for the County of Monterey

CLERK 156 (10/75)

# EXHIBIT B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
 )
BRANDEE TRIPP )
_____ )

CDC Number W-15695



CALIFORNIA INSTITUTION FOR WOMEN

CORONA, CALIFORNIA

MAY 17, 2004

1:50 P.M.

**PENDING REVIEW AND APPROVAL**

PANEL PRESENT:

KEN RISEN, Presiding Commissioner
HERBERT MAY, Deputy Commissioner

OTHERS PRESENT:

BRANDEE TRIPP, Inmate
ADRIAN WOODWARD, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No            See Review of Hearing
_____ Yes           Transcript Memorandum

**Matthew Yates**          **Capitol Electronic Reporting**

ii

## INDEX

Page

Proceedings..................................... 1

Case Factors....................................10

Pre-Commitment Factors..........................23

Post-Commitment Factors.........................29

Parole Plans....................................38

Closing Statements..............................59

Recess..........................................64

Decision........................................65

Adjournment.....................................71

Transcriber Certification.......................72

--oOo--

1

1      **P R O C E E D I N G S**

2           **DEPUTY COMMISSIONER MAY:**  On record.

3           **PRESIDING COMMISSIONER RISEN:**  This is a

4      Subsequent Parole Consideration Hearing for BranDee

5      B-R-A-N-D-E-E Tripp, T-R-I-P-P.  CDC number is W-

6      15695.  Today's date is May the 17th, 2004.  The

7      time is 1:50 P.M. here at the CIW Boardroom,

8      California Institute [sic] for Women.  Prisoner's

9      legal status: She was received 2/18 of '81 from

10     Monterey County.  The offense is murder second,

11     case number CR7639.  Count number three, 187 of the

12     Penal Code.  Term is 15 years to life.  Minimum

13     eligible parole date is 5/6 of 1989.  This hearing

14     is being tape recorded.  For purposes of voice

15     identification, we need to go around the room and

16     identify ourselves.  Please state your name.  Spell

17     your last name.  And in addition to spelling your

18     last name, we need the inmate to give her CDC

19     number.  Go to my left.  My name is Ken Risen, R-I-

20     S-E-N, Commissioner.

21          **DEPUTY COMMISSIONER MAY:**  Herbert May, M-A-

22     Y, Deputy Commissioner.

23          **ATTORNEY WOODWARD:**  Adrian Woodward, W-O-O-

24     D-W-A-R-D, Ms. Tripp's Attorney.  Your turn.

25          **INMATE TRIPP:**  BranDee Tripp, T-R-I-P-P, W-

26     15695.

27          **PRESIDING COMMISSIONER RISEN:**  Okay.  We also

2

1    have one correctional peace officer in the room.

2    She will not be participating in the hearing.  She

3    is here for security purposes.  Ms. Tripp, your

4    first name is spelled Bran, B-R-A-N-capital D-E-E,

5    isn't it?

6         INMATE TRIPP:  Yes, Sir.

7         PRESIDING COMMISSIONER RISEN:  Okay.  Now,

8    you filled out a form 1073, which is our Americans

9    With Disability Act form.  This was done on March

10   15th, 2004 and at that time, you indicated you did

11   not have a disability.  Is that correct?

12        INMATE TRIPP:  Yes, Sir.

13        PRESIDING COMMISSIONER RISEN:  Okay.  What I

14   need you to do is to read that ADA statement there

15   in front of you.

16        INMATE TRIPP:  "The Americans With

17             Disability Act, ADA, is a law to help

18             people with disabilities.

19             Disabilities are problems that make

20             it harder for some people to see,

21             hear, breathe, talk, walk, learn,

22             think, work, or take care of

23             themselves than it is for others.

24             Nobody can be kept out of public

25             places or activities because of a

26             disability.  If you have a

27             disability, you have the right to ask

3

1    for help to get ready for your BPT

2    hearing, get to the hearing, talk,

3    read forms and papers, and understand

4    the hearing process.  BPT will look

5    at what you've asked for to make sure

6    that you have a disability that is

7    covered by the ADA and that you have

8    asked for the right kind of help.  If

9    you do not get help, or if you do not

10    think you got the kind of help you

11    need, ask for a BPT 1074 Grievance

12    form.  You can also get help to fill

13    it out."

14    **PRESIDING COMMISSIONER RISEN:**  Thank you.

15 Now, do you have any problems walking up and down

16 stairs or over a distance of more than 100 yards?

17    **INMATE TRIPP:**  No, Sir.

18    **PRESIDING COMMISSIONER RISEN:**  Do you need

19 glasses or a magnifying device to see or read

20 documents?

21    **INMATE TRIPP:**  Well, I'm waiting for

22 glasses, but it's for distance.  It's not for

23 reading.

24    **PRESIDING COMMISSIONER RISEN:**  Okay.  Do you

25 have any hearing impairments?

26    **INMATE TRIPP:**  No, Sir.

27    **PRESIDING COMMISSIONER RISEN:**  Do you take

4

1    any medication?

2            INMATE TRIPP:  (Inaudible.)

3            PRESIDING COMMISSIONER RISEN:  Any

4    medication that might interfere with your

5    participation in the hearing?

6            INMATE TRIPP:  No, Sir.

7            PRESIDING COMMISSIONER RISEN:  Have you ever

8    been classified as Triple CMS or EOP?

9            INMATE TRIPP:  No, Sir.

10           PRESIDING COMMISSIONER RISEN:  How far did

11   you go in school on the street?

12           INMATE TRIPP:  I went to the 10th or 11th

13   grade.  I got kicked out and then I went to

14   continuation and finished.

15           PRESIDING COMMISSIONER RISEN:  Okay.  So do

16   you have a high school equivalency or a GED?

17           INMATE TRIPP:  I have both.

18           PRESIDING COMMISSIONER RISEN:  Were you ever

19   placed in special education classes or classes for

20   slow learners?

21           INMATE TRIPP:  No, Sir.

22           PRESIDING COMMISSIONER RISEN:  Okay.  The

23   Panel will find that the prisoner has no disability

24   as defined under the Americans With Disability Act.

25   Would you agree, Counsel?

26           ATTORNEY WOODWARD:  I agree.

27           PRESIDING COMMISSIONER RISEN:  Okay.  The

5

1  purpose of today's hearing is to again consider
2  your suitability for parole.  In arriving at a
3  decision, we will consider the commitment offense,
4  your prior criminality and social history, as well
5  as your behavior and overall programming since your
6  commitment.  We have reviewed your files and prior
7  transcripts.  You will have an opportunity to make
8  corrections and clarifications regarding the
9  records.  We will probably read into the record
10  Statement of Facts as reflected by the record.  We
11  will then directly go to your progress since your
12  last hearing, referring to new psychiatric reports,
13  and any other information that has a bearing on
14  your parole suitability.  Any additional parole
15  plans should be brought to our attention.  The
16  prisoner's attorney and the prisoner will be given
17  an opportunity to make a statement regarding parole
18  suitability and length of confinement.  After this
19  is done, we will recess, clear the room, and
20  deliberate.  Once we've reached our decision, we'll
21  resume the hearing and announce the decision.  The
22  prisoner is afforded certain rights, timely notice
23  of this hearing today, availability to review the
24  Central File, the right to present relevant
25  documents at this hearing, the right to an
26  impartial Panel.  Is the prisoner's attorney
27  satisfied these rights are met?

6

1          **ATTORNEY WOODWARD:**  Yes.

2          **PRESIDING COMMISSIONER RISEN:**  The prisoner

3     will receive a copy of a tentative written decision

4     today.  That decision becomes effective upon

5     approval by the Decision Review Unit at the Board

6     of Prison Terms.  Later, you will receive a

7     transcript and a copy of the decision.  It's

8     automatically sent to you.  As of May 1st, 2004,

9     there was a major change limiting your right to

10    appeal.  The Board of Prison Terms no longer accept

11    appeals.  You have to appeal directly to the

12    courts.  And apparently, that information is

13    contained in the prison law library and there's

14    (inaudible) in the Administrative Appeals

15    correspondence, grievance concerning Board of

16    Prison Term decisions.  It's administrative

17    directory AD 4 slash 01.  Okay, today you will not

18    be required to discuss the commitment offense with

19    the Panel, and you will not be required to admit

20    the commitment offense.  However, the Panel accepts

21    as true the Court findings.  Any confidential

22    materials?

23         **DEPUTY COMMISSIONER MAY:**  There will be

24    none, Mr. Chairman, thank you.

25         **PRESIDING COMMISSIONER RISEN:**  Okay.  Any

26    additional documents for us to review today?

27         **ATTORNEY WOODWARD:**  As requested, have the

7

1    Chairpersons had an opportunity to read the brief

2    submitted by my office?   Because I was afraid --

3    it's not in front of you.

4         PRESIDING COMMISSIONER RISEN:   Where?

5    Where?   I didn't see it.

6         ATTORNEY WOODWARD:   I didn't see it in front

7    of you and it was submitted.

8         PRESIDING COMMISSIONER RISEN:   Nope.

9         ATTORNEY WOODWARD:   So I'm a little

10   concerned.

11        PRESIDING COMMISSIONER RISEN:   I was going

12   to say I have two documents, one letter from the

13   archdiocese and a letter from someone else.   So I

14   only have those two letters.   Are there more than

15   that?

16        ATTORNEY WOODWARD:   Yes.   There's additional

17   documentation from a prospective employer.   There's

18   documentation from a conversion to a controlled

19   halfway house, (inaudible).   I can submit copies to

20   this Board presently.

21        DEPUTY COMMISSIONER MAY:   You want to do

22   that right now?

23        ATTORNEY WOODWARD:   My only concern is that

24   the brief is --

25        DEPUTY COMMISSIONER MAY:   Do you have a copy

26   of it?

27        ATTORNEY WOODWARD:   I do.

8

1          DEPUTY COMMISSIONER MAY:   (Inaudible.)   Is

2     that a copy of your (inaudible)?.

3          ATTORNEY WOODWARD:   These are the two copies

4     of an indication from Casanova and your prospective

5     employer.

6          DEPUTY COMMISSIONER MAY:   Okay.   Great.

7     That's really cool.

8          ATTORNEY WOODWARD:   Absolutely.   I don't

9     think the Chairman will have an opportunity to read

10    this.   Mind if we take a brief recess for you?

11         PRESIDING COMMISSIONER RISEN:   Okay, in a

12    moment, we'll take a recess and I'll read them.

13         ATTORNEY WOODWARD:   Yeah.

14         PRESIDING COMMISSIONER RISEN:   I have a

15    hearing check -- No, why don't we finish this so I

16    don't forget where we're at.

17         ATTORNEY WOODWARD:   Yes, I apologize.   These

18    are also two letters, one from two family members

19    that are supportive of her release.

20         PRESIDING COMMISSIONER RISEN:   Okay, so four

21    letters and a brief?   Okay, I have a checklist of

22    documents contained in my file.   I've marked it

23    Exhibit One.   I'd like you to look at it to ensure

24    that you have those documents.   Also, do you have

25    this letter from the Arroyo Grande Police

26    Department?

27         ATTORNEY WOODWARD:   No.   That was never --

9

1    We have (inaudible) type concerns.  We never

2    received a notification from (inaudible).

3        PRESIDING COMMISSIONER RISEN:  I'm sure it's

4    basically the same as it said last time.  Almost

5    word for word.

6        ATTORNEY WOODWARD:  Okay.  Thank you.  I

7    believe I'm aware of the documentation of

8    (inaudible), I'm sure.

9        PRESIDING COMMISSIONER RISEN:  Okay.  Any

10    objections at this time?  Are they in the brief?

11        ATTORNEY WOODWARD:  The objections are not

12    in the brief.  My only concern is the brief is a

13    relevant document and as long as the gentleman --

14    Mr. Risen, you indicate that you're going to --

15    Excuse me, Risen -- read the brief.  It's relevant,

16    and so that's my only concern.

17        PRESIDING COMMISSIONER RISEN:  Okay.  I will

18    read it in just a moment, then.  At this point,

19    we'll go to recess.  The time is 2:04 and we'll

20    call you back in in a few minutes.

21        ATTORNEY WOODWARD:  Thank you.  I understand

22    and appreciate.

23                [Off the record.]

24        DEPUTY COMMISSIONER MAY:  We're back on

25    record.

26        PRESIDING COMMISSIONER RISEN:  Okay, we'll

27    resume the hearing.  We have read the Counsel's

10

1 brief and we do have copies of them.  The time is

2 2:20.  At this point, is the prisoner going to

3 address the Panel today?

4 　　　　ATTORNEY WOODWARD:  Yes.

5 　　　　PRESIDING COMMISSIONER RISEN:  Could you

6 raise your right hand, please?  Best you can.  Do

7 you solemnly swear or affirm that the testimony you

8 give at this hearing will be the truth, the whole

9 truth, and nothing but the truth?

10 　　　　INMATE TRIPP:  I do.

11 　　　　PRESIDING COMMISSIONER RISEN:  Okay.  I'm

12 going to read the Statement of Facts from the

13 summary of the crime in the June, 2004 Board

14 report.

15 　　　　　　　"On July 8th of 1979, the victim's

16 　　　　　　　mother reported her daughter missing

17 　　　　　　　and indicated William Ruckert,

18 　　　　　　　parenthesis, BranDee Tripp's

19 　　　　　　　stepfather parenthesis, might be

20 　　　　　　　involved in the disappearance of her

21 　　　　　　　daughter.  The victim was scheduled

22 　　　　　　　to testify against Mr. Ruckert in a

23 　　　　　　　child molestation case.  Subsequent

24 　　　　　　　investigation led Jon Sorenson to

25 　　　　　　　reveal knowledge of a conspiracy to

26 　　　　　　　kidnap the child by Mr. Ruckert and

27 　　　　　　　Mr. Hilton Tripp, T-R-I-P-P,

11

1        parenthesis, Mrs. Tripp's husband,

2        close parenthesis. Roger Ladd

3        indicated Mr. Ruckert offered him

4        $1,000 to kidnap the victim's older

5        sister Betty Ann Murdock. He

6        observed Hilton Tripp, Randy Cook,

7        and BranDee Tripp discussing methods

8        of killing the older sister. Mr.

9        Ladd also observed further

10       discussions of methods of kidnapping

11       and killing Tamron Carpenter by

12       Hilton and BranDee Tripp. On July

13       9th, 1979, Hilton Tripp implicated

14       Randy Cook as the person who killed

15       the victim and acknowledged he

16       assisted in burying the child. He

17       stated his wife BranDee was in

18       agreement with the kidnapping and

19       arranged for the child to leave the

20       home in order to facilitate the

21       event. The body of the victim was

22       found buried near Avila Beach, A-V-I-

23       L-A. Ms. Tripp was arrested on July

24       10th, 1979."

25   Okay. Would you like to make any corrections or

26   clarifications regarding this crime?

27           **INMATE TRIPP:** Well, some of the things in

12

1    there I really don't remember happening.  I mean, I

2    didn't know that Roger Ladd was approached.  I was

3    always been under the impression that we brought

4    him into the mess.  Because I was staying at his

5    trailer and my ex-husband, now, found me when we

6    were discussing everything which involved Roger,

7    but I don't remember him being directly involved as

8    far as that version.  I always thought we

9    implemented him just by -- I mean, just by being in

10   his area.

11          PRESIDING COMMISSIONER RISEN:  Okay, were

12   you -- Okay, let me ask you this.  Now, were you

13   ever present when there was a conversation between

14   Ruckert, yourself, and someone else to kidnap the

15   older sister and kill her?

16          INMATE TRIPP:  Well, it was a while ago.  It

17   was a few Board hearings ago.  And at the time,

18   they didn't really care to know and -- What

19   happened at the time is me and Randy went with

20   Hilton to talk to my stepfather.  But me and Randy

21   had to sit in the car, and that would be Cook.

22   That would be Mr. Cook.  And we watched Hilton talk

23   to my stepfather on the front of our grass where my

24   mom's house is.  That was when he was staying -- He

25   was being allowed to go there to get his clothes at

26   the time.  And we watched the conversation, but we

27   never really heard the conversation.  But when it

13

1    came to testifying to them, I perjured myself and

2    said I heard everything.  And I just repeated what

3    my husband told me because I didn't think that my

4    stepfather should be the only one not going

5    anywhere.

6         PRESIDING COMMISSIONER RISEN:  Okay.

7         ATTORNEY WOODWARD:  I think -- necessary to

8    clarify that for me is that -- I think what Ms.

9    Tripp is indicating at the trial for Mr. Ruckert,

10   she was primary state's witness against him.  Had

11   she not testified, it's quite probable he would

12   have been exculpated, I think.  Because they

13   couldn't find -- So she perjured herself to convict

14   Mr. Ruckert and become the star witness against Mr.

15   Ruckert in the subsequent (inaudible) convicted of

16   first degree.

17        PRESIDING COMMISSIONER RISEN:  Okay.  Does

18   that mean that her husband Hilton never testified

19   against Ruckert?

20        INMATE TRIPP:  Not to my knowledge.  I was

21   the last one that they ever seen.

22        PRESIDING COMMISSIONER RISEN:  Okay.

23        INMATE TRIPP:  Out of the -- There was four

24   of us.  I was the last.  That would have went to

25   trial if I hadn't pled guilty.

26        PRESIDING COMMISSIONER RISEN:  Okay, now the

27   first one they were going to kidnap was -- and

14

1  according to someone, murder -- would be the older

2  sister.  What was her name?

3      INMATE TRIPP:  Betty Ann Maddox.

4      PRESIDING COMMISSIONER RISEN:  Okay.  What

5  ever happened to her?

6      INMATE TRIPP:  Okay.  He came with this

7  wonderful idea.  I wasn't real thrilled.  And in my

8  mind at the time, I didn't really think I was

9  participating in murder.  And they did discuss

10  murder and they were smoking a joint and they were

11  talking, just like, bizarre, and I told them, I'm

12  not helping you with any murder.  I'll get her out

13  of the house.  If you want to do what you're going

14  to do, you can do it.

15      PRESIDING COMMISSIONER RISEN:  Okay.

16      INMATE TRIPP:  But I'll get her out of the

17  house.  But when I went to get her out of the

18  house, they stayed in the bushes and nobody did

19  anything.  So she went back to her home, so nothing

20  ever happened to her.

21      PRESIDING COMMISSIONER RISEN:  So we're

22  talking about the older sister?

23      INMATE TRIPP:  That's the older sister.

24      PRESIDING COMMISSIONER RISEN:  Okay.  Now,

25  how were you involved in the younger sister's

26  kidnapping?

27      INMATE TRIPP:  In the beginning, I was

15

1    actually running interference with her. Because

2    they were talking and they wanted to kill her. I

3    didn't want to kill her. I didn't want to help

4    kill her. I didn't think she needed to be dead,

5    and I didn't want to do it. And so, we'd set up

6    little plans and they'd kind of just casually fall

7    through. And it wouldn't work, and I'd take Tammy

8    home and we'd go places, and I'd take Tammy home.

9    Well, the day that this happened, before it

10   happened, my husband promised me that no one would

11   get hurt. He promised me that he would go pick

12   Tammy up if I sent her down to the store. I could

13   go to Randy's house and watch her, and they would

14   go convince my stepfather that they kidnapped her

15   and she wouldn't be testifying to get the money.

16   And then we were going to let her go.

17         PRESIDING COMMISSIONER RISEN: And you were

18   supposed to be at Randy Cook's house?

19         INMATE TRIPP: Yeah.

20         PRESIDING COMMISSIONER RISEN: The trailer.

21         INMATE TRIPP: So after she came up -- No, I

22   was supposed to be -- He lived with his girlfriend

23   in a house in Arroyo Grande. So I went after her

24   mom called, I went to Randy's house and I waited

25   and I waited and I waited. And in my head, I knew

26   something wasn't going right, but I was afraid to

27   leave, because I was afraid if I wasn't where I was

16

1   supposed to be and something happened to her, then

2   it was my fault.  And that's how I thought when I

3   was  --

4           PRESIDING COMMISSIONER RISEN:  Okay.  Now

5   how did Tamron Carpenter, the victim, know you?

6           INMATE TRIPP:  He --

7           PRESIDING COMMISSIONER RISEN:  She.

8           INMATE TRIPP:  They were a friend of my

9   stepdad's for years and I met them through my

10  stepfather for years.

11          PRESIDING COMMISSIONER RISEN:  Did you watch

12  them?  Were you like a caretaker?

13          INMATE TRIPP:  Well, no.  We never

14  babysitted, but her older sister, Betty Ann, was my

15  best friend.

16          PRESIDING COMMISSIONER RISEN:  The one --

17          INMATE TRIPP:  The older one.

18          PRESIDING COMMISSIONER RISEN:  The older

19  one.

20          INMATE TRIPP:  Maddox.

21          PRESIDING COMMISSIONER RISEN:  Okay.  But

22  Tamron knew you well.

23          INMATE TRIPP:  Yeah.

24          PRESIDING COMMISSIONER RISEN:  So if you

25  went to Randy Cook's house and held her there, how

26  -- Once you ultimately got away, how would you not

27  be identified?

1        **PRESIDING COMMISSIONER RISEN:** Probably.

2        **INMATE TRIPP:** I would have called the

3 police. I did try to call the police once or

4 twice, but I got scared. When they picked up the

5 phone, I hung up. And I called from a payphone.

6 And now that I'm older, I know that I knew at the

7 time something wasn't right. Or I wouldn't be

8 trying to call the police.

9        **PRESIDING COMMISSIONER RISEN:** Okay. What

10 you're saying, then, is on July 8th, '79, when they

11 didn't bring the girl to you, you knew something

12 was wrong. And so you tried to call the police?

13        **INMATE TRIPP:** I tried twice and I got

14 scared and I hung up the phone as soon as he

15 answered. I was at a payphone in old Arroyo Grande

16 by this bridge. And I hung up the phone. I never

17 talked to anyone because I got scared. In my head,

18 I was thinking, well, if I'm not there and they

19 show up, what happens if they take things into

20 their own hands?

21        **PRESIDING COMMISSIONER RISEN:** Okay, now,

22 she knew both Hilton and Randy Cook? Hilton Tripp?

23        **INMATE TRIPP:** I'm not sure if she really

24 knew Randy really well, but she knew Hilton because

25 he was with me most of the time.

26        **PRESIDING COMMISSIONER RISEN:** Okay. And

27 you sent her to the store near Avila Beach?

20

1        **INMATE TRIPP:**  No.  I sent her down -- The

2   store was, like, right down from her house.  But

3   they were parked down there waiting.

4        **PRESIDING COMMISSIONER RISEN:**  Did you

5   ever --

6        **INMATE TRIPP:**  They (inaudible) up on a hill

7   and the store was right --

8        **PRESIDING COMMISSIONER RISEN:**  Okay.  You

9   were arrested two days later.  Did you ever talk to

10  Hilton and Randy?

11       **INMATE TRIPP:**  No.  No.  What actually

12  happened is they picked me up for questioning.  I

13  denied the whole thing.  I acted like I didn't know

14  anything.  And they held me.  And at the time, I

15  guess it was 23 hours.  They can hold you 23 hours

16  and they have to let you go if they're not going to

17  arrest you.  And during that time, Hilton had came

18  into the police department looking for me.  And

19  they ended up picking him up because he had a

20  juvenile warrant for him for a prior conviction.

21  And they let me go and then I think I got arrested

22  the next day.  I think it was the next day early

23  morning.  I mean, I went through a whole day and

24  then they woke me up out of a dead sleep, so it

25  was, like, two days later, the following morning.

26  But it was, like, within a 24 hour period

27  (inaudible).

22

1    the area.

2        **PRESIDING COMMISSIONER RISEN:** Well, how

3    would you handle a situation like that today?

4        **INMATE TRIPP:** If I heard anyone

5    conspiracizing about any kind of awful thing, I

6    would call the police within a minute. I would

7    have no problem turning anyone in today. Because

8    when I was young, you think, no, they're really not

9    going to do it. You know, people always talk and

10   it's like, they really don't mean it. I wouldn't

11   take that chance. Because what if they do mean it.

12   You know. Tammy's gone, and it is my fault.

13   Because she would have never went down to the

14   store. You know, and they may have not have done

15   anything if I hadn't helped, but I wouldn't have

16   helped if they hadn't promised me that she wouldn't

17   have got hurt. The reason it took so long --

18       **PRESIDING COMMISSIONER RISEN:** Then your

19   motivation was you wanted the $1,000?

20       **INMATE TRIPP:** Well, I wanted to burn my

21   stepfather. I wanted to pay him back for

22   everything that I went through with him.

23       **PRESIDING COMMISSIONER RISEN:** And how did

24   you plan to do that?

25       **INMATE TRIPP:** When he gave us the money, we

26   were going to turn Tammy loose and let her testify.

27   We weren't going to keep her. We were going to let

23

1    her do what she needed to do.  Because we knew he

2    wouldn't -- The one thing we did know is he would

3    never turn us in.  Because what would he say.  You

4    know, he couldn't turn us in.  And I don't remember

5    who put that knowledge in our head, but we knew

6    that for a fact that he wouldn't turn us in.  So if

7    he gave us the money, there was nothing he could do

8    if Tammy showed up to testify.

9         PRESIDING COMMISSIONER RISEN:  Okay, but it

10   was $1,000.

11        INMATE TRIPP:  Well, they said 1,000.  I was

12   told 10,000, so I'm not really sure because I never

13   really heard -- The only thing I heard was what

14   Hilton ever told us.

15        PRESIDING COMMISSIONER RISEN:  Okay, now

16   let's go over your pre-conviction factors.  Says

17   you have no juvenile record.

18        INMATE TRIPP:  No, I don't have (inaudible).

19        PRESIDING COMMISSIONER RISEN:  Okay.  Now,

20   in the Governor's letter, he said that in the '85,

21   '91, and '93 psych evaluation, you talked about

22   shoplifting as a juvenile.  Did you do that?

23        INMATE TRIPP:  I was a delinquent at times,

24   but I never got arrested for it.

25        PRESIDING COMMISSIONER RISEN:  Okay.  Then

26   you stole cars.

27        INMATE TRIPP:  I stole two cars to run away

24

1    with.

2         PRESIDING COMMISSIONER RISEN:  Okay.  And

3    then you stole money from your parents?

4         INMATE TRIPP:  I did steal money from my

5    mom.

6         PRESIDING COMMISSIONER RISEN:  Back to the

7    commitment offense.  Was there any drugs or alcohol

8    on your part?  Were you using drugs or under the

9    influence of alcohol?

10        INMATE TRIPP:  When we were talking about

11   Betty Ann, we were smoking weed.  We were pretty

12   loaded.

13        PRESIDING COMMISSIONER RISEN:  Okay, but on

14   the --

15        INMATE TRIPP:  But I don't remember doing

16   drugs or alcohol at the time when Tammy -- I really

17   tried to talk them out of it and why I didn't call

18   the cops --  At that age, that young.  I think it's

19   because I thought I was in love with him, and I

20   realized that wasn't love when I grew up.  I'm not

21   real sure why.  I think my judgment was very

22   impaired because of everything.  I think I hated my

23   stepfather so much, honestly, that it just blinded

24   me of what was really right and wrong.

25        PRESIDING COMMISSIONER RISEN:  Okay.  But

26   drugs or alcohol didn't cloud your decision-making

27   abilities on this particular day when you sent the

25

1    victim down to the market?

2         INMATE TRIPP:  I don't think so.  I don't

3    remember being high or drinking that day.

4         PRESIDING COMMISSIONER RISEN:  And you had

5    no adult convictions (inaudible).

6         INMATE TRIPP:  No.

7         PRESIDING COMMISSIONER RISEN:  Okay.  Says

8    you're divorced.  Were you divorced at the time of

9    the commitment offense?

10         INMATE TRIPP:  No.  I was still married and

11    my attorney advised me not to get a divorce until

12    after everything was over.  So when I arrived at

13    CIW within the year, I was divorced.

14         PRESIDING COMMISSIONER RISEN:  Okay.  You

15    were born where?  In California?

16         INMATE TRIPP:  Yes.  San Luis Obispo.

17         PRESIDING COMMISSIONER RISEN:  You have one

18    half-sister and one half-brother.  Your parents

19    separated when you were two years old.

20         INMATE TRIPP:  Yes.

21         PRESIDING COMMISSIONER RISEN:  Your mother

22    married William Ruckert.  That's the guy who was

23    charged with the molestation.

24         INMATE TRIPP:  Yeah.

25         PRESIDING COMMISSIONER RISEN:  You were

26    especially close to your maternal grandmother, who

27    is now deceased.

26

1        INMATE TRIPP:  Yes.

2        PRESIDING COMMISSIONER RISEN:  Your mother

3   was a secretary and Ruckert was an electrician?

4        INMATE TRIPP:  Yes.

5        PRESIDING COMMISSIONER RISEN:  Says you were

6   close to your stepfather despite the fact he once

7   attempted to molest you once you were seven years

8   of age.

9        INMATE TRIPP:  That part I disagree because

10   it wasn't a once thing.  It was from seven all my

11   life until I decided I wasn't sleeping with him.

12   It was a molest thing when I was younger and as I

13   matured, it became a money exchange thing.  For me.

14        PRESIDING COMMISSIONER RISEN:  You received

15   average grades in school.  Not a behavioral problem

16   until you met Hilton Tripp.  That was your husband,

17   the guy you married.

18        INMATE TRIPP:  Yes, Sir.

19        PRESIDING COMMISSIONER RISEN:  And that

20   would be in the 10th grade?

21        INMATE TRIPP:  Yeah, it was the 10th grade.

22        PRESIDING COMMISSIONER RISEN:  What kind of

23   an influence did he have on you?

24        INMATE TRIPP:  He was the one who was saving

25   me from my stepdad.  That's why I ran away so much.

26        PRESIDING COMMISSIONER RISEN:  Okay.

27        INMATE TRIPP:  Because he was going to

27

1   protect me and save me.

2       PRESIDING COMMISSIONER RISEN:  And it says

3   you graduated from a continuation high school.

4       INMATE TRIPP:  Yes, Sir.

5       PRESIDING COMMISSIONER RISEN:  Now, you

6   didn't want to marry Tripp?

7       INMATE TRIPP:  When I was pregnant, I didn't

8   want to get -- Getting married wasn't something I

9   really wanted.

10      PRESIDING COMMISSIONER RISEN:  Okay, but

11  your parents --

12      INMATE TRIPP:  My stepdad did and one of my

13  grandmothers.  They said it would be wise because I

14  was pregnant and I should do the right thing and

15  not have the baby out of --

16      PRESIDING COMMISSIONER RISEN:  And Tripp was

17  the father.

18      INMATE TRIPP:  Tripp was the father.

19      PRESIDING COMMISSIONER RISEN:  Okay, then

20  your mother adopted the child.

21      INMATE TRIPP:  Yes, Sir.

22      PRESIDING COMMISSIONER RISEN:  And how old

23  is she now?

24      INMATE TRIPP:  She's going to be 25 in June.

25      PRESIDING COMMISSIONER RISEN:  Any type of

26  work prior to coming to prison?

27      INMATE TRIPP:  I had pieces of jobs.

28

1     **PRESIDING COMMISSIONER RISEN:**  How long was

2  the longest time you worked?

3     **INMATE TRIPP:**  Probably, like, three months.

4  I was in Texas when I got certified to become a

5  nurse's aide.

6     **PRESIDING COMMISSIONER RISEN:**  Okay, how

7  long before the commitment offense were you in

8  Texas?

9     **INMATE TRIPP:**  I went to Texas the summer of

10  '77.  Because I had just graduated.  That's when I

11  first met my (inaudible).  And I had to get a job

12  to come back to California.

13     **PRESIDING COMMISSIONER RISEN:**  And you

14  worked about three months doing what?

15     **INMATE TRIPP:**  I was working in a nursing

16  home.  Trying to become a nurse.  It was a class

17  where you worked.  You could become a nurse's aide

18  as you were working and you took the schooling and

19  the training at the same time.

20     **PRESIDING COMMISSIONER RISEN:**  Okay, now,

21  did you have a problem with drugs at all on the

22  street?

23     **INMATE TRIPP:**  I consider me an addict, an

24  alcoholic, only because of the way I consumed

25  alcohol and drugs.  When I did them, I consumed a

26  lot of them.  I didn't just --

27     **PRESIDING COMMISSIONER RISEN:**  Okay.  What

29

1    age did you start using drugs?

2            INMATE TRIPP:   I started smoking weed in the

3    ninth grade.

4            PRESIDING COMMISSIONER RISEN:   And it just

5    went on from there?

6            INMATE TRIPP:   Yeah.   Most of my stuff was I

7    smoked marijuana and I drank hard liquor.   Once in

8    a while, I would do acid.   Once in a while, I'd do

9    speed.   Once in a while, but --

10            PRESIDING COMMISSIONER RISEN:   Okay.   And at

11    this point, we'll go to the next part of the

12    hearing, post-conviction factors.

13            DEPUTY COMMISSIONER MAY:   Thank you, Mr.

14    Chairman.   At the last hearing -- That was November

15    the 6th, 2002.   Inmate was granted, but the

16    Governor, on April 4th, 2003, reversed the grant

17    and with the following decision:

18            "According to the Probation Officer's

19            report, Tamron Carpenter and her

20            older sister were schedule to testify

21            in a criminal proceeding that William

22            Ruckert had sexually abused them.

23            Mr. Ruckert offered $10,000 to his

24            stepdaughter BranDee Tripp, her

25            husband Hilton, and her husband's

26            friend to kill the girls before they

27            could testify.   The originally agreed

30

1    to kidnap and murder Tamron's older
2    sister.  When that plan failed, they
3    plotted to kidnap the 10 year old
4    Tamron.  Ms. Tripp, age 20, was a
5    family friend of the young victim.
6    In fact, Mrs. Tripp was the only
7    person Tamron's mother trusted to
8    take Tamron places.  Ms. Tripp
9    arranged to take Tamron swimming on
10   July the 8th, 1979.  According to the
11   plans Tripp sent Tamron to the store
12   alone.  Mr. Tripp and his friend met
13   Tamron there, offering to give her a
14   ride back.  This provided them the
15   opportunity to kidnap Tamron, taking
16   her to the beach, where Mrs. Tripp
17   and her husband lived.  Ms. Tripp's
18   husband and his friend tied Tamron
19   up, dug a shallow grave, and then
20   strangled and buried her.  Ms. Tripp
21   pled to second degree murder on the
22   condition that she testify against
23   her stepfather, William Ruckert.  She
24   was sentenced to 15 years to live.
25   While incarcerated, Mrs. Tripp has
26   participated in many self-help and
27   therapy programs, including Alcohol

31

1    and Narcotic Anonymous, 12 Step

2    program, various psychotherapy

3    groups, anger management programs,

4    and Victim Awareness Programs. She

5    has also been involved with a variety

6    of organizations and activities. She

7    has completed her GED and taken some

8    additional classes. All this is

9    commendable. The crime she

10.  facilitated, however, was

11   particularly heinous, the planned

12   killing of an innocent child to

13   prevent her from testifying against a

14   serial child abuser. It was clear

15   that Tamron's mother was concerned

16   about her child's safety. Mrs. Tripp

17   was the only person she trusted to

18   take care of Tamron. Mrs. Tripp

19   abused the trust of not only Tamron's

20   mother, but also Tamron herself.

21   Mrs. Tripp arranged to send Tamron to

22   the store by herself for the very

23   purpose of facilitating the

24   kidnapping and subsequent murder.

25   Mrs. Tripp claims that she only

26   agreed to arrange for the kidnapping

27   on the condition that no one was to

32

1    be hurt.  This is simply not credible

2    and is inconsistent with the facts.

3    Mrs. Tripp claimed she has accepted

4    responsibility for the crime and

5    realizes that her cooperation made

6    the victim more accessible to being

7    kidnapped and murdered.  I am not

8    convinced, however, that Ms. Tripp is

9    not trying to minimize her

10    culpability.  She says that the plan

11    had been to kidnap Tamron, collect

12    the money, and doublecross her

13    stepfather.  But she had to realize

14    that Mr. Ruckert would not agree to

15    pay anything while Tamron's sister

16    could still testify against him.

17    Furthermore, it is not credible that

18    she did not know that Tamron would be

19    killed.  Indeed, in her 1999

20    psychiatric evaluation, Mrs. Tripp

21    admits that she and her husband

22    discussed killing both Tamron and her

23    sister.  Moreover, Mrs. Tripp and her

24    husband lived in a tent.  Mrs. Tripp

25    had to know that they could not keep

26    Tamron hidden there very long.  The

27    planned kidnap and murder of a 10

33

1        year old child is atrocious in and of

2        itself, but Mrs. Tripp's motive is

3        especially heinous.  She aided in the

4        murder of profit to prevent the

5        victim from testifying and to allow a

6        serial child abuser to continue

7        abusing other innocent children.

8        These factors are far beyond the

9        minimum required to support a

10       conviction of second degree murder.

11       The Arroyo Grande Police Department

12       recommended against parole due to

13       Mrs. Tripp's active participation in

14       this heinous crime.  I agree.  The

15       calculated murder for hire,

16       demonstrating especially callous

17       disregard for human suffering,

18       indicates that Mrs. Tripp is not

19       suitable for parole at this time.

20       Additionally, I note that one factor

21       the Board relied upon in granting

22       parole was that Mrs. Tripp had no

23       juvenile record.  I question,

24       however, Mrs. Tripp's truthfulness

25       regarding her discussion of her

26       juvenile history.  During the

27       psychological evaluation in 1985,

34

1    1991, and 1993, she admitted to

2    having had behavior problems,

3    shoplifting, stealing cars, and

4    stealing from her parents. Yet at

5    the 2002 hearing, she indicates that

6    she had no prior criminal activities

7    before the murder. Mrs. Tripp has

8    demonstrated a very unstable

9    lifestyle. She was expelled from

10   school in the 10th grade. She is an

11   alcoholic and (inaudible) from

12   cocaine beginning as a teenager.

13   Prior to the murder, she was living

14   in a tent and stealing for food. In

15   prison, she accumulated 21

16   disciplinary reports, the most recent

17   in 1999. Over the years, psychiatric

18   evaluations have diagnosed her as

19   polysubstance dependent, having an

20   anti-social personality disorder, and

21   a quick and violent temper. Ms.

22   Tripp's role in this murder for hire

23   showed an exceptional callousness and

24   indifference to human life. In view

25   of her unstable history and

26   lifestyle, Mrs. Tripp must

27   demonstrate over a prolonged period

35

1    that the gains she has begun to make

2    in a controlled institutional setting

3    can be maintained upon release.  I am

4    also concerned that Mrs. Tripp lacks

5    realistic parole plans.  She has a

6    sparse employment history before

7    incarceration and does not appear to

8    have any credible employment

9    prospects if paroled.  Instead, she

10   intends to rely on a trust fund and

11   live with her mother.  In this

12   unstructured environment, Mrs. Tripp

13   may lose the gains she has made in

14   prison.  Based upon each of the

15   negative factors discussed above, I

16   believe Mrs. Tripp still poses an

17   unreasonable risk of danger to

18   society if paroled at this time.

19   Accordingly, I reverse the Board of

20   Prison Terms' decision to parole Mrs.

21   Tripp."

22 Since her last hearing, she has remained

23 disciplinary free.  She has accumulated a total of

24 14 128s, the last being May the 27th, 1999 for

25 excessive property.  A total of 11 115s, the last

26 being March the 31st, 1988, Division F.  And since

27 the last hearing, she has continued to participate

36

1    in various self-help and voluntary activities. She

2    completed the Inmate Assistance Module of Anger

3    Management, continued attendance and participation

4    as a member of AA, NA. She also participated in

5    the SOS group crochet project from November the

6    15th, 2002 through May 1st, 2003, and the CIW mass

7    choir. Then the assessment. Mrs. Tripp last

8    appeared before the Board -- She has continued to

9    participate in self-help, voluntary activities, and

10   the assessment was a positive outlook for its

11   future parole possibility and is an asset to the

12   institution. A summary by the Counselor, and that

13   is Pete Florence. With consideration to the

14   commitment offense, prison adjustment, and personal

15   interaction with Mrs. Tripp, this writer believes

16   the prisoner would probably pose a medium to low

17   degree of threat to the public if released from

18   prison at this time. The psychiatric report by Dr.

19   Hu dated January the 16th, 2004. Axis I, no

20   diagnosis. Axis II, no diagnosis. The Doctor

21   concluded the inmate has not been dangerous within

22   a controlled setting.

23          "I do not believe that she will be

24          dangerous if released to the

25          community. This is based on the

26          interview as well as review from her

27          Central File. The first couple of

37

1    years of incarceration has been

2    difficult with numerous write-ups.

3    However, the inmate has been

4    motivated in her self-discovery and

5    has improved dramatically over the

6    years, to the point where she has

7    matured significantly.  The inmate

8    has gained a healthy respect for the

9    rights and privacy of others and

10   appeared to have followed diligently

11   in the rules and regulations here at

12   this institution.  The inmate has

13   been able to keep her pathological

14   characteristics in control and she

15   has also attained a certain level of

16   peace and contentment within herself.

17   Her parole plans, though a viable

18   one, may be better improved if

19   certain additional structures are

20   involved, such as a search for higher

21   education in a junior college, or

22   even a college degree.  Given her

23   level of high intellectual

24   functioning and, or the possibility

25   of a reentry program that can offer

26   her a better strategy of acclimation

27   back into society.  Risk factors, as

38

1          always, would be if she ever

2          attempted to resort to acts of

3          criminality, though given her level

4          of peace and contentment, I would not

5          suspect that to be the case."

6    With that, I will return to the Chair.

7          PRESIDING COMMISSIONER RISEN:  Okay.

8    Regarding your parole plans, I'm going to work from

9    your attorney's brief.  It indicates that you've

10   been accepted by the Casa Solano, a residential

11   treatment facility in Grover Beach.  Is that

12   correct?

13         INMATE TRIPP:  Yes, Sir.

14         PRESIDING COMMISSIONER RISEN:  And that's

15   where you were raised, in Grover Beach?

16         INMATE TRIPP:  Yes, Sir.

17         PRESIDING COMMISSIONER RISEN:  Your mother

18   also lives near there.

19         INMATE TRIPP:  Yeah.

20         ATTORNEY WOODWARD:  And extensive family.

21         PRESIDING COMMISSIONER RISEN:  Yeah.  Also,

22   they provide transportation.  Says here, the

23   residents providing transportation, teaching

24   residents necessary life skills.  Have you ever had

25   a driver's license?

26         INMATE TRIPP:  Yeah.  I had a driver's

27   license before I got arrested.