# EXHIBIT 1
# Part 1 of 2



# SUPERIOR COURT OF CALIFORNIA
## COUNTY OF MONTEREY

FILED

MAR 0 3 2005

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
————— DEPUTY

In re        ) Case No.: HC5015
         )
 BRANDEE TRIPP,   )
         )
     Petitioner,  )
         )
For Writ of Habeas Corpus.  )
         )

---

## PETITION FOR WRIT OF HABEAS CORPUS
## MEMORANDUM OF POINTS & AUTHORITIES
## EXHIBITS A-F

---

ADRIAN T. WOODWARD, Esq.
Law Offices of Adrian T. Woodward
State Bar # 184011
4000 Long Beach Boulevard
Long Beach, CA 90807
Telephone: (562) 424-4880

Counsel for Petitioner
BRANDEE TRIPP

# *TABLE OF CONTENTS*

|  | Page No. |
|---|---|
| Custody | 1 |
| Jurisdiction & Venue | 2 |
| Administrative Remedies | 2 |
| Petitioner's Offense, Prior Record, and Commitment | 2 |
| Petitioner's Post-Conviction Record | 3 |
| Petitioner's Forensic Evaluations; Assessment of Parole Risk | 4 |
| Parole Proceedings | 4 |
|     1986-2001 | 4 |
|     Petitioner's First Parole Grant and Reversal (2003) | 4 |
|     Petitioner's Second Parole Grant (2004) | 5 |
|     The Governor's Reversal of Petitioner's Second Parole Grant | 8 |
| The Requirements of Due Process; Standard of Review | 8 |
| Petitioner's Constitutional Claims | 10 |
| **I. Because the Governor's Finding, that Petitioner's Parole Poses "an Unreasonable Risk of Danger to Society," and, Therefore, that Petitioner is Unsuitable for Parole, is Inapposite to the Record and Supported by no Evidence, Whatsoever, Parole Reversal Abrogated Due Process and Petitioner's Liberty Interest in Parole.** | 10 |
| **II. The Governor's Action Violated Due Process Because it was Based on Incorrect "Facts" and Breached the Express Terms of Her Plea Bargain.** | 11 |
| **III. The Governors' Actions were Prohibited by the Ex Post Facto and Due Process Clauses of the Federal and California Constitutions.** | 17 |
| **IV. Invocation of the Unchangeable Facts of Petitioner's Commitment Offense to Interminably Preclude Her Parole Abrogates Due Process.** | 21 |

## *TABLE OF CONTENTS*
### *(Continued)*

**V. The "Governor's" Decision Voiding Petitioner's Parole**
**Abrogated Due Process and Violated Section 8(b) of Article 5**
**of the California Constitution; it was not the Governor's**
**Decision, but one Written by BPT Staff Signed by the Governor**
**or a Member of his Staff Without the Governor's Personal**
**Review Required by Law.**                                        23


Conclusion; Relief Requested                                        25

Verification                                                        26

## *TABLE OF EXHIBITS*

Exhibit A    Abstract of Judgment

Exhibit B    Certified transcript, May 17, 2004 parole hearing

Exhibit C    Governor's reversal decision, October 11, 2004

Exhibit D    Petitioner's psychological (forensic) evaluations

Exhibit E    Petitioner's correctional evaluation

Exhibit F    Communications regarding BPT's "Executive Summaries"

# *TABLE OF AUTHORITIES*

<u>Page Nos.</u>

**Cases**

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 …..………………………….8, 21, 22

*Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155 ……………………………………… 14, 19

*Fleming v. Oregon Board of Paroles* (9th Cir.1993) 998 F.2d 721 …………………… 18

*Garner v. Jones* (2000) 529 U.S. 244 …………………………………………………… 18

*Griggs v. Superior Court* (1976) 16 Cal.3d 341 ……………………………………………… 2

*In re Arafiles* (1992) 6 Cal.App.4th 1467 ……………………………………………… 24

*In re Dannenberg* (2005) ___ Cal.4th ___, 2005 WL 170692………………………9, 15, 21

*In re Dunham* (1976) 16 Cal. 3d 63 ……………………………………………………… 24

*In re Ibarra* (1983) 34 Cal.3d 277 ……………………………………………………… 15, 19

*In re Minnis* (1972) 7 Cal. 3d 639 ……………………………………………………………… 9

*In re Ramirez* (2001) 94 Cal.App.4th 549…………………………………………8, 9, 24

*In re Rosenkrantz* (2002) 29 Cal.4th 616 ……………………………8, 9, 17, 20, 24

*In re Sena* (2001) 94 Cal.App.4th 836 ……………………………………………………… 2

*In re Smith* (2003) 109 Cal.App.4th 489 …………………………………………………… 11

*In re Stanley* (1976) 54 Cal.App.3d 1030 ……………………………………………… 24

*In re Stanworth* (1982) 33 Cal.3d 176 ………………………………………………… 18

*INS v. St. Cyr* (2001) 533 U.S. 289 …………………………………………… 14, 19, 20

*Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964 ……………………………………… 24

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ……………………………………… 8

*Miller v. Florida* (1987) 482 U.S. 423 ………………………………………………… 18

*Newton v. Rumery* (1987) 480 U.S. 386………………………………………13, 19, 21

*Nulph v. Faatz* (9th Cir. 1994) 27 F.3d 451 …………………………………………… 18

*People v. Barasa* (2002) 103 Cal.App.4th 287 ……………………………………… 16

*People v. Collins* (1996) 45 Cal.App.4th 849 ………………………………………… 13, 19

*People v. Cunningham* (1996) 49 Cal.App.4th 1044 …………………………………… 13

*People v. Frazer* (1999) 21 Cal.4th 737…………………………………………………… 20

*People v. Harvey* (1979) 25 Cal.3d 754 ………………………………………………… 16

*People v. Leroy* (1984) 155 Cal.App.3d 602 …………………………………………… 13

# TABLE OF AUTHORITIES

## (continued)

*People v. Mancheno* (1982) 32 Cal.App.3d 855 ................................................................. 13

*People v. Vargas* (2001) 91 Cal.App.4th 506 ................................................................. 19

*Santabello v. New York* (1971) 404 U.S. 257 ................................................................. 15

*Stogner v. California* (2003) 156 L.Ed.2d 544 ................................................................. 20

*Weaver v. Graham* (1982) 450 U.S. 24 ................................................................. 18

*Weaver v. Maas* (9th Cir. 1995) 53 F.3d 956 ................................................................. 18

**Statutes**

Pen.C. §1508 ................................................................................................................. 2

Pen.C. § 2900.5 ............................................................................................................. 3

Pen.C. § 3041 ................................................................................................ 4, 8, 9, 21

Pen.C. § 3041.2 ......................................................................................... 5, 17, 19, 24

Pen.C. § 4019 ................................................................................................................. 3

**Regulations**

15 CCR § 2000 ............................................................................................................... 3

15 CCR § 2280 ............................................................................................................... 8

15 CCR § 2281 ............................................................................................................... 8

15 CCR § 2401 ............................................................................................................... 4

15 CCR § 2402 ......................................................................................................... 4, 24

15 CCR § 2403 ............................................................................................................... 3

15 CCR § 2410 ............................................................................................................... 3

**Constitutional Provisions**

U.S.Const., Art.I, §10 .................................................................................................. 17

Cal.Const., Art. I, § 9 ................................................................................................... 18

Cal.Const., Art.V, § 8(b) ................................................................................ 5, 9, 17, 19, 24

Cal.Const., Art.VI, § 10 ................................................................................................. 2

1  ADRIAN T. WOODWARD, Esq.
   Law Offices of Adrian T. Woodward
2  State Bar # 184011
   4000 Long Beach Boulevard
3  Long Beach, CA 90807
   Telephone: (562) 424-4880
4
   Counsel for Petitioner
5  BRANDEE TRIPP

6

7                    SUPERIOR COURT OF CALIFORNIA

8                         COUNTY OF MONTEREY

9

10  In re                          ) Case No.:_____
                                   )
11     BRANDEE TRIPP,              ) **PETITION FOR WRIT**
                                   ) **OF HABEAS CORPUS;**
12                  Petitioner,    ) **MEMORANDUM OF**
                                   ) **POINTS & AUTHORITIES;**
13  For Writ of Habeas Corpus.     ) **EXHIBITS A-F**
                                   )
14  ──────────────────────────────)

15

16      Based on the facts, grounds, authorities and exhibits herein, petitioner

17  respectfully applies for issuance of a writ of habeas corpus vacating Governor

18  Schwarzenegger's action of October 14, 2004, that reversed the May 17, 2004 decision

19  by the Board of Prison Terms (BPT) granting petitioner parole (the second time

20  petitioner's parole grant has been reversed by a Governor), reinstating BPT's decision,

21  and directing the Department of Corrections to release petitioner on parole forthwith

22  and to credit her parole term with the time during which she has been confined in

23  prison in excess of her prison term calculated by BPT at her May 17, 2004 parole

24  hearing, after its reduction by appropriate postconviction credit.

25

26                              **Custody**

27      Petitioner is confined by the Department of Corrections (CDC) at California

28  Institution for Women, Corona, California, Dawn Davison, Warden.

### Jurisdiction and Venue

This Court has original jurisdiction to issue the writ (Cal.Const., Art.VI, § 10; Pen.C. § 1508), and venue to adjudicate the petition (petitioner was prosecuted, and her parole will occur, in Monterey County). See *In re Sena* (2001) 94 Cal.App.4th 836; *Griggs v. Superior Court* (1976) 16 Cal.3d 341.

### Administrative Remedies

There is no administrative remedy for an unconstitutional action by a governor reversing a BPT grant of parole.

## PETITIONER'S OFFENSE, PRIOR RECORD AND COMMITMENT

On February 11, 1981, pursuant to her guilty plea to second degree murder, petitioner was sentenced by the Monterey County Superior Court, case no. CR7639, to 15 years-to-life for the July 3, 1979, murder of Tameron Carpenter. (Exhibit A.) At the time of the offense, petitioner was 20 years old and had no prior criminal record. (Exhibit B, pp. 10-11, 23-25.)

Randy Cook and Hilton Tripp, petitioner's husband, kidnapped the victim, age 10, in order to receive $1,000 promised by William Record (Ruckert), petitioner's stepfather, to prevent the victim from testifying against Record in a child molestation case. Cook and Hilton Tripp eventually choked, killed, and buried the victim. Petitioner, as revenge against her stepfather who had sexually molested and physically abused her from age 7 to age 19, planned to keep Tamara's whereabouts secret, then to release her to testify against him. She sent Tamara to the store, where she would be abducted by her husband and Cook. Petitioner, who did not plan or anticipate a murder, has since prior to her commitment accepted responsibility and admitted her role in the offense. (Exhibit B, pp. 10-21, 23-27.)

Petitioner was committed to prison on February 18, 1981. Her minimum eligible parole date (MEPD)[1] lapsed on May 6, **1989**. (Exhibit B, p.1.) The <u>maximum</u> prison term prescribed by the regulations for the facts of petitioner's particular second degree murder lapsed in **1992**.[2] The net prison term set by the 2004 BPT parole hearing panel, 131 months, when reduced by 29 months of pre-sentencing credits, lapsed in **1990**. (Exhibit B, p. 69.)

## **PETITIONER'S POST-CONVICTION RECORD**

Petitioner has maintained an exemplary, disciplinary-free record for 16 years. Her last disciplinary infraction occurred in 1988 (failure to report to work). Her work supervisors' reports have been consistently excellent. Her classification score (19) is the lowest attainable for a lifer. Petitioner earned her GED and became certified in two vocations, Word Processing and Forklift Operation. She has successfully completed all applicable therapy and self-help programming, including attendance in AA and NA since 1988, Women Against Abuse, Relapse Prevention, Breaking Barriers, Drug Awareness Counseling, New Beginnings, SOS, Inmate Assistance Module, American Bible Program, and Arts in Corrections. Petitioner's file is replete with laudatory chronos for her conduct, work, and reform from custody and free staff, and for her charitable work. Her parole plans, repeatedly approved by BPT, include offers of employment, a residence, and substantial family and community support. BPT has consistently acknowledged petitioner's exemplary record of good conduct, work, reform, and rehabilitation. See exhibit A, pp. 65-68; exhibit E.

---

[1] The minimum eligible parole date (MEPD) is defined as "the earliest date on which an ISL or life prisoner may be released on parole." (15 CCR § 2000(b)(66).)

[2] 15 CCR § 2403(c) prescribes a maximum base term of 18 years (subsec. II-A: victim had relationship to prisoner but not directly assaulted by prisoner), to be reduced by 64 months of postconviction credit (4 months for each of 16 disciplinary free years of imprisonment per 15 CCR § 2410), resulting in a net maximum prison term of 12 years, 8 months, which must be further reduced by deducting 875 days of pre-sentencing Pen.C. §§ 2900.5, 4019 credit (exhibit A), resulting in a parole date that lapsed in 1992.

## PETITIONER'S FORENSIC EVALUATIONS;
## ASSESSMENT OF PAROLE RISK

In recent years petitioner has been uniformly evaluated to pose a low, if any, parole risk. In the current psychological evaluation, Peter Hu, M.D., a forensic psychiatrist, concluded that petitioner has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. (Exhibit D, p. 3.)  Two years earlier, a different forensic psychiatrist, Robert D. McDaniel, M.D., reached the same conclusions. (Exhibit D, pp. 5-6.)  A like assessment occurred in 1999. (Exhibit D, pp. 13-14.)

## PAROLE PROCEEDINGS

### 1986-2001

At 12 parole hearings between 1986 and 2001, BPT panels found petitioner unsuitable for parole, based largely or entirely on her commitment offense, and therefore refused to set her prison term or a parole date.[3]  At her 10 hearings since 1990, the panels scheduled petitioner's subsequent hearing in one year, the shortest interval permitted.[4]

### Petitioner's First Parole Grant and Reversal (2003)

On November 6, 2002,  a BPT panel unanimously found petitioner suitable for parole and set her prison term and a parole date.  The panel's grounds for suitability were similar to those set forth at petitioner's 2004 hearing, detailed *infra*.

---

[3] The parole statutes and regulations prescribe a 2-step process: The panel first determines whether a lifer is suitable or unsuitable for parole based on a preponderance of the evidence addressing the issue of whether parole would pose "an unreasonable risk of danger" to "public safety."  The panel proceeds to the second step of determining the length of the prison term and a parole date for lifers it finds to be suitable for parole. Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).

[4] Petitioner's counsel will provide, upon the Court's request, certified copies of her past parole hearings transcripts. The transcript of petitioner's 2004 parole hearing is attached as exhibit B.

Predictably, on April 4, 2003, former Governor Gray Davis, exercising his authority under Pen.C. § 3041.2 and Art. V, § 8(b) of the California Constitution, reversed the parole grant, based mainly on petitioner's commitment offense.

### Petitioner's Second Parole Grant (2004)

On May 17, 2004, a new panel unanimously found petitioner suitable. The panel addressed at length the findings stated by Governor Davis for his reversal of the previous panel's grant of parole, and read his report into the record. See exhibit B, pp. 29-38, 48-54. The District Attorney did not oppose parole, nor did members of the victim's family. The panel explained in detail the grounds for its finding of suitability:

> The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison.
>
> The prisoner, while imprisoned, has enhanced her ability to function within the law upon release through participation in educational programs. She has obtained a GED [and] a vocational certificate in forklift operation and also in vocational word processing . . . She's been in AA and NA since . . . 1988. She's been in the SOS program. She's taken the Women Against Abuse program, the American Bible Academy, Arts and Correctional Music Program, the Relapse Prevention program, the HIV AIDS Prevention program, and Breaking Barriers. Her institutional job assignment is in the PIA working as a label mechanic operator since 2000, and she has received satisfactory work reports in that assignment.
>
> The prisoner lacks a significant criminal history of violent crime. Because of maturation, growth, greater understanding, and advanced age has reduced the probability of her recidivism.

The prisoner has realistic parole plans, which includes a job offer and family support . . . I would rate the parole plans as superior. She has a place to live at the Casa Solano, which is in Grover Beach [and] a [2] job offer[s].

The prisoner has maintained close family ties while in prison by letters and visits [and] has maintained positive institutional behavior, which indicates significant improvement in self-control. She has had no 115s [disciplinary infractions] since 1988 . . .So we feel that she has a good disciplinary record while in custody.

Prisoner shows signs of remorse. She has indicated that she understands the nature and the magnitude of the offense and accepts responsibility for her criminal behavior and has a desire to change towards good citizenship.

The most recent psychological report, authored by Peter Hu . . . a staff psychologist . . . is favorable. He states,

> The inmate has not been dangerous within a controlled setting, and I do not believe that she will be dangerous if released to the community. The inmate has gained a healthier respect for the rights and privacy of others and appears to have followed diligently in the rules and regulations here at the institution. The inmate has been able to keep her pathological characteristics in control and she has obtained a certain level of peace and contentment with herself. Risk factor, as always, would be if she ever attempted to resort to acts of criminality, though given her peace and contentment, I do not suspect that to be the case.

The psych evaluation prior to that was prepared on 9/10 of '99 by Robert D. McDaniels, who's also a staff psychiatrist. It is favorable. He states,

1
2
3
4
5
6
7

     The inmate has not been dangerous within a controlled setting. I do not believe she would be dangerous if released to the community. Her orientation was obviously changed over many years, as reflected by a good work ethic and her involvement within the institution. A significant risk factor, as always, would be appropriate parole plans. However, these have been deemed viable in the past.

8
    (Exhibit B, pp. 65-68.)

9
10
    The panel set petitioner's base term at the mid-term of 204 months prescribed by

11
the regulations for the specific factors of her offense including her relationship with the

12
victim and the fact that she did not participate in the killing. The panel deduced 73

13
months of postconviction credit as prescribed in the regulations, resulting in a total

14
period of confinement of 131 months. (Exhibit B, p. 69.)

15
    Parole conditions imposed by the panel included abstinence from alcohol and

16
substance abuse therapy and testing. (Exhibit B, p. 69.)

17
    In closing, the panel commented:

18
19
20
21
22
23
24
25
26
27

    Couple of comments. I noticed that when you talked About . . . your involvement in the crime, you were very emotional. And I think that is a consideration. I also took into consideration the fact that you've been denied and still kept programming. You didn't give up. There's a lot of people in the institution that will depend on you because people who go out and make mistakes and have to come back, it reflects on them. We as panel members say, where did I go wrong. So you've got a lot of things resting on you. But I want to say that I didn't give you the date. You earned it. You've done a good job in here. So good luck in the future. (Exhibit B, pp.70-71.)

28

### The Governor's Reversal of Petitioner's Second Parole Grant

On October 11, 2004, Governor Schwarzenegger reversed petitioner's second grant of parole, concluding, as always, "I believe she would pose an unreasonable threat to public safety if released from prison at this time." (Exhibit C, p. 3.)  The sole ground stated by the Governor for that conclusion was the 25-year old commitment offense itself, described by the Governor as "premeditated," "monstrous," and demonstrative of "exceptional depravity and an utterly callous disregard for human life and suffering" that petitioner, who was in a "position of trust . . .could have prevented." (Exhibit C, pp. 2-3.)

## REQUIREMENTS OF DUE PROCESS; STANDARD OF REVIEW

1. State parole statutes and regulations bestow on life prisoners a liberty interest in parole protected by due process. (*McQuillion v. Duncan* (9th Cir.2002) 306 F.3d 895, 901-903 ["*McQuillion*"]; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 621 ["*Rosenkrantz*"].

2. Said liberty interest is heightened considerably in the case of an inmate like petitioner who has already been granted a parole date. (*McQuillion*, 305 F.3d at 903.)

3. Petitioner's liberty interest required her being found suitable for, and granted parole because, after her minimum eligible parole date lapsed, she was evaluated not to pose an unreasonable risk of danger to public safety. (Pen.C. §3041(a); 15 CCR §§ 2280, 2281(a).)  Accordingly, BPT panels found petitioner suitable and set parole dates at her successive 2002 and 2004 hearings.

4. Although the commitment offense may justify a finding of unsuitability in some cases, it cannot serve as the basis for *repeated* or *interminable* parole denials. (*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910, 916 [*Biggs*]; see *In re Ramirez* (2000) 94 Cal. App.4th 549, 569-570.)

5. The BPT panel was required to base its findings on a weighing of all relevant, reliable evidence before it. (*Rosenkrantz*, 29 Cal.4th at 655; 15 CCR § 2281(b); *In re*

*Minnis* (1972) 7 Cal. 3d 639, 646; *Ramirez*, 94 Cal.App.4th at pp. 569-672.)

6. Governors are bound by the same statutory and regulatory constraints that bind parole determination by BPT. A governor's decision reversing a BPT parole grant must be based on the governor's personal review of the same evidence that the BPT panel considered and upon the same factors that the BPT panel was required to consider. (*Rosenkrantz*, 29 Cal.4th at p.676; Cal.Const., Art.V, §8(b).)

7. Due process requires that the grounds set forth by a governor for a decision reversing a BPT parole grant must be supported by at least some reliable, relevant evidence. (*Rosenkrantz*, 29 Cal.4th at p. 658.)

8. *In re Dannenberg* (2005) ___ Cal.4th ___, 2005 WL 170692, will undoubtedly be cited by respondent in defending petitioner's constitutional claims. Although the Court in *Dannenberg* broadened BPT's discretion to base parole unsuitability on factors of the commitment offense, the Court did not extinguish a reviewing court's duty to find some reliable, relevant evidence in the record to support each ground stated for parole unsuitability, nor did it condone the Executive Branch's use of static commitment offense factors to *interminably* preclude parole, untenably converting petitioner's legislatively prescribed, judicially imposed sentence of 15 years to life with the possibility of parole, defined by the parole statute as a probability of parole (Pen.C. § 3041(a): panel "shall normally grant a parole release date"), to life without any possibility of parole.

9. As set forth by the controlling authorities cited *infra*, this Court and, more importantly, the Governor, a member of the Executive Branch, absolutely bound by the terms of petitioner's plea agreement, are constitutionally and contractually prohibited from imposing a new, extremely more onerous level of gubernatorial review to reverse her parole grant, and from precluding her parole by re-characterizing her commitment offense as a premeditated first degree murder after striking that offense as a condition of the plea and after petitioner had fully performed her end of the bargain.

# PETITIONER'S CONSTITUTIONAL CLAIMS

## I. *BECAUSE THE GOVERNOR'S FINDING, THAT PETITIONER'S PAROLE POSES "AN UNREASONABLE RISK OF DANGER TO SOCIETY," AND, THEREFORE, THAT PETITIONER IS UNSUITABLE FOR PAROLE, IS INAPPOSITE TO THE RECORD AND SUPPORTED BY NO EVIDENCE WHATSOEVER, PAROLE REVERSAL ABROGATED DUE PROCESS AND PETITIONER'S LIBERTY INTEREST IN PAROLE*

The Governor's basis for reversing petitioner's parole grant was a boilerplate recitation that her parole poses an "unreasonable threat to public safety if released from prison at this time." (Exhibit C, p. 3.) The sole ground stated by the Governor in support of that conclusion, the commitment offense, is detailed *infra*. Parole denial on that basis abrogated due process because *no* evidence whatsoever supports the notion that petitioner's parole poses an unreasonable risk and because *all* evidence in the record, which the Governor did not review, that addresses petitioner's current parole risk and potential danger to public safety, assesses these factors as <u>low</u>. Not a speck of evidence supports "the Governor's" contrary recitation.

The only reliable evidence of petitioner's current dangerousness and parole risk, her forensic psychiatric and correctional evaluations, are uniformly parole-favorable and assess these factors to be low. For several years, petitioner has been consistently evaluated to pose a low parole risk. Last year Peter Hu, M.D., a forensic psychiatrist, concluded that petitioner has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. (Exhibit D, p. 3.) Two years earlier, Robert D. McDaniel, M.D., reached the same conclusions (exhibit D, pp. 5-6), as was the case in 1999. (Exhibit D, pp. 13-14.)

1   *All* forensic documentary evidence addressing petitioner's level of danger and

2   parole risk developed over the past 6 years places her in the lowest category. *No*

3   evidence supports Governor Schwarzenegger's contrary notion that petitioner's parole

4   poses "an unreasonable threat." Parole reversal based on such a whim abrogated due

5   process and petitioner's liberty interest in parole. See *In re Smith* (2003) 109 Cal.App.

6   4th 489, 506-507 [no evidence supporting Governor Davis' "unreasonable risk"

7   grounds; parole ordered].

8

9   ## II. *THE GOVERNOR'S ACTION VIOLATED DUE PROCESS BECAUSE IT WAS*

10  *BASED ON INCORRECT "FACTS" AND BREACHED THE EXPRESS TERMS*

11  *OF HER PLEA BARGAIN*

12      The Governor's sole ground for his "unreasonable risk"/parole unsuitability

13  finding, petitioner's commitment offense, was legally untenable because it was based

14  on incorrect "facts" and re-classification of petitioner's offense as a first degree

15  murder in violation of her plea bargain.

16

17  ### 1. The Governor Relied on Incorrect Facts

18      The Governor stated petitioner, her husband, and Cook "decided to kidnap *and*

19  *kill*" the victim, that petitioner "helped plan the kidnap *and murder*." (Exhibit C, p. 2;

20  emphasis added.) No such testimony was elicited against petitioner, who was not tried.

21  In the perpetrators' trials, a single witness testified he overheard the three defendants

22  mention a possible killing. Petitioner did not contemplate murder or agree to do more

23  than what she did, help set up the kidnapping by sending the victim to the store.    She

24  intended, as revenge against her stepfather who had sexually and physically abused her

25  for 12 years, to keep Tamara's location secret until his trial and then insure her

26  testimony against him. Petitioner was shocked and dismayed to learn of the victim's

27  death. (Exhibit B, pp. 12-23.) Had petitioner known that Tameron would be harmed,

28

she would not have participated even in the revengeful act.  Petitioner did not participate in, plan, anticipate, or contemplate a murder; she participated in a kidnapping.  Notably, the prosecutor's office, although notified, did not submit documents or attend petitioner's hearing to claim otherwise.  Contrary to the Governor's notion, petitioner's statements are not "inconsistent."  For more than 25 years she has consistently maintained that although murder may have been discussed at one point, it was not in the plan that she helped initiate or anticipated by her.

*Accordingly, reversal of petitioner's parole grant based on the notion that she planned or premeditated a murder was arbitrary and abrogated due process.*

## 2. Basing Parole Reversal on a Re-characterization of the Offense as a First Degree Murder Abrogated Due Process and Breached the Express Terms of Petitioner's Plea Bargain

In exchange for the State's promise to determine her offense to be second degree murder and her sentence to be that for second degree murder, petitioner waived her constitutional rights, pled guilty to that offense, and testified truthfully as promised against the two remaining defendants.  In entering into the plea bargain, petitioner understood and relied on the fact that she would be eligible for parole around 1989 and that her parole suitability would be determined only by BPT.

The Governor's sole ground for reversing petitioner's parole grant was the commitment offense, re-cast by the Governor as a first degree murder.  The Governor stated that petitioner "premeditated" the offense, that she "planned" the victim's murder.  (Exhibit C, p. 2.)  Aside from the falsity of that finding, reversal on that basis violated the express term of petitioner's plea agreement that the offense was *not* premeditated, *not* first degree, and did *not* involve the planning of a murder on her part.

Whether "some evidence" exists that petitioner planned or premeditated a murder is also irrelevant because the Due Process Clause prohibits the State from reneging on its promise. The Legislative Branch has decreed a different and less severe punishment for second degree murder than that prescribed for first degree murder. When the Executive Branch enters into a plea bargain with a defendant it binds itself, as when enacting a contract, to the terms of that plea. If the principal term of a plea is that the murder be designated as being of the second degree, then, plainly, it would be a violation of that plea for a different division of the Executive Branch to unilaterally re-characterize the appropriate punishment. The Judicial Branch, by accepting a plea reducing a first degree murder to a second degree, places a constitutional imprimatur upon the contract and is available to either party seeking redress. See *People v. Cunningham* (1996) 49 Cal.App.4th 1044, 1047: "A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound."

Sometimes it is the defendant who breaches the plea. In *People v. Collins* (1996) 45 Cal.App.4th 849, 863, when the defendant breached the plea bargain by refusing to testify as promised against a co-defendant, the Court of appeal held: "The reciprocal nature of a plea bargain agreement mandates that either party to the agreement be entitled to enforce the agreement in a situation where the party is deprived of the benefit of the bargain." Usually, all that is required of a defendant is to waive his or her constitutional rights and accept immediate punishment. See *Newton v. Rumery* (1987) 480 U.S. 386, 394: "When the State enters a plea bargain with a criminal defendant, it receives immediate and tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources." After a defendant has performed his or her part of the bargain the remedy of specific performance of the State's obligation exists. (*People v. Leroy* (1984) 155 Cal.App.3d 602, 606; *People v. Mancheno* (1982) 32 Cal.3d 855, 860.)

Petitioner gave the State much more than the usual acceptance of immediate punishment. She agreed to testify against the codefendants. In doing so, petitioner substantially assisted the prosecutor and State in securing their convictions, and exposed herself to the fright and peril of a "rat jacket" that has persisted throughout 25 years of her imprisonment to date.

The government insures a defendant that her punishment will be imposed as contemplated at the time of the plea. Although remedying the Governor's breach of a plea agreement may vindicate the rights of a disrespected member of society, it focuses the Court's resources on the honor of the government and the fair administration of justice. Fundamental precepts of due process are abrogated when, in order to extract additional punishment from an agreement entered by a defendant, ***the State increases the punishment by increasing the degree of the offense pled***.

Respondent may argue that it was never an explicit term of the plea that the Governor would be bound by the prosecutor's and plea court's concession that the offense must be designated as second degree murder. What, then, was the purpose of the plea bargain? Petitioner, who had insisted on a jury trial and had valid defenses available, certainly did not give or intend to give the State everything she had fought against theretofore. It would be absurd to believe that when a defendant enters into a plea to second degree murder she does so in order to have her punishment fixed as that contemplated for first degree murder. Please see the recent BPT case of *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155, citing *INS v. St.Cyr* (2001) 533 U.S. 289, 322-323, 325 [inferring based on general analysis of what would motivate defendants to accept plea agreements that particular "defendant 'almost certainly' relied on availability of particular relief"].

1    It was not a term of the plea that a governor would have the power of

2    nullification.[5] No defendant at the time would have entered such a plea, and defense

3    counsel for such a defendant would have been derelict for not warning the client of the

4    illusory nature of such a "deal," which would betray the District Attorney's ethical

5    duty, as a representative of the state, to conduct the state's business fairly and honestly.

6    See *In re Ibarra* (1983) 34 Cal.3d 277, 289 [illusory concessions offered by state in

7    plea bargain constitute "a species of fraud"]; *Santabello v. New York* (1971) 404 U.S.

8    257, 261 [plea bargain contracts "presuppose fairness in securing agreement between

9    an accused and a prosecutor"].

10    The Governor may argue, as suggested recently in *Dannenberg*, 2005 WL

11    170692, that even if the offense must be designated as second degree murder, he must

12    still be able to decide whether it was a particularly egregious example of that offense

13    or whether petitioner's role was more than the minimum necessary to constitute its

14    elements and, for that reason, deny parole. The notion is tantamount to a claim to

15    unfettered discretion regardless of the terms of the plea bargain. Further, an inability

16    to define the offense as a more serious, first degree murder, does not deprive the

17    Governor of the use of any of BPT's other codified factors indicating parole

18    unsuitability, e.g., serious prison misconduct, unviable parole plans, or failure to

19    reform or participate in therapy or other programming.

20    Requiring her parole decisions to be based on the crime being second degree

21    murder was the *only* benefit petitioner would receive from her plea. When, as here, the

22    only basis for a Governor's jurisdiction over petitioner is her plea bargain, her due

23    process and liberty interest rights compel a Governors' strict compliance with its

24    terms, which absolutely precluded the actions of Governors Davis and Schwarzenegger

25    that have twice extended her prison term. On this issue, the State's highest court has

26    explained:

27

28

---

[5] The Governor's authority to modify and reverse BPT parole grants did not exist until 1989, an issue detailed in the following subsection.

1
2
3
4
5
6
7
8

> It would be improper and unfair to permit the sentencing court to consider any of the facts underlying the dismissed count for purposes of aggravating or enhancing defendant's sentence. Count three was dismissed in consideration of defendant's agreement to plead guilty to counts one and two. Implicit in such a plea bargain, we think, is the understanding (in the absence of any contrary agreement) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count. (*People v. Barasa* (2002) 103 Cal.App.4th 287, 291, quoting *People v. Harvey* (1979) 25 Cal.3d 754, 758.)

9
10
11
12
13
14
15
16
17
18
19

Thus, for at least 25 years it has been held "improper and "unfair" to circumvent a plea by using the material the People bargained away against the defendant. The California Supreme Court holds the principle "implicit." The United States Supreme Court also recognizes it. It is <u>implicit</u> in a plea bargain reducing the charge of first degree murder to second degree murder, that the indeterminate sentence will not, in actual fact, be based on a representation of the crime as a first degree murder, eliminating all benefit to the defendant from the plea bargain under the guise and expedient of quasi-judicial action by political appointees. The California Supreme Court holds that the State "cannot with one hand give a benefit and with the other take it away." (*People v. Harvey, supra*, 25 Cal.3d at p. 758.)

20
21
22
23
24
25
26
27

Had the prosecutor or trial judge believed that petitioner has acted in a "brutal," or "premeditated" manner or that her role in the offense amounted to first degree murder, there would have been no plea bargain. Petitioner's second degree plea resulted from the prosecutor's obvious difficulty in proving the elements of first degree murder, specifically, that she planned the murder and acted with premeditation. *Because the Governor's action depriving petitioner of parole was based on the allegation of first degree murder, i.e., that she planned and premeditated the victim's murder, an overt violation of her plea bargain, it must be set aside.*

28

### III. *THE GOVERNORS' ACTIONS WERE PROHIBITED BY THE EX POST FACTO AND DUE PROCESS CLAUSES OF THE FEDERAL AND CALIFORNIA CONSTITUTIONS*

#### *1. Ex Post Facto Claim*

Section 8(b) of Article 5 of the California Constitution and its enabling statute, Pen.C. § 3041.2, enacted in 1988 authorizing governors to review, modify, and reverse BPT parole grants in murder cases, are ex post facto when applied to cases like petitioner's in which the offense occurred prior thereto and in which gubernatorial jurisdiction is based on a plea bargain contract between the State and the defendant.

In *Rosenkrantz, supra,* 29 Cal.4th 616, the California Supreme Court held the law not to be ex post facto when applied to a defendant convicted by a trier of fact of a murder committed prior to its enactment. *Rosenkrantz* is inapplicable and inapposite to petitioner's case. Unlike the petitioner in *Rosenkrantz*, who at trial defended against charges of first degree murder, second degree murder, and voluntary manslaughter, and who had no inkling of what his eventual sentence might be and had no voice therein, petitioner waived her not guilty plea and her right to a trial, and further agreed to assist the prosecution of her codefendants, thereby subjecting herself to years of peril in exchange for a specific sentence, the length of which would be determined solely by the Board of Prison Terms based on her commission of an unpremeditated, unplanned second degree murder.

Imposition of a new obstacle to her parole, almost certain gubernatorial reversal, which has extended her prison term and the prison terms of most similarly situated prisoners indefinitely and has extinguished two valid grants of parole by BPT thus far, constitutes a classic example of ex post facto law. Because the new law is necessarily more onerous to petitioner, it is ex post facto. (U.S.Const., Art.I, §10; Cal.Const.,

Art.I, §9; *Miller v. Florida* (1987) 482 U.S. 423, 428-432; *Weaver v. Graham* (1982) 450 U.S. 24, 28-31; *Weaver v. Maas* (9th Cir. 1995) 53 F.3d 956, 959; *Fleming v. Oregon Board of Paroles* (9th Cir. 1993) 998 F.2d 721, 725; *In re Stanworth* (1982) 33 Cal.3d 176, 180, 187-188.)

Petitioner, to establish an ex post facto violation, need not prove that she is necessarily serving a longer prison term due to the new law than would have been the case had it not been enacted (*Miller v. Florida, supra,* 482 U.S. at p. 432; *Fleming v. Oregon Board of Paroles, supra,* 998 F.2d at pp. 723-725), although that is certainly the case, a case that amply satisfies her obligation to establish that application of the new law to her case created a "***significant risk*** of increasing her punishment." See *Garner v. Jones* (2000) 529 U.S. 244, 256. The new gubernatorial obstacle in fact ***necessarily*** works to her detriment and cannot work to her benefit. See *Nulph v. Faatz* (9th Cir, 1994) 27 F.3d 451, 456.

Nor is it necessary for petitioner to have a "vested right" in the form of a parole grant to assert a claim that determining her parole under the new gubernatorial provision constitutes ex post facto law (*In re Stanworth, supra,* 33 Cal.3d at p. 179; see *Weaver v. Graham, supra,* 450 U.S. at 30 ["presence or absence of an affirmative, enforceable right is not relevant"]), although that, too, is the case.

Accordingly, Governors Davis and Schwarzenegger violated petitioners right secured by the Ex Post Facto Clauses of the Federal and State Constitutions in reversing two valid grants of parole by means of a new, more onerous law enacted after she entered into a plea contract with the State to have her prison sentence for second degree murder determined solely by BPT as provided by the laws then in force.

## 2. Due Process Claim

Application of Pen.C. § 3041.2 (Cal.Const., Art.V, §8(b)) to individuals like petitioner who entered into guilty plea contracts prior to its enactment violates the Due Process Clauses of the Federal and State Constitutions.

Petitioner gave the State the substantial benefit of a murder conviction, without costly, protracted proceedings, and extensive personal testimony permitting the State to secure two life convictions, by waiving all defenses and convicting herself by a plea of guilty. Central to the plea contract was petitioner's reliance on the condition that she would be released on parole once she served her minimum term for second degree murder, met the suitability criteria, and was actually granted parole by BPT. The State's courts and prosecutors are well aware of and rely on the fact that when defendants enters into pleas to murder they are focused on and motivated by the prospect of parole pursuant to the process then in place. See *Brown v. Poole*, *supra*, 337 F.3d 1155, citing *INS v. St.Cyr*, *supra*, 533 U.S. at pp. 322-323 ["Inferring based on general analysis of what would motivate defendants to accept plea agreements that particular defendant 'almost certainly' relied on availability of particular relief"].

It cannot be denied that application of Pen.C. § 3041.2 to petitioner nullified the consideration the State gave for her plea bargain. Petitioner had a vested right in the parole determination procedure in place at the time of her plea because it is what the State promised in exchange for the valuable consideration, an expedient, cost efficient conviction and a means to procure two additional convictions that she supplied with a guilty plea. (*Newton v. Rumery*, *supra*, 480 U.S. at p. 394.) When the state nullifies the benefit of a bargain after the fact, it has also perpetrated "a species of fraud." See *In re Ibarra*, *supra*, 34 Cal.3d at p. 289. A party of a plea agreement is entitled to enforce it when deprived of its benefits. Failure to hold a party to its terms "would undermine the integrity of the judicial process." See *People v. Vargas* (2001) 91 Cal.App.4th 506, 533-534, citing *People v. Collins*, *supra*, 45 Cal.App.4th at pp. 863-864.

1    Although *Rosenkrantz*, *supra*,[6] 29 Cal.4[th] at p. 640, defeated an <u>ex post facto</u>

2  claim[7] by labeling the new gubernatorial power "merely" "an additional level of

3  discretionary review," that definition ***defines*** a <u>due process</u> violation under these

4  circumstances.  Because a plea agreement is a binding contract, it is unacceptable for

5  the State to reap the "benefit of the[ ] plea agreement" and then impose "significant

6  and manifest" detriments on the defendant retroactively.  That "would surely be

7  contrary to familiar considerations of fair notice, reasonable reliance,, and settled

8  expectations [because it] clearly attaches a new disability, in respect to transactions or

9  considerations already past."  See *INS v. St.Cyr*, *supra*, 150 L.Ed.2d at pp. 375-378.  It

10  matters not that parole decisions are discretionary; the United States Supreme Court's

11  holdings in *St.Cyr* were made in the context of a similarly discretionary benefit.

12    Even if the voters intended the new gubernatorial authority to be retrospective,

13  its impact on existing plea bargains was not contemplated.  Because the principle of

14  the above cited United States Supreme Court cases is controlling here, the Governors'

15  power may only be applied to individuals who were convicted by a trier of fact before

16  its passage or who committed their offenses after its passage.[8]  Its application to

17  reverse petitioner's grants of parole abrogated her right to due process and liberty

18  interest in parole.

19

20

21

22

23

_____

24  [6] The validity of *Rosenkrantz* has been cast into doubt given the United States Supreme Court's decision in *Stogner v. California* (2003) 156 L.Ed.2d 544 , that disapproved the California Supreme Court's "too narrow" ex post facto position
25  in *People v. Frazer* (1999) 21 Cal.4[th] 737, on which *Rosenkrantz* relied, that labeled statutory changes "procedural only" rather than addressing their impact on fundamental fairness.

26  [7] As detailed in a previous section, *Rosenkrantz*' ex post facto analysis of the impact of the new statute on a defendant convicted by a trier of fact of an offense committed prior to its enactment is inapplicable to a plea bargain for a specific
27  term, sentence, and parole determination.

28  [8] Petitioner herein claims separately that, even if her plea bargain had been contracted after enactment of the new law, the Governors' decisions in her case would have violated due process/plea bargain principles because they were based on re-characterization of her offense as a premeditated first degree murder.

## IV. *INVOCATION OF THE UNCHANGEABLE FACTS OF PETITIONER'S COMMITMENT OFFENSE TO INTERMINABLY PRECLUDE HER PAROLE ABROGATES DUE PROCESS*

The California Supreme Court in *Dannenberg, supra*, 2005 WL 170692, held that the facts of a commitment offense may in some cases serve as a ground to deny parole to an otherwise parole qualified inmate. *Dannenberg* did not hold, and cannot tenably be construed to permit the facts of an offense, because they are unchangeable, to serve, as in petitioner's case, as a valid basis on which to ***interminably*** deny her parole, converting her legislatively prescribed, judicially imposed prison term of 15 years to life with the possibility of parole, which Pen.C. § 3041(a) defines as a probability of parole (Board "shall normally set a parole release date"), to life without any possibility of parole. Please see *Biggs, supra*, 334 F.3d at p. 916.

The Ninth Circuit recently reviewed the constitutional propriety of a BPT panel's use of factors of a first degree murder commitment offense to find a California inmate unsuitable for parole at his *first* hearing. (*Biggs, supra*, 334 F.3d at p. 916.) The Court found no evidence to support most of the panel's grounds for unsuitability (inadequate remorse, an allegedly poor disciplinary record, or that he needed to serve additional time because his gains were too recent), but held that a particularly egregious commitment offense could be an appropriate basis for finding such a prisoner unsuitable for parole at an *initial* parole hearing. The Ninth Circuit cautioned:

> As in the present instance, the parole board's sole
> supportable reliance on the gravity of the offense and
> conduct prior to imprisonment to justify denial of parole can
> be initially justified as fulfilling the requirements set

> forth by state law.  Over time, however, should Biggs
> continue to demonstrate exemplary behavior and evidence of
> rehabilitation, denying him a parole date simply because of
> the nature of Biggs' offense and prior conduct would raise
> serious questions involving his liberty interest in parole. . . .

> A continued reliance in the future on an unchanging factor,
> the circumstances of the offense and conduct prior to
> imprisonment, runs contrary to the rehabilitative goals
> espoused by the prison system and could result in a due
> process violation.  *(Biggs*, 334 F.3d at 916-917.)

Petitioner's case is far more compelling.  She has been imprisoned for 24 years after serving the equivalent of 2½ years in jail.  She was eligible for parole 16 years ago and has served 2 to 2½ times the minimum and maximum terms prescribed by BPT's regulations for her second degree murder and in excess of her prescribed term had the murder been first degree.  She has been repeatedly found to pose a low parole risk to public safety.  She remains imprisoned despite being found suitable for parole by two unanimous BPT panels.  The prison terms applicable to the facts of her offense, properly set by both panels in accordance with the regulations, accounting for her term credits, lapsed 14½ years ago in 1990.  Petitioner has endured 14 parole denials by BPT and the Governors, based on her commitment offense.

Particularly in petitioner's case, the interminable preclusion of her parole based on static factors of her commitment offense, converting her prison term to life without parole, has abrogated her right to due process and liberty interest in parole.

### *V. THE "GOVERNOR'S" DECISION VOIDING PETITIONER'S PAROLE ABROGATED DUE PROCESS AND VIOLATED SECTION 8(b) OF ARTICLE 5 OF THE STATE CONSTITUTION; IT WAS NOT THE GOVERNOR'S DECISION, BUT ONE WRITTEN BY BPT STAFF SIGNED BY THE GOVERNOR OR A MEMBER OF HIS STAFF WITHOUT THE GOVERNOR'S PERSONAL REVIEW REQUIRED BY LAW.*

**BPT**, not the Governor, writes the "Governor's" decisions. Its staff prepares a list of all conceivably negative facts and inferences concerning mainly the commitment offense that minimizes or omits parole-favorable evidence on which the panel based its decision. BPT conceals the fiasco by claiming that these "executive summaries" ("memorandum decisions") it forwards for the Governor's staff's review and a signature are "privileged" or "confidential" (exhibit F); although the process is but an administrative function not involving commissioners or deliberation.

Contrary to recitation in his report, Governor Schwarzenegger did not personally review, as required, all, or any of the documents and evidence read, considered and weighed by the panel that granted parole. Much of the record, e.g., the transcripts of petitioner's previous hearings reflecting her previous record and suitability evolution, that the panel weighed in its decision (see exhibit B, p. 5) *was not forwarded to the Governor's office.* Per the authorities set forth *infra*, Governor Schwarzenegger was required to personally review this material and weigh it in his decision.

What was allegedly the "Governor's" decision was one he did not make based on a record that he never saw. Sometimes the Governor has been out of the country on business at the moment he is purported to make such "decisions." It is undisputed that the Governor does not personally review these records (about 200 cases annually) as constitutionally and statutorily required. The Attorney General has conceded the truth of that fact in responding to like petitions. Further, pursuant to the Governor's/BPT's

1  policy, only about 1% of BPT's decisions (those "*granting*" parole) reach the

2  Governor for his alleged "review."  See exhibit F, p. 4.

3      The procedure is overtly devoid of due process and violates the State's

4  Constitution and governing statute, which require:

6          "[T]he governor, when reviewing the authority's decision . . .
7          shall review materials provided by the parole authority . . . if
           the governor decides to reverse or modify a parole
8          decision . . . he or she shall send a written statement to the
9          inmate specifying the reasons for his or her decision."
           (Pen.C. § 3041.2.)

11          "The Governor may only affirm, modify, or reverse
            the decision of the parole authority on the basis of the same
12          factors which the parole authority is required to consider."
13          (Cal.Const., Art.V, § 8(b).)

15      BPT (the "parole authority") "shall" consider "all relevant, reliable information

16  available to the panel." (15 CCR § 2402(b); *In re Ramirez, supra,* 94 Cal.App.4th at p.

17  566; *In re Rosenkrantz* (2000) 80 Cal.App.4th 409, 424-427; see *In re Dunham* (1976)

18  16 Cal.3d 63, 66; *In re Stanley* (1976) 54 Cal.App.3d 1030, 1038.)  Section 8(b) of

19  Article V of the California Constitution, *supra,* requires Governors' decisions to be

20  based on the same factors the hearing panel considered and was required to consider in

21  its decision. (*In re Arafiles,* (1992) 6 Cal.App.4th 1467, 1477, 1479, 1481; see *Johnson*

22  *v. Gomez* (9th Cir. 1996) 92 F.3d 964, 967; *Ramirez,* 94 Cal.App.4th at pp. 559-560.)

23      A governor's action reversing parole under Pen.C. § 3041.2 is arbitrary,

24  capricious, and denies due process if it is not based on his or her personal review of all

25  of the documents the hearing panel considered and did not, therefore, constitute the

26  governor's "individualized consideration" of the case at hand. (*Rosenkrantz,* 29 Cal.4th

27  at p. 677.)  The process, whereby BPT "grants" parole, then  prepares the governor's

28  decision for his staff to process that inherits his (or staff's) signature, without the

governor's personal review or even his receipt of all of the material weighed by the panel, that reverses its Commissioners' decision based on BPT staff's recommendation, makes a mockery of due process and the State's Constitution and parole laws. Petitioner did not receive individualized, or *any* consideration by Governor Arnold Schwarzenegger; gubernatorial review did not occur.

## CONCLUSION; RELIEF REQUESTED

Having set forth a prima facie case for relief, petitioner respectfully requests issuance of an order to show cause and, after briefing by the parties, based on the foregoing authorities, issuance of a writ of habeas corpus vacating the Governor's action of October 11, 2004, that reversed BPT's second grant of parole, reinstating BPT's decision of May 17, 2004, releasing petitioner on parole on the date calculated therein, and ordering the Department of Corrections to credit her parole term with the number of days of her prison confinement in excess of her prison term calculated by BPT, after deducting applicable statutory and regulatory postconviction credit.

Dated _____, 2005.

Respectfully submitted,

Adrian T. Woodward
Counsel for Petitioner

1
2
3
4

## *VERIFICATION*

5
6      I declare, under penalty of perjury, that the facts set forth above are true.
7   Dated February 26, 2005, at Long Beach, California.

8
9
10                                             _____
                                              Declarant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# *TABLE OF EXHIBITS*

Exhibit A    Abstract of Judgment

Exhibit B    Certified transcript, May 17, 2004 parole hearing

Exhibit C    Governor's reversal decision, October 11, 2004

Exhibit D    Petitioner's psychological (forensic) evaluations

Exhibit E    Petitioner's correctional evaluation

Exhibit F    Communications regarding BPT's "Executive Summaries"

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

ABSTRACT OF JUDGMENT

(Commitment to State Prison)

The People of the State of California,
PLAINTIFF,

vs

BRANDEE TRIPP,
DEFENDANT.

Present:
Hon.  Ralph M. Drummond
JUDGE OF THE SUPERIOR COURT

James T. O'Farrell/Gregory Jacobson
DISTRICT ATTORNEY

Frank Dice
COUNSEL FOR DEFENDANT

This certifies that on  2/11/81  Judgment of conviction of defendant was entered as follows:

(1) Case No. CR 7639 Count No. 3 On his plea of Guilty

he was convicted by the Court of violation of Section 187 of the Penal Code,

murder in the second degree, a felony

with prior felony convictions as follows: None

| Date | County and State | Crime | Disposition |
|------|------------------|-------|-------------|
|      |                  |       |             |

Defendant has been held in custody for 875 days as a result of the same criminal act or acts for which he has been convicted.

Defendant was not armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c, 3024.

Defendant was not armed with a deadly weapon at the time of his commission of the offense within the meaning of Penal Code Sections 969c, 12022.

Defendant did not use a firearm in his commission of the offense within the meaning of Penal Code Sections 969d, 12022.5.

(2) Defendant was not adjudged an habitual criminal within the meaning of Subdivision a or b of Section 644 of the Penal Code, and the Defendant is not an habitual criminal in accordance with provisions of Subdivision (c) of that section.

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant be punished by imprisonment in state prison of the state of California for the term provided by law and that he be remanded to the Sheriff of the County of Monterey, and by him delivered to the Director of Corrections of the State of California at California Institute for Women, Frontera

It is ordered that sentences shall be served in respect to one another as follows: N/A

and in respect to any prior incompleted sentence(s) as follows: N/A

(4) To the Sheriff of the County of Monterey and to said Director of Corrections:

Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above named defendant into custody of Director of Corrections at the Facility above named, at your earliest convenience.

Witness my hand and seal of said court

on February 11, 1981 .

ERNEST A. MAGGINI, Clerk

By _Beverly Clausen_
Deputy

I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made and entered on the minutes of the Superior Court in the above entitled action as provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court on  February 11, 1981

ERNEST A. MAGGINI, County Clerk and Clerk of the Superior Court of California for the County of Monterey.

By _Beverly Clausen_
Deputy

_Ralph M. Drummond_
Judge of the Superior Court of the State of California for the County of Monterey

CLERK 156 (10/76)

# EXHIBIT B

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life    )
Term Parole Consideration    )
Hearing of:                  )
                             )
BRANDEE TRIPP                 )
_____)

CDC Number W-15695



CALIFORNIA INSTITUTION FOR WOMEN

CORONA, CALIFORNIA

MAY 17, 2004          PENDING REVIEW

1:50 P.M.             AND APPROVAL

PANEL PRESENT:

KEN RISEN, Presiding Commissioner
HERBERT MAY, Deputy Commissioner

OTHERS PRESENT:

BRANDEE TRIPP, Inmate
ADRIAN WOODWARD, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No          See Review of Hearing
_____  Yes         Transcript Memorandum

Matthew Yates          Capitol Electronic Reporting

ii

# INDEX

                                                          Page

Proceedings..................................... 1

Case Factors....................................10

Pre-Commitment Factors..........................23

Post-Commitment Factors.........................29

Parole Plans....................................38

Closing Statements..............................59

Recess..........................................64

Decision........................................65

Adjournment.....................................71

Transcriber Certification.......................72

--oOo--

1

1     **P R O C E E D I N G S**

2     **DEPUTY COMMISSIONER MAY:**  On record.

3     **PRESIDING COMMISSIONER RISEN:**  This is a

4     Subsequent Parole Consideration Hearing for BranDee

5     B-R-A-N-D-E-E Tripp, T-R-I-P-P.  CDC number is W-

6     15695.  Today's date is May the 17th, 2004.  The

7     time is 1:50 P.M. here at the CIW Boardroom,

8     California Institute [sic] for Women.  Prisoner's

9     legal status:  She was received 2/18 of '81 from

10    Monterey County.  The offense is murder second,

11    case number CR7639.  Count number three, 187 of the

12    Penal Code.  Term is 15 years to life.  Minimum

13    eligible parole date is 5/6 of 1989.  This hearing

14    is being tape recorded.  For purposes of voice

15    identification, we need to go around the room and

16    identify ourselves.  Please state your name.  Spell

17    your last name.  And in addition to spelling your

18    last name, we need the inmate to give her CDC

19    number.  Go to my left.  My name is Ken Risen, R-I-

20    S-E-N, Commissioner.

21          **DEPUTY COMMISSIONER MAY:**  Herbert May, M-A-

22    Y, Deputy Commissioner.

23          **ATTORNEY WOODWARD:**  Adrian Woodward, W-O-O-

24    D-W-A-R-D, Ms. Tripp's Attorney.  Your turn.

25          **INMATE TRIPP:**  BranDee Tripp, T-R-I-P-P, W-

26    15695.

27          **PRESIDING COMMISSIONER RISEN:**  Okay.  We also

1    have one correctional peace officer in the room.

2    She will not be participating in the hearing.  She

3    is here for security purposes.  Ms. Tripp, your

4    first name is spelled Bran, B-R-A-N-capital D-E-E,

5    isn't it?

6          INMATE TRIPP:  Yes, Sir.

7          PRESIDING COMMISSIONER RISEN:  Okay.  Now,

8    you filled out a form 1073, which is our Americans

9    With Disability Act form.  This was done on March

10   15th, 2004 and at that time, you indicated you did

11   not have a disability.  Is that correct?

12         INMATE TRIPP:  Yes, Sir.

13         PRESIDING COMMISSIONER RISEN:  Okay.  What I

14   need you to do is to read that ADA statement there

15   in front of you.

16         INMATE TRIPP:  "The Americans With

17              Disability Act, ADA, is a law to help

18              people with disabilities.

19              Disabilities are problems that make

20              it harder for some people to see,

21              hear, breathe, talk, walk, learn,

22              think, work, or take care of

23              themselves than it is for others.

24              Nobody can be kept out of public

25              places or activities because of a

26              disability.  If you have a

27              disability, you have the right to ask

3

1          for help to get ready for your BPT

2          hearing, get to the hearing, talk,

3          read forms and papers, and understand

4          the hearing process.  BPT will look

5          at what you've asked for to make sure

6          that you have a disability that is

7          covered by the ADA and that you have

8          asked for the right kind of help.  If

9          you do not get help, or if you do not

10         think you got the kind of help you

11         need, ask for a BPT 1074 Grievance

12         form.  You can also get help to fill

13         it out."

14         **PRESIDING COMMISSIONER RISEN:**  Thank you.

15   Now, do you have any problems walking up and down

16   stairs or over a distance of more than 100 yards?

17         **INMATE TRIPP:**  No, Sir.

18         **PRESIDING COMMISSIONER RISEN:**  Do you need

19   glasses or a magnifying device to see or read

20   documents?

21         **INMATE TRIPP:**  Well, I'm waiting for

22   glasses, but it's for distance.  It's not for

23   reading.

24         **PRESIDING COMMISSIONER RISEN:**  Okay.  Do you

25   have any hearing impairments?

26         **INMATE TRIPP:**  No, Sir.

27         **PRESIDING COMMISSIONER RISEN:**  Do you take

4

1    any medication?

2            INMATE TRIPP:   (Inaudible.)

3            PRESIDING COMMISSIONER RISEN:   Any

4    medication that might interfere with your

5    participation in the hearing?

6            INMATE TRIPP:   No, Sir.

7            PRESIDING COMMISSIONER RISEN:   Have you ever

8    been classified as Triple CMS or EOP?

9            INMATE TRIPP:   No, Sir.

10           PRESIDING COMMISSIONER RISEN:   How far did

11   you go in school on the street?

12           INMATE TRIPP:   I went to the 10th or 11th

13   grade.   I got kicked out and then I went to

14   continuation and finished.

15           PRESIDING COMMISSIONER RISEN:   Okay.   So do

16   you have a high school equivalency or a GED?

17           INMATE TRIPP:   I have both.

18           PRESIDING COMMISSIONER RISEN:   Were you ever

19   placed in special education classes or classes for

20   slow learners?

21           INMATE TRIPP:   No, Sir.

22           PRESIDING COMMISSIONER RISEN:   Okay.   The

23   Panel will find that the prisoner has no disability

24   as defined under the Americans With Disability Act.

25   Would you agree, Counsel?

26           ATTORNEY WOODWARD:   I agree.

27           PRESIDING COMMISSIONER RISEN:   Okay.   The

5

1    purpose of today's hearing is to again consider

2    your suitability for parole.  In arriving at a

3    decision, we will consider the commitment offense,

4    your prior criminality and social history, as well

5    as your behavior and overall programming since your

6    commitment.  We have reviewed your files and prior

7    transcripts.  You will have an opportunity to make

8    corrections and clarifications regarding the

9    records.  We will probably read into the record

10   Statement of Facts as reflected by the record.  We

11   will then directly go to your progress since your

12   last hearing, referring to new psychiatric reports,

13   and any other information that has a bearing on

14   your parole suitability.  Any additional parole

15   plans should be brought to our attention.  The

16   prisoner's attorney and the prisoner will be given

17   an opportunity to make a statement regarding parole

18   suitability and length of confinement.  After this

19   is done, we will recess, clear the room, and

20   deliberate.  Once we've reached our decision, we'll

21   resume the hearing and announce the decision.  The

22   prisoner is afforded certain rights, timely notice

23   of this hearing today, availability to review the

24   Central File, the right to present relevant

25   documents at this hearing, the right to an

26   impartial Panel.  Is the prisoner's attorney

27   satisfied these rights are met?

6

1          ATTORNEY WOODWARD:  Yes.

2          PRESIDING COMMISSIONER RISEN:  The prisoner

3     will receive a copy of a tentative written decision

4     today.  That decision becomes effective upon

5     approval by the Decision Review Unit at the Board

6     of Prison Terms.  Later, you will receive a

7     transcript and a copy of the decision.  It's

8     automatically sent to you.  As of May 1st, 2004,

9     there was a major change limiting your right to

10    appeal.  The Board of Prison Terms no longer accept

11    appeals.  You have to appeal directly to the

12    courts.  And apparently, that information is

13    contained in the prison law library and there's

14    (inaudible) in the Administrative Appeals

15    correspondence, grievance concerning Board of

16    Prison Term decisions.  It's administrative

17    directory AD 4 slash 01.  Okay, today you will not

18    be required to discuss the commitment offense with

19    the Panel, and you will not be required to admit

20    the commitment offense.  However, the Panel accepts

21    as true the Court findings.  Any confidential

22    materials?

23          DEPUTY COMMISSIONER MAY:  There will be

24    none, Mr. Chairman, thank you.

25          PRESIDING COMMISSIONER RISEN:  Okay.  Any

26    additional documents for us to review today?

27          ATTORNEY WOODWARD:  As requested, have the

7

1  Chairpersons had an opportunity to read the brief

2  submitted by my office?   Because I was afraid --

3  it's not in front of you.

4       PRESIDING COMMISSIONER RISEN:   Where?

5  Where?  I didn't see it.

6       ATTORNEY WOODWARD:  I didn't see it in front

7  of you and it was submitted.

8       PRESIDING COMMISSIONER RISEN:  Nope.

9       ATTORNEY WOODWARD:  So I'm a little

10  concerned.

11       PRESIDING COMMISSIONER RISEN:  I was going

12  to say I have two documents, one letter from the

13  archdiocese and a letter from someone else.  So I

14  only have those two letters.  Are there more than

15  that?

16       ATTORNEY WOODWARD:  Yes.  There's additional

17  documentation from a prospective employer.  There's

18  documentation from a conversion to a controlled

19  halfway house, (inaudible).  I can submit copies to

20  this Board presently.

21       DEPUTY COMMISSIONER MAY:  You want to do

22  that right now?

23       ATTORNEY WOODWARD:  My only concern is that

24  the brief is --

25       DEPUTY COMMISSIONER MAY:  Do you have a copy

26  of it?

27       ATTORNEY WOODWARD:  I do.

8

1    **DEPUTY COMMISSIONER MAY:**  (Inaudible.)  Is

2    that a copy of your (inaudible)?

3    **ATTORNEY WOODWARD:**  These are the two copies

4    of an indication from Casanova and your prospective

5    employer.

6    **DEPUTY COMMISSIONER MAY:**  Okay.  Great.

7    That's really cool.

8    **ATTORNEY WOODWARD:**  Absolutely.  I don't

9    think the Chairman will have an opportunity to read

10   this.  Mind if we take a brief recess for you?

11   **PRESIDING COMMISSIONER RISEN:**  Okay, in a

12   moment, we'll take a recess and I'll read them.

13   **ATTORNEY WOODWARD:**  Yeah.

14   **PRESIDING COMMISSIONER RISEN:**  I have a

15   hearing check -- No, why don't we finish this so I

16   don't forget where we're at.

17   **ATTORNEY WOODWARD:**  Yes, I apologize.  These

18   are also two letters, one from two family members

19   that are supportive of her release.

20   **PRESIDING COMMISSIONER RISEN:**  Okay, so four

21   letters and a brief?  Okay, I have a checklist of

22   documents contained in my file.  I've marked it

23   Exhibit One.  I'd like you to look at it to ensure

24   that you have those documents.  Also, do you have

25   this letter from the Arroyo Grande Police

26   Department?

27   **ATTORNEY WOODWARD:**  No.  That was never --

9

1    We have (inaudible) type concerns.  We never

2    received a notification from (inaudible).

3         PRESIDING COMMISSIONER RISEN:  I'm sure it's

4    basically the same as it said last time.  Almost

5    word for word.

6         ATTORNEY WOODWARD:  Okay.  Thank you.  I

7    believe I'm aware of the documentation of

8    (inaudible), I'm sure.

9         PRESIDING COMMISSIONER RISEN:  Okay.  Any

10   objections at this time?  Are they in the brief?

11        ATTORNEY WOODWARD:  The objections are not

12   in the brief.  My only concern is the brief is a

13   relevant document and as long as the gentleman --

14   Mr. Risen, you indicate that you're going to --

15   Excuse me, Risen -- read the brief.  It's relevant,

16   and so that's my only concern.

17        PRESIDING COMMISSIONER RISEN:  Okay.  I will

18   read it in just a moment, then.  At this point,

19   we'll go to recess.  The time is 2:04 and we'll

20   call you back in in a few minutes.

21        ATTORNEY WOODWARD:  Thank you.  I understand

22   and appreciate.

23                   [Off the record.]

24        DEPUTY COMMISSIONER MAY:  We're back on

25   record.

26        PRESIDING COMMISSIONER RISEN:  Okay, we'll

27   resume the hearing.  We have read the Counsel's

10

1    brief and we do have copies of them.    The time is

2    2:20.    At this point, is the prisoner going to

3    address the Panel today?

4            **ATTORNEY WOODWARD:**    Yes.

5            **PRESIDING COMMISSIONER RISEN:**    Could you

6    raise your right hand, please?    Best you can.    Do

7    you solemnly swear or affirm that the testimony you

8    give at this hearing will be the truth, the whole

9    truth, and nothing but the truth?

10           **INMATE TRIPP:**    I do.

11           **PRESIDING COMMISSIONER RISEN:**    Okay.    I'm

12   going to read the Statement of Facts from the

13   summary of the crime in the June, 2004 Board

14   report.

15           "On July 8th of 1979, the victim's

16           mother reported her daughter missing

17           and indicated William Ruckert,

18           parenthesis, BranDee Tripp's

19           stepfather parenthesis, might be

20           involved in the disappearance of her

21           daughter.    The victim was scheduled

22           to testify against Mr. Ruckert in a

23           child molestation case.    Subsequent

24           investigation led Jon Sorenson to

25           reveal knowledge of a conspiracy to

26           kidnap the child by Mr. Ruckert and

27           Mr. Hilton Tripp, T-R-I-P-P,

11

1       parenthesis, Mrs. Tripp's husband,

2       close parenthesis.  Roger Ladd

3       indicated Mr. Ruckert offered him

4       $1,000 to kidnap the victim's older

5       sister Betty Ann Murdock.  He

6       observed Hilton Tripp, Randy Cook,

7       and BranDee Tripp discussing methods

8       of killing the older sister.  Mr.

9       Ladd also observed further

10      discussions of methods of kidnapping

11      and killing Tamron Carpenter by

12      Hilton and BranDee Tripp.  On July

13      9th, 1979, Hilton Tripp implicated

14      Randy Cook as the person who killed

15      the victim and acknowledged he

16      assisted in burying the child.  He

17      stated his wife BranDee was in

18      agreement with the kidnapping and

19      arranged for the child to leave the

20      home in order to facilitate the

21      event.  The body of the victim was

22      found buried near Avila Beach, A-V-I-

23      L-A.  Ms. Tripp was arrested on July

24      10th, 1979."

25  Okay.  Would you like to make any corrections or

26  clarifications regarding this crime?

27      **INMATE TRIPP:**  Well, some of the things in

12

1   there I really don't remember happening.  I mean, I
2   didn't know that Roger Ladd was approached.  I was
3   always been under the impression that we brought
4   him into the mess.  Because I was staying at his
5   trailer and my ex-husband, now, found me when we
6   were discussing everything which involved Roger,
7   but I don't remember him being directly involved as
8   far as that version.  I always thought we
9   implemented him just by -- I mean, just by being in
10  his area.

11          **PRESIDING COMMISSIONER RISEN:**  Okay, were
12  you -- Okay, let me ask you this.  Now, were you
13  ever present when there was a conversation between
14  Ruckert, yourself, and someone else to kidnap the
15  older sister and kill her?

16          **INMATE TRIPP:**  Well, it was a while ago.  It
17  was a few Board hearings ago.  And at the time,
18  they didn't really care to know and -- What
19  happened at the time is me and Randy went with
20  Hilton to talk to my stepfather.  But me and Randy
21  had to sit in the car, and that would be Cook.
22  That would be Mr. Cook.  And we watched Hilton talk
23  to my stepfather on the front of our grass where my
24  mom's house is.  That was when he was staying -- He
25  was being allowed to go there to get his clothes at
26  the time. And we watched the conversation, but we
27  never really heard the conversation.  But when it

13

1    came to testifying to them, I perjured myself and

2    said I heard everything. And I just repeated what

3    my husband told me because I didn't think that my

4    stepfather should be the only one not going

5    anywhere.

6             PRESIDING COMMISSIONER RISEN: Okay.

7             ATTORNEY WOODWARD: I think -- necessary to

8    clarify that for me is that -- I think what Ms.

9    Tripp is indicating at the trial for Mr. Ruckert,

10    she was primary state's witness against him. Had

11    she not testified, it's quite probable he would

12    have been exculpated, I think. Because they

13    couldn't find -- So she perjured herself to convict

14    Mr. Ruckert and become the star witness against Mr.

15    Ruckert in the subsequent (inaudible) convicted of

16    first degree.

17             PRESIDING COMMISSIONER RISEN: Okay. Does

18    that mean that her husband Hilton never testified

19    against Ruckert?

20             INMATE TRIPP: Not to my knowledge. I was

21    the last one that they ever seen.

22             PRESIDING COMMISSIONER RISEN: Okay.

23             INMATE TRIPP: Out of the -- There was four

24    of us. I was the last. That would have went to

25    trial if I hadn't pled guilty.

26             PRESIDING COMMISSIONER RISEN: Okay, now the

27    first one they were going to kidnap was -- and

14

1    according to someone, murder -- would be the older

2    sister.  What was her name?

3            INMATE TRIPP:  Betty Ann Maddox.

4            PRESIDING COMMISSIONER RISEN:  Okay.  What

5    ever happened to her?

6            INMATE TRIPP:  Okay.  He came with this

7    wonderful idea.  I wasn't real thrilled.  And in my

8    mind at the time, I didn't really think I was

9    participating in murder.  And they did discuss

10   murder and they were smoking a joint and they were

11   talking, just like, bizarre, and I told them, I'm

12   not helping you with any murder.  I'll get her out

13   of the house.  If you want to do what you're going

14   to do, you can do it.

15           PRESIDING COMMISSIONER RISEN:  Okay.

16           INMATE TRIPP:  But I'll get her out of the

17   house.  But when I went to get her out of the

18   house, they stayed in the bushes and nobody did

19   anything.  So she went back to her home, so nothing

20   ever happened to her.

21           PRESIDING COMMISSIONER RISEN:  So we're

22   talking about the older sister?

23           INMATE TRIPP:  That's the older sister.

24           PRESIDING COMMISSIONER RISEN:  Okay.  Now,

25   how were you involved in the younger sister's

26   kidnapping?

27           INMATE TRIPP:  In the beginning, I was

15

1    actually running interference with her.  Because

2    they were talking and they wanted to kill her.  I

3    didn't want to kill her.  I didn't want to help

4    kill her.  I didn't think she needed to be dead,

5    and I didn't want to do it.  And so, we'd set up

6    little plans and they'd kind of just casually fall

7    through.  And it wouldn't work, and I'd take Tammy

8    home and we'd go places, and I'd take Tammy home.

9    Well, the day that this happened, before it

10   happened, my husband promised me that no one would

11   get hurt.  He promised me that he would go pick

12   Tammy up if I sent her down to the store.  I could

13   go to Randy's house and watch her, and they would

14   go convince my stepfather that they kidnapped her

15   and she wouldn't be testifying to get the money.

16   And then we were going to let her go.

17        PRESIDING COMMISSIONER RISEN:  And you were

18   supposed to be at Randy Cook's house?

19        INMATE TRIPP:  Yeah.

20        PRESIDING COMMISSIONER RISEN:  The trailer.

21        INMATE TRIPP:  So after she came up -- No, I

22   was supposed to be -- He lived with his girlfriend

23   in a house in Arroyo Grande.  So I went after her

24   mom called, I went to Randy's house and I waited

25   and I waited and I waited.  And in my head, I knew

26   something wasn't going right, but I was afraid to

27   leave, because I was afraid if I wasn't where I was

16

1   supposed to be and something happened to her, then

2   it was my fault.  And that's how I thought when I

3   was --

4       PRESIDING COMMISSIONER RISEN:  Okay.  Now

5   how did Tamron Carpenter, the victim, know you?

6       INMATE TRIPP:  He --

7       PRESIDING COMMISSIONER RISEN:  She.

8       INMATE TRIPP:  They were a friend of my

9   stepdad's for years and I met them through my

10  stepfather for years.

11      PRESIDING COMMISSIONER RISEN:  Did you watch

12  them?  Were you like a caretaker?

13      INMATE TRIPP:  Well, no.  We never

14  babysitted, but her older sister, Betty Ann, was my

15  best friend.

16      PRESIDING COMMISSIONER RISEN:  The one --

17      INMATE TRIPP:  The older one.

18      PRESIDING COMMISSIONER RISEN:  The older

19  one.

20      INMATE TRIPP:  Maddox.

21      PRESIDING COMMISSIONER RISEN:  Okay.  But

22  Tamron knew you well.

23      INMATE TRIPP:  Yeah.

24      PRESIDING COMMISSIONER RISEN:  So if you

25  went to Randy Cook's house and held her there, how

26  -- Once you ultimately got away, how would you not

27  be identified?

1        INMATE TRIPP: Well, in my head, I was not

2    going to let her know that she was being kidnapped.

3    I had planned in my head that I would just tell

4    her, your mom knows we're here. And we're just

5    going to hang out for a while, and then we'll go to

6    the beach and then we'll go back to your mom's.

7    Because she thought we were going somewhere. She

8    never knew. When she was with me and I would take

9    her places and they would want to kidnap her and I

10   wouldn't let them do it then. And I'd tell them,

11   no, no. This isn't going to work. And I'd talk

12   them out of it because I was there. We were going

13   places. Like, we'd go to the park. We'd go

14   swimming. So I was always there with her. And

15   they promised me that they would drop her off and I

16   would just watch her and so I had it planned. And

17   I had my moped and I had it planned that we'd go to

18   the park and she would never know. In my head. I

19   didn't think that anything could go wrong, and I

20   didn't think far enough to know that her life would

21   be taken.

22       PRESIDING COMMISSIONER RISEN: Didn't you

23   feel that Ruckert would have to ensure in some way

24   that she'd been taken care of? Not just by you

25   telling him.

26       INMATE TRIPP: I never thought that far.

27   And after years of growing up and thinking of how

1   he was, I would think that now.  I know what kind

2   of person he is today.  But back then, I didn't

3   think that.  I figured --

4           PRESIDING COMMISSIONER RISEN:  How old were

5   you then?

6           INMATE TRIPP:  I had just turned 20.

7           PRESIDING COMMISSIONER RISEN:  And where

8   were you living?

9           INMATE TRIPP:  Well, at the time, we were

10  living in a tent.

11          ATTORNEY WOODWARD:  Sorry, but did I hear

12  the tape recorder go off or am I imagining things?

13          DEPUTY COMMISSIONER MAY:  It's on.

14          ATTORNEY WOODWARD:  I apologize.  I'm sorry.

15          PRESIDING COMMISSIONER RISEN:  Where you

16  living at the time?

17          INMATE TRIPP:  We were living in a tent

18  underneath an overpass by Avila.

19          PRESIDING COMMISSIONER RISEN:  And this was

20  in 1979.

21          INMATE TRIPP:  Yes, Sir.

22          PRESIDING COMMISSIONER RISEN:  Well, how do

23  you feel about your involvement now in the case?

24          INMATE TRIPP:  I believe that if I hadn't

25  gotten involved at all -- I mean, I should have

26  just called when they were talking about it and

27  preventing it altogether.

1    PRESIDING COMMISSIONER RISEN:  Probably.

2    INMATE TRIPP:  I would have called the

3    police.  I did try to call the police once or

4    twice, but I got scared.  When they picked up the

5    phone, I hung up.  And I called from a payphone.

6    And now that I'm older, I know that I knew at the

7    time something wasn't right.  Or I wouldn't be

8    trying to call the police.

9    PRESIDING COMMISSIONER RISEN:  Okay.  What

10   you're saying, then, is on July 8th, '79, when they

11   didn't bring the girl to you, you knew something

12   was wrong.  And so you tried to call the police?

13   INMATE TRIPP:  I tried twice and I got

14   scared and I hung up the phone as soon as he

15   answered.  I was at a payphone in old Arroyo Grande

16   by this bridge.  And I hung up the phone.  I never

17   talked to anyone because I got scared.  In my head,

18   I was thinking, well, if I'm not there and they

19   show up, what happens if they take things into

20   their own hands?

21   PRESIDING COMMISSIONER RISEN:  Okay, now,

22   she knew both Hilton and Randy Cook?  Hilton Tripp?

23   INMATE TRIPP:  I'm not sure if she really

24   knew Randy really well, but she knew Hilton because

25   he was with me most of the time.

26   PRESIDING COMMISSIONER RISEN:  Okay.  And

27   you sent her to the store near Avila Beach?

20

1      **INMATE TRIPP:** No. I sent her down -- The

2    store was, like, right down from her house. But

3    they were parked down there waiting.

4      **PRESIDING COMMISSIONER RISEN:** Did you

5    ever --

6      **INMATE TRIPP:** They (inaudible) up on a hill

7    and the store was right --

8      **PRESIDING COMMISSIONER RISEN:** Okay. You

9    were arrested two days later. Did you ever talk to

10   Hilton and Randy?

11     **INMATE TRIPP:** No. No. What actually

12   happened is they picked me up for questioning. I

13   denied the whole thing. I acted like I didn't know

14   anything. And they held me. And at the time, I

15   guess it was 23 hours. They can hold you 23 hours

16   and they have to let you go if they're not going to

17   arrest you. And during that time, Hilton had came

18   into the police department looking for me. And

19   they ended up picking him up because he had a

20   juvenile warrant for him for a prior conviction.

21   And they let me go and then I think I got arrested

22   the next day. I think it was the next day early

23   morning. I mean, I went through a whole day and

24   then they woke me up out of a dead sleep, so it

25   was, like, two days later, the following morning.

26   But it was, like, within a 24 hour period

27   (inaudible).

21

1          PRESIDING COMMISSIONER RISEN:    Well, if

2    she's walking somewhere and these two guys pull up

3    and attempt to pick her up, she's probably not

4    going to get in the car.

5          INMATE TRIPP:    No, she was in the store and

6    she knew them.    There's a grocery store down there

7    and I sent them down to the store to buy some

8    items.    And they asked her if -- I guess they asked

9    her if she wanted a ride.    I never really talked to

10   them after it happened because I couldn't believe

11   that they did it.    I couldn't believe that they

12   killed someone.

13         PRESIDING COMMISSIONER RISEN:    Did Hilton or

14   Cook ever tell you that she was strangled to death?

15         INMATE TRIPP:    When they came back, they

16   finally showed up at Randy's house and I asked them

17   where they had been.    And they told me and I told

18   them, I don't want to hear it.    And when they told

19   me where it was, I never went back to the area

20   because I knew that she was there.    And I just

21   couldn't do it.    But before I told him that I

22   didn't want to hear anymore -- He had made the

23   statement that me and Randy pulled the rope at the

24   same time, so neither one of us knows who killed

25   her.    And I told him, I don't want to hear

26   anything.    Don't tell me anything.    I can't believe

27   that you did it.    And then I wouldn't go back to

22

1    the area.

2         PRESIDING COMMISSIONER RISEN: Well, how

3    would you handle a situation like that today?

4         INMATE TRIPP: If I heard anyone

5    conspiracizing about any kind of awful thing, I

6    would call the police within a minute. I would

7    have no problem turning anyone in today. Because

8    when I was young, you think, no, they're really not

9    going to do it. You know, people always talk and

10   it's like, they really don't mean it. I wouldn't

11   take that chance. Because what if they do mean it.

12   You know. Tammy's gone, and it is my fault.

13   Because she would have never went down to the

14   store. You know, and they may have not have done

15   anything if I hadn't helped, but I wouldn't have

16   helped if they hadn't promised me that she wouldn't

17   have got hurt. The reason it took so long --

18        PRESIDING COMMISSIONER RISEN: Then your

19   motivation was you wanted the $1,000?

20        INMATE TRIPP: Well, I wanted to burn my

21   stepfather. I wanted to pay him back for

22   everything that I went through with him.

23        PRESIDING COMMISSIONER RISEN: And how did

24   you plan to do that?

25        INMATE TRIPP: When he gave us the money, we

26   were going to turn Tammy loose and let her testify.

27   We weren't going to keep her. We were going to let

1  her do what she needed to do.  Because we knew he

2  wouldn't -- The one thing we did know is he would

3  never turn us in.  Because what would he say.  You

4  know, he couldn't turn us in.  And I don't remember

5  who put that knowledge in our head, but we knew

6  that for a fact that he wouldn't turn us in.  So if

7  he gave us the money, there was nothing he could do

8  if Tammy showed up to testify.

9       PRESIDING COMMISSIONER RISEN:  Okay, but it

10  was $1,000.

11       INMATE TRIPP:  Well, they said 1,000.  I was

12  told 10,000, so I'm not really sure because I never

13  really heard -- The only thing I heard was what

14  Hilton ever told us.

15       PRESIDING COMMISSIONER RISEN:  Okay, now

16  let's go over your pre-conviction factors.  Says

17  you have no juvenile record.

18       INMATE TRIPP:  No, I don't have (inaudible).

19       PRESIDING COMMISSIONER RISEN:  Okay.  Now,

20  in the Governor's letter, he said that in the '85,

21  '91, and '93 psych evaluation, you talked about

22  shoplifting as a juvenile.  Did you do that?

23       INMATE TRIPP:  I was a delinquent at times,

24  but I never got arrested for it.

25       PRESIDING COMMISSIONER RISEN:  Okay.  Then

26  you stole cars.

27       INMATE TRIPP:  I stole two cars to run away

1    with.

2        **PRESIDING COMMISSIONER RISEN:**   Okay.   And

3    then you stole money from your parents?

4        **INMATE TRIPP:**   I did steal money from my

5    mom.

6        **PRESIDING COMMISSIONER RISEN:**   Back to the

7    commitment offense.   Was there any drugs or alcohol

8    on your part?   Were you using drugs or under the

9    influence of alcohol?

10       **INMATE TRIPP:**   When we were talking about

11   Betty Ann, we were smoking weed.   We were pretty

12   loaded.

13       **PRESIDING COMMISSIONER RISEN:**   Okay, but on

14   the --

15       **INMATE TRIPP:**   But I don't remember doing

16   drugs or alcohol at the time when Tammy -- I really

17   tried to talk them out of it and why I didn't call

18   the cops --   At that age, that young.   I think it's

19   because I thought I was in love with him, and I

20   realized that wasn't love when I grew up.   I'm not

21   real sure why.   I think my judgment was very

22   impaired because of everything.   I think I hated my

23   stepfather so much, honestly, that it just blinded

24   me of what was really right and wrong.

25       **PRESIDING COMMISSIONER RISEN:**   Okay.   But

26   drugs or alcohol didn't cloud your decision-making

27   abilities on this particular day when you sent the

25

1   victim down to the market?

2        INMATE TRIPP:   I don't think so.   I don't

3   remember being high or drinking that day.

4        PRESIDING COMMISSIONER RISEN:   And you had

5   no adult convictions (inaudible).

6        INMATE TRIPP:   No.

7        PRESIDING COMMISSIONER RISEN:   Okay.   Says

8   you're divorced.   Were you divorced at the time of

9   the commitment offense?

10       INMATE TRIPP:   No.   I was still married and

11  my attorney advised me not to get a divorce until

12  after everything was over.   So when I arrived at

13  CIW within the year, I was divorced.

14       PRESIDING COMMISSIONER RISEN:   Okay.   You

15  were born where?   In California?

16       INMATE TRIPP:   Yes.   San Luis Obispo.

17       PRESIDING COMMISSIONER RISEN:   You have one

18  half-sister and one half-brother.   Your parents

19  separated when you were two years old.

20       INMATE TRIPP:   Yes.

21       PRESIDING COMMISSIONER RISEN:   Your mother

22  married William Ruckert.   That's the guy who was

23  charged with the molestation.

24       INMATE TRIPP:   Yeah.

25       PRESIDING COMMISSIONER RISEN:   You were

26  especially close to your maternal grandmother, who

27  is now deceased.

26

1        **INMATE TRIPP:**  Yes.

2        **PRESIDING COMMISSIONER RISEN:**  Your mother

3  was a secretary and Ruckert was an electrician?

4        **INMATE TRIPP:**  Yes.

5        **PRESIDING COMMISSIONER RISEN:**  Says you were

6  close to your stepfather despite the fact he once

7  attempted to molest you once you were seven years

8  of age.

9        **INMATE TRIPP:**  That part I disagree because

10  it wasn't a once thing.  It was from seven all my

11  life until I decided I wasn't sleeping with him.

12  It was a molest thing when I was younger and as I

13  matured, it became a money exchange thing.  For me.

14        **PRESIDING COMMISSIONER RISEN:**  You received

15  average grades in school.  Not a behavioral problem

16  until you met Hilton Tripp.  That was your husband,

17  the guy you married.

18        **INMATE TRIPP:**  Yes, Sir.

19        **PRESIDING COMMISSIONER RISEN:**  And that

20  would be in the 10th grade?

21        **INMATE TRIPP:**  Yeah, it was the 10th grade.

22        **PRESIDING COMMISSIONER RISEN:**  What kind of

23  an influence did he have on you?

24        **INMATE TRIPP:**  He was the one who was saving

25  me from my stepdad.  That's why I ran away so much.

26        **PRESIDING COMMISSIONER RISEN:**  Okay.

27        **INMATE TRIPP:**  Because he was going to

27

1    protect me and save me.

2        **PRESIDING COMMISSIONER RISEN:**  And it says

3    you graduated from a continuation high school.

4        **INMATE TRIPP:**  Yes, Sir.

5        **PRESIDING COMMISSIONER RISEN:**  Now, you

6    didn't want to marry Tripp?

7        **INMATE TRIPP:**  When I was pregnant, I didn't

8    want to get -- Getting married wasn't something I

9    really wanted.

10       **PRESIDING COMMISSIONER RISEN:**  Okay, but

11   your parents --

12       **INMATE TRIPP:**  My stepdad did and one of my

13   grandmothers.  They said it would be wise because I

14   was pregnant and I should do the right thing and

15   not have the baby out of --

16       **PRESIDING COMMISSIONER RISEN:**  And Tripp was

17   the father.

18       **INMATE TRIPP:**  Tripp was the father.

19       **PRESIDING COMMISSIONER RISEN:**  Okay, then

20   your mother adopted the child.

21       **INMATE TRIPP:**  Yes, Sir.

22       **PRESIDING COMMISSIONER RISEN:**  And how old

23   is she now?

24       **INMATE TRIPP:**  She's going to be 25 in June.

25       **PRESIDING COMMISSIONER RISEN:**  Any type of

26   work prior to coming to prison?

27       **INMATE TRIPP:**  I had pieces of jobs.

28

1    PRESIDING COMMISSIONER RISEN:   How long was

2    the longest time you worked?

3        INMATE TRIPP:   Probably, like, three months.

4    I was in Texas when I got certified to become a

5    nurse's aide.

6        PRESIDING COMMISSIONER RISEN:   Okay, how

7    long before the commitment offense were you in

8    Texas?

9        INMATE TRIPP:   I went to Texas the summer of

10   '77.  Because I had just graduated.  That's when I

11   first met my (inaudible).  And I had to get a job

12   to come back to California.

13       PRESIDING COMMISSIONER RISEN:   And you

14   worked about three months doing what?

15       INMATE TRIPP:   I was working in a nursing

16   home.  Trying to become a nurse.  It was a class

17   where you worked.  You could become a nurse's aide

18   as you were working and you took the schooling and

19   the training at the same time.

20       PRESIDING COMMISSIONER RISEN:   Okay, now,

21   did you have a problem with drugs at all on the

22   street?

23       INMATE TRIPP:   I consider me an addict, an

24   alcoholic, only because of the way I consumed

25   alcohol and drugs.  When I did them, I consumed a

26   lot of them.  I didn't just --

27       PRESIDING COMMISSIONER RISEN:   Okay.  What

29

1    age did you start using drugs?

2         **INMATE TRIPP:**    I started smoking weed in the

3    ninth grade.

4         **PRESIDING COMMISSIONER RISEN:**    And it just

5    went on from there?

6         **INMATE TRIPP:**    Yeah.    Most of my stuff was I

7    smoked marijuana and I drank hard liquor.    Once in

8    a while, I would do acid.    Once in a while, I'd do

9    speed.    Once in a while, but --

10        **PRESIDING COMMISSIONER RISEN:**    Okay.    And at

11   this point, we'll go to the next part of the

12   hearing, post-conviction factors.

13        **DEPUTY COMMISSIONER MAY:**    Thank you, Mr.

14   Chairman.    At the last hearing -- That was November

15   the 6th, 2002.    Inmate was granted, but the

16   Governor, on April 4th, 2003, reversed the grant

17   and with the following decision:

18              "According to the Probation Officer's

19              report, Tamron Carpenter and her

20              older sister were schedule to testify

21              in a criminal proceeding that William

22              Ruckert had sexually abused them.

23              Mr. Ruckert offered $10,000 to his

24              stepdaughter BranDee Tripp, her

25              husband Hilton, and her husband's

26              friend to kill the girls before they

27              could testify.    The originally agreed

30

1       to kidnap and murder Tamron's older

2       sister. When that plan failed, they

3       plotted to kidnap the 10 year old

4       Tamron. Ms. Tripp, age 20, was a

5       family friend of the young victim.

6       In fact, Mrs. Tripp was the only

7       person Tamron's mother trusted to

8       take Tamron places. Ms. Tripp

9       arranged to take Tamron swimming on

10      July the 8th, 1979. According to the

11      plans Tripp sent Tamron to the store

12      alone. Mr. Tripp and his friend met

13      Tamron there, offering to give her a

14      ride back. This provided them the

15      opportunity to kidnap Tamron, taking

16      her to the beach, where Mrs. Tripp

17      and her husband lived. Ms. Tripp's

18      husband and his friend tied Tamron

19      up, dug a shallow grave, and then

20      strangled and buried her. Ms. Tripp

21      pled to second degree murder on the

22      condition that she testify against

23      her stepfather, William Ruckert. She

24      was sentenced to 15 years to live.

25      While incarcerated, Mrs. Tripp has

26      participated in many self-help and

27      therapy programs, including Alcohol

31

1      and Narcotic Anonymous, 12 Step

2      program, various psychotherapy

3      groups, anger management programs,

4      and Victim Awareness Programs.  She

5      has also been involved with a variety

6      of organizations and activities.  She

7      has completed her GED and taken some

8      additional classes.  All this is

9      commendable.  The crime she

10     facilitated, however, was

11     particularly heinous, the planned

12     killing of an innocent child to

13     prevent her from testifying against a

14     serial child abuser.  It was clear

15     that Tamron's mother was concerned

16     about her child's safety.  Mrs. Tripp

17     was the only person she trusted to

18     take care of Tamron.  Mrs. Tripp

19     abused the trust of not only Tamron's

20     mother, but also Tamron herself.

21     Mrs. Tripp arranged to send Tamron to

22     the store by herself for the very

23     purpose of facilitating the

24     kidnapping and subsequent murder.

25     Mrs. Tripp claims that she only

26     agreed to arrange for the kidnapping

27     on the condition that no one was to

32

1    be hurt.  This is simply not credible

2    and is inconsistent with the facts.

3    Mrs. Tripp claimed she has accepted

4    responsibility for the crime and

5    realizes that her cooperation made

6    the victim more accessible to being

7    kidnapped and murdered.  I am not

8    convinced, however, that Ms. Tripp is

9    not trying to minimize her

10   culpability.  She says that the plan

11   had been to kidnap Tamron, collect

12   the money, and doublecross her

13   stepfather.  But she had to realize

14   that Mr. Ruckert would not agree to

15   pay anything while Tamron's sister

16   could still testify against him.

17   Furthermore, it is not credible that

18   she did not know that Tamron would be

19   killed.  Indeed, in her 1999

20   psychiatric evaluation, Mrs. Tripp

21   admits that she and her husband

22   discussed killing both Tamron and her

23   sister.  Moreover, Mrs. Tripp and her

24   husband lived in a tent.  Mrs. Tripp

25   had to know that they could not keep

26   Tamron hidden there very long.  The

27   planned kidnap and murder of a 10

33

| | |
|---|---|
| 1 | year old child is atrocious in and of |
| 2 | itself, but Mrs. Tripp's motive is |
| 3 | especially heinous.  She aided in the |
| 4 | murder of profit to prevent the |
| 5 | victim from testifying and to allow a |
| 6 | serial child abuser to continue |
| 7 | abusing other innocent children. |
| 8 | These factors are far beyond the |
| 9 | minimum required to support a |
| 10 | conviction of second degree murder. |
| 11 | The Arroyo Grande Police Department |
| 12 | recommended against parole due to |
| 13 | Mrs. Tripp's active participation in |
| 14 | this heinous crime.  I agree.  The |
| 15 | calculated murder for hire, |
| 16 | demonstrating especially callous |
| 17 | disregard for human suffering, |
| 18 | indicates that Mrs. Tripp is not |
| 19 | suitable for parole at this time. |
| 20 | Additionally, I note that one factor |
| 21 | the Board relied upon in granting |
| 22 | parole was that Mrs. Tripp had no |
| 23 | juvenile record.  I question, |
| 24 | however, Mrs. Tripp's truthfulness |
| 25 | regarding her discussion of her |
| 26 | juvenile history.  During the |
| 27 | psychological evaluation in 1985, |

34

1    1991, and 1993, she admitted to

2    having had behavior problems,

3    shoplifting, stealing cars, and

4    stealing from her parents.  Yet at

5    the 2002 hearing, she indicates that

6    she had no prior criminal activities

7    before the murder.  Mrs. Tripp has

8    demonstrated a very unstable

9    lifestyle.  She was expelled from

10   school in the 10th grade.  She is an

11   alcoholic and (inaudible) from

12   cocaine beginning as a teenager.

13   Prior to the murder, she was living

14   in a tent and stealing for food.  In

15   prison, she accumulated 21

16   disciplinary reports, the most recent

17   in 1999.  Over the years, psychiatric

18   evaluations have diagnosed her as

19   polysubstance dependent, having an

20   anti-social personality disorder, and

21   a quick and violent temper.  Ms.

22   Tripp's role in this murder for hire

23   showed an exceptional callousness and

24   indifference to human life.  In view

25   of her unstable history and

26   lifestyle, Mrs. Tripp must

27   demonstrate over a prolonged period

35

1        that the gains she has begun to make

2        in a controlled institutional setting

3        can be maintained upon release.  I am

4        also concerned that Mrs. Tripp lacks

5        realistic parole plans.  She has a

6        sparse employment history before

7        incarceration and does not appear to

8        have any credible employment

9        prospects if paroled.  Instead, she

10       intends to rely on a trust fund and

11       live with her mother.  In this

12       unstructured environment, Mrs. Tripp

13       may lose the gains she has made in

14       prison.  Based upon each of the

15       negative factors discussed above, I

16       believe Mrs. Tripp still poses an

17       unreasonable risk of danger to

18       society if paroled at this time.

19       Accordingly, I reverse the Board of

20       Prison Terms' decision to parole Mrs.

21       Tripp."

22  Since her last hearing, she has remained

23  disciplinary free.  She has accumulated a total of

24  14 128s, the last being May the 27th, 1999 for

25  excessive property.  A total of 11 115s, the last

26  being March the 31st, 1988, Division F.  And since

27  the last hearing, she has continued to participate

37

1    years of incarceration has been

2    difficult with numerous write-ups.

3    However, the inmate has been

4    motivated in her self-discovery and

5    has improved dramatically over the

6    years, to the point where she has

7    matured significantly.  The inmate

8    has gained a healthy respect for the

9    rights and privacy of others and

10   appeared to have followed diligently

11   in the rules and regulations here at

12   this institution.  The inmate has

13   been able to keep her pathological

14   characteristics in control and she

15   has also attained a certain level of

16   peace and contentment within herself.

17   Her parole plans, though a viable

18   one, may be better improved if

19   certain additional structures are

20   involved, such as a search for higher

21   education in a junior college, or

22   even a college degree.  Given her

23   level of high intellectual

24   functioning and, or the possibility

25   of a reentry program that can offer

26   her a better strategy of acclimation

27   back into society.  Risk factors, as

38

1        always, would be if she ever

2        attempted to resort to acts of

3        criminality, though given her level

4        of peace and contentment, I would not

5        suspect that to be the case."

6  With that, I will return to the Chair.

7        PRESIDING COMMISSIONER RISEN:  Okay.

8  Regarding your parole plans, I'm going to work from

9  your attorney's brief.  It indicates that you've

10  been accepted by the Casa Solano, a residential

11  treatment facility in Grover Beach.  Is that

12  correct?

13        INMATE TRIPP:  Yes, Sir.

14        PRESIDING COMMISSIONER RISEN:  And that's

15  where you were raised, in Grover Beach?

16        INMATE TRIPP:  Yes, Sir.

17        PRESIDING COMMISSIONER RISEN:  Your mother

18  also lives near there.

19        INMATE TRIPP:  Yeah.

20        ATTORNEY WOODWARD:  And extensive family.

21        PRESIDING COMMISSIONER RISEN:  Yeah.  Also,

22  they provide transportation.  Says here, the

23  residents providing transportation, teaching

24  residents necessary life skills.  Have you ever had

25  a driver's license?

26        INMATE TRIPP:  Yeah.  I had a driver's

27  license before I got arrested.