# EXHIBIT 1
# Part 2 of 2

39

1          PRESIDING COMMISSIONER RISEN:  Okay.

2          INMATE TRIPP:  Expired.

3          PRESIDING COMMISSIONER RISEN:  Now, also in

4    reading the psych evaluation, there it indicated

5    you were probably going to live with your mother.

6    That's not the case now.

7          INMATE TRIPP:  No.  When he did my psych

8    evaluation, that was in January.  And between

9    January and March, I was on the calendar for March

10   31st.  They removed me and put me on May 17th.

11   After my meeting with him, he had talked to me for

12   a minute and he said, well, I think your parole

13   plan is viable, but I think you'd do better.  And I

14   listened and as soon as I walked out the building,

15   I proceeded to try to do what he felt would be

16   better also.

17         PRESIDING COMMISSIONER RISEN:  A little more

18   structured setting, I think.

19         INMATE TRIPP:  Yeah.

20         PRESIDING COMMISSIONER RISEN:  And there is

21   a letter in the file dated March 4th, 2004 from

22   Sister Mary Sheen Hodges, H-O-D-G-E-S, at the Casa

23   Solano in Grover Beach, California, accepting you

24   into the program.  Now, for work, you've already

25   found a job for release.  There's a letter here

26   from Cheryl Langford Bookkeeping and Tax Services

27   in Pismo Beach, which is nearby.  But you're going

40

1   to have to have some transportation to get there.

2   Offering you a job.  She says, both of my

3   businesses have the capability of ensuring a job

4   for BranDee when she is released.  I understand

5   that from BranDee's mom that BranDee has acquired a

6   broad knowledge of many different skills and I am

7   sure I can put her to work.  Do you know Cheryl

8   Langford or is it someone in your family?

9        **INMATE TRIPP:**  Not personally.  My mother

10   knows her.

11        **PRESIDING COMMISSIONER RISEN:**  Okay.  And

12   what is your knowledge as to what you plan to do

13   there in the way of work?

14        **INMATE TRIPP:**  Pretty much anything she

15   wants me to do.  I do have good clerical skills.  I

16   do know how to operate computers from in here.

17        **DEPUTY COMMISSIONER MAY:**  You do know how to

18   operate computers?  You're familiar with a word

19   processor?

20        **INMATE TRIPP:**  Yeah.  I do have a word

21   processor in my present job right now.  So, I mean,

22   I could type.  I did take a bookkeeping class about

23   probably 17, 18 years ago.  But I'm sure that if

24   she sat down with me and helped refresh my memory,

25   I would -- I'm a very quick learner, so I don't

26   really see the problem as being able to do what she

27   would like me to do for --

41

1          [Thereupon, the tape was turned over.]

2          **DEPUTY COMMISSIONER MAY:**  Okay.

3          **PRESIDING COMMISSIONER RISEN:**  Okay, there

4    is also some indication here that you will receive

5    a monthly income from a family trust.  Who set the

6    trust up for you?

7          **INMATE TRIPP:**  My grandmother.

8          **PRESIDING COMMISSIONER RISEN:**  Okay, and you

9    have any idea of what the monthly lump would be for

10   you?

11         **INMATE TRIPP:**  My mother's attorney had said

12   it would be, like, $1,000.

13         **ATTORNEY WOODWARD:**  She has current access

14   to 1,000, so minimum of 1,000.  It may approach

15   $1,500.

16         **PRESIDING COMMISSIONER RISEN:**  Okay.  And

17   you also have indicated in here that you want to

18   attend some computer courses and continue in self-

19   help.  How do you plan to remain substance free

20   once you're out of here?

21         **INMATE TRIPP:**  Well, once I complete the

22   recovery program, then I'll continue to go to my

23   meetings and stuff.  I've been writing Mr. Golodner

24   for about the last five, six, seven years.  And

25   I've never personally met him, but he's familiar

26   with me through my letters for my counseling.

27   Because I believe that integration isn't going to

42

1    be really simple.  I believe that you need help and

2    keeping yourself in a positive atmosphere is really

3    beneficial for you and -- So I'll keep going

4    because the meetings presently right now -- The

5    home meetings are -- They're only, like,

6    approximately maybe three or four blocks from my

7    house.  And I tried to find things that would be

8    within walking distance because I know getting a

9    driver's license isn't as easy as it was.  You have

10   to have insurance.  You have to have a car and you

11   have to have a lot of things in order just to be

12   able to drive.  So as long as I can get to the area

13   on a bicycle and a helmet -- Because I know they

14   have a helmet law now.  -- that I, you know, I can

15   keep myself in my program.  So I tried to make my

16   arrangements close to where I would be.  And with

17   Golodner, he's in Santa Maria, but I know my mom

18   would make sure that I got to my appointments.  My

19   mom and my dad, if I can't have a driver's license

20   at the time.

21        PRESIDING COMMISSIONER RISEN:  Okay, you're

22   referring to Charles Golodner.

23        INMATE TRIPP:  Golodner.  Yeah.

24        PRESIDING COMMISSIONER RISEN:  G-O-L-O-D-N-

25   E-R.  It's a counseling group on Willow Street in

26   Santa Maria.  There's a letter here, 9/5 of 2003

27   from him, indicating that he would meet with you as

43

1   a counselor once you're released. Now there's a

2   letter here from Help? Eldrit? What is in

3   (inaudible)?

4        INMATE TRIPP: Yeah. She was at (inaudible)

5   -- Well, what it was was I had written her husband,

6   right. Her husband, he had recently passed on and

7   he was into the job training partnership back in

8   the EED program.

9        PRESIDING COMMISSIONER RISEN: Okay.

10       INMATE TRIPP: And so she was writing me to

11  let me know that he had passed on and was no longer

12  in that. It was just giving me other outlets. And

13  you can look here, and you can look here, because

14  I'm under the understanding that the EED Employment

15  Agency has specific programs that are for ex-

16  felons. That they do help ex-felons. Yes, Sir.

17       PRESIDING COMMISSIONER RISEN: The crime was

18  committed in Grover Beach, well, Avila Beach. In

19  that area.

20       INMATE TRIPP: Yeah, in San Luis Obispo.

21       PRESIDING COMMISSIONER RISEN: Is this going

22  to be a problem, you paroling back to that area?

23       INMATE TRIPP: No. In the beginning, I

24  thought it would because I figured that it would be

25  very hard to find work and I had started looking

26  outside where I did have family, but in other

27  areas. But when the program accepted me and my

44

1    mom's tax lady said, okay, I'll hire her.  And I

2    thought, well, I can get a job and those people

3    will accept me.  I thought maybe it would be all

4    right.  From what my mom tells me, I don't know

5    personally, no, but I know that Ruckert's family,

6    they just moved.  So they no longer live there.

7    And if they still lived there, I don't think I'd

8    feel comfortable being there.  Or for them or

9    myself, because, you know, they tried real hard to

10    move on with their life, I'm assuming.  You know,

11    they've left that behind and tried to move on and

12    to see my face every day around the corner, that

13    would be, you know.  That's just not right to do,

14    and I would work on finding something out of that

15    community.  But I don't feel that they live there

16    anymore.

17           PRESIDING COMMISSIONER RISEN:  Okay, Vivia?

18    Vivian, is it?  Vienna, is it?

19           INMATE TRIPP:  Venna.

20           PRESIDING COMMISSIONER RISEN:  Venna Jenkins

21    is your daughter.

22           INMATE TRIPP:  Yeah.  She was my --

23           PRESIDING COMMISSIONER RISEN:  And there's a

24    letter here dated 5/11/2004.  She lives with your

25    mother.

26           INMATE TRIPP:  Yes, Sir.

27           PRESIDING COMMISSIONER RISEN:  And this is

1  the daughter your mother adopted.

2        INMATE TRIPP:  Yes, Sir.

3        PRESIDING COMMISSIONER RISEN:  Okay.  And

4  there's a letter of support from her here.  And

5  there's also a letter from your mother, Mary

6  Jenkins.

7        INMATE TRIPP:  Yes, Sir.

8        PRESIDING COMMISSIONER RISEN:  Dated May

9  11th, 2004.  It's a letter of support.  She also

10  lists one, two, six, six names for the relatives

11  who live in that area.  Santa Maria, Clovis,

12  Nipomo, Santa Maria, Grover Beach.  They're also

13  supporting you in your release.  Is there anything

14  else we should know about your parole plans?

15        INMATE TRIPP:  Once I complete the program,

16  I know the program (inaudible).  It's a three and

17  six month program, and they have two separate

18  houses, from what my daughter told me.

19        PRESIDING COMMISSIONER RISEN:  Okay.  And

20  now, as part of the hearing process, we sent out

21  3042 notices.  Those are notices that go to the

22  presiding judge, District Attorney, the Police

23  Department, and solicit comments from them

24  regarding your release.  Only response we received

25  was from the Arroyo Grande Police Department.

26  Received a letter May 6, 2004 from Steven Andrews,

27  Operational Commander of the Police Department.

46

1   And they would be opposed to your parole.   We

2   received no other responses for two of those

3   letters.  We'll go to the next phase.   Any

4   questions?

5       DEPUTY COMMISSIONER MAY:   No.   Just for the

6   record, though, you've completed vocation forklift

7   operator and vocational word processing.   Is that

8   it or was there any other vocational?

9       INMATE TRIPP:   No.   I completed vocational

10  word processing and then I focused my jobs around

11  utilizing my vocation.

12      DEPUTY COMMISSIONER MAY:   Just those are the

13  two, right?

14      INMATE TRIPP:   Yeah.   The forklift was on

15  the side kind of thing.

16      DEPUTY COMMISSIONER MAY:   Yeah.   Okay.   Now,

17  as far as the different therapy groups, you were in

18  Breaking Barriers, Relapse Prevention, HIV AIDS

19  Education Prevention Program, Mexican-American

20  Resource Association, Arts and Crafts, Correction

21  Music Program, American Bible Academy Study Course.

22  Was there any other or is that it?   But did I cover

23  everything?

24      INMATE TRIPP:   I did for -- I'm trying to

25  think.   I think it was (inaudible).

26      DEPUTY COMMISSIONER MAY:   What about AA, NA?

27      INMATE TRIPP:   I've been in AA, NA since

47

1    1988.

2            DEPUTY COMMISSIONER MAY:  Are you in that

3    now?

4            INMATE TRIPP:  Yes.

5            DEPUTY COMMISSIONER MAY:  Did I cover

6    everything?

7            INMATE TRIPP:  And I also did -- I had an

8    incest therapy group.

9            DEPUTY COMMISSIONER MAY:  Incest?

10           INMATE TRIPP:  Yeah, it was for incest

11   survivors.  And then I had --

12           DEPUTY COMMISSIONER MAY:  Yeah.  Women

13   Against Abuse.  The domestic violence.

14           INMATE TRIPP:  Yeah, by Linda Hayes.

15           DEPUTY COMMISSIONER MAY:  Yeah.  That's

16   domestic violence.

17           INMATE TRIPP:  Okay.  Okay.

18           PRESIDING COMMISSIONER RISEN:  I believe the

19   file contains a -- from the last Board, some

20   recommendations from Ms. Hayes as to her counseling

21   therapy as a result of the sexual relationship that

22   she suffered (inaudible).

23           DEPUTY COMMISSIONER MAY:  So does that cover

24   everything that you've done in the institution?

25           INMATE TRIPP:  Besides volunteering my time

26   (inaudible).

27           DEPUTY COMMISSIONER MAY:  Yeah, I mean --

48

1          **INMATE TRIPP:**  I mean, because I did

2    volunteer for things.  I mean, I teach line

3    dancing.

4          **DEPUTY COMMISSIONER MAY:**  Okay.

5          **INMATE TRIPP:**  And we'd volunteer.  When

6    they'd have little shows, we'd volunteer to go in

7    front of all those people.

8          **DEPUTY COMMISSIONER MAY:**  Okay.  All right.

9    Thank you.  That's it.  Return to the Chair.

10         **PRESIDING COMMISSIONER RISEN:**  All right.

11   Couple of questions.  In the Governor's letter we

12   talked a little bit about -- It says in 2002, you

13   indicated that you had no prior criminal activity

14   before the murder.  Then he refers back to the '85,

15   '91, and '93 psych reports where you talked about

16   stealing cars and stealing from your parents and

17   shoplifting.  You were never arrested on any of

18   those charges?

19         **INMATE TRIPP:**  The only thing that ever

20   happened to me was I was picked up in Utah when I

21   ran away.  And I had a stolen car; but they never

22   filed on me, but they picked me up in Utah.  I

23   stayed in juvenile hall and got shipped back down

24   to my mom.  But I wasn't put under arrest for it.

25   It was because I was out of state when they picked

26   me up.

27         **ATTORNEY WOODWARD:**  And I believe that the

1    -- I was present at that hearing. -- that the

2    statement by Ms. Tripp where she had no past

3    criminal record.  I don't think she made any

4    assertions as to any other activity.

5         PRESIDING COMMISSIONER RISEN:  Okay.  Says

6    in the 1999 psychiatric evaluation, Ms. Tripp

7    admits that she and her husband discussed both

8    Tamron and her sister.  Moreover, Ms. Tripp and her

9    husband looked at, you know -- He says, it is not

10   credible that she did not know that Tamron would be

11   killed because you had discussed her being killed

12   with your husband prior to this.

13        INMATE TRIPP:  I was part of -- I can't take

14   myself out of the conversation.  I was there when

15   -- All four of us were actually there when the

16   conversations were taking place.  I didn't help the

17   matters.  I know today that I probably helped them

18   more than I really liked to.  I didn't help stop

19   the matters and it was a discussion that I was on

20   the side of no, let's not do it that way.  No,

21   let's not do it that way.  Let's try to do it this

22   way.  And I guess that's why I ended up being

23   considered the person in charge.  Pretty much, they

24   think I was the overseer of the whole thing and

25   there was really nothing I could do about that.

26   Because that's how they see that, but I was always

27   trying to run interference.  And then when he

50

1   promised me that they wouldn't hurt her, then I
2   became more willing to go along with it because I
3   didn't know that (inaudible). And then I became
4   afraid to act on it. I was too afraid to do
5   anything. I didn't really want to believe that my
6   husband would kill anyone anyway, because they
7   didn't do anything with Betty Ann. They were
8   supposed to do everything and they didn't do
9   anything. So in the back of my mind, I guess I
10  just thought, well, you know, they couldn't do
11  that. They couldn't even just throw her in the
12  trunk. You know, they're not going to do anything.
13  He promised me he's going to do that and I just
14  talked myself into believing that he wouldn't kill
15  anyone, which blinded me about any results other
16  than what it was supposed to be like. That's how
17  it was supposed to be. He said it was going to
18  happen that way. I believed him, and I didn't want
19  to believe anything else until I got older and
20  realized that this was the first time they ever
21  asked me to go along. What did you think, because
22  they had asked me before what did I think my dad
23  was going to do if we didn't produce positive proof
24  that they did what they said they were going to do.
25  Well, I never thought of that. I didn't think
26  beyond just making him believe that taking his
27  money, letting her go. I thought that was the

1  reality.  I thought that could really happen at the

2  time.  And I know that could never happen.  I mean,

3  because of me, I know she is dead because her

4  family wouldn't have -- I don't know if Tammy

5  would have gotten in the car with them if I hadn't

6  of been a part of it in the beginning because

7  that's not what happened.  But I know it helped her

8  to get in the car because she knew they were taking

9  her back.  (inaudible) going to the beach, so she

10  (inaudible) okay, let's go.  And I put that thought

11  in her mind, so it's just as much my fault as it

12  probably was to pull the rope (inaudible).

13      PRESIDING COMMISSIONER RISEN:  Okay.  I have

14  no other questions.  Do you have any questions of

15  your client?

16      ATTORNEY WOODWARD:  Yes.  We touched briefly

17  on it.  I want to make sure that we understand.

18  You indicated that from age seven for approximately

19  seven, eight, nine, 10 years, you were molested by

20  your stepfather.  Is that a true statement?

21      INMATE TRIPP:  Yeah.  I would say it was

22  mostly from seven to about 14.  Fifteen, 14 years

23  old and then it started to become, well, if you do

24  this, I'll get you this.  If you do this, then I'll

25  get you that type of thing.  So it was a money

26  deal.  And when I was young, early in the time, I

27  used to call -- I thought it was blackmail.  I

1   didn't really know the concept of blackmail at the

2   time when I said it and it was more of a

3   prostitution thing.  I classify it as prostituting

4   because if I gave him sex, he would give me money

5   or he'd buy me something or we'd, like, go

6   somewhere.  And that was the way that I got things

7   that I wanted was to pay for it with my body,

8   actually.

9           ATTORNEY WOODWARD:  That was after seven

10  years of non-consensual sex.

11          INMATE TRIPP:  Yeah.  I don't remember it

12  being consensual until after I was 17 and I figured

13  out that's how I could get my way.  That's how I

14  could get things.  Daddy will give them to me.

15          ATTORNEY WOODWARD:  Mr. May indicated that

16  you were disciplinary free since 1988, with the

17  exception of a 115 in 1999.

18          INMATE TRIPP:  No, 128.

19          ATTORNEY WOODWARD:  128, sorry, in 1999.

20  And that 128, I understand, was for -- You'd kept

21  some clothing (inaudible).

22          INMATE TRIPP:  No, I had a extra laundry

23  bag.

24          ATTORNEY WOODWARD:  You had an extra laundry

25  bag.  Other than that issue, you've been

26  disciplinary free since 1988.

27          INMATE TRIPP:  And there was a '95 one for

53

1    logbook.  My sponsor had given me a logbook that

2    was empty, so I could use as a clipboard.  And the

3    warden took it in room searches and said it was

4    contraband.  My boss said it would be contraband

5    only if the pages were written on, so she ripped

6    the pages out.  It was still contraband, so.

7           ATTORNEY WOODWARD:  If you were given a

8    parole date, you are comfortable with the

9    transition going to the Casa Solano?

10          INMATE TRIPP:  Yes.  I'm real comfortable

11   with that because that puts me in an area to help

12   adjust around people that are really familiar with

13   the adjusting period.  Because I've never paroled.

14   You know, I just hear stories about it from people

15   that come in and out and it's just -- To me, it

16   feels better to be in an environment of people that

17   are going to understand that you're going to have a

18   lot of questions.  Learning how to work a CDC

19   player was really a big deal for me.  And the

20   microwave.  That was something I was like, oh, god.

21   And I realize -- It made me realize that the world

22   has changed out there since I've been out there,

23   and it's not the same.  When I was out there, they

24   had eight track tapes and those I don't think exist

25   anymore, so.  So things have changed and it's good

26   to have people that are familiar and comfortable

27   around inmates.  I was mostly concerned about my

54

 1    mom, you know.  Putting the burden of adjusting on

 2    her, because she's never had an ex-con in her house

 3    that she knew of.  Because she never knew about

 4    Ruckert until it was too late.  So she's never been

 5    through the parole procedures and parole plans and,

 6    you know, and having a parole officer and all that.

 7    And I told her, well, you know, there's a lot of

 8    things I can't do, Mom, but it's okay.  You know,

 9    at least we get to see each other.  That'll be okay

10    with me.  If I have to stay home all the time,

11    that's fine with me.

12         PRESIDING COMMISSIONER RISEN:  Your being

13    there.

14         INMATE TRIPP:  So I can work there because

15    then I'll be able to adjust.  It'll be easier for

16    me and my mom.  Then I can help my mom with her

17    adjustment, too.

18         PRESIDING COMMISSIONER RISEN:  And you did

19    testify against Mr. Ruckert at his trial?

20         INMATE TRIPP:  Yes, I did.

21         PRESIDING COMMISSIONER RISEN:  And you've

22    been here almost 25 years?

23         INMATE TRIPP:  Twenty-five years in July.

24         PRESIDING COMMISSIONER RISEN:  And when you

25    testified against Mr. Ruckert, you entered into a

26    plea negotiation with the District Attorney's

27    office?

1          INMATE TRIPP:  Yes, I did.

2          PRESIDING COMMISSIONER RISEN:  Did you

3    understand in the plea negotiation that you were to

4    serve 15 years to life?

5          INMATE TRIPP:  Yes.  Someone in that area,

6    but I'm not sure if it was ever on record, he told

7    me I'd only do ten years.  But I just figured that

8    until it's (inaudible) formal, I guess that's how

9    long it's supposed to be.  And just trying to do

10   the best I can while I'm here.

11         PRESIDING COMMISSIONER RISEN:  So you

12   honestly think you've had time to reflect on your

13   actions and what you did?  Your participation in

14   this crime?  Do you believe you pose a risk to

15   society?  That you (inaudible) any kind of a

16   criminal act that would pose a danger to society?

17         INMATE TRIPP:  I don't think I have the

18   capabilities of becoming a risk anymore, creating a

19   danger.  Because I've learned to become very law-

20   abiding.  Even in prison.  I'm very rule-bound and

21   you don't break the rules.  They don't allow you to

22   smoke.  You go outside and (inaudible).  Little

23   things that people take advantage of every day that

24   they don't think twice of that are big rules for us

25   in here.  And can do just as much damage in

26   (inaudible) and you're here for a reason.  And I

27   understand that and I don't think any -- I've

56

1    worked for years putting myself in a place where no

2    one can twist me or manipulate me into

3    participating in anything that's against the law,

4    period, any way. But especially (inaudible) After

5    years, I know the difference between right and

6    wrong. And I wouldn't have any problem standing up

7    and telling. I could pick up the phone or stay on

8    the line and turn someone in today. Because it's

9    not right.

10        **ATTORNEY WOODWARD:** I have no further

11    questions.

12        **PRESIDING COMMISSIONER RISEN:** I have a

13    couple. Where is Mr. Ruckert?

14        **INMATE TRIPP:** I think he passed away in

15    1985.

16        **PRESIDING COMMISSIONER RISEN:** (Inaudible.)

17        **INMATE TRIPP:** And I don't know what

18    institution he was in.

19        **PRESIDING COMMISSIONER RISEN:** They're still

20    in as far as you --

21        **INMATE TRIPP:** As far as I know.

22        **PRESIDING COMMISSIONER RISEN:** And Randy

23    Cook?

24        **INMATE TRIPP:** And he's still in also as far

25    as I know.

26        **ATTORNEY WOODWARD:** But they have a first

27    degree conviction (inaudible).

57

1    **PRESIDING COMMISSIONER RISEN:**  Now, when

2    Ruckert was molesting you, did you ever think about

3    telling your mom?

4    **INMATE TRIPP:**  I did think about telling my

5    mom.  I think because of my mom's (inaudible)

6    divorce with my original dad and the remarried

7    thing, it was real important for me as a child to

8    have a full family.  Because kids would make fun of

9    me anyway and I can't really remember why.  I just

10   know they used to make fun of me.  When I was in

11   school, I wasn't quite built like everybody or

12   something.  And so he used to tell me that if I

13   told my mom, you know, she'll make me leave and you

14   won't have a daddy and people aren't going to like

15   you.  And when I was little, having friends was

16   really important to me.  And well, now I'm older, I

17   don't know why that was so important because I

18   couldn't invite them over because one time I tried,

19   my stepdad really did try to touch one of my

20   friends and I didn't do anything about it.  I was

21   younger then.  I was probably only around 12 or

22   something.  But I never asked anybody over to my

23   house again because now I had to protect them from

24   him also.

25   **PRESIDING COMMISSIONER RISEN:**  Okay.  You

26   know, you indicated in -- Not today, but I read it

27   here.  In the first nine years, you felt that you

58

1    really hadn't done too much. What was it that made
2    you realize that you were more involved in the
3    crime and responsible than you were the first nine
4    years? What changed your mind?

5          **INMATE TRIPP:** Actually, what really started
6    making me think about it was -- It was a
7    combination. When I started going to AA and NA and
8    started doing 12 Steps. Twelve Steps were very big
9    for me. And at the same time, I was doing my
10   Incest Survivor's Group and realized where it came
11   from. But I would have to say more of my AA. My
12   AA and my honesty in accepting responsibility
13   because there's nothing I -- I can't do anything to
14   change it. And my biggest motivation, actually,
15   was Tammy. Because it was, like, well, she's gone
16   now. And I can't do nothing, but I can make sure I
17   never let anyone (inaudible) sister again. It kind
18   of motivated me to find out why. And as I was
19   doing my programming, the honesty thing kicked in,
20   everything was starting to say, well, okay, you
21   were a little more -- Because I used to get an
22   attitude when they tried to throw it all off on me
23   and I didn't understand why. And I thought well,
24   if it wasn't for me, she probably wouldn't have
25   been at the store. And if she wasn't at the store,
26   they probably wouldn't have picked her up, so yeah,
27   you're responsible. You did that and then I had to

1    deal with that.  And then I had to learn how to
2    kind of try to forgive myself.  And the only way I
3    can do that is by working my program and helping
4    people.  That's why I really like the SOS program.
5    Because we give all those things either to the
6    elderly veterans or the homeless children.
7         PRESIDING COMMISSIONER RISEN:  Okay.  What
8    does SOS stand for?
9         INMATE TRIPP:  Sharing Our Stitches.  My
10   program I'm involved in is the crochet program.  So
11   we crochet little hats and sweaters and blankets
12   and booties.  And our sponsor takes them to the
13   homeless shelter places for the kids.  And so, I
14   focus my area around helping kids and helping other
15   people so they don't have to go through this.
16        PRESIDING COMMISSIONER RISEN:  Any
17   questions?
18        ATTORNEY WOODWARD:  Closing statement, but I
19   (inaudible).
20        PRESIDING COMMISSIONER RISEN:  Okay.  Okay.
21   We'll go to closing then.
22        ATTORNEY WOODWARD:  Initially, I want to
23   point out to the Board, if I may, the same
24   Probation Report that Governor Davis drew most of
25   his information in rejecting the last parole date
26   that was issued last parole Board.  There's a
27   paragraph in there by the author that indicates

60

1   that that author in 1979 agreed with Ms. Tripp in

2   that she said -- And you can read the words

3   yourself.   Quote, I believe that she's being

4   truthful in her words, unquote.   The relevance of

5   that is that while Ms. Tripp is understood her

6   complicity in the conspiracy and understood that

7   complicity that ultimately led to the death of a

8   child -- that it does drive home the persistent

9   adamance that she believed, whether it was founded

10  in reality or not, that she was a participant in a

11  kidnapping and not a murder.   It is also relevant

12  to understand that most of us sitting here could

13  not fathom, as you raised, Mr. Risen, is why

14  couldn't you project down the road that your

15  actions would have created these reactions.   Is

16  that it's relevant to understand that we come from

17  a position not helping sexual abuse.   It does

18  change your personality.   It does impact your

19  ability to reason.   And I would ask that when you

20  look at the egregiousness of the crime, that we

21  understand that we have to place ourselves in that

22  capacity and not the capacity we sit in here today.

23  Her remorse is documented and unfaltering in the

24  last 14 years.   She understands, agrees, and has to

25  deal with, her complicity in the crime.   The issue

26  is whether in fact she poses an unreasonable risk

27  to society if she is released.   Whether, in fact if

61

1    she is released, that her employment or future

2    prospective plans are realistic.  She has served 24

3    years, 10 months for her participation in this

4    crime.  Following case law, if you compare it to

5    the egregiousness of the crime to similarly

6    situated people, many of those same people cited in

7    case law, specifically Danberg and Rosenberg --

8    Excuse me, Ramirez. -- were committed for longer

9    periods, did less time than if they had committed a

10   more egregious act.  The matrix for an egregious

11   act of this type, if you assume all things to be

12   true, even in Governor Davis's letter, the matrix

13   is 21 years.  She has done just about 25 years.  If

14   you take her combined time, her prior incestual

15   issues, her remorse, her realistic post-parole

16   plans and you combine that with 13 subsequent psych

17   reports issued from this institution indicating she

18   would not pose an unreasonable risk to society --

19   Thirteen years.  In fact, the first one was 18

20   years ago.  The last 13 psych report have parroted

21   the same words: She would not pose an unreasonable

22   risk to society.  In light of the consideration

23   given to her time spent, her plans after she leaves

24   here, her remorse, her participation in the act

25   itself.  At some point we have to ask ourselves has

26   she paid her debt.  If she has paid her debt, if

27   she doesn't pose an unreasonable risk, and she has

62

1    realistic parole plans, then it is the right thing

2    to parole and give her a release date. It is the

3    absolute correct thing to do. It is time to do it.

4    This Board at the last meeting, I believe saw an

5    opportunity for an individual to become a

6    constructive member of society. Unfortunately,

7    this present administration, then-present

8    administration, did not. Nothing has changed since

9    then other than her continued good participation in

10   this institution. I ask you to look at all of the

11   honest considerations given to her parole date and

12   issue a parole release date for Ms. Tripp.

13          **PRESIDING COMMISSIONER RISEN:** Thank you.

14   Ms. Tripp, it's now your opportunity to tell the

15   Board why you're suitable for parole or you can

16   rely on your attorney's statement.

17          **INMATE TRIPP:** I personally feel that I've

18   done a lot of time. I feel that I've learned what

19   I was supposed to learn in here. That I've grown

20   how I was supposed to grow in here. And that I

21   actually have morals and principles in my life and

22   that I have a foundation and will stand on it. I

23   couldn't tell people no. I couldn't differ from

24   right or wrong and not go along with it. I had to

25   fit in and today, I don't have to go against the

26   grain and I don't have to go against the rules and

27   regulations to fit in. Because I know I'm okay

1    today being who I am and just being who I am and
2    not having to prove anything to anybody else
3    because who I am is going to show by itself anyway.
4    I think that if the Board finds me suitable and,
5    Lord willing, the Governor decides to agree with
6    the Board this year -- If you find me suitable,
7    that I would be a very productive part of society.
8    I have very good work ethics which I had to learn
9    in there.   I think if I had to praise my own self,
10   the work ethics are very -- That would be my high
11   points because I really enjoy keeping a job and
12   working in a job and doing my best and realizing
13   that anything that you do in life reflects who you
14   are.   So everything I do, I try to do to the best
15   of my ability and the qualities that I have in here
16   that's been given to me and taught to me.   And I
17   feel that I would be very -- I would make the Board
18   proud and my attorney proud and the institution
19   real proud when I never came back here again.   And
20   I would be able to fit into society because I think
21   my qualities and my job skills would fit out there
22   once I got a driver's license.   Of course, since I
23   can't drive or anything until I can, but -- And
24   then one of my biggest things that I was thinking
25   about the other day is that -- Because I don't know
26   where they put Tammy when they buried her in that
27   sewer, she's (inaudible).   But if she's in the

64

1    area, I think, I thought one of my biggest things

2    that I would probably do for her is just, you know.

3    Because I know that I've never had anyone pass away

4    before, that I had to take care of their little

5    area that I know you have to take care of it.  And

6    that is one of the things that I'd like to do for

7    her is take care of her little area.  And make her

8    little bed nice.  And I'm just (inaudible).

9         **PRESIDING COMMISSIONER RISEN:**  Okay.  We'll

10   recess -- It is 3:30 -- for deliberations.  We'll

11   call you back in a few minutes.

12                    R E C E S S

13                    --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

65

1            **CALIFORNIA BOARD OF PRISON TERMS**

2               **D E C I S I O N**

3     **DEPUTY COMMISSIONER MAY:**  We're on record.

4     **PRESIDING COMMISSIONER RISEN:**  Okay.  Everyone

5 who was previously in the room has returned.  The

6 time is 4:00.  The Panel reviewed all information

7 received from the Public and relied on the

8 following circumstances in concluding that the

9 prisoner is suitable for parole and would not pose

10 an unreasonable risk of danger to society or a

11 threat to public safety if released from prison.

12 The prisoner, while imprisoned, has enhanced her

13 ability to function within the law upon release

14 through participation in educational programs.  She

15 has obtained a GED, vocational programs.  She has

16 obtained a vocational certificate in forklift

17 operation and also in vocational word processing.

18 She's also, through self-help, taken the following:

19 She's been in AA and NA since 1998.  What did I

20 say?

21     **DEPUTY COMMISSIONER MAY:**  1988.

22     **PRESIDING COMMISSIONER RISEN:**  1988.  She's

23 been in the SOS program.  She's taken the Womens

24 Against Abuse program, the American Bible Academy,

25 Arts and Correctional Music Program, the Relapse

26 Prevention program, the HIV AIDS Prevention

27 **BRANDEE TRIPP    W-15695    DECISION PAGE 1    5/17/04**

66

1    Program, and Breaking Barriers.  Her institutional

2    job assignment is in the PIA working as a label

3    mechanic operator since 2000, and she has received

4    satisfactory work reports in that assignment.  The

5    prisoner lacks a significant criminal history of

6    violent crime.  Because of maturation, growth,

7    greater understanding, and advanced age has reduced

8    the probability of her recidivism.  The prisoner

9    has realistic parole plans, which includes a job

10   offer and family support.  Would say that I would

11   rate the parole plans as superior.  She has a place

12   to live at the Casa Solano, which is in Grover

13   Beach.  It is part of the Archdiocese of Los

14   Angeles.  She also has a job offer from Cheryl

15   Langford, who has a bookkeeping and tax service.

16   In fact, she has two of them in the Pismo Beach

17   area.  The prisoner has maintained close family

18   ties while in prison by letters and visits.  And

19   today, we have a letter, from her mother, of

20   support listing six relatives in the Grover Beach,

21   Santa Maria, Nipomo, Clovis area that support her

22   release and are willing to help her in any way they

23   can when she is released.  Prisoner has maintained

24   a positive institutional behavior, which indicates

25   significant improvement in self-control.  She has

26   had no 115s since 1988.  Her last 115 was failure

27   **BRANDEE TRIPP    W-15695    DECISION PAGE 2   5/17/04**

1  to report to a work assignment.  She also has had a
2  few 128As.  The last was in 1999 for excessive
3  clothing.  And prior to that, was three years,
4  misuse of state property.  And then the last was in
5  1988 prior to that.  So we feel that she has a good
6  disciplinary record while in custody.  Prisoner
7  shows signs of remorse.  She has indicated that she
8  understands the nature and the magnitude of the
9  offense and accepts responsibility for her criminal
10  behavior and has a desire to change towards good
11  citizenship.  The psychological factors -- The most
12  recent psychological report, authored by Peter Hu,
13  H-U.  Mr. Hu is a staff psychologist and is
14  reporting through January 16th, 2004.  It is
15  favorable.  He states,
16       "The inmate has not been dangerous
17       within a controlled setting, and I do
18       not believe that she will be
19       dangerous if released to the
20       community.  The inmate has gained a
21       healthier respect for the rights and
22       privacy of others and appears to have
23       followed diligently in the rules and
24       regulations here at the institution.
25       The inmate has been able to keep her
26       pathological characteristics in
27  **BRANDEE TRIPP   W-15695   DECISION PAGE 3  5/17/04**

68

1          control and she has obtained a

2          certain level of peace and

3          contentment with herself.  Risk

4          factor, as always, would be if she

5          ever attempted to resort to acts of

6          criminality, though given her peace

7          and contentment, I do not suspect

8          that to be the case."

9   The psych evaluation prior to that was prepared on

10  9/10 of '99 by Robert D. McDaniels, who's also a

11  staff psychiatrist.  It is favorable.  He states,

12          "The inmate has not been dangerous

13          within a controlled setting.  I do

14          not believe she would be dangerous if

15          released to the community.  Her

16          orientation was obviously changed

17          over many years, as reflected by a

18          good work ethic and her involvement

19          within the institution.  A

20          significant risk factor, as always,

21          would be appropriate parole plans.

22          However, these have been deemed

23          viable in the past."

24  We would comment that the Panel feels her parole

25  plans are superior.  Base term of confinement.  The

26  base of life offense for which the prisoner has

27  **BRANDEE TRIPP    W-15695    DECISION PAGE 4  5/17/04**

1    been convicted is murder second, 187 of the Penal

2    Code.   The offense occurred on 7/8 of '79.   The

3    term is derived from the matrix located in the CC

4    and R Title XV at 2403 parentheses C, second degree

5    murder, offense committed on or after 11/8 of '78.

6    The Panel finds that Category A2 is appropriate in

7    that the crime partners were actually the one who

8    committed the homicide or murder and the prisoner

9    had a relationship with the victim.   It was that of

10   a friend.   The Panel assess 204 months for the base

11   offense and notes that this is the midterm.   So the

12   base term of confinement is 204 months.   The total

13   period of confinement is 204 months.   Post-

14   conviction credits from February 18th, 1981 until

15   today's date, 5/17 of 2004, is 73 months.   Total

16   period of confinement -- That would be minus the

17   post-conviction credits.   Total period of

18   confinement is 131 months.   Special conditions of

19   parole.   The following special conditions of parole

20   are imposed: Do not use alcoholic beverages.

21   Submit to alcohol testing.   Submit to anti-narcotic

22   testing.   Submit to THC testing.   Participate in

23   substance abuse program, such as AA or NA and

24   attend outpatient clinic for evaluation.   These

25   were made conditions of parole because the

26   psychologist -- And at the time of the commitment

27   **BRANDEE TRIPP    W-15695    DECISION PAGE 5  5/17/04**

1  offense, she had been using drugs, although it

2  wasn't something that was involved in the

3  commitment offense itself.  You will be paroled

4  back to the same county that the commitment offense

5  was.  And that's where the Panel feels that you

6  will be most successful, based upon the parole

7  plans that you've developed today.  Any comments,

8  Commissioner?

9      **DEPUTY COMMISSIONER MAY:**  Good luck to you.

10     **PRESIDING COMMISSIONER RISEN:**  Okay.  The

11  process now is it goes to Decision Review and

12  they'll evaluate it.  Once it's gone to them, it

13  then will go to the Governor and he has 90 days

14  from the date we give it to him to make an

15  evaluation.  So I think overall it's going to be

16  about six months before you hear anything.  Couple

17  of comments.  I notice that when you talked about

18  -- You were closing. -- about your involvement in

19  the crime, you were very emotional.  And I think

20  that is a consideration.  I also took into

21  consideration the fact that you've been denied and

22  you still kept programming.  You didn't give up.

23  There's a lot of people in the institution that

24  will depend on you because people who go out and

25  make mistakes and have to come back, it reflects on

26  them.  We as Panel members say, where did I go

27  **BRANDEE TRIPP    W-15695    DECISION PAGE 6   5/17/04**

71

1  wrong.  So you've got a lot of things resting on

2  you.  But I want to say that I didn't give you the

3  date.  You earned it.  You've done a good job in

4  here.  So good luck in the future.

5      INMATE TRIPP:  Thank you very much.

6      PRESIDING COMMISSIONER RISEN:  Bye now.  Thank

7  you both.  I'm going to keep your parole plan

8  letters and send them up with the file.

9      INMATE TRIPP:  Okay.  Thank you very much.

10      PRESIDING COMMISSIONER RISEN:  Thank you.

11      INMATE TRIPP:  You guys have a nice evening.

12      PRESIDING COMMISSIONER RISEN:  You too.

13                  --oOo--

14

15

16

17

18

19

20

21

22

23  PAROLE GRANTED                  PENDING REVIEW

24  THIS DECISION WILL BE FINAL ON:  AND APPROVAL
                                     _____

25  YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  BRANDEE TRIPP    W-15695    DECISION PAGE 7   5/17/04

72

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MATTHEW YATES, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 71, and which recording was duly recorded at CALIFORNIA INSTITUTION FOR WOMEN, at CORONA, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of BRANDEE TRIPP, CDC No. W-15695, on MAY 17, 2004 and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 26, 2004 at El Dorado County, California.

Matthew Yates
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT C

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
(Penal Code Section 3041.2)

**BRANDEE TRIPP, W-15695**
**SECOND-DEGREE MURDER**

NO ACTION:  _____

MODIFY:  _____

REVERSE:  _____ X _____

On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death. Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both Tameron and Ms. Maddocks. To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks. Mr. Tripp, his 20-year-old wife, Brandee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks. That plan failed. They then decided to kidnap and kill young Tameron. .

Mrs. Tripp was a family friend and had access to Tameron. On the day of the murder, she arranged to take Tameron on a swimming trip. Before the trip, she asked Tameron to go to the store and pick up some drinks. Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted. The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living. They took Tameron into the Tripps' tent, tied her up, and placed cord from the tent around her neck. Mr. Tripp pulled on one side while Mr. Cook pulled on the other—until Tameron died. They then buried her in a grave that they had dug near the tent.

Tameron's mother notified police that her daughter was missing and that she suspected Mr. Record might be involved.

When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts. Mr. Trip, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried. Mrs. Tripp was arrested the next day. And Mr. Cook later surrendered to the police.

Mrs. Tripp was charged with conspiracy to commit murder, kidnapping, and murder with special circumstances. She accepted a plea agreement and pled guilty to second-degree murder, with the other counts to be dismissed in exchange for her testimony against her stepfather, Mr. Record. Mrs. Tripp was sentenced to 15 years to life in prison. Her husband was found guilty by a jury of conspiracy to commit murder and first-degree murder and was sentenced to 25 years to life. Mr. Cook pled guilty to first-degree murder and was also sentenced to 25 years to life. Mr. Record was convicted of second-degree and was sentenced to 15 years to life.



Brandee Tripp, W-15695
Second-Degree Murder
Page 2

Despite a turbulent pre-prison history, which included verbal, emotional, and sexual abuse, substance abuse, and prostituting herself, Mrs. Tripp had no criminal record at the time of Tameron's murder.

Now 45 years old, Mrs. Tripp has been incarcerated for more than 23 years. While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release. She completed her GED and has obtained vocational certificates in word processing and forklift operation. She has participated in a number of self-help and therapy programs, including Women Against Abuse, the Relapse Prevention Program, Breaking Barriers, Anger Management, and Alcoholics Anonymous and Narcotics Anonymous consistently since 1988. She has received laudatory reports from various prison staff for her volunteer and self-help activities as well as receiving favorable Life Prisoner and mental-health evaluations. She has also established and maintained seemingly solid relationships with her mother and her daughter and has viable parole plans that include residence at a licensed treatment facility for recovering addicts and a job offer from a family friend.

Mrs. Tripp maintains that she did not intend for Tameron to be killed. During her 2004 parole hearing, she told the Board that her husband "promised me that no one would get hurt" and that "In my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken." But at that same hearing, she admitted to suggesting various ways to kill Tameron, and explained, "I guess that's why I ended up being considered the person in charge." In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be involved in the physical abduction of Ms. Maddocks—but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder.

Be that as it may, however, I cannot ignore the circumstances surrounding this particularly monstrous—and premeditated—crime. Mrs. Tripp, who was initially charged with conspiracy to commit murder, kidnapping, and special-circumstances murder, helped plan the kidnap and murder of a 10-year-old child. And she did so for money and to help an accused child molester by eliminating Tameron so she could not testify against him. Because of Mrs. Tripp, Tameron was lured into a car, taken to a remote location, and viciously killed by two individuals who strangled her in a type of tug-of-war action between them. The terror and horror Tameron must have endured is unimaginable. Mrs. Tripp had numerous opportunities to prevent this murder from happening—but she did nothing to spare Tameron. Mrs. Tripp herself acknowledged during her 1985 mental-health evaluation that she could have prevented the murder. Similarly, during her 2004 parole hearing, she said that she tried calling the police twice on the day of the murder but failed to do so because she was "scared." The manner in which this crime was planned and carried out—particularly against one so young and vulnerable—demonstrates exceptional depravity and an utterly callous disregard for human life and suffering.



Brandee Tripp, W-15695
Second-Degree Murder
Page 3

Moreover, Tameron was not just any child to Mrs. Tripp. At the 2004 parole hearing, Mrs. Tripp described Tameron's sister as her "best friend." During her 1992 mental-health evaluation, she stated that she was "the only one who was allowed to take Tameron places alone." Mrs. Tripp not only perpetrated a chilling and revolting crime, she did so by violating her position of trust with Tameron and Tameron's family.

Mrs. Tripp has made creditable gains while in prison. But after carefully considering each of the factors the Board is required to consider, the gravity of the murder Mrs. Tripp perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole. Accordingly, because I believe she would pose an unreasonable threat to public safety if released from prison at this time, I REVERSE the Board of Prison Terms' 2004 decision to parole Ms. Tripp.

Decision Date: 10/11/04

ARNOLD SCHWARZENEGGER
Governor, State of California



INMATE COPY

3

# EXHIBIT D

CALIFORNIA INSTITUTION FOR WOMEN
PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERMS
March 2004 CALENDAR

TRIPP, Brandee
W-15695

**IDENTIFYING DATA:** This is a subsequent and my first Board Report on this 40-year old Caucasian female who was received at CIW on 2/18/81 for the term of 15 years to life for Second Degree Murder.

**RELEVANT INFORMATION:** I spent approximately 1 hour and 15 minutes on 1/15/04 interviewing the inmate.. In addition to the interview, I also had an opportunity to review her central file and medical records.

The inmate was informed regarding the non-confidential nature of the interview, and that I would be utilizing the information from the interview as well as information obtained from the central file and medical records in order to generate an opinion for the Board of Prison Terms. The inmate had a clear understanding regarding the non-confidential nature of the report.

**REVIEW OF LIFE CRIME:** Please refer to her central file for more information.

In essence, the inmate was the victim of her stepfather's sexual molestation since the age of 7 until she moved out at age 18. Per the inmate, her stepfather was allegedly charged with sexual molestation and had offered her boyfriend and her, in addition to two additional accomplices, to murder the victims in his child molestation case. Per the inmate as well as the review of the central file, the inmate was responsible in participating in the planning of the kidnapping of the victim in this case. In a plea bargain process, she was convicted of Second Degree Murder and testified against others in the trial.

During the discussion of this crime and incidence that led up to this crime and subsequent events following her incarceration, the inmate has demonstrated an excellent understanding of her actions. In addition, she demonstrated significant remorse and regret of the crime and assumed responsibility for her actions. She indicated that the first nine years of her incarceration that she had significant difficulties and has had numerous write-ups and acts of rebellion. However, she began to focus on her actions and her characters after being involved in the mental health treatment. She stated that she has developed a new sense of understanding regarding her chaotic past and her sense of "narcissism." She indicated that she has obtained a new respect for people's rights and understood that she can only control her own actions.

## CURRENT PROGRESS WHILE IN THE INSTITUTION

**Medical Information:**  The inmate has been diagnosed with diabetes and is currently receiving medications for the treatment of the medical problem.  In addition, the inmate indicated that she is allergic to Penicillin.

**Mental Health Information:**  The inmate indicated that she is currently not involved in the mental health system at this point in time as she does not satisfy criteria for treatment.

**Substance Abuse History:**  The inmate indicated that prior to incarceration she always has done things to the extreme, and that while using alcohol that there was relatively poor self control.  The inmate has indicated that since she began in earnest to change herself for the better, she has been actively involved in Alcoholic Anonymous and Narcotic Anonymous, and she has a healthy understanding regarding her skills in maintaining abstinence.

**Disciplinary Problems:**  The inmate has indicated that she has had no disciplinary problems during the last interval.  This is consistent with what's found in the disciplinary section of her central file.

**Work:**  The inmate indicated that she is currently working as a label maker in the PIA.  In addition, she also volunteers her time in the band as well as S.O.S.  She also participates actively in AA and NA, and in anger management modules that are offered to her at the institution.  Please refer to her central file for the numerous laudatory chronos regarding her accomplishments and her achievements.

**PLANS IF GRANTED RELEASE:**  The inmate stated that she wishes to be paroled to her mother in Grover Beach, California.  She states that she has a contact with the E.D.D. in the city and plans to be involved with the E.D.D. in assisting her to acclimate back into society by working on finding employment.  She states that she is hopeful that with the possibility of employment that she will be able to receive health benefits from her employer.  The inmate indicated that her family, which consists of her mother and her daughter, are supportive of her emotionally and has offered assistance to her such as housing.  The inmate has a very realistic expectation of her parole.  She indicates that because it is a small city that people would be aware of her parole given the notoriety of the crime.

The inmate states that despite her expectation that the transition back to society will be a difficult one, she is hopeful that with the assistance from the community that she would be able to acclimate successfully and re-intregate with society.

**MENTAL STATUS EXAMINATION:**  Appearance:  The inmate is a clean groomed Caucasian female in no acute distress.  Behavior showed no psychomotor agitation, retardation.  The inmate was calm and cooperative with interview.  Maintained good eye contact.  Speech was regular rate and rhythm.  Mood was described as feeling okay.

Affect was noted to be normal intensity, normal range. Affect was mood congruent, it was stable. I was able to relate. Thought process was goal directed. Thought content: The inmate was preoccupied with her parole plans. The inmate denied any perceptual disturbances such as hallucinations with delusions. Denies any suicidal or homicidal thoughts. Her cognition is intact. Her insight and judgment is appropriate.

**DIAGNOSIS:**

|        |              |
|--------|--------------|
| AXIS I | No Diagnosis |
| AXIS II| No Diagnosis |

**ASSESSMENT OF DANGEROUSNESS:** The inmate has not been dangerous within a controlled setting. I do not believe she will be dangerous if released to the community. This is based on the interview as well as review from her central file; although the first couple of years of incarceration has been difficult with numerous write-ups. However, the inmate has been motivated in her self-discovery and has improved dramatically over the years, to the point where she has matured significantly. The inmate has gained a healthy respect for the rights and privacy of others, and appeared to have been followed diligently in the rules and regulations here at this institution. The inmate has been able to keep her pathological characteristics in control and she has also obtained a certain level of peace and contentment within herself. Her parole plans, though a viable one, may be better improved if certain additional structures are involved, such as a search for higher education in a junior college or even a college degree given her level of high intellect functioning; and/or the possibility of a reentry program that can offer her a better strategy of acclimation back into society. Risk factors as always would be if she was ever tempted to resort to acts of criminality though given her level of peace and contentment, I would not suspect that to be the case.

Inmate Tripp was informed that she could consult with me again regarding this report should she have any questions.

Respectfully submitted,

PETER HU, M.D.
Staff Psychiatrist

CALIFORNIA INSTITUTION FOR WOMEN
PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERM
NOVEMBER 2002 CALENDAR

TRIPP, Brandee
W-15695

**IDENTIFYING DATA:** This is a Subsequent, and my sixth, Board Report on this 43-year-old inmate received at CIW on 2/18/81, for the term of 15-years to life for Second Degree Murder. This report was the result of review of the central file, clinical chart, and an interview on 8/29/02.

**RELEVANT HISTORY:** The inmate, when last evaluated in 1999, had no psychiatric diagnosis. Her last Board appearance was in July 2001 at which time parole plans were considered acceptable.

**CURRENT PROGRESS WHILE IN THE INSTITUTION:**
1.    **Disciplinary Problems:** The inmate has had no disciplinary problems in the interval period.

2.    **Work/School in Past Year:** The inmate has above average work reports, documented January 2002, as a label machine operator. She is described as dependable, with a good attitude. The inmate indicates that she has learned a lot about label technology, and in her spare time has also worked overtime sewing Nomex garments, which has afforded her other job skills.

**MEDICAL HISTORY:** The inmate has been diagnosed with diabetes. She is under fair control, via her clinical chart, although her eating habits are not quite ideal. Nevertheless, it has not resulted in any significant disability. She is currently on medication to control her diabetic condition.

**PLANS IF GRANTED RELEASE:** The inmate has had no change in her parole plans. Because her parole plans have been considered viable by her last appearance, I did not delve into this much further. I believe she has a good prognosis for community living.

<u>Clinical Assessment</u>

**MENTAL STATUS EVALUATION:** There has been no appreciable change in her mental status evaluation over the last several years. She is alert and oriented to time, person, and place. Her affect shows a full range of emotion. Memory for short term and long term is good. Psychomotor activity and speech are normal. She currently denies any alteration in sleep or appetite, and denies being troubled by nightmares. Her energy

levels tend to vary according to how she eats. She denies difficulty with mental concentration, and none is observed. She denies any particular difficulty with tearfulness, although as she relates her crime she becomes emotional. She denies any specific fears or phobias or symptoms of anxiety. She denies any suicidal, homicidal, or paranoid ideation. There is no evidence for any thought disorder.

Insight and judgment both appear to be good. The inmate later spoke at considerable length regarding the origins of her behavior, how it manifested antisocial behavior, why she picked the type of people she did to be around, and how all this resulted into a rather awful crime.

DIAGNOSIS:
Axis I:       No Diagnosis.
Axis II:      No Diagnosis.

**CURRENT LEVEL OF CARE:** The inmate currently is not afforded any treatment through the C3MS Program. She has, however, been through many different psychotherapy groups over the years, dealing with incest issues as well as other psychological issues. She currently is involved in an anger management group. In the past she has been involved in 12-Step and AA Programs. I am satisfied that these needs are being met. The inmate also continues to be active in various activities within the Institution.

**REVIEW OF LIFE CRIME:** Per central file, the inmate had lured a ten-year-old victim to be kidnapped by two others, who later strangled her to death. The background behind this has been described extensively in past reports. The inmate had been sexually abused by her stepfather, who was a serial predator among women, and who was about to be held accountable. A potential witness was kidnapped. The stepfather had promised her financial reward if she followed the plan. The inmate states that her two codefendants agreed not to hurt the young girl, but merely to take her stepfather's money. They were being offered $10,000. They instead strangled the girl and buried her.

The inmate believes that at the time she had been raised in a very ugly, distorted environment in which her stepfather preyed upon her. She associated with the man who became her husband, who was a sociopath. She states that she never would have stood by and saw the victim killed, and would have prevented it had she been there. She indicates she could not imagine ever associating with someone who could be that violent and cruel.

Causative factors appear obviously to reflect the type of upbringing she had and her association with the antisocial element, and the predicament she was in regarding her stepfather, who was particularly cruel and manipulative. She demonstrates a degree of insight and empathy regarding the crime.

TRIPP, B. W-15695 CIW        -2-        BPT EVAL.        9/10/02        hm

**ASSESSMENT OF DANGEROUSNESS:** The inmate has not been dangerous within a controlled setting. I do not believe she would be dangerous if released to the community. Her orientation has obviously changed over many years, as reflected by a good work ethic and her involvement within the Institution. Significant risk factors as always would be appropriate parole plans, however these have been deemed viable in the past.

Inmate Tripp was informed that she could consult with me again regarding this report should she have any questions.

Robert D. McDaniel, M.D.
Staff Psychiatrist

TRIPP, B.  W-15695  CIW          -3-          BPT EVAL.          9/10/02          hm



CALIFORNIA INSTITUTION FOR WOMEN
PSYCHIATRIC EVALUATION FOR THE BOARD OF PRISON TERM
NOVEMBER 1999 CALENDAR


TRIPP, Brandee
W-15695


**IDENTIFYING DATA:**   This is a subsequent, and my fifth, Board Report on this 40-year-old inmate received at CIW on 2/18/81, for the term of 15 years to life for Second Degree Murder of a ten year old kidnap victim. This report was the result of review of the central file, clinical chart, and an interview on 9/7/99, lasting approximately 45 minutes.

**RELEVANT HISTORY:**   My prior report of May 1998 noted no psychiatric diagnosis and that the inmate had undergone a lot of psychotherapy. She, in the past, had been dependent upon sociopathic individuals. She has stated that she trusted her codefendants not to hurt the victim. In addition, the past use of illegal drugs had made her aggressive.


### Psychosocial Assessment

I.    Identifying Information
   A.    Age: 40
         Date of Birth: 3/30/59

   B.    Marital Status: Divorced once.
         Race: White
         Sex: Female
         Religion: Unaffiliated

   C.    Unusual physical characteristics, nicknames, aliases:
         The inmate notes that she has had tattoos on 27 separate occasions.

II.   Developmental History
   A.    Prenatal/perinatal concerns, birth defects:
         The inmate notes that she was born with a congenital heart defect that required surgical correction. She was also born with an underdeveloped hip socket that required some type of physical therapy.


TRIPP, B. W-15695 CIW        -1-        BPT EVAL.        9/10/99        hm

B.    Abnormalities of developmental milestones, speech/language/motor developments:
The inmate otherwise notes no other abnormalities of development.

C.    Habits, peer interaction and socialization skills:
She denies any problem interacting with peers as a child.

D.    History of cruelty to animals, enuresis, arson:
She denies a history of cruelty to animals or enuresis, but admits to fire-setting on one occasion as a child.

E.    Significant childhood medical history:
She notes no other significant childhood medical problems.

F.    History of physical or sexual abuse as perpetrator or victim:
The inmate has a history of sexual abuse, being abused by her stepfather from ages 7 to 18.

III.    Education
A.    Claimed grade level:
The inmate notes that she did finish high school through a continuation school. She had been running away at the age of 17 and had missed school, requiring the transfer.

B.    Measured grade level:
She believes her measured grade level to be 12.9.

C.    History of special education, academic or behavioral problems:
She denies a history of any other special education problems other than the behavioral problems noted above.

D.    Current involvement/interests in educational activities:
She denies any current involvement in educational activities.

IV.    Family History
A.    Age, mental medical, substance abuse, educational, occupational, legal and criminal information on biological/step/adoptive parents, grandparents, and siblings:
The inmate is unaware of her biological father's history, but notes her stepfather was a pedophile and died five years after her crime. Her mother is currently in her sixties and in frail health, having been treated with chemotherapy for breast cancer. Her mother has a history of alcoholism, but no longer drinks. The inmate has no siblings.

B.      Relationship with family members historically and currently:
        The inmate communicates with her mother weekly.

V.      Psychosexual Development and Sexual Orientation
        A.      Age of puberty, sexual relationship, sexual orientation:
                The inmate feels her age of puberty was around 17. Her early life was
                sexualized by a pedophilic stepfather, later leading to sexual behavior with
                her peers in the ninth grade.

        B.      History of high-risk behavior, sexual aggression, fantasy, etc.:
                She denies any other particular high-risk behavior.

VI.     Marital history
        A.      Dates of marriages/common-law type relationships
                The inmate notes she was only married once, to her codefendant, at the
                age of 19. He was 17.

        B.      Children:
                The inmate indicates that she has one daughter, age 21, currently living
                with her mother.

        C.      Characterize past and current relationships with spouse/children:
                The inmate indicates she is very close with her daughter and
                communicates with her regularly.

VII.    Military History
        A.      Periods of service:
                The inmate denies any military history.

VIII.   Employment/Income History
        A.      Significant periods of employment/reasons for termination:
                The inmate notes she worked variously as a nurses aide or as a maid in a
                motel up until the time that she was married. Thereafter, she did not work.

        B.      Work skills/government programs/union affiliations:
                The inmate has no union affiliations.

        C.      Public assistance/money management:
                She was on public assistance while pregnant.

        D.      Current interests/aptitudes:
                While incarcerated, she has variously worked as a clerk, forklift driver,
                and currently working in the maintenance warehouse.

TRIPP, B.  W-15695  CIW        -3-        BPT EVAL.        9/10/99        hm

IX.    Substance Abuse History
    A.    Acknowledged alcohol and illegal drug usage:
        The inmate describes using illegal drugs and alcohol at the age of 13.  She used marijuana, cocaine, and amphetamine.

    B.    Treatment programs or placements:
        The inmate had no treatment prior to incarceration.  Since, she has attended various AA and 12-step groups, and in the past has demonstrated a good working knowledge of the technical aspects of the maintenance of sobriety.  She continues to maintain herself in these activities which should continue on a lifetime basis.

X.    Psychiatric and Medical History
    A.    Prior diagnoses, onset of illness:
        The inmate denies any prior diagnosis.

    B.    Prior hospitalizations and response to treatment:
        She denies a history of psychiatric treatment.

    C.    History of serious accident or head injury:
        She denies a history of any serious accident or head injury.

    D.    History of suicidal/homicidal assaultive behavior:
        She denies a history of suicidal behavior.  She denies homicidal behavior but notes she was assaultive towards a boy who struck her at the age of 16 or 17.  She recalls being drunk at the time.

    E.    Seizure or other neurological conditions:
        She denies any seizure or neurologic condition.

    F.    Disabilities, significant impairments or illnesses:
        She denies any current disabilities or impairments.

    G.    Medications:
        She is on no medications.

XI.    Plans if Granted Release
    A.    Living arrangement and support system:
        The inmate would return to live with her mother, where her daughter currently resides as well.

B.    Financial/vocational plans:
She has been made the beneficiary of her mother's trust and anticipates an income of approximately $1000 per month. She would like to work part time in the capacity of a hotel maid, or any other capacity, and attend computer school at the same time.

C.    Compliance with conditions of parole/outpatient treatment:
She indicates that she would attend meetings and go to counseling. She describes what attempt she has made to locate these services which might be nearby.

D.    Viability of plans/problem areas/supportive relationships:
It appears that the inmate has given some thought regarding the viability of her parole plans, including the community reaction to her release.

E.    Prognosis for community living:
The prognosis for community living is likely to be good based upon her current ability to conform within the confines of the Institution and attend self-help activities.


## Clinical Assessment

XII.    Current Mental Status/Treatment Needs
A.    Summary Mental Status Evaluation:
The inmate is alert and oriented to time, person, and place. Her affect shows a full range of emotion. Her overall mood is normal. Her attitude towards the examination is fairly calm and self-disclosing. Memory for short term and long term is good. She can quickly recall three of three objects after three minutes. She can serially subtract 7 from 100. Psychomotor activity and speech are normal. She reports no problem with sleep, appetite, or energy. She denies being troubled by nightmares. She denies and shows no difficulty with mental concentration or focusing her attention. She denies and shows no evidence for any tearfulness, but does become briefly emotional when speaking about the death of her victim. She denies any particular fears or phobias or symptoms of anxiety. She denies any suicidal, homicidal, or paranoid ideation. There is no evidence for any thought disorder.

Insight appears to be good into the consequences of an incestuous relationship with an abusive stepfather, leading to substance abuse and the association with the antisocial element. Judgment would appear to be

TRIPP, B.  W-15695  CIW        -5-        BPT EVAL.        9/10/99        hm

good as manifested by a disciplinary-free record in the interval period, with the exception of a 128 in May 1999 for excessive and altered clothing.

B.   Clinical Diagnoses and Level of Functioning (including personality disorders and organic/neurological impairment):
**DIAGNOSIS:**
Axis I:      **No Diagnosis.**
Axis II:     **No Diagnosis.**

C.   Current Level of Care:
Currently psychological treatment is not available to inmates who do not meet C3MS criteria.

D.   Treatment Activities:
The inmate has participated in the victim's impact group, as well as relapse prevention groups, through the auspices of AA. She has also facilitated Breaking Barrier groups.

E.   Medications:
She is currently on no medication.

F.   Prognosis:
Her prognosis for continued self-improvement is good.

XIII.  Review of Life Crime
A.   Inmate's version of offense/attitude toward victim/assessment of causative factors:
The inmate's crime has been discussed extensively in prior evaluations. The inmate conspired with two others to kidnap a potential witness to a trial in which her stepfather had been accused of molesting a ten year old girl. The inmate lured the girl to where her two male codefendants took her to a remote location where she was strangled and buried. The inmate states that the victim died because of the inmate's stupidity. She becomes emotional stating that while she did not physically kill the child, she feels bad that she married the person she did, that she associated with these type of people, and that she allowed these series of events to happen. She maintains, however, that it was never her intention that the victim come to any harm.

The inmate disputes her husband's version of the crime, feeling that he is merely self-serving and unable to face the truth. The inmate will describe

TRIPP, B.  W-15695  CIW        -6-        BPT EVAL.        9/10/99        hm

her husband as being younger, and not very intelligent. She indicates he probably would have been capable of more if he had ever applied himself. He was too busy being "tough." Of note, a review of the central file reveals that her husband's I.Q. was assessed in prison as being around 78.

I asked the inmate if there had ever been another kidnapping planned amongst herself and her codefendants. The inmate admits that the victim's sister, an older woman of 20 years, had also been considered for abduction. When asked if she had been in on this possible plan, the inmate replies, "I was partly in on it." The inmate notes that she had refused to be involved in the physical abduction, but would have helped them in luring the woman outside.

I asked the inmate if any particular discussion had been made about killing this particular woman. She replies, "They talked about killing her, but I felt that if I didn't participate I wouldn't be guilty."

I asked the inmate if there was ever any talk about killing the victim in her crime, that is, the 10 year old girl. She replies, "Hilton talked about it one night while smoking marijuana." The inmate goes on to explain that her husband had spoken of shooting people from a distance, but that she had told him that it was not right to shoot someone. The inmate then reflects that at the time she felt that if she was involved in the circumstances, she might be able to control it. Of note there is information in a police report in the central file that alludes to one witness stating that the inmate, as well as her two codefendants, did in fact discuss killing a potential victim sometime before the crime itself.

B.    Relevance of mental condition to life crime/criminal behavior
The inmate, at the time, had an antisocial orientation, perhaps the result of being the victim of an incestuous relationship, involving herself in drugs and alcohol, and the antisocial element.

C.    Inmate's level of insight/remorse/empathy:
The inmate demonstrates regret for the victim's death, and seems to recognize the type of behaviors that led to this circumstance.

D.    Causative factors (including mental condition, if appropriate):
The inmate maintains that she never intended the victim to come to any personal harm. Information contained in the central file describes some type of discussion regarding harm coming to the victim, although this is not clear.

XIV:   Assessment of Dangerousness
     A.    Within Controlled Setting:
         The inmate has not been dangerous within a controlled setting in the recent past.

     B.    If Released to Community:
         If released to the community it appears likely that she would continue with her current behavior.  She shows enthusiasm for a good work ethic, introspection, and has availed herself of numerous self-help groups and opportunities.

     C.    Significant Risk Factors/Precursors to Violence:
         In the past, significant risk factors appeared to involve this inmate's inability to support herself either financially or emotionally, and she did not appear to appreciate the level of dangerousness she was involved in while associating with her codefendant.

XV:   Clinical Observations/Comments/Recommendations:
    It appears that the inmate has become far more careful regarding who she associates with and verbalizes at length her desire to be extremely cautious regarding her behavior, the people she associates with, and to be vigilant regarding what is going on around her.

Inmate Tripp was informed that she could consult with me again regarding this report should she have any questions.

Robert D. McDaniel, M.D.
Staff Psychiatrist

# EXHIBIT E

CALIFORNIA INSTITUTION FOR WOMEN
BOARD OF PRISON TERMS
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

TRIPP, BRANDEE                                    W-15695

I.    COMMITMENT FACTORS:

    A.    Life Crime:

        Murder 2nd, PC 187, Case #CR7639, Monterey County,
        15 years to life.  Victim: Tameron Carpenter, age
        10.

        1.    SUMMARY OF CRIME:

            As taken from Initial Parole Consideration
            Hearing Report dated 08/16/88.

            On July 8, 1979, the victim's mother reported
            her daughter missing, and indicated William
            Record (Brandee Tripp's Stepfather) might be
            involved in the disappearance of her
            daughter.   The victim was scheduled to
            testify against Mr. Record in a child
            molestation case.   Subsequent investigation
            led John Sorenson to reveal knowledge of a
            conspiracy to kidnap the child by Mr. Record
            and Hilton Tripp (Ms. Tripp's husband).
            Roger Ladd indicated Mr. Record offered him
            $1000.00 to kidnap the victim's older sister,
            Betty Ann Murdock.  He observed Hilton Tripp,
            Randy Cook and Brandee Tripp discussing
            methods of killing the older sister.   Mr.
            Ladd also observed further discussions of
            methods of kidnapping and killing Tameron
            Carpenter by Hilton and Brandee Tripp.   On
            July 9, 1979, Hilton Tripp implicated Randy
            Cook as the person who killed the victim, and
            acknowledged he assisted in burying the
            child.   He stated his wife Brandee was in
            agreement with  the kidnapping and arranged
            for the child to leave home in order to
            facilitate the events.   The body of the
            victim was found buried near Avila Beach.
            Ms. Tripp was arrested on July 10, 1979.

2.   <u>Prisoner's Version:</u>

Ms. Tripp has reviewed her Prisoner's Version from her BPT report dated September 2002. Her version remains the same.

Ms. Tripp admits that she had prior knowledge of the kidnapping, and that she arranged for the victim to go to the store alone, where she would be picked up by Hilton Tripp and Randy Cook. However, she remains adamant that she had no idea that Tameron would be killed. She states that throughout their planning it was never a question in her mind that their scheme would result in the victim's murder. She alleges that she agreed to and participated in the kidnapping to collect $10,000 offered by William Record, and that she was not present during the commission of the crime. When the others told her that Tameron had been murdered she reported that she was stunned and upset, and wanted to block the incident out of her mind. She accepts responsibility for Tameron's death and realizes that her cooperation made the victim more accessible to being kidnapped and subsequently murdered.

3.   <u>AGGRAVATING/MITIGATING CIRCUMSTANCES:</u>

A.   <u>AGGRAVATING FACTORS:</u>

1.   Victim was particularly vulnerable since she was only 10-years-old.

2.   Inmate may have occupied a position of leadership or dominance over other participants in the commission of the crime.

3.   During the commission of the crime the inmate had a clear opportunity to cease but instead continued.

4.   Inmate had special position of trust with the victim as a family friend for several years.

5.   The inmate involved minors in the commission of the crime.

TRIPP, BRANDEE     W-15695   CIW     JUNE     03/30/04     PF/cy

6.    The crime involved a high degree of viciousness and callousness.

7.    The planning of the crime indicated premeditation.

B.    MITIGATING FACTORS:

1.    The inmate has no prior history of criminal behavior.

## II.    PRECONVICTION FACTORS:

A.    JUVENILE RECORD:

None indicated.

B.    ADULT CONVICTIONS AND ARRESTS:

None indicated.

C.    PERSONAL FACTORS:

Ms. Tripp is a divorced woman, born to the union of Bill Sisemore and Mary Record in California. She has one half sister and one half brother. Her parents were separated when Ms. Tripp was two-years-old and her mother married William Record, co-defendant, three-years later. Ms. Tripp claims she was especially close to her maternal grandmother who is now deceased. Her mother was employed as secretary and her stepfather as an electrician. Ms. Tripp claims she was close to her stepfather despite the fact that he once attempted to molest her when she was about 7-years of age. She describes the relationship between herself and her stepfather as sick, in that she would often use blackmail attempts to get what she wanted from him. Ms. Tripp received average grades in school and was not seen as a behavior problem until she met Hilton Tripp in the 10th grade. At this point she was expelled from school, but later graduated from a continuation high school. Ms. Tripp claims her marriage to Hilton was forced upon her by both her grandmother and stepfather because she was pregnant. She reports she never loved or wanted to marry him. A child was conceived as a result of this union. After the birth of her daughter, she and her husband were unable to financially care for the child; therefore her mother became the primary caretaker and has since legally adopted Ms. Tripp's child. Ms. Tripp has no documented history of prior work experience.

TRIPP, BRANDEE        W-15695      CIW      JUNE    03/30/04        PF/cy

III. <u>POST CONVICTION FACTORS</u>:

A.   <u>SPECIAL PROGRAMMING/ACCOMMODATIONS</u>:

Not applicable.

B.   <u>CUSTODY HISTORY</u>:

Ms. Tripp was received at the California Institution for Women on 02/18/81 for the offense of Murder 2nd Degree, PC 187, count 3, case #CR7639. She received a term of 15 years to life.

02/18/81   Received at the Reception Center of the California Institution for Women.

02/24/81   Appeared before the Institutional Classification Committee where she was placed in protective custody.

03/04/81   Assigned to PTU Proper by ICC.

10/16/81   Job change to SCU Clerk.

06/18/82   Assigned as CCI Clerk, Medium A custody, receiving above average to excellent evaluations.

05/06/83   Appeared before UCC for Program Review, Minimum A custody. Ms. Tripp was subsequently granted Minimum A custody and a white pass.

08/22/83   Appeared before UCC, Minimum A custody and was job changed to RC Statistic Clerk.

11/04/83   Appeared before UCC, Minimum A custody for a Six-month Review. Committee elected to continue present programming.

03/27/84   Appeared before UCC, Minimum A custody and reassigned to RC Records Clerk.

05/04/84    Appeared before UCC for Program Review.
            The committee acted to raise custody to
            Medium A and continue present program.

02/15/85    Appeared before UCC, Medium A custody
            and was job changed to Relief PM Cook.

04/19/85    Reviewed in absentia by UCC for a Semi-
            Annual Program Review.    The committee
            acted to retain subject in her work
            assignment.

06/06/85    Appeared before Classification Sub-
            Committee for Review for a Campus Pass.
            Committee acted to give Ms. Tripp and
            undesignated Green Pass.

07/19/85    Appeared     before     Classification
            Subcommittee for consideration for a
            White Pass.   The committee acted to
            approve a White Pass.

10/25/85    Appeared before Unit Classification for
            a Six-month Program Review.  Committee
            acted to continue present program and
            reschedule for review in six-months.

12/13/85    Appeared  before  Unit  Classification
            Committee, Medium A custody.    The
            committee acted to reassign Ms. Tripp to
            RC ADM JTS and Self-Development Class.

08/15/86    Appeared  before  Unit  Classification
            Committee for Annual Review, medium
            custody, classification score 42.   The
            committee acted to continue present
            program.

12/22/86    Appeared before Classification Committee
            for work reassignment.   Reassigned to
            Self-Development.

02/13/87    Appeared  before  Unit  Classification
            Committee for Annual Review, Medium A
            custody,    classification    score   38.
            Committee acted to refer case to ICC,

recommending    general    population placement.

05/29/87    Appeared    before    Unit    Classification Committee for housing evaluation, Medium A custody, classification score 38. Committee acted to refer case to ICC for general population placement.

09/18/87    Appeared    before    Unit    Classification Committee for Annual Review.  Medium A custody,    classification    score    44, assignment IST Clerk.  Committee acted to continue present program.

12/14/89    Appeared before UCC for Annual Review, medium A custody, classification score 46,    assignment    Clerk    Maintenance. Committee    acted    to    continue    present program.

08/01/91    Appeared before UCC I for Annual Review, medium A custody, classification score 26, assignment Maintenance Office Clerk. Committee acted to refer case to CSR, recommending CIW.

08/13/91    Endorsed    for    CIW,    administrative placement, WOR.

08/04/92    Appeared before UCC for Program Review, medium A custody, classification score 26.   Committee acted to confirm Peer Helper assignment.

08/18/92    Appeared before UCC for Annual Review, medium A custody, classification score 18,    assignment    Peer    Helper    Clerk. Committee acted to refer case to CSR recommending CCWF/Retain at CIW due to critical worker position need.

09/09/92    Endorsed for CIW-III based on Life term status.

TRIPP, BRANDEE    W-15695    CIW    JUNE    03/30/04    PF/cy

07/03/93    Appeared before Unit Classification Committee for Program Review requesting job change, medium A custody, classification score 10, assignment Peer Helper. Committee acted to place on Word Processing Waiting List.

08/17/93    Appeared before UCC for Annual Review, medium A custody, classification score 10, assignment Graphic Arts. Committee acted to retain at CIW level I per inmate request.

08/18/94    Appeared before Unit Classification Committee for Annual Review, Medium A custody, classification score 2. The committee acted to continue present program per inmate request.

08/17/95    Appeared before UCC for Annual Review, medium A custody, Classification Score 0. The committee acted to continue present program per inmate request.

08/28/96    Appeared before UCC for Annual Review, medium A custody, classification score 0. Committee acted to continue present program per inmate request.

08/06/97    Appeared before UCC for Annual Review, medium A custody, classification score 0, assignment Warehouse Clerk. The committee acted to continue present program per inmate request.

08/12/98    Appeared before UCC for Annual Review, medium A custody, classification score 0. The committee acted to refer the case to CSR, recommending CIW-III override per inmate request.

08/25/98    Ms. Tripp was endorsed for CIW-III. Administrative placement Life.

08/05/99    Appeared before UCC for Annual Review, medium A custody, classification score

TRIPP, BRANDEE    W-15695    CIW    JUNE    03/30/04    PF/cy

0, assignment Warehouse Clerk. The committee acted to continue present program per inmate's request.

05/11/00    Appeared before UCC for Job change Review, medium A custody. The committee acted to assign to PIA.

08/10/00    Appeared before UCC for Annual Review, medium A custody, classification score 0, assignment Industry. The committee acted to continue present program per inmate's request.

08/02/01    Appeared before UCC for Annual Review, medium A custody, classification score 0. The committee acted to refer case to CSR, recommending CIW-II/LIF/WOR/FAM.

09/06/02    Endorsed for CIW-II.

08/12/03    Appeared before UCC for Annual Review, medium A custody, placement score 19, assignment PIA. The committee acted to continue present program per inmate request.

C.    THERAPY AND SELF-HELP ACTIVITIES:

Since her last hearing on 11/06/02, Ms. Tripp has continued her positive program and enhanced her parole suitability by continuing her participation in various self-help and volunteer activities. On 12/04/02, she completed the Inmate Assistance Module, Anger Management. She is noted for continued attendance and participation as a member of AA/NA. Ms. Tripp also participated in the SOS Crochet Project from 11/15/02 through 05/01/03. The CIW Mass Choir also thanks Ms. Tripp for her continued assistance and dedication to the choir. (See Post Conviction Progress Report for more details.)

D.    DISCIPLINARY HISTORY:

Custodial Counseling Chrono (CDC 128-A):

06/03/81    Refusing to work.

06/05/81    Horseplay.

TRIPP, BRANDEE    W-15695    CIW    JUNE    03/30/04    PF/cy

08/18/81  Disruptive behavior.

10/30/81  Door not being flushed.

05/30/82  Sexual behavior.

07/11/82  Inappropriate photograph.

09/17/83  Playing radio too loudly.

06/06/84  Disrupting count.

09/08/84  Disruptive behavior.

03/23/87  Out of Bounds.

03/09/88  Failed to report to work assignment.

03/30/88  Failed to report to work assignment.

01/25/96  Misuse of state property.

05/27/99  Excess property.

**Rule Violation Reports (CDC 115):**

09/04/81  DR3007- Guilty, 10 days disciplinary detention.

02/14/82  DR3005(A)-Guilty, 5 days CTQ.

03/11/82  DR3005(B)-Guilty, 4 days disciplinary detention.

10/06/85  3040(D), division F-Guilty, 10 days LOC.

12/23/86  3004(B) & 3005(B)-Administrative-Guilty, 3 weekend room locks.

05/10/87  3015-Administrative-Guilty, 20 hours extra duty.

06/18/87  3005(B), division F-Guilty, 10 days LOC.

11/24/87  3004, division F-Guilty, 20 days LOC.

11/27/87  3007, division F-Guilty 20 days LOC.

11/24/87  3004, division F-Guilty, 20 days LOC.

03/31/88  3063, division F-Guilty, 2 weekend locks

E.   **OTHER:**

Noted in the Miscellaneous Section are various certificates of completion.

IV.  **FUTURE PLANS:**

Ms. Tripp is single and has no children to support. She has made no plans to wed in the near future and does not foresee any problems.

A.   **RESIDENCE:**

Upon her release, Ms. Tripp plans to parole to Casa Solana, which is a residential treatment facility. The address is 383 s. 13th St., Grover Beach, CA 93433. Telephone number is (805) 489-4179. After completion of this program, Ms. Tripp plans to reside with her mother Mary Jenkins, at 1559 Seabright, Grover Beach, CA 93433, telephone number (805) 489-4179.

B.   **EMPLOYMENT:**

Ms. Tripp will seek employment in the areas of Word Processing, clerical work, warehousing, forklift driver or as a label mechanic operator. She also plans to attend computer school and has written programs for additional housing and employment plans.

C.   **ASSESSMENT:**

Ms. Tripp last appeared before the Board of Prison Terms on 11/06/02. The BPT found Ms. Tripp suitable for parole pending Governor's Review. On 04/04/03 the Governor invoked his authority to reverse the Board's decision to grant Ms. Tripp parole. Since her last hearing, Ms. Tripp has enhanced her suitability by continued participation in various self-help and volunteer activities. She maintains a positive outlook towards future parole possibilities and is an asset to the institution.

V    **USINS STATUS:**

Not applicable.

VI.  **SUMMARY:**

A.   With consideration to the commitment offense, prison adjustment and personal interaction with Ms. Tripp, this writer believes the prisoner would probably present a Medium to Low degree of threat

TRIPP, BRANDEE   W-15695   CIW   JUNE   03/30/04   PF/cy

to the public if released from prison at this time.

B. Prior to release, Ms. Tripp could benefit from:

1. Continue to remain disciplinary free.

2. Continue to upgrade vocationally.

3. Continue to participate in available self-help/therapy programs.

C. This Report is based on a one (1) hour interview with Ms. Tripp and a four (4) hour review of the central file.

D. Ms. Tripp took the opportunity to examine her central file on 04/08/04 in preparation for her BPT hearing.

E. No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan for effective communication to complete this report.

PREPARED BY:                    REVIEWED BY:


P. FLORENCE, CCI                D. GARCIA, CCII



P. CLARK
CLASSIFICATION & PAROLE REPRESENTATIVE



TRIPP, BRANDEE      W-15695    CIW    JUNE    03/30/04    PF/cy

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☐  PAROLE CONSIDERATION HEARING

☐  PROGRESS HEARING

**INSTRUCTIONS**

TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.

TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | **PLACEMENT:** Review Period 11/2002 to Present  Ms. Tripp remained in general population, medium A custody, Placement Score of 19. Continued assignment in PIA receiving primarily satisfactory evaluations.  **CUSTODY:**  Medium A.  **VOCATIONAL TRAINING:**  Continued assignment in PIA, where she has been since 05/12/00. Lupe Quiroz, PIA Supervisor notes, Ms. Trip is doing satisfactory work, has good working habits and is always willing to cooperate.  **ACADEMICS:**  None noted. |

| CORRECTIONAL COUNSELOR SIGNATURE | DATE |
|---|---|
| | |

| NAME | CDC NUMBER | INSTITUTION | | CALENDAR | HEARING DATE |
|---|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

BPT 1004 (REV. 7/86)

PAGE 1 of 4

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | **WORK RECORDS:** |
| | | | Continued in PIA since 05/12/00. |
| | | | **GROUP ACTIVITIES (CDC 128-B):** |
| | | | 12/11/02  A member of AA/NA. |
| | | | 01/09/03  Received a letter of appreciation from the Forever Free Program. |
| | | | 03/31/03  Recognized for contributing to the line-dancing classes. |
| | | | 05/01/03  Acknowledged for her commitment to the SOS Crochet Project. |
| | | | 06/04/03  Continued participation as a member of AA/NA. |
| | | | 06/25/03  Continued participation in the Inmate Assistance Module, Anger Management. |
| | | | 12/04/03  Completed the Inmate Assistance Module, Anger Management. |

ORDER:

☐ BPT date advanced by_____months.     ☐ BPT date affirmed without change

☐ BPT date advanced by_____months.     ☐ PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING |
|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW    MAY | 03/30/04 | PF/cy |

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISO   R: POSTCONVICTION PROGRESS REF   .T

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | 12/30/03  CIW Mass Choir thanks Ms. Tripp for her assistance and dedication to the choir. <br><br> **PSYCHIATRIC TREATMENT:** <br><br> None Noted. <br><br> **PRISONER BEHAVIOR:** <br><br> Ms. Tripp's overall prison behavior would be described as satisfactory.  She interacts well with staff and inmates at the California Institution for Women and meets the standards and expectations set down by the Department of Corrections. <br><br> **OTHER:** <br><br> No further information. |

**ORDER:**

☐ BPT date advanced by_____ months.      ☐ BPT date affirmed without change

☐ BPT date advanced by_____ months.      ☐ PBR date affirmed without change

**SPECIAL CONDITIONS OF PAROLE:**

☐ Previously imposed conditions affirmed.

☐ Add or modify_____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | | CALENDAR | HEARING |
|---|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

BPT 1004 (REV. 7/86)                          PAGE  3   of  4                          PERMANENT ADDENDA

BOARD OF PRISON TERMS                                                                STATE OF CALIFORNIA
CONTINUATION SHEET: LIFE PRIS  ER: POSTCONVICTION PROGRESS RE  RT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| | | | |
| | | | SUBMITTED BY:          REVIEWED BY: |
| | | | *P. E~*          *signature* |
| | | | P. FLORENCE, CCI          D. GARCIA, CCII |
| | | | *signature D. Clark* |
| | | | P. CLARK |
| | | | CLASSIFICATION & PAROLE REPRESENTATIVE |
| | | | |

ORDER:

☐ BPT date advanced by _____ months.     ☐ BPT date affirmed without change

☐ BPT date advanced by _____ months.     ☐ PBR date affirmed without change

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.

☐ Add or modify _____

☐ Schedule for Progress Hearing on appropriate institutional calendar.

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING |
|---|---|---|---|---|
| TRIPP, BRANDEE | W-15695 | CIW | MAY | 03/30/04 | PF/cy |

# EXHIBIT F

STATE OF CALIFORNIA—YOUTH AND ADULT CORRECTIONAL AGENCY                                    GRAY DAVIS, *GOVERNOR*

**BOARD OF PRISON TERMS**
1515 K Street, Suite 600
Sacramento, California 95814
(916) 445-4072



May 31, 2002


Gary M. Diamond
Attorney at Law
P.O. Box 429
Rocklin, CA 95677

RE: Production of Documents

Dear Mr. Diamond:

This is in response to your May 15, 2002 letter addressed to the Executive Officer. The memorandum referenced in your letter is referred to as an executive summary. This summary is an analysis of the parole decision prepared by the Board's Legal Unit. Our executive summaries are protected from disclosure under the attorney work-product doctrine and the deliberative process privilege. We also assert that any attempt to inquire into the mental processes of counsel for the Board is irrelevant and impermissible under a doctrine first enunciated by the United States Supreme Court in United States v. Morgan (1941) 313 U.S. 409, 422, and more recently recognized in Hornung v. Superior Court (2000) 81 Cal.App.4th 1095. According to this precedent, neither the court nor counsel are allowed to inquire into the deliberative process relating to an adjudicative decision made by a member of the executive branch. We believe this precedent applies to the review of parole decisions by the Board's Legal Unit.

Given this background, we will not be providing you with copies of any executive summaries. Thank you for your attention to this matter.

Sincerely,

JOHN P. WINN
Chief Counsel


cc:  Carol A. Daly
     Marvin E. Speed



RECEIVED
JUN 1 1 2002
BY: ..................

## DECLARATION OF GARY M. DIAMOND

I, GARY M. DIAMOND, hereby declare:

1.    I am an attorney, licensed to practice law in California, specializing in parole law, writs and appeals involving parole and the Board of Prison Terms (BPT).

2.    During the most recent five-year period I have represented inmates at approximately one thousand parole hearings for lifers. By "lifer", I mean prison inmates serving life-maximum indeterminate sentences.

3.    By law, Governor Gray Davis appointments BPT's Chairperson and commissioners. Since April 8, 1999, when Governor Davis announced and BPT implemented his no-parole mandate precluding parole for lifers convicted of murder and other offenses, I have suspected and been concerned about a policy by which BPT, upon granting parole to a lifer and approving its decision on review, has its staff prepare the "Governor's" decision consisting of negative facts and inferences extracted from the inmate's record that disfavor parole (although BPT found the inmate suitable and "granted" parole), which the Governor or his staff member signs or rubberstamps, using Penal Code § 3041.2 to reverse all paroles "granted" to lifers convicted of murder and § 3041.1 to refer all paroles "granted" to lifers convicted of other offenses to BPT for an en banc hearing and possible rescission of the parole grant. For the following reasons I now believe that this policy was implemented by BPT and has been in force for at least several years.

4.    At least three such "Governor's" decisions reversing paroles "granted" by BPT to inmates I represented encompassed inferences and language that, in my experience, could only have originated with BPT. The verbiage used in the "Governor's" parole decisions is often identical to that commonly used in reports prepared by BPT's investigative and legal staff, including the reports they prepare in cases of Battered Woman's Syndrome. In at least three such cases the Governor's report included erroneous "facts" and implications that would not be contained in the usual material forwarded to the Governor by BPT for review, which are available only to BPT staff, including but not limited to material that originated from BPT's investigative staff.

5.    On April 29, 2002, I attended a meeting in BPT's board room convened by BPT's Chairperson, Carol Daly, that was attended by representatives from several law enforcement offices, legislative aides, Department of Corrections officials and attorneys who regularly represent lifer inmates in parole matters.

6.    A topic on the agenda of BPT's April 29, 2002 meeting that I attended involved parole determination procedures for lifers. When someone asked about the material that BPT sends to the Governor for his review of lifer parole grants, two members of BPT's panel, including Marvin Speed, its Executive Director, were evasive. I repeated the question, but Mr. Speed gave only a partial answer, describing some of the material BPT sends to the Governor's office.

2

7. I then asked what other documents BPT formulates and sends to the Governor's office. After some of BPT's panel members looked at each other, Mr. Speed replied, "We can't discuss that." I then asked John Wynn, BPT's legal counsel, if BPT prepares any documents for the Governor comprising or suggesting his eventual decision for or against parole in such cases. Mr. Wynn replied, "I can't answer that question. Let's move on."

8. I then posed the question to Mr. Speed and Mr. Wynn, "Are you telling me that someone from the board writes a letter or memorandum and forwards it to the Governor's office that is contrary to the parole decision made by the granting panel and the DRU [BPT's decision review unit] or does someone within the board actually write the decision that the Governor signs when he denies parole?" The panel members refused to answer my question.

9. The following day while attending a parole hearing at Calipatria Prison, I spoke to a BPT commissioner and discussed the conversations I described above. The commissioner confirmed that someone within the board, most likely investigative or legal staff, formulates and suggests that parole be denied based on the negative factors described therein. The commissioner told me that this procedure was implemented during or before the time when Mr. Nielsen [Jim Nielsen] was BPT's Chairman, and has continued under Commissioners Hepburn [David Hepburn] and Daly [Carol Daly, current BPT Chairperson].

10. Since that time I have spoken to other BPT commissioners, two of whom have confirmed this procedure.

11. From these facts and my experience in handling large numbers of parole cases including many subjected to this process, I believe that the "decisions" made by Governor Davis in these cases under Penal Code § 3041.1 and § 3041.2 , are in fact formulated by BPT to recommend contrary to its decisions granting parole, and that the Governor or a member of his staff signs or rubberstamps these "decisions."

12. I am providing this information in the interest of justice, I have received no compensation or consideration therefor, and I am willing to testify thereto in a court of law if called upon to do so.

I DECLARE, under penalty of perjury, that the facts I have stated above are true and correct, except where I have declared a belief thereof, in which case I believe such facts to be true based on the evidence I have set forth.

Dated ___8 | 2 0___, 2002, at ___Rocklin___, California.

_____
Gary M. Diamond

State of California

# MEMORANDUM

To:   Mr. James Gomez
      Director
      California Department of Corrections
      1515 S Street, Room 351 N
      Sacramento, California 94283-0001

Date: October 24, 1991

File No:

Subject: Forwarding of
Lifer Central Files to the
Board of Prison Terms

From:   **BOARD OF PRISON TERMS**

Penal Code Section 3041.1 specifies that up to 90 days prior to a scheduled parole release date, the Governor shall have the power to request review of any decision concerning the grant or denial of parole to any prisoner in a state prison.

Penal Code Section 3041.2 provides that during the 30 days following the granting, denial, revocation, or suspension by the Board of Prison Terms (BPT) of the parole of a person sentenced to an indeterminate prison term based upon a conviction of murder, the Governor, when reviewing the BPT's decision, shall review materials provided by the BPT.

Since the issuance of a Department of Corrections instructional memorandum concerning this matter, dated August 28, 1991, the Governor's Office has requested the Central File be provided for their review following any BPT decisions involving the following type cases:

1) Parole consideration hearings involving the grant of a parole date;

2) Parole Board Rules hearings;

3) Parole rescission hearings; and

4) Progress hearings.

Additionally, the Governor's Office has requested the Central File be provided for their review prior to the release on parole of any DSL prisoner whose commitment offense involved a "heinous" crime.

Any questions concerning this should be directed to the Office of the Board of Prison Terms Chief Counsel at (916) 322-6729 or ATSS 492-6729.

I appreciate your continued cooperation in this matter.

JOHN W. GILLIS
Chairman

# DECLARATION OF SERVICE BY MAIL

Case Name: **In re Brandee Tripp** on Habeas Corpus

I declare that on ~~February 26, 2005~~, I served the attached

**Petition for Writ of Habeas Corpus; Memorandum of P&As; Exhibits**

On the parties listed below by enclosing same in an envelope to which adequate first class postage was affixed, and depositing same in the box for United States Mail at Walnut, California.

**Attorney General**
**455 Golden Gate Avenue**
**San Francisco, CA 94102**

I declare, under penalty of perjury, that the facts I have stated above are true and correct.

Dated ~~February 25,~~ , 2005, at Walnut , California

Joseph M. Wasko
Declarant

MAILROOM
SAN FRANCISCO
CA. DEPT. OF JUSTICE
2005 MAY 10 A 9 44
ATTORNEY GENERAL
RECEIVED