# EXHIBIT 2

*BILL LOCKYER*
*Attorney General*

ATTORNEY GENERAL--OFFICE COPY

*State of California*
*DEPARTMENT OF JUSTICE*



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5567
Facsimile: (415) 703-5843
E-Mail: Julie.Le@doj.ca.gov

**FILED**

June 29, 2005

**JUN 3 0 2005**

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
_____DEPUTY

The Honorable Marla O. Anderson, Judge
Monterey County Superior Court
P.O. Box 1051
Salinas, CA 93902-0414

RE:   *In re Brandee Tripp*, on Writ of Habeas Corpus
      Superior Court of California, County of Monterey, Case No. HC05015
      **Informal Response**

Dear Judge Anderson:

This letter brief is submitted pursuant to the Court's April 29, 2005 order directing respondent to file an informal response to the petition for writ of habeas corpus. The Court granted respondent's request for an extension to file the informal response by June 30, 2005.

## INTRODUCTION

Petitioner Brandee Tripp (Tripp) is a California state prisoner serving a 15-year-to-life sentence imposed in 1981 pursuant to a guilty plea to second degree murder. (Ex. A, Abstract of Judgment.) Tripp is currently incarcerated at the California Institution for Women. In this habeas corpus petition, Tripp does not challenge her conviction but the Governor's recent denial of parole. The Board of Prison Terms (Board) found Tripp suitable for parole on May 17, 2004. On October 14, 2004, Governor Schwarzenegger exercised his gubernatorial authority and reversed the Board's decision to grant Tripp parole.

Tripp facilitated the kidnapping of 10-year old Tamaron Carpenter which led to her murder. (Ex. B, Probation Officer's Report.) Tripp was a close friend of the victim and her 19-year old sister Betty. Both the victim and her sister were scheduled to testify against Tripp's stepfather, William Record, in a child molestation case against him. Record had also sexually abused Tripp when she was as a child until her teenage years. Record wanted to eliminate the sisters as witnesses and offered $1,000 to Tripp's husband to kidnap and murder the girls. Tripp, her husband, and a friend Randy Cook first attempted to kidnap the older sister but failed.

*In re Brandee Tripp*
June 29, 2005
Page 2

They then planned to kidnap and murder the young victim.

Tripp was responsible for arranging the kidnapping. On the day of the murder, she told the victim she was taking her on a swimming trip, but first asked her to go down to the store and pick up some drinks. Tripp had planned that her husband and Cook would meet the victim at the store and offer her a ride home, which they did. The men drove the victim to a tent where Tripp and her husband had been living at the time. They tied up the child, placed a cord around her neck, and while pulling on each side of the cord, strangled her to death. They then buried the victim in a grave that they had dug near the tent. Tripp first denied involvement in the crime when questioned by police. Her husband, however, confessed to the crime and led police to the body. Tripp was arrested the next day.

Tripp was charged with conspiracy to commit murder, kidnapping, and murder with special circumstances. In a plea agreement, she pled guilty to second-degree murder, with the other counts dismissed in exchange for her testimony against her stepfather. Tripp was sentenced to 15 years to life in prison.

In this petition, Tripp claims that the Governor's reliance on the facts of the crime, as stated above, to reverse the Board's grant of parole violates her rights under due process, the terms of her plea agreement, and constitutes an ex post facto violation. However, Tripp's allegations have no merit and the petition should be denied.

## ARGUMENT

### I.

### BECAUSE THE GOVERNOR'S DECISION IS SUPPORTED BY SOME EVIDENCE, THE COURT SHOULD DENY THIS PETITION.

#### A.    The Governor's Discretionary Parole Authority.

Article V, section 8, subdivision (b) of the California Constitution confers upon the Governor the authority to review the decision of the parole authority to grant, deny, revoke, or suspend parole of a person sentenced to an indeterminate term following a murder conviction. (Cal. Const. art. V, § 8, subd. (b).) In exercising his discretion, the Governor may "affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (*Id.;* see also *In re Rosenkrantz* (2002) 29 Cal.4th 616, 625-626.)

In *Rosenkrantz*, the California Supreme held that "a governor's decision granting or denying parole is subject to a limited judicial review to determine only whether the decision is supported by 'some evidence.'" (*Rosenkrantz, supra*, 29 Cal.4th at 625.) The judicial branch is authorized to review the factual basis of a decision of the Governor denying parole in order to ensure that the decision comports with the requirements of due process of law, but in conducting

*In re Brandee Tripp*
June 29, 2005
Page 3

such a review, the court may inquire only whether *some evidence* in the record before the Governor supports the decision to deny parole, based on the factors specified by statute and regulation. (*Id.* at p. 658.) "Only a modicum of evidence" is required to satisfy the some evidence standard. (*Id.* at pp. 665, 677; see also *Superintendent v. Hill* (1985) 472 U.S. 445, 455-456 [Under the "some evidence" standard, "the relevant question is whether there is any evidence in the record that could support of the conclusion reached by [the Governor]"].)

Because the Governor's discretionary decision is subject to an "extremely deferential" standard of review, the court cannot second-guess the Governor's decision; nor can it re-weigh the evidence or resolve conflicts in the evidence. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 665, 677.) Therefore, the Court must uphold the Governor's decision in this case if the Governor gave Tripp individualized consideration of the specified criteria and his decision is supported by some evidence in the record. (*Id.* at p. 667.)

**B.    The Governor May Properly Consider the Gravity of the Offense.**

Penal Code section 3041, subd. (b) provides that "[t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses . . . is such that consideration of public safety requires a more lengthy period of incarceration." In determining parole suitability, the Board and therefore also the Governor, is guided by title 15 of the California Code of Regulations, section 2402. The factors set out there are not exclusive and serve only as guidelines. Both the Board and the Governor are to consider all relevant, reliable information in the record before it. (Cal. Code Regs., tit. 15, § 2402, subd. (b).) Information to be considered by the Governor in making parole suitability determinations includes but is not limited to the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control; including the use of special conditions under which the prisoner may safely be released to the community; and any other information which the bears on the prisoner's suitability for release. (*Ibid.*)

Here, the Governor's reliance on the commitment offense is consistent with the regulations, which provide that if the offense was carried out in an "especially heinous, atrocious or cruel manner," it is a factor indicating unsuitability for parole. (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1).) In considering whether an offense meets this standard, the Governor may consider whether:  (1) multiple victims were attacked, injured, or killed in the incident; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) the victim was abused, defiled, or mutilated; (4) the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering; or (5) the motive for the crime is inexplicable or very trivial. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

*Rosenkrantz* holds that the "nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 682.) And "the [parole] authority properly may weigh heavily the degree of violence used and the amount of

*In re Brandee Tripp*
June 29, 2005
Page 4

viciousness shown by a defendant." (*Id.* at p. 683.) The California Supreme Court's recent decision in *In re Dannenberg* (2005) 34 Cal.4th 1061, 1084, also held that the circumstances of the life crime are paramount in the parole decision:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole. [Citations omitted.] Although the parole authority is prohibited from adopting a blanket rule that automatically excludes parole for individuals who have been convicted for a particular type of offense, the authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant.

(*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.)

The *Dannenberg* court further stated that as long as a finding of unsuitability is supported by the record, "the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in a term of comparative equality with those served by other similar offenders." (*In re Dannenberg, supra*, 34 Cal.4th 1061, 1084.) Thus, "[w]hile the [decision maker] must point to factors beyond the minimum elements of the crime for which the inmate was committed, it need engage in no further comparative analysis before concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release." (*Id.* at p. 1071.)

C.    **The Governor's Decision Is Supported By Some Evidence.**

Here, the Governor's decision reflects an individualized consideration of Tripp's parole suitability, and the reversal of parole is supported by some evidence. Further, the Governor properly pointed to facts suggesting that the crime was particularly egregious, and beyond the minimum necessary for a second degree murder conviction, in denying Tripp parole. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1071.) "Because of Mrs. Tripp, Tameron was lured into a car, taken to a remote location, and viciously killed by two individuals who strangled her in a type of tug-of-war action between them. The terror and horror Tameron must have endured is unimaginable. Mrs. Tripp had numerous opportunities to prevent this murder from happening—but she did nothing to spare Tameron." (Ex. C, Governor's Decision, at p. 2.) The Governor noted that Tripp had acknowledged during her 1985 mental-health evaluation that she could have prevented the murder, and that during her 2004 parole hearing she stated that she tried calling the police twice but was too scared to continue the call. (*Ibid.*)

At her 2004 parole hearing, Tripp stated that she did not believe the victim would be harmed. Although Tripp attempted to distance herself from the actual killing, her statements that she had no knowledge of the murder plot were not credible. The Governor found that Tripp, in her conversation with her husband and Cook in planning the victim's kidnapping, had in fact suggested ways of killing the victim. (*Ibid.*) The Governor concluded that "[t]he manner in which this crime was planned and carried out – particularly against one so young and vulnerable – demonstrates exceptional depravity and an utterly callous disregard for human life

*In re Brandee Tripp*
June 29, 2005
Page 5

and suffering." (*Id.;* Cal. Code Regs., tit. 15, §2402, subd. (c)(1).) The Governor emphasized the fact that Tripp, as a trusted friend of the victim's family, "not only perpetrated a chilling and revolting crime, she did so by violating her position of trust with Tameron and Tameron's family." (Ex. C at p. 2.)

In addition to the facts of the crime discussed above, the Governor acknowledged Tripp's positive gains during her 23 years in prison including completing her GED, obtaining vocational certificates in word processing and fork-lifting operation, participating in various self-help programs, and attending substance abuse programs. (*Ibid.*) The Governor noted her laudatory reports from various prison staff and favorable Life Prisoner and mental-health evaluations. (*Ibid.*) Tripp had also established solid relationships with her mother and daughter, had viable parole plans which included residence at a licensed treatment facility for recovering addicts, and a job offer from a family friend. (*Ibid.*)

However, in weighing all relevant, reliable evidence in determining Tripps's suitability for parole, the Governor concluded that the gravity of the crime presently outweighed the positive factors supporting parole. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Id.* at p. 677.) Under *Dannenberg,* because the facts of the life crime in this case were particularly egregious and demonstrated more than the minimum necessary for a second-degree murder conviction, the Governor acted properly in reversing the Board's grant of parole. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1071.) Therefore, because the decision is supported by some evidence and comports with due process, it must be upheld and the petition denied.

## II.

### THE DENIAL OF PAROLE DOES NOT VIOLATE TRIPP'S PLEA AGREEMENT.

Tripp also claims that the Governor's reversal of the Board's May 2004 decision finding her suitable for parole violated the terms of her plea agreement. Specifically, Tripp claims that the Governor's reliance on the facts of the commitment offense suggesting first degree murder (e.g., premeditation) violates her agreement to plead guilty to second degree murder.

However, there is no evidence that as a condition of Tripp's plea, the prosecution promised that the facts of the crime would not be considered in her parole determination. Tripp was initially charged with conspiracy to commit murder, kidnapping, and murder with special circumstances. Pursuant to the plea agreement, she pled guilty to second-degree murder, with the other counts dismissed in exchange for her testimony against her stepfather. She gained the benefit of not having the other counts charged against her. Tripp's claim is based not on any actual terms of the agreement, but on her subjective belief that her plea would entitle her to benefits during parole consideration.

*In re Brandee Tripp*
June 29, 2005
Page 6

In *In re Honesto*, __ Cal.App.4th __, [2005 Cal.App. LEXIS 933](2005), the Sixth District Court of Appeal found that:

> A plea agreement violation claim depends on the actual terms of the agreement, not the subjective understanding of the defendant or deficient advice provided by his attorney. The superior court could not find that there was a violation of a term of the plea agreement involving parole eligibility in the absence of evidence of a promise or representation regarding parole eligibility at the time of the plea. No such promise or representation may be inferred from the record here.

(*Id.* at *19.)

As in *Honesto*, Tripp has not submitted to the court the transcript of her plea or any other documentary evidence to support that an actual term of her plea agreement was violated. The appellate court further noted that "the applicable statutes and regulations make the facts of the offense a critical part of the Board's consideration of parole suitability, and this was true when Honesto entered into the plea agreement." (*In re Honesto, supra,* 2005 Cal. App. LEXIS at *22. (Pen. Code, § 3041, subd. (b); Cal. Code of Regs., tit. 15, §2402(c)(1); *In re Dannenberg, supra,* 34 Cal.4th at p. 1082.) Therefore, because the Governor was not prevented from considering the life crime in his parole decision by an explicit term of the plea agreement, Tripp's claim that her plea agreement was violated must fail.

### III.

### PETITIONER HAS NOT ESTABLISHED AN EX POST FACTO VIOLATION.

Tripp further argues that the Governor's parole reversal in her case violated her constitutional right to be free from ex post facto application of the law. Tripp claims that because she pled guilty to second degree murder in 1981, before the effective date of the amendment to article V, section 8 of the California Constitution, the retroactive application of that amendment violated ex post facto principles. Tripp's claim lacks merit.

In 1988, article V, section 8 of the California Constitution was amended by the California voters through Proposition 89 to give the Governor the power to affirm, modify or reverse the Board's decision to allow or deny parole to persons sentenced to an indeterminate term for murder convictions. Cal. Const., art. V, § 8(b). The ex post facto argument has been previously rejected in *Rosenkrantz,* where the California Supreme Court found no ex post facto violation in applying article V, section 8 to crimes committed prior to 1988. (*In re Rosenkrantz, supra,* 29 Cal.4th at 638.) The court held that "the type of procedural change effected by adoption of Article V, section 8(b) -- i.e., the addition of a new level of review of parole decisions and a change of identity of the ultimate decision maker, without a change in any substantive standard-- did not constitute an 'increase in punishment' and was not the type of procedural change that fell within the prohibition of the ex post facto clause." (*Id.* at pp. 643-644.)

*In re Brandee Tripp*
June 29, 2005
Page 7

The *Rosenkrantz* court relied heavily on the ex post facto analysis in *Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964. In *Johnson*, the Ninth Circuit Court of Appeals held that "the application of Proposition 89 to authorize the governor's review of Johnson's grant of parole did not violate the Ex Post Facto Clause" because Proposition 89 is a neutral law inasmuch the Governor can either affirm or reverse the Board's granting or denial of parole, and the Governor must use the same criteria as the Board in making his decision. (*Johnson, supra*, 92 F.3d at pp. 967-968.) Therefore, Proposition 89 "simply removes final parole decision-making authority from the Board and places it in the hands of the governor." (*Ibid.*)

In this case, Tripp cannot demonstrate that the application of Proposition 89 creates more than a speculative risk of increasing her punishment. (*Ibid.*) Tripp cannot show that an increase in her punishment actually occurred because she had not been granted parole under the old law when the Board's decision would have been subjected to no gubernatorial review. (*Ibid.*) Therefore, it cannot be said with certainty that the Board would have granted Tripp parole in 2004 had it possessed the final review authority. Tripp's sentence has remained at all times the indeterminate term of 15 years to life. Because Tripp cannot establish an ex post facto violation and the Governor's decision is supported by some evidence, the petition should be denied.

## CONCLUSION

The Governor's reliance on the facts of the crime to reverse Tripp's grant of parole is supported by some evidence in the record. Tripp committed a particularly egregious crime. In exchange for $1,000, Tripp arranged for the kidnapping of a young family friend to keep her from testifying against her molester at trial. The 10-year old victim, who was in Tripp's trust, was subjected to a cruel death which Tripp could have prevented. Further, there is no basis to find that the Governor's decision violated either the explicit terms of her plea agreement or the constitution's ex post facto prohibition. Therefore, respondent urges the Court to uphold the Governor's decision and deny this habeas petition.

Sincerely,

JULIA Y. JE
Deputy Attorney General
State Bar No. 192746

For    BILL LOCKYER
Attorney General

20020449.wpd

# EXHIBIT A

SUPERIOR COURT OF CALIFORNIA COUNTY OF MONTEREY
ABSTRACT OF JUDGMENT

(Commitment to State Prison)

The People of the State of California,
                                PLAINTIFF,

                    vs

BRANDEE TRIPP,                  DEFENDANT.

Present:
Hon.    Ralph M. Drummond
        JUDGE OF THE SUPERIOR COURT
        James T. O'Farrell/Gregory Jacobson
        DISTRICT ATTORNEY
        Frank Dice
        COUNSEL FOR DEFENDANT

This certifies that on __2/11/81__ judgment of conviction of defendant was entered as follows:

(1) Case No. __CR 7639__ Count No. __3__ On his plea of __Guilty__
he was convicted by __the Court__ of violation of Section 187 of the Penal Code,
__murder in the second degree, a felony__
with prior felony convictions as follows: None

| Date | County and State | Crime | Disposition |
|------|------------------|-------|-------------|

Defendant has been held in custody for __875__ days as a result of the same criminal act or acts for which he has been convicted.

Defendant __was not__ armed with a deadly weapon at the time of his commission of the offense or a concealed deadly weapon at the time of his arrest within the meaning of Penal Code Sections 969c, 3024.

Defendant __was not__ armed with a deadly weapon at the time of his commission of the offense within the meaning of Penal Code Sections 969c, 12022.

Defendant __did not use__ a firearm in his commission of the offense within the meaning of Penal Code Sections 969d, 12022.5.

(2) Defendant __was not__ adjudged an habitual criminal within the meaning of Subdivision __a or b__ of Section 644 of the Penal Code, and the Defendant __is not__ an habitual criminal in accordance with provisions of Subdivision (c) of that section.

(3) IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendant be punished by imprisonment in state prison of the state of California for the term provided by law and that he be remanded to the Sheriff of the County of Monterey; and by him delivered to the Director of Corrections of the State of California at __California Institute for Women, Frontera__

It is ordered that sentences shall be served in respect to one another as follows: __N/A__
and in respect to any prior incompleted sentence(s) as follows: __N/A__

(4) To the Sheriff of the County of Monterey and to said Director of Corrections:
Pursuant to the aforesaid judgment, this is to command you, the said Sheriff, to deliver the above named defendant into custody of Director of Corrections at the Facility above named, at your earliest convenience.

Witness my hand and seal of said court

on __February 11, 1981__

ERNEST A. MAGGINI, Clerk

by _____ Deputy

I do hereby certify the foregoing to be a true and correct abstract of the judgment duly made and entered on the minutes of the Superior Court in the above entitled action as provided by Penal Code Section 1213.

Attest my hand and seal of the said Superior Court on __February 11, 1981__

ERNEST A. MAGGINI, County Clerk and Clerk of the Superior Court of California for the County of Monterey.

by _____ Deputy

Judge of the Superior Court of the State of California for the County of Monterey

CLERK 156 (10/75)

# EXHIBIT  B

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

STATE OF CALIFORNIA                                    DEPT.   1(2-4-81)
vs.

                                                       ACTION NO.   CR7639

BRANDEE TRIPP                              CONTROLLED
                                           DOCUMENT
DEFENDANT                                  PROBATION OFFICER'S REPORT

CASE DATA

DATE OFFENSE COMMITTED          July 8, 1979

DATE OF ARREST                  July 10, 1979

INFORMATION FILED               October 16, 1979

DATE OF REFERRAL                January 5, 1981

REPORT FILED                    January 23, 1981

ORIGINAL OFFENSE                182 Penal Code

                                207 Penal Code

                                187 Penal Code

                                Special Circumstances alleged.

CONVICTED OFFENSE               187 Penal Code, 2nd Degree, on condition Counts I, II,

                                and IV be dismissed and defendant testify at any subsequent

                                trial of Winjam Record

DAYS IN CUSTODY                 576 (CUSTODY)

LEGAL COUNSEL                   Braudrick, appointed

PROBATION OFFICER               Hosang

DATE OF BIRTH                   March 30, 1959 (21)

BIRTHPLACE                      San Luis Obispo, CA.

ADDRESS                         1559 Seabright, Grover City, California

TELEPHONE NUMBER                489-4172

PROBATION 3/76

PENAL CODE SECTION 2900.5 - TIME SERVED CREDITS

THE DEFENDANT WAS IN CUSTODY IN THE FOLLOWING FACILITY(S) BECAUSE OF THE CONDUCT FOR WHICH THE DEFENDANT WAS CONVICTED IN THIS CASE:

| | NAME OR LOCATION OF FACILITY | FROM | TO | TOTAL DAYS |
|---|---|---|---|---|
| JAIL | San Luis Obispo | 7-10-79 | 7-1-80 | 358 |
| XXXX JAIL CAMP | Monterey County | 7-2-80 | 2-4-81 | 218 |
| WORK FURLOUGH | | | | |
| HALF-WAY HOUSE | | | | |
| REHABILITATION FACILITIES | | | | |
| HOSPITAL | | | | |
| PRISON | | | | |

ANY OTHER PLACE DEFENDANT WAS ORDERED BY A COURT TO RESIDE AS A CONDITION OF PROBATION, SUCH AS A RESIDENTIAL DRUG (ALCOHOL, PSYCHIATRIC) TREATMENT CENTER.

TOTAL CREDITS                                                          576

GOOD TIME/WORK TIME CREDITS              288

CIRCUMSTANCES OF THE OFFENSE: (Source: Arroyo Grande Police Department records.)

Mrs. Elizabeth Ketchum contacted officers of the Arroyo Grande Police Department at approximately 1:15 p.m. on July 8, 1979, and reported that her daughter, Tameron Carpenter, age 10 years, had been missing since approximately 1:05 p.m. on that day when she had gone to a grocery store to purchase two Cokes prior to going swimming together with a family acquaintance, Brandee Tripp (20). A few hours later, Mrs. Ketchum again contacted officers reporting Tameron was still missing and Brandee Tripp had not been seen since she went to look for Tameron. Mrs. Ketchum indicated that she believed a William Record (53) could be involved with Tameron's disappearance as Record was facing Court charges that he allegedly molested Tameron twice during November of 1978. Tameron was to testify in regard to this matter at Record's next scheduled hearing on July 16, 1979. In an effort to ascertain and obtain information as to Tameron's whereabouts, officers proceeded to contact various individuals. On July 8, 1979, at approximately 6:18 p.m., officers contacted William Record at his residence in Grover City and Mr.

PROBATION                                    (2)

Record stated he had not seen Tameron. Approximately four hours later, officers returned to Mr. Record's residence where they contacted a John Sorenson (37). Sorenson stated Record had left and would not return until July 16, 1979. Brandee Tripp, who is a step-daughter of William Record, was also at the residence and informed officers she had searched for Tameron but could not find her. Immediately thereafter, officers contacted Mrs. Ketchum who stated that Brandee and Hilton Tripp (17) had been by her house, indicating they had not seen Tameron and intended to search for her on the Nipomo Mesa.

At approximately 11:50 p.m. on July 8, 1979, John Sorenson contacted Arroyo Grande Police Department officers, expressing a desire to meet and speak with them. In summary, Mr. Sorenson advised officers he was driving in the Arroyo Grande area with William Record on July 6, 1979, when Record said something like, "I can't find her a little blonde-haired girl". Sorenson reported that on July 7, 1979, Hilton Tripp came by Record's residence and Sorenson overheard Hilton tell Record, "It's going down". Sorenson stated he further overheard Record indicate that he was going to get out of town. Sorenson advised officers he subsequently visited Hilton Tripp at a camp site located near Avila Beach and, after a short visit, Hilton told Sorenson to leave because they had to dig a hole and did not want Sorenson around when they did it. Officers determined that the campsite in reference was the current permanent home of Hilton and Brandee Tripp. On July 9, 1979, a Sheriff's officer located the campsite on a dirt road beneath Highway 101 west of Ontario Road between Avila Road and San Luis Bay Drive. A blue tent containing various items was located at the campsite. The Sheriff's officer who located the campsite had been informed by Arroyo Grande Police Department officers that an informant overheard conversation indicating Tameron might have been taken to a hidden campsite near Avila Beach where she would be killed and buried, presumably to prevent her upcoming Court testimony.

On July 11, 1979, officers contacted and questioned a Roger Ladd (20). Ladd stated that on the evening of July 4, 1979, Hilton Tripp visited with him at Ladd's trailer house and supposedly informed Ladd that William Record had offered him $1,000.00 to kill a Betty Ann Maddocks to prevent her testifying against Record in Court. Ms. Maddocks was identified as Tameron Carpenter's older sister. Ladd further indicated that on the evening of July 5, 1979, Hilton and Brandee Tripp and Randy Cook (17) came to Ladd's trailer, consumed beer and discussed methods of

(3)

killing Ms. Maddocks. Ladd additionally reported that shortly after July 5, 1979, Hilton and Brandee Tripp and Randy Cook again came to his trailer and talked about how they had just failed in an effort to kidnap Maddocks. According to Ladd, Randy Cook was talking and laughing about how he was supposed to push Maddocks into the trunk of a vehicle, but did not because her boyfriend was watching. Hilton and Brandee Tripp and Randy Cook again came to Ladd's trailer on July 7, 1979, and were visiting when William Record and John Sorenson arrived. Hilton spoke with Record outside the trailer. Record and Sorenson then left and Hilton returned to the trailer. Ladd indicated that at that point, Hilton began talking about kidnapping Tameron Carpenter and killing her. Hilton and Brandee Tripp, according to Ladd, thought up about half a dozen ways of kidnapping and killing Tameron. Ladd believes that on approximately July 7, 1979, Hilton visited and borrowed a shovel and a blue scarf from him. On July 8, 1979, Hilton contacted Ladd at his trailer and returned a buck knife and case which Hilton stated he had taken from Ladd's trailer.

Officers contacted Brandee Tripp on July 9, 1979, and questioned her. In general Brandee claimed she had nothing to do with the disappearance of Tameron, but that Hilton Tripp was involved.

On July 9, 1979, at approximately 4:00 p.m., Hilton Tripp came to the Arroyo Grande Police Station, indicating that he had heard the police wanted to speak with him. Hilton spoke with investigator John Tooley and waived his legal rights. After initially denying knowledge about the disappearance of Tameron, Hilton stated Record had previously asked him if he knew of anyone who would take care of Tameron Carpenter for $1,000.00. Record wanted Tameron to disappear so she would not be around to testify against him. Hilton claimed he advised Record he did not want any part of it, but indicated he had a companion, Randy Cook, who might be interested. Hilton further stated he introduced Cook to Record and that he subsequently saw Cook on July 8, 1979. At this time, Hilton received the general impression from Cook that Cook had "taken care of it". Hilton was subsequently placed under arrest and administered a polygraph examination. Hilton then changed his statement, advising investigators that he and Randy Cook had kidnapped Tameron and taken her to the campsite near Avila Beach. Hilton indicated he then went for a walk and when he returned, Randy and Tameron were gone. Hilton advised that Randy had told him what he would

have done to the body if he had had to do anything to Tameron. Hilton was agreeable to showing officers where the spot might be and was transported to the campsite where attention was drawn to a possible gravesite directly in front of Hilton's tent. Officers subsequently located Tameron's body in the gravesite. Investigator Tooley again interviewed Hilton on July 11, 1979, and in summary Hilton stated Record had offered him $1,000.00 to get rid of Tameron so she could not testify against him. In agreement with Brandee Tripp, on July 8, 1979, Brandee arranged for Tameron to leave her residence with Hilton and Randy Cook kidnapping Tameron shortly thereafter. Hilton stated he and Randy took Tameron directly to the campsite near Avila Beach where Randy proceeded to tie up Tameron. According to Hilton, after a few hours he and Randy decided they had to kill Tameron. Hilton claimed he looked at Randy and then decided he could not do it. Hilton further claimed Randy proceeded to strangle Tameron and then they both buried her. Investigator Tooley indicated that Hilton basically claimed Randy did the actual tying up and killing of Tameron.

On July 14, 1979, Randy Cook surrendered himself to officers of the Arroyo Grande Police Department, and subsequently submitted to questioning after having waived his legal rights. Cook stated that from past conversations with Hilton and Brandee Tripp he was aware that they were going to either kidnap Betty Maddocks or Tameron in order to get $1,000.00 from Record. Randy informed officers that on July 7, 1979, Brandee and Hilton Tripp arrived at his house, advising Cook that "the prime suspect (Tameron)" was seated in a vehicle outside the residence. After a short while, Hilton, Brandee, Randy and Tameron drove to a market in Arroyo Grande. Shortly thereafter, an individual identified as Tameron's grandmother arrived at the same area and told Brandee to return to Tameron's house and pick up some other children to take to a show. Cook indicated that prior to the arrival of Tameron's grandmother, their plan was to leave Arroyo Grande after getting gas and go to Kingsburg to meet with Record so that he could view Tameron. Record was supposed to then give them $1,000.00 and they were in turn to get rid of Tameron. Sometime later Brandee returned with Tameron and three other children and they, together with Randy and Hilton, drove to Roger Ladd's trailer. Randy, Hilton and Brandee entered Ladd's trailer and discussed methods of getting rid of the other three children so that they could take Tameron to

(5)

Kingsburg. They could not finalize a plan and as a consequence Hilton and Brandee took Randy home and then supposedly took the children to a show. On the following day of July 8, 1979, Hilton and Randy drove to the Commercial Market in Arroyo Grande with Randy inquiring what was going on. Hilton informed Randy it all depended upon whether Brandee could send Tameron to the store around 1:00 p.m. Hilton and Randy subsequently saw Tameron enter the store, with Randy initially contacting Tameron with instructions from Hilton to see if she would be receptive to having them provide her with a ride back home. Randy claims he entered the store but "got scared" and did not contact Tameron. Randy added that Hilton then entered the store and came out with Tameron. Hilton and Randy then drove Tameron to the Avila Beach campsite. They had Tameron enter the tent, then tied her wrists behind her back and also tied her elbows and ankles. Randy stated he placed a piece of cloth in Tameron's mouth and tied a scarf over her mouth. According to Randy, Hilton told Tameron that what they were doing "was called kidnap and they were keeping her until after the Court date". Randy stated Hilton then left the area for a brief period of time and then returned. While Hilton was gone, Randy claimed he untied Tameron. When Hilton returned, they retied Tameron. Randy and Hilton then started digging a hole by the tent. According to Randy, he asked Hilton if he was scared and stated something to the effect, "this is going to stay with us for the rest of our lives if we get caught we can go to prison". Randy then cut a piece of cord from the tent, put the cord around Tameron's neck and pulled on the cord. Randy heard Tameron choking, but Hilton indicated he believed she was still breathing. Hilton then pulled on the cord which was around Tameron's neck. Randy stated that after a while, Hilton told Randy to pull on one end of the cord while he pulled on the other. Randy stated he did not really want to kill Tameron and held onto one end of the cord while Hilton pulled the other. Hilton and Randy then both determined that Tameron was dead and buried her.

On July 10, 1979, Brandee Tripp was arrested by the Arroyo Grande Police Department and was booked into the San Luis Obispo County Jail.

Both Randy Cook and Hilton Tripp were found to be unfit subjects to be dealt with under the Juvenile Court law and were certified to Superior Court to be treated as adults. All four defendants were granted a change of venue to Monterey County and charges are still pending against William Record. Randy Cook pleaded guilty to first degree murder and was committed to

(6)

prison. Hilton Tripp was found guilty of conspiracy to commit murder, 1st degree murder and the special circumstances alleged were found to be true after a Court trial. He was committed to life in prison without the possibility of parole. This defendant has spent 576 days in custody for her involvement in this offense.

STATEMENT OF THE DEFENDANT: (Source: Interview with the defendant.)

The defendant stated that her husband said he was offered some money. She advised at the time they didn't have any money and weren't eating. She said at first she didn't go along with this but then she did and they tried it with Maddock at first but it didn't work. She stated that then they tried with Tammy and she didn't want her hurt. She said that Randy and Hilton said she wouldn't be hurt so she decided that if it was just for the money and she wouldn't be hurt she would help them. She related that after they picked Tammy up they were supposed to pick her up so she knew she would be there so nothing would happen. She stated they never showed up and by the time they did it was too late.

The defendant stated that later she was told what had happened. She advised then when Hilton was arrested on a juvenile warrant he took a lie detector test and mentioned her name. She said that Randy left the area and asked her if she wanted to go with him but she told him she didn't. She added that she feels that Randy told the truth and that Hilton didn't. She related that she is planning to get a divorce from Hilton. She further stated that she was not involved in the murder and feels that she will still have a life ahead of her when she is released.

ADDITIONAL INFORMATION: (Source: Telephone contact with Dr. Thomas Reidy.)

Dr. Reidy stated that the defendant is of average or above average intelligence and that she has psychopathic and sociopathic features in her personality. He advised that she is immature and does not handle her emotions well. He added that he is preparing a written evaluation for the Court's consideration.

PRIOR CRIMINAL RECORD: (Source: Department of Justice records.)

Department of Justice #A06565890 - F.B.I. #313357V2.

(7)

No prior record.

SOCIAL HISTORY: (Source: Interview with the defendant.)

FAMILY HISTORY DATA:

Father: Bill Sisemore (age and whereabouts unknown).

Mother: Mary Record (43) - divorced (second) - 1559 Seabright, Grover City, California - homemaker.

Step-father: William Record (co-defendant in this case).

Siblings: One half-sister (10), one half-brother (6).

Family Arrest History: None other than husband and step-father.

DEFENDANTS MENTALITY: Average intelligence - cooperative.

WORK RECORD:

Laundry Worker - Cabrillo Convalescent Home - San Luis Obispo, California - one month (1979).

Had worked for various motels as a maid in 1978.

MARITAL HISTORY: Married Hilton Tripp (19) on May 20, 1958 in Santa Maria, California. One child (2½). Child has been cared for by her maternal grandmother for the past year and a half to two years. Is planning to divorce her husband.

HEALTH AND HABITS: Health good - underwent open heart surgery to open a closed valve. Smokes - does not gamble - does not drink - used marijuana over a two to two and a half year period of time - denies the use of any other drugs or narcotics.

MILITARY HISTORY: None.

EVALUATION: It is felt that this defendant was truthful in her statement and that she does feel some degree of remorse over the death of the victim. She does exhibit immaturity, however is able

(8)

to verbalize well and to express the feeling that if it weren't for her step-father and his influence, the victim would still be alive and none of the defendants would have been involved in this offense. She denies being involved in the actual murder of the victim but does accept responsibility for arranging for Hilton and Randy to pick up the victim at the store and to planning the offense in advance. In her behalf, she is planning to testify during her step-father's trial and states that she will tell the truth, however, as with the co-defendants she must be considered to be a danger to society until such time as she can gain enternalized controls over her behavior. When considering the psychopathic and sociopathic features of her personality it is not known if that can be accomplished, even over a long period of time. Further, it is not known if this defendant fully comprehends the impact of her involvement in this offense or of the offense itself.

## SENTENCING CONSIDERATIONS

PROBATION ELIGIBILITY:  Pursuant to Section 1203 of the Penal Code this defendant does not appear to be eligible for probation.

POSSIBLE FACTORS IN AGGRAVATION:  (Rule 421) This offense appears to be aggravated by the following factors:  (1) the crime involved a high degree of viciousness and callousness; (2) the victim was particularly vulnerable; (3) the defendant may have occupied a position of leadership or dominance of other participants in the crimes commission; (4) the planning with which the crime was carried out indicated premeditation; (5) the defendant involved minors in the commission of the crime; and (6) the defendant took advantage of a position of trust to commit the offense.

POSSIBLE FACTORS IN MITIGATION:  (Rule 423)  This offense appears to be mitigated by the following factor:  (1) the defendant has no prior record.

BASE TERM SENTENCING RANGE:

187 P.C., 2nd Degree                                    15 years to life

FINANCIAL RESPONSIBILITY: This defendant has no financial capability.

GOVERNMENT CODE 13967 FINDINGS: It is recommended that the Court find this to be a crime of violence and that the defendant not be assessed for the State Indemnity Fund.

RECOMMENDATION: It is recommended that the defendant be committed to the State Department of Corrections.

Respectfully submitted,

YH/gcf

Dated this 22nd day of January, 1981.

DONALD G. FARMER
COUNTY PROBATION OFFICER

I have read and considered the fore-
going report of the Probation Officer.

Mrs. Yvonne Hosang
Deputy Probation Officer

Leo Arredondo

_____
Judge of the Superior Court

Approved for filing

(10)

# EXHIBIT  C



# OFFICE OF THE GOVERNOR

October 14, 2004

*Via Facsimile and U.S. Mail*

Ms. Brandee Tripp, W-15695
*California Institution for Women*
Miller A – 16U
16756 Chino-Corona Road
Corona, California 92880-9508

Dear Ms. Tripp:

Penal Code section 3041.2 authorizes the Governor to review parole decisions of the Board of Prison Terms (Board) concerning persons sentenced to an indeterminate term upon conviction of murder.

After considering the same factors considered by the Board, the Governor has invoked his authority to reverse the Board's decision to grant parole in your case. The Governor's statement of the reasons for his decision is attached.

A copy of this letter is being provided to you via facsimile, and the signed original (along with a statement of the reasons for his decision) is being sent by mail. Additionally, we are transmitting a copy of this letter and the attached decision to the Chairperson of the Board of Prison Terms.

Sincerely,

PETER SIGGINS
Legal Affairs Secretary

Attachment

cc: Ms. Margarita Perez, Chairperson, Board of Prison Terms (w/attachment)

GOVERNOR ARNOLD SCHWARZENEGGER • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

# INDETERMINATE SENTENCE PAROLE RELEASE REVIEW
## (Penal Code Section 3041.2)

**BRANDEE TRIPP, W-15695**
**SECOND-DEGREE MURDER**

NO ACTION:                              _____

MODIFY:                                 _____

REVERSE:                               __X_____

On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death. Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both Tameron and Ms. Maddocks. To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks. Mr. Tripp, his 20-year-old wife, Brandee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks. That plan failed. They then decided to kidnap and kill young Tameron.

Mrs. Tripp was a family friend and had access to Tameron. On the day of the murder, she arranged to take Tameron on a swimming trip. Before the trip, she asked Tameron to go to the store and pick up some drinks. Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted. The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living. They took Tameron into the Tripps' tent, tied her up, and placed cord from the tent around her neck. Mr. Tripp pulled on one side while Mr. Cook pulled on the other—until Tameron died. They then buried her in a grave that they had dug near the tent.

Tameron's mother notified police that her daughter was missing and that she suspected Mr. Record might be involved.

When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts. Mr. Trip, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried. Mrs. Tripp was arrested the next day. And Mr. Cook later surrendered to the police.

Mrs. Tripp was charged with conspiracy to commit murder, kidnapping, and murder with special circumstances. She accepted a plea agreement and pled guilty to second-degree murder, with the other counts to be dismissed in exchange for her testimony against her stepfather, Mr. Record. Mrs. Tripp was sentenced to 15 years to life in prison. Her husband was found guilty by a jury of conspiracy to commit murder and first-degree murder and was sentenced to 25 years to life. Mr. Cook pled guilty to first-degree murder and was also sentenced to 25 years to life. Mr. Record was convicted of second-degree and was sentenced to 15 years to life.

Brandee Tripp, W-15695
Second-Degree Murder
Page 2

Despite a turbulent pre-prison history, which included verbal, emotional, and sexual abuse, substance abuse, and prostituting herself, Mrs. Tripp had no criminal record at the time of Tameron's murder.

Now 45 years old, Mrs. Tripp has been incarcerated for more than 23 years. While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release. She completed her GED and has obtained vocational certificates in word processing and forklift operation. She has participated in a number of self-help and therapy programs, including Women Against Abuse, the Relapse Prevention Program, Breaking Barriers, Anger Management, and Alcoholics Anonymous and Narcotics Anonymous consistently since 1988. She has received laudatory reports from various prison staff for her volunteer and self-help activities as well as receiving favorable Life Prisoner and mental-health evaluations. She has also established and maintained seemingly solid relationships with her mother and her daughter and has viable parole plans that include residence at a licensed treatment facility for recovering addicts and a job offer from a family friend.

Mrs. Tripp maintains that she did not intend for Tameron to be killed. During her 2004 parole hearing, she told the Board that her husband "promised me that no one would get hurt" and that "In my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken." But at that same hearing, she admitted to suggesting various ways to kill Tameron, and explained, "I guess that's why I ended up being considered the person in charge." In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be involved in the physical abduction of Ms. Maddocks—but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder.

Be that as it may, however, I cannot ignore the circumstances surrounding this particularly monstrous—and premeditated—crime. Mrs. Tripp, who was initially charged with conspiracy to commit murder, kidnapping, and special-circumstances murder, helped plan the kidnap and murder of a 10-year-old child. And she did so for money and to help an accused child molester by eliminating Tameron so she could not testify against him. Because of Mrs. Tripp, Tameron was lured into a car, taken to a remote location, and viciously killed by two individuals who strangled her in a type of tug-of-war action between them. The terror and horror Tameron must have endured is unimaginable. Mrs. Tripp had numerous opportunities to prevent this murder from happening—but she did nothing to spare Tameron. Mrs. Tripp herself acknowledged during her 1985 mental-health evaluation that she could have prevented the murder. Similarly, during her 2004 parole hearing, she said that she tried calling the police twice on the day of the murder but failed to do so because she was "scared." The manner in which this crime was planned and carried out—particularly against one so young and vulnerable—demonstrates exceptional depravity and an utterly callous disregard for human life and suffering.

Brandee Tripp, W-15695
Second-Degree Murder
Page 3

Moreover, Tameron was not just any child to Mrs. Tripp. At the 2004 parole hearing, Mrs. Tripp described Tameron's sister as her "best friend." During her 1992 mental-health evaluation, she stated that she was "the only one who was allowed to take Tameron places alone." Mrs. Tripp not only perpetrated a chilling and revolting crime, she did so by violating her position of trust with Tameron and Tameron's family.

Mrs. Tripp has made creditable gains while in prison. But after carefully considering each of the factors the Board is required to consider, the gravity of the murder Mrs. Tripp perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole. Accordingly, because I believe she would pose an unreasonable threat to public safety if released from prison at this time, I REVERSE the Board of Prison Terms' 2004 decision to parole Ms. Tripp.

Decision Date: 10/11/04

ARNOLD SCHWARZENEGGER
Governor, State of California

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **In re BRANDEE TRIPP, On Habeas Corpus**

No.:        **Monterey County Superior Court, Case No. HC05015**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On June 29, 2005, I served the attached

### INFORMAL RESPONSE TO HABEAS PETITION

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Adrian T. Woodward, Esq.**
**Law Offices of Adrian T. Woodward**
**4000 Long Beach Boulevard**
**Long Beach, CA 90807**

**Attorney for Brandee Tripp, CDC #W-15659**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 29 2005, at San Francisco, California.

_____          _____
          A. Albano                        *A. Albano*
          Declarant                        Signature

20020463.wpd