# EXHIBIT 5
# Part 2 of 3

12

1   there I really don't remember happening.  I mean, I
2   didn't know that Roger Ladd was approached.  I was
3   always been under the impression that we brought
4   him into the mess.  Because I was staying at his
5   trailer and my ex-husband, now, found me when we
6   were discussing everything which involved Roger,
7   but I don't remember him being directly involved as
8   far as that version.  I always thought we
9   implemented him just by -- I mean, just by being in
10  his area.

11          PRESIDING COMMISSIONER RISEN:  Okay, were
12  you -- Okay, let me ask you this.  Now, were you
13  ever present when there was a conversation between
14  Ruckert, yourself, and someone else to kidnap the
15  older sister and kill her?

16          INMATE TRIPP:  Well, it was a while ago.  It
17  was a few Board hearings ago.  And at the time,
18  they didn't really care to know and -- What
19  happened at the time is me and Randy went with
20  Hilton to talk to my stepfather.  But me and Randy
21  had to sit in the car, and that would be Cook.
22  That would be Mr. Cook.  And we watched Hilton talk
23  to my stepfather on the front of our grass where my
24  mom's house is.  That was when he was staying -- He
25  was being allowed to go there to get his clothes at
26  the time.  And we watched the conversation, but we
27  never really heard the conversation.  But when it

13

1    came to testifying to them, I perjured myself and

2    said I heard everything.  And I just repeated what

3    my husband told me because I didn't think that my

4    stepfather should be the only one not going

5    anywhere.

6            PRESIDING COMMISSIONER RISEN:  Okay.

7            ATTORNEY WOODWARD:  I think -- necessary to

8    clarify that for me is that -- I think what Ms.

9    Tripp is indicating at the trial for Mr. Ruckert,

10   she was primary state's witness against him.  Had

11   she not testified, it's quite probable he would

12   have been exculpated, I think.  Because they

13   couldn't find -- So she perjured herself to convict

14   Mr. Ruckert and become the star witness against Mr.

15   Ruckert in the subsequent (inaudible) convicted of

16   first degree.

17           PRESIDING COMMISSIONER RISEN:  Okay.  Does

18   that mean that her husband Hilton never testified

19   against Ruckert?

20           INMATE TRIPP:  Not to my knowledge.  I was

21   the last one that they ever seen.

22           PRESIDING COMMISSIONER RISEN:  Okay.

23           INMATE TRIPP:  Out of the -- There was four

24   of us.  I was the last.  That would have went to

25   trial if I hadn't pled guilty.

26           PRESIDING COMMISSIONER RISEN:  Okay, now the

27   first one they were going to kidnap was -- and

14

1   according to someone, murder -- would be the older

2   sister.  What was her name?

3          INMATE TRIPP:  Betty Ann Maddox.

4          PRESIDING COMMISSIONER RISEN:  Okay.  What

5   ever happened to her?

6          INMATE TRIPP:  Okay.  He came with this

7   wonderful idea.  I wasn't real thrilled.  And in my

8   mind at the time, I didn't really think I was

9   participating in murder.  And they did discuss

10  murder and they were smoking a joint and they were

11  talking, just like, bizarre, and I told them, I'm

12  not helping you with any murder.  I'll get her out

13  of the house.  If you want to do what you're going

14  to do, you can do it.

15         PRESIDING COMMISSIONER RISEN:  Okay.

16         INMATE TRIPP:  But I'll get her out of the

17  house.  But when I went to get her out of the

18  house, they stayed in the bushes and nobody did

19  anything.  So she went back to her home, so nothing

20  ever happened to her.

21         PRESIDING COMMISSIONER RISEN:  So we're

22  talking about the older sister?

23         INMATE TRIPP:  That's the older sister.

24         PRESIDING COMMISSIONER RISEN:  Okay.  Now,

25  how were you involved in the younger sister's

26  kidnapping?

27         INMATE TRIPP:  In the beginning, I was

15

1    actually running interference with her.  Because

2    they were talking and they wanted to kill her.  I

3    didn't want to kill her.  I didn't want to help

4    kill her.  I didn't think she needed to be dead,

5    and I didn't want to do it.  And so, we'd set up

6    little plans and they'd kind of just casually fall

7    through.  And it wouldn't work, and I'd take Tammy

8    home and we'd go places, and I'd take Tammy home.

9    Well, the day that this happened, before it

10    happened, my husband promised me that no one would

11    get hurt.  He promised me that he would go pick

12    Tammy up if I sent her down to the store.  I could

13    go to Randy's house and watch her, and they would

14    go convince my stepfather that they kidnapped her

15    and she wouldn't be testifying to get the money.

16    And then we were going to let her go.

17         **PRESIDING COMMISSIONER RISEN:**  And you were

18    supposed to be at Randy Cook's house?

19         **INMATE TRIPP:**  Yeah.

20         **PRESIDING COMMISSIONER RISEN:**  The trailer.

21         **INMATE TRIPP:**  So after she came up -- No, I

22    was supposed to be -- He lived with his girlfriend

23    in a house in Arroyo Grande.  So I went after her

24    mom called, I went to Randy's house and I waited

25    and I waited and I waited.  And in my head, I knew

26    something wasn't going right, but I was afraid to

27    leave, because I was afraid if I wasn't where I was

16

1   supposed to be and something happened to her, then

2   it was my fault. And that's how I thought when I

3   was --

4         PRESIDING COMMISSIONER RISEN: Okay. Now

5   how did Tamron Carpenter, the victim, know you?

6         INMATE TRIPP: He --

7         PRESIDING COMMISSIONER RISEN: She.

8         INMATE TRIPP: They were a friend of my

9   stepdad's for years and I met them through my

10   stepfather for years.

11         PRESIDING COMMISSIONER RISEN: Did you watch

12   them? Were you like a caretaker?

13         INMATE TRIPP: Well, no. We never

14   babysitted, but her older sister, Betty Ann, was my

15   best friend.

16         PRESIDING COMMISSIONER RISEN: The one --

17         INMATE TRIPP: The older one.

18         PRESIDING COMMISSIONER RISEN: The older

19   one.

20         INMATE TRIPP: Maddox.

21         PRESIDING COMMISSIONER RISEN: Okay. But

22   Tamron knew you well.

23         INMATE TRIPP: Yeah.

24         PRESIDING COMMISSIONER RISEN: So if you

25   went to Randy Cook's house and held her there, how

26   -- Once you ultimately got away, how would you not

27   be identified?

1        **INMATE TRIPP:**  Well, in my head, I was not

2   going to let her know that she was being kidnapped.

3   I had planned in my head that I would just tell

4   her, your mom knows we're here.  And we're just

5   going to hang out for a while, and then we'll go to

6   the beach and then we'll go back to your mom's.

7   Because she thought we were going somewhere.  She

8   never knew.  When she was with me and I would take

9   her places and they would want to kidnap her and I

10   wouldn't let them do it then.  And I'd tell them,

11   no, no.  This isn't going to work.  And I'd talk

12   them out of it because I was there.  We were going

13   places.  Like, we'd go to the park.  We'd go

14   swimming.  So I was always there with her.  And

15   they promised me that they would drop her off and I

16   would just watch her and so I had it planned.  And

17   I had my moped and I had it planned that we'd go to

18   the park and she would never know.  In my head.  I

19   didn't think that anything could go wrong, and I

20   didn't think far enough to know that her life would

21   be taken.

22        **PRESIDING COMMISSIONER RISEN:**  Didn't you

23   feel that Ruckert would have to ensure in some way

24   that she'd been taken care of?  Not just by you

25   telling him.

26        **INMATE TRIPP:**  I never thought that far.

27   And after years of growing up and thinking of how

1   he was, I would think that now.  I know what kind

2   of person he is today.  But back then, I didn't

3   think that.  I figured --

4         **PRESIDING COMMISSIONER RISEN:**  How old were

5   you then?

6         **INMATE TRIPP:**  I had just turned 20.

7         **PRESIDING COMMISSIONER RISEN:**  And where

8   were you living?

9         **INMATE TRIPP:**  Well, at the time, we were

10   living in a tent.

11         **ATTORNEY WOODWARD:**  Sorry, but did I hear

12   the tape recorder go off or am I imagining things?

13         **DEPUTY COMMISSIONER MAY:**  It's on.

14         **ATTORNEY WOODWARD:**  I apologize.  I'm sorry.

15         **PRESIDING COMMISSIONER RISEN:**  Where you

16   living at the time?

17         **INMATE TRIPP:**  We were living in a tent

18   underneath an overpass by Avila.

19         **PRESIDING COMMISSIONER RISEN:**  And this was

20   in 1979.

21         **INMATE TRIPP:**  Yes, Sir.

22         **PRESIDING COMMISSIONER RISEN:**  Well, how do

23   you feel about your involvement now in the case?

24         **INMATE TRIPP:**  I believe that if I hadn't

25   gotten involved at all -- I mean, I should have

26   just called when they were talking about it and

27   preventing it altogether.

19

1    **PRESIDING COMMISSIONER RISEN:** Probably.

2    **INMATE TRIPP:** I would have called the

3    police. I did try to call the police once or

4    twice, but I got scared. When they picked up the

5    phone, I hung up. And I called from a payphone.

6    And now that I'm older, I know that I knew at the

7    time something wasn't right. Or I wouldn't be

8    trying to call the police.

9    **PRESIDING COMMISSIONER RISEN:** Okay. What

10   you're saying, then, is on July 8th, '79, when they

11   didn't bring the girl to you, you knew something

12   was wrong. And so you tried to call the police?

13   **INMATE TRIPP:** I tried twice and I got

14   scared and I hung up the phone as soon as he

15   answered. I was at a payphone in old Arroyo Grande

16   by this bridge. And I hung up the phone. I never

17   talked to anyone because I got scared. In my head,

18   I was thinking, well, if I'm not there and they

19   show up, what happens if they take things into

20   their own hands?

21   **PRESIDING COMMISSIONER RISEN:** Okay, now,

22   she knew both Hilton and Randy Cook? Hilton Tripp?

23   **INMATE TRIPP:** I'm not sure if she really

24   knew Randy really well, but she knew Hilton because

25   he was with me most of the time.

26   **PRESIDING COMMISSIONER RISEN:** Okay. And

27   you sent her to the store near Avila Beach?

1    **INMATE TRIPP:**  No.  I sent her down -- The

2    store was, like, right down from her house.  But

3    they were parked down there waiting.

4    **PRESIDING COMMISSIONER RISEN:**  Did you

5    ever --

6    **INMATE TRIPP:**  They (inaudible) up on a hill

7    and the store was right --

8    **PRESIDING COMMISSIONER RISEN:**  Okay.  You

9    were arrested two days later.  Did you ever talk to

10   Hilton and Randy?

11   **INMATE TRIPP:**  No.  No.  What actually

12   happened is they picked me up for questioning.  I

13   denied the whole thing.  I acted like I didn't know

14   anything.  And they held me.  And at the time, I

15   guess it was 23 hours.  They can hold you 23 hours

16   and they have to let you go if they're not going to

17   arrest you.  And during that time, Hilton had came

18   into the police department looking for me.  And

19   they ended up picking him up because he had a

20   juvenile warrant for him for a prior conviction.

21   And they let me go and then I think I got arrested

22   the next day.  I think it was the next day early

23   morning.  I mean, I went through a whole day and

24   then they woke me up out of a dead sleep, so it

25   was, like, two days later, the following morning.

26   But it was, like, within a 24 hour period

27   (inaudible).

21

1      PRESIDING COMMISSIONER RISEN:  Well, if

2  she's walking somewhere and these two guys pull up

3  and attempt to pick her up, she's probably not

4  going to get in the car.

5      INMATE TRIPP:  No, she was in the store and

6  she knew them.  There's a grocery store down there

7  and I sent them down to the store to buy some

8  items.  And they asked her if -- I guess they asked

9  her if she wanted a ride.  I never really talked to

10  them after it happened because I couldn't believe

11  that they did it.  I couldn't believe that they

12  killed someone.

13      PRESIDING COMMISSIONER RISEN:  Did Hilton or

14  Cook ever tell you that she was strangled to death?

15      INMATE TRIPP:  When they came back, they

16  finally showed up at Randy's house and I asked them

17  where they had been.  And they told me and I told

18  them, I don't want to hear it.  And when they told

19  me where it was, I never went back to the area

20  because I knew that she was there.  And I just

21  couldn't do it.  But before I told him that I

22  didn't want to hear anymore -- He had made the

23  statement that me and Randy pulled the rope at the

24  same time, so neither one of us knows who killed

25  her.  And I told him, I don't want to hear

26  anything.  Don't tell me anything.  I can't believe

27  that you did it.  And then I wouldn't go back to

22

1    the area.

2          PRESIDING COMMISSIONER RISEN:    Well, how

3    would you handle a situation like that today?

4          INMATE TRIPP:    If I heard anyone

5    conspiracizing about any kind of awful thing, I

6    would call the police within a minute.    I would

7    have no problem turning anyone in today.    Because

8    when I was young, you think, no, they're really not

9    going to do it.    You know, people always talk and

10   it's like, they really don't mean it.    I wouldn't

11   take that chance.    Because what if they do mean it.

12   You know.    Tammy's gone, and it is my fault.

13   Because she would have never went down to the

14   store.    You know, and they may have not have done

15   anything if I hadn't helped, but I wouldn't have

16   helped if they hadn't promised me that she wouldn't

17   have got hurt.    The reason it took so long --

18          PRESIDING COMMISSIONER RISEN:    Then your

19   motivation was you wanted the $1,000?

20          INMATE TRIPP:    Well, I wanted to burn my

21   stepfather.    I wanted to pay him back for

22   everything that I went through with him.

23          PRESIDING COMMISSIONER RISEN:    And how did

24   you plan to do that?

25          INMATE TRIPP:    When he gave us the money, we

26   were going to turn Tammy loose and let her testify.

27   We weren't going to keep her.    We were going to let

23

1   her do what she needed to do.  Because we knew he

2   wouldn't -- The one thing we did know is he would

3   never turn us in.  Because what would he say.  You

4   know, he couldn't turn us in.  And I don't remember

5   who put that knowledge in our head, but we knew

6   that for a fact that he wouldn't turn us in.  So if

7   he gave us the money, there was nothing he could do

8   if Tammy showed up to testify.

9          PRESIDING COMMISSIONER RISEN:  Okay, but it

10  was $1,000.

11         INMATE TRIPP:  Well, they said 1,000.  I was

12  told 10,000, so I'm not really sure because I never

13  really heard -- The only thing I heard was what

14  Hilton ever told us.

15         PRESIDING COMMISSIONER RISEN:  Okay, now

16  let's go over your pre-conviction factors.  Says

17  you have no juvenile record.

18         INMATE TRIPP:  No, I don't have (inaudible).

19         PRESIDING COMMISSIONER RISEN:  Okay.  Now,

20  in the Governor's letter, he said that in the '85,

21  '91, and '93 psych evaluation, you talked about

22  shoplifting as a juvenile.  Did you do that?

23         INMATE TRIPP:  I was a delinquent at times,

24  but I never got arrested for it.

25         PRESIDING COMMISSIONER RISEN:  Okay.  Then

26  you stole cars.

27         INMATE TRIPP:  I stole two cars to run away

24

1    with.

2       **PRESIDING COMMISSIONER RISEN:** Okay. And

3    then you stole money from your parents?

4       **INMATE TRIPP:** I did steal money from my

5    mom.

6       **PRESIDING COMMISSIONER RISEN:** Back to the

7    commitment offense. Was there any drugs or alcohol

8    on your part? Were you using drugs or under the

9    influence of alcohol?

10      **INMATE TRIPP:** When we were talking about

11   Betty Ann, we were smoking weed. We were pretty

12   loaded.

13      **PRESIDING COMMISSIONER RISEN:** Okay, but on

14   the --

15      **INMATE TRIPP:** But I don't remember doing

16   drugs or alcohol at the time when Tammy -- I really

17   tried to talk them out of it and why I didn't call

18   the cops -- At that age, that young. I think it's

19   because I thought I was in love with him, and I

20   realized that wasn't love when I grew up. I'm not

21   real sure why. I think my judgment was very

22   impaired because of everything. I think I hated my

23   stepfather so much, honestly, that it just blinded

24   me of what was really right and wrong.

25      **PRESIDING COMMISSIONER RISEN:** Okay. But

26   drugs or alcohol didn't cloud your decision-making

27   abilities on this particular day when you sent the

1   victim down to the market?

2        INMATE TRIPP:  I don't think so.  I don't

3   remember being high or drinking that day.

4        PRESIDING COMMISSIONER RISEN:  And you had

5   no adult convictions (inaudible).

6        INMATE TRIPP:  No.

7        PRESIDING COMMISSIONER RISEN:  Okay.  Says

8   you're divorced.  Were you divorced at the time of

9   the commitment offense?

10       INMATE TRIPP:  No.  I was still married and

11  my attorney advised me not to get a divorce until

12  after everything was over.  So when I arrived at

13  CIW within the year, I was divorced.

14       PRESIDING COMMISSIONER RISEN:  Okay.  You

15  were born where?  In California?

16       INMATE TRIPP:  Yes.  San Luis Obispo.

17       PRESIDING COMMISSIONER RISEN:  You have one

18  half-sister and one half-brother.  Your parents

19  separated when you were two years old.

20       INMATE TRIPP:  Yes.

21       PRESIDING COMMISSIONER RISEN:  Your mother

22  married William Ruckert.  That's the guy who was

23  charged with the molestation.

24       INMATE TRIPP:  Yeah.

25       PRESIDING COMMISSIONER RISEN:  You were

26  especially close to your maternal grandmother, who

27  is now deceased.

26

1           INMATE TRIPP:  Yes.

2           PRESIDING COMMISSIONER RISEN:  Your mother

3    was a secretary and Ruckert was an electrician?

4           INMATE TRIPP:  Yes.

5           PRESIDING COMMISSIONER RISEN:  Says you were

6    close to your stepfather despite the fact he once

7    attempted to molest you once you were seven years

8    of age.

9           INMATE TRIPP:  That part I disagree because

10   it wasn't a once thing.  It was from seven all my

11   life until I decided I wasn't sleeping with him.

12   It was a molest thing when I was younger and as I

13   matured, it became a money exchange thing.  For me.

14          PRESIDING COMMISSIONER RISEN:  You received

15   average grades in school.  Not a behavioral problem

16   until you met Hilton Tripp.  That was your husband,

17   the guy you married.

18          INMATE TRIPP:  Yes, Sir.

19          PRESIDING COMMISSIONER RISEN:  And that

20   would be in the 10th grade?

21          INMATE TRIPP:  Yeah, it was the 10th grade.

22          PRESIDING COMMISSIONER RISEN:  What kind of

23   an influence did he have on you?

24          INMATE TRIPP:  He was the one who was saving

25   me from my stepdad.  That's why I ran away so much.

26          PRESIDING COMMISSIONER RISEN:  Okay.

27          INMATE TRIPP:  Because he was going to

27

1    protect me and save me.

2         PRESIDING COMMISSIONER RISEN:  And it says

3    you graduated from a continuation high school.

4         INMATE TRIPP:  Yes, Sir.

5         PRESIDING COMMISSIONER RISEN:  Now, you

6    didn't want to marry Tripp?

7         INMATE TRIPP:  When I was pregnant, I didn't

8    want to get -- Getting married wasn't something I

9    really wanted.

10        PRESIDING COMMISSIONER RISEN:  Okay, but

11   your parents --

12        INMATE TRIPP:  My stepdad did and one of my

13   grandmothers.  They said it would be wise because I

14   was pregnant and I should do the right thing and

15   not have the baby out of --

16        PRESIDING COMMISSIONER RISEN:  And Tripp was

17   the father.

18        INMATE TRIPP:  Tripp was the father.

19        PRESIDING COMMISSIONER RISEN:  Okay, then

20   your mother adopted the child.

21        INMATE TRIPP:  Yes, Sir.

22        PRESIDING COMMISSIONER RISEN:  And how old

23   is she now?

24        INMATE TRIPP:  She's going to be 25 in June.

25        PRESIDING COMMISSIONER RISEN:  Any type of

26   work prior to coming to prison?

27        INMATE TRIPP:  I had pieces of jobs.

1  PRESIDING COMMISSIONER RISEN:  How long was

2  the longest time you worked?

3  INMATE TRIPP:  Probably, like, three months.

4  I was in Texas when I got certified to become a

5  nurse's aide.

6  PRESIDING COMMISSIONER RISEN:  Okay, how

7  long before the commitment offense were you in

8  Texas?

9  INMATE TRIPP:  I went to Texas the summer of

10  '77. Because I had just graduated. That's when I

11  first met my (inaudible). And I had to get a job

12  to come back to California.

13  PRESIDING COMMISSIONER RISEN:  And you

14  worked about three months doing what?

15  INMATE TRIPP:  I was working in a nursing

16  home. Trying to become a nurse. It was a class

17  where you worked. You could become a nurse's aide

18  as you were working and you took the schooling and

19  the training at the same time.

20  PRESIDING COMMISSIONER RISEN:  Okay, now,

21  did you have a problem with drugs at all on the

22  street?

23  INMATE TRIPP:  I consider me an addict, an

24  alcoholic, only because of the way I consumed

25  alcohol and drugs. When I did them, I consumed a

26  lot of them. I didn't just --

27  PRESIDING COMMISSIONER RISEN:  Okay. What

29

1  age did you start using drugs?

2      INMATE TRIPP:  I started smoking weed in the

3  ninth grade.

4      PRESIDING COMMISSIONER RISEN:  And it just

5  went on from there?

6      INMATE TRIPP:  Yeah.  Most of my stuff was I

7  smoked marijuana and I drank hard liquor.  Once in

8  a while, I would do acid.  Once in a while, I'd do

9  speed.  Once in a while, but --

10      PRESIDING COMMISSIONER RISEN:  Okay.  And at

11  this point, we'll go to the next part of the

12  hearing, post-conviction factors.

13      DEPUTY COMMISSIONER MAY:  Thank you, Mr.

14  Chairman.  At the last hearing -- That was November

15  the 6th, 2002.  Inmate was granted, but the

16  Governor, on April 4th, 2003, reversed the grant

17  and with the following decision:

18          "According to the Probation Officer's

19          report, Tamron Carpenter and her

20          older sister were schedule to testify

21          in a criminal proceeding that William

22          Ruckert had sexually abused them.

23          Mr. Ruckert offered $10,000 to his

24          stepdaughter BranDee Tripp, her

25          husband Hilton, and her husband's

26          friend to kill the girls before they

27          could testify.  The originally agreed

30

1       to kidnap and murder Tamron's older

2       sister.  When that plan failed, they

3       plotted to kidnap the 10 year old

4       Tamron.  Ms. Tripp, age 20, was a

5       family friend of the young victim.

6       In fact, Mrs. Tripp was the only

7       person Tamron's mother trusted to

8       take Tamron places.  Ms. Tripp

9       arranged to take Tamron swimming on

10      July the 8th, 1979.  According to the

11      plans Tripp sent Tamron to the store

12      alone.  Mr. Tripp and his friend met

13      Tamron there, offering to give her a

14      ride back.  This provided them the

15      opportunity to kidnap Tamron, taking

16      her to the beach, where Mrs. Tripp

17      and her husband lived.  Ms. Tripp's

18      husband and his friend tied Tamron

19      up, dug a shallow grave, and then

20      strangled and buried her.  Ms. Tripp

21      pled to second degree murder on the

22      condition that she testify against

23      her stepfather, William Ruckert.  She

24      was sentenced to 15 years to live.

25      While incarcerated, Mrs. Tripp has

26      participated in many self-help and

27      therapy programs, including Alcohol

31

1    and Narcotic Anonymous, 12 Step

2    program, various psychotherapy

3    groups, anger management programs,

4    and Victim Awareness Programs.  She

5    has also been involved with a variety

6    of organizations and activities.  She

7    has completed her GED and taken some

8    additional classes.  All this is

9    commendable.  The crime she

10    facilitated, however, was

11    particularly heinous, the planned

12    killing of an innocent child to

13    prevent her from testifying against a

14    serial child abuser.  It was clear

15    that Tamron's mother was concerned

16    about her child's safety.  Mrs. Tripp

17    was the only person she trusted to

18    take care of Tamron.  Mrs. Tripp

19    abused the trust of not only Tamron's

20    mother, but also Tamron herself.

21    Mrs. Tripp arranged to send Tamron to

22    the store by herself for the very

23    purpose of facilitating the

24    kidnapping and subsequent murder.

25    Mrs. Tripp claims that she only

26    agreed to arrange for the kidnapping

27    on the condition that no one was to

1 be hurt.  This is simply not credible

2 and is inconsistent with the facts.

3 Mrs. Tripp claimed she has accepted

4 responsibility for the crime and

5 realizes that her cooperation made

6 the victim more accessible to being

7 kidnapped and murdered.  I am not

8 convinced, however, that Ms. Tripp is

9 not trying to minimize her

10 culpability.  She says that the plan

11 had been to kidnap Tamron, collect

12 the money, and doublecross her

13 stepfather.  But she had to realize

14 that Mr. Ruckert would not agree to

15 pay anything while Tamron's sister

16 could still testify against him.

17 Furthermore, it is not credible that

18 she did not know that Tamron would be

19 killed.  Indeed, in her 1999

20 psychiatric evaluation, Mrs. Tripp

21 admits that she and her husband

22 discussed killing both Tamron and her

23 sister.  Moreover, Mrs. Tripp and her

24 husband lived in a tent.  Mrs. Tripp

25 had to know that they could not keep

26 Tamron hidden there very long.  The

27 planned kidnap and murder of a 10

1    year old child is atrocious in and of

2    itself, but Mrs. Tripp's motive is

3    especially heinous. She aided in the

4    murder of profit to prevent the

5    victim from testifying and to allow a

6    serial child abuser to continue

7    abusing other innocent children.

8    These factors are far beyond the

9    minimum required to support a

10    conviction of second degree murder.

11    The Arroyo Grande Police Department

12    recommended against parole due to

13    Mrs. Tripp's active participation in

14    this heinous crime. I agree. The

15    calculated murder for hire,

16    demonstrating especially callous

17    disregard for human suffering,

18    indicates that Mrs. Tripp is not

19    suitable for parole at this time.

20    Additionally, I note that one factor

21    the Board relied upon in granting

22    parole was that Mrs. Tripp had no

23    juvenile record. I question,

24    however, Mrs. Tripp's truthfulness

25    regarding her discussion of her

26    juvenile history. During the

27    psychological evaluation in 1985,

34

1    1991, and 1993, she admitted to

2    having had behavior problems,

3    shoplifting, stealing cars, and

4    stealing from her parents.  Yet at

5    the 2002 hearing, she indicates that

6    she had no prior criminal activities

7    before the murder.  Mrs. Tripp has

8    demonstrated a very unstable

9    lifestyle.  She was expelled from

10   school in the 10th grade.  She is an

11   alcoholic and (inaudible) from

12   cocaine beginning as a teenager.

13   Prior to the murder, she was living

14   in a tent and stealing for food.  In

15   prison, she accumulated 21

16   disciplinary reports, the most recent

17   in 1999.  Over the years, psychiatric

18   evaluations have diagnosed her as

19   polysubstance dependent, having an

20   anti-social personality disorder, and

21   a quick and violent temper.  Ms.

22   Tripp's role in this murder for hire

23   showed an exceptional callousness and

24   indifference to human life.  In view

25   of her unstable history and

26   lifestyle, Mrs. Tripp must

27   demonstrate over a prolonged period

35

1      that the gains she has begun to make

2      in a controlled institutional setting

3      can be maintained upon release.   I am

4      also concerned that Mrs. Tripp lacks

5      realistic parole plans.  She has a

6      sparse employment history before

7      incarceration and does not appear to

8      have any credible employment

9      prospects if paroled.  Instead, she

10     intends to rely on a trust fund and

11     live with her mother.  In this

12     unstructured environment, Mrs. Tripp

13     may lose the gains she has made in

14     prison.  Based upon each of the

15     negative factors discussed above, I

16     believe Mrs. Tripp still poses an

17     unreasonable risk of danger to

18     society if paroled at this time.

19     Accordingly, I reverse the Board of

20     Prison Terms' decision to parole Mrs.

21     Tripp."

22  Since her last hearing, she has remained

23  disciplinary free.  She has accumulated a total of

24  14 128s, the last being May the 27th, 1999 for

25  excessive property.  A total of 11 115s, the last

26  being March the 31st, 1988, Division F.  And since

27  the last hearing, she has continued to participate

36

1    in various self-help and voluntary activities.  She

2    completed the Inmate Assistance Module of Anger

3    Management, continued attendance and participation

4    as a member of AA, NA.  She also participated in

5    the SOS group crochet project from November the

6    15th, 2002 through May 1st, 2003, and the CIW mass

7    choir.  Then the assessment.  Mrs. Tripp last

8    appeared before the Board -- She has continued to

9    participate in self-help, voluntary activities, and

10   the assessment was a positive outlook for its

11   future parole possibility and is an asset to the

12   institution.  A summary by the Counselor, and that

13   is Pete Florence.  With consideration to the

14   commitment offense, prison adjustment, and personal

15   interaction with Mrs. Tripp, this writer believes

16   the prisoner would probably pose a medium to low

17   degree of threat to the public if released from

18   prison at this time.  The psychiatric report by Dr.

19   Hu dated January the 16th, 2004.  Axis I, no

20   diagnosis.  Axis II, no diagnosis.  The Doctor

21   concluded the inmate has not been dangerous within

22   a controlled setting.

23        "I do not believe that she will be

24        dangerous if released to the

25        community.  This is based on the

26        interview as well as review from her

27        Central File.  The first couple of

1    years of incarceration has been

2    difficult with numerous write-ups.

3    However, the inmate has been

4    motivated in her self-discovery and

5    has improved dramatically over the

6    years, to the point where she has

7    matured significantly.  The inmate

8    has gained a healthy respect for the

9    rights and privacy of others and

10   appeared to have followed diligently

11   in the rules and regulations here at

12   this institution.  The inmate has

13   been able to keep her pathological

14   characteristics in control and she

15   has also attained a certain level of

16   peace and contentment within herself.

17   Her parole plans, though a viable

18   one, may be better improved if

19   certain additional structures are

20   involved, such as a search for higher

21   education in a junior college, or

22   even a college degree.  Given her

23   level of high intellectual

24   functioning and, or the possibility

25   of a reentry program that can offer

26   her a better strategy of acclimation

27   back into society.  Risk factors, as

38

1      always, would be if she ever

2      attempted to resort to acts of

3      criminality, though given her level

4      of peace and contentment, I would not

5      suspect that to be the case."

6  With that, I will return to the Chair.

7      **PRESIDING COMMISSIONER RISEN:** Okay.

8  Regarding your parole plans, I'm going to work from

9  your attorney's brief.  It indicates that you've

10  been accepted by the Casa Solano, a residential

11  treatment facility in Grover Beach.  Is that

12  correct?

13      **INMATE TRIPP:** Yes, Sir.

14      **PRESIDING COMMISSIONER RISEN:** And that's

15  where you were raised, in Grover Beach?

16      **INMATE TRIPP:** Yes, Sir.

17      **PRESIDING COMMISSIONER RISEN:** Your mother

18  also lives near there.

19      **INMATE TRIPP:** Yeah.

20      **ATTORNEY WOODWARD:** And extensive family.

21      **PRESIDING COMMISSIONER RISEN:** Yeah.  Also,

22  they provide transportation.  Says here, the

23  residents providing transportation, teaching

24  residents necessary life skills.  Have you ever had

25  a driver's license?

26      **INMATE TRIPP:** Yeah.  I had a driver's

27  license before I got arrested.

39

1          PRESIDING COMMISSIONER RISEN:   Okay.

2          INMATE TRIPP:   Expired.

3          PRESIDING COMMISSIONER RISEN:   Now, also in

4     reading the psych evaluation, there it indicated

5     you were probably going to live with your mother.

6     That's not the case now.

7          INMATE TRIPP:   No.  When he did my psych

8     evaluation, that was in January.  And between

9     January and March, I was on the calendar for March

10    31st.  They removed me and put me on May 17th.

11    After my meeting with him, he had talked to me for

12    a minute and he said, well, I think your parole

13    plan is viable, but I think you'd do better.  And I

14    listened and as soon as I walked out the building,

15    I proceeded to try to do what he felt would be

16    better also.

17         PRESIDING COMMISSIONER RISEN:   A little more

18    structured setting, I think.

19         INMATE TRIPP:   Yeah.

20         PRESIDING COMMISSIONER RISEN:   And there is

21    a letter in the file dated March 4th, 2004 from

22    Sister Mary Sheen Hodges, H-O-D-G-E-S, at the Casa

23    Solano in Grover Beach, California, accepting you

24    into the program.  Now, for work, you've already

25    found a job for release.  There's a letter here

26    from Cheryl Langford Bookkeeping and Tax Services

27    in Pismo Beach, which is nearby.  But you're going

40

1    to have to have some transportation to get there.

2    Offering you a job.  She says, both of my

3    businesses have the capability of ensuring a job

4    for BranDee when she is released.  I understand

5    that from BranDee's mom that BranDee has acquired a

6    broad knowledge of many different skills and I am

7    sure I can put her to work.  Do you know Cheryl

8    Langford or is it someone in your family?

9         INMATE TRIPP:  Not personally.  My mother

10   knows her.

11        PRESIDING COMMISSIONER RISEN:  Okay.  And

12   what is your knowledge as to what you plan to do

13   there in the way of work?

14        INMATE TRIPP:  Pretty much anything she

15   wants me to do.  I do have good clerical skills.  I

16   do know how to operate computers from in here.

17        DEPUTY COMMISSIONER MAY:  You do know how to

18   operate computers?  You're familiar with a word

19   processor?

20        INMATE TRIPP:  Yeah.  I do have a word

21   processor in my present job right now.  So, I mean,

22   I could type.  I did take a bookkeeping class about

23   probably 17, 18 years ago.  But I'm sure that if

24   she sat down with me and helped refresh my memory,

25   I would -- I'm a very quick learner, so I don't

26   really see the problem as being able to do what she

27   would like me to do for --

41

1          [Thereupon, the tape was turned over.]

2          **DEPUTY COMMISSIONER MAY:**  Okay.

3          **PRESIDING COMMISSIONER RISEN:**  Okay, there

4    is also some indication here that you will receive

5    a monthly income from a family trust.  Who set the

6    trust up for you?

7          **INMATE TRIPP:**  My grandmother.

8          **PRESIDING COMMISSIONER RISEN:**  Okay, and you

9    have any idea of what the monthly lump would be for

10   you?

11         **INMATE TRIPP:**  My mother's attorney had said

12   it would be, like, $1,000.

13         **ATTORNEY WOODWARD:**  She has current access

14   to 1,000, so minimum of 1,000.  It may approach

15   $1,500.

16         **PRESIDING COMMISSIONER RISEN:**  Okay.  And

17   you also have indicated in here that you want to

18   attend some computer courses and continue in self-

19   help.  How do you plan to remain substance free

20   once you're out of here?

21         **INMATE TRIPP:**  Well, once I complete the

22   recovery program, then I'll continue to go to my

23   meetings and stuff.  I've been writing Mr. Golodner

24   for about the last five, six, seven years.  And

25   I've never personally met him, but he's familiar

26   with me through my letters for my counseling.

27   Because I believe that integration isn't going to

42

1    be really simple.  I believe that you need help and

2    keeping yourself in a positive atmosphere is really

3    beneficial for you and -- So I'll keep going

4    because the meetings presently right now -- The

5    home meetings are -- They're only, like,

6    approximately maybe three or four blocks from my

7    house.  And I tried to find things that would be

8    within walking distance because I know getting a

9    driver's license isn't as easy as it was.  You have

10   to have insurance.  You have to have a car and you

11   have to have a lot of things in order just to be

12   able to drive.  So as long as I can get to the area

13   on a bicycle and a helmet -- Because I know they

14   have a helmet law now.  -- that I, you know, I can

15   keep myself in my program.  So I tried to make my

16   arrangements close to where I would be.  And with

17   Golodner, he's in Santa Maria, but I know my mom

18   would make sure that I got to my appointments.  My

19   mom and my dad, if I can't have a driver's license

20   at the time.

21           PRESIDING COMMISSIONER RISEN:  Okay, you're

22   referring to Charles Golodner.

23           INMATE TRIPP:  Golodner.  Yeah.

24           PRESIDING COMMISSIONER RISEN:  G-O-L-O-D-N-

25   E-R.  It's a counseling group on Willow Street in

26   Santa Maria.  There's a letter here, 9/5 of 2003

27   from him, indicating that he would meet with you as

43

1    a counselor once you're released.  Now there's a

2    letter here from Help?  Eldrit?  What is in

3    (inaudible)?

4         INMATE TRIPP:  Yeah.  She was at (inaudible)

5    -- Well, what it was was I had written her husband,

6    right.  Her husband, he had recently passed on and

7    he was into the job training partnership back in

8    the EED program.

9         PRESIDING COMMISSIONER RISEN:  Okay.

10        INMATE TRIPP:  And so she was writing me to

11   let me know that he had passed on and was no longer

12   in that.  It was just giving me other outlets.  And

13   you can look here, and you can look here, because

14   I'm under the understanding that the EED Employment

15   Agency has specific programs that are for ex-

16   felons.  That they do help ex-felons.  Yes, Sir.

17        PRESIDING COMMISSIONER RISEN:  The crime was

18   committed in Grover Beach, well, Avila Beach.  In

19   that area.

20        INMATE TRIPP:  Yeah, in San Luis Obispo.

21        PRESIDING COMMISSIONER RISEN:  Is this going

22   to be a problem, you paroling back to that area?

23        INMATE TRIPP:  No.  In the beginning, I

24   thought it would because I figured that it would be

25   very hard to find work and I had started looking

26   outside where I did have family, but in other

27   areas.  But when the program accepted me and my

44

1    mom's tax lady said, okay, I'll hire her.  And I

2    thought, well, I can get a job and those people

3    will accept me.  I thought maybe it would be all

4    right.  From what my mom tells me, I don't know

5    personally, no, but I know that Ruckert's family,

6    they just moved.  So they no longer live there.

7    And if they still lived there, I don't think I'd

8    feel comfortable being there.  Or for them or

9    myself, because, you know, they tried real hard to

10   move on with their life, I'm assuming.  You know,

11   they've left that behind and tried to move on and

12   to see my face every day around the corner, that

13   would be, you know.  That's just not right to do,

14   and I would work on finding something out of that

15   community.  But I don't feel that they live there

16   anymore.

17          PRESIDING COMMISSIONER RISEN:  Okay, Vivia?

18   Vivian, is it?  Vienna, is it?

19          INMATE TRIPP:  Venna.

20          PRESIDING COMMISSIONER RISEN:  Venna Jenkins

21   is your daughter.

22          INMATE TRIPP:  Yeah.  She was my --

23          PRESIDING COMMISSIONER RISEN:  And there's a

24   letter here dated 5/11/2004.  She lives with your

25   mother.

26          INMATE TRIPP:  Yes, Sir.

27          PRESIDING COMMISSIONER RISEN:  And this is

1    the daughter your mother adopted.

2         INMATE TRIPP:  Yes, Sir.

3         PRESIDING COMMISSIONER RISEN:  Okay.  And

4    there's a letter of support from her here.  And

5    there's also a letter from your mother, Mary

6    Jenkins.

7         INMATE TRIPP:  Yes, Sir.

8         PRESIDING COMMISSIONER RISEN:  Dated May

9    11th, 2004.  It's a letter of support.  She also

10   lists one, two, six, six names for the relatives

11   who live in that area.  Santa Maria, Clovis,

12   Nipomo, Santa Maria, Grover Beach.  They're also

13   supporting you in your release.  Is there anything

14   else we should know about your parole plans?

15        INMATE TRIPP:  Once I complete the program,

16   I know the program (inaudible).  It's a three and

17   six month program, and they have two separate

18   houses, from what my daughter told me.

19        PRESIDING COMMISSIONER RISEN:  Okay.  And

20   now, as part of the hearing process, we sent out

21   3042 notices.  Those are notices that go to the

22   presiding judge, District Attorney, the Police

23   Department, and solicit comments from them

24   regarding your release.  Only response we received

25   was from the Arroyo Grande Police Department.

26   Received a letter May 6, 2004 from Steven Andrews,

27   Operational Commander of the Police Department.

46

1    And they would be opposed to your parole.  We

2    received no other responses for two of those

3    letters.  We'll go to the next phase.  Any

4    questions?

5              DEPUTY COMMISSIONER MAY:  No.  Just for the

6    record, though, you've completed vocation forklift

7    operator and vocational word processing.  Is that

8    it or was there any other vocational?

9         INMATE TRIPP:  No.  I completed vocational

10   word processing and then I focused my jobs around

11   utilizing my vocation.

12             DEPUTY COMMISSIONER MAY:  Just those are the

13   two, right?

14        INMATE TRIPP:  Yeah.  The forklift was on

15   the side kind of thing.

16             DEPUTY COMMISSIONER MAY:  Yeah.  Okay.  Now,

17   as far as the different therapy groups, you were in

18   Breaking Barriers, Relapse Prevention, HIV AIDS

19   Education Prevention Program, Mexican-American

20   Resource Association, Arts and Crafts, Correction

21   Music Program, American Bible Academy Study Course.

22   Was there any other or is that it?  But did I cover

23   everything?

24        INMATE TRIPP:  I did for -- I'm trying to

25   think.  I think it was (inaudible).

26             DEPUTY COMMISSIONER MAY:  What about AA, NA?

27        INMATE TRIPP:  I've been in AA, NA since

1   1988.

2           DEPUTY COMMISSIONER MAY:   Are you in that

3   now?

4           INMATE TRIPP:   Yes.

5           DEPUTY COMMISSIONER MAY:   Did I cover

6   everything?

7           INMATE TRIPP:   And I also did -- I had an

8   incest therapy group.

9           DEPUTY COMMISSIONER MAY:   Incest?

10          INMATE TRIPP:   Yeah, it was for incest

11  survivors.  And then I had --

12          DEPUTY COMMISSIONER MAY:   Yeah.  Women

13  Against Abuse.  The domestic violence.

14          INMATE TRIPP:   Yeah, by Linda Hayes.

15          DEPUTY COMMISSIONER MAY:   Yeah.  That's

16  domestic violence.

17          INMATE TRIPP:   Okay.  Okay.

18          PRESIDING COMMISSIONER RISEN:   I believe the

19  file contains a -- from the last Board, some

20  recommendations from Ms. Hayes as to her counseling

21  therapy as a result of the sexual relationship that

22  she suffered (inaudible).

23          DEPUTY COMMISSIONER MAY:   So does that cover

24  everything that you've done in the institution?

25          INMATE TRIPP:   Besides volunteering my time

26  (inaudible).

27          DEPUTY COMMISSIONER MAY:   Yeah, I mean --

48

1       INMATE TRIPP:  I mean, because I did

2   volunteer for things.  I mean, I teach line

3   dancing.

4       DEPUTY COMMISSIONER MAY:  Okay.

5       INMATE TRIPP:  And we'd volunteer.  When

6   they'd have little shows, we'd volunteer to go in

7   front of all those people.

8       DEPUTY COMMISSIONER MAY:  Okay.  All right.

9   Thank you.  That's it.  Return to the Chair.

10      PRESIDING COMMISSIONER RISEN:  All right.

11  Couple of questions.  In the Governor's letter we

12  talked a little bit about -- It says in 2002, you

13  indicated that you had no prior criminal activity

14  before the murder.  Then he refers back to the '85,

15  '91, and '93 psych reports where you talked about

16  stealing cars and stealing from your parents and

17  shoplifting.  You were never arrested on any of

18  those charges?

19      INMATE TRIPP:  The only thing that ever

20  happened to me was I was picked up in Utah when I

21  ran away.  And I had a stolen car, but they never

22  filed on me, but they picked me up in Utah.  I

23  stayed in juvenile hall and got shipped back down

24  to my mom.  But I wasn't put under arrest for it.

25  It was because I was out of state when they picked

26  me up.

27      ATTORNEY WOODWARD:  And I believe that the

1    -- I was present at that hearing. -- that the

2    statement by Ms. Tripp where she had no past

3    criminal record. I don't think she made any

4    assertions as to any other activity.

5         **PRESIDING COMMISSIONER RISEN:** Okay. Says

6    in the 1999 psychiatric evaluation, Ms. Tripp

7    admits that she and her husband discussed both

8    Tamron and her sister. Moreover, Ms. Tripp and her

9    husband looked at, you know -- He says, it is not

10   credible that she did not know that Tamron would be

11   killed because you had discussed her being killed

12   with your husband prior to this.

13        **INMATE TRIPP:** I was part of -- I can't take

14   myself out of the conversation. I was there when

15   -- All four of us were actually there when the

16   conversations were taking place. I didn't help the

17   matters. I know today that I probably helped them

18   more than I really liked to. I didn't help stop

19   the matters and it was a discussion that I was on

20   the side of no, let's not do it that way. No,

21   let's not do it that way. Let's try to do it this

22   way. And I guess that's why I ended up being

23   considered the person in charge. Pretty much, they

24   think I was the overseer of the whole thing and

25   there was really nothing I could do about that.

26   Because that's how they see that, but I was always

27   trying to run interference. And then when he

1   promised me that they wouldn't hurt her, then I

2   became more willing to go along with it because I

3   didn't know that (inaudible). And then I became

4   afraid to act on it. I was too afraid to do

5   anything. I didn't really want to believe that my

6   husband would kill anyone anyway, because they

7   didn't do anything with Betty Ann. They were

8   supposed to do everything and they didn't do

9   anything. So in the back of my mind, I guess I

10  just thought, well, you know, they couldn't do

11  that. They couldn't even just throw her in the

12  trunk. You know, they're not going to do anything.

13  He promised me he's going to do that and I just

14  talked myself into believing that he wouldn't kill

15  anyone, which blinded me about any results other

16  than what it was supposed to be like. That's how

17  it was supposed to be. He said it was going to

18  happen that way. I believed him, and I didn't want

19  to believe anything else until I got older and

20  realized that this was the first time they ever

21  asked me to go along. What did you think, because

22  they had asked me before what did I think my dad

23  was going to do if we didn't produce positive proof

24  that they did what they said they were going to do.

25  Well, I never thought of that. I didn't think

26  beyond just making him believe that taking his

27  money, letting her go. I thought that was the

1    reality. I thought that could really happen at the

2    time. And I know that could never happen. I mean,

3    because of me, I know she is dead because her

4    family wouldn't have -- I don't know if Tammy

5    would have gotten in the car with them if I hadn't

6    of been a part of it in the beginning because

7    that's not what happened. But I know it helped her

8    to get in the car because she knew they were taking

9    her back. (inaudible) going to the beach, so she

10   (inaudible) okay, let's go. And I put that thought

11   in her mind, so it's just as much my fault as it

12   probably was to pull the rope (inaudible).

13        PRESIDING COMMISSIONER RISEN: Okay. I have

14   no other questions. Do you have any questions of

15   your client?

16        ATTORNEY WOODWARD: Yes. We touched briefly

17   on it. I want to make sure that we understand.

18   You indicated that from age seven for approximately

19   seven, eight, nine, 10 years, you were molested by

20   your stepfather. Is that a true statement?

21        INMATE TRIPP: Yeah. I would say it was

22   mostly from seven to about 14. Fifteen, 14 years

23   old and then it started to become, well, if you do

24   this, I'll get you this. If you do this, then I'll

25   get you that type of thing. So it was a money

26   deal. And when I was young, early in the time, I

27   used to call -- I thought it was blackmail. I

52

1  didn't really know the concept of blackmail at the

2  time when I said it and it was more of a

3  prostitution thing.  I classify it as prostituting

4  because if I gave him sex, he would give me money

5  or he'd buy me something or we'd, like, go

6  somewhere.  And that was the way that I got things

7  that I wanted was to pay for it with my body,

8  actually.

9        ATTORNEY WOODWARD:  That was after seven

10  years of non-consensual sex.

11        INMATE TRIPP:  Yeah.  I don't remember it

12  being consensual until after I was 17 and I figured

13  out that's how I could get my way.  That's how I

14  could get things.  Daddy will give them to me.

15        ATTORNEY WOODWARD:  Mr. May indicated that

16  you were disciplinary free since 1988, with the

17  exception of a 115 in 1999.

18        INMATE TRIPP:  No, 128.

19        ATTORNEY WOODWARD:  128, sorry, in 1999.

20  And that 128, I understand, was for -- You'd kept

21  some clothing (inaudible).

22        INMATE TRIPP:  No, I had a extra laundry

23  bag.

24        ATTORNEY WOODWARD:  You had an extra laundry

25  bag.  Other than that issue, you've been

26  disciplinary free since 1988.

27        INMATE TRIPP:  And there was a '95 one for

53

1   logbook.  My sponsor had given me a logbook that

2   was empty, so I could use as a clipboard.  And the

3   warden took it in room searches and said it was

4   contraband.  My boss said it would be contraband

5   only if the pages were written on, so she ripped

6   the pages out.  It was still contraband, so.

7       **ATTORNEY WOODWARD:**  If you were given a

8   parole date, you are comfortable with the

9   transition going to the Casa Solano?

10      **INMATE TRIPP:**  Yes.  I'm real comfortable

11   with that because that puts me in an area to help

12   adjust around people that are really familiar with

13   the adjusting period.  Because I've never paroled.

14   You know, I just hear stories about it from people

15   that come in and out and it's just -- To me, it

16   feels better to be in an environment of people that

17   are going to understand that you're going to have a

18   lot of questions.  Learning how to work a CDC

19   player was really a big deal for me.  And the

20   microwave.  That was something I was like, oh, god.

21   And I realize -- It made me realize that the world

22   has changed out there since I've been out there,

23   and it's not the same.  When I was out there, they

24   had eight track tapes and those I don't think exist

25   anymore, so.  So things have changed and it's good

26   to have people that are familiar and comfortable

27   around inmates.  I was mostly concerned about my

54

1     mom, you know. Putting the burden of adjusting on

2     her, because she's never had an ex-con in her house

3     that she knew of. Because she never knew about

4     Ruckert until it was too late. So she's never been

5     through the parole procedures and parole plans and,

6     you know, and having a parole officer and all that.

7     And I told her, well, you know, there's a lot of

8     things I can't do, Mom, but it's okay. You know,

9     at least we get to see each other. That'll be okay

10    with me. If I have to stay home all the time,

11    that's fine with me.

12          **PRESIDING COMMISSIONER RISEN:** Your being

13    there.

14          **INMATE TRIPP:** So I can work there because

15    then I'll be able to adjust. It'll be easier for

16    me and my mom. Then I can help my mom with her

17    adjustment, too.

18          **PRESIDING COMMISSIONER RISEN:** And you did

19    testify against Mr. Ruckert at his trial?

20          **INMATE TRIPP:** Yes, I did.

21          **PRESIDING COMMISSIONER RISEN:** And you've

22    been here almost 25 years?

23          **INMATE TRIPP:** Twenty-five years in July.

24          **PRESIDING COMMISSIONER RISEN:** And when you

25    testified against Mr. Ruckert, you entered into a

26    plea negotiation with the District Attorney's

27    office?

55

1    **INMATE TRIPP:**  Yes, I did.

2    **PRESIDING COMMISSIONER RISEN:**  Did you

3    understand in the plea negotiation that you were to

4    serve 15 years to life?

5    **INMATE TRIPP:**  Yes.  Someone in that area,

6    but I'm not sure if it was ever on record, he told

7    me I'd only do ten years.  But I just figured that

8    until it's (inaudible) formal, I guess that's how

9    long it's supposed to be.  And just trying to do

10   the best I can while I'm here.

11   **PRESIDING COMMISSIONER RISEN:**  So you

12   honestly think you've had time to reflect on your

13   actions and what you did?  Your participation in

14   this crime?  Do you believe you pose a risk to

15   society?  That you (inaudible) any kind of a

16   criminal act that would pose a danger to society?

17   **INMATE TRIPP:**  I don't think I have the

18   capabilities of becoming a risk anymore, creating a

19   danger.  Because I've learned to become very law-

20   abiding.  Even in prison.  I'm very rule-bound and

21   you don't break the rules.  They don't allow you to

22   smoke.  You go outside and (inaudible).  Little

23   things that people take advantage of every day that

24   they don't think twice of that are big rules for us

25   in here.  And can do just as much damage in

26   (inaudible) and you're here for a reason.  And I

27   understand that and I don't think any -- I've

1   worked for years putting myself in a place where no

2   one can twist me or manipulate me into

3   participating in anything that's against the law,

4   period, any way.  But especially (inaudible) After

5   years, I know the difference between right and

6   wrong.  And I wouldn't have any problem standing up

7   and telling.  I could pick up the phone or stay on

8   the line and turn someone in today.  Because it's

9   not right.

10      **ATTORNEY WOODWARD:**  I have no further

11   questions.

12      **PRESIDING COMMISSIONER RISEN:**  I have a

13   couple.  Where is Mr. Ruckert?

14      **INMATE TRIPP:**  I think he passed away in

15   1985.

16      **PRESIDING COMMISSIONER RISEN:**  (Inaudible.)

17      **INMATE TRIPP:**  And I don't know what

18   institution he was in.

19      **PRESIDING COMMISSIONER RISEN:**  They're still

20   in as far as you --

21      **INMATE TRIPP:**  As far as I know.

22      **PRESIDING COMMISSIONER RISEN:**  And Randy

23   Cook?

24      **INMATE TRIPP:**  And he's still in also as far

25   as I know.

26      **ATTORNEY WOODWARD:**  But they have a first

27   degree conviction (inaudible).

57

1    **PRESIDING COMMISSIONER RISEN:**  Now, when

2  Ruckert was molesting you, did you ever think about

3  telling your mom?

4    **INMATE TRIPP:**  I did think about telling my

5  mom.  I think because of my mom's (inaudible)

6  divorce with my original dad and the remarried

7  thing, it was real important for me as a child to

8  have a full family.  Because kids would make fun of

9  me anyway and I can't really remember why.  I just

10 know they used to make fun of me.  When I was in

11 school, I wasn't quite built like everybody or

12 something.  And so he used to tell me that if I

13 told my mom, you know, she'll make me leave and you

14 won't have a daddy and people aren't going to like

15 you.  And when I was little, having friends was

16 really important to me.  And well, now I'm older, I

17 don't know why that was so important because I

18 couldn't invite them over because one time I tried,

19 my stepdad really did try to touch one of my

20 friends and I didn't do anything about it.  I was

21 younger then.  I was probably only around 12 or

22 something.  But I never asked anybody over to my

23 house again because now I had to protect them from

24 him also.

25    **PRESIDING COMMISSIONER RISEN:**  Okay.  You

26 know, you indicated in -- Not today, but I read it

27 here.  In the first nine years, you felt that you

58

1    really hadn't done too much.  What was it that made
2    you realize that you were more involved in the
3    crime and responsible than you were the first nine
4    years?  What changed your mind?

5         **INMATE TRIPP:**  Actually, what really started
6    making me think about it was -- It was a
7    combination.  When I started going to AA and NA and
8    started doing 12 Steps.  Twelve Steps were very big
9    for me.  And at the same time, I was doing my
10    Incest Survivor's Group and realized where it came
11    from.  But I would have to say more of my AA.  My
12    AA and my honesty in accepting responsibility
13    because there's nothing I -- I can't do anything to
14    change it.  And my biggest motivation, actually,
15    was Tammy.  Because it was, like, well, she's gone
16    now.  And I can't do nothing, but I can make sure I
17    never let anyone (inaudible) sister again.  It kind
18    of motivated me to find out why.  And as I was
19    doing my programming, the honesty thing kicked in,
20    everything was starting to say, well, okay, you
21    were a little more -- Because I used to get an
22    attitude when they tried to throw it all off on me
23    and I didn't understand why.  And I thought well,
24    if it wasn't for me, she probably wouldn't have
25    been at the store.  And if she wasn't at the store,
26    they probably wouldn't have picked her up, so yeah,
27    you're responsible.  You did that and then I had to

59

1    deal with that. And then I had to learn how to

2    kind of try to forgive myself. And the only way I

3    can do that is by working my program and helping

4    people. That's why I really like the SOS program.

5    Because we give all those things either to the

6    elderly veterans or the homeless children.

7        PRESIDING COMMISSIONER RISEN: Okay. What

8    does SOS stand for?

9        INMATE TRIPP: Sharing Our Stitches. My

10   program I'm involved in is the crochet program. So

11   we crochet little hats and sweaters and blankets

12   and booties. And our sponsor takes them to the

13   homeless shelter places for the kids. And so, I

14   focus my area around helping kids and helping other

15   people so they don't have to go through this.

16       PRESIDING COMMISSIONER RISEN: Any

17   questions?

18       ATTORNEY WOODWARD: Closing statement, but I

19   (inaudible).

20       PRESIDING COMMISSIONER RISEN: Okay. Okay.

21   We'll go to closing then.

22       ATTORNEY WOODWARD: Initially, I want to

23   point out to the Board, if I may, the same

24   Probation Report that Governor Davis drew most of

25   his information in rejecting the last parole date

26   that was issued last parole Board. There's a

27   paragraph in there by the author that indicates

60

1    that that author in 1979 agreed with Ms. Tripp in

2    that she said -- And you can read the words

3    yourself. Quote, I believe that she's being

4    truthful in her words, unquote. The relevance of

5    that is that while Ms. Tripp is understood her

6    complicity in the conspiracy and understood that

7    complicity that ultimately led to the death of a

8    child -- that it does drive home the persistent

9    adamance that she believed, whether it was founded

10   in reality or not, that she was a participant in a

11   kidnapping and not a murder. It is also relevant

12   to understand that most of us sitting here could

13   not fathom, as you raised, Mr. Risen, is why

14   couldn't you project down the road that your

15   actions would have created these reactions. Is

16   that it's relevant to understand that we come from

17   a position not helping sexual abuse. It does

18   change your personality. It does impact your

19   ability to reason. And I would ask that when you

20   look at the egregiousness of the crime, that we

21   understand that we have to place ourselves in that

22   capacity and not the capacity we sit in here today.

23   Her remorse is documented and unfaltering in the

24   last 14 years. She understands, agrees, and has to

25   deal with, her complicity in the crime. The issue

26   is whether in fact she poses an unreasonable risk

27   to society if she is released. Whether, in fact if

1    she is released, that her employment or future

2    prospective plans are realistic.  She has served 24

3    years, 10 months for her participation in this

4    crime.  Following case law, if you compare it to

5    the egregiousness of the crime to similarly

6    situated people, many of those same people cited in

7    case law, specifically Danberg and Rosenberg --

8    Excuse me, Ramirez. -- were committed for longer

9    periods, did less time than if they had committed a

10   more egregious act.  The matrix for an egregious

11   act of this type, if you assume all things to be

12   true, even in Governor Davis's letter, the matrix

13   is 21 years.  She has done just about 25 years.  If

14   you take her combined time, her prior incestual

15   issues, her remorse, her realistic post-parole

16   plans and you combine that with 13 subsequent psych

17   reports issued from this institution indicating she

18   would not pose an unreasonable risk to society --

19   Thirteen years.  In fact, the first one was 18

20   years ago.  The last 13 psych report have parroted

21   the same words: She would not pose an unreasonable

22   risk to society.  In light of the consideration

23   given to her time spent, her plans after she leaves

24   here, her remorse, her participation in the act

25   itself.  At some point we have to ask ourselves has

26   she paid her debt.  If she has paid her debt, if

27   she doesn't pose an unreasonable risk, and she has

62

1    realistic parole plans, then it is the right thing

2    to parole and give her a release date.  It is the

3    absolute correct thing to do.  It is time to do it.

4    This Board at the last meeting, I believe saw an

5    opportunity for an individual to become a

6    constructive member of society.  Unfortunately,

7    this present administration, then-present

8    administration, did not.  Nothing has changed since

9    then other than her continued good participation in

10   this institution.  I ask you to look at all of the

11   honest considerations given to her parole date and

12   issue a parole release date  for Ms. Tripp.

13        **PRESIDING COMMISSIONER RISEN:**  Thank you.

14   Ms. Tripp, it's now your opportunity to tell the

15   Board why you're suitable for parole or you can

16   rely on your attorney's statement.

17        **INMATE TRIPP:**  I personally feel that I've

18   done a lot of time.  I feel that I've learned what

19   I was supposed to learn in here.  That I've grown

20   how I was supposed to grow in here.  And that I

21   actually have morals and principles in my life and

22   that I have a foundation and will stand on it.  I

23   couldn't tell people no.  I couldn't differ from

24   right or wrong and not go along with it.  I had to

25   fit in and today, I don't have to go against the

26   grain and I don't have to go against the rules and

27   regulations to fit in.  Because I know I'm okay

edit

63

1    today being who I am and just being who I am and

2    not having to prove anything to anybody else

3    because who I am is going to show by itself anyway.

4    I think that if the Board finds me suitable and,

5    Lord willing, the Governor decides to agree with

6    the Board this year -- If you find me suitable,

7    that I would be a very productive part of society.

8    I have very good work ethics which I had to learn

9    in there.  I think if I had to praise my own self,

10   the work ethics are very -- That would be my high

11   points because I really enjoy keeping a job and

12   working in a job and doing my best and realizing

13   that anything that you do in life reflects who you

14   are.  So everything I do, I try to do to the best

15   of my ability and the qualities that I have in here

16   that's been given to me and taught to me.  And I

17   feel that I would be very -- I would make the Board

18   proud and my attorney proud and the institution

19   real proud when I never came back here again.  And

20   I would be able to fit into society because I think

21   my qualities and my job skills would fit out there

22   once I got a driver's license.  Of course, since I

23   can't drive or anything until I can, but -- And

24   then one of my biggest things that I was thinking

25   about the other day is that -- Because I don't know

26   where they put Tammy when they buried her in that

27   sewer, she's (inaudible).  But if she's in the

64

1   area, I think, I thought one of my biggest things

2   that I would probably do for her is just, you know.

3   Because I know that I've never had anyone pass away

4   before, that I had to take care of their little

5   area that I know you have to take care of it.    And

6   that is one of the things that I'd like to do for

7   her is take care of her little area.    And make her

8   little bed nice.    And I'm just (inaudible).

9           PRESIDING COMMISSIONER RISEN:    Okay.    We'll

10  recess -- It is 3:30 -- for deliberations.    We'll

11  call you back in a few minutes.

12                      R E C E S S

13                      --o0o--

14

15

16

17

18

19

20

21

22

23

24

25

26

27

65

1    CALIFORNIA BOARD OF PRISON TERMS

2    D E C I S I O N

3    DEPUTY COMMISSIONER MAY:  We're on record.

4    PRESIDING COMMISSIONER RISEN:  Okay.  Everyone

5    who was previously in the room has returned.  The

6    time is 4:00.  The Panel reviewed all information

7    received from the Public and relied on the

8    following circumstances in concluding that the

9    prisoner is suitable for parole and would not pose

10    an unreasonable risk of danger to society or a

11    threat to public safety if released from prison.

12    The prisoner, while imprisoned, has enhanced her

13    ability to function within the law upon release

14    through participation in educational programs.  She

15    has obtained a GED, vocational programs.  She has

16    obtained a vocational certificate in forklift

17    operation and also in vocational word processing.

18    She's also, through self-help, taken the following:

19    She's been in AA and NA since 1998.  What did I

20    say?

21        DEPUTY COMMISSIONER MAY:  1988.

22        PRESIDING COMMISSIONER RISEN:  1988.  She's

23    been in the SOS program.  She's taken the Womens

24    Against Abuse program, the American Bible Academy,

25    Arts and Correctional Music Program, the Relapse

26    Prevention program, the HIV AIDS Prevention

27    BRANDEE TRIPP    W-15695    DECISION PAGE 1  5/17/04