# EXHIBIT 6

ATTORNEY GENERAL—OFFICE COPY

**BILL LOCKYER**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5715
Facsimile: (415) 703-5843
E-Mail: Elizabeth.Kim@doj.ca.gov

February 6, 2006

Michael J. Yerly
Clerk of the Court
Court of Appeal of the State of California
Sixth Appellate District
333 West Santa Clara Street #1060
San Jose, CA 95113

Court of Appeal - Sixth App. Dist.

# FILED

FEB 7 - 2006

MICHAEL J. YERLY, Clerk

By ————————————
DEPUTY

RE:   INFORMAL RESPONSE
      In re Brandee Tripp, Case No. H-029507

Dear Mr. Yerly:

This letter brief is submitted pursuant to the Court's January 23, 2006 letter requesting an informal response to the habeas corpus petition filed by Brandee Tripp.

## BACKGROUND

Petitioner Brandee Tripp (Tripp) is a California state prisoner serving a 15-year-to-life sentence imposed in 1981 pursuant to a guilty plea to second degree murder. (Tripp Petn. Ex. A.) Tripp is currently incarcerated at the California Institution for Women. In this habeas corpus petition, Tripp challenges the Governor's denial of parole. The Board of Parole Hearings (Board) found Tripp suitable for parole on May 17, 2004. On October 14, 2004, Governor Schwarzenegger exercised his gubernatorial authority and reversed the Board's decision.

Tripp was actively involved in the kidnaping of a 10-year old Tamaron Carpenter that led to her murder by strangulation. (Ex. A, Probation Officer's Report.) Tripp had a close relationship with the minor victim and was best-friend to her 19-year old sister Betty. Both the victim and her older sister were scheduled to testify against Tripp's stepfather, William Record[1], in a child molestation case against him. Record had also sexually abused Tripp from childhood to her teenage years. Record wanted to eliminate the sisters as witnesses and offered $1,000 to Tripp's husband to kidnap and murder the girls. Petitioner, her husband, and his friend Randy Cook first attempted to kidnap the older sister, but when that failed, they planned the kidnap and murder of the young sister Tamaron.

---

[1]The Governor's decision follows the spelling of Tripp's stepfather's last name as it appears in the Probation Officer's Report ("Record" as opposed to "Ruckert").

February 6, 2006
Page 2

Tripp was responsible for arranging the kidnaping. On the day of the murder, she told the victim she was taking her on a swimming trip, but first asked her to go down to the store and pick up some drinks. Tripp had planned for her husband and Cook to meet the victim at the store and to offer her a ride home, which they did. The men drove the victim to a tent where Tripp and her husband had been living. They tied up the child, placed a cord around her neck, and while pulling on each side of the cord, strangled her to death. They then buried the victim in a grave that they had dug near the tent. Tripp first denied involvement in the crime when questioned by police. Her husband, however, confessed to the crime and led police to the body. Tripp was arrested the next day.

Tripp was charged with conspiracy to commit murder, kidnaping, and murder with special circumstances. In a plea agreement, she pled guilty to second-degree murder, with the other counts dismissed in exchange for her testimony against her stepfather Record.

In this petition, Tripp claims that the Governor's reliance on the facts of the crime to reverse the Board's grant of parole violates her rights to due process, the terms of her plea agreement, and the prohibition against ex post facto application of the law. Tripp's allegations have no merit, and thus, the petition should be denied.

## ARGUMENT

### I.

### BECAUSE THE GOVERNOR'S DECISION IS SUPPORTED BY SOME EVIDENCE, THE COURT SHOULD DENY THE PETITION.

**A.**     **The Governor's Discretionary Parole Authority.**

Article V, section 8, subdivision (b) of the California Constitution confers upon the Governor the authority to review the decision of the parole authority to grant, deny, revoke, or suspend parole of a person sentenced to an indeterminate term following a murder conviction. (Cal. Const. art. V, § 8, subd. (b).) In exercising his discretion, the Governor may "affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (*Id.*; see also *In re Rosenkrantz* (2002) 29 Cal.4th 616, 625-626.)

In *Rosenkrantz*, the California Supreme held that "a governor's decision granting or denying parole is subject to a limited judicial review to determine only whether the decision is supported by 'some evidence.'" (*Rosenkrantz, supra,* 29 Cal.4th at p. 625.) The judicial branch is authorized to review the factual basis of a decision of the Governor denying parole in order to ensure that the decision comports with the requirements of due process of law, but in conducting such a review, the court may inquire only whether *some evidence* in the record before the Governor supports the decision to deny parole, based on the factors specified by statute and regulation. (*Id.* at p. 658.) "Only a modicum of evidence" is required to satisfy the some

February 6, 2006
Page 3

evidence standard. (*Id.* at pp. 665, 677; see also *Superintendent v. Hill* (1985) 472 U.S. 445, 455-456 [under the "some evidence" standard, "the relevant question is whether there is any evidence in the record that could support of the conclusion reached by [the Governor]"].)

Because the Governor's discretionary decision is subject to an "extremely deferential" standard of review, the court cannot second-guess the Governor's decision; nor can it re-weigh the evidence or resolve conflicts in the evidence. (*Rosenkrantz, supra,* 29 Cal.4th at pp. 665, 677.) Therefore, the Court must uphold the Governor's decision in this case if the Governor gave Tripp individualized consideration of the specified criteria and his decision is supported by some evidence in the record. (*Id.* at p. 667.)

**B.     The Governor May Properly Consider the Gravity of the Offense.**

Penal Code section 3041, subd. (b) provides that "[t]he panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses . . . is such that consideration of public safety requires a more lengthy period of incarceration." In determining parole suitability, the Board, and therefore also the Governor, is guided by title 15 of the California Code of Regulations, section 2402. The factors set forth in section 2402 are not exclusive and serve only as guidelines. (Cal. Code Regs., tit. 15, § 2402, subd. (c).) And both the Board and the Governor are to consider all relevant, reliable information in the record before it. (*Id.* at § 2402, subd. (b).)

Information to be considered by the Governor in making parole suitability determinations includes, but is not limited to, the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control; including the use of special conditions under which the prisoner may safely be released to the community; and any other information which the bears on the prisoner's suitability for release. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Here, the Governor's reliance on the commitment offense is consistent with the regulations, which provide that if the offense was carried out in an "especially heinous, atrocious or cruel manner," it is a factor indicating unsuitability for parole. (Cal. Code Regs., tit. 15, § 2281, subd. (c)(1).) In considering whether an offense meets this standard, the Governor may consider whether:  (1) multiple victims were attacked, injured, or killed in the incident; (2) the offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (3) the victim was abused, defiled, or mutilated; (4) the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering; or (5) the motive for the crime is inexplicable or very trivial. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).)

The "nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 682.) And "the [parole] authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant."

February 6, 2006
Page 4

(*Id.* at p. 683.) The California Supreme Court's recent decision in *In re Dannenberg* (2005) 34
Cal.4th 1061, 1084, also holds that the circumstances of
the life crime are paramount in the parole decision:

> The nature of the prisoner's offense, alone, can constitute a sufficient basis for
> denying parole. [Citations omitted.] Although the parole authority is prohibited
> from adopting a blanket rule that automatically excludes parole for individuals who
> have been convicted for a particular type of offense, the authority properly may
> weigh heavily the degree of violence used and the amount of viciousness shown by
> a defendant.

(*Dannenberg, supra*, at p. 1095.)

The Supreme Court in *Dannenberg* further stated that as long as a finding of unsuitability
is supported by the record, "the overriding statutory concern for public safety in the individual
case trumps any expectancy the indeterminate life inmate may have in a term of comparative
equality with those served by other similar offenders." (*Dannenberg, supra*, 34 Cal.4th at p.
1084.) Thus, "[w]hile the [decision maker] must point to factors beyond the minimum elements
of the crime for which the inmate was committed, it need engage in no further comparative
analysis before concluding that the particular facts of the offense make it unsafe, at that time, to
fix a date for the prisoner's release." (*Id.* at p. 1071.)

### C.    The Governor's Decision Is Supported By Some Evidence.

Here, the Governor's decision[2] reflects an individualized consideration of Tripp's parole
suitability, and the reversal of parole is supported by some evidence. The Governor properly
pointed to facts suggesting that the crime was particularly egregious, and beyond the minimum
necessary for a second degree murder conviction. (*In re Dannenberg, supra*, 34 Cal.4th at p.
1071.) "Because of Mrs. Tripp, Tameron was lured into a car, taken to a remote location, and
viciously killed by two individuals who strangled her in a type of tug-of-war action between
them. The terror and horror Tameron must have endured is unimaginable. Mrs. Tripp had
numerous opportunities to prevent this murder from happening– but she did nothing to spare
Tameron." (Tripp Petn., Ex. C, p. 2.) The Governor noted that Tripp had acknowledged during
her 1985 mental-health evaluation that she could have prevented the murder, and that during her
2004 parole hearing she stated that she tried calling the police twice but was too scared to
continue the call. (*Ibid.*)

---

[2]Tripp's claims that she did not received due, individualized consideration by the
Governor because his staff wrote his decision. (Petn. at pp. 21-23.) The claims lacks merit
because there is no authority that the Governor cannot rely on the assistance of his staff in
preparing and reviewing parole decisions issued by the Board, and there is no dispute Governor
signed his decision.

February 6, 2006
Page 5

At her 2004 parole hearing, Tripp stated that she did not believe the victim would be harmed. Although Tripp attempted to distance herself from the actual killing, her statements that she had no knowledge of the murder plot were not credible. The Governor found that Tripp, in her conversation with her husband and Cook in planning the victim's kidnaping, had in fact suggested ways of killing the victim. (Tripp Petn., Ex. C, p. 2.) The Governor concluded that "[t]he manner in which this crime was planned and carried out – particularly against one so young and vulnerable – demonstrates exceptional depravity and an utterly callous disregard for human life and suffering." (*Ibid.;* Cal. Code Regs., tit. 15, §2402, subd. (c)(1).) The Governor emphasized the fact that Tripp, as a trusted friend of the victim's family, "not only perpetrated a chilling and revolting crime, she did so by violating her position of trust with Tameron and Tameron's family." (Tripp Petn., Ex. C at p. 2.)

In addition to the facts of the crime discussed above, the Governor acknowledged Tripp's positive gains during her 23 years in prison, including completing her GED, obtaining vocational certificates in word processing and fork-lifting operation, participating in various self-help programs, and attending substance abuse programs. (Tripp Petn., Ex. C at p. 2.) The Governor noted her laudatory reports from various prison staff and favorable Life Prisoner and mental-health evaluations. (*Ibid.*) Tripp had also established solid relationships with her mother and daughter, had viable parole plans which included residence at a licensed treatment facility for recovering addicts, and a job offer from a family friend. (*Ibid.*)

However, in weighing all relevant, reliable evidence in determining Tripps's suitability for parole, the Governor concluded that the gravity of the crime presently outweighed the positive factors supporting parole. "It is irrelevant that a court might determine that evidence in the record tending to establish suitability for parole far outweighs evidence demonstrating unsuitability for parole." (*Rosenkrantz, supra,* 29 Cal.4th at p. 677.) Under *Dannenberg,* because the facts of the life crime in this case were particularly egregious and demonstrated more than the minimum necessary for a second-degree murder conviction, the Governor acted properly in reversing the Board's grant of parole. (*Dannenberg, supra,* 34 Cal.4th at p. 1071.) Therefore, because the decision is supported by some evidence and comports with due process, it must be upheld and the petition denied.

## II.

## THE DENIAL OF PAROLE DOES NOT
## VIOLATE TRIPP'S PLEA AGREEMENT.

Tripp also claims that the Governor's reversal of the Board's May 2004 decision finding her suitable for parole violated the terms of her plea agreement. Specifically, Tripp claims that the Governor's reliance on the facts of the commitment offense violates her agreement to plead guilty to second degree murder.

Here, there is no evidence that as a condition of Tripp's plea, the prosecution promised that the facts of the crime would not be considered in her parole consideration hearings. And, the

February 6, 2006
Page 6

Governor did not rely on incorrect facts in making his parole decision. In his decision, the Governor noted that Tripp continues to maintain that she did not intend for Tameron to be killed, but he pointed to other places in the record where she contradicted herself. (See Tripp Petn. Ex. C at p. 2.)

Also, the Governor lawfully characterized Tripp's offense as involving an element of first degree murder, even though she pled guilty only to second degree murder. (See *Rosenkrantz, supra*, 29 Cal.4th at pp. 678-679 [Governor not precluded from considering evidence of premeditation and deliberation even where the jury has rejected such evidence].) In this case, there was no agreement that the Board, and thus the Governor, would not consider all the circumstances of Tripp's commitment offense when considering her parole suitability. All of Tripp's claims regarding the supposed plea bargain violation are not based not on any actual terms of the agreement, but on her subjective belief that her plea would entitle her to benefits during parole consideration; and therefore, lack merit. (*In re Honesto* (2005) 130 Cal.App.4th 81, 661 ["a plea agreement violation claim depends on the actual terms of the agreement, not the subjective understanding of the defendant or deficient advice provided by his attorney"].) As this Court stated in *Honesto*, a court "cannot properly find there was a violation of a term of the plea agreement involving parole eligibility in the absence of evidence of a promise or representation regarding parole eligibility at the time of the plea." (*Id.* at p. 660.) And no promise of any kind may be inferred in the present case because the record is void of any promise made during the time of plea. (*Ibid.*)

"The applicable statutes and regulations make the facts of the offense a critical part of the Board's consideration of parole suitability, and this was true when [petitioner] entered into the plea agreement." (*Honesto, supra,* 130 Cal.App.4th at p. 661; Pen. Code, § 3041, subd. (b); Cal. Code of Regs., tit. 15, §2402(c)(1); *In re Dannenberg, supra*, 34 Cal.4th at p. 1082.) Therefore, because the Governor was not prevented from considering the life crime in his parole decision by an explicit term of the plea agreement, Tripp's claim that her plea agreement was violated must fail.

### III.

### PETITIONER HAS NOT ESTABLISHED
### AN EX POST FACTO VIOLATION.

Tripp further argues that the Governor's parole reversal violated her constitutional right to be free from ex post facto application of the law. Tripp claims that because she pled guilty to second degree murder in 1981, before the effective date of the amendment to article V, section 8 of the California Constitution, the retroactive application of that amendment violated ex post facto principles. Tripp further argues that the findings made by the California Supreme Court in *Rosenkrantz* as to the ex post facto claim raised in that case is inapplicable because she pled guilty to second degree murder, as opposed to being found guilty of second degree murder by a jury. For reasons set forth below, Tripp's claim lacks merit.

February 6, 2006
Page 7

    In 1988, article V, section 8(b) of the California Constitution was amended by the California voters through Proposition 89 to give the Governor the power to affirm, modify or reverse the Board's decision to allow or deny parole to persons sentenced to an indeterminate term for murder convictions. (Cal. Const., art. V, § 8(b).) In *Rosenkrantz*, the California Supreme Court found no ex post facto violation in applying article V, section 8(b) to crimes committed prior to 1988. (*Rosenkrantz, supra*, 29 Cal.4th at p. 638.) The court held that "the type of procedural change implemented by article V, section 8(b) -- i.e., a change that simply created a new level of review, . . . but did not change the substantive standard governing the grant or denial of parole - is *not* the type of change to which the ex post facto clause applies." (*Ibid.*) Such procedural change, the Court held, did not "increase punishment" for the murderer's offense. (*Id.* at pp. 640-641, 643-644, 650-651.) Therefore, regardless of whether Tripp was sentenced to a 15-year-to-life term through a plea agreement or through a jury or a court trial, after the adoption of Proposition 89, her sentence remains 15 years to life. (See *id.* at p. 640.)

    Furthermore, there is no ex post facto violation when there is no evidence that Tripp was promised that only the Board would review her parole suitability and/or that the Board would be the ultimate decision maker. "[A]n individual who commits a crime has no reasonable expectation that his or her suitability for parole will be determined by the particular individuals who happen to exercise authority over parole decisions at the time the individual commits the crime." (*Id.* at p. 651-652.)

    Additionally, Tripp cannot show that the application of Proposition 89 creates more than a speculative risk of increasing her punishment. (*Johnson v. Gomez* (9th Cir. 1996) 92 F.3d 964, 967.) Tripp cannot show that an increase in her punishment actually occurred because she had never been granted parole under the old law when the Board's decision would have been subjected to no gubernatorial review. (*Ibid.*) Because Tripp cannot establish an ex post facto violation and the Governor's decision is supported by some evidence, the petition should be denied.

\\\

February 6, 2006
Page 8

## CONCLUSION

The Governor's reliance on the facts of the crime to reverse Tripp's grant of parole is supported by some evidence in the record. Tripp committed a particularly egregious crime. In exchange for $1,000, Tripp arranged for the kidnaping of a young family friend to keep her from testifying against her molester at trial. The 10-year old victim, who was in Tripp's trust, was subjected to a cruel death which Tripp could have prevented. Further, there is no basis to find that the Governor's decision violated either the explicit terms of her plea agreement or the Constitution's ex post facto prohibition. Therefore, respondent urges the Court to uphold the Governor's decision and deny this habeas petition.

Sincerely,

ELIZABETH S. KIM
Deputy Attorney General
State Bar No. 166599

For      BILL LOCKYER
Attorney General

ESK:

EXHIBIT    A

SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY

STATE OF CALIFORNIA
v s.

DEPT.    1(2-4-81)

ACTION NO.    CR7639

BRANDEE TRIPP

**CONTROLLED DOCUMENT**

PROBATION OFFICER'S REPORT

DEFENDANT

CASE DATA

| | |
|---|---|
| DATE OFFENSE COMMITTED | July 8, 1979 |
| DATE OF ARREST | July 10, 1979 |
| INFORMATION FILED | October 16, 1979 |
| DATE OF REFERRAL | January 5, 1981 |
| REPORT FILED | January 23, 1981 |
| ORIGINAL OFFENSE | 182 Penal Code |
| | 207 Penal Code |
| | 187 Penal Code |
| | Special Circumstances alleged. |
| CONVICTED OFFENSE | 187 Penal Code, 2nd Degree, on condition Counts I, II, and IV be dismissed and defendant testify at any subsequent trial of William Record. |
| DAYS IN CUSTODY | 576 (CUSTODY) |
| LEGAL COUNSEL | Braudrick, appointed |
| PROBATION OFFICER | Hosang |
| DATE OF BIRTH | March 30, 1959 (21) |
| BIRTHPLACE | San Luis Obispo, CA |
| ADDRESS | 1559 Seabright, Grover City, California |
| TELEPHONE NUMBER | 489-4170 |

PROBATION 3/76

PENAL CODE SECTION 2900.5 - TIME SERVED CREDITS

THE DEFENDANT WAS IN CUSTODY IN THE FOLLOWING FACILITY(S) BECAUSE OF THE CONDUCT
FOR WHICH THE DEFENDANT WAS CONVICTED IN THIS CASE:

| | NAME OR LOCATION OF FACILITY | DATES FROM | TO | TOTAL DAYS |
|---|---|---|---|---|
| JAIL | San Luis Obispo | 7-10-79 | 7-1-80 | 358 |
| CAMP   JAIL | Monterey County | 7-2-80 | 2-4-81 | 218 |
| WORK FURLOUGH | | | | |
| HALF-WAY HOUSE | | | | |
| REHABILITATION FACILITIES | | | | |
| HOSPITAL | | | | |
| PRISON | | | | |

ANY OTHER PLACE DEFENDANT WAS ORDERED BY A COURT TO RESIDE AS A CONDITION OF
PROBATION, SUCH AS A RESIDENTIAL DRUG (ALCOHOL, PSYCHIATRIC) TREATMENT CENTER.

| | |
|---|---|
| TOTAL CREDITS | 576 |
| GOOD TIME/WORK TIME CREDITS | 288 |

CIRCUMSTANCES OF THE OFFENSE: (Source: Arroyo Grande Police Department records.)

Mrs. Elizabeth Ketchum contacted officers of the Arroyo Grande Police Department at approximately 1:15 p.m. on July 8, 1979, and reported that her daughter, Tameron Carpenter, age 10 years, had been missing since approximately 1:05 p.m. on that day when she had gone to a grocery store to purchase two Cokes prior to going swimming together with a family acquaintance, Brandee Tripp (20). A few hours later, Mrs. Ketchum again contacted officers reporting Tameron was still missing and Brandee Tripp had not been seen since she went to look for Tameron. Mrs. Ketchum indicated that she believed a William Record (53) could be involved with Tameron's disappearance as Record was facing Court charges that he allegedly molested Tameron twice during November of 1978. Tameron was to testify in regard to this matter at Record's next scheduled hearing on July 16, 1979. In an effort to ascertain and obtain information as to Tameron's whereabouts, officers proceeded to contact various individuals. On July 8, 1979, at approximately 6:18 p.m., officers contacted William Record at his residence in Grover City and Mr.

Record stated he had not seen Tameron. Approximately four hours later, officers returned to Mr. Record's residence where they contacted a John Sorenson (37). Sorenson stated Record had left and would not return until July 16, 1979. Brandee Tripp, who is a step-daughter of William Record, was also at the residence and informed officers she had searched for Tameron but could not find her. Immediately thereafter, officers contacted Mrs. Ketchum who stated that Brandee and Hilton Tripp (17) had been by her house, indicating they had not seen Tameron and intended to search for her on the Nipomo Mesa.

At approximately 11:50 p.m. on July 8, 1979, John Sorenson contacted Arroyo Grande Police Department officers, expressing a desire to meet and speak with them. In summary, Mr. Sorenson advised officers he was driving in the Arroyo Grande area with William Record on July 6, 1979, when Record said something like, "I can't find her a little blonde-haired girl". Sorenson reported that on July 7, 1979, Hilton Tripp came by Record's residence and Sorenson overheard Hilton tell Record, "It's going down". Sorenson stated he further overheard Record indicate that he was going to get out of town. Sorenson advised officers he subsequently visited Hilton Tripp at a camp site located near Avila Beach and, after a short visit, Hilton told Sorenson to leave because they had to dig a hole and did not want Sorenson around when they did it. Officers determined that the campsite in reference was the current permanent home of Hilton and Brandee Tripp. On July 9, 1979, a Sheriff's officer located the campsite on a dirt road beneath Highway 101 west of Ontario Road between Avila Road and San Luis Bay Drive. A blue tent containing various items was located at the campsite. The Sheriff's officer who located the campsite had been informed by Arroyo Grande Police Department officers that an informant overheard conversation indicating Tameron might have been taken to a hidden campsite near Avila Beach where she would be killed and buried, presumably to prevent her upcoming Court testimony.

On July 11, 1979, officers contacted and questioned a Roger Ladd (20). Ladd stated that on the evening of July 4, 1979, Hilton Tripp visited with him at Ladd's trailer house and supposedly informed Ladd that William Record had offered him $1,000.00 to kill a Betty Ann Maddocks to prevent her testifying against Record in Court. Ms. Maddocks was identified as Tameron Carpenter's older sister. Ladd further indicated that on the evening of July 5, 1979, Hilton and Brandee Tripp and Randy Cook (17) came to Ladd's trailer, consumed beer and discussed methods of

(3)

killing Ms. Maddocks. Ladd additionally reported that shortly after July 5, 1979, Hilton and Brandee Tripp and Randy Cook again came to his trailer and talked about how they had just failed in an effort to kidnap Maddocks. According to Ladd, Randy Cook was talking and laughing about how he was supposed to push Maddocks into the trunk of a vehicle, but did not because her boyfriend was watching. Hilton and Brandee Tripp and Randy Cook again came to Ladd's trailer on July 7, 1979, and were visiting when William Record and John Sorenson arrived. Hilton spoke with Record outside the trailer. Record and Sorenson then left and Hilton returned to the trailer. Ladd indicated that at that point, Hilton began talking about kidnapping Tameron Carpenter and killing her. Hilton and Brandee Tripp according to Ladd, thought up about half a dozen ways of kidnapping and killing Tameron. Ladd believes that on approximately July 7, 1979, Hilton visited and borrowed a shovel and a blue scarf from him. On July 8, 1979, Hilton contacted Ladd at his trailer and returned a buck knife and case which Hilton stated he had taken from Ladd's trailer.

Officers contacted Brandee Tripp on July 9, 1979, and questioned her. In general Brandee claimed she had nothing to do with the disappearance of Tameron, but that Hilton Tripp was involved.

On July 9, 1979 at approximately 4:00 p.m., Hilton Tripp came to the Arroyo Grande Police Station, indicating that he had heard the police wanted to speak with him. Hilton spoke with investigator John Tooley and waived his legal rights. After initially denying knowledge about the disappearance of Tameron, Hilton stated Record had previously asked him if he knew of anyone who would take care of Tameron Carpenter for $1,000.00. Record wanted Tameron to disappear so she would not be around to testify against him. Hilton claimed he advised Record he did not want any part of it, but indicated he had a companion, Randy Cook, who might be interested. Hilton further stated he introduced Cook to Record and that he subsequently saw Cook on July 8, 1979. At this time, Hilton received the general impression from Cook that Cook had "taken care of it". Hilton was subsequently placed under arrest and administered a polygraph examination. Hilton then changed his statement, advising investigators that he and Randy Cook had kidnapped Tameron and taken her to the campsite near Avila Beach. Hilton indicated he then went for a walk and when he returned, Randy and Tameron were gone. Hilton advised that Randy had told him what he would

(4)

have done to the body if he had had to do anything to Tameron. Hilton was agreeable to showing officers where the spot might be and was transported to the campsite where attention was drawn to a possible gravesite directly in front of Hilton's tent. Officers subsequently located Tameron's body in the gravesite. Investigator Tooley again interviewed Hilton on July 11, 1979, and in summary Hilton stated Record had offered him $1,000.00 to get rid of Tameron so she could not testify against him. In agreement with Brandee Tripp, on July 8, 1979, Brandee arranged for Tameron to leave her residence with Hilton and Randy Cook kidnapping Tameron shortly thereafter. Hilton stated he and Randy took Tameron directly to the campsite near Avila Beach where Randy proceeded to tie up Tameron. According to Hilton, after a few hours he and Randy decided they had to kill Tameron. Hilton claimed he looked at Randy and then decided he could not do it. Hilton further claimed Randy proceeded to strangle Tameron and then they both buried her. Investigator Tooley indicated that Hilton basically claimed Randy did the actual tying up and killing of Tameron.

On July 14, 1979, Randy Cook surrendered himself to officers of the Arroyo Grande Police Department, and subsequently submitted to questioning after having waived his legal rights. Cook stated that from past conversations with Hilton and Brandee Tripp he was aware that they were going to either kidnap Betty Maddocks or Tameron in order to get $1,000.00 from Record. Randy informed officers that on July 7, 1979, Brandee and Hilton Tripp arrived at his house, advising Cook that "the prime suspect (Tameron)" was seated in a vehicle outside the residence. After a short while, Hilton, Brandee, Randy and Tameron drove to a market in Arroyo Grande. Shortly thereafter, an individual identified as Tameron's grandmother arrived at the same area and told Brandee to return to Tameron's house and pick up some other children to take to a show. Cook indicated that prior to the arrival of Tameron's grandmother, their plan was to leave Arroyo Grande after getting gas and go to Kingsburg to meet with Record so that he could view Tameron. Record was supposed to then give them $1,000.00 and they were in turn to get rid of Tameron. Sometime later Brandee returned with Tameron and three other children and they, together with Randy and Hilton, drove to Roger Ladd's trailer. Randy, Hilton and Brandee entered Ladd's trailer and discussed methods of getting rid of the other three children so that they could take Tameron to

Kingsburg. They could not finalize a plan and as a consequence Hilton and Brandee took Randy home and then supposedly took the children to a show. On the following day of July 8, 1979, Hilton and Randy drove to the Commercial Market in Arroyo Grande with Randy inquiring what was going on. Hilton informed Randy it all depended upon whether Brandee could send Tameron to the store around 1:00 p.m. Hilton and Randy subsequently saw Tameron enter the store, with Randy initially contacting Tameron with instructions from Hilton to see if she would be receptive to having them provide her with a ride back home. Randy claims he entered the store but "got scared" and did not contact Tameron. Randy added that Hilton then entered the store and came out with Tameron. Hilton and Randy then drove Tameron to the Avila Beach campsite. They had Tameron enter the tent, then tied her wrists behind her back and also tied her elbows and ankles. Randy stated he placed a piece of cloth in Tameron's mouth and tied a scarf over her mouth. According to Randy, Hilton told Tameron that what they were doing "was called kidnap and they were keeping her until after the Court date". Randy stated Hilton then left the area for a brief period of time and then returned. While Hilton was gone, Randy claimed he untied Tameron. When Hilton returned, they retied Tameron. Randy and Hilton then started digging a hole by the tent. According to Randy, he asked Hilton if he was scared and stated something to the effect, "this is going to stay with us for the rest of our lives if we get caught we can go to prison". Randy then cut a piece of cord from the tent, put the cord around Tameron's neck and pulled on the cord. Randy heard Tameron choking, but Hilton indicated he believed she was still breathing. Hilton then pulled on the cord which was around Tameron's neck. Randy stated that after a while, Hilton told Randy to pull on one end of the cord while he pulled on the other. Randy stated he did not really want to kill Tameron and he held onto one end of the cord while Hilton pulled the other. Hilton and Randy then both determined that Tameron was dead and buried her.

On July 10, 1979, Brandee Tripp was arrested by the Arroyo Grande Police Department and was booked into the San Luis Obispo County Jail.

Both Randy Cook and Hilton Tripp were found to be unfit subjects to be dealt with under the Juvenile Court law and were certified to Superior Court to be treated as adults. All four defendants were granted a change of venue to Monterey County and charges are still pending against William Record. Randy Cook pleaded guilty to first degree murder and was committed to

(6)

prison. Hilton Tripp was found guilty of conspiracy to commit murder, 1st degree murder and the special circumstances alleged were found to be true after a Court trial. He was committed to life in prison without the possibility of parole. This defendant has spent 576 days in custody for her involvement in this offense.

STATEMENT OF THE DEFENDANT: (Source: Interview with the defendant.)

The defendant stated that her husband said he was offered some money. She advised at the time they didn't have any money and weren't eating. She said at first she didn't go along with this but then she did and they tried it with Maddock at first but it didn't work. She stated that then they tried with Tammy and she didn't want her hurt. She said that Randy and Hilton said she wouldn't be hurt so she decided that if it was just for the money and she wouldn't be hurt she would help them. She related that after they picked Tammy up they were supposed to pick her up so she knew she would be there so nothing would happen. She stated they never showed up and by the time they did it was too late.

The defendant stated that later she was told what had happened. She advised then when Hilton was arrested on a juvenile warrant he took a lie detector test and mentioned her name. She said that Randy left the area and asked her if she wanted to go with him but she told him she didn't. She added that she feels that Randy told the truth and that Hilton didn't. She related that she is planning to get a divorce from Hilton. She further stated that she was not involved in the murder and feels that she will still have a life ahead of her when she is released.

ADDITIONAL INFORMATION: (Source: Telephone contact with Dr. Thomas Reidy.)

Dr. Reidy stated that the defendant is of average or above average intelligence and that she has psychopathic and sociopathic features in her personality. He advised that she is immature and does not handle her emotions well. He added that he is preparing a written evaluation for the Court's consideration.

PRIOR CRIMINAL RECORD: (Source: Department of Justice records.)

Department of Justice #A06565890 - F.B.I. #313357V2.

No prior record.


SOCIAL HISTORY: (Source: Interview with the defendant.)


FAMILY HISTORY DATA:

Father: Bill Sisemore (age and whereabouts unknown).

Mother: Mary Record (43) - divorced (second) - 559 Seabright, Grover City, California - homemaker.

Step-father: William Record (co-defendant in this case).

Siblings: One half-sister (10), one half-brother (6).

Family Arrest History: None other than husband and step-father.


DEFENDANT'S MENTALITY: Average intelligence - cooperative.


WORK RECORD:

Laundry Worker - Cabrillo Convalescent Home - San Luis Obispo, California - one month (1979).

Had worked for various motels as a maid in 1978.


MARITAL HISTORY: Married Hilton Tripp (19) on May 20, 1958 in Santa Maria, California. One child (2½). Child has been cared for by her maternal grandmother for the past year and a half to two years. Is planning to divorce her husband.


HEALTH AND HABITS: Health good - underwent open heart surgery to open a closed valve. Smokes - does not gamble - does not drink - used marijuana over a two to two and a half year period of time - denies the use of any other drugs or narcotics.


MILITARY HISTORY: None.


EVALUATION: It is felt that this defendant was truthful in her statement and that she does feel some degree of remorse over the death of the victim. She does exhibit immaturity, however is able

(8)

to verbalize well and to express the feeling that if it weren't for her step-father and his influence, the victim would still be alive and none of the defendants would have been involved in this offense. She denies being involved in the actual murder of the victim but does accept responsibility for arranging for Hilton and Randy to pick up the victim at the store and to planning the offense in advance. In her behalf, she is planning to testify during her step-father's trial and states that she will tell the truth; however, as with the co-defendants she must be considered to be a danger to society until such time as she can gain enternalized controls over her behavior. When considering the psychopathic and sociopathic features of her personality it is not known if that can be accomplished, even over a long period of time. Further, it is not known if this defendant fully comprehends the impact of her involvement in this offense or of the offense itself.

## SENTENCING CONSIDERATIONS

PROBATION ELIGIBILITY: Pursuant to Section 1203 of the Penal Code this defendant does not appear to be eligible for probation.

POSSIBLE FACTORS IN AGGRAVATION: (Rule 421) This offense appears to be aggravated by the following factors: (1) the crime involved a high degree of viciousness and callousness; (2) the victim was particularly vulnerable; (3) the defendant may have occupied a position of leadership or dominance of other participants in the crimes commission; (4) the planning with which the crime was carried out indicated premeditation; (5) the defendant involved minors in the commission of the crime; and (6) the defendant took advantage of a position of trust to commit the offense.

POSSIBLE FACTORS IN MITIGATION: (Rule 423) This offense appears to be mitigated by the following factor: (1) the defendant has no prior record.

BASE TERM SENTENCING RANGE:

187 P.C., 2nd Degree                                              15 years to life

FINANCIAL RESPONSIBILITY: This defendant has no financial capability.

GOVERNMENT CODE 13967 FINDINGS: It is recommended that the Court find this to be a crime of violence and that the defendant not be assessed for the State Indemnity Fund.

RECOMMENDATION: It is recommended that the defendant be committed to the State Department of Corrections.

YH/gcf

Dated this 22nd day of January, 1981.

I have read and considered the fore-
going report of the Probation Officer.

Respectfully submitted,

DONALD G. FARMER
COUNTY PROBATION OFFICER

Mrs. Yvonne Hosang
Deputy Probation Officer

_Leo Arredondo_

Approved for filing

_____
Judge of the Superior Court

(10)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **In re BRANDEE TRIPP**

No.:    **H-029507**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age and older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>February 6, 2006,</u> I served the attached

### INFORMAL RESPONSE

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

Adrian T. Woodward
Law Offices of Adrian T. Woodward
States Bar No. 184011
4000 Long Beach Boulevard
Long Beach, CA  90807
ATTORNEY FOR Brandee Tripp
W-15659

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on February 6, 2006, at San Francisco, California.

R. Torres
_____
Declarant

_____
Signature

40078906.wpd