**EXHIBIT 7**



LAW OFFICE OF
# Adrian T. Woodward
400 Long Beach Boulevard, Suite 3001
Long Beach, CA 90807
Telephone: (562) 424-4880
Facsimile: (562) 494-4830

February 14, 2006

Clerk of the Court
California Court of Appeal
Sixth Appellate District
333 W. Santa Clara St., Suite 1060
San Jose, CA 95113

Re:  *In re Brandee Tripp* (Habeas Corpus)
     Case No. **H029507**

To THE HONORABLE Conrad L. Rushing, Presiding Justice, and THE HONORABLE Associate Justices of the Court of Appeal, Sixth Appellate District:

Petitioner respectfully lodges this letter brief in reply to the informal response ("response") filed on February 6, 2006, pursuant to the Court's order of January 23, 2006. Petitioner will review each of her constitutional claims with respect to the defenses, if any, asserted in the response.

**I. The Governor's Decision that Petitioner is Unsuitable for Parole Based Solely on her Commitment Offense Abrogated Due Process and her Liberty Interest[1] in Parole Because the "Facts" Upon Which the Decision was Based are False, Unsupported by any Evidence, Inapposite to the Record, or Irrelevant to Petitioner's Current Parole Risk**

**A.**
Please see petition, pp. 10-12, 17-18. Respondent, like the Governor, has misrepresented the facts and assigned all responsibility for the victim's death to petitioner. Respondent asserts. "they [including petitioner] planned

---

[1] Respondent does not dispute petitioner's vested liberty interest in her parole date protected by the Due Process Clauses. See petition, pp. 15, 17 et seq.

the kidnap *and murder*" of the victim. (Response, p. 1; emphasis added.) Respondent further alleges that the victim "was viciously killed by two individuals [*neither of whom was petitioner*], and that petitioner helped them plan the victim's murder in that she "suggested ways of killing the victim." (Response, p. 3.) Those "facts" – the basis for the Governor's decision – re-recited in the response, are incorrect, supported by no reliable evidence, inapposite to the record, and highly speculative[2].

Petitioner, as revenge against her stepfather who sexually molested and physically abused her since age 7, planned to keep Tamara's location secret, then release her to testify against him. Her sole role in what she thought would be a kidnapping was to send Tamara to the store, where she would be abducted by her husband and Cook. Petitioner, *who did not plan or anticipate a murder*, has since prior to her commitment accepted responsibility and admitted her role and intent in the offense. (Exhibit B, pp. 10-21, 23-27.) The first suggestion that petitioner's intent was anything more was made by two governors' staffs in reversing her parole grants.

No reliable evidence has been cited supporting the alleged intent of petitioner in the homicide that occurred. The only possible suggestion of such facts was testimony by one witness during the trial of petitioner's two *codefendants* that he overheard the three defendants mention a possible killing. Petitioner, who could have done so had she been tried and such facts been suggested, has steadfastly denied that she contemplated a murder, suggested anything to provoke or commit a murder, or do anything more than what she did, help set up the kidnapping by sending the victim to the store and, as revenge against her stepfather who had sexually and physically abused her for 12 years, to keep Tamara's location secret until his trial to insure that he had no access to her and her testimony against him would be preserved. Had petitioner known that Tamara would be harmed, she would not have participated even in the initial revengeful act; she was shocked and dismayed to learn of the victim's death. (Exhibit B, pp. 12-23.).

Petitioner did not participate in, plan, or contemplate a murder; she participated in a kidnapping by sending the victim to the store and therefore was an accessory to a murder impulsively and unexpectedly committed by her two codefendants. Notably, the prosecutor's office, although notified,

---

[2] Respondent has attached to the response and relies for "facts" on "exhibit A," an incomplete probation department report consisting mostly of uncorroborated hearsay.

did not submit documents or attend petitioner's hearing to claim otherwise. Nor, contrary to the Governor's notion, implied also in the response, have petitioner's statements been inconsistent. For more than 25 years she has consistently maintained that although murder may have been discussed at one point, it was not in the plan that she helped initiate or anticipated by her.

Respondent's notion, like the Governor's, that petitioner "had numerous opportunities to prevent this murder from happening, but she did nothing to spare Tameron" (response, p. 4) is false, inapposite to the record, and unavailing. Because petitioner neither contemplated murder nor knew it was occurring, she had no opportunity whatsoever to prevent it other than the same opportunity that can be attributed to all prospective parolees – to refuse involvement from the start.

Respondent's notion, like the Governor's, that petitioner's offense may be employed as the sole factor to preclude her parole (apparently forever) because her criminal conduct constituted more than "the minimum necessary for a second degree murder conviction" (response, p. 5), is utterly false. Unlike the two codefendants who, without her knowledge, impulsively transformed a kidnap into homicide and were appropriately prosecuted for first degree murder, the prosecutor fashioned a plea contract in which it was stipulated that petitioner's offense was a non-premeditated second degree murder. The prosecutor and trial court would have been derelict to permit that stipulation and plea contract had reliable evidence been available suggesting that petitioner contemplated or planned the victim's death.

Because petitioner's intent and conduct – taking the victim to a place from where she could be kidnapped – constituted but the minimum act necessary to sustain a second degree murder conviction, the requisite elements being a homicide and implied malice/intent to kill, the commitment offense cannot consistent with due process be employed as the sole factor to interminably preclude her parole. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 683 [*Rosenkrantz*] [due process precludes parole denial based solely on a commitment offense in which the defendant's conduct was not "more aggravated or violent than the minimum necessary to sustain a conviction for that offense"]; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1095.

In re BRANDEE TRIPP; Petitioner's Informal Reply Brief – Page 3

**B.**

Petitioner alleged that the Governor's basis for reversing her parole grant, a boilerplate recitation that her parole poses an "unreasonable threat to public safety if released from prison at this time" (exhibit C, p. 3), was unsupported by any evidence whatsoever and inapposite to the record. Her forensic evaluations for over six years have uniformly concluded that the risk to public safety from her parole is "low." No evidence suggests otherwise. See petition, pp. 17-18 and references there cited. Parole reversal based on such a whim abrogated due process. The response is unavailing on this claim and cites no evidence to dispute it.

**C.**

The Governor's sole ground for his "unreasonable threat" conclusion, that petitioner committed the offense with "utterly callous disregard for human life and suffering," was likewise inapplicable. Please see petition, pp. 11-12, and authorities cited. The recitation, which appears in *all* of the Governor's parole reversals in second degree murder cases, is arbitrary because (1) "utterly" or otherwise petitioner did not disregard life or suffering because she did not plan, anticipate or know that a murder would occur, and (2) because disregard for life is the *definition* of implied malice, an element of her second degree murder offense. The response is unavailing on this claim and cites no evidence to the contrary.

**II. Basing Parole Reversal on a Re-characterization of the Offense as a First Degree Murder Abrogated Due Process and Breached the Express Terms of Petitioner's Plea Bargain**

Please see petition, pp. 12-16, and authorities cited. The Governor's characterization of the offense as a premeditated first degree murder abrogated due process because, first, as detailed above, it was based entirely on incorrect "facts."

Second, in exchange for the State's stipulation that the offense was a non-premeditated second degree murder, petitioner waived her rights, pled guilty to that offense, and testified truthfully as promised in order to secure the State's first degree murder convictions of the two co-defendants. In entering into the plea contract petitioner understood and relied on the fact that she would be eligible for parole around 1989 and that her parole release would be determined solely by BPT according to the laws then in effect which, according to contract law then and now, was incorporated as a term of the contract as existing law.

Depriving petitioner of this provision, the prison term prescribed for unpremeditated second degree murder, *her sole benefit* from the plea bargain, was particularly egregious because she gave the State much more than the usual acceptance of immediate punishment. She agreed to testify against the codefendants to assist the prosecutor and State in securing two first degree murder convictions. In doing so she exposed herself to the fright and peril of a "rat jacket" that persists after 25 years of imprisonment. The State "cannot with one hand give a benefit and with the other take it away." (*People v. Harvey* (1979) 25 Cal.3d 754, 758.)

Respondent's defense, that nothing was explicitly "promised" regarding who would determine her parole suitability that would preclude the addition of the onerous review by governors' staffs that would reverse most parole grants, is unavailing because it ignores the facts that a defendant is entitled to punishment contemplated at the time of a plea and that a contract incorporates existing law. See, e.g., *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155, citing *INS v. St.Cyr* (2001) 533 U.S. 289, 322-323, 325 [defendant motivated to plead guilty by provisions of existing law].

### III. Precluding Petitioner's Parole by Recasting it as a First Degree Murder Abrogated Due Process Because she has now Served a Prison Term in Excess of the Maximum Prison Term Prescribed by the Regulations for the Facts of her Offense had it Resulted in her Conviction of First Degree Murder[3]

In *Rosenkrantz*[4], *supra*, relied on in the response, in which a governor likewise reversed a parole grant in a second degree murder case, the California Supreme Court warned:

---

[3] The maximum (aggravated) prison term prescribed by 15 CCR § 2403(b) for a first degree murder with the facts of petitioner's offense is 30 years (subsection II – C [relationship with victim, death by severe trauma]), from which 72 months (4 months for each of 18 disciplinary-free years of imprisonment) and 29 months (875 days) of pre-sentencing term credits awarded by the sentencing court would be deducted, resulting in a net maximum prison term of 21 years, 7 months, which, according to her commitment date of February 18, 1981, lapsed in September *2002*.

[4] Rosenkrantz purchased and practiced with an Uzi, laid in wait for and shot the victim multiple times, watched him bleed to death on the street, absconded, and threatened further violence. (29 Cal.4th at p. 629.) Petitioner's criminal conduct in the offense did not approach the Rosenkrantz level of premeditation and violence to justify precluding her parole based solely on a second degree murder commitment offense.

> [T]here will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder.
>
> Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a *first degree* murder in order to promote the parole statute's goal ... Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 691.)

### IV. The Interminable Preclusion of Petitioner's Parole Based Solely on Alleged, Unchangeable Facts of her Commitment Offense, Abrogates Due Process and her Liberty Interest in her Properly Granted Parole Dates Because it has Converted her Prison Term to Life Without the Possibility of Parole

Please see petition, pp. 18-21. Petitioner cited abundant authority supporting a prima facie case for her most vital constitutional claim[5], which respondent has altogether ignored in the response. Accordingly, an order to show cause is warranted.

### V. Petitioner did not Receive Due, Individualized, or *any* Consideration by Governor Schwarzenegger Because (1) he did not Review Petitioner's Files or any of the Evidence Relied on by the Granting Panel as Required and *was not Involved in the Decision* Except Possibly to Sign or Authorize a Staff Member to Sign it, and (2) the "Decision" was a Boilerplate of *all* Reversals of Paroles Granted in Murder Cases

#### 1.

Please see petition, pp. 21-23. Petitioner alleged that Governor Schwarzenegger was not involved in the decision and therefore did not fulfill the minimal requirements of his reversal authority. Respondent

---

[5] Since the petition was filed, the Court of Appeal has also cited and relied on the federal authorities cited for this claim. See *In re Scott* (2005) 133 Cal.App.4th 573, 595.

concedes the issue[6] except to proclaim, without citation of authority (none exists for the notion) that a mere appearance of a governor's signature on such a document is all that's required, a notion that obliterates unequivocally mandatory ("shall") constitutional and statutory requirements, due process, and the authorities cited in the petition.[7] Petitioner's prima facie case on this issue, unrefuted by any authority cited in the response, is worthy of an order to show cause and the Court's adjudication.

## 2.

Petitioner also demonstrated by means of statistics that she did not receive individualized consideration because the "the Governor's" decision was but a boilerplate format used by the governors' staffs in reversing all second degree murder parole grants. See petition, pp. 23-24. The response does not contest this claim, either.

## VI. The Governors' Actions Were Prohibited by the Ex Post Facto and Due Process Clauses of the State and Federal Constitutions

### *1. Ex Post Facto*

The facts and authorities cited by petitioner at pp. 24-25 of the petition establish a classic ex post facto violation. Respondent mis-relies on *Rosenkrantz*, first by misstating the claim. Petitioner's case in inapposite to that of *Rosenkrantz*.

In *Rosenkrantz, supra*, 29 Cal.4th 616, the California Supreme Court held the law not to be ex post facto when applied to a defendant convicted by a trier of fact of a murder committed prior to its enactment. *Rosenkrantz* is inapplicable and inapposite to petitioner's case. Unlike the petitioner in *Rosenkrantz*, who defended against charges of first degree murder, second

---

[6] Respondent's notion that there is nothing wrong with a governor's relying "on the assistance of his staff" in making such decisions (response, p. 4, fn. 2) is unavailing because, since Governor Schwarzenegger did not review anything and was not involved in the actual decision in any way, his staff's work was more than "assistance" – it was all there was.

[7] The due process requirements of gubernatorial review in such cases are no less than those in a governor's review of a petition for clemency from a death penalty. The results are the same in either case – the inmate's ultimate death in prison.

In re BRANDEE TRIPP; Petitioner's Informal Reply Brief – Page 7

degree murder, and voluntary manslaughter and who thus had no inkling of what his eventual sentence might be nor any voice therein, petitioner withdrew her not guilty plea, waived her right to a trial, and agreed to assist the prosecution of her codefendants, thereby subjecting herself to years of peril in exchange for a specific sentence, the length of which would be determined solely by the Board of Prison Terms according to the laws then in effect, based on her commission of unpremeditated second degree murder.

Imposition of the new obstacle to her parole, almost certain gubernatorial reversal, which has extended her prison term interminably, extinguished two valid grants of parole to date, and will always preclude her parole because the grounds employed by the governors can never change, constitutes a classic example of ex post facto law. Because the new law is necessarily more onerous to petitioner it is ex post facto. See authorities at petition, p. 25.

Respondent's defense to this claim, the notion that petitioner "cannot show that an increase in her punishment actually occurred because she had never been granted parole under the old law when the Board's decision would have been subjected to no gubernatorial review" (response, p. 7) is both absurd and false because what respondent says cannot be shown is precisely what occurred. Petitioner was found suitable for and granted parole – *twice* – "under the old law," i.e., without gubernatorial review she would necessarily have paroled on both occasions under the law that existed at the time she entered into her plea contract with the State[8].

Respondent's final notion, that petitioner "cannot show that the application of proposition 89 creates more than a speculative risk of increasing her punishment" (response, p. 7), is likewise false. As this Court is well aware (also see *Rosenkrantz, supra*, 29 Cal.4[th] at p. 684), the enforcement of "Proposition 89" by Governor Davis reversed all but a handful of paroles granted in second degree murder cases, and Governor Schwarzenegger has followed suit in more than 70% of such cases. Without "Proposition 89" petitioner would have paroled (twice) and been discharged from parole. An evidentiary hearing would resolve in petitioner's favor any doubts the Court may have about these facts.

---

[8] Respondent's argument is also contrary to controlling authority cited in the petition which specifically holds that a petitioner need not show that he or she would necessarily serve a longer prison term under the new law to establish an ex post facto violation. See petition, p. 25.

In re BRANDEE TRIPP; Petitioner's Informal Reply Brief – Page 8

## 2. Due Process

Petitioner also demonstrated that application of Pen.C. § 3041.2 (Cal.Const., Art.V, §8(b)) to individuals like her who entered into guilty plea contracts prior to its enactment violates the Due Process Clauses of the Federal and State Constitutions. See petition, pp. 26-27. Respondent does not dispute this claim in the response.

## VII. Denying Parole Based on Some Evidence of Serious Commitment Offenses Abrogated Due Process Because a Finding of Parole Unsuitability Must be Supported by a Preponderance of the Evidence Indicating That the Offense Causes her Parole to Pose an Unreasonable Risk of Danger to Public Safety;

## No Rational Panelist Reviewing the Evidence of Petitioner's Parole Suitability Could Have Found a Preponderance of Unreasonable Risk

### A.

In response to respondent's misunderstanding of the "some evidence" standard of review, petitioner presents the Court with two considerations. For years BPH panels and governors have untenably adopted the some evidence standard reserved for a *reviewing court's* assessment of executive decisions by routinely finding prospective parolees unsuitable for parole based on *some (any)* evidence of a serious commitment offense. Petitioner's case is a classic example.

Parole decisions by BPH and by governors who are bound by the same constraints in such decisions (*Rosenkrantz*, 29 Cal.4th at p.676; Cal.Const., Art.V, §8(b)) must be based on "good cause[9]," defined as "*a preponderance of the evidence* that there is a factual basis and good reason for the decision made. (15 CCR § 2000(b)(49) (emphasis added).) Even a parole decision supported by some evidence may abrogate due process if the panel did not consider and weigh all parole-favorable evidence. (*In re Capistran, supra*, 107 Cal.App.4th at p. 1306.)

---

[9] Decisions determining parole must be based on "good cause." *In re Powel* (1988) 45 Cal.3d 894, 901; *In re Brown* (1967) 67 Cal.2d 339, 342; *In re McClain* (1960) 55 Cal.2d 78, 87; *In re Caswell* (2001) 92 Cal.App.4th 1017, 1024, 1026; *In re Clutchette* (1974) 39 Cal.App.3d 561, 565; *In re Monzo* (1973) 33 Cal.App.3d 144, 147; 15 CCR § 2450.

15 CCR § 2402(c) lists six "circumstances tending to show *unsuitability*" of which one, the commitment offense, is *arguably* applicable to petitioner. The other five offense factors were absent ("sadistic sexual offenses," "psychological factors," "institutional behavior," "previous record of violence," "unstable social history").

15 CCR § 2281(d) lists nine "circumstances of *suitability*." All eight applicable to petitioner (excluding BWS) favor her parole (no "juvenile record," "stable social history," "signs of remorse," "stress," "lack of criminal history," inmate's "present age reduces the probability of recidivism," "realistic plans for release/marketable skills that can be put to use upon release," and good "institutional behavior").

Because, of the fourteen codified suitability and unsuitability factors that apply to petitioner, <u>thirteen favor her parole</u> (arguably, not "commitment offense"), denial of parole satisfied neither the required preponderance of the evidence determination nor the fundamentally fair decisionmaking required by due process.

Petitioner is not asking the court to abandon any standard of review it selects, but to determine if the Governor violated her right to due process by rendering a decision based only on some evidence of unsuitability that he knew was inapposite to its preponderance standard binding his parole suitability decisions.

In a newly published decision, *In re Scott, supra*, 133 Cal.App.4th 573 (review denied, November 30, 2005), the Court of Appeal explained why reliance on the gravity of a murder did not constitute "some evidence" that Scott was currently unsuitable for parole; it was far outweighed by evidence of Scott's exemplary reform and low parole risk confirmed by his forensic evaluations. The Court explained:

> The Governor's determination that the gravity of Scott's offense shows him unsuitable for release is doubly flawed. Not only is the determination unsupported by "some evidence," but the Governor failed to consider a factor indicative of suitability that he was required to take into account. We address the latter problem before turning to the insufficiency of the evidence of unsuitability . . .

In re BRANDEE TRIPP; Petitioner's Informal Reply Brief – Page 10

. . . Putting aside factors relating to his offense and prior conduct, there is no dispute that all other applicable regulatory criteria clearly indicate Scott is suitable for release on parole. He has no juvenile record, possesses a

stable social history, has performed acts which tend to indicate the presence of remorse, his age reduces the probability of recidivism, he has made realistic plans for release, and his activities while in prison indicate an enhanced ability to function within the law. The chief reason the Governor nevertheless found Scott unsuitable for release was the gravity of his offense.

. . . [the] Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense "alone" is correct (*Rosenkrantz, supra,* 29 Cal.4th at p. 682, 128 Cal.Rptr.2d 104, 59 P.3d 174) [ ] but the proposition must be properly understood . . . Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (*In re Smith* (2003) 114 Cal.App.4th 343, 372, 7 Cal.Rptr.3d 655), and "runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p. 917.) . . .

***The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.*** Yet, the predictive value of the commitment offense may be very questionable after a long period of time [FN9] (*Irons v. Warden of California State Prison—Solano* (E.D. Cal. 2005) 358F.Supp.2d 936, 947, fn. 2.) Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny . . .

. . . Under Board regulations, aspects of the commitment offense may indicate unsuitability or

In re BRANDEE TRIPP; Petitioner's Informal Reply Brief – Page 11

suitability for release. The offense is indicative of *unsuitability* when it was committed "in an especially heinous, atrocious or cruel manner" (Cal.Code Regs., tit. 15, § 2402, subd. (c)(1)) . . . there is not "some evidence" that the gravity of Scott's offense shows him unsuitable for release . .

Before explaining the insufficiency of this evidence, it is necessary to remember that denial of parole based upon the nature of the offense alone may rise to the level of a due process violation . . .

For example, premeditation was considered in *Rosenkrantz* because, though the prisoner had been convicted only of second degree murder, the evidence showed " 'a full week of careful preparation, rehearsal and execution,' " and that the prisoner, who "fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement," carried out the crime with "planning, sophistication or professionalism." (*Rosenkrantz*, at p. 678, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

. . . the record contains no evidence Scott committed his offense "in an especially heinous, atrocious or cruel manner," or that the nature of his crime indicates he poses a continuing threat to the public safety if released. Indeed, the record contains abundant *uncontradicted* evidence to the contrary. *All* of the many psychological evaluations of Scott [indicated] there was a low risk he would commit another violent act if released . . .The life prisoner evaluation report prepared by the Department of Corrections reached the same conclusion . . .he "would pose a low degree of threat to the public at this time if released from prison." ***The Governor may believe Scott would pose an unreasonable risk of danger to society if now released from prison, but that opinion finds no factual support whatsoever in the record that was before him.*** (*Scott, supra,* 133 Cal.App.4th at 594-596; emphasis added).

In re BRANDEE TRIPP; Petitioner's Informal Reply Brief – Page 12

Because petitioner has been imprisoned longer than the maximum term prescribed by the regulations for a premeditated first degree murder with the facts of her offense, because all but (arguably) one factor – the commitment offense – indicated her *suitability* for parole, and because no rational panelist could have found based on a weighing of all evidence in the record addressing her current suitability for parole that a preponderance indicated that she currently poses an "unreasonable risk of danger" to public safety, denial of parole based solely on some evidence of serious offenses abrogated her right to due process and liberty interest in parole.

**B.**

The "some evidence" standard of judicial review urged by respondent evolved from *Superintendent v. Hill* (1985) 472 U.S. 445, 455 ["*Hill*"]. See *In re Powell* (1988) 45 Cal.3d 894, 904. Petitioner respectfully objects to the application of the some evidence standard to her case. It is difficult to understand why the narrowest of standards should apply. First, the United States Supreme Court prescribed it in *Hill* to apply to a hearing at which disciplinary charges were based on a confidential source causing the prisoner's due process right to be diminished by the prison's need for security and confidentiality. Brandee Tripp's due process right is not diminished because neither the parole determination process used by the Governor nor adjudication of her habeas claims requires disclosure of a confidential source or involves any security concern.

Second, the State's courts that adopted *Hill*'s some evidence standard to review parole decisions expressly held that California's indeterminately sentenced inmates did ***not*** have a due process liberty interest in a parole grant. *In re Powell, supra*, 45 Cal.3d at p. 911. The contrary has now been established. (*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 902; *Rosenkrantz,* 29 Cal. 4th at p. 621.) Due process demands a finding of something more than "some" (*any*) evidence in the record to protect what is now defined as a vested liberty interest protected by the Due Process Clause.

Third, *Hill* excluded claims like those at bench that allege that the *procedure* used did not comply with state law. (472 U.S. at p. 457 ["respondents relied only upon the Federal Constitution, and did not claim that the disciplinary board's findings failed to meet evidentiary standards imposed by state law"].)

Petitioner respectfully asks the Court, based on the foregoing authorities, to find that the some evidence standard should not apply because it is too narrow to foreclose her liberty interest protected by due process.

## *CONCLUSION*

Petitioner, 20 years old at the time, became an unwitting accessory to a murder by helping to temporarily kidnap a child to keep her whereabouts secret in order to preserve her testimony in a child molestation case against petitioner's stepfather whom she despised because he had sexually molested and physically abused petitioner since she was seven years old. Petitioner did not intend, condone, plan, or know of the homicide that would eventually occur at the hands of its two perpetrators.

Petitioner confessed to the offense, withdrew her not guilty plea, waived her constitutional rights and pled guilty to what the State and trial court agreed was a non-premeditated second degree murder in exchange for her testimony that helped convict the murderers of first degree murder and for a prison term of 15 years-to-life that provided for her eligibility to parole after eight years, her prison term and parole date to be determined solely by the parole board because that was the law at the time of her plea contract with the state which by law was incorporated as one of its terms.

Petitioner has been incarcerated for 25 years, all but two years of her adult life. She became eligible for parole release *16 years ago* in 1989 and remains imprisoned six years in excess of the prison term set by the BPH panel, *13 years beyond* the maximum prison term prescribed by the regulations for the facts of her second degree murder, and 3 years in excess of the prison term prescribed for those facts had they resulted in her conviction of *first* degree murder.

Notwithstanding those facts, set forth in the petition and *undisputed by respondent*, petitioner can never parole. Her prison term, 15 years-to-life with the possibility of parole, which Pen.C. § 3041(a) defines as a *probability* of parole [panel "shall normally set a parole release date"], has been converted to life without the possibility of parole because neither the distorted facts of her offense cited as the sole basis for reversing both of her valid parole grants to date, nor her exceptional parole suitability otherwise can ever improve.

To justify this process, respondent avers in conclusory fashion that the Governor's "facts" and ground for reversal constitutes "some" evidence sufficient to support the decision, without addressing the critical claims asserted by petitioner that the facts are incorrect and the grounds are both inapplicable to her former criminal conduct and her current suitability for parole. Respondent, like the Governor, cites no reliable evidence to support the notion that petitioner contemplated, intended, or planed a murder, or to rebut her claim that because her criminal conduct in the offense was the minimum requisite to her conviction of second degree murder (as an accessory), the facts alleged as to her offense, even were they true, cannot consistent with due process continue to constitute the sole basis to altogether preclude her parole.

Respondent claims that despite the language of the 1988 statute and constitutional amendment and controlling authority requiring a governor's personal review of the same information considered by a parole board panel whose decision he may reverse, governors need not be involved in the process at all except to sign or authorize someone to sign "their" decisions. Respondent cites no authority for the proposition (none exists) that a governor's staff may make such decisions by issuing boilerplate letters without input and without any consideration of the facts and evidence of the case by the governor.

Respondent opposes petitioner's constitutional claims involving her plea contract with the State by alleging that petitioner can't show that her punishment was "actually increased" by means of the new law or that the new law created more than "a speculative risk" of increasing her prison term. The notions are worse than false; they are ridiculous. Not only do the statistics establish <u>the certainty</u> (more than the requisite "significant risk" of increasing the punishment under *Garner*) that the new law acts only to petitioner's detriment, but her prison term has been extended twice and will be extended forever by extinguishing (so far) two valid grants of parole ***that would have occurred but for the new law***.

The response completely ignores several of petitioner's most compelling claims including the due process violation in interminably precluding her parole based solely on her unchangeable offense facts after she has long completed all parole requirements and been imprisoned in excess of the maximum prison term prescribed by the regulations for the

facts of her particular second degree murder and for a first degree murder with those facts. Without judicial intervention, petitioner will serve an unimposed, legally untenable prison term, life without the possibility of parole – unless, as the *Irons* court reasoned, some future governor arbitrarily decides that the former governors erred because the facts they stated were untrue or because those facts were outweighed by the overwhelming evidence of petitioner's parole suitability.

In his signature song from years back, Johnny Cash succinctly and powerfully described the plight facing Brandee Tripp, who committed an implied malice second degree murder as an accessory 25 yeas ago when she was 20 years old, who has since fulfilled all requirements for parole, but who can never parole: "I wear [the black] for the prisoner who has long paid for his crime, but is there because he's a victim of the times." (Johnny Cash, *Man in Black*, 1971.) Decades later, this Court has the power to finally ensure that Brandee Tripp is afforded justice. It should exercise that power.

Because petitioner has established a prima facie case for relief, an order to show cause should issue to permit the Court to adjudicate her constitutional claims following additional briefing on the merits[10].

Petitioner respectfully thanks the Court for the opportunity to address respondent's argument.

---

[10] The response is replete with factual errors and misrepresentations many of which are not addressed in this brief in order to prevent undue length. E.g., (a) petitioner does not ask the Court to "re-weigh" evidence relied on by the Governor's staff "to resolve conflicts in the evidence." (Response, p. 3.) There are no conflicts in the evidence.. it is unambiguous. Petitioner asks the Court to determine if the facts relied on by the Governor were supported by reliable evidence and relevant to her current parole suitability and risk.

(b) Nor did petitioner argue that as a condition of her plea, "the prosecution promised that the facts of the crime would not be considered in her parole consideration process." (Response, p. 5.)

(c) Nor are petitioner's "claims regarding the supposed plea bargain violation" based "on her subjective belief that her plea would entitle her to benefits during parole consideration." (Response, p. 6.) Petitioner's claims are based on the record and the law existing at the time of the plea contract.

Dated  2-14-06

Respectfully submitted,

Adrian T. Woodward
Counsel for Petitioner

# DECLARATION OF SERVICE BY MAIL

Case: **In re Brandee Tripp** on Habeas Corpus, No. **H029507**

I declare that on February 21, 2006, I served the attached

**Petitioner's Informal Letter Reply Brief**

on the parties listed below by enclosing same in an envelope to which adequate first class postage was affixed, and depositing same in the box for United States Mail at Walnut, California.

> **Attorney General**
> **455 Golden Gate Avenue**
> **San Francisco, CA 94102**

I declare, under penalty of perjury, that the facts I have stated above are true and correct.

Dated February 21, 2006, at Walnut, California

Joseph Wasko
Declarant