# EXHIBIT 8

ATTORNEY GENERAL'S COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

In re

BRANDIE TRIPP,

Petitioner

On Habeas Corpus

H029507



Court of Appeal No. H-

F I L E D

SEP 5 2006

MICHAEL J. YERLY, Clerk

BY_____ DEPUTY

RESPONDENT'S RETURN TO THE ORDER TO SHOW CAUSE;
SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

BILL LOCKYER
Attorney General of the State of California

MARY E. JO GRAVES
Chief Assistant Attorney General

JULIE L. GARLAND
Senior Assistant Attorney General

JENNIFER A. NEILL
Supervising Deputy Attorney General

DENISE A. YATES
Deputy Attorney General
State Bar No. 191075

455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5834
Fax: (415) 703-5843

Attorneys for Respondent D. Davison,
Warden at the Correctional Institution for
Women

# TABLE OF CONTENTS

**Page**

INTRODUCTION     1

RETURN     2

MEMORANDUM OF POINTS AND AUTHORITIES     10

     ARGUMENT     10

         I.    THE SOME-EVIDENCE STANDARD DOES NOT APPLY TO TRIPP'S FEDERAL DUE PROCESS CLAIMS.     10

         II.    IN THE ALTERNATIVE, TRIPP'S DUE PROCESS RIGHTS WERE SATISFIED BECAUSE SOME EVIDENCE SUPPORTS THE GOVERNOR'S DECISION TO DENY PAROLE.     12

CONCLUSION     17

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Adams v. Pacific Bell Directory*
(2003) 111 Cal.App.4th 93                                        16

*Biggs v. Terhune*
(2003) 334 F.3d 910                                         10, 15

*Greenholtz v. Inmates of Neb. Penal & Corr. Complex*
(1979) 442 U.S. 1                                         2, 3, 11

*In re Carr*
(1995) 38 Cal.App.4th 209                                        8

*In re Dannenberg*
(2005) 34 Cal.4th 1061                                  2, 3, 7, 13-16

*In re Lowe*
(2005) 130 Cal.App.4th 1405                                      14

*In re Rosenkrantz*
(2002) 29 Cal.4th 616                                3, 7, 12, 13, 16

*In re Smith*
(2003) 114 Cal.App.4th 343                                      14

*In re Williams*
(1994) 7 Cal.4th 572                                             1

*Jancsek v. Or. Bd. of Parole*
(9th Cir. 1987) 833 F.2d 1389                                   10

*Machado v. Kane*
(N.D. Cal. Feb. 22, 2006, No. C 05-01632 WHA)
2006 WL 449146                                                 15

## TABLE OF AUTHORITIES  (continued)

Page

*Marquez v. Rawers*
(E.D.Cal. Aug. 6, 2006, No. CV-F-03-6508 OWW  WMW HC)
2006 WL 2285780                                                    2

*McQuillion v. Duncan*
(9th Cir. 2002) 306 F.3d 895                                       10

*Sandrini Bros. v. Voss*
(1992) 7 Cal.App.4th 1398                                         12

*Sass v. California Bd. of Prison Terms*
(9th Cir. Aug. 31, 2006, No. 05-16455) ___ F.3d ___
[2006 WL 2506393, at *4]                              3, 7, 10, 13, 15

*Superintendent v. Hill*
(1985) 472 U.S. 445                                          3, 10-13

*Trevino v. Mendoza-Powers*
(E.D.Cal. Oct. 2, 2005, No. CVF03 6738OWW SMS HC)
2005 WL 2436471                                                    2

*Wolff v. McDonnell*
(1974) 418 U.S. 539                                               11


**Statutes**

Penal Code
        § 3041, subd. (b)                                   7, 13, 16
        § 3041.2                                                  3
        § 3042, subds. (a), (f)(3)                               16

# TABLE OF AUTHORITIES  (continued)

**Page**

**Other Authorities**

California Code of Regulations, Title 15

| | |
|---|---:|
| § 2402 | 12 |
| § 2402, subd. (b) | 12 |
| § 2402, subds. (b)-(c) | 16 |
| § 2402, subds. (b), (c)(1) | 7, 13 |
| § 2402, subd. (c) | 12, 14 |
| § 2402, subd. (c)(1)(E) | 14 |

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re | H-029507 |
| **BRANDEE TRIPP,** | |
| Petitioner, | |
| **On Habeas Corpus.** | |

## INTRODUCTION

Petitioner BranDee Tripp (W-15695) is a California state prisoner proceeding with counsel in this habeas action. Tripp challenges the Governor's October 11, 2004 reversal of her May 17, 2004 parole grant. Tripp alleges multiple bases in support of her petition, but this court directed respondent to address only: "whether some evidence supports the Governor's determination that petitioner poses an unreasonable threat to public safety considering her actual role in the murder and her progress in prison." (Order to Show Cause.) Accordingly, respondent need not address the other issues. (*In re Williams* (1994) 7 Cal.4th 572, 611 [noting that by omitting certain claims in the order to show cause, the court has implicitly determined that those claims do not state a prima facie case for relief].) This court should deny the petition because the Governor properly relied on the commitment offense when denying Tripp parole, and some evidence supports his decision that she would be an unreasonable threat to public safety if released.

1

# RETURN

Respondent D. Davison, Warden at the Correctional Institution for Women, as a Return to the Order to Show Cause, states:

1.      Petitioner Brandee Tripp is lawfully incarcerated by the California Department of Corrections and Rehabilitation and is serving a 15-year-to-life sentence imposed in 1981 following Tripp's guilty plea to second degree murder. (Exs. 1, 2; Ex. 3 at p. 1; Ex. 4 at pp. 1, 13.)[1] The Department of Corrections (as it was then known) received Tripp on February 18, 1981. (Ex. 4 at p. 1.)

2.      Tripp does not challenge her conviction in this petition. (Pet. at p. 1.) Rather, Tripp challenges the Governor's October 11, 2004 reversal of the Board of Prison Terms's (Board [now known as the Board of Parole Hearings]) May 17, 2004 decision granting Tripp parole. (*Ibid.*)

3.      Tripp does not have a federally protected liberty interest in parole arising from either the federal Due Process Clause (*Greenholtz v. Inmates of Neb. Penal & Corr. Complex* (1979) 442 U.S. 1, 7) or the California parole statutes (*Marquez v. Rawers* (E.D.Cal. Aug. 6, 2006, No. CV-F-03-6508 OWW WMW HC) 2006 WL 2285780; *Trevino v. Mendoza-Powers* (E.D.Cal. Oct. 2, 2005, No. CVF03 6738OWW SMS HC) 2005 WL 2436471 [all unpublished opinions are included in the appendix]; *In re Dannenberg* (2005) 34 Cal.4th 1061).

4.      Even if Tripp has a federally protected liberty interest in parole, she received all the process due at her 2004 consideration hearing, including an opportunity to be heard (e.g., Ex. 4 at pp. 62-64), and a decision informing her of the reasons the Governor reversed her parole grant (Ex. 5).

---

1.  Respondent cites to the page numbers originally reflected on the documents rather than the consecutive page numbers respondent affixed pursuant to the court rules.

(*Greenholtz v. Inmates of Neb. Penal & Corr. Complex, supra,* 442 U.S. at p. 16.)

5.    The some-evidence standard of review for parole decisions does not apply for purposes of federal due process because the United States Supreme Court has expressly held that less process is due in parole-release determinations than for guilt determinations, such as those made in prison disciplinary hearings.  (*Greenholtz v. Inmates of Neb. Penal & Corr. Complex, supra,* 442 U.S. at p. 15; see Argument I, *post.*; but see *Sass v. California Bd. of Prison Terms* (9th Cir. Aug. 31, 2006, No. 05-16455) ___ F.3d ___ [2006 WL 2506393, at *4].)

6.    In the alternative, the Governor did not violate Tripp's state or federal due process rights when finding her unsuitable for parole because some evidence supports the Governor's October 11, 2004 decision reversing Tripp's parole grant.  (*Superintendent v. Hill* (1985) 472 U.S. 445, 455-456; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 677; *In re Dannenberg, supra,* 34 Cal.4th at pp. 1094-1095.)

7.    Pursuant to his authority under Penal Code section 3041.2, the Governor reversed the Board's grant of parole.  (Ex. 5.)  In his decision, the Governor began by reviewing the horrific crime whereby ten-year-old Tameron Carpenter was strangled to death in order to prevent her from testifying against the man who had molested her.  (*Id.* at p. 1.)

> Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year old William Record.  Mr. Record was accused of molesting both Tameron and Ms. Maddocks.  To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks.  Mr. Tripp, his 20-year-old wife, [Petitioner] Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks.  That plan failed.  They then decided to kidnap and kill young Tameron.

3

[Petitioner] Tripp was a family friend and had access to
Tameron. On the day of the murder, [Petitioner Tripp]
arranged to take Tameron on a swimming trip. Before the trip,
[Petitioner Tripp] asked Tameron to go to the store and pick
up some drinks. Once Tameron was at the store, [Tameron]
encountered Mr. Hilton and Mr. Cook who offered her a ride
home. Tameron accepted. The two men then drove Tameron
to a campsite where [Mr. Tripp and Petitioner Tripp] were
living. [Mr. Hilton and Mr. Cook] took Tameron into the
Tripps' tent, tied her up, and placed cord from the tent around
her neck. Mr. Tripp pulled on one side while Mr. Cook pulled
on the other—until Tameron died. They then buried her in a
grave that they had dug near the tent.

Tameron's mother notified police that her daughter was
missing and that she suspected Mr. Record might be involved.

When interviewed by police, [Petitioner Tripp] denied any
knowledge of Tameron's whereabouts. Mr. Trip [sic],
however, confessed to police that he was involved in the
kidnap-murder and subsequently took them to the campsite
where Tameron's body was buried. [Petitioner Tripp] was
arrested the next day. And Mr. Cook later surrendered to the
police.

[Petitioner Tripp] was charged with conspiracy to commit
murder, kidnapping, and murder with special circumstances.
She accepted a plea agreement and pled guilty to second-
degree murder, with the other counts to be dismissed in
exchange for her testimony against her stepfather, Mr. Record.
(*Ibid.*)

8. The Governor also noted Tripp's turbulent pre-prison history.
Specifically, although Tripp suffered verbal, emotion, and sexual abuse,
suffered from substance abuse, and prostituted herself, she had no criminal
record at the time of Tameron's murder. (Ex. 5 at p. 2.) In addition to what
the Governor articulated, Tripp's statements at the 2004 hearing reflect the
depth of her unstable social history. Beginning at age seven, Tripp's step-
father and co-defendant, William Record, had sexual intercourse with Tripp.

4

(Ex. 4 at p. 51.) At about fourteen or fifteen, Tripp began having consensual sex with her step-father because he would give her money in return. (*Id.* at pp. 51-52.) Further, Tripp has a history of substance abuse, describing herself as an alcoholic and addict, who used cocaine, acid, speed, and marijuana. (Ex. 4 at pp. 24, 28-29; Ex. 9 at p. 4; Ex. 10 at p. 4.) As well as using drugs, Tripp admittedly broke the law as a teenager, including stealing cars and stealing money from her parents. (Ex. 4 at pp. 23-24.)

9.    The Governor next noted Tripp's behavior while incarcerated. "While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release." (Ex. 5 at p. 2; see also Exs. 7, 8.) The Governor acknowledged Tripp's various accomplishments, laudatory behavior, favorable life prisoner and mental-health evaluations, her seemingly solid relationships with her mother and daughter, and viable parole plans. (Ex. 5 at p. 2.)

10.    Further, the Governor noted that Tripp gave inconsistent statements regarding her involvement in the murder, but she nevertheless accepted responsibility and is sorry for Tameron's murder. (Ex. 5 at p. 2; see also Ex. 4 at pp. 15, 17, 49-50; Ex. 9 at p. 7.) Further illustration of the Governor's comments is found in the probation officers report and by Tripp's testimony at the 2004 hearing. Specifically, Roger Ladd, a man whom Tripp's husband divulged the crime plan to, observed Tripp discussing how to kill Tameron's older sister and how to kidnap and kill Tameron. (Ex. 3 at pp. 3-4; Ex. 4 at p. 11.) At the 2004 hearing, Tripp stated that she watched, but did not hear, the conversation about killing Tameron's older sister. (Ex. 4 at p. 12.) Tripp further stated that at the trial against her step-father, she perjured herself and said that she heard everything. (*Id.* at pp. 12-13.) But later, Tripp stated that she suggested

5

ways of committing the crime. (*Id*. at p. 49.) According to Tripp, the plan was to kidnap Tameron, collect the money from Tripp's step-father, and then turn Tameron loose to testify against Tripp's step-father. (Ex. 4 at p. 22.)

11.    After considering all the factors the Board is required to consider, the Governor concluded that Tripp's gains in prison were outweighed by the gravity of the murder and that Tripp would pose an unreasonable threat to public safety if released from prison. (Ex. 5 at p. 3.) Specifically, this premeditated crime was monstrous. (*Id*. at p. 2.) Because of Tripp's planning, Tameron was lured into a car, taken to a remote location, and viciously killed by two men who strangled her in a type of tug-of-war action between them. (*Ibid*.; see also Ex. 3 at pp. 5-6, 9; Ex. 6.) Tameron must have endured unimaginable terror and horror, all so that Tripp would receive some money and prevent Tameron from testifying against Tripp's stepfather, who had also molested Tripp when she was young. (Ex. 5 at p. 2; see also Ex. 4 at pp. 11, 26.)

12.    The Governor further noted that Tripp, as she conceded, could have prevented this chilling and revolting crime, and she allegedly tried calling the police twice on the day of the murder but hung-up because she was scared. (Ex. 5 at p. 2; see also Ex. 4 at p. 19.)

13.    Moreover, the Governor noted that Tripp violated a position of trust with Tameron. Tameron's sister, whom Tripp and her co-defendants also attempted to kill, was Tripp's best friend. (Ex. 5 at p. 3; see also Ex. 4 at p. 16.) And, Tripp was the only one who was allowed to take Tameron places alone. (Ex. 5 at p. 3; see also Ex. 11 at p. 1.) In summary, the Governor found that the manner in which the crime was planned and carried out — particularly against one so young and vulnerable — demonstrates an exceptional depravity and an utterly callous disregard for human life and suffering. (Ex. 5 at p. 2.)

14.    In his report for her 2004 hearing, Tripp's correctional counselor opined that Tripp would pose a medium to low degree of threat to the public if paroled. (Ex. 4 at p. 26; Ex. 12 at pp. 10-11.)[2] The psychiatrist for the 2004 hearing opined that he did not believe Tripp would be dangerous if released to the community. (Ex. 13 at p. 3.) But after extensive testing, a psychologist thereafter opined that Tripp's "risk of dangerous behavior in the community is considered low to moderate for the future." (Ex. 14 at p. 8.)

15.    The Arroyo Grande Police Department opposed parole based on the motive and senseless nature of the crime, and because the crime may not have occurred without Tripp luring Tameron from her home. (Ex. 6; see also Ex. 4 at pp. 45-46.)

16.    Tripp does not allege or establish any grounds for habeas corpus relief.

17.    The Governor properly relied on the commitment offense when denying Tripp parole. (Pen. Code, § 3041, subd. (b); Cal. Code Regs., tit. 15, § 2402, subds. (b), (c)(1); *In re Dannenberg, supra,* 34 Cal.4th at p. 1095; *In re Rosenkrantz, supra,* 29 Cal.4th at pp. 679-680, 682-683; *Sass v. California Bd. of Prison Terms, supra,* 2006 WL 2506393, at *4.)

18.    The offense for which Tripp was convicted exhibited more viciousness than is minimally necessary to convict her of second degree murder. (*In re Dannenberg, supra,* 34 Cal.4th at p. 1095; *In re Rosenkrantz, supra,* 29 Cal.4th at p. 682-683.)

19.    Except as expressly admitted above, respondent denies, specifically and generally, each and every allegation of the petition, including but not limited to Tripp's allegations in support of the claim that

_____

2.   Counsel for Respondent redacted from the counselor's report the street address and telephone number for Tripp's mother.

7

the Governor's October 11, 2004 decision denying Tripp parole violated her state and federal due process rights.

20.    Respondent further denies that: the commitment offense may not be the basis for repeated parole denials; the Governor's denial violated Tripp's plea agreement; the Governor mischaracterized Tripp's crime as premeditated first degree murder; the Governor's statements that Tripp decided to kidnap and kill the victim and helped plan the kidnap and murder were not supported by some evidence; the Governor improperly described Tripp's crime as reflecting an "utterly callous disregard for human life and suffering;" the only reliable evidence of Tripp's current dangerousness and parole risk is her psychiatric and correctional evaluations; Tripp has been imprisoned in excess of her maximum term; the Governor's use of staff to prepare his decisions violated Tripp's due process rights; the Governor's reliance on factors and use of language included in the relevant regulations reflects that he did not individually consider Tripp's parole suitability; and the Governor's constitutional and statutory power to review Tripp's parole grant violated the ex post facto and due process clauses of the federal and state constitutions. Respondent further denies that Tripp's state and federal administrative, statutory, or constitutional rights were violated in this case.

21.    Respondent denies that: the Governor's October 11, 2004 decision should be vacated; the Board's May 17, 2004 decision should be reinstated; Tripp should be released on parole; and Tripp's parole term should be credited with the number of days her prison confinement is in excess of her prison term the Board calculated. Rather, the proper relief for a due process violation is to order the process due, namely, a hearing in conformance with due process. (*In re Carr* (1995) 38 Cal.App.4th 209, 218.)

WHEREFORE, respondent respectfully requests that this court deny the Petition for Writ of Habeas Corpus and discharge the Order to Show Cause.

Dated:  September 6, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

MARY JO GRAVES
Chief Assistant Attorney General

JULIE L. GARLAND
Senior Assistant Attorney General

JENNIFER A. NEILL
Supervising Deputy Attorney General

DENISE A. YATES
Deputy Attorney General

Attorneys for Respondent D. Davison, Warden at the Correctional Institution for Women

## MEMORANDUM OF POINTS AND AUTHORITIES

## ARGUMENT

## I.

### THE SOME-EVIDENCE STANDARD DOES NOT APPLY TO TRIPP'S FEDERAL DUE PROCESS CLAIMS.

This court should find that the some-evidence standard does not apply to Tripp's federal due process claims because the United States Supreme Court has not made that determination. In *Superintendent v. Hill* (1985) 472 U.S. 445, the Supreme Court held that where good time credits constitute a protected liberty interest, a decision to revoke such credits must be supported by some evidence. (*Id.* at p. 447.) The Ninth Circuit Court of Appeal, however, has stretched *Hill's* holding to various parole situations. The Ninth Circuit applied *Hill's* holding to a prison board's decision setting a prisoner's release date outside the range guidelines based on aggravating circumstances. (*Jancsek v. Or. Bd. of Parole* (9th Cir. 1987) 833 F.2d 1389, 1389-1390.) The *Jancsek* court reasoned that the some-evidence standard applied because the board's decision in *Hill* also directly affected the duration of the prison term. (*Id.* at p. 1390.) Thereafter, the Ninth Circuit characterized the *Jancsek* decision as holding that the process due in the parole rescission setting is the same as outlined in *Hill* for prison disciplinary hearings. (*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895, 904.) Accordingly, the Ninth Circuit found that the some-evidence standard applied when reviewing the Board's decision to rescind parole (*ibid.*) and later, to determine one's parole suitability (*Biggs v. Terhune* (2003) 334 F.3d 910, 915; *Sass v. California Bd. of Prison Terms, supra*, 2006 WL 2506393, at *4).

This court should not follow the Ninth Circuit's application of *Hill's*

some-evidence standard to parole suitability determinations. In applying the some-evidence standard to parole suitability decisions, the Ninth Circuit failed to consider that because prison disciplinary hearings involve a finding of guilt, the process due in disciplinary hearings is *greater* than that required for parole hearings. Specifically, in *Hill*, the United States Supreme Court reaffirmed the holding in *Wolff v. McDonnell* (1974) 418 U.S. 539, 563-567 that at a disciplinary hearing where a loss of good time credits may result, the inmate must be provided with: (1) advance written notice of the disciplinary charges; (2) an opportunity to present evidence and call witnesses so long as safety allows; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action. (*Superintendent v. Hill*, *supra*, 472 U.S. at p. 454.)

Further, the Supreme Court has expressly held that less process is due in parole-release determinations than for guilt determinations, such as those made in prison disciplinary hearings. In parole proceedings, there is no requirement that inmates be allowed witnesses at their hearings, and the parole authority need not specify the particular evidence relied upon in reaching its decision. (*Greenholtz v. Nebraska*, *supra*, 442 U.S. at p. 15.) Moreover, the Supreme Court distinguished the two types of hearings: "To require the parole authority to provide a summary of the evidence would tend to convert the process into an adversary proceeding and to equate the Board's parole-release determination with a guilt determination. (*Id.* at pp. 15-16.) Therefore, by requiring that some evidence support parole decisions, the Ninth Circuit has improperly equated parole decisions with guilt determinations and misapplied United States Supreme Court precedent. Accordingly, this court should find that the federal due process clause does not require the Governor's decision to be supported by some evidence.

11

## II.

## IN THE ALTERNATIVE, TRIPP'S DUE PROCESS RIGHTS WERE SATISFIED BECAUSE SOME EVIDENCE SUPPORTS THE GOVERNOR'S DECISION TO DENY PAROLE.

If this court finds that the some-evidence standard applies to Tripp's federal due process claim and in response to Tripp's state due process claim, this court should find that the Governor's reversal meets the minimally stringent standard.[3/] There must be a factual basis underlying the Governor's decision, but that basis need only consist of "some evidence." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 667.) This is an "extremely deferential" standard of review (*id.* at p. 665) that is satisfied by a mere "modicum of evidence" (*id.* at p. 677; accord *Superintendent v. Hill, supra*, 472 U.S. at p. 455).

In determining parole suitability, the Governor, is guided by California Code of Regulations, title, 15, section 2402. The factors set forth in section 2402 are not exclusive and serve only as guidelines. (Cal. Code Regs., tit. 15, § 2402, subd. (c).) Further, the Governor must consider all relevant, reliable information in the record before him. (*Id.* at § 2402, subd. (b).) Factors weighing favorably towards the inmate's parole suitability are immaterial under the some-evidence standard. (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 677.) Further, the precise manner in which the specified factors relevant to parole suitability are considered and balanced lies within the discretion of the Governor. (*Ibid.*) Similarly, the Governor — not the court — resolves any conflicts in the evidence and determines the weight to be

---

3.  Because the federal and state due process provisions are sufficiently similar (*Sandrini Bros. v. Voss* (1992) 7 Cal.App.4th 1398, 1405, fn. 2 [noting that the two provisions have been held to have the same scope and purpose]), respondent addresses Tripp's state and federal due process claims simultaneously.

given to the evidence. (*Ibid.*; accord *Superintendent v. Hill, supra*, 472 U.S. at p. 455.) If the Governor has duly considered the prisoner's individual parole suitability in light of the specified criteria, the only relevant question for the court to decide is whether there is any evidence to support the Governor's reversal. (*Rosenkrantz*, at p. 677.)

The Governor does not act arbitrarily when relying on the commitment offense to deny parole, despite how remote the offense was to the parole consideration hearing. (Pen. Code, § 3041, subd. (b); Cal. Code Regs., tit. 15, § 2402, subds. (b), (c)(1); *In re Dannenberg, supra*, 34 Cal.4th at p. 1095; *In re Rosenkrantz, supra*, 29 Cal.4th at pp. 679-680, 682-683; *Sass v. California Bd. of Prison Terms, supra*, 2006 WL 2506393, at *4.) In fact, the commitment offense is the paramount factor in determining one's suitability for parole. (See Pen. Code, § 3041, subd. (b) [identifying the commitment offense and one's criminal history only as a basis for not setting a parole date]; *Dannenberg*, at p. 1084 [noting the overriding statutory concern for public safety] and p. 1071 [noting that the parole authority can decide that "the particular facts of the offense make it unsafe, at that time, to fix a date for the prisoner's release"].) Similarly, the Governor properly relies on the commitment offense alone to deny parole when the crime involves violence and viciousness beyond the minimum necessary to convict for that offense. (*Dannenberg*, at p. 1095; *Rosenkrantz*, at p. 683 [finding that the "the [parole] authority properly may weigh heavily the degree of violence used and the amount of viciousness shown by a defendant"].)

Here, Tripp's crime involved violence and viciousness beyond the minimum necessary to convict her of second degree murder. (*In re Dannenberg, supra*, 34 Cal.4th at p. 1095.) Tripp was instrumental in the ultimate abduction and murder of ten-year-old Tameron. Tripp and Tameron had a trusting friendship. Tripp requested that Tameron go to the store to

13

buy items to take with them swimming, all the while knowing that her co-defendants were going to abduct Tameron. Thereafter, Tripp's co-defendants took Tameron back to Tripp's makeshift residence and viciously killed Tameron by tying rope around her neck and strangling her in a type of tug-of-war action. Tameron's death involved unimaginable terror and horror and was vicious beyond that necessary to sustain a conviction for second degree murder. (Compare *In re Dannenberg, supra*, 34 Cal.4th at p. 1095 [finding that the crime was especially callous and cruel when the prisoner either put the incapacitated victim's head in a bathtub full of water or left her head in the water until she died]; *In re Lowe* (2005) 130 Cal.App.4th 1405, 1427 [finding that the prisoner acted with cold, calculated dispassion when he shot the sleeping victim five times in the head and chest, the prisoner and the victim had a trusting relationship, and the prisoner kept the victim's body in a coffin]; with *In re Smith* (2003) 114 Cal.App.4th 343, 367 [finding no evidence that the murder evidenced an exceptional callousness when the prisoner killed the victim instantly and did not unnecessarily prolong her suffering and pain]). Accordingly, the crime was especially heinous, atrocious, and cruel in that Tameron's strangulation was carried out in a dispassionate and calculated manner and Tameron's strangulation was akin to torture. (Cal. Code Regs., tit. 15, § 2402, subd. (c).)

Further, Tripp admits that when things did not go as planned, she suspected something might have gone wrong and she could have prevented the murder from happening, but she did not do so. (Ex. 4 at pp. 15, 18-19.) Thus, Tripp's actions exhibited an especially callous disregard for human suffering. (*Ibid.*) Also, Tripp's motive of obtaining money and double-crossing her step-father was trivial in relation to the atrocious death Tameron endured. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(E).)

Tripp appropriately concedes that she is as responsible for Tameron's

14

death as are her co-defendants who actually pulled the cord around
Tameron's neck until she died. (See Ex. 4 at p. 22; Ex. 12 at p. 2; Ex. 14 at
p. 5.) And this court should not find differently. "Whether petitioner
planned, condoned or anticipated the specific act is irrelevant. . . . He is
responsible for all the reasonably foreseeable acts of violence during the
crime. Petitioner's codefendant was convicted of first-degree murder. He
thereby was held responsible for petitioner pulling the trigger. So too is
petitioner responsible for his partner's brutality." (*Machado v. Kane* (N.D.
Cal. Feb. 22, 2006, No. C 05-01632 WHA) 2006 WL 449146.) Here, Tripp
could have reasonably foreseen that Tameron would be killed, considering
that they had originally planned to kill Tameron's older sister for the same
purpose of preventing her testimony. (Ex. 4 at pp. 12-14; Ex. 5 at p. 1.)
Accordingly, this court should find that Tripp's failure to actually strangle
Tameron does not mitigate the egregiousness of her acts.

And the Ninth Circuit's comment in *Biggs* that continued reliance on
the commitment offense may result in a due process violation does not
undermine the Governor's decision because the comment was merely dicta.
(Compare *Biggs v. Terhune, supra,* 334 F.3d at p. 916 with *id.* at p. 917.) In
addition, the *Biggs* court did not definitely state that such reliance would
violate due process, only that it could. (*Id.* at p. 917.) Further, the Ninth
Circuit itself recently undermined its statements in *Biggs*. (*Sass v. California
Bd. of Prison Terms, supra,* 2006 WL 2506393, at *4.) Moreover, the
comment of the *Biggs* court is contrary to the California Supreme Court's
decision in *Dannenberg,* where the court found that "an inmate whose
offense was so serious as to warrant, at the outset, a maximum term of life in
prison, may be denied parole during whatever time the [executive
decisionmaker] deems required for 'this individual' by 'consideration of
public safety.'" (*In re Dannenberg, supra,* 34 Cal.4th at p. 1084, quoting

Pen. Code, § 3041, subd. (b).) Finally, the Ninth Circuit's rulings are merely persuasive authority for the state courts, even regarding matters of federal law. (*Adams v. Pacific Bell Directory* (2003) 111 Cal.App.4th 93, 97.)

Moreover, the Governor's decision reflects an individualized consideration of Tripp's parole suitability. The Governor acknowledged Tripp's positive gains during her 23 years in prison, and her laudatory reports, positive evaluations, and viable parole plans. (Ex. 4 at p. 2.) But in weighing all relevant, reliable evidence in determining Tripp's suitability for parole, the Governor concluded that the gravity of the crime presently outweighed the positive factors supporting parole. The Governor has the discretion to weigh the factors and ultimately determine that the positive factors are outweighed by the commitment offense. (See *In re Rosenkrantz, supra,* 29 Cal.4th at p. 677.)

And the Governor's decision was supported by some evidence. Tripp admitted that "It took a long time for me to get so messed up. I think it will take a number of years before I am to the point where I feel comfortable about myself and my self growth." (Ex. 16 at p. 2.) The Governor's decision properly reflects that Tripp's history of being a "lying deceitful person . . . since childhood" (Ex. 15 at p. 2) and her many years of being "messed up" require additional incarceration time before she can be safely paroled. In addition, Tripp's unstable social history, including her substance abuse problems and criminal acts, as well as the police department's opposition to Tripp's parole, are some evidence supporting the Governor's denial of parole. (Cal. Code Regs., tit. 15, § 2402, subds. (b)-(c); Pen. Code, § 3042, subds. (a), (f)(3) [providing that the parole authority must review the information received from the investigating law enforcement agency]); *In re Dannenberg, supra,* 34 Cal.4th at p. 1085 [finding that public input on one's parole suitability may be influential and even decisive in appropriate cases].)

Therefore, because some evidence supports the Governor's decision and otherwise comports with due process, this court must uphold his decision and deny the petition.

## CONCLUSION

This court should deny the petition because the Governor's reversal of Tripp's parole grant was in accordance with due process. The Governor considered Tripp's case individually in light of the specified factors, exercised his discretion in weighing those factors, and decided that the egregious circumstances of Tripp's crime rendered her an unreasonable threat to public safety if released.

Dated: September 6, 2006

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

MARY JO GRAVES
Chief Assistant Attorney General

JULIE L. GARLAND
Senior Assistant Attorney General

JENNIFER A. NEILL
Supervising Deputy Attorney General

DENISE A. YATES
Deputy Attorney General

Attorneys for Respondent D. Davison,
Warden at the Correctional Institution for
Women

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

In re

**BRANDEE TRIPP,**

On Habeas Corpus.

H-029507

## CERTIFICATE OF COMPLIANCE

Pursuant to California Rules of Court, Rule 33(b)(1), I certify that the text in the attached **RESPONDENT'S RETURN TO THE ORDER TO SHOW CAUSE; SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** was prepared in Corel WordPerfect 8, is proportionally spaced, and contains 4,662 words.

Dated:  September 6, 2005

Respectfully submitted,

BILL LOCKYER
Attorney General of the State of California

MARY JO GRAVES
Chief Assistant Attorney General

JULIE L. GARLAND
Senior Assistant Attorney General

JENNIFER A. NEILL
Supervising Deputy Attorney General

DENISE A. YATES
Deputy Attorney General

Attorneys for Respondents-Appellants

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:   **In re BRANDEE TRIPP**

No.:   **H-029507**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age and older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>September 6, 2006,</u> I served the attached

### RESPONDENT'S RETURN TO THE ORDER TO SHOW CAUSE AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

### EXHIBITS TO RESPONDENT'S RETURN TO THE ORDER TO SHOW CAUSE AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

| | |
|---|---|
| **Adrian T. Woodward, Esq** | **Sixth District Appellate Program** |
| **Law Offices of Adrian T. Woodward** | **Attn: Executive Director** |
| **4266 Atlantic Avenue** | **100 N. Winchester Blvd., Suite 310** |
| **Long Beach, CA  90807** | **Santa Clara, CA 95050** |
| Attorney for Brandee Tripp W-15695 | |

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **September 6, 2006,** at San Francisco, California.

| | |
|---|---|
| J. Tucay | *J. Tucay* |
| Declarant | Signature |

20058060.wpd