# EXHIBIT 12



## CALIFORNIA SUPREME COURT

|  |  |
|---|---|
| In re | Case No._____ |
|     BRANDEE TRIPP, | (Court of Appeal, Sixth District, Case No. H029507) |
|               Petitioner, | |
| For Writ of Habeas Corpus. | |

---

# PETITION FOR REVIEW

---

ADRIAN T. WOODWARD, Esq.
Law Offices of Adrian T. Woodward
State Bar # 184011
4266 Atlantic Avenue
Long Beach, CA 90807
Telephone: (562) 498-9666

Counsel for Petitioner
BRANDEE TRIPP

# *TABLE OF CONTENTS*

|  | Page No. |
|---|---|
| Petition for Review | 1 |
| Questions Presented for Review | 2 |
| Necessity for Review | 3 |
| Petitioner's Offense, Prior Record, and Commitment | 4 |
| Petitioner's Post-Conviction Record | 5 |
| Petitioner's Parole Risk Evaluations | 6 |
| Parole Proceedings | 6 |
| 1986-2001 | 6 |
| Petitioner's First Parole Grant & Reversal (2003) | 7 |
| Petitioner's Second Parole Grant (2004) | 7 |
| The Governor's Reversal of Petitioner's Second Parole Grant | 10 |
| Lower Court Remedy | 10 |
| Petitioner's Constitutional Claims | 12 |
| I.   THE GOVERNOR'S ACTION VIOLATED DUE PROCESS BECAUSE IT WAS BASED ON INCORRECT "FACTS" AND BREACHED THE EXPRESS TERMS OF PETITIONER'S PLEA BARGAIN | 12 |
| II.  BECAUSE THE GOVERNOR'S STAFF'S FINDING, THAT PETITIONER'S PAROLE POSES "AN UNREASONABLE RISK OF DANGER TO SOCIETY" AND THAT SHE IS THEREFORE UNSUITABLE FOR PAROLE, IS INAPPOSITE TO THE RECORD AND SUPPORTED BY NO EVIDENCE WHATSOEVER, PAROLE REVERSAL ON THAT BASIS ABROGATED DUE PROCESS AND PETITIONER'S LIBERTY INTEREST IN PAROLE | 21 |

In re BRANDEE TRIPP; Petition for Review

# TABLE OF CONTENTS
## *(Continued)*

III.   THE DECISION OF THE GOVERNOR'S STAFF
       BASED ON ARGUABLY APPLICABLE OFFENSE
       FACTORS VIOLATED DUE PROCESS BECAUSE IT
       ESTABLISHED  NO NEXUS TO PETITIONER'S
       CURRENT PAROLE RISK AND BECAUSE IT LACKED
       THE REQUISITE PREPONDERANCE OF EVIDENCE
       INDICATING THAT PETITIONER'S PAROLE NOW
       POSES AN UNREASONABLE RISK OF DANGER TO
       PUBLIC SAFETY                                         22


IV.   INTERMINABLE DENIAL OF PETITIONER'S PAROLE
       BASED SOLELY ON THE FACTS OF HER
       UNCHANGEABLE COMMITMENT OFFENSE
       VIOLATES DUE PROCESS BY AMENDING HER
       PRISON TERM TO LIFE WITHOUT ANY
       POSSIBILITY OF PAROLE                                 31

V.    REMAINING CONSTITUTIONAL CLAIMS                        42

Conclusion; Relief Requested                                42

# TABLE OF AUTHORITIES

**Cases**

*Biggs v. Terhune* (9th Cir. 2003) 334 F.3d 910 ...................................................... 25, 29, 32-34, 36-40

*Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155 ........................................................ 18

*Greenholtz v. Inmates of Nebraska Penal & Correctional* (1979) 442 U.S. 1 ................................. 40

*In re Brown* (1967) 67 Cal.2d 339 ........................................................................ 23

*In re Capistran* (2003) 107 Cal.App.4th 1299 .............................................................. 23

*In re Caswell* (2001) 92 Cal.App.4[th] 1017 ............................................................... 23

*In re Clutchette* (1974) 39 Cal.App.3d 561 ............................................................... 23

*In re Dannenberg* (2005) 34 Cal.4th 1061 ............................................................. 4, 18, 31

*In re Elkins* (2006) 144 Cal.App.4[th] 475 ........................................................ 26, 31, 40, 41

*In re Fields* (1990) 51 Cal.3d 1063 ..................................................................... 12

*In re Lee* (2006) 143 Cal.App.4[th] 1400 ........................................................... 27, 28, 40

*In re Lewallen* (1979) 23 Cal.3d 274 ................................................................... 12

*In re McClain* (1960) 55 Cal.2d 78 ..................................................................... 23

*In re Monzo* (1973) 33 Cal.App.3d 144 .................................................................. 23

*In re Powell* (1988) 45 Cal.3d 894 ..................................................................... 23

*In re Ramirez* (2001) 94 Cal.App.4[th] 549 ............................................................. 26

*In re Rosenkrantz* (2002) 29 Cal.4[th] 616 ..................................................... 11, 20, 24, 25, 26

*In re Scott* (2005) 133 Cal.App.4th 573 .......................................................... 23-26, 28-30, 37-41

*In re Sixto* (1989) 48 Cal.3d 1247 ..................................................................... 12

*In re Smith* (2003) 109 Cal.App.4th 489 .............................................................. 14, 22

*In re Smith* (2003) 114 Cal.App.4[th] 343 ............................................................ 14, 24

*INS v. St. Cyr* (2001) 533 U.S. 289 .................................................................... 18

*Irons v. Carey* (9th Cir. 2007) ___ F.3d ___, 2007 WL 656345 ................................... 33, 34, 36

*Irons v. Warden* (E.D.Cal. 2005) 358 F.Supp.2d 936 .................................................. 29, 37

*Johnson v. Finn* (E.D. Cal. 2006), 2006 WL 195159 .................................................. 29, 39

*Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038 .............................................. 38

*Martin v. Marshall* (N.D. Cal. 2006) 448 F.Supp.2d 1143 .............................................. 38

## TABLE OF AUTHORITIES
(Continued)

*McQuillion v. Duncan* (9th Cir. 2002) 306 F.3d 895 ........................................................... 37

*Newton v. Rumery* (1987) 480 U.S. 386 ........................................................................... 16

*People v. Barasa* (2002) 103 Cal.App.4th 287 ................................................................ 19

*People v. Collins* (1996) 45 Cal.App.4th 849 .................................................................. 16

*People v. Cunningham* (1996) 49 Cal.App.4th 1044 ......................................................... 16

*People v. Harvey* (1979) 25 Cal.3d 754 ...................................................................... 19, 20

*People v. Leroy* (1984) 155 Cal.App.3d 602 ................................................................... 17

*People v. Mancheno* (1982) 32 Cal.App.3d 855 .............................................................. 17

*People v. Nieto-Benitez* (1992) 4 Cal.4th 91 ................................................................... 14

*People v. Roberts* (1992) 2 Cal.4th 271 .......................................................................... 14

*People v. Sanchez* (2001) 86 Cal.App.4th 970 ................................................................ 14

*People v. Watson* (1981) 30 Cal.3d 290 ......................................................................... 14

*Rosas v. Nielsen* (9th Cir. 2005) 429 F.3d 1229 ............................................................. 37

*Rosenkrantz v. Marshall* (C.D. Cal. 2006) 444 F.Supp.2d 1063 ................................... 30, 40

*Sanchez v. Kane* (C.D. Cal. 2006) 444 F.Supp.2d 1049 ........................................ 30, 36, 38

*Santobello v. New York* (1971) 404 U.S. 257 .................................................................. 18

*Sass v. Cal. Board Of Prison Terms* (9th Cir. 2006) 461 F.3d 1123 ............................. 33-35

*Superintendent v. Hill* (1985) 472 U.S. 445 ................................................................. 37, 40


**Regulations**

15 CCR § 2000 .............................................................................................................. 5, 23

15 CCR § 2401 .............................................................................................................. 7, 31

15 CCR § 2402 ......................................................................................... 7, 14, 23, 28, 31

15 CCR § 2403 ................................................................................................................... 5

15 CCR § 2410 ................................................................................................................... 5

# *TABLE OF AUTHORITIES*
(Continued)

**Statutes**

Pen.C. § 190 ........................................................................................................... 26

Pen.C. § 2900.5 ........................................................................................................ 5

Pen.C. § 3000 ........................................................................................................... 42

Pen.C. § 3041 ......................................................................... 7, 26, 31, 32, 41

Pen.C. § 3041.2 ........................................................................................................ 7

Pen.C. § 4019 ........................................................................................................... 5


**Constitutional Provisions**

Cal.Const., Art.V, § 8(b) ........................................................................................ 7

ADRIAN T. WOODWARD, Esq.
Law Offices of Adrian T. Woodward
State Bar # 184011
4266 Atlantic Avenue
Long Beach, CA 90807
Telephone: (562) 498-9666

Counsel for Petitioner
BRANDEE TRIPP

## SUPREME COURT OF CALIFORNIA

|  |  |
|---|---|
| In re | Case No._____ |
| BRANDEE TRIPP, | (Court of Appeal, Sixth District, Case No. H029507) |
| Petitioner, | **PETITION FOR REVIEW** |
| For Writ of Habeas Corpus. | |

TO THE HONORABLE RONALD M. GEORGE, Chief Justice, and

THE HONORABLE ASSOCIATE JUSTICES of the California Supreme

Court:

## PETITION FOR REVIEW

Petitioner Brandee Tripp respectfully petitions the Court for review

of the decision of the Court of Appeal, Sixth Appellate District, filed on

March 28, 2007, case No. H029507, denying the petition for writ of habeas

corpus. A copy of the opinion of the Court of Appeal to be reviewed is

attached after page 44.

## QUESTIONS PRESENTED FOR REVIEW

1. Does due process permit the Governor's staff and Board of Parole Hearings (BPH) to interminably (*14 times* - by 12 BPH panels and 2 Governors) preclude parole for an indeterminately sentenced inmate who has indisputably maintained maximum parole suitability for more than 15 years and has been forensically assessed to pose a low parole risk to public safety, far below the State's codified "unreasonable risk of danger" parole unsuitability standard, based solely on the facts of a 25-year old second degree murder commitment offense in which she did not kill, attempt to kill, nor intend to kill and was not present when that offense occurred, after she has been imprisoned *twelve years* **longer** than the *maximum* prison term prescribed by the codified regulations for the facts of her second degree murder commitment offense, *fourteen years* longer *than her* ***actual prison term and the parole date set by two BPH granting panels,* and *four years* longer than the maximum prison term prescribed for a *first degree murder* with those very facts?

2. May a governor's staff reverse BPH parole grants and preclude parole interminably by repeated recitations of commitment offense facts without stating any nexus between such facts and the prospective parolee's current parole risk, the State's parole suitability determinant, even if the subject has been deemed a low or negligible parole risk and has served in excess of the prison term prescribed by the regulations for the committed offense with those particular facts?

## NECESSITY FOR REVIEW

Review is necessary to settle these issues of law, some being of first impression in this Court, and to settle varied holdings by the Courts of Appeal on these issues, which have widespread significance. This process, with which the Court is profoundly familiar, instigated and enforced by the Executive Branch, not to protect public safety (petitioner and hundreds like her have long been assessed forensically to pose a low or negligible public safety risk), but solely to insure the political popularity of our Governors, who seat BPH Commissioner-panelists for that very purpose, (1) has created an enormous, unnecessary cost of hundreds of millions of tax dollars to imprison thousands of parole suitable low-risk citizens, (2) has imposed enormous suffering upon these would-be citizens, many of whom are aged, ill, and dying, and upon hundreds of thousands of law-abiding state citizens – their parents, children, siblings, other relatives, friends and community members who would benefit by their parole, and (3) stands the State's parole determinations scheme on its proverbial head by precluding setting parole dates based on offense facts long after the prison terms prescribed for the offenses with those very facts have lapsed, and forever, until the subject dies in prison, having served the unimposed term of life without the possibility of parole.

The instant case is an ideal one to review because its fact pattern is a typical example of the sordid process being challenged, the question is one of first impression, and the case reflects blatant and widespread disregard and disrespect of this Court's caveat against it set forth in Justice Moreno's concurring opinion in *Rosenkrantz*.

The Court opened the door to the Executive Branch's abuse of due process and the State's parole process when it held in *Dannenberg* that "some," i.e., *any* evidence that a serious offense was committed decades ago justifies the denial of parole even to one like Ms. Tripp who is by all standards overly qualified for parole, poses the lowest parole risk to public safety possible, and whose imprisonment exceeds by far the longest prison term prescribed by the regulations for the most aggravated version of her offense. Petitioner respectfully suggests that the time has come for the Court to at least partially close that door to further abuse by holding that the process may not be perpetrated interminably as it is now, converting thousands of such prison terms to life without any possibility of parole.

## PETITIONER'S OFFENSE, PRIOR RECORD, & COMMITMENT

On February 11, 1981, pursuant to her guilty plea to second degree murder, petitioner was sentenced by the Monterey County Superior Court, case no. CR7639, to 15 years-to-life for the July 3, 1979, murder of Tameron Carpenter. (Exhibit A.) At the time petitioner was 20 years old and had no prior criminal record. (Exhibit B, pp. 10-11, 23-25.)

Randy Cook and Hilton Tripp, petitioner's husband, kidnapped the victim, age 10, in order to receive $1,000 promised by William Record (Record), petitioner's stepfather, to prevent the victim from testifying against Record in a child molestation case. Cook and Hilton Tripp eventually choked, killed, and buried the victim. Petitioner, as revenge against Record who had sexually molested and physically abused her since she was seven years old, planned to keep Tameron's whereabouts secret, then to release her to insure Tameron's testimony against him. She sent

Tameron to the store, where she would be abducted by her husband and Cook. Petitioner, who did not plan or anticipate a murder, has since before her commitment accepted responsibility and admitted her role in the offense. (Exhibit B, pp. 10-21, 23-27.)

Petitioner was committed to prison on February 18, 1981. Her minimum eligible parole date (MEPD)[1] lapsed on May 6, **1989**. (Exhibit B, p.1.) The <u>maximum</u> prison term prescribed by the regulations for the facts of petitioner's particular second degree murder lapsed in **1992**.[2] The net prison term set by the 2004 BPH parole hearing panel, 131 months, when reduced by 29 months of pre-sentencing credits, lapsed in **1990**. (Exhibit B, p. 69.) Likewise, the prison term prescribed for petitioner's criminal conduct, had it resulted in a *first degree murder* conviction, lapsed 4 years ago in 2003.

## PETITIONER'S POST-CONVICTION RECORD

Petitioner has maintained an exemplary, disciplinary-free record for more than 16 years. Her last infraction occurred in 1988 (failure to report to work). Her work supervisors' reports are consistently excellent. Her classification score (19) is the lowest attainable for a lifer. Petitioner earned her GED and became certified in two vocations, Word Processing

---

[1] The minimum eligible parole date (MEPD) is defined as "the earliest date on which an ISL or life prisoner may be released on parole." (15 CCR § 2000(b)(67).)

[2] 15 CCR § 2403(c) prescribes a maximum base term of 18 years (subsec. II-A: victim had relationship to prisoner but not directly assaulted by prisoner), to be reduced by 64 months of postconviction credit (4 months for each of 16 disciplinary-free years of imprisonment per 15 CCR § 2410), resulting in a net maximum prison term of 12 years, 8 months, which must be further reduced by deducting 875 days of pre-sentencing Pen.C. §§ 2900.5, 4019 credit (exhibit A), resulting in a parole date that lapsed in *1992*.

and Forklift Operation. She has successfully completed all applicable therapy and self-help programming, including attendance in AA and NA since 1988, Women Against Abuse, Relapse Prevention, Breaking Barriers, Drug Awareness Counseling, New Beginnings, SOS, Inmate Assistance Module, American Bible Program, and Arts in Corrections. Petitioner's file is replete with laudatory chronos for her conduct, work, and reform from custody and free staff, and for her charitable work. Her parole plans, repeatedly approved by BPH, include offers of employment, a residence, and substantial family and community support. BPH has consistently acknowledged petitioner's exemplary record of good conduct, work, reform, and rehabilitation. See exhibit A, pp. 65-68; exhibit E.

## PETITIONER'S PAROLE RISK EVALUATIONS

In recent years petitioner has been uniformly evaluated to pose a low (if any) parole risk. In the current psychological evaluation Peter Hu, M.D., a forensic psychiatrist, concluded that petitioner has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. (Exhibit D, p. 3.) Two years earlier, a different forensic psychiatrist Robert D. McDaniel, M.D., reached the same conclusions. (Exhibit D, pp. 5-6.) The same assessment occurred in 1999. (Exhibit D, pp. 13-14.)

## PAROLE PROCEEDINGS
### 1986-2001

At **twelve** parole hearings between 1986 and 2001, BPH panels found petitioner unsuitable for parole based largely or entirely on her

commitment offense, and therefore refused to set her prison term or a parole date.[3] At her ten hearings since 1990, the panels scheduled petitioner's subsequent hearing in one year, the shortest interval permitted.[4]

### Petitioner's First Parole Grant and Reversal (2003)

On November 6, 2002, a BPH panel unanimously found petitioner suitable for parole and set her prison term and a parole date. The panel's grounds for suitability were similar to those set forth at petitioner's 2004 hearing, detailed below.

Predictably, on April 4, 2003, former Governor Gray Davis, exercising his authority under Pen.C. § 3041.2 and Art. V, § 8(b) of the California Constitution, as he promised to do in all murder cases, reversed petitioner's parole grant based on her commitment offense.

### Petitioner's Second Parole Grant (2004)

On May 17, 2004, a new panel unanimously found petitioner suitable. The panel addressed at length the findings stated by Governor Davis for his reversal of the previous panel's grant of parole, and read his report into the record. See exhibit B, pp. 29-38, 48-54. Neither the District

---

[3] The parole statutes and regulations prescribe a two-step process: The panel first determines whether a lifer is suitable or unsuitable for parole based on a preponderance of the evidence addressing the issue of whether parole would pose "an unreasonable risk of danger" to "public safety." The panel proceeds to the second step of determining the length of the prison term and a parole date for lifers it finds to be suitable for parole. Pen.C. § 3041(b); 15 CCR §§ 2401, 2402(a), (b).

[4] Petitioner's counsel will provide, upon the Court's request, certified copies of her past parole hearing transcripts. The transcript of petitioner's 2004 parole hearing is attached as exhibit B.

Attorney nor members of the victim's family opposed parole.  The panel explained in detail the grounds for its finding of suitability:

> The Panel reviewed all information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison.
>
> The prisoner, while imprisoned, has enhanced her ability to function within the law upon release through participation in educational programs.  She has obtained a GED [and] a vocational certificate in forklift operation and also in vocational word processing . . . She's been in AA and NA since . . . 1988.  She's been in the SOS program.  She's taken the Women Against Abuse program, the American Bible Academy, Arts and Correctional Music Program, the Relapse Prevention program, the HIV AIDS Prevention program, and Breaking Barriers.  Her institutional job assignment is in the PIA working as a label mechanic operator since 2000, and she has received satisfactory work reports in that assignment.
>
> The prisoner lacks a significant criminal history of violent crime. Because of maturation, growth, greater understanding, and advanced age have reduced the probability of her recidivism.
>
> The prisoner has realistic parole plans, which includes a job offer and family support . . . I would rate the parole plans as superior.  She has a place to live at the Casa Solano, which is in Grover Beach [and two] job offer[s].
>
> The prisoner has maintained close family ties while in prison by letters and visits [and] has maintained positive institutional behavior, which indicates significant improvement in self-control.  She has had no 115s [disciplinary infractions] since 1988 . . . So we feel that she has a good disciplinary record while in custody.

Prisoner shows signs of remorse. She has indicated that she understands the nature and the magnitude of the offense and accepts responsibility for her criminal behavior and has a desire to change towards good citizenship.

The most recent psychological report, authored by Peter Hu, a staff psychologist, is favorable. He states:

> The inmate has not been dangerous within a controlled setting, and I do not believe that she will be dangerous if released to the community. The inmate has gained a healthier respect for the rights and privacy of others and appears to have followed diligently in the rules and regulations here at the institution. The inmate has been able to keep her pathological characteristics in control and she has obtained a certain level of peace and contentment with herself. Risk factor, as always, would be if she ever attempted to resort to acts of criminality, though given her peace and contentment, I do not suspect that to be the case.

The panel set petitioner's base term at the mid-term of 204 months prescribed by the regulations for the specific factors of her second degree murder including her relationship with the victim and the fact that she did not participate in the killing. The panel deduced 73 months of postconviction credit as prescribed in the regulations, resulting in a total period of confinement of 131 months. (Exhibit B, pp. 68-69.)

Parole conditions imposed by the panel included abstinence from alcohol and substance abuse therapy and testing. (Exhibit B, p. 69.)

In closing, the panel commented:

Couple of comments. I noticed that when you talked
About . . . your involvement in the crime, you were very
emotional. And I think that is a consideration. I also
took into consideration the fact that you've been denied
and still kept programming. You didn't give up. There's
a lot of people in the institution that will depend on you
because people who go out and make mistakes and
have to come back, it reflects on them. We as panel
members say, where did I go wrong. So you've got a
lot of things resting on you. But I want to say that I
didn't give you the date. You earned it. You've done a
good job in here. So good luck in the future. (Exhibit B,
pp.70-71.)

### The Governor's Reversal of Petitioner's Second Parole Grant

On October 11, 2004, Governor Schwarzenegger's staff reversed

petitioner's second parole grant, concluding as always, "I believe she

would pose an unreasonable threat to public safety if released from prison

at this time." (Exhibit C, p. 3.) The sole ground for that conclusion was

the 25-year-old commitment offense itself, described by the Governor's

staff as "premeditated," "monstrous," and demonstrative of "exceptional

depravity and an utterly callous disregard for human life and suffering" that

petitioner, who was in a "position of trust . . .could have prevented."

(Exhibit C, pp. 2-3.)

## **LOWER COURT REMEDY**

Petitioner respectfully draws the Court's attention to a few salient aspects of the Court of Appeal's unpublished opinion, attached after page 45 below.

The opinion is largely devoted to a discussion of whether petitioner anticipated that a murder would occur or participated in its planning. Petitioner has stipulated all along that she was present at a stage when murder was discussed and that she blames herself for not anticipating it and stopping the precedent kidnapping. The opinion's conclusion that the Governor could have reasonably interpreted the facts to implicate petitioner in planning the murder that eventually occurred in her absence is unavailing because by the time of the reversal at issue petitioner had served long in excess of the prison term prescribed for a premeditated *first* degree murder with these facts had she personally premeditated and committed it. See *In re Rosenkrantz* (2002) 29 Cal.4[th] 616, 689-690.

The opinion raises but does not address or adjudicate the crucial question of how long a commitment offense may be employed as the sole basis for precluding the parole of one sentenced to a prison term with the possibility of parole who has served in excess of the prison term prescribed by the regulations, even for the most aggravated version of the offense.

The opinion impliedly purports to disqualify this claim because petitioner, having offered to supply any additional transcripts of the previous hearings requested by the court, did not lodge all of them (approximately 2,000 pages of transcripts) in the Court of Appeal. Petitioner lodged transcripts and records of the parole proceedings at issue and notified the Court that approximately twelve additional transcripts

were available upon request. Importantly, the facts and statistics regarding the number of petitioner's parole hearings and the length of her imprisonment, set forth in the superior court and Court of Appeal petitions, *have not been contested* in respondent's briefs. See, e.g., *In re Fields* (1990) 51 Cal.3d 1063, 1070, fn. 2; *In re Sixto* (1989) 48 Cal.3d 1247, 1252; *In re Lewallen* (1979) 23 Cal.3d 274, 278 [facts alleged in habeas petition not disputed in respondent's briefs taken as true by reviewing court].

## PETITIONER'S CONSTITUTIONAL CLAIMS

The following constitutional claims, argument, and authorities were set forth in the superior court and Court of Appeal.

## I. THE GOVERNOR'S ACTION VIOLATED DUE PROCESS BECAUSE IT WAS BASED ON INCORRECT "FACTS" AND BREACHED THE EXPRESS TERMS OF PETITIONER'S PLEA BARGAIN

The Governor's sole ground for his "unreasonable risk"/parole unsuitability finding, petitioner's commitment offense, was legally untenable because (1) it was based on incorrect "facts" and (2) it improperly re-classified petitioner's offense and sentence as that for first degree murder in violation of her plea bargain and due process.

### 1. The Governor Relied on Incorrect Facts

The Governor stated petitioner, her husband, and Cook "decided to kidnap *and kill*" the victim, that petitioner "helped plan the kidnap *and*

*murder*." (Exhibit C, p. 2; emphasis added.) No such testimony was elicited against petitioner, who was not tried. In the perpetrators' trials, a single witness testified that he overheard the three defendants mention a possible killing. Petitioner did not contemplate murder or agree to do more than what she did, help set up the kidnapping by sending the victim to the store. She intended, as revenge against her stepfather who had sexually and physically abused her for 12 years, to keep Tameron's location secret until his trial and thereby insure her testimony against him. Petitioner was shocked and dismayed to learn of the victim's death. (Exhibit B, pp. 12-23.) Had petitioner known that Tameron would be harmed, she would not have participated even in the revengeful act.

Petitioner did not participate in, plan, anticipate, or contemplate a murder; she participated in a kidnapping. Notably, the prosecutor's office, although notified, did not submit documents or attend petitioner's hearing to claim otherwise. Contrary to the Governor's notion, petitioner's statements are not "inconsistent." For more than 25 years she has consistently maintained that although murder may have been discussed at one point, it was not in the plan that she helped initiate or anticipated by her – although her early acceptance of full responsibility for the offense has never been questioned.

Reversal of petitioner's parole grant based on the notion that she planned or premeditated a murder was arbitrary and violated due process.

## 2. "Utterly Callous Disregard for Human Life and Suffering"[5]

Use of this factor, recited in all of the Governor's parole reversals in second degree murder cases, is arbitrary because (1) "utterly" or otherwise petitioner did not disregard life or suffering because she did not plan, anticipate or know that a murder would occur and more importantly, because disregard for life is the *definition* of implied malice, an element of second degree murder, it could be used to reverse paroles granted in all second degree murder cases. In *People v. Roberts* (1992) 2 Cal.4th 271, this Court explained that the implied malice theory of second-degree murder applies:

> [W]hen a defendant, knowing that his or her conduct endangers a life, and acting with a conscious disregard of the danger, commits an act the natural consequences of which are dangerous to life. (*Roberts, supra,* 2 Cal.4th at pp. 281-282; emphasis added; See also CALJIC 8.11; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 93; *People v. Watson* (1981) 30 Cal.3d 290, 299-301; *People v. Sanchez* (2001) 86 Cal.App. 4th 970, 975-976, 981.)

Courts have repeatedly cautioned governors, who are bound by the same parole determination guidelines that govern BPH, against such reckless, routine use of these terms in cases like petitioner's in which they are inherent or do not apply. Because petitioner's offense was not in that category, parole reversal based on her planning and premeditating a murder or acting with disregard for life and suffering, an element of her offense, violated due process. See *In re Mark Smith* (2003) 109 Cal.App.4th 489, 506 & fn.9; also *In re Ernest Smith* (2003) 114 Cal.App.4th 343, 367.

---

[5] 15 CCR § 2402(c)(1)(D) lists the unsuitability factor, "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering."

### 3. Basing Parole Reversal on a Re-characterization of the Offense as a First Degree Murder Violated Due Process and Breached the Express Terms of Petitioner's Plea Bargain

In exchange for the State's promise to determine her offense to be second degree murder and her sentence to be that for second degree murder, petitioner waived her constitutional rights, pled guilty to that offense, and testified truthfully as promised in order to secure the State's first degree murder convictions of the two remaining defendants. In entering into the plea bargain, petitioner understood and relied on the fact that she would be eligible for parole around 1989 and that her parole suitability would be determined only by BPH according to the laws then in effect.

The Governor's staff's sole ground for reversing petitioner's parole grant was the commitment offense, re-cast as a first degree murder. The Governor's staff stated that petitioner "premeditated" the offense, that she "planned" the victim's murder. (Exhibit C, p. 2.) Aside from the falsity of that finding, reversal on that basis violated the express term of petitioner's plea agreement that the offense was *not* premeditated, *not* first degree, and did *not* involve the planning of a murder on her part. Petitioner's claim is not diminished by this Court's ruling in *Rosenkrantz* because the defendant in that case knew that his not guilty plea exposed him to sentences for first or second degree murder or manslaughter. Petitioner, on the other hand, contracted with the state for a specific prison term to be determined as it was at the time the contract was entered into.

Whether "some evidence" existed that petitioner planned or premeditated a murder is also irrelevant because the Contract and Due

Process Clauses prohibit the State from reneging on its promise. The Legislative Branch has decreed a different and less severe punishment for second degree murder than that prescribed for first degree murder. When the Executive Branch enters into a plea bargain with a defendant it binds itself, as when enacting a contract, to the terms of that plea. If the principal term of a plea is that the murder be designated as being of the second degree, then plainly, it is a violation of the plea for a different division of the Executive Branch to unilaterally re-characterize the agreed-upon offense in order to increase the punishment. The Judicial Branch, by accepting a plea reducing a first degree murder to a second degree, places a constitutional imprimatur upon the contract and is available to either party seeking redress. See *People v. Cunningham* (1996) 49 Cal.App.4th 1044, 1047: "A plea agreement is, in essence, a contract between the defendant and the prosecutor to which the court consents to be bound."

Sometimes it is the defendant who breaches the plea. In *People v. Collins* (1996) 45 Cal.App.4th 849, 863, when the defendant breached the plea bargain by refusing to testify as promised against a co-defendant, the Court of appeal held: "The reciprocal nature of a plea bargain agreement mandates that either party to the agreement be entitled to enforce the agreement in a situation where the party is deprived of the benefit of the bargain." Usually, all that is required of a defendant is to waive his or her constitutional rights and accept immediate punishment. See *Newton v. Rumery* (1987) 480 U.S. 386, 394: "When the State enters a plea bargain with a criminal defendant, it receives immediate and tangible benefits, such as promptly imposed punishment without the expenditure of prosecutorial resources." After a defendant has performed his or her part of the bargain

the remedy of specific performance of the State's obligation exists. (*People v. Leroy* (1984) 155 Cal.App.3d 602, 606; *People v. Mancheno* (1982) 32 Cal.3d 855, 860.)

Petitioner gave the State much more than the usual acceptance of immediate punishment. She agreed to testify against the codefendants. In doing so, petitioner substantially assisted the prosecutor and State in securing two first degree murder convictions, and exposed herself to the fright and peril of a "rat jacket" that has persisted throughout 25 years of her imprisonment.

The government insures a defendant that her punishment will be imposed *as contemplated at the time of the plea*. Although remedying the Governor's breach of a plea agreement may vindicate the rights of a disrespected member of society, it focuses the Court's resources on the honor of the government and the fair administration of justice. Fundamental precepts of due process are abrogated when, in order to extract additional punishment from an agreement entered by a defendant, the State increases the punishment by increasing the degree of the offense pled.

Respondent may argue that it was never an explicit term of the plea that the Governor would be bound by the prosecutor's and plea court's concession that the offense be designated as second degree murder. What then, was the purpose of the plea bargain? Petitioner, who had insisted on a jury trial and had valid defenses available, did not intend to give the State everything she had fought against to that point. It would be absurd to believe that when a defendant enters into a plea to second degree murder she does so to have her punishment fixed as that contemplated for first

degree murder. Please see the recent BPH case of *Brown v. Poole* (9th Cir. 2003) 337 F.3d 1155, citing *INS v. St.Cyr* (2001) 533 U.S. 289, 322-323, 325 [inferring based on general analysis of what would motivate defendants to accept plea agreements that particular "defendant 'almost certainly' relied on availability of particular relief"].

It was not a term of the plea that a governor would have the power of nullification.[6] No defendant at the time would have entered such a plea, and defense counsel for such a defendant would have been derelict for not warning the client of the illusory nature of such a "deal," which would betray the District Attorney's ethical duty, as a representative of the state, to conduct the state's business fairly and honestly. See *In re Ibarra* (1983) 34 Cal.3d 277, 289 [illusory concessions offered by state in plea bargain constitute "a species of fraud"]; *Santabello v. New York* (1971) 404 U.S. 257, 261 [plea bargain contracts "presuppose fairness in securing agreement between an accused and a prosecutor"].

The Governor may argue, as suggested recently in *In re Dannenberg* (2005) 34 Cal.4th 1061, that even if the offense is designated as second degree murder, his staff must still be able to decide whether it was a particularly egregious example of that offense or whether petitioner's role was more than the minimum necessary to constitute its elements, and for that reason, deny parole. The notion is tantamount to a claim to unfettered discretion that disrespects the terms of the plea bargain. Further, an inability to define the offense as a more serious, first degree murder, does not deprive the Governor's staff of the use of any of BPH's other codified

---

[6] The Governor's authority to modify and reverse BPH parole grants did not exist until 1989, an issue argued in the Appellate Court.

factors indicating parole unsuitability; e.g., serious prison misconduct, unviable parole plans, or failure to reform or participate in therapy or other programming.

Requiring parole decisions to be based on the crime being second degree murder was the *only* benefit petitioner would receive from her plea. When, as here, the only basis for a Governor's jurisdiction over petitioner is her plea bargain, contract law and her due process and liberty interest rights compel a Governors' strict compliance with its terms, which absolutely precluded the actions of Governors Davis and Schwarzenegger that have twice extended her prison term. On this issue, the Courts have explained:

> It would be improper and unfair to permit the sentencing court to consider any of the facts underlying the dismissed count for purposes of aggravating or enhancing defendant's sentence. Count three was dismissed in consideration of defendant's agreement to plead guilty to counts one and two. Implicit in such a plea bargain, we think, is the understanding (in the absence of any contrary agreement) that defendant will suffer no adverse sentencing consequences by reason of the facts underlying, and solely pertaining to, the dismissed count.

(*People v. Barasa* (2002) 103 Cal.App.4th 287, 291, quoting *People v. Harvey* (1979) 25 Cal.3d 754, 758.)

Thus, for at least 25 years it has been held legally untenable to circumvent a plea by using the material the People bargained away against the defendant. Courts hold the principle "implicit" – it is <u>implicit</u> in a plea bargain reducing the charge of first degree murder to second degree murder that the indeterminate sentence will not, in actual fact, be based on a representation of the crime as a first degree murder, eliminating all benefit

to the defendant from the plea bargain under the guise and expediency of quasi-judicial action by political appointees. This Court holds that the State "cannot with one hand give a benefit and with the other take it away." (*People v. Harvey, supra,* 25 Cal.3d at p. 758.)

Had the prosecutor or trial judge believed that petitioner had acted in a "brutal," or "premeditated" manner or that her role in the offense amounted to first degree murder, there would have been no plea bargain. *Petitioner's second degree plea resulted from the prosecutor's obvious difficulty in proving the elements of first degree murder; specifically, that she planned the murder and acted with premeditation.*

Because the Governor's staff's action depriving petitioner of parole was based on a nonexistent conviction of a planned, premeditated first degree murder and overtly violated petitioner's plea contract with the State, it must be set aside.

It is particularly noteworthy that petitioner has served 4 years in excess of the *maximum* term prescribed for her offense had it resulted in her conviction of *first* degree murder. In such a case, this Court in *Rosenkrantz,* a second degree murder case, warned:

> [T]here will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a *first degree* murder in order to promote the parole statute's goal ... Under this circumstance, the justification for denying his parole would become less clear, even under the deferential "some evidence" standard. (29 Cal.4[th] at p. 691.)

In re BRANDEE TRIPP; Petition for Review – Page 20

## II. BECAUSE THE GOVERNOR'S STAFF'S FINDING, THAT PETITIONER'S PAROLE POSES "AN UNREASONABLE RISK OF DANGER TO SOCIETY" AND THAT SHE IS THEREFORE UNSUITABLE FOR PAROLE, IS INAPPOSITE TO THE RECORD AND SUPPORTED BY NO EVIDENCE WHATSOEVER, PAROLE REVERSAL ON THAT BASIS ABROGATED DUE PROCESS AND PETITIONER'S LIBERTY INTEREST IN PAROLE

The Governor's staff's basis for reversing petitioner's parole grant was a boilerplate recitation that her parole poses an "unreasonable threat to public safety if released from prison at this time." (Exhibit C, p. 3.) The sole ground stated by the Governor's staff in support of that conclusion, the commitment offense, is detailed herein. Parole denial on that basis abrogated due process because *no* evidence whatsoever, not even the 25-year old commitment offense, supports the notion that petitioner's parole poses an unreasonable risk and because *all* evidence in the record (which Governor Schwarzenegger did not review) that addresses her current parole risk and potential danger to public safety, assesses these factors as low. Not a speck of evidence supports "the Governor's" contrary recitation.

The only reliable evidence of petitioner's current dangerousness and parole risk, her forensic psychiatric and correctional evaluations, are uniformly parole-favorable and assess these factors to be low. For several years, petitioner has been consistently evaluated to pose a low parole risk. Last year Peter Hu, M.D., a forensic psychiatrist, concluded that petitioner has accepted responsibility for her offense, has appropriate insight and remorse, and would not be dangerous if released to the community. (Exhibit D, p. 3.) Two years earlier, Robert D. McDaniel, M.D., reached

the same conclusions (exhibit D, pp. 5-6), as was the case in 1999. (Exhibit D, pp. 13-14.) Petitioner's last three correctional evaluations have likewise concluded that she would pose a low risk to public safety if paroled. (Exhibit D, pp. 3, 6, 14.)

*All* forensic documentary evidence addressing petitioner's level of danger and parole risk developed over the past 6 years places her in the lowest category. *No* evidence supports Governor Schwarzenegger's staff's contrary notion that petitioner's parole poses "an unreasonable threat." Parole reversal based on such a whim abrogated due process and petitioner's liberty interest in parole. See *In re Smith* (2003) 109 Cal.App. 4th 489, 506-507 [no evidence supporting Governor Davis' "unreasonable risk" grounds; parole ordered].

## III. THE DECISION OF THE GOVERNOR'S STAFF BASED ON ARGUABLY APPLICABLE OFFENSE FACTORS VIOLATED DUE PROCESS BECAUSE IT ESTABLISHED NO NEXUS TO PETITIONER'S CURRENT PAROLE RISK AND BECAUSE IT LACKED THE REQUISITE PREPONDERANCE OF EVIDENCE INDICATING THAT PETITIONER'S PAROLE NOW POSES AN UNREASONABLE RISK OF DANGER TO PUBLIC SAFETY

For years BPH panels and governors' staffs have inappropriately employed the some evidence standard reserved for a ***reviewing court's*** assessment of executive decisions by routinely finding prospective parolees unsuitable for parole based on *some* or *any* evidence of a serious commitment offense. Petitioner's case is a classic example.

BPH decisions must be based on "good cause," defined as *a preponderance of the evidence* that there is a factual basis and good reason for the decision made.[7] Even a parole decision supported by some evidence may violate due process if the panel did not consider and weigh all parole-favorable evidence. (*In re Scott, supra*, 133 Cal.App.4th at p. 596 et seq.; *In re Capistran, supra*, 107 Cal. App. 4th at p. 1306.)

15 CCR § 2402(c) lists six "circumstances tending to show *unsuitability*" of which but one, the commitment offense, *arguably* applied to petitioner's parole risk. The other five factors were either not cited by the Governor because they were absent ("unstable social history," "sadistic sexual offenses," "psychological factors," "previous record of violence," and, "serious institutional misbehavior").

15 CCR § 2402(d) lists nine "circumstances of *suitability*." ALL eight factors applicable (Battered Women's Syndrome *may not have* applied) favored petitioner's parole ("no juvenile record," "stable social history," "signs of remorse," "lack of criminal history," "inmate's present age reduces the probability of recidivism," "realistic plans or marketable skills that can be put to use upon release," "stress" and "institutional behavior").

Because, of the fourteen codified parole suitability and unsuitability factors in the regulations that apply to petitioner, *thirteen* (all but, arguably,

---

[7] Decisions determining parole must be based on "good cause." (*In re Powell* (1988) 45 Cal.3d at p. 901; *In re Brown* (1967) 67 Cal.2d 339, 342; *In re McClain* (1960) 55 Cal.2d 78, 87; *In re Caswell* (2001) 92 Cal.App.4th 1017, 1024, 1026; *In re Clutchette* (1974) 39 Cal.App.3d 561, 565; *In re Monzo* (1973) 33 Cal.App.3d 144, 147.) The Board's regulations define good cause as a preponderance of the evidence. (15 CCR § 2000(b)(50).)

the commitment offense) *favored* her parole, denial of parole based solely on the offense satisfied neither the preponderance of the evidence standard nor fundamentally fair decision-making required by due process.

Petitioner is not asking the Court to abandon its chosen standard of review, but to determine if the Governor violated due process by rendering a decision he knew to be contrary to the preponderance of the evidence standard for parole determinations.

In *In re Scott, supra*, 133 Cal.App.4[th] 573, the Court of Appeal explained why reliance on the gravity of a second degree murder did not constitute "some evidence" that Scott was currently unsuitable for parole; it was far outweighed by evidence of Scott's exemplary reform and low parole risk confirmed by his forensic evaluations. The Court explained:

> The Governor's determination that the gravity of Scott's offense shows him unsuitable for release is doubly flawed . . . [P]utting aside factors relating to his offense and prior conduct, there is no dispute that all other applicable regulatory criteria clearly indicate Scott is suitable for release on parole. He [ ] possesses a stable social history, has performed acts which tend to indicate the presence of remorse, his age reduces the probability of recidivism, he has made realistic plans for release, and his activities while in prison indicate an enhanced ability to function within the law. The chief reason the Governor nevertheless found Scott unsuitable for release was the gravity of his offense.

> . . . [the] Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense "alone" is correct (*Rosenkrantz, supra,* 29 Cal.4th at p. 682, 128 Cal.Rptr.2d 104, 59 P.3d 174) [ ] but the proposition must be properly understood . . . Reliance on such an immutable factor "without regard to or consideration of subsequent circumstances" may be unfair (*In re Smith* (2003) 114 Cal.App.4[th] 343, 372, 7 Cal.Rptr.3d 655), and "runs

In re BRANDEE TRIPP; Petition for Review – Page 24

contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." (*Biggs v. Terhune, supra,* 334 F.3d at p. 917.) . . .

The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time...Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny . . .

Before explaining the insufficiency of this evidence, it is necessary to remember that denial of parole based upon the nature of the offense alone may rise to the level of a due process violation . . . For example, premeditation was considered in *Rosenkrantz* because, though the prisoner had been convicted only of second degree murder, the evidence showed " 'a full week of careful preparation, rehearsal and execution,' " and that the prisoner, who "fired 10 shots at close range from an assault weapon and fired at least three or four shots into the victim's head as he lay on the pavement," carried out the crime with "planning, sophistication or professionalism." (*Rosenkrantz,* at p. 678, 128 Cal.Rptr.2d 104, 59 P.3d 174.)

. . . the record contains no evidence Scott committed his offense "in an especially heinous, atrocious or cruel manner," or that the nature of his crime indicates he poses a continuing threat to the public safety if released. Indeed, the record contains abundant uncontradicted evidence to the contrary. All of the many psychological evaluations of Scott [indicated] there was a low risk he would commit another violent act if released . . .The life prisoner evaluation report prepared by the Department of Corrections reached the same conclusion . . .he "would pose a low degree of threat to the public at this time if released from prison." The Governor may believe Scott would pose an unreasonable risk of danger to society if now released

from prison, but that opinion finds no factual support whatsoever in the record that was before him.

(*In re Scott, supra,* 133 Cal.App.4th at pp. 594-596.)


The decision of the *Scott* court was recently reinforced by another Court of Appeal.  See *In re Elkins* at pp. 30-31, 40-41 of this brief.

The applicability of offense factors is the *exception*, not the rule the Governor's staff has apparently adopted, pursuant to the regulations' "exceptionally" prefix, and to the mandate of Pen.C. § 3041(a) that parole "shall normally" be granted.  As this Court has held:

> The Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by <u>Penal Code section 3041</u>, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (<u>Pen. Code, § 190</u> et seq.) [¶] Therefore, a life term offense or any other offenses underlying an indeterminate sentence must be particularly egregious to justify the denial of a parole date.

(*In re Rosenkrantz, supra,* 29 Cal.4th at p. 683; quoting *In re Ramirez, supra,* 94 Cal.App.4th at p. 570.)


Perhaps most importantly, the statute requires that parole "shall normally" be granted (Pen.C § 3041(a)), *unless* "the gravity of the current convicted offense or offenses, or the timing and gravity of the current or past convicted offense or offenses, is such that a consideration of

the public safety requires a more lengthy period of incarceration for this
individual, and that a parole date, therefore, cannot be fixed at this
meeting." (Subd. (b).)  The statute and petitioner's protected liberty interest
in its benefits require more than what the Governor's staff did – recite
alleged and inapplicable commitment offense factors to *presume* an alleged
current parole risk to public safety. Even the narrow "some evidence" test
requires evidence of a *nexus* between those facts and the alleged risk to
public safety currently posed by petitioner's parole.

The unambiguous language of the statute, that parole "shall
normally" be granted "unless" either the "timing" or "gravity" of the
commitment offenses *translates to* a current public safety risk, clearly
requires articulation of at least a minimal *nexus* between the facts alleged to
constitute a grave commitment offense, and a prospective parolee's *current*
parole risk.  Such a nexus may be established, e.g., if an offense was
caused by or related to alcohol, drugs, gangs, or other factors that the
inmate's prison record or forensic evaluations indicate may still be a public
safety concern.  The Governor's staff merely recited the codified verbiage
they inappropriately applied to the commitment offense, to imply that
public safety *therefore* requires her continued imprisonment (forever – the
offense facts can never change); it failed to suggest any nexus whatsoever
between the offense factors it recited and petitioner's current parole risk to
public safety.  **None** exists.

In *In re Lee, supra*, 143 Cal.App.4[th] 1400, the Court of Appeal, on
remand from this Court, in ordering Lee's release on parole, clarified the
"some evidence" standard as it applies to prospective California parolees
committed for second degree murder:

The test is not whether some evidence supports the *reasons* the Governor cites for denying parole, but whether some evidence indicates a parolee's release *unreasonably endangers public safety*. (Cal.Code Regs., tit. 15, § 2402, subd. (a) [parole denied if prisoner "will pose an unreasonable risk of danger to society if released from prison"]; see e.g. *In re Scott* (2005) 133 Cal.App.4th 573, 595 ["The commitment offense can negate suitability [for parole] only if circumstances of the crime ... rationally indicate that the offender will present an unreasonable public safety risk if released from prison"[.] Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.[FN3] (Emphasis in original.)

We must therefore view the Governor's two reasons within the context of the other factors he must consider to see if some evidence shows Lee continues to pose an unreasonable risk to public safety. (*In re Scott, supra,* 133 Cal.App.4th at pp. 594-595.) Applying that test, we find no evidence that Lee is likely to commit another crime or that his release would unreasonably endanger the public. Like the Governor, we do not minimize the seriousness of Lee's offenses 19 years ago, for which society has legitimately punished him. No reasonable possibility exists, however, that Lee will re-offend. [ ] The two reasons the Governor cites-the nature of Lee's crimes and recent acceptance of responsibility-do not change those facts. We conclude the Governor's reversal of the board's decision is therefore not supported by some evidence.

Simply from the passing of time, Lee's crimes almost 20 years ago have lost much of their usefulness in foreseeing the likelihood of future offenses than if he had committed them five or ten years ago. (*In re Scott, supra,* 133 Cal.App.4th 573, 595 [past crime's value for predicting future crime diminishes over time].)

(*In re Lee, supra,* 143 Cal.App.4th 1400, 1408-1409.)

In another second degree murder case, a California district court, in vacating a finding of unsuitability after the petitioner's **fourth** parole hearing for a second degree murder and ordering his release from prison, explained the nexus requirement:

> Here, petitioner had three prior parole suitability hearings, after each of which he continued to demonstrate "exemplary behavior and evidence of rehabilitation[,]" *Biggs,* 334 F.3d at 916, before the Board found him suitable for parole. Yet, petitioner has consistently maintained "positive institutional behavior" and "significant and proven self-control[,]" [] thus, "the predictive ability of the circumstances of the crime is near zero." *Irons,* 358 F.Supp.2d at 947 n. 2; *see also In re Scott,* 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905, 920
>
> ("The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison.
>
> Yet, the predictive value of the commitment offense may be very questionable after a long period of time."). Under these circumstances, the Governor's continued reliance on the circumstances surrounding the murder to deny petitioner parole violates due process of law. *Irons,* 358 F.Supp.2d at 947; *Scott,* 133 Cal.App.4th at 597-601, 34 Cal.Rptr.3d 905; *see also Johnson,* 2006 WL 195159 at *8 ("As recognized by the [Board,] the inhumanity of the murder will never change, it will not minimize in its shockingness over time. A later decision that the murder 'wasn't so bad' will never be made, and if it were, such a decision would be clearly arbitrary.
>
> Therefore, if the Governor's decision to deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measure parole eligibility on the reformation of the prisoner after the

proscribed period of punishment, parole eligibility is an impossibility, not a possibility. The parole statutes do not vest the Governor with the power to re-sentence petitioner.").

(*Sanchez v. Kane, supra,* 444 F.Supp.2d at pp. 1061-1062.)

Another recent decision by a California district court addressed the nexus issue in ordering the release of an inmate who committed a far more egregious second degree murder than petitioner. Please see the quotation from *Rosenkrantz v. Marshall* at pp. 38-40 below.

More recently the Court of Appeal addressed the nexus requirement in a *first* degree murder case. The defendant had beaten the victim to death with a baseball bat and dumped his body in a field. In ordering the inmate's release from prison, the court explained:

> . . . continued reliance on these aggravating facts of the crime no longer amount to "some evidence" supporting denial of parole . . . . The commitment offense, this court has observed, is an unsuitability factor that is immutable and whose predictive value "may be very questionable after a long period of time [citation]." ( *Scott II, supra,* 133 Cal.App.4th at pp. 594-595, fn. omitted.) We have also noted, as has our Supreme Court, strong legal and scientific support that "predictions of future dangerousness are exceedingly unreliable," even where the passage of time is not a factor and the assessment is made by an expert. ( *Id.* 595, fn.9.) Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation. ( *Id.* p. 595.)

> . . . Thus, a governor, in reviewing a suitability determination, must remain focused not on circumstances that may be aggravating in the abstract but, rather, on facts

indicating that release currently poses "an unreasonable risk of danger to society" ( § 2402, subd. (a)); accord, Pen.Code, § 3041(b)).

(In re Elkins, supra, 144 Cal.App.4th 475, 499.)

As these recent state and federal decisions hold, due process and the State's parole scheme (Pen.C § 3041; 15 CCR §§ 2401, 2402(a)) clearly required some nexus between the offense facts recited and the petitioner's current parole risk. Because none was set forth by the Governor's staff or exists in this case, denial of parole based on offense facts was arbitrary and violated due process, particularly after petitioner had been forensically evaluated not to pose an undue parole risk to public safety and had served *twelve years in excess* of the *maximum prison term*, prescribed by the Board's regulations for the facts of her offense, and (at the time) two years longer than the term prescribed for a *first* degree murder with those facts.

## IV. INTERMINABLE DENIAL OF PETITIONER'S PAROLE BASED SOLELY ON THE FACTS OF HER UNCHANGEABLE COMMITMENT OFFENSE VIOLATES DUE PROCESS BY AMENDING HER PRISON TERM TO LIFE WITHOUT ANY POSSIBILITY OF PAROLE

This Court in *Dannenberg* held that the facts of a commitment offense may *in some cases* serve as a ground to deny parole to an otherwise parole qualified inmate. *Dannenberg* did <u>not</u> hold, and cannot tenably be construed to permit the facts of an offense, because they are unchangeable, to serve as in petitioner's case as a valid basis on which to *interminably* deny her parole, converting her legislatively prescribed, judicially imposed

prison term of 15 years to life with the possibility of parole, which Pen.C. §
3041(a) defines as a probability of parole (Board "shall normally set a
parole release date"), to life without any possibility of parole. Please see
*Biggs*, *supra*, 334 F.3d at p. 916.

The Ninth Circuit reviewed the constitutional propriety of a BPH
panel's use of a <u>first</u> degree murder commitment offense to find a prisoner
unsuitable for parole at his *first* hearing. The Court found no evidence to
support most of the panel's grounds for unsuitability, but held that a
particularly egregious commitment offense could be an appropriate basis
for finding such a prisoner unsuitable for parole at an *initial* parole hearing.
The Ninth Circuit cautioned:

> As in the present instance, the parole board's sole supportable
> reliance on the gravity of the offense and conduct prior to
> imprisonment to justify denial of parole can be initially
> justified as fulfilling the requirements set forth by state law.
> Over time, however, should Biggs continue to demonstrate
> exemplary behavior and evidence of rehabilitation, denying
> him a parole date simply because of the nature of Biggs'
> offense and prior conduct would raise serious questions
> involving his liberty interest in parole. . . .
>
> A continued reliance in the future on an unchanging factor, the
> circumstances of the offense and conduct prior to
> imprisonment, runs contrary to the rehabilitative goals
> espoused by the prison system and could result in a due
> process violation.

(*Biggs*, *supra*, 334 F.3d at 916-917.)

*Biggs*' holding has been relied on in addressing the issue here raised
by petitioner, most recently in decisions by the U.S. District Courts for the

Central, Eastern, and Northern Districts of California, and more recently by
several California Courts of Appeal.

*Irons v. Carey* (9th Cir. 2007) ___ F.3d ___, 2007 WL 656345
("*Irons*") is the Ninth Circuit's third in a trilogy that includes *Biggs,* and
*Sass v. California Board of Prison Terms* (9th Cir. 2006) 461 F.3d 1123
("*Sass*"). In *Biggs, Sass, and Irons,* the Ninth Circuit adjudicated
petitioner's pivotal claim: whether, consistent with due process, the
unchanging facts of commitment offenses may be employed repeatedly or
interminably to preclude the parole of one like petitioner who indisputably
satisfies all parole requirements who is forensically evaluated to pose a low
parole risk, and who has served in excess of the appropriate or maximum
prison term prescribed by the regulations for an offense with those facts.

In *Irons* the Ninth Circuit held that the BPH panel's use of Irons'
crime, a *particularly egregious* second degree murder, at Irons' *fourth*
parole hearing, and *before he had served the minimum prison term imposed
by the trial court,* satisfied the "some evidence" test sufficiently to uphold
the BPH panel's decision finding that Irons was unsuitable for parole.

The Ninth Circuit first focused on Irons' egregious murder; he
fired 12 rounds into the victim, then, when he found the victim was still
alive, stabbed him twice. After leaving the corpse in a sleeping bag for
10 days, Irons removed and weighted it, and dropped it in the ocean.
Irons received a sentence of 17 years-to-life. Petitioner is serving 15
years-to-life for a second degree murder she did not commit but for which
she vas vicariously responsible.

The Ninth Circuit then emphasized that Irons, like Sass and Biggs
before him, had not served his minimum term, i.e., "the minimum number

of years to which they had been sentenced at the time of the challenged parole denial by the Board." In discussing *Biggs, Sass*, and *Irons*, the Court carefully noted that while each decision must rest on its own facts, neither Biggs, Sass, nor Irons had served their aforementioned "minimum" terms when the Board denied parole.

In *Irons* the Court explained why *Biggs* is still good law and was <u>not</u> overturned by *Sass*, and re-emphasized that ***continued use of commitment offense facts to find such an inmate unsuitable for parole may constitute a due process violation <u>after the minimum term has been served</u>***:

> In *Biggs*, we affirmed the district court's denial of a prisoner's petition for habeas corpus challenging the Board's determination that he was unsuitable for parole on the basis of his commitment offense. [ ] Although we held that the Board's decision was supported by "some evidence" because "[t]he murder of which Biggs was convicted involved killing a witness in a manner which exhibited callous disregard for life," we made clear that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.
>
> . . . Specifically, we held that a parole board's sole ... reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law. Over time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole. []
>
> Subsequently, in *Sass*, we held that denying parole to an individual in reliance on his offense of commitment did not violate due process. [] Although we acknowledged that *Biggs*

represents the law of this circuit and specifically noted that "continued reliance ... [on] the offense and on conduct prior to imprisonment ... could result in a due process violation,' " *id.*, we nonetheless held that the Board's reliance on the "gravity" of the second degree murder of which Sass was convicted, in combination with prior incidents of unlawful conduct, provided a sufficient basis for the Board to deem Sass unsuitable for parole.

Because the murder Sass committed was less callous and cruel than the one committed by Irons, and because Sass was likewise denied parole in spite of exemplary conduct in prison and evidence of rehabilitation, our decision in *Sass* precludes us from accepting Iron's due process argument or otherwise affirming the district court's grant of relief. *We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence.* Specifically, *in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.* [] All we held in those cases and all we hold today, therefore, is that, *given the particular circumstances of the offenses in these cases,* due process was not violated when these prisoners were deemed unsuitable for parole *prior to the expiration of their minimum terms.*

Furthermore, we note that in *Sass* and in the case before us there was substantial evidence in the record demonstrating rehabilitation. In both cases, the California Board of Prison Terms appeared to give little or no weight to this evidence in reaching its conclusion that Sass and Irons presently constituted a danger to society and thus were unsuitable for parole. *We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given*

In re BRANDEE TRIPP; Petition for Review – Page 35

> *the liberty interest in parole that flows from the relevant*
> *California statutes. Biggs*, 334 F.3d at 917.

(*Irons*,__F.3d__, 2007 WL 656345 at *5-6; emphasis added).

In the case at bench these facts are undisputed:  At the time of petitioner's 2004 reversal of her parole grant, she had appeared before *fourteen* BPH panels, she had been found suitable and granted parole by *two* of those panels, she had been imprisoned for more than *twenty-five years*.  Petitioner became eligible to parole *15 years earlier* in *1989* and had served *more than ten years in excess* of her minimum term of fifteen years imposed by the sentencing court (not counting time served in the county jail), and *twelve years in excess of the maximum* prison term prescribed by the regulations for the facts of her offense.  The Ninth Circuit's reasoning in *Irons* is relevant, depicting and prohibiting the precise due process violation argued by petitioner.

In *Sanchez v. Kane, supra*, 444 F.Supp.2d 1049, Sanchez had been denied parole for the fourth time, as compared to *ten* denials for petitioner, the only arguably viable ground being the gravity of his commitment offense, also a second degree murder.  The Court affirmed Sanchez' protected liberty interest in parole. (*Id.* at p. 1058.)  After rejecting several evidentiarily unsupported grounds, the Court, in ordering Sanchez' release, addressed the claim here at issue – the continued use of commitment offenses to repeatedly preclude Sanchez' parole:

> Finally, the Governor relied upon the callous nature and
> circumstances of the crime, stating "[i]t was a planned
> calculated and cold-blooded murder demonstrating
> exceptionally callous disregard for human suffering ··· [and
> it] involved particularly egregious acts beyond the
> minimum necessary to sustain a conviction of second-

degree murder." [] However, as the Board recognized, the events and circumstances surrounding petitioner's crime are unchanging. [] ("I want to explain to you that no matter what happens in your lifetime, the crime is never going to change. You understand that···· That's always going to be there, period···· [T]he crime is never going to change····").

Although the Board or Governor is "initially justified" in relying on the gravity of an inmate's offense in denying him parole, *Rosas*, 428 F.3d at 1232-33; *Biggs*, 334 F.3d at 916. "continued reliance ··· on an unchanging factor, the circumstances of the offense and conduct prior to imprisonment, runs contrary to the rehabilitation goals espoused by the prison system and could result in a due process violation." *Biggs*, 334 F.3d at 916-17; *Irons v. Warden of Cal. State Prison-Solano*, 358 F.Supp.2d 936, 947 (E.D.Cal.2005).

[See quoted portion of this case at pp. 29-30 above.]

. . . if the Governor's decision to deny parole based on the nature of the offense is permitted to stand, contrary to the parole statutes which logically measure parole eligibility on the reformation of the prisoner after the proscribed period of punishment, parole eligibility is an impossibility, not a possibility. The parole statutes do not vest the Governor with the power to re-sentence petitioner.").

For the reasons stated herein, the Court finds the Governor's reversal of the Board's grant of parole to petitioner is not supported by "some evidence" in the record, *Hill*, 472 U.S. 455-56, 105 S.Ct. at 2774; *McQuillion*, 306 F.3d at 912; thus, petitioner was denied due process. Accordingly, "the California Supreme Court's silent denial of this claim was an unreasonable application of clearly established Supreme Court authority [,]" *Irons*, 358 F.Supp.2d at 949, and petitioner "is therefore entitled to the release date ordered by the Board." *Scott*, 133 Cal.App.4th at 603, 34 Cal.Rptr.3d 905.

In re BRANDEE TRIPP; Petition for Review – Page 37

(*Sanchez v. Kane, supra*, 444 F.Supp.2d at pp. 1061-1062.)

In another recent decision, *Martin v. Marshall* (N.D. Cal. 2006) 431 F.Supp.2d 1038, the Northern District re-affirmed the principles of *Biggs* and its progeny in vacating a decision denying parole in a second degree murder case. Unlike petitioner, Martin's parole risk was moderate to low, and he committed twenty disciplinary infractions. The court held that "because petitioner cannot change the past," repeated denials of parole based on outdated static factors impermissibly converted Martin's prison term to life without the possibility of parole. Please see the Court's amended judgment in *Martin v. Marshall* at 448 F.Supp.2d 1143.

In *In re Scott, supra*, 133 Cal.App.4th 573, the Court of Appeal recently relied on *Biggs* in reversing an almost identical decision by Governor Schwarzenegger. (*Id.*, pp. 594-595.) In an even more recent decision on this issue the United States District Court for the Central District of California ordered the release of a life term prisoner well known to this Court whose commitment offense was one of the most egregious second degree murders on record – the defendant had purchased and practiced with an Uzi, laid in wait, shot the victim ten times, absconded, and threatened further revenge. In ordering the inmate's release from prison, the district court explained:

> In the circumstances of this case, the BP[H]'s continued reliance upon the nature of petitioner's crime to deny parole [ ] violated due process. First, continued reliance upon the unchanging facts of petitioner's crime makes a sham of California's parole system and amounts to an arbitrary denial of petitioner's liberty interest. Petitioner had been denied parole on six occasions prior to the determination he now challenges. Continued reliance upon the unchanging

characterization of petitioner's offense amounts to converting petitioner's sentence of seventeen years to life to a term of life without the possibility of parole. [ ]

Second, in this case, the circumstances of petitioner's crime do not amount to some evidence supporting the conclusion that petitioner poses an unreasonable risk of danger if released. As discussed, "[i]n the parole context, the requirements of due process are met if some evidence supports the decision." Significantly, the evidence underlying the decision must be supported by "some indicia of reliability." *Biggs,* 334 F.3d at 914 (internal quotations omitted)[.] Otherwise, it does not constitute "some evidence." [ ]

While relying upon petitioner's crime as an indicator of his dangerousness may be reasonable for some period of time, in this case, continued reliance on such unchanging circumstances-after nearly two decades of incarceration and half a dozen parole suitability hearings-violates due process because petitioner's commitment offense has become such an unreliable predictor of his present and future dangerousness that it does not satisfy the "some evidence" standard. After nearly twenty years of rehabilitation, the ability to predict a prisoner's future dangerousness based simply on the circumstances of his or her crime is nil. *See Johnson v. Finn,* 2006 WL 195159 at p. 8 n. 3 (E.D.Cal.2006) (stating that "the seriousness of the crime had predictive value for the dangerousness of petitioner's release for the first, second, perhaps third suitability hearing. But as the years go by, this factor loses its predictive value in light of the growing experience to the contrary (assuming petitioner's record in prison is exemplary)."); *Irons,* 358 F.Supp.2d at 947 n. 2

Petitioner's case is exactly what *Biggs* envisioned when it stated that repeated refusals to grant a parole release date to an inmate with an exemplary post-conviction record may violate the prisoner's due process rights. *Biggs,* 334 F.3d at 919. The record is replete with evidence of petitioner's remorse and rehabilitation, including glowingly positive psychological

reports, extensive self-improvement through educational and vocational advancements as well as therapy, valued service in promoting the penological goals of the prison, and nearly two decades of disciplinary-free incarceration. The evidence of petitioner's outstanding performance while incarcerated is particularly significant. As the Supreme Court has recognized, "[t]he behavior of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release." *Greenholtz*, 442 U.S. at 15. Regardless of whether the BP[H] ever was entitled to rely upon the commitment offense to find that this particular petitioner posed an unreasonable risk of danger and was unsuitable for parole, under these unusual circumstances, the BP[H]'s continued reliance on the commitment offense violates due process because it resulted in an arbitrary decision and because the facts surrounding the offense do not now constitute "some evidence" with "some indicia of reliability" of petitioner's dangerousness. See *Hill*, 472 U.S. at 455; *Biggs*, 334 F.3d at 917; *Irons*, 358 F.Supp.2d at 947[.]

(*Rosenkrantz v. Marshall, supra*, 444 F.Supp.2d at 1083-1087.)

California's state courts have ruled identically on the issue in ordering the release of inmates committed for second degree murders. See *In re Scott*, quoted at pp. 24-26 above, and the more recent decision in *In re Lee*, detailed at p. 28 above (Lee had been convicted of two life crimes, murder and attempted murder, having fired four shots, killing one victim and seriously injuring another). More recently in *In re Elkins, supra*, 144 Cal.App.4th 475, the Court of Appeal, in a published decision in a *first-degree* murder case held, in ordering the prisoner's release on parole:

Given the lapse of [many] years and the exemplary rehabilitative gains made by Elkins over that time, continued reliance on these aggravating facts of the crime no longer amount to "some evidence" supporting denial of parole.

[Note: Elkins' sentence was 25 years-to-life.]

The commitment offense, this court has observed, is an unsuitability factor that is immutable and whose predictive value "may be very questionable after a long period of time [citation]." ( *Scott II, supra,* 133 Cal.App.4th at pp. 594-595, fn. omitted.) We have also noted, as has our Supreme Court, strong legal and scientific support that "predictions of future dangerousness are exceedingly unreliable," even where the passage of time is not a factor and the assessment is made by an expert. ( *Id.* at p. 595, fn. 9.) Reliance on an immutable factor, without regard to or consideration of subsequent circumstances, may be unfair, run contrary to the rehabilitative goals espoused by the prison system, and result in a due process violation. ( *Id.* at p. 595.)

[Court reviews authorities, mostly those herein, and orders Elkins' release on parole forthwith.]

(*In re Elkins, supra,* 144 Cal.App.4th 475, 498-499.)

The facts of petitioner's case are more compelling than those in the cases cited above in which BPH panels and governors employed the same boilerplate offense factors. Because neither the facts of her offense nor the maximum parole suitability she has indisputably achieved and maintained can ever improve, preclusion of her parole based on her offense is necessarily *interminable*. The process has converted petitioner's prison term, 15-years-to-life with the possibility of parole, which Pen.C. § 3041(a) defines as a *probability* of parole (panel "shall normally set a parole release date"), to life without any possibility of parole – unless some future governor's staff arbitrarily decides – before petitioner's ultimate death in state prison – that all of the previous governors were wrong. Neither the

State's parole laws and regulations nor the Due Process Clauses permit the possibility of petitioner's parole to rest entirely on such arbitrary speculation.

## V. REMAINING CONSTITUTIONAL CLAIMS

Length limitations imposed on this brief do not permit a complete restatement of petitioner's remaining claims, which are valid as argued, including petitioner's claim that she did not receive due, individualized, or any consideration by Governor Schwarzenegger, who did not personally review her files and the evidence relied on by the panel as required, and because the decision was a boilerplate of all reversals of paroles printed out by governors' staffs.

## CONCLUSION; RELIEF REQUESTED

For the reasons set forth on pages 2-4 above, and based on the authorities set forth above and in the Court of Appeal, petitioner respectfully asks the Court to review her case and the unpublished decision of the Court of Appeal. Because she is suitable for parole as a matter of law, and because any prison term set for petitioner under the regulations and her prescribed 5-year parole term (Pen.C. § 3000) has long lapsed, Brandee Tripp should be released from all custody and her prison and parole terms should be discharged.

Dated _____4-3-07_____

Respectfully submitted,

Adrian T. Woodward
Counsel for Petitioner
Brandee Tripp

## **CERTIFICATION OF WORD COUNT**

I certify that the word count of this document, excluding the tables of contents and authorities and the Court of Appeal Opinion, according to the Microsoft Word program is 10, 887.

Dated: April 2, 2007

Joseph Wesley

Declarant

Westlaw.

Not Reported in Cal.Rptr.3d

Page 1

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

In re TrippCal.App. 6 Dist.,2007.Only the Westlaw citation is currently available.
California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.
Court of Appeal, Sixth District, California.
In re Brandee TRIPP, on Habeas Corpus.
No. H029507.
(Monterey County Super.Ct.No. HC05015).

March 28, 2007.

Richard Darington Pfeiffer, Santa Ana, CA, Adrian T. Woodward, Law OfcAdrian T. Wooward, Long Beach, CA, for Brandee Tripp.
Elizabeth Seon Kim, Office of the Attorney General, San Francisco, CA, for The People.

INTRODUCTION

DUFFY, J.
*1 At issue in this case is whether petitioner BranDee Tripp is entitled to a parole release date. She is currently in prison because, on July 8, 1979, 10-year-old Tameron Carpenter was strangled to death by Hilton Tripp and Randy Cook. At the time, petitioner, born in March 1959, was Hilton's wife and the mother of his child. In February 1981, petitioner was convicted by guilty plea of second degree murder and was sentenced to prison for 15 years to life. (Pen.Code, § 187.) [FN1] Under the plea agreement, other charges were dismissed, and petitioner agreed to testify against the man who solicited this murder, William Record, petitioner's stepfather.[FN2]

FN1. Unspecified code section references are to the Penal Code.

FN2. Eventually, Cook pleaded guilty to first-degree murder and was sentenced to 25 years to life. Hilton Tripp received the same sentence after a jury convicted him of first-degree murder and conspiracy to murder. After petitioner testified against Record, he was convicted of second-degree murder and was sentenced to 15 years to life.

After a hearing on May 17, 2004, California's Board of Prison Terms [FN3] determined that petitioner, then age 45, was entitled to a parole date, as she "is suitable for parole and would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison." The Board had previously found petitioner suitable for parole after a hearing on November 6, 2002, and that decision was reversed on April 4, 2003, by Governor Davis.

FN3. As of July 1, 2005, the Board of Parole Hearings replaced the Board of Prison Terms. (Gov.Code, § 12838.4; Pen.Code, §§ 5075, 5075.1.) We will use " Board" to refer to these successive entities.

The overarching concern of the Board in granting a prisoner a parole release date is whether " consideration of the public safety requires a more lengthy period of incarceration for this individual." ( § 3041, subd. (b).) A parole date should be denied if "the prisoner will pose an unreasonable risk of danger to society if released from prison" (Cal.Code Regs., tit. 15, § 2402(a)), [FN4] in other words, if the prisoner is "a continuing danger to the public." (In re Dannenberg (2005) 34 Cal.4th 1061, 1084) ( Dannenberg ).)

FN4. All further references to regulations ( "Regs.") are to the California Code of Regulations, title 15.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                                          Page 2

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

Governor Arnold Schwarzenegger (Governor) reviewed the May 2004 grant of a parole date and, on October 14, 2004, reversed it, asserting his belief that petitioner "would pose an unreasonable threat to public safety if released from prison at this time."

Petitioner has challenged the Governor's decision by a habeas corpus petition, which the Monterey County Superior Court denied in September 2005. In August 2006, this court issued an order to show cause asking the parties to further discuss "whether some evidence supports the Governor's determination that petitioner poses an unreasonable threat to public safety considering her actual role in the murder and her progress in prison." [FN5] After reviewing the administrative record under a deferential standard, we will conclude that there is some evidence supporting the Governor's decision and will deny the habeas petition.

> FN5. Petitioner's habeas petition also presented other issues that we did not ask the parties to brief, such as that the parole denial violated the ex post facto clause and breached petitioner's plea bargain and that the Governor did not personally review her case. This court has rejected similar plea bargain arguments. (*In re DeLuna* (2005) 126 Cal.App.4th 585, 598-599 (*DeLuna*); *In re Honesto* (2005) 130 Cal.App.4th 81, 92; *In re Lowe* (2005) 130 Cal.App.4th 1405, 1422-1426.) The California Supreme Court has rejected an ex post facto argument. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 636-652 (*Rosenkrantz*).)

## STANDARDS OF REVIEW

In this case it is important to establish the applicable standard of review before stating the critical facts available in the record. Whether a prison inmate is entitled to release on parole is an inherently subjective determination (*Rosenkrantz, supra,* 29 Cal.4th at p. 655; *Greenholtz v. Nebraska Penal Inmates* (1979) 442 U.S. 1, 9) that should be guided by a number of factors, some objective, identified in section 3041 and in the Board's

regulations. (Regs., §§ 2281, 2402.) [FN6] "The Governor may only affirm, modify, or reverse the decision of the parole authority on the basis of the same factors which the parole authority is required to consider." (Cal. Const., art. V, § 8(b).) The Governor's decision is based on "materials provided by the parole authority." (§ 3041.2, subd. (a).) " Although these provisions contemplate that the Governor will undertake an independent, de novo review of the prisoner's suitability for parole, the Governor's review is limited to the same considerations that inform the Board's decision." (*Rosenkrantz, supra,* 29 Cal.4th at pp. 660-661.) Since parole unsuitability factors need only be found by a preponderance of the evidence, the Governor is free to consider facts apart from those found true by a jury or judge beyond a reasonable doubt. (*Id.* at p. 679; cf. *In re Morrall* (2002) 102 Cal.App.4th 280, 302.)

> FN6. The same parole suitability criteria are listed in Regulations section 2281 and section 2402, with the latter applying to murders like this one committed after November 8, 1978. The text of these regulations is fully quoted in several cases. (E.g., *In re Scott* (2005) 133 Cal.App.4th 573, 592-593 (*Scott II*); *In re Lee* (2006) 143 Cal.App.4th 1400, 1406, fn. 2.) We quote relevant parts below.

*2 *Rosenkrantz* concluded "that the judicial branch is authorized to review the factual basis of a decision of the Board denying parole in order to ensure that the decision comports with the requirements of due process of law, but that in conducting such a review, the court may inquire only whether some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation." (*Rosenkrantz, supra,* 29 Cal.4th at p. 658.) After further discussion (*id.* at pp. 658-667), the California Supreme Court concluded that the same standard applies to judicial review of a Governor's parole suitability decision. Judicial "review properly can include a determination of whether the factual basis of such a decision is supported by some evidence in the record that was before the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

Board." (*Id.* at p. 667.) We are bound by these determinations of our standard of review. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

We note that *Rosenkrantz* identified a prisoner's conditional liberty interest in a parole release date as arising under California's constitution. ( *Rosenkrantz, supra,* 29 Cal.4th. at p. 655.) According to the Ninth Circuit, the some evidence standard is also settled federal law in reviewing California's parole suitability determinations. (*Sass v. California Bd. of Prison Terms* (9th Cir.2006) 461 F.3d 1123, 1129.) [FN7]

> FN7. The Attorney General asks us to reject the Ninth Circuit's federal application of the some evidence standard " because the United States Supreme Court has not made that determination." The Attorney General argues for an unspecified lesser standard. Petitioner agrees with the Attorney General's premise, but argues that a greater standard of substantial evidence should apply. In view of our conclusions under the state constitution, we "have no occasion to further explore or rely upon the federal right." (*In re Elkins* (2006) 144 Cal.App.4th 475, 492.)

*Rosenkrantz* emphasized that this standard of evidentiary review "is extremely deferential." ( *Rosenkrantz, supra,* 29 Cal.4th at p. 665.) "Only a modicum of evidence is required. Resolution of any conflicts in the evidence and the weight to be given the evidence are matters within the authority of the Governor." (*Id.* at p. 677.) On the other hand, the evidence must substantiate the ultimate conclusion that the prisoner's release currently poses an unreasonable risk of danger to the public. (*Ibid.; In re Lee, supra,* 143 Cal.App.4th at p. 1408.) It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public or relies on an unsupported conclusion. (E.g., *DeLuna, supra,* 126 Cal.App.4th at p. 597 [Board concluded, contrary to psychological evaluations, that inmate needed therapy, and faulted inmate

facing deportation for failing to learn English]; *Scott II, supra,* 133 Cal.App.4th at pp. 597-603 [Governor was wrong about inmate's history of violent crime and the nature of the commitment offense]; *In re Lee, supra,* 143 Cal.App.4th at pp. 1413-1414 [Governor overstated seriousness of commitment offense and wrongly faulted inmate for late acceptance of responsibility].)

If we were reviewing a trial court's habeas findings based on documentary evidence without an evidentiary hearing, we would independently review the record. (*Rosenkrantz, supra,* 29 Cal.4th at p. 677 .) However, the Governor's interpretation of a documentary record is due deference. So long as the Governor's interpretation of a document is reasonable, it is not for us to say that he should have adopted another interpretation, though equally reasonable. We confine our review to the evidence of unsuitability credited by the Governor and do not consider unsuitability factors apparently discounted by the Governor. (*In re Elkins, supra,* 144 Cal.App.4th at p. 493; cf. *DeLuna, supra,* 126 Cal.App.4th at pp. 593-594.)

## THE GOVERNOR'S DECISION

*3 The Governor reversed the Board in a two-and one-half page, single-spaced, typed decision. It narrows our review to identify what is not in issue. The Governor recognized that, during petitioner's 23 years in prison, while she initially violated some rules, for the last 16 years she has obeyed the rules and made consistent and commendable progress in terms of education, vocations and therapy.[FN8]

> FN8. The Governor noted the following: " Now 45 years old, Mrs. Tripp has been incarcerated for more than 23 years. While her first six years in prison included multiple serious-rules violations and an array of minor misconduct, she has been discipline-free for the last 16 years and has worked to enhance her ability to function within the law upon release. She completed her GED and has obtained vocational certificates in word processing

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

and forklift operation. She has participated in a number of self-help and therapy programs, including Women Against Abuse, the Relapse Prevention Program, Breaking Barriers, Anger Management, and Alcoholics Anonymous and Narcotics Anonymous consistently since 1988. She has received laudatory reports from various prison staff for her volunteer and self-help activities as well as receiving favorable Life Prisoner and mental-health evaluations. She has also established and maintained seemingly solid relationships with her mother and her daughter and has viable parole plans that include residence at a licensed treatment facility for recovering addicts and a job offer from a family friend."

The Governor's decision was not based on prison misconduct by petitioner, her lack of rehabilitation, or any prior criminal history. He noted, "Despite a turbulent pre-prison history, which included verbal, emotional, and sexual abuse, substance abuse, and prostituting herself, [petitioner] had no criminal record at the time of Tameron's murder." [FN9] Contrary to the Attorney General's suggestion, we do not understand the Governor to have relied on petitioner's pre-offense behavior as evidence of unsuitability.

> FN9. Although the Governor's decision does not elaborate, the sexual abuse to which he refers was obviously the molestation of petitioner by her stepfather, William Record, beginning at the age of seven.

The Governor's parole denial is based entirely on the commitment offense. He explained, "after carefully considering each of the factors the Board is required to consider, the gravity of the murder [petitioner] perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole." The Governor stated that petitioner "helped plan the kidnap and murder of a 10-year-old child. And she did so for money and to help an accused child molester by eliminating

Tameron so she could not testify against him." We further consider the Governor's understanding of the commitment offense in the next sections.

## THE COMMITMENT OFFENSE

There is no dispute that the murder occurred as broadly outlined in the Governor's decision. "On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death. Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both Tameron and Ms. Maddocks. To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks. Mr. Tripp, his 20-year-old wife, Bran[D]ee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks. That plan failed. They then decided to kidnap and kill young Tameron.

"Mrs. Tripp was a family friend and had access to Tameron. On the day of the murder, she arranged to take Tameron on a swimming trip. Before the trip, she asked Tameron to go to the store and pick up some drinks. Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted. The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living. They took Tameron into the Tripps' tent, tied her up, and placed cord from the tent around her neck. Mr. Tripp pulled on one side while Mr. Cook pulled on the other until Tameron died. They then buried her in a grave that they had dug near the tent."

*4 "When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts. Mr. Tripp, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried. Mrs. Tripp was arrested the next day. And Mr. Cook later surrendered to the police."

To establish petitioner's role in the murder, the Governor considered some of petitioner's later

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d                                                    Page 5

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

statements as follows. "Mrs. Tripp maintains that she did not intend for Tameron to be killed. During her 2004 parole hearing, she told the Board that her husband 'promised me that no one would get hurt' and that 'In my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken.' But at that same hearing, she admitted to suggesting various way to kill Tameron, and explained, 'I guess that's why I ended up being considered the person in charge.' In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be involved in the physical abduction of Ms. Maddocks-but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder." Petitioner acknowledged that she could have prevented the murder. "[D]uring her 2004 parole hearing, she said that she tried calling the police twice on the day of the murder but failed to do so because she was 'scared.' "

The Governor concluded, "The manner in which this crime was planned and carried out-particularly against one so young and vulnerable-demonstrates exceptional depravity and an utterly callous disregard for human life and suffering."

PETITIONER'S ROLE IN THE COMMITMENT OFFENSE

Petitioner objects to the Governor's conclusion that she "helped plan the kidnap and murder" and that she was involved in the decision "to kidnap and kill" Tameron. Petitioner focuses on her role in the conspiracy that led to Tameron being kidnapped and killed by petitioner's husband and his friend. As quoted above, the Governor's conclusion about petitioner's role is based on her statements at the May 2004 parole hearing, so we focus on those statements.

This topic was discussed twice at the parole hearing. Initially, petitioner stated: "In the beginning, I was actually running interference with [ sic ] her. Because they were talking and they wanted to kill her. I didn't want to kill her. I didn't want to help kill her.... Well, the day that this happened, before it happened, my husband promised me that no one would get hurt. He promised me that he would go pick Tammy up if I sent her down to the store. I could go to [Cook's] house and watch her, and they would go convince my stepfather that they kidnapped her and she wouldn't be testifying to get the money. And then we were going to let her go." It was only as petitioner kept waiting for them at Cook's house that she realized something had gone awry.

*5 Later at the hearing, the presiding commissioner stated: "Says in the 1999 psychiatric evaluation, [petitioner] admits that she and her husband discussed both Tam[e]ron and her sister. Moreover, [petitioner] and her husband looked at, you know-He says, it is not credible that she did not know that Tam [e]ron would be killed because you had discussed her being killed with your husband prior to this." FN10

FN10. In the 1999 evaluation, Dr. McDaniel reported asking petitioner if there was ever talk about killing Tameron. Petitioner stated that her husband talked about it one night while smoking marijuana. He talked about shooting people from a distance. She told him it was not right to shoot someone.
The evaluation noted that there was a " police report" in the central file alluding to a witness who stated that petitioner had discussed killing a potential victim. This police report does not appear in the record we have, unless it is a misdescription of the 1981 probation report. That probation report quotes statements by Roger Ladd that he participated in a conversation in which petitioner and her husband thought up a half a dozen ways to kidnap and kill Tameron. The Attorney General has also invoked this probation report, but the Governor did not rely on it.

Petitioner responded: "I was part of-I can't take myself out of the conversation. I was there when-All

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in Cal.Rptr.3d

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
(Cite as: Not Reported in Cal.Rptr.3d)

four of us were actually there when the conversations were taking place. I didn't help the matters. I know today that I probably helped them more than I really liked to. I didn't help stop the matters and it was a discussion that I was on the side of no, let's not do it that way. No, let's not do it that way. Let's try to do it this way. And I guess that's why I ended up being considered the person in charge. Pretty much, they think I was the overseer of the whole thing and there was really nothing I could do about that. Because that's how they see that, but I was always trying to run interference. And then when he promised me that they wouldn't hurt her, then I became more willing to go along with it because I didn't know that (inaudible.) And then I became afraid to act on it. I was too afraid to do anything. I didn't really want to believe that my husband would kill anyone anyway, because they didn't do anything with Betty Ann.... He promised me he's going to do that and I just talked myself into believing that he wouldn't kill anyone."

Having studied these statements closely, we conclude that they are reasonably susceptible to the Governor's interpretation. Petitioner's statements at the parole hearing fall short of a claim that she told her husband in no uncertain terms that she opposed killing Tameron. Petitioner stated that she "did not want to help kill her." This could mean that she did not share the criminal intent required for an aider and abettor (cf. *People v. Coffman* (2004) 34 Cal.4th 1, 107 [aider and abettor is liable for natural and probable consequences of target crime]; *People v. Prettyman* (1996) 14 Cal.4th 248, 261 [same] ), but it also could mean only that she would not personally participate in the actual murder. Even if petitioner proposed alternatives to killing Tameron, she did not say she unequivocally disavowed the fatal plan. She said she "became more willing to go along with" the plan when her husband promised not to hurt Tameron This suggests some initial acquiescence to the fatal alternative.[FN11]

> FN11. We do not intend to suggest that her use of the word "more" in this context is why petitioner deserves continued incarceration. Other parts of her statement, in the absence of further explanation, also

appear to suggest a reluctant acquiescence to murder.

Although the Governor simply reviewed the documents before the Board, he was free to make his own credibility determinations. If he had chosen to disbelieve petitioner, we would be bound by that determination. (*Rosenkrantz, supra,* 29 Cal.4th 626, 665, 677.) Contrary to the Attorney General's oral argument, we do not understand the Governor to have disbelieved petitioner. Instead, he found and believed that she admitted helping to plan Tameron's murder. We conclude that this is a reasonable interpretation of petitioner's somewhat ambiguous and unclear statements at her parole hearing. When undisputed facts in an administrative record give rise to conflicting inferences and support equally reasonable interpretations, our appellate function requires us to defer to the fact-finder's interpretation. (Cf. *Halaco Engineering Co. v. South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74-75; *Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal .3d 770, 774, fn. 2; *Yordamlis v. Zolin* (1992) 11 Cal.App.4th 655, 659-660.) [FN12] There is thus some evidence that petitioner participated in planning not only the kidnapping, but the 1979 murder, of Tameron. This evidence also supports the Governor's conclusion that petitioner, at age 45, remained dangerous to public safety.

> FN12. At least after *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, appellate courts have not been similarly deferential to trial courts when the issue is interpretation of a written instrument unaided by extrinsic evidence (*id.* at pp. 865-866), but that situation involves different jurisprudential concerns than the reading of a transcript.

REPEATED RELIANCE ON COMMITMENT OFFENSE

*6 Petitioner further argues that she has been denied due process by the Governor denying her parole based solely on the immutable circumstances of her commitment offense.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

A person who commits the kind of crime subject to an indeterminate life prison term almost always poses an unreasonable risk of danger to society at the time of the crime.[FN13] The "timing and gravity" of the circumstances of that crime may remain probative of an inmate's current dangerousness many years later. (§ 3041, subd. (b).) The California Supreme Court has concluded that the " 'nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole.' " ( *Dannenberg, supra,* 34 Cal.4th 1061, 1094, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 682.) One indicator of parole unsuitability is that "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel manner." (Regs., § 2402, subd. (c)(1).) [FN14] The *Dannenberg* majority decided that the Board and Governor can find the commitment offense to be especially heinous, atrocious or cruel so long as the crime involved elements beyond " 'the minimum necessary to sustain a conviction for that offense,' " without comparing the crime to other similar crimes. ( *Dannenberg, supra,* 34 Cal.4th at pp. 1094-1095, 1098.)

FN13. Among the crimes subject to an indeterminate life sentence are certain types of gang crimes (§ 186.22, subd. (b)(4)), murder (§ 190), attempted premeditated murder (§ 664, subd. (a)), gross vehicular manslaughter while intoxicated (§ 191.5), aggravated sexual assault on a child (§ 269), aggravated arson (§ 451.5), aggravated sex offenses (§ 667.61), certain types of kidnapping (§§ 209, 209.5), and various recidivist felony offenses (§ 667, subd. (e)(2)(A), § 667.51, subd. (c), § 667.75, § 1170.12, subd. (c)(2)(A)).

FN14. The full regulation states: "The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:
"(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
"(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
"(C) The victim was abused, defiled or mutilated during or after the offense.
"(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
"(E) The motive for the crime is inexplicable or very trivial in relation to the offense." (Regs., § 2402, subd. (c)(1).)

Establishing that the commitment offense involved some elements more than minimally necessary to sustain a conviction is a step on the path of evaluating a prisoner's current dangerousness, but it is not the final step under the regulations. Due process affords an inmate "an individualized consideration of all relevant factors." (*In re Rosenkrantz, supra,* 29 Cal.4th at p. 655.)

As *Scott II, supra,* 133 Cal.App.4th 573 explained at pages 594-594, the proposition that the commitment offense alone may establish unsuitability for release "must be properly understood. The commitment offense is one of only two factors indicative of unsuitability a prisoner cannot change (the other being his 'Previous Record of Violence'). Reliance on such an immutable factor 'without regard to or consideration of subsequent circumstances' may be unfair (*In re Smith* (2003) 114 Cal.App.4th 343, 372), and 'runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.' (*Biggs v. Terhune* [ (9th Cir.2003) ] 334 F.3d [910,] 917 [*Biggs* ].) The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison. Yet, the predictive value of the commitment offense may be very questionable after a long period of time. (*Irons v. Warden of California State Prison-Solano* (E.D.Cal.2005) 358 F.Supp.2d 936, 947, fn. 2.) [FN15] Thus, denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny. '[T]he gravity of the

Not Reported in Cal.Rptr.3d                                                    Page 8

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)
**(Cite as: Not Reported in Cal.Rptr.3d)**

commitment offense or offenses alone *may* be a sufficient basis for denying a parole application, *so long as the Board does not fail to consider all other relevant factors.*' (*In re Ramirez, supra,* 94 Cal.App.4th at p. 569; latter italics added; accord *Rosenkrantz, supra,* 29 Cal.4th at pp. 660, 677; *Scott I, supra,* 119 Cal.App.4th at p. 891.)" (Fns.omitted.)

> FN15. The Ninth Circuit recently reversed this district court decision in *Irons v. Carey* (9th Cir.2007) --- F.3d ----, 2007 WL 656345.

*7 Under the regulations applicable to evaluating an inmate's current dangerousness, the viciousness of the commitment offense must be balanced against the passage of time and any evidence of an inmate's rehabilitation. Among the indicators of parole suitability are: "(7) Age. The prisoner's present age reduces the probability of recidivism. [¶] (8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release. [¶] (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release." (Regs., § 2402, subd. (d).)

Relying on dictum in *Biggs,* petitioner asserts that it is a denial of due process to interminably deny her parole based solely on her commitment offense. Petitioner asserts at one point in her petition that she has "endured *fourteen* parole denials by [Board] panels and governors *based on her commitment offense.* " (Original bolding.) At another point, she claims that, "At **twelve** parole hearings between 1986 and 2001, [Board] panels found petitioner unsuitable for parole based largely or entirely on her commitment offense." (Original bolding.) Petitioner offers to provide the transcripts of these prior hearings on request. The only hearing for which she has provided a transcript is the latest one. This offer falls short of adequately documenting this contention. (*People v. Duvall* (1995) 9 Cal.4th 464, 474.)

In any event, in the latest decision denying parole, it

appears that the Governor has provided petitioner with an individualized consideration of the relevant factors. We have quoted above (in footnote 8 on page 5), his recognition of several factors favoring petitioner's parole, including numerous rehabilitative efforts in prison. Petitioner cites no factor as overlooked by the Governor. Her real disagreement is with the weight he attached in 2004 to her 1979 behavior. But the Governor was authorized to independently review the evidence before the Board that granted her a parole date. On the existing record, we cannot say that due process required the Governor to strike a different balance.

### DISPOSITION

The petition for writ of habeas corpus is denied.

WE CONCUR: PREMO, Acting P.J., and MIHARA , J.

Cal.App. 6 Dist.,2007.

In re Tripp

Not Reported in Cal.Rptr.3d, 2007 WL 915112 (Cal.App. 6 Dist.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

## DECLARATION OF SERVICE BY MAIL

Case Name: **In re Brandee Tripp** (Petition for Review)

I declare that on _April 4, 2007_, I served the attached

**Petition for Review; Application to File Enlarged Brief**

on the parties listed below by enclosing same in an envelope to which

adequate postage was affixed, and depositing same at the United States Post

Office in Walnut, California for mailing.

Attorney General
455 Golden Gate Avenue
San Francisco, CA 94102

Superior Court
Monterey County
1200 Aguajito Road
Monterey County, CA 93940

Court of Appeal
Sixth Appellate District
222 W. Santa Clara Street #1060
San Jose, California 95113

I declare, under penalty of perjury, that the facts I have stated above

are true and correct.

Dated _April 4_, 2007, at Walnut, California

Declarant

In re BRANDEE TRIPP; Petition for Review