**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8       IN THE UNITED STATES DISTRICT COURT
9       FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11  BRANDEE TRIPP,                          No. C 07-05748 CW
12          Petitioner,                     ORDER GRANTING PETITION
                                            FOR WRIT OF HABEAS CORPUS
13      v.                                  AND DENYING RESPONDENT'S
                                            MOTION TO DISMISS
14  MATTHEW CATE, Secretary of the
    California Department of
15  Corrections and Rehabilitation,
16          Respondent.
    _____/
17
18       On November 13, 2007, Petitioner BranDee Tripp, a prisoner
19  then incarcerated at the California Institution for Women, through
20  counsel, filed a petition for a writ of habeas corpus, alleging
21  that the Governor violated her federally protected liberty
22  interest when he reversed her grant of parole.  The Court issued
23  an order to show cause why the writ should not be granted.  On
24  June 23, 2008, Respondent Warden Dawn Davison filed an answer and
25  on July 2, 2008 Petitioner timely filed a traverse.  On September
26  25, 2008, Petitioner was released on parole.  Soon after,
27  Respondent Matthew Cate, Secretary of the California Department of
28  Corrections and Rehabilitation, filed a motion to dismiss the

habeas petition as moot.[1]  Petitioner opposes the motion.  For the reasons set forth below, the petition is GRANTED and the motion to dismiss is DENIED.

BACKGROUND

On February 11, 1981, pursuant to a guilty plea to second degree murder, Petitioner was sentenced to fifteen years to life for the July 3, 1979 murder of ten-year-old Tameron Carpenter.  At the time, Petitioner was twenty years old.

At twelve hearings between 1986 and 2001, the Board of Parole Hearings (Board) found Petitioner unsuitable for parole.  On November 6, 2002, at her thirteenth parole hearing, the Board found Petitioner suitable for parole.  On April 4, 2003, former Governor Gray Davis reversed the Board's grant of parole.  On May 17, 2004, at her fourteenth parole hearing, the Board again found Petitioner suitable for parole.  On October 11, 2004, Governor Arnold Schwarzenegger reversed the Board's grant of parole.

Petitioner filed petitions challenging Governor Schwarzenegger's decision in the Monterey County Superior Court and the California Court of Appeal.  On March 28, 2007, the Court of Appeal issued a reasoned opinion affirming the Governor's

---

[1]The proper respondent in a habeas case is the "'state officer having custody'" of the petitioner.  Ortiz-Sandoval v. Gomez, 81 F.3d 891, 894 (9th Cir. 1996) (quoting Rule 2(a) of the Rules Governing Habeas Corpus Cases Under Section § 2254).  Where the petitioner is on probation or parole, he may name his probation or parole officer "and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate."  Id. at 896.  Therefore, the Court directs the Clerk of the Court to substitute Matthew Cate, Secretary of the California Department of Corrections and Rehabilitation as Respondent in this action.

United States District Court
For the Northern District of California

decision.  See In re Tripp, 150 Cal. App. 4th 306 (2007).  On August 15, 2007, the California Supreme Court denied Petitioner's petition for review without comment.

The Court of Appeal summarized the commitment offense as follows:

> On July 8, 1979, 10-year-old Tameron Carpenter was strangled to death.  Both Tameron and her 19-year-old sister, Betty Ann Maddocks, were scheduled to testify in a criminal case against 53-year-old William Record. Mr. Record was accused of molesting both Tameron and Ms. Maddocks.  To eliminate them as witnesses, Mr. Record offered to pay his stepdaughter's husband, 17-year-old Hilton Tripp, to kidnap and murder Tameron and Ms. Maddocks.  Mr. Tripp, his 20-year-old wife, BranDee Tripp, and his friend Randy Cook first planned to kidnap and kill Ms. Maddocks.  That plan failed. They then decided to kidnap and kill young Tameron.
>
> Mrs. Tripp was a family friend and had access to Tameron.  On the day of the murder, she arranged to take Tameron on a swimming trip.  Before the trip, she asked Tameron to go to the store and pick up some drinks.  Once Tameron was at the store, she encountered Mr. Hilton and Mr. Cook who offered her a ride home. Tameron accepted.  The two men then drove Tameron to a campsite where Mr. and Mrs. Tripp were living.  They took Tameron into the Tripps' tent, tied her up, and placed a cord from the tent around her neck.  Mr. Tripp pulled on one side while Mr. Cook pulled on the other -- until Tameron died.  They then buried her in a grave that they had dug near the tent.
>
> When interviewed by police, Mrs. Tripp denied any knowledge of Tameron's whereabouts.  Mr. Tripp, however, confessed to police that he was involved in the kidnap-murder and subsequently took them to the campsite where Tameron's body was buried.  Mrs. Tripp was arrested the next day.  And Mr. Cook later surrendered to the police.

In re Tripp, 150 Cal. App. 4th at 315.

At her parole hearing in 2004, at which the Board for the second time concluded that Petitioner was suitable for parole, it specifically noted that Petitioner

> would not pose an unreasonable risk of danger to society or a threat to public safety if released from prison.  The prisoner, while imprisoned, has enhanced her ability to function within the law upon release

3

United States District Court
For the Northern District of California

through participation in educational programs.  She has
obtained a GED, [and participated in] vocational
programs.  She has obtained a vocational certificate in
forklift operation and also in vocational word
processing.  She's also, through self-help, taken the
following: She's been in AA and NA since . . . 1988.
She's been in the SOS program.[2]  She's taken the Women
Against Abuse program, the American Bible Academy, Arts
and Correction Music Program, the Relapse Prevention
program, the HIV/AIDS prevention program, and Breaking
Barriers. . . . The prisoner lacks a significant
criminal history of violent crime. [The prisoner's]
maturation, growth, greater understanding, and advanced
age has reduced the probability of her recidivism.  The
prisoner has realistic parole plans, which includes a
job offer and family support. [I w]ould say that I
would rate the parole plans as superior. . . . She has
had no 115s since 1988.[3]  Her last 115 was [for a]
failure to report to a work assignment.  She also has
had a few 128-A [violations].  The last was in 1999 for
excessive clothing.  And prior to that, was three
years, misuse of state property.  And then the last was
in 1988 prior to that.  So we feel that she has a good
disciplinary record while in custody.  Prisoner shows
signs of remorse.  She has indicated that she
understands the nature and the magnitude of the offense
and accepts responsibility for her criminal behavior
and has a desire to change towards good citizenship.

Pet. Ex. B at 65-67.

The Board also cited Petitioner's most recent psychological

evaluation performed in January, 2004.  The report noted, "The

_____

[2]SOS (Sharing our Stitches) is a program in which prisoners
knit blankets and clothing for the homeless.

[3]115 and 128-A refer to different CDC forms used by prison
officials to report rules violations.
    Inmate misconduct shall be handled by:
    (1) Verbal Counseling.  Staff may respond to minor misconduct
    by verbal counseling.  When verbal counseling achieves
    corrective action, a written report of the misconduct or
    counseling is unnecessary.
    (2) Custodial Counseling Chrono.  When similar minor
    misconduct recurs after verbal counseling or if documentation
    of minor misconduct is needed, a description of the
    misconduct and counseling provided shall be documented on a
    CDC Form 128-A, Custodial Counseling Chrono. . .
    (3) Rules Violation Report.  When misconduct is believed to
    be a violation of law or is not minor in nature, it shall be
    reported on a CDC Form 115 . . .
Cal. Code. Regs. tit. 15 § 3312(a).

inmate has not been dangerous within a controlled setting.  I do not believe she will be dangerous if released to the community."  Pet. Ex. D at 3.  The report also stated that "the inmate has been motivated in her self-discovery and has improved dramatically over the years, to the point where she has matured significantly."  Id.  The report concluded that "risk factors as always would be if she was ever tempted to resort to acts of criminality though given her level of peace and contentment, I would not suspect that to be the case."  Id.

On October 11, 2004, the Governor, pursuant to California Penal Code § 3041.2, reviewed the evidence considered by the Board and reversed the grant of parole.  In his decision, the Governor found that "after carefully considering each of the factors the Board is required to consider, the gravity of the murder Mrs. Tripp perpetrated upon young Tameron presently outweighs the positive factors tending to support her parole."  Pet. Ex. C.  The Governor also commented that "the manner in which this crime was planned and carried out -- particularly against one so young and vulnerable -- demonstrates exceptional depravity and an utterly callous disregard for human life and suffering."  Id.

The Governor also concluded that Petitioner "helped plan the kidnap and murder" and that she was involved in the decision "to kidnap and kill" Tameron.  The Governor's conclusion about Petitioner's role in the crime is based on her statements at the May, 2004 parole hearing.  The Governor stated that

> Mrs. Tripp maintains that she did not intend for
> Tameron to be killed.  During her 2004 parole hearing,
> she told the Board that her husband "promised me that

5

no one would get hurt" and that "in my head, I didn't think that anything could go wrong, and I didn't think far enough to know that her life would be taken." But at that same hearing, she admitted to suggesting various ways to kill Tameron, and explained, "I guess that's why I ended up being considered the person in charge." In her 1999 mental-health evaluation, Mrs. Tripp said that she refused to be involved in the physical abduction of Ms. Maddocks--but was willing to help lure her outside to be kidnapped. She also was agreeable to planning a way for her husband and Mr. Cook to kidnap Tameron. Her statements are inconsistent. Nevertheless, she says she accepts responsibility and is sorry for Tameron's murder.

Id. Although the Governor described these inconsistent statements, he did not rely on them to reverse the Board's parole grant. As noted above, the Governor denied Petitioner parole because "the gravity of the murder outweighs the positive factors tending to support her parole." Id.

In the petition for a writ of habeas corpus that Petitioner filed in the Monterey County Superior Court after the Governor issued his decision, she alleged that the Governor's decision was not supported by some evidence, and that its sole reliance on the circumstances of the commitment offense violated her federal due process rights. The court's denial of the writ explained that "the Governor may deny parole based solely on the nature of the commitment offense, so long as he identifies specific elements of the commitment offense showing the inmate would pose an unacceptable risk to the public." Resp. Ex. 5(G). The court concluded that "the Governor's October 11, 2004 decision, which contains a thorough description of Petitioner's commitment offense, clearly meets this standard." Id.

On Petitioner's petition to the Court of Appeal, that court

6

noted that "the Governor's parole denial is based entirely on the commitment offense." In re Tripp, 150 Cal. App. 4th 306, 314 (2007).  The court then stated that "'denial of release solely on the basis of the gravity of the commitment offense warrants especially close scrutiny. [T]he gravity of the commitment offense or offenses alone may be a sufficient basis for denying a parole application, so long as the Board does not fail to consider all other relevant factors.'"  Id. at 320 (quoting In re Scott II, 133 Cal. App. 4th 573, 595 (2005)).  Denying the writ, the court held that "it appears that the Governor has provided petitioner with an individualized consideration of the relevant factors," therefore, "we cannot say that due process required the Governor to strike a different balance."  Id.

The court also concluded that there is "some evidence that petitioner participated in planning not only the kidnapping, but the 1979 murder of Tameron.  This evidence also supports the Governor's conclusion that petitioner, at age 45, remained dangerous to public safety."  Id. at 318.

As noted above, the California Supreme Court summarily denied Petitioner's petition for review.  Resp't Ex. 13, Aug. 15, 2007 California Supreme Court Order at 1.

In the petition now before this Court, Petitioner challenges the Governor's reversal of the Board's decision.  She argues that the state appellate court decision affirming the Governor violated her constitutional right to due process because it involved an unreasonable application of federal law in that the Governor's reversal was not supported by some evidence.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Meanwhile, on April 24, 2008, the parole board again found Petitioner suitable for parole and on September 19, 2008, the Governor declined to review that grant.  On September 25, 2008, Petitioner was released on parole for a term of five years. Respondent now moves to dismiss the habeas petition as moot. Petitioner opposes the motion.

MOOTNESS

Before turning to the merits of the case, the Court considers whether the habeas petition is moot.  Article III, Section 2 of the United States Constitution establishes the scope of federal court jurisdiction, which includes "all Cases . . . arising under this Constitution . . . [and] Controversies to which the United States shall be a Party . . . ."  "'This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. . . .  The parties must continue to have a personal stake in the outcome' of the lawsuit.'" Spencer v. Kemna, 523 U.S. 1, 7 (1998) (quoting Lewis v. Continental Bank Corp., 949 U.S. 472, 477-78 (1990)).  This means that, throughout the litigation, Petitioner "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  Id.

Petitioner argues that her actual injury traceable to Respondent is the Governor's unconstitutional reversal of the parole board's grant of parole in 2004.  The Court's ability to redress Petitioner's injury with a favorable judicial decision is limited by the nature of habeas corpus relief.

"The essence of habeas corpus is an attack by a person in

8

custody upon the legality of that custody, and . . . the
traditional function of the writ is to secure release from illegal
custody."  Preiser v. Rodriguez, 411 U.S. 475, 484 (1973).
However, federal courts "have a fair amount of flexibility in
fashioning specific habeas relief."  Burnett v. Lampert, 432 F.3d
996, 999 (9th Cir. 2005).  "A federal court is vested with the
largest power to control and direct the form of judgment to be
entered in cases brought up before it on habeas corpus.  The court
is free to fashion the remedy as law and justice require and is
not required to order petitioner's immediate release from physical
custody."  Id. (quoting Sandlers v. Ratelle, 21 F.3d 1446, 1461
(9th Cir. 1994).

Petitioner's habeas petition is not moot.  Although she has
completed the institutional phase of her sentence, her current
status as a parolee prevents this case from being moot.  As it
currently stands, Petitioner was released on a five year parole
term on September 25, 2008.  Petitioner asks that, if she
prevails, the Court reinstate the Board's 2004 parole grant.  If
the Court reinstates her 2004 parole grant, the parole board may
determine that her current parole term could end sooner than
September 25, 2013.  Therefore, a favorable decision in this
petition could advance the end date of the parole term currently
being served, and the Court DENIES Respondent's motion to dismiss.

STANDARD OF REVIEW

The petition in this case was filed after the effective date
of the Antiterrorism and Effective Death Penalty Act of 1996
(AEDPA), so the provisions of that act apply.  Lindh v. Murphy,

521 U.S. 320, 327 (1997); <u>McQuillion v. Duncan</u>, 306 F.3d 895, 901 (9th Cir. 2002).

Under AEDPA, a district court may not grant habeas relief unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000). The first prong applies both to questions of law and to mixed questions of law and fact, <u>Williams</u>, 529 U.S. at 407-09, while the second prong applies to decisions based on factual determinations, <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 413. The federal court on habeas review may not issue the writ "simply because that court concludes in its independent judgment

United States District Court

For the Northern District of California

10

that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Rather, the application must be "objectively unreasonable" to support granting the writ. See id. at 409.

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El, 537 U.S. at 340. A petitioner must present clear and convincing evidence to overcome § 2254(e)(1)'s presumption of correctness; conclusory assertions will not do. Id. Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

When there is no reasoned opinion from the highest state court to consider a petitioner's claims, the court looks to the last reasoned opinion to analyze whether the state judgment was erroneous under the standard of § 2254(d). Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991); Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000). In the present case, the last state court opinion to address the merits of Petitioner's claim is the reasoned opinion of the Court of Appeal.

DISCUSSION

As noted above, under California law, the Governor considers the same factors as the Board in determining whether to affirm or reverse the Board's decision. Cal. Const., art. V, § 8(b); In re Rosenkrantz, 29 Cal. 4th 616, 660 (2002).

The Supreme Court has clearly established that a parole

11

United States District Court
For the Northern District of California

board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006) (citing Superintendent v. Hill, 472 U.S. 445, 457 (1985)). The standard of "some evidence" is met if there was some evidence from which the conclusion of the administrative tribunal could be deduced. Hill, 472 U.S. at 455. An examination of the entire record is not required nor is an independent weighing of the evidence. Id. The relevant question is whether there is any evidence in the record that could support the conclusion reached by the administrative board. Id.

Respondent argues that, under AEDPA, the "some evidence" standard of Hill does not apply to parole suitability hearings because the United States Supreme Court has not applied it in that context. Respondent claims the due process protections to which California prisoners are entitled by clearly established Supreme Court authority are limited to an opportunity to be heard and a statement of reasons for denial. This position, however, has been rejected by the Ninth Circuit, which held in Sass that a prisoner's due process rights are violated if the Board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." 461 F.3d at 1128-1129. The "some evidence" standard identified is thus clearly established federal law in the parole context for purposes of § 2254(d). Id.

When assessing whether a state parole board's suitability

12

determination, or in the present case the Governor's reversal, was
supported by "some evidence," the court's analysis is framed by
the statutes and regulations governing parole suitability
determinations in the relevant state.  <u>Sass</u>, 461 F.3d at 1128.
Accordingly, in California, the court must look to California law
to determine the findings that are necessary to deem a prisoner
unsuitable for parole, and then must review the record to
determine whether the state court decision constituted an
unreasonable application of the "some evidence" principle.  <u>Id.</u>

California law provides that a parole date is to be granted
unless it is determined "that the gravity of the current convicted
offense or offenses, or the timing and gravity of current or past
convicted offense or offenses, is such that consideration of the
public safety requires a more lengthy period of
incarceration . . . ."  Cal. Penal Code § 3041(b).

The California Code of Regulations sets out the factors
showing suitability or unsuitability for parole that the parole
authority is required to consider.  <u>See</u> Cal. Code Regs. tit. 15,
§ 2402(b) (2001).  These include "[a]ll relevant, reliable
information available," such as:

> the circumstances of the prisoner's social history;
> past and present mental state; past criminal history,
> including involvement in other criminal misconduct
> which is reliably documented; the base and other
> commitment offenses, including behavior before, during
> and after the crime; past and present attitude toward
> the crime; any conditions of treatment or control,
> including the use of special conditions under which the
> prisoner may safely be released to the community; and
> any other information which bears on the prisoner's
> suitability for release.  Circumstances which taken
> alone may not firmly establish unsuitability for parole
> may contribute to a pattern which results in a finding
> of unsuitability.

**United States District Court**
For the Northern District of California

1    <u>Id.</u>

2         Circumstances tending to show unsuitability for parole

3    include the nature of the commitment offense and whether "[t]he

4    prisoner committed the offense in an especially heinous, atrocious

5    or cruel manner."  <u>Id.</u> § 2402(c).  This includes consideration of

6    the number of victims, whether "[t]he offense was carried out in a

7    dispassionate and calculated manner," whether the victim was

8    "abused, defiled or mutilated during or after the offense,"

9    whether "[t]he offense was carried out in a manner which

10   demonstrates an exceptionally callous disregard for human

11   suffering," and whether "[t]he motive for the crime is

12   inexplicable or very trivial in relation to the offense."  <u>Id.</u>

13        Other circumstances tending to show unsuitability for parole

14   are a previous record of violence, an unstable social history,

15   previous sadistic sexual offenses, a history of severe mental

16   health problems related to the offense, and serious misconduct in

17   prison or jail.  <u>Id.</u>

18        Circumstances tending to support a finding of suitability for

19   parole include no juvenile record, a stable social history, signs

20   of remorse, that the crime was committed as a result of

21   significant stress in the prisoner's life, a lack of criminal

22   history, a reduced possibility of recidivism due to the prisoner's

23   present age, that the prisoner has made realistic plans for

24   release or has developed marketable skills that can be put to use

25   upon release, and that the prisoner's institutional activities

26   indicate an enhanced ability to function within the law upon

27   release.  <u>Id.</u> § 2402(d).

28        Respondent argues that the appellate court properly found

14

that some evidence in the record supported the Governor's finding that Petitioner admitted to helping plan the victim's kidnapping and murder.   Respondent also argues that the appellate court correctly concluded that the Governor properly relied on the commitment offense alone to deny parole because he provided Petitioner with individual consideration and reviewed the relevant factors favoring her release on parole.

The Court finds that the facts relating to Petitioner's commitment offense alone do not satisfy the "some evidence" standard, more than twenty-five years after she committed the offense.

In Biggs v. Terhune and Sass, the Ninth Circuit addressed the effect of continued denial of parole based solely on unchanging factors such as the inmate's commitment offense.   See Biggs v. Terhune, 334 F.3d 910, 917 (9th Cir. 2003); Sass, 461 F.3d at 1129.   In Biggs, the court, in dicta, stated that "continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."   Biggs, 334 F.3d at 917.   The Ninth Circuit's opinion in Irons v. Carey sheds further light on whether continuous reliance on an immutable factor such as the commitment offense may violate due process.   505 F.3d 846, 850 (9th Cir. 2007).   In Irons, the District Court for the Eastern District of California granted a habeas petition challenging the parole board's fifth denial of parole where the petitioner had served sixteen years of a seventeen years to life sentence for second degree murder with a two-year enhancement for use of a

firearm, and where all factors indicated suitability for parole; however, the Ninth Circuit reversed.  358 F. Supp. 2d 936, 947 (E.D. Cal. 2005), rev'd, 505 F.3d 846 (9th Cir. 2007).  The Ninth Circuit limited its holding to inmates deemed unsuitable prior to the expiration of their minimum sentences and left the door open for inmates deemed unsuitable after the expiration of their minimum sentences.  505 F.3d at 854.  The Ninth Circuit stated:

> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. Specifically, in Biggs, Sass, and here, the petitioners had not served the minimum number of years to which they had been sentenced at the time of the challenged parole denial by the Board.  Biggs, 334 F.3d at 912; Sass, 461 F.3d at 1125.  All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

Id. at 853-54.  The court recognized that, at some point after an inmate has served his minimum sentence, the probative value of his commitment offense as an indicator of an unreasonable risk of danger to society recedes below the "some evidence" required by due process to support a denial of parole.  Id.

Unlike Biggs, Sass and Irons, at the time of the Board's decision at issue here, Petitioner had served more than eight years after the expiration of her minimum fifteen-year sentence. Even under the Governor's version of the facts, much distinguishes the present case from Biggs, Sass and Irons, and pushes it beyond the point at which sole reliance on the commitment offense may be said to constitute "some evidence" in compliance with due process.

United States District Court
For the Northern District of California

1

2      The record contains substantial evidence to support the

3   Board's finding of parole suitability under the factors contained

4   in the California Code of Regulations.  Before reversing the

5   Board's parole grant, the Governor accurately summarized

6   Petitioner's positive factors tending to support parole.

7          While her first six years in prison included multiple
           serious-rules violations and an array of minor
8          misconduct, she has been discipline free for the last 16
           years and has worked to enhance her ability to function
9          within the law upon release.  She completed her GED and
           has obtained vocational certificates in word processing
10         and forklift operation.  She has participated in a
           number of self-help and therapy programs, including
11         Women Against Abuse, the Relapse Prevention Program,
           Breaking Barriers, Anger Management, and Alcoholics
12         Anonymous and Narcotics Anonymous consistently since
           1988.  She has received laudatory reports from various
13         prison staff for her volunteer and self-help activities
           as well as receiving favorable Life Prisoner and mental-
14         health evaluations.  She has also established and
           maintained seemingly solid relationships with her mother
15         and her daughter and has viable parole plans that
           include residence at a licensed treatment facility for
16         recovering addicts and a job offer from a family friend.

17   Pet. Ex. C at 2.

18     The relevant factors listed in Title 15 of the California

19   Code of Regulations § 2402(d) indicate that Petitioner was

20   suitable for parole, including her signs of remorse, reduced

21   possibility of recidivism due to her age at the time (forty-five),

22   realistic plans for release, marketable skills that can be put to

23   use upon release, and participation in institutional activities

24   such as NA and AA and therapy that indicate an enhanced ability to

25   function within the law upon release.  See Cal. Code Regs. tit.

26   15, § 2402(d).  The Governor also noted that, although Petitioner

27   had a "turbulent pre-prison history, which included verbal,

28   emotional, and sexual abuse, and prostituting herself, [she] had

no criminal record at the time of Tameron's murder."  Pet. Ex. C at 2.

Nevertheless, the Governor reversed the Board's findings because of "circumstances surrounding this particularly monstrous -- and premeditated -- crime."  Id.  In the reversal, the Governor emphasized Petitioner's role in planning the victim's murder, not just the kidnapping.  The Governor also noted, "The manner in which this crime was planned and carried out -- particularly against one so young and vulnerable -- demonstrates exceptional depravity and an utterly callous disregard for human life and suffering."  Id.  According to Petitioner's 1992 mental health evaluation, Petitioner was "the only one who was allowed to take Tameron places alone."  Id. at 3.  Therefore, by sending Tameron out on an errand by herself, knowing that Tameron would be kidnapped, Petitioner "not only perpetrated a chilling and revolting crime, she did so by violating her position of trust with Tameron and Tameron's family."  Id.  In sum, the Governor reversed the parole board's grant because the gravity of Petitioner's offense outweighed the positive factors supporting parole.  Id.

Even if, for a certain period of time, the commitment offense provided some evidence of unsuitability based upon Petitioner's continuing danger to the community, the Governor's reversal does not comport with federal due process standards because twenty-five years later the commitment offense can no longer constitute the sole reason for a finding of parole unsuitability.  See Biggs, 334 F.3d at 917.

Although In re Dannenberg held that the Board may rely on the

United States District Court

For the Northern District of California

**United States District Court**
For the Northern District of California

commitment offense to deny parole by heavily weighing its degree of violence and viciousness, the offense must be "particularly egregious" to justify parole denial under California law.  34 Cal. 4th 1061, 1070 (2005).  While the circumstances of this offense were arguably more aggravated than the minimum necessary to sustain a conviction for second degree murder, Petitioner did not participate in the actual murder.  Her role was limited to the planning stages and getting the victim out of the house alone.

        In a recent decision, <u>In re Lawrence</u>, the California Supreme Court held that the assumption that "a particularly egregious commitment offense always will provide the requisite modicum of evidence supporting the Board's or the Governor's decision," as <u>In re Rosenkrantz</u> and <u>In re Dannenberg</u> had been interpreted to imply, was "inconsistent with the statutory mandate that the Board and the Governor consider all relevant statutory factors when evaluating an inmate's suitability for parole, and inconsistent with the inmate's due process liberty interest in parole . . . recognized in <u>Rosenkrantz</u>."  <u>In re Lawrence</u>, 44 Cal. 4th 1181, 1191 (2008) (citing <u>In re Rosenkrantz</u>, 29 Cal. 4th at 664).  The Board found Lawrence suitable for parole for the fourth time, after she had been in custody for twenty-four years on her life sentence for first degree murder, and the Governor for the fourth time relied upon the circumstances of the offense to justify his reversal of the Board's decision.  <u>In re Lawrence</u>, 44 Cal. 4th at 1197-1201.  Lawrence filed a state habeas petition in the California Court of Appeal and challenged on several grounds the Governor's decision.  <u>Id.</u> at 1201.  The appellate court in a split decision issued a writ vacating the Governor's reversal and

United States District Court
For the Northern District of California

reinstating the Board's latest finding of parole suitability.  Id.
The California Supreme Court affirmed, holding that the record
failed to support the Governor's conclusion that Lawrence remained
a current danger to public safety.  The court further held that
the commitment offense alone did not constitute "some evidence"
that the prisoner posed a threat to public safety:

> In some cases, such as this one, in which evidence of
> the inmate's rehabilitation and suitability for parole
> under the governing statutes and regulations is
> overwhelming, the only evidence related to unsuitability
> is the gravity of the commitment offense, and that
> offense is both temporally remote and mitigated by
> circumstances indicating the conduct is unlikely to
> recur, the immutable circumstance that the commitment
> offense involved aggravated conduct does not provide
> "some evidence" inevitably supporting the ultimate
> decision that the inmate remains a threat to public
> safety.

Id. at 1191.  The court found a due process violation and
concluded that:

> although the Board and the Governor may rely upon the
> aggravated circumstances of the commitment offense as a
> basis for a decision denying parole, the aggravated
> nature of the crime does not in and of itself provide
> some evidence of current dangerousness to the public
> unless the record also establishes that something in
> the prisoner's pre- or post-incarceration history, or
> his or her current demeanor and mental state, indicates
> that the implications regarding the prisoner's
> dangerousness that derive from his or her commission of
> the commitment offense remain probative to the
> statutory determination of a continuing threat to
> public safety.

Id. at 1214 (emphasis in original).

In contrast, in the companion case of In re Shaputis, the
California Supreme Court did not find a due process violation, but
rather found "some evidence" of "current dangerousness," stating:

> By statute, it is established that the gravity of the
> commitment offense and petitioner's current attitude
> toward the crime constitute factors indicating

20

United States District Court
For the Northern District of California

1
2
3

> unsuitability for parole, and because in this case these factors provide evidence of the risk currently posed by petitioner to the community, they provide "some evidence" that petitioner constitutes a current threat to public safety.

4  In re Shaputis, 44 Cal. 4th 1241, 1246 (2008) (citations omitted).

5  Following several unfavorable parole hearings and after rulings by

6  the Superior Court as well as the Court of Appeal, the Board found

7  Shaputis suitable for parole after he had been in custody for more

8  than eighteen years on his seventeen-years-to-life sentence for

9  the second degree murder of his wife.  Id. at 1245, 1252-53.  The

10 Governor reversed the Board's decision, concluding that Shaputis

11 constituted a threat to public safety and, specifically, that the

12 gravity of the offense as well as his lack of insight and failure

13 to accept responsibility outweighed the factors favoring

14 suitability for parole.  Id. at 1253.  In a split decision, the

15 Court of Appeal issued a writ vacating the Governor's reversal.

16 Id. at 1253-54.  The California Supreme Court concluded that the

17 appellate court erred in setting aside the Governor's decision

18 because "the Court of Appeal majority improperly substituted its

19 own parole suitability determination for that of the Governor."

20 Id. at 1255.  The state supreme court held that Shaputis's claim

21 that the shooting was an "accident," considered with "evidence of

22 [his] history of domestic abuse and recent psychological reports

23 reflecting that his character remains unchanged and that he is

24 unable to gain insight into his antisocial behavior despite years

25 of therapy and rehabilitative 'programming,'" all provided "some

26 evidence" in support of the Governor's conclusion that Shaputis

27 remained dangerous and was unsuitable for parole.  Id. at 1260.

28

United States District Court
For the Northern District of California

Here, Petitioner was found not suitable at twelve parole consideration hearings prior to 2002.  She was finally found suitable for parole at her thirteenth hearing, after she had been in custody for over twenty-three years on her fifteen years to life sentence.  The Governor looked at the same evidence as the Board and reached the opposite conclusion.  Then, in 2004, the Board again found Petitioner suitable for parole, and the Governor again reversed the Board's decision.

This case is analogous to In re Lawrence, and it is just the sort of case the Ninth Circuit envisioned in Biggs, Sass and Irons: where the commitment offense is relied on to deny parole after service of considerably more than the minimum term, notwithstanding the prisoner's exemplary behavior and evidence of rehabilitation since the commitment offense.  In light of the extensive evidence of Petitioner's in-prison rehabilitation and exemplary behavior, the reliance on the unchanging facts of the murder to deny Petitioner parole for the fourteenth time -- over twenty-three years into her minimum fifteen year sentence -- violated her right to due process.  The "some evidence" standard provides more protection than against fabricated charges or bureaucratic mistakes; the "some evidence" standard also protects against arbitrary decisions.  See Hill, 472 U.S. at 454-55, 457. The state court's conclusion that the commitment offense constituted "some evidence" to support the Governor's decision constituted an unreasonable application of Hill.  Id.

Petitioner is entitled to relief under 28 U.S.C. § 2254(d) because the Governor's reversal of the Board was not supported by

"some evidence" and the state court's decision was an unreasonable application of federal law.

Accordingly, the Court GRANTS the petition for a writ of habeas corpus.

CONCLUSION

For the reasons stated above, the petition for writ of habeas corpus is GRANTED.  Directing Respondent to calculate a release date would be futile because Petitioner was released on parole on September 25, 2008.  Therefore, the Court reinstates the Board's 2004 parole grant and remands to the California Department of Corrections and Rehabilitation to calculate Petitioner's term of parole.

The Clerk of the Court shall terminate all pending motions, enter judgment and close the file.  Each party shall bear his or her own costs.  The Court retains jurisdiction to insure compliance with its order.

IT IS SO ORDERED.

DATED:   2/2/09                    _____
                                  CLAUDIA WILKEN
                                  United States District Judge

United States District Court
For the Northern District of California